UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,<br><br>                 Plaintiff,<br><br>          - against-<br><br>CIBC WORLD MARKETS CORP., CIBC WORLD MARKETS INC., BANK OF AMERICA SECURITIES, INC., MERRILL LYNCH CANADA INC., MERRILL LYNCH PROFESSIONAL CLEARING CORP., TD SECURITIES, INC., TD SECURITIES(USA) LLC, CORMARK SECURITIES, INC., UBS FINANCIAL SERVICES, INC., UBS SECURITIES CANADA, INC., SOCIETE GENERALE CAPITALE CANADA, INC., SG AMERICAS SECURITIES, LLC, and JOHN DOES 1 THROUGH 10.<br><br>                Defendants. | Civil Action<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Harrington Global Opportunity Fund Limited ("Harrington"), by and through its undersigned attorneys, Warshaw Burstein, LLP and Christian Smith and Jewell LLP, as and for its complaint against CIBC World Markets Corp. ("CIBC-U.S."),  CIBC World Markets, Inc. ("CIBC-Canada"), Bank of America Securities, Inc. ("Merrill-U.S."), Merrill Lynch Canada, Inc. ("ML-Canada"), Merrill Lynch Professional Clearing Corp. ("MLPro"), TD Securities, Inc. ("TD-Canada"), TD Securities (USA) LLC ("TD-U.S."), Cormark Securities, Inc. ("Cormark"), UBS Financial Services, Inc. ("UBS-U.S."), UBS Securities Canada, Inc. ("UBS-Canada"), Société Générale Capitale Canada, Inc. ("SocGen-Canada"), SG Americas Securities, LLC ("SocGen-U.S."), and John Does 1 through 10 ("John Doe-Canada," "John Doe-U.S.") (collectively referred to as "Defendants"), alleges upon personal knowledge, information and belief, and an  investigation by counsel as follows:

## I.   <u>SUMMARY OF CLAIMS</u>

1.     This case arises from Defendants' market manipulation scheme involving spoofing and abusive naked short selling that caused Harrington to lose tens of millions of dollars in connection with its sale of approximately 9 million shares of Concordia International Corp. ("Concordia" or the "Company") stock during the period January 27, 2016 to November 15, 2016 ("Relevant Period).

Defendants' spoofing and abusive naked short selling schemes were complementary forms of unlawful market manipulation. Both schemes injected false and misleading pricing information into the market that interfered with the natural forces of supply and demand and drove Concordia's share price downward during the Relevant Period from $34.77 to $1.83, in violation of Section 10(b) and Rule 10b-5 and Section 9(a)(2) of the Securities Exchange Act of 1934.

2.     Concordia is an "Interlisted Security" that is registered for trading on multiple stock exchanges in Canada and the United States. In this case, Defendants CIBC-U.S., CIBC-Canada, Merrill-U.S., Merrill-Canada, TD-Canada, TD-U.S., John Doe-Canada, and John Doe-U.S. (the "Spoofing Defendants"), utilized exchanges in both countries, including the Toronto Stock Exchange ("TSX") in Canada and the National Association of Securities Dealers Automated Quotations Exchange ("NASDAQ") in the United States, to perpetrate their unlawful spoofing and naked short selling schemes involving Concordia stock.

3.     Spoofing is an insidious form of market manipulation that can profoundly undermine the integrity and stability of securities markets. The objective of a spoofing scheme is to manipulate the market price of a security either upward or downward. A spoofing scheme is executed by brokers who utilize high frequency trading systems that operate algorithmic trading programs to maximize the speed of their market access and trading strategies. Spoofing is

accomplished by simultaneously placing hundreds or thousands of illegitimate orders, known as "Baiting Orders," into the Market Order Book[1] that are not intended to be executed.  If the spoofer's goal is to drive the price down, they enter Baiting Orders to sell, which are intended to "bait" or "trick" investors into entering their own sell orders to avoid suffering losses in a downward trending market.  At the same time that the spoofer places the Baiting Orders to sell, the spoofer simultaneously places legitimate orders to buy on the opposite side of the Market Order Book, known as the "Executing Order."  The Executing Orders are intended to be executed at the manipulated prices generated by the Baiting Orders. Immediately after placing an Executing Order in the Market Order Book, the spoofer cancels all of the Baiting Orders, which completes the spoofing cycle. This scheme can be used multiple times during a trading day, and then continuously repeated throughout a protracted trading period.  A spoofing scheme to sell a company's stock that continues over a protracted period of time causes a downward spiral of the company's share price, from which the share price does not generally recover to its original market price.

---

[1]  A "Market Order Book" is an electronic list of buy and sell orders for specific securities and other financial instruments that is organized by price levels and lists the number of shares being bid or offered at each price point.  The Market Order Book reflects whether the market price for the security is moving upwards or downwards and is visible to every trader on the exchange.  *See* Investopedia, Order Book.

4.      The Spoofing Defendants, through their algorithmic high frequency trading, placed at various times throughout the Relevant Period, thousands of Baiting Orders to sell Concordia shares on exchanges in Canada, including the TSX and exchanges in the United States, including NASDAQ.  These Baiting Orders were placed in Canada and the United States in order to keep the manipulated market prices aligned in both countries.  When these orders were placed in the Market Order Books in both Canada and the United States, they were intended to manipulate Concordia's share price downward by flooding the market with Baiting Orders to sell.

5.      At the same time that they placed their Baiting Orders to sell, the Spoofing Defendants also placed in the Market Order Book, Executing Orders to buy Concordia's shares.  This allowed the Spoofing Defendants to purchase Concordia shares at the manipulated lower prices and also caused those shareholders, like Harrington, who sold their shares into the manipulated market, to suffer significant losses.

6.      As the Spoofing Defendants perpetrated their scheme to drive the price of Concordia's stock downward, it signaled to UBS-U.S., UBS-Canada, Merrill-U.S., Merrill-Canada, MLPro, Cormark, SocGen-Canada, SocGen-U.S., John Doe-U.S. and John Doe-Canada (the "Naked Short Selling Defendants"), that

it was a propitious time for their abusive naked short selling scheme to be executed simultaneously on both the Canadian and U.S. exchanges.

7.      Abusive naked short selling is, according to the Securities and Exchange Commission ("SEC"), an unlawful form of short selling[2] where the short seller does not borrow shares prior to the short sale and fails to deliver ("FTD") any shares on the settlement date to the purchaser[3]  Instead, the naked short sale results in the electronic creation of a what is commonly referred to as "fictitious," "phantom," or "counterfeit" shares ("Fictitious Shares").  Irrespective of their title, these shares are unauthorized and were never issued by the company for trading but appear to the market as authorized shares.  By creating and selling Fictitious Shares, the naked short seller injects into the market false and misleading information concerning the fake supply of a company's shares that appear available for trading. This interferes with the natural market forces of supply and demand, driving the price of the shares downward.

_____

[2] Short selling is a lawful trading strategy.  In a short sale, the investor anticipates that the price of a security that they do not own is trending downward.  Therefore, the short seller borrows shares, generally from a broker, and sells them into market.  Thereafter, the short seller purchases shares in the market, hopefully at a lower price, to return the borrowed shares.  The short sellers' profit or loss is the difference between the price that they sold the borrowed shares and the price that they paid for the replacement shares, net of brokerage fees.

[3] The settlement of a trade occurs when there is an exchange of cash and securities between the purchaser and seller. In the event the trade does not settle, an FTD is created until such time as the securities are delivered.

8.      In an effort to prohibit naked short selling, the SEC promulgated Regulation SHO, 17 C.F.R. § 242, 200 ("Reg SHO"), which prohibits a broker from accepting a short sale order in an equity security unless the broker can locate securities that are lawfully borrowable to be sold, has entered into a bona fide arrangement to borrow the security, or has a reasonable basis to believe that the security can be borrowed so that it can be timely delivered at settlement.  If an investor or broker does not timely deliver the shares, a FTD occurs.  The objective of Reg SHO is to limit short selling to shares that can be lawfully borrowed and to prohibit abusive naked short selling in the market that creates an excessive amount of FTD's.

9.      During the Relevant Period, Concordia had approximately 40 million shares issued and outstanding for investors to trade.  However, during this same period, there were approximately 410 million Concordia shares traded on the U.S. and Canadian exchanges.

10.      The enormous discrepancy between the 40 million shares issued by Concordia for trading and the approximately 410 million Concordia shares traded during this time period represents an astonishingly high turnover rate of 1,000%. Stated differently, if there had been approximately 410 million issued and outstanding shares traded during this time period, each of the 40 million issued shares available for trading would have been sold and resold 10 times.  This did

not happen.  Instead, a strong inference can be drawn that the approximately 410 million shares that were traded were not limited to the 40 million shares that Concordia issued for trading. Instead, they included millions of Fictitious Shares unlawfully manufactured by the Naked Short Selling Defendants.

11.     During the same period, there were approximately 238 million shares of Concordia stock that was sold short on the Canadian and U.S. exchanges combined.  This accounted for approximately 58% of the approximately 410 million Concordia shares traded during this period.  The short sale turnover rate was approximately 600% of the 40 million shares Concordia actually issued for trading.  Stated differently, based on the short sale turnover rate, each share of the 40 million shares available for trading was sold short 6 times for each available trading share.  This also did not happen.  Instead, the enormous volume of the approximately 238 million shares that were sold short, included millions of Fictitious Shares that the Naked Short Selling Defendants unlawfully manufactured in connection with their abusive naked short selling scheme in violation of Reg SHO.

12.     Defendants' spoofing and abusive naked short selling schemes caused Harrington to lose tens of millions of dollars in connection with the sale of its Concordia shares.  Harrington reasonably believed that it was selling its Concordia shares into a market that was fair, efficient, and free from manipulation, not

knowing that in fact, the market was being unlawfully manipulated by the Defendants.

## II.   JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]; and 28 U.S.C. § 1331.  This Court also has jurisdiction over the state law claim under 28 U.S.C. § 1367 because this claim is so related to the federal claims that it forms part of the same case or controversy.

14.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, in that many of the acts, transactions and occurrences alleged herein occurred in this District, and all of the Defendants conducted business here in connection with the events described herein.  Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce including the mails and the facility of a national securities exchange in connection with the conduct alleged herein.  Where claims involve securities listed or traded on domestic stock exchanges, Section 27 of the Exchange Act provides for personal jurisdiction over those parties who trade on these exchanges.

## III.   THE PARTIES

### A.   Plaintiff

15.    Plaintiff Harrington is a Bermuda based investment company that is wholly owned by its unit holders.  It is managed by Harrington Global Limited ("HGL"), a fund management company.  During the Relevant Period, Harrington sold 8,931,109 shares of Concordia on the U.S. and Canadian markets, including NASDAQ and the TSX.  Harrington believed it was selling its Concordia shares into a market that was fair, efficient, and free from manipulation.  However, the market in Concordia shares was in fact being manipulated by the Defendants, causing Harrington to lose tens of millions of dollars in connection with the sale of its Concordia shares.

### B.   Defendants[4]

#### (a)   CIBC Defendants

16.    Defendants CIBC-U.S. and CIBC-Canada employed high speed algorithmic systems to route orders of Concordia shares to their affiliated cross border companies.

---

[4] Whenever reference is made to any act, device, contrivance, or scheme to manipulate Concordia securities by any of the Defendants, the allegation is intended to also include the subsidiaries, affiliates, sister companies, agents and representatives of that Defendant, whose identities and specific involvement in this market manipulation case are unknown by Harrington at this time. Only after discovery is taken will their identities and involvement become known.

17.     Defendant CIBC-U.S. is located at 425 Lexington Ave, New York, NY.  CIBC-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

18.     Defendant CIBC-Canada is headquartered at 161 Bay Street, Toronto, Ontario, Canada. CIBC-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada, including the TSX, for its own proprietary account and the accounts of its customers.

**(b)     <u>Merrill Defendants</u>**

19.     Defendants Merrill-U.S., Merrill-Canada and MLPro employed high speed algorithmic systems to route orders of Concordia shares to their affiliated cross border companies.

20.     Defendant Merrill-U.S. is formerly known as Bank of America Merrill Lynch and is headquartered at One Bryant Park, New York, New York. Merrill-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S., including NASDAQ, for its own proprietary account and the accounts of its customers.

21.     Defendant ML-Canada has its headquarters located at 181 Bay Street, Toronto, Ontario, Canada.  ML-Canada is a registered broker dealer that executes

securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

22.     Defendant MLPro is located at 222 Broadway, 6th Floor, New York, NY.  MLPro is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

**(c)     TD Defendants**

23.     Defendants TD-Canada and TD-U.S. employed high speed algorithmic systems to route orders of Concordia shares to their affiliated cross border companies.

24.     Defendant TD-Canada is located at 66 Wellington Street West Toronto, Ontario, Canada.  TD-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

25.     Defendant TD-U.S. is located at 31 W 52nd Street, New York, NY. TD-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

**(d)**   **Cormark Defendant**

26.    Defendant Cormark employed high speed algorithmic systems to route orders of Concordia shares to its affiliated U.S. brokers.

27.    Defendant Cormark is located at 200 Bay Street, Suite 2800, Toronto, Ontario, Canada.  Cormark is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

**(e)**   **UBS Defendants**

28.    Defendants UBS-U.S. and UBS-Canada employed high speed algorithmic systems to route orders of Concordia shares to their affiliated cross border companies.

29.    Defendant UBS-U.S. is located at 1285 Avenue of the Americas, New York, NY.  UBS-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

30.    Defendant UBS-Canada has its headquarters at 154 University Avenue Toronto, Ontario, Canada.  UBS-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

**(f)**     <u>**SocGen Defendants**</u>

31.     Defendants SocGen-Canada and SocGen-U.S. employed high speed algorithmic systems to route orders of Concordia shares to their affiliated cross border companies.

32.     Defendant SocGen-U.S. is located at 245 Park Avenue, New York, NY.  SocGen-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

33.     Defendant SocGen-Canada is located at 130 King Street West, Suite 2200, Toronto, Ontario, Canada.  SocGen-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

**(g)**     <u>**John Doe Defendants**</u>

34.     Defendants John Doe-Canada and John Doe-U.S. employed high speed algorithmic systems to route orders of Concordia shares to their affiliated cross border companies.

35.     Defendants John Doe-Canada and John Doe-U.S. are entities, including market makers, subsidiaries, affiliates, and sister companies of the Defendants, and Defendants' customers, whose identities are currently unknown, that unlawfully participated in the scheme to manipulate the trading and market

price of Concordia securities.  During the Relevant Period, each of the Defendants executed trades of Concordia's shares for their own proprietary accounts and/or their clients' accounts.

**C.     Non-Party**

36.     Concordia is a diverse healthcare company, focused on legacy pharmaceutical products and orphan drugs. Concordia was incorporated in 2005 under the laws of Ontario, Canada.  Concordia started trading on the TSX exchange in 2013 and NASDAQ in 2015.  The Company sells its portfolio of products in 100 countries including the United States and Canada.  Currently, it trades under the name ADVANZ Pharma.  During the Relevant Period, the Company had approximately 51 million shares issued and outstanding, with approximately 40 million of those shares authorized for interlisted public trading.

37.     Since 2015, Concordia has been an Interlisted Security with its shares listed and traded on both the TSX in Canada and NASDAQ in the United States. The trading of Interlisted Securities, like Concordia, is facilitated by means of a security identifier known as a CUSIP (Committee on Uniform Securities Identification).  Concordia's CUSIP was 20653P102.  Trades on both the Canadian and U.S. exchanges are electronically executed and settled through the CUSIP number of the security.  A share of Concordia's stock that is traded in the United States is exactly the same share that is traded in Canada.  Because shares of

Interlisted Securities, like Concordia, have identical CUSIP numbers and are fungible in Canada and the United States, they are netted out in the cross-border settlement process.  Purchasers and sellers of Interlisted Securities, unless specifically requested, have no control over where their orders are routed and executed, or whether they are acquiring inventory from the United States or Canada. As a result of the seamless interconnection between the Canadian and U.S. markets for Interlisted Securities, trades in either country's market affects trading in the other country's market.

## IV.   CLAIMS FOR RELIEF

**A.   First Claim for Relief for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder Against CIBC-Canada, CIBC-U.S., TD-Canada, TD-U.S., Merrill-U.S., Merrill-Canada, John Doe-Canada, and John Doe-U.S.**

38.     Plaintiff incorporates by reference paragraphs 1 through 37 as if more fully set forth herein.

39.     During the Relevant Period, the Spoofing Defendants, consisting of CIBC-Canada, Merrill-Canada, TD-Canada, and John Doe-Canada, and John Doe-U.S.("Canadian Spoofing Defendants") and CIBC-U.S., Merrill-U.S, TD-U.S. and John Doe-U.S. ("U.S. Spoofing Defendants"), engaged in and employed devices, schemes, illegal acts, practices, and a course of conduct, that were intended to

manipulate the market price of Concordia's Interlisted Securities that were listed and traded on both the TSX and NASDAQ.

## **The Nature, Purpose, and Effect of Defendants' Spoofing Scheme**

40.     Spoofing is a form of market manipulation that can profoundly undermine the integrity and stability of securities markets.  It occurs when a broker creates an illusion of supply and demand of a security in order to move the market price of that security either upward or downward.  Spoofing rests on the fundamental microeconomics principal that increased supply drives prices down and increased demand drives prices up.  A spoofing scheme involves the placement, cancellation, and execution of Baiting and Execution Orders that are generated by high-speed trading systems that use algorithmic trading programs.

41.     There are generally two alternative objectives for spoofing: First, manipulate the price downward, in order to buy at a more favorable price, which was the objective of the Spoofing Defendants; or Second, manipulate the price upward, in order to sell at a more favorable price.

42.     The spoofing scheme perpetrated by the Spoofing Defendants occurred in the following three stages:

(a)     First, the Spoofing Defendants flooded the markets with large quantities of Baiting Orders to sell.  These orders had no legitimate purpose and

when placed, were not intended to be executed.  The sole purpose for the placement of Baiting Orders was to deceive and mislead market participants into believing that the market price of Concordia's securities was moving downward;

(b)     Second, at the same time that the Baiting Orders were placed in the Market Order Book, the Spoofing Defendants also placed their Executing Orders to purchase Concordia shares at the lower stock prices created by the downward manipulation of the Baiting Orders; and

(c)     Third, immediately after the completion of their Executing Orders to buy Concordia shares at the lower prices, the Spoofing Defendants cancelled all of their Baiting Orders, removing them from the Market Order Book.

43.     Once the three stages of this spoofing cycle were completed, the pattern was repeated by the Spoofing Defendants multiple times a day and continuously throughout the Relevant Period.

44.     The Spoofing Defendants perpetrated their spoofing scheme on both the Canadian and U.S. exchanges simultaneously in order to ensure that the price of Concordia stock in both countries was determined by the manipulated price and not by natural market forces.

45.     The continuous placement and cancellation of Baiting Orders by the Spoofing Defendants throughout the Relevant Period operated as a fraud on the market.  As evidenced by the high volume of sell orders, these Baiting Orders were

intended to mislead other market participants into believing that the downward movement of Concordia's share price was being caused by the natural forces of supply and demand.  The placement and cancellation of thousands of Baiting Orders by the Spoofing Defendants was not in furtherance of any legitimate purpose.  Rather, this activity was intended to send a false and misleading pricing signal to the market in order to trick or bait market participants, like Harrington, into executing their own sell orders.  This resulted in driving down Concordia's share price even further, thereby enabling the Spoofing Defendants to purchase Concordia's shares at artificially manipulated lower prices.

46.    The intention of the Spoofing Defendants not to execute their Baiting Orders, can be inferred from *inter alia*: the short time period between the continuous and repeated placement and cancellation of the Baiting Orders; the concentration of cancelled Baiting Orders during the limited period when each spoofing event occurred; the average size of the Baiting Orders that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; the ratio of cancelled Baiting Orders to sell compared to the executed bona-fide orders to buy that existed; and the reoccurrence of the same trading patterns throughout the Relevant Period.

47.     Based on an analysis of the Canadian trading data for the period of September 21, 2015 through November 25, 2016 ("Analysis Period")[5], Canadian Spoofing Defendants CIBC-Canada, ML-Canada and TB-Canada, engaged in at least 59,672 spoofing events in Concordia stock on the Canadian markets.  During the same period, in addition to the 59,672 instances of spoofing of Concordia's stock by the three Canadian Spoofing Defendants, the fourth Canadian Spoofing Defendant, John Doe-Canada a/k/a "Anonymous" reflects an additional 39,978 spoofing events for a total of 99,650 spoofing events.[6]  During this period, there were one or more instances of spoofing in Concordia stock on 293 out of 294 trading days.

48.     In an efficient market that is free from manipulation, there should not be any spoofing taking place that would artificially affect the market price of a security.  There is an extremely low statistical likelihood that the price variations for each of the 99,650 spoofing events in Canada occurred naturally.  However, the market impact of these 99,650 spoofing events was material and statistically

---

[5] Harrington is seeking recovery of damages incurred during the period January 27, 2016 through November 15, 2016, which has been defined as the Relevant Period.  Reference to any date prior to January 27, 2016 is only intended to demonstrate that the pattern and practice of Defendants' unlawful conduct started prior to the Relevant Period.  The Relevant Period comprises approximately 70% of the Analysis Period.

[6] Through discovery it is expected that the identities of the John Doe-Canada's trading under "Anonymous" will be ascertained.

significant.  During the Relevant Period, an average of 4.5% of the total trading volume in Concordia stock on the TSX was attributable to spoofing trades.

49.     The impact of this spoofing activity extended beyond the specific spoofing cycle of Bait, Execute, and Cancel, because the market did not immediately rebound from the manipulated prices once the spoofing cycle was completed.  In fact, during the Relevant Period, a large amount of the trading in Concordia's stock on the Canadian exchanges took place during the 15-minute period immediately following the completion of each spoofing cycle.  On at least 114 of the 294 trading days during the Analysis Period, more than 10% of the trading in Concordia stock in Canada astonishingly took place at manipulated prices.

50.     During the Analysis Period, based on identifiable trading patterns between the U.S. and Canadian market data consisting of order and trade records of the U.S. markets integrated with the Canadian trading data, a strong inference can be drawn that Spoofing Defendants CIBC-U.S., Merrill-U.S., TD-U.S. and John Doe-U.S., engaged in approximately 49,000 instances of spoofing in Concordia stock on U.S. markets[7]  During the Analysis Period, there was one or

---

[7]  Trades on U.S. markets are not attributable directly to a broker. The instances cited in this complaint are based on correlating trading activity of the Canadian Spoofing Defendants with trading activity in the U.S. by their corporate affiliates and/or sibling companies on the same date.

more instances of spoofing in Concordia stock on 263 out of 294 trading days. There is an extremely low statistical likelihood that the price variations for each of the spoofing instances in the U.S. occurred naturally.  The market impact of these spoofing events was material and statistically significant.

51.     The impact of this spoofing activity extended beyond the specific spoofing cycle of spoofed orders, trades, and cancellations, because the market did not immediately rebound from the manipulated prices once the spoofing sequences were completed.  In fact, during the Analysis Period, on at least 68 of the 294 trading days, more than 10% of the trading in Concordia stock in the U.S. took place at manipulated prices.  On 16 of those days, more than 25% of U.S. trading volume took place at manipulated prices, while on one day, April 22, 2016, 61.15% of all trading in Concordia in the U.S. took place at manipulated prices.

52.     The coordinated cross-border activity by each of the Spoofing Defendants was necessary to the success of the spoofing scheme because without the simultaneous spoofing activity in the U.S., the pricing manipulation that the Spoofing Defendants were inducing in Canada would have been mitigated by natural market forces of supply and demand in the U.S.

### Examples of Defendants' Spoofing Activities
### During the Relevant Period

53.     The following are some examples of specific spoofing activities of

each Spoofing Defendant taken from the Canadian and U.S. exchange trading data.

These examples reflect the interplay between the Baiting and Executing Orders and

how each Spoofing Defendant used these orders to manipulate the market price of

Concordia's shares downward on both the U.S. and Canadian markets

simultaneously.  The examples establish the date, time, amount of shares and price

of each Baiting and Executing Order.

## Defendants CIBC-Canada and CIBC-U.S.

### i.        February 11, 2016

54.     On February 11, 2016 at 1:05:29.099[8], the Best Bid and Offer

("BBO")[9] for Concordia shares trading on the Canadian market was 33.86 bid for

100 shares and 2,000 shares offered at 33.97.  Between 1:05:28.120 and

1:09:29.128, Spoofing Defendant CIBC-Canada submitted 61 Baiting Orders to

---

[8] As set forth herein after, the time format is read as follows: HH:MM:SS.000, where "HH" represents hours, "MM" represents minutes, "SS" represents seconds and ".000" represents milliseconds.

[9] In the securities industry, the best bid is defined as the highest price a buyer will pay for a stock and the best offer is defined as the lowest price that a seller will accept to sell its stock.  The best bid and best offer are reflected on the top line of the Market Order Book for each security that is traded in the market.  The algorithmic trading programs that are used by high frequency trading firms are linked to and affected by the fluctuations in the BBO.

sell on the Canadian market, totaling 13,200 shares, at prices ranging from 34.28 down to 33.96.  By entering multiple Baiting Orders, Spoofing Defendant CIBC-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

55.    The Baiting Orders placed by Spoofing Defendant CIBC-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  Between 1:05:29.109 and 1:05:29.128, CIBC-Canada executed six Executing Orders on the Canadian market to buy a total of 900 Concordia shares, at prices between 33.96 and 33.91, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:05:29.109 | 33.96 | 100 | CIBC-Canada |
| 1:05:29.109 | 33.95 | 100 | CIBC-Canada |
| 1:05:29.109 | 33.95 | 100 | CIBC-Canada |
| 1:05:29.109 | 33.93 | 200 | CIBC-Canada |
| 1:05:29.109 | 33.92 | 200 | CIBC-Canada |
| 1:05:29.109 | 33.91 | 200 | CIBC-Canada |

Through the Executing Orders, Spoofing Defendant CIBC-Canada was able to purchase shares at prices below the prevailing best offer of 33.97, which was the natural price before Spoofing Defendant CIBC-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant CIBC-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 1:05:29.126, as it was submitting and executing the Executing

Orders, Spoofing Defendant CIBC-Canada began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 1:05:30.193.

56.    Concurrent with Spoofing Defendant CIBC-Canada's spoofing activity on the Canadian market, Spoofing Defendant CIBC-U.S. entered 283 Baiting Orders to sell in the U.S. markets totaling 57,400 shares. Immediately after Spoofing Defendant CIBC-Canada executed its Executing Trades on the Canadian market, CIBC-U.S. canceled its Baiting Orders on the U.S. market.

57.    The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle. These spoofing cycles continued throughout the course of the trading day. At 1:06:44.904, the BBO for Concordia shares traded on the Canadian market had dropped to 33.82 bid for 200 shares (down from 33.86 before the spoofing) and 700 shares offered at 33.92 (down from 33.97 before the spoofing).

## ii.    March 15, 2016

58.    On March 15, 2016 at 10:23:48.439, the BBO for Concordia shares trading on the Canadian market was 41.10 bid for 200 shares and 41.28 offered for 1,500. Between 10:23:48.447 and 10:23:48.500, Spoofing Defendant CIBC-

Canada submitted 30 Baiting Orders to sell on the Canadian market, totaling 6,000

shares, at prices ranging from 41.34 to 41.18.  By entering multiple Baiting Orders,

Spoofing Defendant CIBC-Canada intended to create fictitious selling pressure that

would induce other market participants to submit additional sell orders and drive

the price of Concordia shares downward.

59.    The Baiting Orders placed by Spoofing Defendant CIBC-Canada

successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  As a result, between 10:23:48.475 and

10:23:48.500, Spoofing Defendant CIBC-Canada successfully executed 7

Executing Orders on the Canadian market to buy a total of 700 shares of Concordia

stock at lower prices, ranging from 41.10 to 41.00, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:23:48.475 | 41.10 | 100 | CIBC-Canada |
| 10:23:48.475 | 41.07 | 100 | CIBC-Canada |
| 10:23:48.475 | 41.07 | 100 | CIBC-Canada |
| 10:23:48.475 | 41.07 | 100 | CIBC-Canada |
| 10:23:48.482 | 41.06 | 100 | CIBC-Canada |
| 10:23:48.482 | 41.06 | 100 | CIBC-Canada |
| 10:23:48.500 | 41.00 | 100 | CIBC-Canada |

Through the Executing Orders, Spoofing Defendant CIBC-Canada was able to

purchase shares at prices below the prevailing best offer of 41.28, which was the

natural price before Spoofing Defendant CIBC-Canada entered the Baiting Orders.

Without the Baiting Orders, Spoofing Defendant CIBC-Canada would have been

required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:23:48.496, as it was submitting and executing the Executing Orders, Spoofing Defendant CIBC-Canada canceled all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:23:48.509.

60.    Concurrent with Spoofing Defendant CIBC-Canada's spoofing activities on the Canadian market, Spoofing Defendant Spoofing Defendant CIBC-U.S. entered 344 Baiting Orders to sell for a total of 64,500 Concordia shares on the U.S. market.  Immediately after Spoofing Defendant CIBC-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant CIBC-U.S. canceled its Baiting Orders on the U.S. Market.

61.    The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 10:24:47.852, the BBO of Concordia shares trading on the Canadian market had dropped to 40.57 bid for 200 shares of Concordia (down from 41.10 before the spoofing) and 200 shares offered at 40.64 (down from 41.28 before the spoofing).

### iii.    **March 24, 2016**

62.    On March 24, 2016 at 11:11:23.638, the BBO for Concordia shares trading on the Canadian market was 36.15 bid for 100 shares and 36.28 offered for 1,700 shares.  Between 11:11:23.703 and 11:11:25.670, Spoofing Defendant CIBC-Canada submitted 21 Baiting Orders to sell on the Canadian market, totaling 5,800 shares, at prices ranging from 36.39 down to 36.25.  By entering multiple Baiting Orders, Spoofing Defendant CIBC-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

63.    The Baiting Orders placed by Spoofing Defendant CIBC-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 11:11:23.624 and 11:11:23.703, Spoofing Defendant CIBC-Canada executed ten Executing Orders on the Canadian market to buy a total of 1,400 Concordia shares at lower prices ranging from 36.21 to 36.12, as follows:

**[INTENTIONALLY LEFT BLANK]**

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 11:11:23.624 | 36.21 | 100 | CIBC-Canada |
| 11:11:23.624 | 36.21 | 100 | CIBC-Canada |
| 11:11:23.624 | 36.21 | 100 | CIBC-Canada |
| 11:11:23.639 | 36.17 | 500 | CIBC-Canada |
| 11:11:23.654 | 36.19 | 100 | CIBC-Canada |
| 11:11:23.654 | 36.17 | 100 | CIBC-Canada |
| 11:11:23.654 | 36.17 | 100 | CIBC-Canada |
| 11:11:23.656 | 36.17 | 100 | CIBC-Canada |
| 11:11:23.656 | 36.16 | 100 | CIBC-Canada |
| 11:11:23.703 | 36.12 | 100 | CIBC-Canada |

Through the Executing Orders, Spoofing Defendant CIBC-Canada was able to purchase shares at prices below the prevailing best offer of 36.28, which was the natural price before Spoofing Defendant CIBC-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant CIBC-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 11:11:23.703, as it was submitting and executing the Executing Orders, Spoofing Defendant CIBC-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 11:11:25.670.

64.     Concurrent with Spoofing Defendant CIBC-Canada's spoofing activity on the Canadian market, Spoofing Defendant CIBC-U.S. entered 404 Baiting Orders to sell on the U.S. market totaling 56,900 shares.  Immediately after Spoofing Defendant CIBC-Canada executed its Executing Trades on the Canadian

market, Spoofing Defendant CIBC-U.S. canceled its Baiting Orders on the U.S. market.

65.     The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 11:11:30.172, the BBO of Concordia shares trading on the Canadian market had dropped to 36.13 bid for 1,900 shares (down from 36.15 before the spoofing) and 100 shares offered at 36.21 (down from 36.28 before the spoofing).

### iv.     <u>March 28, 2016</u>

66.     On March 28, 2016 at 10:25:46.278, the BBO for Concordia shares trading on the Canadian market was 34.64 bid for 300 shares and 400 shares offered at 34.68.  Between 10:25:46.360 and 10:25:51.053, Spoofing Defendant CIBC-Canada submitted 23 Baiting Orders to sell on the Canadian market, totaling 3,000 shares, at prices ranging from 34.82 down to 34.65.  By entering multiple Baiting Orders, Spoofing Defendant CIBC-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

67.     The Baiting Orders placed by Spoofing Defendant CIBC-Canada, successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 10:25:46.300 and 10:25:46.344, Spoofing Defendant CIBC-Canada successfully executed four Executing Orders on the Canadian market to buy Concordia shares, totaling 400 shares, at prices between 34.62 and 34.61, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:25:46.300 | 34.62 | 100 | CIBC-Canada |
| 10:25:46.300 | 34.62 | 100 | CIBC-Canada |
| 10:25:46.344 | 34.61 | 100 | CIBC-Canada |
| 10:25:46.344 | 34.61 | 100 | CIBC-Canada |

Through the Executing Orders, Spoofing Defendant CIBC-Canada was able to purchase shares at prices below the prevailing best offer of 34.68, which was the natural price before Spoofing Defendant CIBC-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant CIBC-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:25:46.360, as it was submitting and executing the Executing Orders, Spoofing Defendant CIBC-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:25:51.053.

68.     Concurrent with Spoofing Defendant CIBC-Canada's spoofing activity on the Canadian market, Spoofing Defendant CIBC-U.S. entered 306 Baiting Orders to sell on the U.S. market totaling 39,340 shares.  Immediately after Spoofing Defendant CIBC-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant CIBC-U.S. cancelled its Baiting Orders on the U.S. market.

69.     The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 10:26:43.202, the BBO of Concordia shares on the Canadian market had dropped to 34.57 bid for 300 shares (down from 34.64 before the spoofing) and 400 shares offered at 34.61 (down from 34.68 before the spoofing).

### v.      **April 18, 2016**

70.     On April 18, 2016 at 10:35:40.322, the BBO for Concordia shares trading on the Canadian market was 31.71 bid for 200 shares and 1,400 shares offered at 31.78.  Between 10:35:40.327 and 10:35:40.360, Spoofing Defendant CIBC-Canada submitted 44 Baiting Orders to sell on the Canadian market, totaling 6,500 shares, at prices ranging from 31.92 down to 31.74.  By entering multiple

Baiting Orders, Spoofing Defendant CIBC-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

71.    The Baiting Orders placed by Spoofing Defendant CIBC-Canada successfully induced the entry of sell orders from other market participants driving the price of Concordia shares downward.  As a result, at 10:35:40.360, Spoofing Defendant CIBC-Canada executed six Executing Orders on the Canadian market to buy Concordia shares, totaling 600 shares, at prices between 31.73 and 31.69, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:35:40.360 | 31.73 | 100 | CIBC-Canada |
| 10:35:40.360 | 31.72 | 100 | CIBC-Canada |
| 10:35:40.360 | 31.72 | 100 | CIBC-Canada |
| 10:35:40.360 | 31.69 | 100 | CIBC-Canada |
| 10:35:40.360 | 31.69 | 100 | CIBC-Canada |
| 10:35:40.360 | 31.69 | 100 | CIBC-Canada |

Through the Executing Orders, Spoofing Defendant CIBC-Canada was able to purchase shares at prices below the prevailing best offer of 31.78, which was the natural price before Spoofing Defendant CIBC-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant CIBC-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:35:40.358, as it was submitting and executing the Executing Orders, Spoofing Defendant CIBC-Canada began canceling all of its Baiting

Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:35:41.104.

72.     Concurrent with Spoofing Defendant CIBC-Canada's spoofing activity on the Canadian market, Spoofing Defendant CIBC-U.S. entered 119 Baiting Orders to sell on the U.S. market totaling 16,179 shares.  Immediately after Spoofing Defendant CIBC-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant CIBC-U.S. canceled its Baiting Orders on the U.S. market.

73.     The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 10:35:40.356, the BBO for Concordia shares traded on the Canadian market had dropped to 31.55 bid for 200 shares (down from 31.71 before the spoofing) and 100 shares offered at 31.60 (down from 31.78 before the spoofing).

### vi.     <u>April 25, 2016</u>

74.     On April 25, 2016 at 10:27:18.366, the BBO for Concordia shares trading on the Canadian market was 41.19 bid for 300 shares and 800 shares offered at 41.25.  Between 10:27:18.381 and 10:27:19.117, Spoofing Defendant

CIBC-Canada submitted 30 Baiting Orders to sell on the Canadian market, totaling 4,600 shares, at prices ranging from 41.39 down to 41.18.  By entering multiple Baiting Orders, Spoofing Defendant CIBC-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

75.    The Baiting Orders placed by Spoofing Defendant CIBC-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:27:19.117, CIBC-Canada executed four Executing Orders on the Canadian market to buy a total of 500 Concordia shares, at prices between 41.18 and 41.12, as follows:

| Time | Price | Shares | Buyer |
| --- | --- | --- | --- |
| 10:27:19.117 | 41.18 | 200 | CIBC-Canada |
| 10:27:19.117 | 41.16 | 100 | CIBC-Canada |
| 10:27:19.117 | 41.13 | 100 | CIBC-Canada |
| 10:27:19.117 | 41.12 | 100 | CIBC-Canada |

Through the Executing Orders, Spoofing Defendant CIBC-Canada was able to purchase shares at prices below the prevailing best offer of 41.25, which was the natural price before Spoofing Defendant CIBC-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant CIBC-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:27:19.115, as it was submitting and executing the Executing Orders, Spoofing Defendant CIBC-Canada began canceling all of its Baiting

Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:27:21.566.

76.     Concurrent with Spoofing Defendant CIBC-Canada's spoofing activity on the Canadian market, Spoofing Defendant CIBC-U.S. entered 87 Baiting Orders to sell in the U.S. markets totaling 11,200 shares.  Immediately after Spoofing Defendant CIBC-Canada executed its Executing Trades on the Canadian market, CIBC-U.S. canceled its Baiting Orders on the U.S. market.

77.     The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 10:27:31.119, the BBO for Concordia shares traded on the Canadian market had dropped to 41.10 bid for 800 shares (down from 41.19 before the spoofing) and 100 shares offered at 41.15 (down from 41.25 before the spoofing).

78.     Based on the Spoofing Defendant CIBC-U.S.'s precise timing of the entry and cancelation of the U.S. Baiting Orders as it relates to the entry and cancellation of Spoofing Defendant CIBC-Canada's Baiting Orders and the execution of Spoofing Defendant CIBC-Canada's Executing Orders; the fact that Concordia's stock is traded as an Interlisted Security in Canada and the U.S.; the interconnected nature of the Canadian and U.S. markets; and the size of the U.S.

Baiting Orders relative to the average trade size in Concordia stock, a strong and cogent inference can be drawn that the U.S. Baiting Orders were entered by Spoofing Defendant CIBC-U.S. on the U.S. market in coordination with the Canadian Baiting Orders entered by Spoofing Defendant CIBC-Canada on the Canadian market.  The coordinated cross border activity was necessary for the success of the spoofing scheme because without the spoofing activity by Spoofing Defendant CIBC-U.S. on the U.S. markets, the pricing anomaly that Spoofing Defendant CIBC-Canada induced on the Canadian markets would have been mitigated by natural market forces in the U.S.

**Defendants TD-Canada and TD-U.S.**

       i.    **March 17, 2016**

79.    On March 17, 2016 at 1:17:32.437, the BBO for Concordia shares trading on the Canadian market was 36.60 bid for 400 shares and 1700 shares offered at 38.62.  Between 1:17:32.500 and 1:17:32.522, Spoofing Defendant TD-Canada submitted 4 Baiting Orders to sell on the Canadian market, totaling 3,600 shares, at prices ranging from 38.62 down to 38.60.  By entering multiple Baiting Orders, Spoofing Defendant TD-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

80.    The Baiting Orders placed by Spoofing Defendant TD-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 1:17:32.522, Spoofing Defendant TD-Canada executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 110 shares, at prices between 38.60 and 38.59, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:17:32.522 | 38.60 | 10 | TD-Canada |
| 1:17:32.522 | 38.59 | 100 | TD-Canada |

Through the Executing Orders, Spoofing Defendant TD-Canada was able to purchase shares at prices below the prevailing best offer of 38.62, which was the natural price before Spoofing Defendant TD-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant TD-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. As it was submitting and executing the Executing Orders, Spoofing Defendant TD-Canada began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 1:17:32.523.

81.    Concurrent with Spoofing Defendant TD-Canada's spoofing activity on the Canadian market, Spoofing Defendant TD-U.S. entered 94 Baiting Orders to sell on the U.S. market totaling 23,200 shares.  Immediately after Spoofing

Defendant TD-Canada executed its Executing Trades on the Canadian market,
Spoofing Defendant TD-U.S. canceled its Baiting Orders on the U.S. market.

82.    The combined U.S. and Canadian spoofing activity had the effect of
depressing the natural market for Concordia's stock for as much as fifteen minutes
after the Baiting Orders were canceled for each individual spoofing cycle.  These
spoofing cycles continued throughout the course of the trading day. At
1:22:32.205, the BBO of Concordia shares trading on the Canadian market had
dropped to 38.30 bid for 200 shares (down from 38.60 before the spoofing) and
200 shares offered at 38.31 (down from 38.62 before the spoofing).

### ii.   <u>March 18, 2016</u>

83.    On March 18, 2016 at 9:50:55.978, the BBO for Concordia shares
trading on the Canadian market was 37.07 bid for 700 shares and 100 shares
offered at 37.12.  Between 9:50:55.981 and 9:50:56.401, Spoofing Defendant TD-
Canada submitted 8 Baiting Orders to sell on the Canadian market, totaling 8,200
shares, at prices ranging from 37.19 down to 37.09.  By entering multiple Baiting
Orders, Spoofing Defendant TD-Canada intended to create fictitious selling
pressure that would induce other market participants to submit additional sell
orders and drive the price of Concordia shares downward.

84.     The Baiting Orders placed by Spoofing Defendant TD-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 9:50:56.401, Spoofing Defendant TD-Canada executed six Executing Orders on the Canadian market to buy Concordia shares, totaling 760 shares, at prices between 37.00 and 36.99, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 9:50:56.401 | 37.00 | 100 | TD-Canada |
| 9:50:56.401 | 37.00 | 400 | TD-Canada |
| 9:50:56.401 | 37.00 | 100 | TD-Canada |
| 9:50:56.401 | 37.00 | 60 | TD-Canada |
| 9:50:56.401 | 37.00 | 50 | TD-Canada |
| 9:50:56.401 | 36.99 | 50 | TD-Canada |

Through the Executing Orders, Spoofing Defendant TD-Canada was able to purchase shares at prices below the prevailing best offer of 37.12, which was the natural price before Spoofing Defendant TD-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant TD-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 9:50:55.981, as it was submitting and executing the Executing Orders, Spoofing Defendant TD-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 9:50:59.069.

85.     Concurrent with Spoofing Defendant TD-Canada's spoofing activity on the Canadian market, Spoofing Defendant TD-U.S. entered 270 Baiting Orders to sell on the U.S. market totaling 75,900 shares.  Immediately after Spoofing Defendant TD-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant TD-U.S. canceled its Baiting Orders on the U.S. market.

86.     The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle. These spoofing cycles continued throughout the course of the trading day. At 9:55:56.368, the BBO of Concordia shares trading on the Canadian market had dropped to 36.63 bid for 200 shares (down from 37.07 before the spoofing) and 600 shares offered at 36.75 (down from 37.12 before the spoofing).

### iii.     April 21, 2016

87.     On April 21, 2016 at 9:47:50.531, the BBO for Concordia shares trading on the Canadian market was 29.95 bid for 200 shares and 1,100 shares offered at 29.98.  Between 9:47:50.531 and 9:47:50.640, Spoofing Defendant TD-Canada submitted 11 Baiting Orders to sell on the Canadian market, totaling 9,000 shares, at prices ranging from 29.97 down to 29.90  By entering multiple Baiting Orders, Spoofing Defendant TD-Canada intended to create fictitious selling

pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

88.     The Baiting Orders placed by Spoofing Defendant TD-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia downward.  As a result, at 9:47:51.341, Spoofing Defendant TD-Canada executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 300 shares, at 29.89, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 9:47:51.341 | 29.89 | 200 | TD-Canada |
| 9:47:51.341 | 29.89 | 100 | TD-Canada |

Through the Executing Orders, Spoofing Defendant TD-Canada was able to purchase shares at prices below the prevailing best offer of 29.98, which was the natural price before Spoofing Defendant TD-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant TD-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 9:47:50.547, as it was submitting and executing the Executing Orders, Spoofing Defendant TD-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 9:47:54.102.

89.     Concurrent with Spoofing Defendant TD-Canada's spoofing activity on the Canadian market, Spoofing Defendant TD-U.S. entered 92 Baiting Orders to sell on the U.S. market totaling 33,700 shares.  Immediately after Spoofing Defendant TD-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant TD-U.S. canceled its Baiting Orders on the U.S. market.

90.     The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day. At 9:48:51.253, the BBO of Concordia shares trading on the Canadian market had dropped to 29.61 bid for 600 shares (down from 29.95 before the spoofing) and 1,200 shares offered at 29.66 (down from 29.98 before the spoofing).

### iv.    <u>August 15, 2016</u>

91.     On August 15, 2016 at 12:10:58.877, the BBO for Concordia shares trading on the Canadian market was 11.93 bid for 100 shares and 11,000 shares offered at 11.95.  At 12:10:58.905, Spoofing Defendant TD-Canada submitted 1 Baiting Order to sell on the Canadian market, totaling 10,000 shares, at 11.95.  By entering this Baiting Order, Spoofing Defendant TD-Canada intended to create

fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

92.   The Baiting Order placed by Spoofing Defendant TD-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 12:10:59.070, Spoofing Defendant TD-Canada successfully executed three Executing Orders on the Canadian market to buy Concordia shares, totaling 1,000 shares, at 11.93, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 12:10:59.070 | 11.93 | 700 | TD-Canada |
| 12:10:59.070 | 11.93 | 200 | TD-Canada |
| 12:10:59.070 | 11.93 | 100 | TD-Canada |

Through the Executing Orders, Spoofing Defendant TD-Canada was able to purchase shares at prices below the prevailing best offer of 11.95, which was the natural price before Spoofing Defendant TD-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant TD-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. At 12:10:59.257, after it had executed the Executing Orders, TD-Canada canceled its Baiting Order to sell on the Canadian market.

93.   Concurrent with Spoofing Defendant TD-Canada's spoofing activity on the Canadian market, Spoofing Defendant TD-U.S. entered 29 Baiting Orders

to sell on the U.S. market totaling 12,900 shares.  Immediately after Spoofing

Defendant TD-Canada executed its Executing Trades on the Canadian market,

Spoofing Defendant TD-U.S. canceled its Baiting Orders on the U.S. market.

94.    The combined U.S. and Canadian spoofing activity had the effect of

depressing the natural market for Concordia's stock for as much as fifteen minutes

after the Baiting Orders were canceled for each individual spoofing cycle.  These

spoofing cycles continued throughout the course of the trading day. At

12:11:53.000, the BBO for Concordia shares trading on the Canadian market had

dropped to 11.88 bid for 1,400 shares (down from 11.93 before the spoofing) and

700 shares offered at 11.90 (down from 11.95 before the spoofing).

## v.    November 1, 2016

95.    On November 1, 2016 at 11:52:02.983, the BBO for Concordia shares

trading on the Canadian market was 4.24 bid for 6,400 shares and 24,000 shares

offered at 4.26.  At 11:52:02.991, Spoofing Defendant TD-Canada submitted 4

Baiting Orders to sell on the Canadian market, totaling 21,400 shares, at prices

ranging from 4.26 down to 4.25.  By entering multiple Baiting Orders, Spoofing

Defendant TD-Canada intended to create fictitious selling pressure that would

induce other market participants to submit additional sell orders and drive the price

of Concordia shares downward.

96.    The Baiting Orders placed by Spoofing Defendant TD-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 11:52:03.024, Spoofing Defendant TD-Canada successfully executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 360 shares, at 4.24, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 11:52:03.024 | 4.24 | 300 | TD-Canada |
| 11:52:03.024 | 4.24 | 60 | TD-Canada |

Through the Executing Orders, Spoofing Defendant TD-Canada was able to purchase shares at prices below the prevailing best offer of 4.26, which was the natural price before Spoofing Defendant TD-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant TD-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 11:52:02.991, as it was submitting and executing the Executing Orders, Spoofing Defendant TD-Canada began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 11:52:06.560.

97.    Concurrent with Spoofing Defendant TD-Canada' spoofing activity on the Canadian market, Spoofing Defendant TD-U.S. entered 154 Baiting Orders to sell on the U.S. market totaling 55,100 shares.  Immediately after Spoofing

Defendant TD-Canada executed its Executing Trades on the Canadian market,

Spoofing Defendant TD-U.S. canceled its Baiting Orders on the U.S. market.

98.     The combined U.S. and Canadian spoofing activity had the effect of

depressing the natural market for Concordia's stock for as much as fifteen minutes

after the Baiting Orders were canceled for each individual spoofing cycle.  These

spoofing cycles continued throughout the course of the trading day. At

11:52:58.866, the BBO for Concordia shares trading on the Canadian market had

dropped to 4.22 bid for 100 shares (down from 4.24 before the spoofing) and 5,800

shares offered at 4.23 (down from 4.24 before the spoofing).

### vi.    <u>November 11, 2016</u>

99.     On November 11, 2016 at 12:33:29.733, the BBO for Concordia share

trading on the Canadian market was 3.78 bid for 5,900 shares and 29,700 shares

offered at 3.80.  At 12:33:29.726, Spoofing Defendant TD-Canada submitted 1

Baiting Order to sell on the Canadian market, totaling 17,000 shares, at 3.80.  By

entering this Baiting Order, Spoofing Defendant TD-Canada intended to create

fictitious selling pressure that would induce other market participants to submit

additional sell orders and drive the price of Concordia shares downward.

100.   The Baiting Order placed by Spoofing Defendant TD-Canada

successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  As a result, between 12:33:29.741 and

12:33:29.749, TD-Canada executed eight Executing Orders on the Canadian

market to buy Concordia shares, totaling 1,100 shares, at 3.79, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 12:33:29.741 | 3.79 | 100 | TD-Canada |
| 12:33:29.741 | 3.79 | 100 | TD-Canada |
| 12:33:29.741 | 3.79 | 100 | TD-Canada |
| 12:33:29.741 | 3.79 | 100 | TD-Canada |
| 12:33:29.741 | 3.79 | 100 | TD-Canada |
| 12:33:29.741 | 3.79 | 300 | TD-Canada |
| 12:33:29.741 | 3.79 | 200 | TD-Canada |
| 12:33:29.749 | 3.79 | 100 | TD-Canada |

Through the Executing Orders, Spoofing Defendant TD-Canada was able to

purchase shares at prices below the prevailing best offer of 3.80, which was the

natural price before Spoofing Defendant TD-Canada entered the Baiting Orders.

Without the Baiting Orders, Spoofing Defendant TD-Canada would have been

required to pay the prevailing best offer price (or higher) to buy Concordia shares.

At 12:33:29.875, after it had executed the Executing Orders, Spoofing Defendant

TD-Canada canceled its Baiting Order to sell on the Canadian market.

101.   Concurrent with Spoofing Defendant TD-Canada's spoofing activity

on the Canadian market, Spoofing Defendant TD-U.S. entered 34 Baiting Orders

to sell on the U.S. market totaling 24,300 shares.  Immediately after Spoofing

Defendant TD-Canada executed its Executing Trades on the Canadian market,
Spoofing Defendant TD-U.S. canceled its Baiting Orders on the U.S. market.

102.    The combined U.S. and Canadian spoofing activity had the effect of
depressing the natural market for Concordia's stock for as much as fifteen minutes
after the Baiting Orders were canceled for each individual spoofing cycle.  These
spoofing cycles continued throughout the course of the trading day. At
12:34:28.052, the BBO for Concordia shares on the Canadian market had dropped
to 3.77 bid for 1,600 shares (down from 3.78 before the spoofing) and 4,700 shares
offered at 3.78 (down from 3.80 before the spoofing).

103.    Based on the Spoofing Defendant TD-U.S.'s precise timing of the
entry and cancellation of the U.S. Baiting Orders as it relates to the entry and
cancellation of Spoofing Defendant TD-Canada's Baiting Orders and the execution
of Spoofing Defendant TD-Canada's Executing Orders; the fact that Concordia's
stock is traded as an Interlisted Security in Canada and the U.S.; the interconnected
nature of the Canadian and U.S. markets; and the size of the U.S. Baiting Orders
relative to the average trade size in Concordia stock, a strong and cogent inference
can be drawn that the U.S. Baiting Orders were entered by Spoofing Defendant
TD-U.S. on the U.S. market in coordination with the Canadian Baiting Orders
entered by Spoofing Defendant TD-Canada on the Canadian market.  The
coordinated cross border activity was necessary for the success of the spoofing

scheme because without the spoofing activity by Spoofing Defendant TD-U.S. on the U.S. markets, the pricing anomaly that Spoofing Defendant TD-Canada induced on the Canadian markets would have been mitigated by natural market forces in the U.S.

## Defendants Merrill-Canada and Merrill- U.S.

### i.   February 3, 2016

104.   On February 3, 2016 at 10:47:28.784, the BBO for Concordia shares trading on the Canadian market was 38.12 bid for 700 shares and 2,600 shares offered at 38.30.  Between 10:47:28.882 and 10:47:28.885, Spoofing Defendant Merrill-Canada submitted 15 Baiting Orders to sell on the Canadian market, totaling 4,300 shares, at prices ranging from 38.33 down to 38.27.  By entering multiple Baiting Orders, Spoofing Defendant Merrill-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

105.   The Baiting Orders placed by Spoofing Defendant Merrill-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 1:03:42.614, Spoofing Defendant Merrill-Canada executed one Executing Order on the Canadian market to buy Concordia shares, totaling 500 shares, at 38.11, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:47:28.885 | 38.11 | 500 | Merrill-Canada |

Through the Executing Order, Spoofing Defendant Merrill-Canada was able to purchase shares at a price below the prevailing best offer of 38.30, which was the natural price before Spoofing Defendant Merrill Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant Merrill-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 10:47:28.882, as it was submitting and executing the Executing Orders, Spoofing Defendant Merrill-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:47:30.348.

106.   Concurrent with Spoofing Defendant Merrill-Canada's spoofing activity on the Canadian market, Spoofing Defendant Merrill-U.S. entered 81 Baiting Orders to sell on the U.S. market totaling 11,900 shares.  Immediately after Spoofing Defendant Merrill-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant Merrill-U.S. canceled its Baiting Orders on the U.S. market.

107.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These

spoofing cycles continued throughout the course of the trading day.  At 10:48:28.857, the BBO for Concordia shares trading on the Canadian market had dropped to 38.12 bid for 700 shares (unchanged from before the spoofing) and 400 shares offered at 38.25 (down from 38.30 before the spoofing).

### ii.   March 24, 2016

108.   On March 24, 2016 at 10:24:09.950, the BBO for Concordia shares trading on the Canadian market was 36.25 bid for 1,200 shares and 2,200 shares offered at 36.43.  At 10:24:10.002, Spoofing Defendant Merrill-Canada submitted 23 Baiting Orders to sell on the Canadian market, totaling 5,900 shares, at prices ranging from 36.52 down to 36.43.  By entering multiple Baiting Orders, Spoofing Defendant Merrill-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

109.   The Baiting Orders placed by Spoofing Defendant Merrill-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:24:10.006, Spoofing Defendant Merrill-Canada executed one Executing Order on the Canadian market to buy Concordia shares, totaling 100 shares, at 36.34, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:24:10.006 | 36.34 | 100 | Merrill-Canada |

Through the Executing Order, Spoofing Defendant Merrill-Canada was able to purchase shares at a price below the prevailing best offer of 36.43, which was the natural price before Spoofing Defendant Merrill-Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant Merrill-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 10:24:10.002, as it was submitting and executing the Executing Orders, Spoofing Defendant Merrill-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:24:10.284.

110.   Concurrent with Spoofing Defendant Merrill-Canada's spoofing activity on the Canadian market, Spoofing Defendant Merrill-U.S. entered 38 Baiting Orders to sell on the U.S. market totaling 7,600 shares.  Immediately after Spoofing Defendant Merrill-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant Merrill-U.S. canceled its Baiting Orders on the U.S. market.

111.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These

spoofing cycles continued throughout the course of the trading day. At 10:25:08.495, the BBO for Concordia shares trading on the Canadian market had dropped to 36.21 bid for 400 shares (down from 36.25 before the spoofing) and 100 shares offered at 36.32 (down from 36.43 before the spoofing).

### iii.   April 18, 2016

112.   On April 18, 2016 at 10:35:40.331, the BBO for Concordia shares trading on the Canadian market was 31.68 bid for 100 shares and 700 shares offered at 31.77.  Between 10:35:40.344 and 10:35:40.376, Spoofing Defendant Merrill-Canada submitted 30 Baiting Orders to sell on the Canadian market, totaling 5,800 shares, at prices ranging from 31.80 down to 31.74.  By entering multiple Baiting Orders, Spoofing Defendant Merrill-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

113.   The Baiting Orders placed by Spoofing Defendant Merrill-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:35:40.376, Spoofing Defendant Merrill-Canada executed one Executing Order on the Canadian market to buy Concordia shares, totaling 500 shares, at 31.68, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:35:40.376 | 31.68 | 500 | Merrill-Canada |

Through the Executing Order, Spoofing Defendant Merrill-Canada was able to purchase shares at a price below the prevailing best offer of 31.77, which was the natural price before Spoofing Defendant Merrill-Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant Merrill-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 10:35:40.344, as it was submitting and executing the Executing Orders, Spoofing Defendant Merrill-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:35:41.005.

114.   Concurrent with Spoofing Defendant Merrill-Canada's spoofing activity on the Canadian market, Spoofing Defendant Merrill-U.S. entered 121 Baiting Orders to sell on the U.S. market totaling 16,289 shares.  Immediately after Spoofing Defendant Merrill-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant Merrill-U.S. canceled its Baiting Orders on the U.S. market.

115.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These

spoofing cycles continued throughout the course of the trading day. At

10:36:40.356, the BBO for Concordia shares trading on the Canadian market had

dropped to 31.55 bid for 200 shares (down from 31.68 before the spoofing) and

100 shares offered at 31.60 (down from 31.77 before the spoofing).

### iv.   <u>August 29, 2016</u>

116.   On August 29, 2016 at 10:17:31.849, the BBO for Concordia shares

trading on the Canadian market was 11.52 bid for 300 shares and 8,900 shares

offered at 11.55.  Between 10:17:31.851 and 10:17:31.896, Spoofing Defendant

Merrill-Canada submitted six Baiting Orders to sell on the Canadian market,

totaling 10,200 shares, at prices ranging from 11.55 down to 11.54.  By entering

multiple Baiting Orders, Spoofing Defendant Merrill-Canada intended to create

fictitious selling pressure that would induce other market participants to submit

additional sell orders and drive the price of Concordia shares downward.

117.   The Baiting Orders placed by Spoofing Defendant Merrill-Canada

successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  As a result, at 10:17:31.896, Spoofing

Defendant Merrill-Canada executed three Executing Order on the Canadian market

to buy Concordia shares, totaling 500 shares, at prices between 11.52 and 11.50, as

follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:17:31.896 | 11.52 | 200 | Merrill-Canada |
| 10:17:31.910 | 11.51 | 100 | Merrill-Canada |
| 10:17:32.001 | 11.50 | 200 | Merrill-Canada |

Through the Executing Order, Spoofing Defendant Merrill-Canada was able to purchase shares at a price below the prevailing best offer of 11.55, which was the natural price before Spoofing Defendant Merrill-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant Merrill-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:17:31.894, as it was submitting and executing the Executing Orders, Merrill-Canada began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 10:17:32.891.

118.   Concurrent with Spoofing Defendant Merrill-Canada's spoofing activity in the Canadian market, Spoofing Defendant Merrill-U.S. entered 55 Baiting Orders to sell on the U.S. market totaling 22,600 shares. Immediately after Spoofing Defendant Merrill-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant Merrill-U.S. canceled its Baiting Orders on the U.S. market.

119.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle. These

spoofing cycles continued throughout the course of the trading day.  At

10:18:28.121, the BBO for Concordia shares trading on the Canadian market had

dropped to 11.51 bid for 600 shares (down from 11.52 before the spoofing) and

300 shares offered at 11.53 (down from 11.55 before the spoofing).  September 15,

2016.

### v.    September 15, 2016

120.   On September 15, 2016 at 2:30:23.506, the BBO for Concordia shares

trading on the Canadian market was 8.77 bid for 1,200 shares and 700 shares

offered at 8.79.  Between 2:30:23.515 and 2:30:23.173, Spoofing Defendant

Merrill-Canada submitted 30 Baiting Orders to sell on the Canadian market,

totaling 58,400 shares, at prices ranging from 8.79 down to 8.72.  By entering

multiple Baiting Orders, Spoofing Defendant Merrill-Canada intended to create

fictitious selling pressure that would induce other market participants to submit

additional sell orders and drive the price of Concordia shares downward.

121.   The Baiting Orders placed by Spoofing Defendant Merrill-Canada

successfully induced the entry of sell orders from other market participants, driving

he price of Concordia shares downward.  As a result, between 2:30:23.781 and

2:30:24.173, Spoofing Defendant Merrill-Canada executed four Executing Order

to buy Concordia shares on the Canadian market, totaling 400 shares, at prices between 8.75 and 8.72, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 2:30:23.781 | 8.75 | 100 | Merrill-Canada |
| 2:30:23.952 | 8.74 | 100 | Merrill-Canada |
| 2:30:23.956 | 8.72 | 100 | Merrill-Canada |
| 2:30:24.173 | 8.72 | 100 | Merrill-Canada |

Through the Executing Order, Spoofing Defendant Merrill-Canada was able to purchase shares at a price below the prevailing best offer of 8.79, which was the natural price before Spoofing Defendant Merrill-Canada entered the Baiting Orders. Without the Baiting Orders, Spoofing Defendant Merrill-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 2:30:23.515, as it was submitting and executing the Executing Orders, Spoofing Defendant Merrill-Canada began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 2:30:25.031.

122.   Concurrent with Spoofing Defendant Merrill-Canada's spoofing activity on the Canadian market, Spoofing Defendant Merrill-U.S. entered 425 Baiting Orders to sell on the U.S. market totaling 163,900 shares. Immediately after Spoofing Defendant Merrill-Canada executed its Executing Trades on the

Canadian market, Spoofing Defendant Merrill-U.S. canceled its Baiting Orders on the U.S. market.

123.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day. At 14:31:17.105, the BBO for Concordia shares trading on the Canadian market had dropped to 8.68 bid for 2,200 shares (down from 8.77 before the spoofing) and 1,100 shares offered at 8.70 (down from 8.79 before the spoofing).

### vi.      October 24, 2016

124.   On October 24, 2016 at 9:55:17.128, the BBO for Concordia shares trading on the Canadian market was 5.56 bid for 400 shares and 10,200 shares offered at 5.58.  Between 9:55:17.108 and 9:55:17.171, Spoofing Defendant Merrill-Canada submitted 11 Baiting Orders to sell on the Canadian market, totaling 19,000 shares, at prices ranging from 5.61 down to 5.54.  By entering multiple Baiting Orders, Spoofing Defendant Merrill-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

125.   The Baiting Orders placed by Spoofing Defendant Merrill-Canada successfully induced the entry of sell orders from other market participants, driving he price of Concordia shares downward.  As a result, between 9:55:17.124 and 9:55:17.171, Spoofing Defendant Merrill-Canada executed six Executing Order to buy Concordia shares on the Canadian market, totaling 1,400 shares, at prices between 5.55 and 5.53, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 9:55:17.128 | 5.55 | 100 | Merrill-Canada |
| 9:55:17.128 | 5.54 | 100 | Merrill-Canada |
| 9:55:17.128 | 5.53 | 200 | Merrill-Canada |
| 9:55:17.128 | 5.53 | 100 | Merrill-Canada |
| 9:55:17.128 | 5.53 | 200 | Merrill-Canada |
| 9:55:17.128 | 5.53 | 700 | Merrill-Canada |

Through the Executing Order, Spoofing Defendant Merrill-Canada was able to purchase shares at a price below the prevailing best offer of 5.58, which was the natural price before Spoofing Defendant Merrill-Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant Merrill-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 9:55:17.171, as it was submitting and executing the Executing Orders, Spoofing Defendant Merrill-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 9:55:21.816.

126.   Concurrent with Spoofing Defendant Merrill-Canada's spoofing activity on the Canadian market, Spoofing Defendant Merrill-U.S. entered 422 Baiting Orders to sell on the U.S. market totaling 119,200 shares.  Immediately after Spoofing Defendant Merrill-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant Merrill-U.S. canceled its Baiting Orders on the U.S. market.

127.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day. At 9:56:16.584, the BBO for Concordia shares trading on the Canadian market had dropped to 5.46 bid for 1,900 shares (down from 5.56 before the spoofing) and 5,800 shares offered at 5.48 (down from 5.58 before the spoofing).

128.   Based on the Spoofing Defendant Merrill-U.S.'s precise timing of the entry and cancelation of the U.S. Baiting Orders as it relates to the entry and cancellation of Spoofing Defendant Merrill-Canada's Baiting Orders and the execution of Spoofing Defendant Merrill-Canada's Executing Orders; the fact that Concordia's stock is traded as an Interlisted Security in Canada and the U.S.; the interconnected nature of the Canadian and U.S. markets; and the size of the U.S. Baiting Orders relative to the average trade size in Concordia stock, a strong and

cogent inference can be drawn that the U.S. Baiting Orders were entered by Spoofing Defendant Merrill-U.S. on the U.S. market in coordination with the Canadian Baiting Orders entered by Spoofing Defendant Merrill-Canada on the Canadian market.  The coordinated cross border activity was necessary for the success of the spoofing scheme because without the spoofing activity by Spoofing Defendant Merrill-U.S. on the U.S. markets, the pricing anomaly that Spoofing Defendant Merrill-Canada induced on the Canadian markets would have been mitigated by natural market forces in the U.S.

**Defendants John Doe-Canada and John Doe-U.S.**

   **i.**  **February 2, 2016**

129. On February 2, 2016 at 1:29:17.000, the BBO for Concordia shares trading on the Canadian market was 39.91 bid for 100 shares and 100 shares offered at 40.07.  Between 1:29:17.713 and 1:29:17.745, Spoofing Defendant John Doe-Canada submitted 46 Baiting Orders to sell on the Canadian market, totaling 12,600 shares, at prices ranging from 40.27 down to 40.05.  By entering multiple Baiting Orders, Spoofing Defendant John Doe-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

130.   The Baiting Orders placed by Spoofing Defendant John Doe-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 1:29;17.727 and 1:29:17.745, John Doe-Canada executed eight Executing Orders on the Canadian market to buy Concordia shares, totaling 1,200 shares, at prices between 40.05 and 39.91, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:29:17.727 | 40.05 | 100 | John Doe-Canada |
| 1:29:17.727 | 40.05 | 500 | John Doe-Canada |
| 1:29:17.727 | 40.01 | 100 | John Doe-Canada |
| 1:29:17.727 | 40.00 | 100 | John Doe-Canada |
| 1:29:17.727 | 39.94 | 100 | John Doe-Canada |
| 1:29:17.729 | 39.99 | 100 | John Doe-Canada |
| 1:29:17.745 | 39.94 | 100 | John Doe-Canada |
| 1:29:17.745 | 39.91 | 100 | John Doe-Canada |

Through the Executing Orders, Spoofing Defendant John Doe-Canada was able to purchase shares at prices below the prevailing best offer of 40.07, which was the natural price before Spoofing Defendant John Doe-Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant John Doe-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 1:29:17.713, as it was submitting and executing the Executing Orders, Spoofing Defendant John Doe-Canada began canceling all of its

Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 1:29:17.804.

131.   Concurrently with Spoofing Defendant John Doe-Canada's spoofing activity on the Canadian market, Spoofing Defendant John Doe-U.S. entered 100 Baiting Orders to sell on the U.S. market totaling 10,800 shares.  Immediately after Spoofing Defendant John Doe-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant John Doe-U.S. canceled its Baiting Orders on the U.S. market.

132.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 1:29:59.670, the BBO for Concordia shares trading on the Canadian market had dropped to 39.92 bid for 1,400 shares (compared to 39.91 before the spoofing) and 100 shares offered at 45.40.00 (down from 40.07 before the spoofing).

### ii.      February 9, 2016

133.   On February 9, 2016 at 10:19:40.630, the BBO for Concordia shares trading on the Canadian market was 37.31 bid for 400 shares and 1,000 shares offered at 37.39.  Between 10:19:40.642 and 10:19:40.655, Spoofing Defendant

John Doe-Canada submitted 14 Baiting Orders to sell on the Canadian market, totaling 4,600 shares, at prices ranging from 37.49 down to 37.40.  By entering multiple Baiting Orders, Spoofing Defendant John Doe-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

134.   The Baiting Orders placed by Spoofing Defendant John Doe-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:19:40.655, John Doe-Canada executed four Executing Orders on the Canadian market to buy Concordia shares, totaling 400 shares, at prices between 37.36 and 37.32, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:19:40.655 | 37.36 | 100 | John Doe-Canada |
| 10:19:40.655 | 37.34 | 100 | John Doe-Canada |
| 10:19:40.655 | 37.34 | 100 | John Doe-Canada |
| 10:19:40.655 | 37.32 | 100 | John Doe-Canada |

Through the Executing Orders, Spoofing Defendant John Doe-Canada was able to purchase shares at prices below the prevailing best offer of 37.39, which was the natural price before Spoofing Defendant John Doe-Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant John Doe-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 10:19:40.653, as it was submitting and executing the Executing Orders, Spoofing Defendant John Doe-Canada began canceling all

of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:16:41.139.

135.   Concurrent with Spoofing Defendant John Doe-Canada's spoofing activity on the Canadian market, Spoofing Defendant John Doe-U.S. entered 38 Baiting Orders to sell on the U.S. market totaling 6,300 shares.  Immediately after Spoofing Defendant John Doe-Canada executed its Executing Trades on the Canadian market, John Doe-U.S. canceled its Baiting Orders on the U.S. market.

136.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 10:20:39.094, the BBO for Concordia shares trading on the Canadian market had dropped to 37.31 bid for 400 shares (compared to 37.32 before the spoofing) and 1000 shares offered at 37.39 (down from 37.42 before the spoofing).

### iii.   April 29, 2016

137.   On April 29, 2016 at 1:45:07.926, the BBO for Concordia shares trading on the Canadian market was 37.19 bid for 1,000 shares and 800 shares offered at 37.24.  Between 1:45:07.935 and 1:45:08.645, Spoofing Defendant John Doe-Canada submitted 32 Baiting Orders to sell on the Canadian market, totaling

9,400 shares, at prices ranging from 38.18 down to 37.20.  By entering multiple Baiting Orders, Spoofing Defendant John Doe-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

138.   The Baiting Orders placed by Spoofing Defendant John Doe-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 1:45:08.634 and 1:45:08.647, John Doe-Canada executed five Executing Orders on the Canadian exchange to buy Concordia shares, totaling 500 shares, at prices between 37.19 and 37.13, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:45:08.634 | 37.19 | 100 | John Doe-Canada |
| 1:45:08.634 | 37.19 | 100 | John Doe-Canada |
| 1:45:08.647 | 37.13 | 100 | John Doe-Canada |
| 1:45:08.647 | 37.13 | 100 | John Doe-Canada |
| 1:45:08.647 | 37.13 | 100 | John Doe-Canada |

Through the Executing Orders, Spoofing Defendant John Doe-Canada was able to purchase shares at prices below the prevailing best offer of 37.24, which was the natural price before Spoofing Defendant John Doe-Canada entered the Baiting Orders.  Without the Baiting Orders, Spoofing Defendant John Doe-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 1:45:08.645, as it was submitting and executing the

Executing Orders, Spoofing Defendant John Doe-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 1:45:11.347.

139.   Concurrent with Spoofing Defendant John Doe-Canada's spoofing activity on the Canadian market, Spoofing Defendant John Doe-U.S. entered 158 Baiting Orders to sell on the U.S. market totaling 49,166 shares.  Immediately after Spoofing Defendant John Doe-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant John Doe-U.S. canceled its Baiting Orders on the U.S. market.

140.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 1:45:08.647, the BBO for Concordia shares trading on the Canadian market had dropped to 37.12 bid for 100 shares (down from 37.19 before the spoofing) and 1,100 shares offered at 37.16(down from 37.24 before the spoofing).

### iv.   **May 2, 2016**

141.   On May 2, 2016 at 12:22:27.263, the BBO for Concordia shares trading on the Canadian market was 24.11 bid for 700 shares and 1,100 shares

offered at 34.17.  Between 12:22:27.250 and 12:22:27.282, Spoofing Defendant

John Doe-Canada submitted 22 Baiting Orders to sell on the Canadian market,

totaling 10,000 shares, at prices ranging from 34.95 down to 34.15.  By entering

multiple Baiting Orders, Spoofing Defendant John Doe-Canada intended to create

fictitious selling pressure that would induce other market participants to submit

additional sell orders and drive the price of Concordia shares downward.

142.   The Baiting Orders placed by Spoofing Defendant John Doe-Canada

successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  As a result, between 12:22:27.267 and

12:22:27.282, John Doe-Canada executed four Executing Orders on the Canadian

market to buy Concordia shares, totaling 500 shares, at prices between 34.12 and

34.10, as follows:

| Time | Price | Shares | Buyer |
| --- | --- | --- | --- |
| 12:22:27.263 | 34.12 | 100 | John Doe-Canada |
| 12:22:27.263 | 34.12 | 100 | John Doe-Canada |
| 12:22:27.263 | 34.11 | 200 | John Doe-Canada |
| 12:22:27.263 | 34.10 | 100 | John Doe-Canada |

Through the Executing Orders, Spoofing Defendant John Doe-Canada was able to

purchase shares at prices below the prevailing best offer of 34.17, which was the

natural price before Spoofing Defendant John Doe-Canada entered the Baiting

Orders.  Without the Baiting Orders, Spoofing Defendant John Doe-Canada would

have been required to pay the prevailing best offer price (or higher) to buy

Concordia shares. Beginning at 12:22:27.267, as it was submitting and executing the Executing Orders, Spoofing Defendant John Doe-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 12:22:28.253.

143.   Concurrently with Spoofing Defendant John Doe-Canada's spoofing activity on the Canadian market, Spoofing Defendant John Doe-U.S. entered 100 Baiting Orders to sell on the U.S. market totaling 24,800 shares.  Immediately after Spoofing Defendant John Doe-Canada executed its Executing Trades on the Canadian market, Spoofing Defendant John Doe-U.S. canceled its Baiting Orders on the U.S. market.

144.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.  These spoofing cycles continued throughout the course of the trading day.  At 12:23:23.025, the BBO for Concordia shares trading on the Canadian market had dropped to 34.05 bid for 600 shares (compared to 34.11 before the spoofing) and 900 shares offered at 34.09 (down from 34.17 before the spoofing).

### v.   **May 10, 2016**

145.   On May 10, 2016 at 10:50:50.541, the BBO for Concordia shares trading on the Canadian market was 30.54 bid for 700 shares and 1600 shares offered at 30.64.  Between 10:50:50.591 and 10:50:50.594, Spoofing Defendant John Doe-Canada submitted 30 Baiting Orders on the Canadian market to sell, totaling 7,000 shares, at prices ranging from 31.22 down to 30.61.  By entering multiple Baiting Orders, Spoofing Defendant John Doe-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

146.   The Baiting Orders placed by Spoofing Defendant John Doe-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:50:50.594, Spoofing Defendant John Doe-Canada successfully executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 200 shares at 30.51, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:50:50.594 | 30.51 | 100 | John Doe-Canada |
| 10:50:50.594 | 30.51 | 100 | John Doe-Canada |

Through the Executing Orders, Spoofing Defendant John Doe-Canada was able to purchase shares at prices below the prevailing best offer of 30.64, which was the natural price before Spoofing Defendant John Doe-Canada entered the Baiting

Orders.  Without the Baiting Orders, Spoofing Defendant John Doe-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:50:50.591, as it was submitting and executing the Executing Orders, Spoofing Defendant John Doe-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:50:51.149.

147.   Concurrent with Spoofing Defendant John Doe-Canada's spoofing activity on the Canadian market, Spoofing Defendant John Doe-U.S. entered 57 Baiting Orders to sell on the U.S. market totaling 11,300 shares.  Immediately after Spoofing Defendant John Doe-Canada executed its Executing Trades on the Canadian market, John Doe-U.S. canceled its Baiting Orders on the U.S. market.

148.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.   These spoofing cycles continued throughout the course of the trading day.  At 10:51:46.031, the BBO for Concordia shares trading on the Canadian market had dropped to 30.50 bid for 100 shares (compared to 30.54 before the spoofing) and 1400 shares offered at 30.56 (down from 30.64 before the spoofing).

### vi.   September 2, 2016

149.   On September 2, 2016 at 10:47:04.834, the BBO for Concordia shares trading on the Canadian market was 10.78 bid for 1,300 shares and 3,400 shares offered at 10.81.  Between 10:47:04.828 and 10:47:05.080, Spoofing Defendant John Doe-Canada submitted 20 Baiting Orders on the Canadian market to sell, totaling 4,300 shares, at prices ranging from 10.92 down to 10.77.  By entering multiple Baiting Orders, Spoofing Defendant John Doe-Canada intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.

150.   The Baiting Orders placed by Spoofing Defendant John Doe-Canada successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:47:05.080, Spoofing Defendant John Doe-Canada successfully executed three Executing Orders on the Canadian market to buy Concordia shares, totaling 500 shares at 10.76, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:47:04.834 | 10.76 | 100 | John Doe-Canada |
| 10:47:04.834 | 10.76 | 100 | John Doe-Canada |
| 10:47:04.834 | 10.76 | 300 | John Doe-Canada |

Through the Executing Orders, Spoofing Defendant John Doe-Canada was able to purchase shares at prices below the prevailing best offer of 10.81, which was the natural price before Spoofing Defendant John Doe-Canada entered the Baiting

Orders.  Without the Baiting Orders, Spoofing Defendant John Doe-Canada would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:47:04.999, as it was submitting and executing the Executing Orders, Spoofing Defendant John Doe-Canada began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:47:05.840.

151.   Concurrent with Spoofing Defendant John Doe-Canada's spoofing activity on the Canadian market, Spoofing Defendant John Doe-U.S. entered 206 Baiting Orders to sell on the U.S. market totaling 63,520 shares.  Immediately after Spoofing Defendant John Doe-Canada executed its Executing Trades on the Canadian market, John Doe-U.S. canceled its Baiting Orders on the U.S. market.

152.   The combined U.S. and Canadian spoofing activity had the effect of depressing the natural market for Concordia's stock for as much as fifteen minutes after the Baiting Orders were canceled for each individual spoofing cycle.   These spoofing cycles continued throughout the course of the trading day.  At 10:47:45.585, the BBO for Concordia shares trading on the Canadian market had dropped to 10.66 bid for 100 shares (compared to 10.78 before the spoofing) and 1,200 shares offered at 10.68 (down from 10.81 before the spoofing).

153.   Based on the Spoofing Defendant John Doe-U.S.'s precise timing of the entry and cancelation of the U.S. Baiting Orders as it relates to the entry and

cancellation of Spoofing Defendant John Doe-Canada's Baiting Orders and the

execution of Spoofing Defendant John Doe-Canada's Executing Orders; the fact

that Concordia's stock is traded as an Interlisted Security in Canada and the U.S.;

the interconnected nature of the Canadian and U.S. markets; and the size of the

U.S. Baiting Orders relative to the average trade size in Concordia stock, a strong

and cogent inference can be drawn that the U.S. Baiting Orders were entered by

Spoofing Defendant John Doe-U.S. on the U.S. market in coordination with the

Canadian Baiting Orders entered by Spoofing Defendant John Doe-Canada on the

Canadian market.  The coordinated cross border activity was necessary for the

success of the spoofing scheme because without the spoofing activity by Spoofing

Defendant John Doe-U.S. on the U.S. markets, the pricing anomaly that Spoofing

Defendant John Doe-Canada induced on the Canadian markets would have been

mitigated by natural market forces in the U.S.

### Defendants' Trading Activities Reflect a Conscious or Reckless Intent to Manipulate the Market Price of Concordia's Securities

154.   As registered brokers, the Spoofing Defendants knew or should have

known that their conduct violated the securities laws and the rules and regulations

of the securities industries in both Canada and the United States.  As registered

brokers, the Spoofing Defendants were required to have internal policies,

procedures and systems that detected and prohibited manipulative or fraudulent

trading devices or schemes.  *See* FINRA Rule 2020., The Spoofing Defendants were also required to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm. *See* FINRA Rules 5210, Supplementary Material .02; Rule 1220 and Exchange Rule 575, Disruptive Practices Prohibited.

155.   The Spoofing Defendants knew or should have known that:

(a)      it was unlawful to place Baiting Orders in a Market Order Book in order to trick market participants into selling their shares of Concordia stock and drive the price of Concordia stock downward.  The placement of these Baiting Orders was not inadvertent or unintentional.  Rather, the Spoofing Defendants either consciously or recklessly placed the Baiting Orders in the Market Order Book as can be inferred from *inter alia*: the short time period between the repeated placement and cancellation of the Baiting Orders; the concentration of cancelled Baiting Orders during the limited period when each spoofing event occurred; the greater average size of the Baiting Orders that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; the ratio of cancelled Baiting Orders to sell, compared with  the executed bona-fide orders to buy that existed; and the reoccurrence of the same trading pattern throughout the Relevant Period;

(b)     it was unlawful to submit and cancel any Baiting Orders to delay or impede the execution of trades;

(c)     it was unlawful to submit and cancel multiple Baiting Orders to create an appearance of market depth; and

(d)     it was required by FINRA that all brokers have surveillance systems in place and internal controls and procedures to monitor their trading activities.

156.   A strong and cogent inference can be drawn from these facts that each Spoofing Defendant consciously or recklessly disregarded industry standards and engaged in unlawful trading activities to manipulate the market price of Concordia's shares.

### Harrington's Damages Were Caused by Its Reliance on An Efficient Market Free of Manipulation

157.   Concordia's securities were intended to be traded in an efficient market.  Harrington, like other market participants, reasonably relied upon the assumption that when it sold its Concordia securities, it was trading in a market that was free from manipulation, and that the market price of Concordia's securities would be determined by the natural forces of supply and demand, rather than false and misleading pricing information injected into the market by the Spoofing Defendants.

**Defendants Used National Securities Exchanges and The
Mails to Perpetrate Their Market Manipulation Scheme**

158.   Each Spoofing Defendant used the means or instrumentalities of
interstate commerce, the facilities of a national securities exchange, and the mail,
to trade Concordia's securities by placing, routing, filling, and executing these
orders.

159.   The Spoofing Defendants each knowingly employed devices,
schemes, or artifices to defraud and engaged in acts, practices, and a course of
conduct which operated as a fraud upon Harrington and the market in violation of
Section 10(b) and Rule 10b-5 promulgated under the Exchange Act of 1934.

**B.    Second Claim for Relief for Abusive Naked Short Selling in Violation
of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against UBS-U.S., UBS-Canada, Merrill-U.S., Merrill-
Canada, MLPro, SocGen-U.S., SocGen-Canada, Cormark, John Doe-
U.S. and John Doe-Canada**

160.   Plaintiff incorporates by reference paragraphs 1 through 159 as if
more fully set forth herein.

161.   During the Relevant Period, the Naked Short Selling Defendants
engaged in and employed devices, schemes, illegal acts, practices, and a course of
conduct that were intended to manipulate the price of Concordia shares downward.
The Naked Short Selling Defendants engaged in an abusive naked short selling
scheme that injected false pricing signals into the market and created a misleading

impression in the market that Concordia's share price was being determined by the natural forces of supply and demand.  The Naked Short Selling Defendants' scheme consisted of several activities that were designed to manipulate the price of Concordia's shares including: short selling Concordia shares without locating or borrowing legally authorized shares in violation of Reg SHO; failing to deliver legally borrowable Concordia shares on the settlement date in violation of Reg SHO; failing to establish a system of supervision that was required by the FINRA Supervision Rule, and the FINRA Security Counting and Verification Rule; failing to supervise the effective implementation of the supervision and monitoring systems that were required by the FINRA Supervisory Control System Rule; and mailing account statements to customers containing false information concerning the amount of authorized Concordia shares that their customers paid for and were actually holding in safekeeping on the customers' behalf.

### The Nature, Purpose, and Effect of Defendants' Naked Short Selling Scheme

162.   The Naked Short Selling Defendants manipulated Concordia's share price by injecting millions of Fictitious Shares into the U.S. and Canadian markets that were not authorized for sale by Concordia.  In its adoption of Reg SHO, the SEC has held that it is unlawful for a broker to accept a short sale order without locating shares or having a reasonable basis to believe that shares can be lawfully

borrowed, so that they can be timely delivered on the settlement date. The objective of Reg SHO is to prevent abusive naked short selling that results in the electronic creation of Fictitious Shares and the failure to deliver legally borrowable shares. Fictitious Shares provide the market manipulators with artificial "leverage" to trade unauthorized shares at high volumes that can be used to depress the price of a security, as was the case with Concordia stock.

163. By selling short millions of Fictitious Shares into the market, the Naked Short Selling Defendants intentionally created a false impression of how the market valued Concordia shares, which misled shareholders like Harrington into selling their Concordia shares at depressed prices.

164. Like spoofing, the abusive naked short selling schemes perpetrated by the Naked Short Selling Defendants interfered with the natural forces of supply and demand, which would have determined the fair and true market price of Concordia's shares. The scheme engaged in by the Naked Short Selling Defendants effectively manufactured millions of unauthorized Fictitious Shares. When these Fictitious Shares were sold at high volumes by the Naked Short Selling Defendants, a false signal was sent to the market that something was fundamentally wrong with Concordia. This triggered a massive selloff that resulted in a devastating price decline of Concordia stock during the Relevant Period.

165.   The following charts reflect the short sale volumes of Concordia's shares in both the U.S. and Canada.  As the charts reflect, while the volume of short selling increased, the price of Concordia's shares declined.  These charts reflect the total monthly trading volume (Column B); the total monthly volume of shares sold short (Column C); the percentage of shares sold short in comparison to the total trade volume (Column D); and the devastating impact the abusive short selling had on the price of Concordia's stock (Column E).

## U.S. - Concordia Monthly Share Totals

| A | B | C | D | E |
|---|---|---|---|---|
| Month | Monthly Total Volume | Monthly Short Volume | Percent | Monthly Starting Price |
| January 2016 | 5,635,249 | 3,642,988 | 64.65% | 40.16 |
| February 2016 | 4,302,065 | 2,636,399 | 61.28% | 28.80 |
| March 2016 | 7,989,346 | 4,963,601 | 62.13% | 29.57 |
| April 2016 | 12,210,657 | 8,935,538 | 73.18% | 25.44 |
| May 2016 | 12,302,645 | 7,694,703 | 62.55% | 26.51 |
| June 2016 | 18,412,530 | 8,434,048 | 45.81% | 31.05 |
| July 2016 | 4,326,526 | 2,349,107 | 54.30% | 21.85 |
| August 2016 | 36,380,525 | 19,867,468 | 54.61% | 17.14 |
| September 2016 | 33,519,107 | 21,631,498 | 64.53% | 8.43 |
| October 2016 | 54,368,433 | 33,710,891 | 62.00% | 5.17 |
| November 2016 | 64,431,703 | 30,505,486 | 47.35% | 3.37 |
| December 2016 | 18,309,314 | 8,301,818 | 45.34% | 2.49 |

**Canada - Concordia Monthly Share Totals**

| A | B | C | D | E |
|---|---|---|---|---|
| Month | Monthly Total Volume | Monthly Short Volume | Percent | Monthly Starting Price |
| January 2016 | 9,774,860 | 6,197,245 | 63.40% | 73.84 |
| February 2016 | 8,528,830 | 5,323,353 | 62.42% | 40.14 |
| March 2016 | 17,191,060 | 10,581,771 | 61.55% | 39.68 |
| April 2016 | 17,470,400 | 12,561,310 | 71.90% | 33.10 |
| May 2016 | 18,664,790 | 11,711,266 | 62.75% | 33.18 |
| June 2016 | 19,121,610 | 8,838,877 | 46.22% | 40.52 |
| July 2016 | 7,505,640 | 4,089,859 | 54.49% | 27.34 |
| August 2016 | 23,602,550 | 13,174,025 | 55.82% | 18.97 |
| September 2016 | 22,065,720 | 14,177,373 | 64.25% | 11.04 |
| October 2016 | 19,768,640 | 12,503,417 | 63.25% | 6.78 |
| November 2016 | 27,566,000 | 13,949,432 | 50.60% | 4.49 |
| December 2016 | 10,930,220 | 5,193,189 | 47.51% | 3.33 |

166.   Based on the following facts, a strong inference can be drawn that Concordia's share price was being manipulated by the Naked Short Selling Defendants, who consciously or recklessly engaged in an abusive naked short selling scheme to manipulate the market price of Concordia shares during the Relevant Period. These facts are:

(a) During the Relevant Period approximately 410 million interlisted Concordia shares traded in Canada and the U.S, but only 40 million shares were

authorized to be traded by Concordia. This represented an astonishingly high turnover rate of 1,000% for the 40 million shares authorized for trading;

(b) During the Relevant Period, approximately 238 million interlisted Concordia shares sold short in Canada and the U.S., but only 40 million shares were authorized for trading by Concordia. This represented a turnover rate of approximately 600% of the 40 million shares authorized for trading;

(c) On most days during the Relevant Period, between 50% and 90% of all Concordia shares that were traded were sold short despite an industry average for short selling of 25% of the volume of a particular security on a given day for companies listed on U.S. exchanges;

(d) During the period March 1, 2016 through June 27, 2016, the Naked Short Selling Defendants sold short approximately 3 million Concordia shares in Canada without having shares in their inventory;

(e) Concordia was an Interlisted Stock and therefore brokers in Canada and the U.S. routinely routed and traded Concordia shares seamlessly in both countries. Industry rules and regulation in both Canada and the U.S. require brokers, including the Naked Short Selling Defendants, to publish their order routing policies which generally disclose that orders originating in Canada can and will be routed to U.S. markets through designated U.S. brokers and vice-versa;

(f) During the Relevant Period, the trading patterns of the affiliated Defendants in both Canada and the U.S. were parallel to each other.  This included both the spoofing activities and the short selling activities that manipulated the price of Concordia shares downward;

(g) As registered brokers, the Naked Short Selling Defendants knew or should have known that industry standards of care and applicable rules and regulations, in both Canada and the U.S., imposed a duty to monitor their internal trading practices.  The manipulative conduct of the Naked Short Selling Defendants and their failure to maintain sufficient controls to avoid fraud permits an inference of conscious misbehavior or recklessness in perpetrating their abusive naked short selling scheme.

167.   Based on the available Canadian trading data from March 1, 2016 to June 27, 2016, the identities and short share totals of the Canadian Naked Short Selling Defendants is partially known.  A significant amount of the short selling trades that occurred on Canadian exchanges were listed as "Anonymous" and comprise the John Doe Canada Defendants.  As an Interlisted Security, Concordia's shares are considered fungible and intertwined between the Canadian Naked Short Selling Defendants and their U.S. Short Selling Defendant affiliated counterparts.  Upon information and belief, short sale orders that were placed with Canadian Naked Short Selling Defendants were routed to and executed by their

U.S. Short Selling Defendant affiliated counterparts. Conversely, short sale orders that were placed with U.S. Naked Short Selling Defendants were similarly routed and executed by Canadian Naked Short Selling Defendants.  The industry average for short selling in the U.S. is approximately between 20% and 25% of the volume of a particular security on a given day.  The large percentage of short selling that occurred on exchanges in both countries closely mirrored each other and more than doubled the range for short selling in the U.S.  There were approximately 238 million shares sold short during the Relevant Period, which accounted for 58% of the approximately 410 million shares traded during this period.  In addition, the short sale turnover rate was approximately 600% of the 40 million shares Concordia actually issued for trading. Stated differently each share of the 40 million shares available for trading were sold short 6 times.  This did not happen. Based upon the enormous amount of shares that were sold short, the limited amount of borrowable shares that were available, the absence of shares in each Naked Short Selling Defendants inventory, and the limited FTD's reflected in the public record, a strong inference can be drawn from these facts that the Naked Short Selling Defendants were electronically generating and trading Fictitious Shares.  Alternatively, upon information and belief, to conceal their unlawful activities, the affiliated Canadian and U.S. Naked Short Selling Defendants created accounts in each country to offset the Fictitious Shares and internalize the FTD's

or misappropriated customer's shares that were required to be held in segregated accounts for safekeeping to avoid regulatory scrutiny and detection of violations of Reg SHO.

### Examples of Defendants Naked Short Selling Activities During the Relevant Period

168.   The following are examples of naked short selling by the Naked Short Selling Defendants, who each sold shares of Concordia stock that they did not have in their inventories.

## Defendants UBS-Canada and UBS-U.S.

169.   During the Relevant Period, UBS-Canada engaged in the short selling of Concordia's shares.  UBS-Canada is affiliated with UBS-U.S. and both defendants are owned by a common parent, UBS A.G.  As Concordia was an Interlisted Security, the affiliated companies regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

170.   Reflected in the following chart, UBS-Canada sold approximately 343,000 shares short that it did not have in inventory.  As an Interlisted Security, these shares are fungible and were either executed by UBS-Canada or UBS-U.S., without the public's knowledge, and these shares could be included in either country's Concordia short volume totals.

**UBS-Canada – Concordia Short Shares**

| A | B | | A | B |
|---|---|---|---|---|
| **Date** | **Shares Sold Short** | | **Date** | **Shares Sold Short** |
| 3/17/2016 | 130 | | 5/5/2016 | 4,300 |
| 3/18/2016 | 2,850 | | 5/6/2016 | 49,900 |
| 3/21/2016 | 59,616 | | 5/10/2016 | 400 |
| 3/24/2016 | 1,402 | | 5/11/2016 | 36,885 |
| 3/29/2016 | 90,730 | | 5/12/2016 | 463 |
| 3/30/2016 | 4,300 | | 6/7/2016 | 100 |
| 3/31/2016 | 7,095 | | 6/8/2016 | 0 |
| 4/1/2016 | 1,726 | | 6/9/2016 | 100 |
| 4/4/2016 | 24,290 | | 6/10/2016 | 76 |
| 4/27/2016 | 2,719 | | 6/15/2016 | 27,600 |
| 5/2/2016 | 180 | | 6/24/2016 | 21,017 |
| 5/3/2016 | 4,657 | | 6/27/2016 | 500 |
| 5/4/2016 | 1,800 | | | |
| | | | Total | 342,836 |

**Defendants SocGen-Canada and SocGen-U.S.**

171.   During the Relevant Period, SocGen-Canada engaged in the short selling of Concordia's shares.  SocGen-Canada is affiliated with SocGen-U.S. and both defendants are owned by a common parent, Société Générale U.S.  As Concordia was an Interlisted Security, the affiliated companies regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

172.   Reflected in the following chart, SocGen-Canada sold approximately 56,000 shares short that it did not have in inventory.  As an Interlisted Security, Concordia shares are fungible and were either executed by SocGen-Canada or

SocGen-U.S. without the public's knowledge.  As a result, these Concordia shares could be included in either country's short volume totals.

### SocGen-Canada – Concordia Short Shares

| A | B | | A | B |
|---|---|---|---|---|
| Date | Shares Sold Short | | Date | Shares Sold Short |
| 3/17/2016 | 200 | | 5/12/2016 | 2,300 |
| 3/18/2016 | 200 | | 5/13/2016 | 700 |
| 3/21/2016 | 1,800 | | 6/7/2016 | 2,050 |
| 3/22/2016 | 300 | | 6/8/2016 | 2,000 |
| 3/23/2016 | 500 | | 6/9/2016 | 200 |
| 3/24/2016 | 6,900 | | 6/10/2016 | 100 |
| 3/30/2016 | 11,700 | | 6/13/2016 | 4,600 |
| 3/31/2016 | 2,250 | | 6/14/2016 | 500 |
| 4/4/2016 | 3,600 | | 6/15/2016 | 152 |
| 4/27/2016 | 365 | | 6/17/2016 | 4,700 |
| 4/29/2016 | 600 | | 6/20/2016 | 300 |
| 5/2/2016 | 3,500 | | 6/21/2016 | 1,200 |
| 5/3/2016 | 1,250 | | 6/22/2016 | 300 |
| 5/4/2016 | 500 | | 6/23/2016 | 250 |
| 5/5/2016 | 100 | | 6/27/2016 | 3,200 |
| | | | | |
| | | | Total | 56,317 |

### Defendants Merrill-Canada, Merrill-U.S., and MLPro

173.   During the Relevant Period, Merrill-Canada engaged in the short selling of Concordia's shares.  Merrill-Canada is affiliated with Merrill-U.S. and MLPro.  All three defendants are owned by a common parent, Bank of America Corp.  Since Concordia was an Interlisted Security, the affiliated companies

regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

174.   As reflected in the following chart, Merrill-Canada sold approximately 112,000 shares of Concordia short through Canada, although it did not have these shares in its inventory.  As an Interlisted Security, Concordia shares are fungible and were either executed by Merrill-Canada, Merrill-U.S. or MLPro, without the public's knowledge, and these shares could be included in either country's Concordia short volume totals.

**Merrill-Canada – Concordia Short Shares**

| A | B |
|---|---|
| Date | Shares Sold Short |
| 3/17/2016 | 4,333 |
| 3/18/2016 | 3,835 |
| 3/21/2016 | 22,466 |
| 3/22/2016 | 1,211 |
| 3/23/2016 | 59,051 |
| 3/24/2016 | 19,101 |
| 4/1/2016 | 1,949 |
|  |  |
| Total | 111,946 |

**Defendant Cormark**

175.    During the Relevant Period, Cormark engaged in the short selling of Concordia's shares.  Since Concordia was an Interlisted Security, Cormark regularly routed orders to buy or sell Concordia shares to either U.S. broker ITG or BTIG for the seamless execution of these fungible shares in both countries.

176.    During the Relevant Period, according to the SEC, Cormark entered more than 200 sale orders for a hedge fund customer (the "Hedge Fund") into an intermediary broker's execution management system as "long"[10] orders.  At the time these sale orders were entered, the Hedge Fund was not "deemed to own" the stock being sold and did not have a net long position in the stock.  Thus, the orders should have been marked as "short" sales under Regulation SHO. The intermediary broker, ITG Canada Corp. ("ITG Canada"), routed the sale orders with the incorrect order-marking information provided by Cormark to the Executing Broker, which in turn, executed the orders as "long" sales on U.S. exchanges.  As a result, Cormark caused the Executing Broker to mismark sale orders as "long," in violation of Rule 200(g) of Regulation SHO.  Cormark also caused the Executing Broker to be in violation of Reg SHO's locate and delivery requirements.

---

[10] A sale is considered long when the seller owns the security that is being sold prior to the sale. In comparison, a short sale occurs when the seller does not own the shares it is selling and borrows the shares prior to the sale.

177.   Cormark was fined $800,000 for this unlawful conduct which occurred at or about the same time that Cormark was engaged in the unlawful trading activities of Concordia's shares. *See* Securities Exchange Act of 1934 Release No. 90740 / December 21, 2020.

178.   As reflected in the following chart, Cormark sold approximately 322,000 shares short through Canada that it did not have in inventory.  Since Concordia is an Interlisted Security, these shares are fungible and were either executed by ITG or BTIG in the U.S. for Cormark without the public's knowledge. Therefore, these shares could be included in either country's Concordia short volume totals.  A reasonable inference can be drawn that Cormark was engaged in the same or similar conduct in connection with the naked short sales of Concordia's securities as it was in the SEC action set forth above.

### Cormark – Concordia Short Shares

| A | B |
|---|---|
| Date | Shares Sold Short |
| 3/29/2016 | 45,500 |
| 3/30/2016 | 30,000 |
| 3/31/2016 | 34,600 |
| 5/5/2016 | 1,300 |
| 5/6/2016 | 11,700 |
| 6/7/2016 | 199,300 |
|  |  |
| Total | 322,400 |

**Defendants John Doe-Canada and John Doe-U.S.**

179.   During the Relevant Period, John Doe-Canada a/k/a "Anonymous[11]"
engaged in short selling of Concordia's shares.  Upon information and belief, John
Doe-Canada is affiliated with John Doe-U.S.  Since Concordia was an Interlisted
Security, the affiliated John Doe companies, like the other named Naked Short
Selling Defendants, regularly routed orders to buy or sell Concordia shares
between each other for the seamless execution of these fungible shares in both
countries.

180.   As reflected in the following chart, the John Doe-Canada Defendants
sold approximately 2.2 million shares short that they did not have in inventory.
Since Concordia is an Interlisted Security, these shares are fungible and were either
executed by the John Doe-Canada or John Doe-U.S. Defendants without the
public's knowledge.  Therefore, these shares could be included in either country's
Concordia short volume totals.

**[INTENTIONALLY LEFT BLANK]**

---

[11] On the TSX website Member Firm Directory page, reference is made to broker number 001
named "Anonymous".

### John Doe-Canada – Concordia Short Shares

| A | B | | A | B |
|---|---|---|---|---|
| Date | Shares Sold Short | | Date | Shares Sold Short |
| 3/17/2016 | 181,147 | | 5/10/2016 | 20,578 |
| 3/18/2016 | 292,842 | | 5/11/2016 | 1,226 |
| 3/21/2016 | 58,782 | | 5/12/2016 | 66,198 |
| 3/22/2016 | 26,400 | | 5/13/2016 | 28,074 |
| 3/23/2016 | 8,568 | | 6/7/2016 | 16,201 |
| 3/24/2016 | 234,043 | | 6/8/2016 | 158,803 |
| 3/29/2016 | 41,094 | | 6/9/2016 | 49,795 |
| 3/30/2016 | 147,434 | | 6/10/2016 | 24,500 |
| 3/31/2016 | 7,800 | | 6/13/2016 | 88,180 |
| 4/1/2016 | 2,918 | | 6/14/2016 | 20,287 |
| 4/4/2016 | 1,823 | | 6/15/2016 | 41,893 |
| 4/27/2016 | 2,900 | | 6/16/2016 | 129,554 |
| 4/29/2016 | 1,200 | | 6/17/2016 | 38,677 |
| 5/2/2016 | 1,300 | | 6/20/2016 | 13,123 |
| 5/3/2016 | 34,700 | | 6/21/2016 | 13,529 |
| 5/4/2016 | 55,600 | | 6/22/2016 | 59,299 |
| 5/5/2016 | 74,100 | | 6/23/2016 | 38,050 |
| 5/6/2016 | 6,450 | | 6/24/2016 | 90,039 |
| 5/9/2016 | 57,675 | | 6/27/2016 | 96,681 |
| | | | | |
| | | | Total | 2,231,463 |

181.   A strong inference can be drawn from these facts that there was an excessive amount of short selling that can be deemed naked short selling based on an insufficient supply of authorized shares that Concordia issued for public trading. This could only have been accomplished by the unlawful creation of Fictitious

Shares which were injected into the market by the Naked Short Selling Defendants
to increase the supply in support of the naked short selling.

### Scienter – There is Strong Circumstantial Evidence
### Of Defendants' Conscious Misbehavior or Reckless Conduct

182.    The conduct of the Naked Short Selling Defendants did not reflect
inadvertent anomalies, innocent accidents or "one-off" errors.  Rather, the trading
activities of the Naked Short Selling Defendants and their failure to comply with
industry standards of care when viewed collectively constitutes strong
circumstantial evidence that each Naked Short Selling Defendant consciously or
recklessly engaged in unlawful conduct that was intended to deceive Concordia's
investors.

**First**, as registered brokers, each of the Naked Short Selling Defendants
knew or should have known that by continuously and consciously failing to locate,
borrow and deliver authorized Concordia shares by the settlement date of their
naked short sales, they were manipulating the price of Concordia's shares
downward; and

**Second**, as registered brokers, each Naked Short Selling Defendant knew or
should have known that their conduct was an extreme departure from industry
standards of care of the securities industry, including, FINRA Rule 3110 (the
"FINRA Supervision Rule") which required the Naked Short Selling Defendants to

"establish and maintain a system" of supervision that is "reasonably designed to achieve compliance with applicable securities laws and regulations."  This rule requires the Naked Short Selling Defendants' to monitor their internal trading and settlement activities, establish written supervisory procedures, appoint qualified supervisors, and implement reviews at least annually to detect and prevent violations of, and achieve compliance with, the applicable securities laws, regulations, and rules.  Under the FINRA Supervision Rule, the compliance program must include periodic examinations regarding designed to detect and prohibit unlawful trading activities.  FINRA Rule 3120 (the "FINRA Supervisory Control System Rule") reinforces the requirements of the FINRA Supervision Rule by further requiring that firms test and verify that their supervisory procedures are reasonably designed and operated to achieve compliance with the applicable laws, regulations, and rules.

183.   If properly monitored by the Naked Short Selling Defendants, the interrelated nature of these facts and the corresponding supervisory and compliance obligations would have caused Naked Short Selling Defendants to be aware of the violations described herein.  In this context, a strong inference can be drawn that the Naked Short Selling Defendants consciously or recklessly disregarded their legal obligations and turned a blind eye to their unlawful trading conduct in order to avoid having to take any form of internal corrective actions.

### The Naked Short Selling Defendants Used National Securities Exchanges and the Mails to Perpetrate Their Market Manipulation Scheme In Connection With Trading Concordia Shares

184. Each Naked Short Selling Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to purchase and sell Concordia securities.

185. The Naked Short Selling Defendants each knowingly employed devices, schemes, or artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud or deceit upon Concordia and the market.

### Harrington Suffered Damages As A Result Of Naked Short Selling Defendants' Market Manipulation Scheme

186. As a direct and proximate result of the Naked Short Selling Defendants' schemes, devices and manipulative conduct, Harrington has been damaged in an amount that is presently undetermined but believed to exceed tens of millions of dollars. The Naked Short Selling Defendants' scheme was sustained and unrelenting and together with the spoofing scheme caused Concordia's share price to decline during the Relevant Period from $34.77 per share to $1.83 per share. Harrington's damages were caused by the unlawful conduct of the Defendants.

187.   Concordia securities were intended to be traded in an efficient and fair market free of manipulation.  Harrington relied on the assumption that the market was free from manipulation when it sold its Concordia shares and that the market price of these securities was determined by the natural forces of supply and demand rather than the false and misleading information that was secretly injected into the market by the Naked Short Selling Defendants.

188.   By reasons of the foregoing, Harrington seeks to recover damages for the loss that the Naked Short-Selling Defendants' conduct caused it to suffer, by violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.

**C.   Third Claim for Relief for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934 Against CIBC-Canada, CIBC-U.S., TD-Canada, TD-U.S., Merrill-U.S., Merrill-Canada, John Doe-Canada, and John Doe-U.S.**

189.   Plaintiff incorporates by reference paragraphs 1 through 188 as if more fully set forth herein.

190.   The Spoofing Defendants' scheme violated Section 9(a)(2) of the Securities Exchange Act of 1934, which makes it unlawful to engage in "a series of transactions in any security…creating actual or apparent active trading in such a security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

191.   By reason of the conduct described in paragraphs 39 to 159 above, the Spoofing Defendants, their affiliates, subsidiaries, related companies and John Doe entities, directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to affect alone or with one or  more other persons, a series of transactions in Concordia's securities that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others, engaged in the market manipulation strategy of spoofing which artificially affected the prices of Concordia's securities that Harrington sold.

192.   The Spoofing Defendants acted consciously or recklessly to artificially affect the price of Concordia's shares, that Harrington sold during the Relevant Period.

193.   By reason of the foregoing, Spoofing Defendants violated Section 9(a)(2) of the Exchange Act of 1934.

**D.    Fourth Claim For Relief For Unjust Enrichment**

194.   Plaintiff incorporates by reference paragraphs 1 through 193 as if more fully set forth herein.

195.   The Defendants financially benefitted from their unlawful acts.  As alleged herein, the Spoofing Defendants manipulated the market price of Concordia securities during the Relevant Period by intentionally placing orders to

sell that were never intended to be executed in order to signal to the market that Concordia's shares were being sold, at prices that were declining. These sell orders were never intended to be executed and were cancelled after the Spoofing Defendants executed orders to buy Concordia shares at the artificially low prices that they created by their scheme.

196.   The Spoofing Defendants acted consciously or recklessly to manipulate Concordia shares, resulting in the market share price of Concordia to decline and causing Harrington to suffer losses in connection with the sale of its shares during the Relevant Period.

197.   The Naked Short Selling Defendants benefitted from their unlawful acts. As alleged herein, the Naked Short Selling Defendants manipulated the market price of Concordia securities during the Relevant Period by unlawfully naked short selling Concordia shares that they neither had in inventory nor located or borrowed as required by Reg SHO. The unlawful conduct of the Naked Short Selling Defendants injected false and misleading information into the market that interfered with Concordia's share price being determined by the natural forces of supply and demand. The unlawful conduct of the Naked Short Selling Defendants was consciously or recklessly performed.

198.   These unlawful acts caused Harrington to suffer financial injury, by being forced to sell its securities at artificially low prices.

199.   As a result of the Defendants' spoofing and naked short selling activities as set forth herein, it is unjust and inequitable for the Defendants to have enriched themselves in this manner at the expense of Harrington.  Under the facts and circumstances of this case, equity and good conscience require the Defendants to make restitution.

200.   Each Defendant should pay restitution for its own unjust enrichment to Harrington.

## V.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

201.   The applicable statute of limitations relating to the claims alleged herein was tolled because of the Defendants' concerted efforts to conceal their fraudulent scheme to manipulate the market price of Concordia shares and because the U.S. exchanges do not display or identify the broker who is executing the trades.  Defendants knew that their spoofing and abusive naked short selling schemes were unlawful and which, if exposed, would have subjected them to civil liability.  Defendants went to great lengths and expense to design algorithmic trading programs that were used on high frequency trading computer systems to perpetrate their unlawful spoofing and abusive naked short selling schemes.

202.   Harrington had no way of accessing or discovering Defendants' algorithmic computerized trading programs and/or strategies that involved millions of Concordia shares being traded on multiple exchanges in Canada and the U.S.  In

addition, Harrington had no way of discovering the identities of the spoofers and abusive short sellers who trade under a veil of anonymity in the U.S.

203.   Defendants' unlawful market manipulation schemes involved highly technical and voluminous trading activities that occurred under a cloak of secrecy on exchanges that were located in both Canada and the U.S.  Defendants should not be permitted to benefit from committing and concealing their unlawful market manipulation schemes, which caused Harrington to suffer enormous financial damages.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.   Finding that Defendants violated the federal securities laws as alleged in this complaint;

B.   Ordering Defendants to pay damages as a result of their unlawful conduct in an amount to be determined at trial;

C.   Awarding reasonable attorney's fees and costs together with all available pre and post judgment interest; and

D.   Granting such other and further relief as the Court deems just and appropriate.

## VII.    DEMAND FOR JURY DUTY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff

demands trial by jury in this action of all issues so triable.


Dated:  January 27, 2021
        New York, New York

                                          Respectfully submitted,

                                          By:  /s/ Alan M. Pollack
                                                Alan M. Pollack
                                                Felicia S. Ennis
                                                Warshaw Burstein, LLP
                                                575 Lexington Avenue, 7th Floor
                                                New York, New York 10022
                                                Tel: (212) 984-7700
                                                Fax: (212) 956-2164

                                                       and

                                          By:  /s/ James Wes Christian
                                                James Wes Christian
                                                Ardalan Attar
                                                Christian Smith & Jewell, LLP
                                                2302 Fannin, Suite 500
                                                Houston, Texas 77002
                                                Tel: (713) 659-7616