UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,<br><br>                   Plaintiff,<br><br>        - against-<br><br>CIBC WORLD MARKETS CORP., CIBC WORLD MARKETS INC., BOFA SECURITIES, INC., MERRILL LYNCH CANADA INC., MERRILL LYNCH PROFESSIONAL CLEARING CORP., TD SECURITIES, INC., TD SECURITIES(USA) LLC, UBS FINANCIAL SERVICES, INC., UBS SECURITIES CANADA, INC., SOCIETE GENERALE CAPITALE CANADA, INC., SG AMERICAS SECURITIES, LLC, and JOHN DOES 1 THROUGH 10.<br><br>              Defendants. | Civil Action: 21-cv-00761 (LGS)<br><br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Harrington Global Opportunity Fund Limited ("Harrington"), by and through its undersigned attorneys, Warshaw Burstein, LLP and Christian Smith and Jewell LLP, as and for its complaint against CIBC World Markets Corp. ("CIBC-U.S."),  CIBC World Markets, Inc. ("CIBC-Canada"), BOFA Securities, Inc. ("Merrill-U.S."), Merrill Lynch Canada, Inc. ("ML-Canada"), Merrill Lynch Professional Clearing Corp. ("MLPro"), TD Securities, Inc. ("TD-Canada"), TD Securities (USA) LLC ("TD-U.S."), UBS Financial Services, Inc. ("UBS-U.S."), UBS Securities Canada, Inc. ("UBS-Canada"), Société Générale Capitale Canada, Inc. ("SocGen-Canada"), SG Americas Securities, LLC ("SocGen-U.S."), and John Does 1 through 10 ("John Doe-Canada," "John Doe-U.S.") (collectively referred to as "Defendants"), alleges upon personal knowledge, information and belief, and an investigation by counsel as follows:

## I.   <u>SUMMARY OF CLAIMS</u>

1.     This case arises from Defendants' market manipulation scheme involving spoofing and abusive short selling that caused Harrington to lose millions of dollars in connection with its sale of approximately 4.8 million shares of Concordia International Corp. ("Concordia" or the "Company") stock that were sold on U.S. Exchanges, including the National Association of Securities Dealers Automated Quotations Exchange ("NASDAQ"), and approximately 4.1 million

shares of Concordia stock that were sold on the Canadian exchanges, including the Toronto Stock Exchange ("TSX") during the period January 27, 2016 to November 15, 2016 ("Relevant Period").  Defendants' spoofing and abusive short selling schemes were complementary forms of unlawful market manipulation.  Each U.S. Defendant entered into a conspiracy with their Affiliated Canadian Counterpart to manipulate the market price of Concordia's shares.  The fraudulent overt acts of spoofing and short selling that were committed on the Canadian exchanges were intended to and had a direct impact on the trading of Concordia's shares on the U.S. exchanges.  The spoofing and short selling schemes both injected false and misleading pricing information into the market that was intended to drive Concordia's share price downward on the exchanges in both countries.

2.     Throughout the Relevant Period, the Defendants engaged in constant and unrelenting spoofing and abusive short selling which put enormous downward pressure on Concordia's shares.  Defendants' pressure interfered with the natural forces of supply and demand and drove Concordia's share price downward in steady increments from $28.03 to $3.13, in violation of Section 10(b) and Rule 10b-5 and Section 9(a)(2) of the Securities Exchange Act of 1934.  Defendants also conspired to commit a fraud in the U.S. and took steps in furtherance of the conspiracy in New York.

3.     Defendants' fraudulent activity directly and proximately caused losses to Harrington, when it sold Concordia stock on U.S. exchanges at artificially depressed prices into the market that Defendants were actively manipulating downward.

**Spoofing Scheme**

4.     Spoofing is an insidious form of market manipulation that can profoundly undermine the integrity and stability of securities markets by artificially moving the market price of a security either upwards or downwards.  A spoofing scheme is executed by brokers who utilize high frequency trading computer systems that operate algorithmic trading programs to maximize the speed of their market access and execution of their trading strategies.  Spoofing is accomplished by simultaneously placing hundreds or thousands of orders, known as "Baiting Orders," into the Market Order Book[1] that are not intended to be executed and have no legitimate economic purpose.  These orders are entered into the Market Order Book to create an illusion of market interest that is intended to

---

[1]  A "Market Order Book" is an electronic list of buy and sell orders for specific securities and other financial instruments that is organized by price levels and lists the number of shares being bid or offered at each price point.  The Market Order Book reflects whether the market price for the security is moving upwards or downwards and is visible to every trader on the exchange.  *See* Investopedia, Order Book.

generate a response from other market participants to follow either the selling or buying trend that the manipulation has created.

5.     If the spoofer's goal is to drive the price down, the spoofer enters Baiting Orders to sell, which are intended to "bait" or "trick" investors into entering their own sell orders to minimize or avoid suffering losses in a downward trending market.  At the same time that the spoofer places the Baiting Orders to sell, the spoofer places orders to buy on the opposite side of the Market Order Book, known as "Executing Orders."  These orders to buy are intended to be executed at the manipulated prices generated by the Baiting Orders to sell. Immediately after placing an Executing Order to buy in the Market Order Book, the spoofer cancels all of the Baiting Orders to sell, which completes the spoofing cycle.  This scheme can be used multiple times during a trading day, and then continuously repeated throughout a protracted trading period.

6.     Concordia's shares were registered and traded as "Interlisted Securities" on exchanges in the United States, including NASDAQ and in Canada, including the TSX.  An Interlisted Security is a security that is listed on multiple stock exchanges, usually in a company's home country and one or more additional countries.  When orders are entered and/or executed in one country, it has a direct and simultaneous impact on the Market Order Book price in the other country.

7.     To ensure that their spoofing scheme in the United States was successful,  Defendants CIBC-U.S., TD-U.S., Merrill-U.S., and John Doe-U.S. ("the U.S. Spoofing Defendants" or "U.S. Affiliated Counterparts") conspired with CIBC-Canada, TD-Canada, Merrill-Canada, and John Doe-Canada ("the Canadian Spoofing Defendants" or "Canadian Affiliated Counterparts") (collectively, the "Spoofing Defendants"), to place on U.S. and Canadian exchanges thousands of Baiting Orders to sell Concordia shares.[2]  These Baiting Orders to sell were placed on exchanges in both the United States and Canada simultaneously in order to keep the manipulated Market Order Books aligned and avoid orders being routed to an unmanipulated Market Order Book.

8.     Each spoofing event had a small negative impact on the price of Concordia's shares.  However, the persistent and relentless placement and cancellation of Baiting Orders to sell virtually "all day, every day" throughout the

---

[2] Harrington is seeking damages that it suffered in connection with the sale of its Concordia shares on the U.S. exchanges. Although Harrington has referenced the Affiliated Canadian Counterpart companies of the Defendants, it is not seeking to extend the territorial reach of section 10(b) or 9(a) of the 1934 Exchange Act to transactions that occurred on the Canadian exchanges.  The foreign affiliated companies are referenced in this complaint as co-conspirators whose foreign conduct was in furtherance of a conspiracy that had a direct impact on the price of Concordia's Interlisted Securities on the U.S. exchanges and the damages that Harrington sustained in connection with the sale of its approximately 4.9 million shares on the U.S. exchanges.  The U.S. Defendants collaboration with their Affiliated Canadian Counterparts reflected their conscious misbehavior and recklessness.

Relevant Period had the cumulative effect together with abusive short selling of driving Concordia's share price down from $28.03 to $3.13.

**Abusive Short Selling Scheme**

9.      As the U.S. Spoofing Defendants and their Canadian Affiliated Counterparts perpetrated their scheme to drive the price of Concordia's stock downward, it was a signal that triggered a massive sell-off of Concordia shares throughout the Relevant Period on the U.S. exchanges.  This sell-off resulted in excessive and abusive short selling by various brokers which included Defendants UBS-U.S., UBS-Canada, Merrill-U.S., Merrill-Canada, MLPro, SocGen-U.S., SocGen-Canada, John Doe-U.S. and John Doe-Canada (the "Short Selling Defendants"), which far exceeded the number of shares that were available to borrow.  This violated the basic principles of Regulation SHO ,17 C.F.R. § 242, 200 ("Reg SHO").  During the Relevant Period, but for the spoofing and abusive short-selling schemes and the massive sell-offs caused by the schemes, shareholders, like Harrington— who were unaware of these schemes and sold their shares into the manipulated market— would not have suffered damages from the sale of its Concordia shares on the U.S. exchanges.

10.     Abusive "naked" short selling is, according to the Securities and Exchange Commission ("SEC"), an unlawful form of short selling[3] where the short seller does not borrow shares prior to the short sale and fails to deliver ("FTD") any shares on the settlement date to the purchaser[4]  Reg SHO was promulgated by the SEC to prevent brokers from executing short sale orders without possessing or having a reasonable basis to believe that they are able to locate and borrow shares to make timely delivery by the settlement date of the short sale.  Instead, the abusive or naked short sale results in the electronic creation of a what is commonly referred to as "fictitious," "phantom," or "counterfeit" shares ("Fictitious Shares"). Irrespective of their title, these shares are unauthorized and were never issued by the company for trading but appear to the market as authorized shares.  By creating and selling Fictitious Shares, the abusive or naked short seller injects into the market false and misleading information concerning the fake supply of a

---

[3] Short selling is a lawful trading strategy.  In a short sale, the investor anticipates that the price of a security that they do not own is trending downward.  Therefore, the short seller borrows shares, generally from a broker, and sells them into market.  Thereafter, the short seller purchases shares in the market, hopefully at a lower price, to return the borrowed shares.  The short seller's profit or loss is the difference between the price at which the short seller sold the borrowed shares and the price at which they paid for the replacement shares, net of brokerage fees.

[4] The settlement of a trade occurs when there is an exchange of cash and securities between the purchaser and seller. In the event the trade does not settle, an FTD is created until such time as the securities are delivered.

company's shares that appear available for trading. This interferes with the natural market forces of supply and demand, driving the price of the shares downward.

11.    During the Relevant Period, on the U.S. exchanges there were approximately 236 million Concordia shares sold and approximately 134 million of these shares were sold short, despite there only being approximately 40 million shares to be traded.  This trading data indicates that either the turnover rate of the authorized 40 million shares was approximately 300% of the 134 million shares sold short, which was highly unlikely or unauthorized shares were manufactured and sold short, which is highly probable.  Stated differently, this would have required the short sellers to borrow over three times the number of shares that existed.

12.    On 161 out of 205 trading days during the Relevant Period, excessive short selling occurred on U.S. exchanges.  On each trading day the percentage of shares that were sold short, compared with all shares that were sold, was between 50.45% and 89.76%.  This far exceeded the industry average of 20% to 25%.  A strong inference can be drawn that the majority of the approximately 134 million shares that were sold short on U.S. exchanges, included millions of Fictitious Shares that the Short Selling Defendants unlawfully manufactured without the authorization of Concordia.

13.     The objective of the Spoofing Defendants was to drive the price of Concordia shares downward which sent a market signal that triggered the Short Selling Defendants to sell fictitious shares into the market, thereby creating the illusion of increased supply which drove the price of Concordia's shares even further downward.  The spoofing and short selling schemes were complementary forms of market manipulation that together drove the price down further than either scheme separately would have during the Relevant Period, when Harrington sold its shares on the U.S. exchanges.  Defendants' spoofing and abusive short selling schemes caused Harrington to lose millions of dollars in connection with the sale of its Concordia shares.

14.     The following table reflects the timeframe during the Relevant Period from August 1, 2016 to November 15, 2016 when Harrington was actively selling its Concordia shares on U.S. Exchanges.  This table reflects the coordinated effect that the spoofing and short selling schemes had on the price of Concordia shares during this same period.  As reflected in this table, during the period August 1, 2016 to November 15, 2016, the large price declines occurred on days with high trading volumes and high percentages of abusive shorting and spoofing.  During this period, there were constant and consistent decreases in the closing price of Concordia's shares that were directly connected to and caused by a combination of the unlawful short-selling and spoofing schemes.  As an example, on August 12,

2016, the trading volume of Concordia shares was 11,078,542, the short volume

percentage was 49%, and the spoofing volume percentage was 34.45% of those

shares.  This caused a 38% price decline from $16.36 to $10.13 per share.

| Trade Date | Total Volume | Short Volume | Short Percentage of Total Volume | 15-minute Post-Spoof Volume | 15-Minute Post-Spoof Percentage of Total Volume | Harrington Shares Sold | Closing Price |
|---|---|---|---|---|---|---|---|
| 8/1/2016 | 148,573 | 53,887 | 36.27% | 0 | 0.00% | | 17.14 |
| 8/2/2016 | 1,626,107 | 1,085,162 | 66.73% | 656,555 | 40.38% | | 14.45 |
| 8/3/2016 | 481,499 | 281,238 | 58.41% | 127,142 | 26.41% | | 14.79 |
| 8/4/2016 | 421,010 | 188,278 | 44.72% | 34,059 | 8.09% | | 15.01 |
| 8/5/2016 | 326,876 | 203,038 | 62.11% | 78,231 | 23.93% | | 16.41 |
| 8/8/2016 | 473,640 | 315,852 | 66.69% | 172,096 | 36.33% | | 16.55 |
| 8/9/2016 | 541,078 | 295,966 | 54.70% | 70,300 | 12.99% | | 17.05 |
| 8/10/2016 | 535,402 | 293,936 | 54.90% | 177,544 | 33.16% | | 17.01 |
| 8/11/2016 | 972,514 | 591,416 | 60.81% | 49,252 | 5.06% | | 16.36 |
| 8/12/2016 | 11,078,542 | 5,428,541 | 49.00% | 3,816,902 | 34.45% | 100,000 | 10.13 |
| 8/15/2016 | 6,164,517 | 3,160,843 | 51.27% | 1,849,472 | 30.00% | 650,000 | 9.37 |
| 8/16/2016 | 1,426,568 | 773,778 | 54.24% | 129,708 | 9.09% | | 9.29 |
| 8/17/2016 | 2,766,361 | 1,402,458 | 50.70% | 827,149 | 29.90% | 408,000 | 9.35 |
| 8/18/2016 | 1,276,751 | 559,545 | 43.83% | 204,778 | 16.04% | | 9.54 |
| 8/19/2016 | 580,460 | 462,465 | 79.67% | 80,904 | 13.94% | | 9.20 |
| 8/22/2016 | 617,200 | 323,307 | 52.38% | 37,725 | 6.11% | | 9.07 |
| 8/23/2016 | 1,099,873 | 699,633 | 63.61% | 46,954 | 4.27% | | 8.95 |
| 8/24/2016 | 1,988,540 | 1,591,373 | 80.03% | 623,764 | 31.37% | | 8.91 |
| 8/25/2016 | 1,423,524 | 666,891 | 46.85% | 168,609 | 11.84% | 350,000 | 8.93 |
| 8/26/2016 | 611,429 | 372,328 | 60.89% | 21,340 | 3.49% | 31,300 | 8.84 |
| 8/29/2016 | 549,318 | 358,976 | 65.35% | 147,778 | 26.90% | | 8.99 |
| 8/30/2016 | 762,990 | 387,352 | 50.77% | 20,506 | 2.69% | 147,70) | 8.96 |
| 8/31/2016 | 507,753 | 371,205 | 73.11% | 23,864 | 4.70% | 2,400 | 8.71 |
| 9/1/2016 | 685,847 | 496,560 | 72.40% | 33,870 | 4.94% | | 8.43 |
| 9/2/2016 | 964,501 | 666,252 | 69.08% | 191,197 | 19.82% | | 8.18 |
| 9/6/2016 | 820,071 | 604,526 | 73.72% | 29,344 | 3.58% | | 7.98 |
| 9/7/2016 | 917,355 | 602,553 | 65.68% | 76,179 | 8.30% | | 7.86 |
| 9/8/2016 | 608,442 | 355,327 | 58.40% | 10,112 | 1.66% | | 7.72 |
| 9/9/2016 | 1,449,316 | 967,351 | 66.75% | 150,397 | 10.38% | | 7.30 |
| 9/12/2016 | 854,710 | 681,449 | 79.73% | 144,054 | 16.85% | | 7.14 |
| 9/13/2016 | 1,882,635 | 1,182,428 | 62.81% | 357,082 | 18.97% | 200,000 | 6.49 |
| 9/14/2016 | 1,392,283 | 855,801 | 61.47% | 405,575 | 29.13% | | 6.93 |
| 9/15/2016 | 1,628,961 | 1,202,382 | 73.81% | 138,894 | 8.53% | | 6.61 |

| 9/16/2016 | 6,909,046 | 4,176,425 | 60.45% | 1,984,755 | 28.73% | | 5.40 |
| 9/19/2016 | 1,486,086 | 845,045 | 56.86% | 211,947 | 14.26% | | 5.11 |
| 9/20/2016 | 1,139,257 | 714,129 | 62.68% | 207,936 | 18.25% | | 5.12 |
| 9/21/2016 | 2,267,009 | 1,575,495 | 69.50% | 303,979 | 13.41% | | 4.50 |
| 9/22/2016 | 1,748,980 | 1,028,236 | 58.79% | 310,276 | 17.74% | 45,947 | 4.93 |
| 9/23/2016 | 1,577,900 | 1,030,543 | 65.31% | 393,940 | 24.97% | | 5.33 |
| 9/26/2016 | 1,749,452 | 1,243,255 | 71.07% | 195,890 | 11.20% | | 4.98 |
| 9/27/2016 | 1,681,379 | 960,484 | 57.12% | 95,182 | 5.66% | 276,200 | 4.83 |
| 9/28/2016 | 1,009,297 | 688,237 | 68.19% | 99,937 | 9.90% | | 4.76 |
| 9/29/2016 | 1,283,863 | 779,169 | 60.69% | 59,908 | 4.67% | 90,620 | 4.54 |
| 9/30/2016 | 1,462,717 | 975,851 | 66.71% | 178,103 | 12.18% | | 4.48 |
| 10/3/2016 | 4,761,050 | 2,634,280 | 55.33% | 988,394 | 20.76% | | 5.17 |
| 10/4/2016 | 3,250,785 | 2,217,236 | 68.21% | 168,578 | 5.19% | | 4.51 |
| 10/5/2016 | 931,026 | 683,881 | 73.45% | 48,509 | 5.21% | | 4.62 |
| 10/6/2016 | 1,519,627 | 1,012,975 | 66.66% | 382,880 | 25.20% | 81,400 | 4.75 |
| 10/7/2016 | 959,542 | 606,247 | 63.18% | 0 | 0.00% | | 4.53 |
| 10/10/2016 | 656,733 | 364,838 | 55.55% | 25,502 | 3.88% | | 4.50 |
| 10/11/2016 | 778,473 | 520,508 | 66.86% | 115,196 | 14.80% | 3,950 | 4.31 |
| 10/12/2016 | 811,122 | 487,280 | 60.07% | 161,649 | 19.93% | | 4.31 |
| 10/13/2016 | 1,723,318 | 987,678 | 57.31% | 102,992 | 5.98% | | 4.04 |
| 10/14/2016 | 2,085,510 | 1,346,543 | 64.57% | 165,694 | 7.95% | | 3.67 |
| 10/17/2016 | 1,337,352 | 959,222 | 71.73% | 259,802 | 19.43% | | 3.55 |
| 10/18/2016 | 1,143,896 | 713,783 | 62.40% | 202,326 | 17.69% | | 3.66 |
| 10/19/2016 | 839,925 | 620,129 | 73.83% | 59,391 | 7.07% | | 3.56 |
| 10/20/2016 | 2,202,564 | 1,367,955 | 62.11% | 270,879 | 12.30% | | 3.97 |
| 10/21/2016 | 21,542,736 | 12,633,197 | 58.64% | 6,522,290 | 30.28% | 80,049 | 4.48 |
| 10/24/2016 | 2,458,368 | 1,543,948 | 62.80% | 469,507 | 19.10% | 15,100 | 4.23 |
| 10/25/2016 | 2,591,115 | 1,986,556 | 76.67% | 450,243 | 17.38% | | 3.86 |
| 10/26/2016 | 1,003,807 | 587,291 | 58.51% | 105,319 | 10.49% | | 3.89 |
| 10/27/2016 | 1,338,225 | 639,331 | 47.77% | 0 | 0.00% | 318,350 | 3.66 |
| 10/28/2016 | 1,196,730 | 853,451 | 71.32% | 0 | 0.00% | | 3.59 |
| 10/31/2016 | 1,236,529 | 944,562 | 76.39% | 49,264 | 3.98% | 21,000 | 3.41 |
| 11/1/2016 | 1,616,075 | 1,049,732 | 64.96% | 186,800 | 11.56% | | 3.37 |
| 11/2/2016 | 2,569,498 | 1,592,961 | 62.00% | 502,134 | 19.54% | 180,000 | 3.45 |
| 11/3/2016 | 1,304,703 | 946,795 | 72.57% | 147,943 | 11.34% | 32,500 | 3.27 |
| 11/4/2016 | 1,344,613 | 941,336 | 70.01% | 163,344 | 12.15% | 20,900 | 3.19 |
| 11/7/2016 | 17,268,858 | 5,048,497 | 29.23% | 1,227,199 | 7.11% | 1,413,147 | 2.03 |
| 11/8/2016 | 4,642,853 | 2,735,461 | 58.92% | 379,266 | 8.17% | 216,732 | 1.83 |
| 11/9/2016 | 2,885,560 | 932,826 | 32.33% | 225,240 | 7.81% | | 1.99 |
| 11/10/2016 | 2,859,690 | 1,113,172 | 38.93% | 170,645 | 5.97% | 71,000 | 2.25 |
| 11/11/2016 | 7,020,105 | 3,957,651 | 56.38% | 1,406,000 | 20.03% | 50,000 | 2.83 |
| 11/14/2016 | 6,209,387 | 3,271,091 | 52.68% | 1,280,524 | 20.62% | 35,000 | 3.50 |
| 11/15/2016 | 3,455,245 | 1,991,874 | 57.65% | 478,021 | 13.83% | | 3.13 |

15.     The continuous placement and cancellation of Baiting Orders to sell and the creation and use of unauthorized Fictitious Shares to facilitate short selling throughout the Relevant Period on both the Canadian and U.S. exchanges, caused Concordia's market share price to decline.  Both of these unlawful schemes injected false and misleading information into the marketplace that interfered with the natural forces of supply and demand and drove the price of Concordia's shares downward while Harrington was selling its Concordia shares on U.S. exchanges. But for these unlawful schemes, the sale of Concordia's shares would not have occurred at manipulated lower prices.

## II.     <u>JURISDICTION AND VENUE</u>

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]; and [28 U.S.C. § 1331].  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because this claim is so related to the federal claims that it forms part of the same case or controversy.

17.     This court has personal jurisdiction over each Defendant.  Each Defendant either maintained its business offices and conducted a substantial part of the events asserted in this complaint in this District, directed its fraudulent activity into this market by manipulating Concordia stock on the NASDAQ exchange and/or conspired with Defendants located in the District to commit fraud.

Defendants manipulated, or conspired to manipulate, Concordia's share price on the NASDAQ, which is located in this District.  The Canadian Spoofing and Short Selling Defendants manipulated the price at which Concordia stock traded on a domestic exchange, NASDAQ, and additionally, they conspired with the U.S. Spoofing and Short Selling Defendants in this District. The unlawful acts committed by the Canadian Spoofing and Short Selling Defendants had a direct and substantial impact on the market price of Concordia shares that were traded in this District in the United States.  Each Defendant reported false and misleading information in this District, or conspired to do so, facilitating the short selling that caused Concordia's market share price to decline and caused Harrington financial loss during the Relevant Period.

18.    Specific personal jurisdiction of the Canadian Spoofing and Short-Selling Defendants is premised on their participation in a conspiracy with the U.S. Defendants in the United States to manipulate the market price of Concordia's Interlisted Securities.  The conduct of the Canadian Spoofing and Short-Selling Defendants on the Canadian exchanges was part of the fraudulent conspiracy and was intended to and had a direct impact on the market price of Concordia's Interlisted Securities that were also traded on the U.S. exchanges.  The Canadian Defendants overt acts in furtherance of the conspiracy with their affiliated counterparts in the United States were sufficient that they should have reasonably

anticipated being hauled into court in New York as co-conspirators in this jurisdiction.

19.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, in that many of the acts, transactions and occurrences alleged herein occurred in this District, and all of the Defendants conducted business here, or conspired with those that did, in connection with the events described herein.  Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce including the mails and the facility of a national securities exchange in connection with the conduct alleged herein.  Where claims involve securities listed or traded on domestic stock exchanges, Section 27 of the Exchange Act provides for personal jurisdiction over those parties who trade on these exchanges.

### III.     THE PARTIES

**A.     Plaintiff**

20.     Plaintiff Harrington is a Bermuda based investment company that is wholly owned by its unit holders.  It is managed by Harrington Global Limited ("HGL"), a fund management company.  During the Relevant Period, Harrington sold approximately 4.9 million shares of Concordia on the U.S. markets and approximately 4.1 million shares on the Canadian markets.

**B.**   **Defendants** [5]

**(a)**   **CIBC Defendants**

21.    Defendant CIBC-U.S.  maintains its principal place of business in New York at 425 Lexington Ave., New York, New York.  CIBC-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

22.    Defendant CIBC-Canada is headquartered at 161 Bay Street, Toronto, Ontario, Canada. CIBC-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada, including the TSX, for its own proprietary account and the accounts of its customers.

23.    Defendants CIBC-U.S. and CIBC-Canada conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

---

[5] Whenever reference is made to any act, device, contrivance, or scheme to manipulate Concordia securities by any of the Defendants, the allegation is intended to also include the subsidiaries, affiliates, sister companies, agents and representatives of that Defendant, whose identities and specific involvement in this market manipulation case are unknown by Harrington at this time. Only after discovery is taken will their identities and involvement become known.

**(b)** **Merrill Defendants**

24.     Defendant Merrill-U.S. is formerly known as Bank of America Merrill Lynch and maintains its principal place of business in New York at One Bryant Park, New York, New York.  Merrill-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S., including NASDAQ, for its own proprietary account and the accounts of its customers.

25.     Defendant MLPro maintains its principal place of business in New York at 222 Broadway, 6th Floor, New York, NY.  MLPro is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

26.     Defendant ML-Canada has its headquarters located at 181 Bay Street, Toronto, Ontario, Canada.  ML-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

27.     Defendants Merrill-U.S., Merrill-Canada and MLPro conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

**(c)      TD Defendants**

28.      Defendant TD-U.S. maintains its principal place of business in New York at 31 W 52nd Street, New York, NY.  TD-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

29.      Defendant TD-Canada is located at 66 Wellington Street West Toronto, Ontario, Canada.  TD-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

30.      Defendants TD-Canada and TD-U.S. conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

**(d)      UBS Defendants**

31.      Defendant UBS-U.S. maintains its principal place of business in New York at 1285 Avenue of the Americas, New York, NY.  UBS-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

32.     Defendant UBS-Canada has its headquarters at 154 University Avenue Toronto, Ontario, Canada.  UBS-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

33.     Defendants UBS-U.S. and UBS-Canada conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

### (e)     **SocGen Defendants**

34.     Defendant SocGen-U.S.  maintains its principal place of business in New York at 245 Park Avenue, New York, NY.  SocGen-U.S.  is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

35.     Defendant SocGen-Canada is located at 130 King Street West, Suite 2200, Toronto, Ontario, Canada.  SocGen-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

36.     Defendants SocGen-Canada and SocGen-U.S. conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

### (f)     John Doe Defendants

37.     Defendants John Doe-Canada and John Doe-U.S. are entities, including market makers, subsidiaries, affiliates, and sister companies of the Defendants, and Defendants' customers, whose identities are currently unknown, that unlawfully participated in the scheme to manipulate the trading and market price of Concordia securities.

38.     Defendants John Doe-Canada and John Doe-U.S. conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

C.     **Non-Party**[6]

39.     Concordia, currently trading as under the name ADVANZ Pharma, is a diverse healthcare company, focused on legacy pharmaceutical products and orphan drugs. Concordia was incorporated in 2005 under the laws of Ontario, Canada.  Concordia started trading on the TSX exchange in 2013 and NASDAQ in 2015.  The Company has marketed its portfolio of products in 100 countries including the United States and Canada.  During the Relevant Period, the Company had approximately 51 million shares issued and outstanding, with approximately 40 million of those shares authorized for interlisted public trading.

40.     Since 2015, Concordia has been an Interlisted Security with its shares listed and traded on both the TSX in Canada and NASDAQ in the United States. The trading of Interlisted Securities, like Concordia, is facilitated by means of a security identifier known as a CUSIP (Committee on Uniform Securities Identification).  Concordia's CUSIP was 20653P102.  Trades on both the Canadian and U.S. exchanges are electronically executed and settled through the CUSIP number of the security.  A share of Concordia's stock that is traded in the United States is exactly the same share that is traded in Canada.  Because shares of

---

[6] Although Concordia was the primary target of the Defendants market manipulation schemes, this case does not seek damages on its behalf for trading that occurred on either Canadian or U.S. exchanges.  By manipulating the market price of Concordia on both the Canadian and U.S. exchanges, Defendants schemes caused Harrington to suffer injury in connection with the sale of its Concordia shares on the U.S. exchanges.

Interlisted Securities, like Concordia, have identical CUSIP numbers and are fungible in Canada and the United States, they are netted out in the cross-border settlement process.  Purchasers and sellers of Interlisted Securities, unless specifically requested, have no control over where their orders are routed and executed, or whether they are acquiring inventory from the United States or Canada. As a result of the seamless interconnection between the Canadian and U.S. markets for Interlisted Securities, trades in either country's market affects trading in the other country's market.

## IV.    <u>INVESTIGATION OF MARKET MANIPULATION CLAIMS</u>

41.     In April 2016, based on negative social media postings that appeared related to Concordia's price volatility, Harrington requested the Investment Industry Regulatory Organization of Canada ("IIROC")[7] commence an investigation of whether Concordia's share price was being manipulated on the Canadian exchanges.  At this time, Harrington also retained a former British Columbia securities commissioner as a consultant to investigate the cause of Concordia's share price volatility.

---

[7] The Investment Industry Regulatory Organization of Canada is a non-profit, national self-regulatory organization. Established through the merger of the Investment Dealers Association of Canada and Market Regulation Services Inc. on June 1, 2008, IIROC oversees all investment dealers and trading activity on debt and equity markets in Canada.

42.     During its investigation, IIROC provided Harrington in September 2016 with Trade Order and Quote Reports ("TOQ Reports")[8] containing certain trading data with "masked" Trade Desk IDs; and in March 2017, IIROC delivered to Harrington TOQ reports with some Trade Desk IDs "unmasked". This data was limited to and focused on trading activities on Canadian exchanges.

43.     As part of IIROC's investigation of the cross-border trading activities of Concordia's Interlisted Securities, IIROC also sent a request to the Financial Industry Regulatory Authority ("FINRA")[9], seeking the production of documents concerning brokerage companies in the United States that were affiliated with Canadian brokers, that were also executing Concordia trades on U.S. exchanges. In February 2017, FINRA objected to IIROC's request for information on the grounds that the disclosure would violate the confidentiality of its members and would violate its regulatory objectives and therefor produce the requested information.

---

[8] TOQ Reports detail the type of trading activity, when the activity occurred, and the investment dealer that initiated the activity known as Trade Desk ID. The TOQ Report may also identify clients by Client ID, but Client IDs are not mandatory data provided by investor dealers.

[9] FINRA is a private American corporation that acts as a self-regulatory organization which regulates member brokerage firms and exchange markets. FINRA is the successor to the National Association of Securities Dealers, Inc. as well as the member regulation, enforcement, and arbitration operations of the New York Stock Exchange. The US government agency which acts as the ultimate regulator of the US securities industry, including FINRA, is the US Securities and Exchange Commission.

44.    In March 2017, IIROC reported to Harrington that it had completed its investigation and was closing its file based on its failure to discover sufficient evidence that Concordia's share price had been manipulated on Canadian exchanges.  The former British Columbia securities commissioner also concluded his investigation because he did not have sufficient data to conduct a proper and thorough analysis.

45.    Harrington remained undeterred and continued to pursue information to determine whether Concordia's stock price had been manipulated. In the spring of 2017, Harrington retained the Bates Group, LLC, a financial services consulting firm that conducts regulatory and internal investigations concerning market activities that involve data analysis.  Based on the analysis by the Bates Group, sometime in the Fall of 2017, Harrington re-approached IIROC and attempted to obtain additional information and was denied.

46.    In January 2018, Harrington filed in the Ontario Superior Court of Justice an application for Norwich Relief[10] against IIROC to obtain information it possessed concerning Concordia's trading including the Trade Desk IDs, the

---

[10] A Norwich Pharmacal Order ("NPO"), also known as a third-party disclosure order, is an equitable form of relief granted (only where necessary) by the court requiring a respondent to disclose certain documents or information to an applicant. Typically, with an NPO, the applicant knows that wrongdoing has occurred, but cannot identify the wrongdoer, but can identify a third party with relevant information. An NPO can be granted before proceedings, during proceedings or post-judgment.

names of the brokers and the clients, that had not been provided previously.  This application was denied on December 31, 2018, but the Court rejected IIROC's argument that Harrington did not have a potential claim for market manipulation.

47.     In the immediate ensuing months thereafter, Harrington continued its extensive search for alternative ways of discovering whether Concordia's stock had been manipulated on the Canadian and U.S. exchanges and the identity of the parties who were responsible for the manipulation.

48.     Harrington ultimately located, interviewed and, in July 2019, engaged the services of the firm Urvin.ai ("Urvin") to investigate whether Concordia's share price had been manipulated and if it had been, the identities of the manipulators.

49.     Urvin is a consulting firm that specializes in stock market investigations including high frequency trading, and designs software and systems that help compliance departments concerning market manipulation schemes. Urvin employs machine learning and artificial intelligence experts who consult with the SEC and CFTC to design rules and regulations that will prevent manipulation through advanced high frequency trading algorithms.

50.     In order to determine whether Concordia's stock had been manipulated, Urvin had to design and create its own "Pattern Recognition Analysis Program", which included complex mathematical modeling, in order to search for

market manipulation patterns and the identity of traders who may have been conducting the market manipulation on U.S. exchanges.

51.    Urvin's Pattern Recognition Analysis Program was specifically developed to analyze the trading activities of Concordia.  Urvin's program was able to analyze multiple gigabytes of exchange trading data that it purchased to recreate Concordia's historical Market Order Books of the Relevant Period in both Canada and the U.S.  No other consultant that Harrington was aware of or dealt with possessed skills, had knowledge and technical expertise to analyze the voluminous and technical cross border trading activities of Concordia's Interlisted Securities.

52.    Urvin completed its analysis of the gigabytes of trading data in May 2020, and identified for the first time, the nature and scope of the market manipulation schemes of Concordia's Interlisted Securities and the identities of the manipulators on both Canadian and U.S. markets.  It was only after Urvin completed its analysis of the voluminous and highly technical trading data of Concordia for both the U.S. and Canadian exchanges (which IIROC and FINRA had previously refused to provide) that Harrington at the earliest had sufficient information to file this complaint against the Defendants and plead with the required specificity and particularity the market manipulation claims being asserted in this case.

## V.    CLAIMS FOR RELIEF

**A.    First Claim for Relief for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder Against CIBC-Canada, CIBC-U.S., TD-Canada, TD-U.S., Merrill-U.S., Merrill-Canada, John Doe-Canada, and John Doe-U.S.**

53.    Plaintiff incorporates by reference paragraphs 1 through 52 as if more fully set forth herein.

54.    During the Relevant Period, the U.S. and Canadian Spoofing Defendants, engaged in and employed devices, schemes, illegal acts, practices, and a course of conduct, that were intended to manipulate the market price of Concordia shares which were listed and traded on both the NASDAQ and TSX exchanges.

### The Nature, Purpose, and Effect of Defendants' Spoofing Scheme

55.    Spoofing is a form of market manipulation that can profoundly undermine the integrity and stability of securities markets.  Spoofing rests on three well established economic principles and assumptions; increased supply decreases prices and increased demand increases prices; a security's share price accurately reflects the security's value; and the Market Order Book reflects legitimate trading interest.  Spoofing occurs when a broker through algorithmic high frequency trading creates an illusion of excess supply or demand by placing, cancelling, and

executing Baiting and Execution Orders that are intended to move the market price of that security either upward or downward.

56.     The spoofing scheme perpetrated by the U.S. and Canadian Spoofing Defendants was intended to drive Concordia's market price downward in order to purchase Concordia shares at lower prices.  This scheme was accomplished through the following three stages:

(a)     First, the U.S. and Canadian Spoofing Defendants flooded the markets with large quantities of Baiting Orders to sell.  These orders had no legitimate purpose and when placed, were not intended to be executed.  The sole purpose for the placement of these Baiting Orders to sell was to deceive and mislead market participants into believing that the market price of Concordia's securities was moving downward;

(b)     Second, at the same time that the Baiting Orders to sell were placed in the Market Order Book, the U.S. and Canadian Spoofing Defendants also placed their Executing Orders on the opposite side of the Market Order Book to purchase Concordia shares at the lower stock prices created by the downward manipulation of their Baiting Orders to sell; and

(c)     Third, immediately after the completion of their Executing Orders to buy Concordia shares at the lower prices, the U.S. and Canadian

Spoofing Defendants cancelled and removed all of their Baiting Orders to sell from the Market Order Book.

57.     Once the three stages of this spoofing cycle were completed, the pattern was repeated by the U.S. and Canadian Spoofing Defendants multiple times a day and continuously throughout the Relevant Period.

58.     The continuous placement and cancellation of Baiting Orders to sell by the U.S. and Canadian Spoofing Defendants throughout the Relevant Period operated as a fraud on the market.  As evidenced by the high volume of Baiting Orders to sell, which were intended to mislead other market participants into believing that the downward movement of Concordia's share price was being caused by the natural forces of supply and demand.  The placement and cancellation of thousands of Baiting Orders to sell by the U.S. and Canadian Spoofing Defendants was not in furtherance of any legitimate purpose.  Rather, this activity was intended to send a false and misleading pricing signal to the market in order to trick or bait market participants, like Harrington, into executing their own sell orders.  This created a "pile-on" effect which drove down Concordia's share price even further, thereby enabling all Defendants to purchase Concordia's shares at artificially manipulated lower prices for either their client's accounts or their own proprietary accounts.

59.     The intention of the U.S. and Canadian Spoofing Defendants not to execute their Baiting Orders to sell, can be inferred from *inter alia*: the short time period between the continuous and repeated placement and cancellation of their Baiting Orders; the concentration of cancelled Baiting Orders during the limited period when each spoofing event occurred; the average size of the Baiting Orders that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; the ratio of cancelled Baiting Orders to sell compared to the executed bona-fide orders to buy that existed; the reoccurrence of the same trading patterns; and the coordinated spoofing activities between the U.S. Spoofing Defendants in the U.S. and their Affiliated Canadian Counterparts in Canada, throughout the Relevant Period.

60.     Based on trading data for the Canadian exchanges, for the period of September 21, 2015 through November 25, 2016 ("Analysis Period")[11], Harrington was able to determine the identities and trading patterns of the Affiliated Canadian Counterparts who engaged in approximately 100,000 spoofing events on the Canadian markets.  In or about May 2020 Harrington was able to identify trading

---

[11] Harrington is seeking recovery of damages incurred during the period January 27, 2016 through November 15, 2016, which has been defined as the Relevant Period.  Reference to any date prior to January 27, 2016 is only intended to demonstrate that the pattern and practice of Defendants' unlawful conduct started prior to the Relevant Period.  The Relevant Period comprises approximately 70% of the Analysis Period.

patterns reflecting spoofing activities that occurred simultaneously on both the U.S. and Canadian markets.  Upon information and belief, the U.S. Spoofing Defendants, engaged in approximately 49,000 instances of spoofing in Concordia stock on U.S. markets.  During the Analysis Period, the U.S. Spoofing Defendants coordinated their spoofing activities in the U.S. with their Affiliated Canadian Counterparts on 263 out of 294 trading days. Examples of the coordinated spoofing activities in the U.S. and Canada are set forth in paragraphs 70 through 165 herein. The coordination of these Bating Orders to sell in the U.S. and Canada was determined by calculating the increase in U.S. orders and cancellations done simultaneously with each Affiliated Canadian Counterpart spoofing event in Canada.

61.    There is an extremely low statistical likelihood that the price variations for each of the spoofing events in the U.S. occurred naturally.  The market impact of these spoofing events was material and statistically significant.

62.    The impact of this spoofing activity extended beyond the specific spoofing cycle [i.e., orders, trades, and cancellations], because the market neither immediately nor fully rebounded from the manipulated prices once each of the spoofing events were completed.  In fact, during the Analysis Period, on at least 68 of the 294 trading days, more than 10% of the trading in Concordia stock in the U.S. took place at manipulated prices.  On 16 of those days, more than 25% of the

U.S. trading volume occurred at manipulated prices, while on one day, April 22, 2016, 61.15% of all trading in Concordia in the U.S. took place at manipulated prices.

63.     The nature of Interlisted Securities facilitates the manipulation of the market price on both Canadian and U.S. exchanges simultaneously.  In order to accomplish the manipulation of Concordia's share price, the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts conspired to manipulate the market price of Concordia's shares downward through a spoofing scheme on exchanges in both the U.S. and Canada.  In furtherance of the conspiracy, the Affiliated Canadian Counterparts coordinated the placement of their Baiting Orders to sell on the Canadian exchanges with each U.S. Spoofing Defendant's placement of its Baiting Orders to sell on the U.S. exchanges.  This conspiracy simultaneously manipulated Concordia's market price on both the U.S. and Canadian markets.  The U.S. Spoofing Defendants and their Affiliated Canadian Counterparts were each other's agents whose overt acts in furtherance of the conspiracy occurred on both the U.S. and Canadian exchanges.

64.     Upon information and belief, U.S. Baiting Orders to sell were entered on the U.S. market in coordination with Baiting Orders to sell entered by their Affiliated Canadian Counterparts on the Canadian market based on precise timing of the entry and cancelation of the Baiting Orders to sell on both markets.  The

coordinated cross border fraudulent trading activity was necessary for the success of the spoofing scheme on the U.S. exchanges because without the spoofing activity by their Affiliated Canadian Counterpart on the Canadian markets, the pricing manipulation that the U.S. Spoofing Defendants induced on the U.S. markets would have been mitigated by orders being routed to the Canadian markets that would have been free from manipulation.

65.     Upon information and belief, the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts acted intentionally to artificially depress the price of Concordia's shares on both the U.S. and Canadian exchanges and to financially harm Concordia's investors who were trading on both U.S. and Canadian exchanges.

### Examples of U.S. Spoofing Defendants and Their Affiliated Canadian Counterparts' Spoofing Activities During the Relevant Period

66.     The following are examples of specific spoofing activities of each U.S. Spoofing Defendant that was coordinated with their Affiliated Canadian Counterpart.  These examples are based on trading data collected and analyzed from U.S. and Canadian exchanges that reflect the interplay between the Baiting and Executing Orders and how each U.S. Spoofing Defendant, in coordination with their Affiliated Canadian Counterpart, manipulated downward the market price of Concordia's shares on the U.S. exchanges.  These coordinated examples of

market manipulation between the U.S. Spoofing Defendants and their Affiliated

Canadian Counterparts, represents evidence of conscious conspiratorial

misbehavior by the U.S. Spoofing Defendants and their Affiliated Canadian

Counterparts.  These facts demonstrate that the U.S. Spoofing Defendants and their

Affiliated Canadian Counterparts knowingly and intentionally engaged in unlawful

conduct that was intended to deceive, manipulate or defraud the U.S. market and

its participants, including Harrington.  The U.S. Spoofing Defendants and their

Affiliated Canadian Counterparts relentless and repetitive spoofing activities

throughout the Relevant Period caused a sustained decline in the market price of

Concordia shares from which it did not recover during the Relevant Period.

67.    There were approximately 100,000 spoofing events that occurred

during the Relevant Period on both the U.S. and Canadian exchanges.  The

following twenty-four examples represent the mechanics of each of the

approximately 100,000 spoofing events that occurred during the Relevant Period.

These twenty-four examples are not set forth to show the magnitude of the

diminution in the market price of Concordia shares that was caused by a single

spoofing event, rather these examples demonstrate the mechanics and coordination

of the U.S. Spoofing Defendants with their Affiliated Canadian Counterparts.

While a single spoofing event may take less than a second to complete and its

impact on the market may last for 15 minutes, when there are over 100,000

spoofing events placed on a continuous daily basis for 11 months, the cumulative impact of this unrelenting downward pressure caused a massive sell-off that drove the market price of Concordia's shares down from $28.03 to $3.13.

68.     As an Interlisted Stock, the Concordia prices moved in tandem on the Canadian exchanges and the U.S. exchanges.  Therefore, the Canadian Spoofing Defendants knew, or were reckless in not knowing, that their manipulation of Concordia's market price through spoofing – even if such spoofing occurred on the Canadian exchanges – was simultaneously manipulating the Concordia market price on the U.S. exchanges.  Harrington thus seeks to hold all such Defendants, including those in Canada, liable for their violations of the U.S. securities laws and other misconduct based on Harrington's transactions in Concordia stock at manipulated downward prices on the U.S. exchanges.

69.     These examples reflect the specific date, time, number of shares and price of each Baiting and Executing Order that were placed on both U.S. and Canadian exchanges.

**Defendant CIBC**

    i.      **February 11, 2016**

70.    On February 11, 2016 at 1:05:29.099[12], the Best Bid and Offer

("BBO")[13] for Concordia shares trading on the Canadian market was 24.31[14] bid

for 100 shares and 2,000 shares offered at 24.39.  By entering multiple Baiting

Orders to sell, U.S. Spoofing Defendant CIBC in coordination with its Affiliated

Canadian Counterpart, CIBC-Canada. ("CIBC's Canadian Counterpart"), intended

to create fictitious selling pressure that would induce other market participants to

submit additional sell orders and drive the price of Concordia shares downward.

Between 1:05:28.120 and 1:09:29.128, CIBC's Canadian Counterpart submitted 61

Baiting Orders to sell on the Canadian market, totaling 13,200 shares, at prices

ranging from 24.61 down to 24.38.

71.    The Baiting Orders to sell placed by CIBC's Canadian Counterpart

successfully induced the entry of sell orders from other market participants, driving

---

[12] As set forth herein after, the time format is read as follows: HH:MM:SS.000, where "HH" represents hours, "MM" represents minutes, "SS" represents seconds and ".000" represents milliseconds.

[13] In the securities industry, the best bid is defined as the highest price a buyer will pay for a stock and the best offer is defined as the lowest price that a seller will accept to sell its stock. The best bid and best offer are reflected on the top line of the Market Order Book for each security that is traded in the market.  The algorithmic trading programs that are used by high frequency trading firms are linked to and affected by the fluctuations in the BBO.

[14] For continuity, all prices are reflected in U.S. dollars.

the price of Concordia shares downward.  Between 1:05:29.109 and 1:05:29.128,

CIBC's Canadian Counterpart executed six Executing Orders on the Canadian

market to buy a total of 900 Concordia shares, at prices between 24.38 and 24.35,

as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:05:29.109 | 24.38 | 100 | CIBC World Markets |
| 1:05:29.109 | 24.37 | 100 | CIBC World Markets |
| 1:05:29.109 | 24.37 | 100 | CIBC World Markets |
| 1:05:29.109 | 24.36 | 200 | CIBC World Markets |
| 1:05:29.109 | 24.35 | 200 | CIBC World Markets |
| 1:05:29.109 | 24.35 | 200 | CIBC World Markets |

Through the Executing Orders, CIBC's Canadian Counterpart was able to purchase

shares at prices below the prevailing best offer of 24.39, which was the natural

price before CIBC's Canadian Counterpart entered the Baiting Orders.  Without

the Baiting Orders, CIBC's Canadian Counterpart would have been required to pay

the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at

1:05:29.126, as it was submitting and executing the Executing Orders, CIBC's

Canadian Counterpart began canceling all of its Baiting Orders to sell on the

Canadian market.  The last Baiting Order was canceled at 1:05:30.193.

72.     Concurrent with CIBC's Canadian Counterpart's entry of its Baiting

Orders to sell on the Canadian market, U.S. Spoofing Defendant CIBC entered 283

Baiting Orders to sell in the U.S. markets totaling 57,400 shares.  Immediately

after CIBC's Canadian Counterpart executed its Executing Trades on the Canadian

market, U.S. Spoofing Defendant CIBC canceled its Baiting Orders on the U.S.

Market.

73.     These spoofing cycles continued throughout the course of the trading

day placing continuous downward pressure on Concordia's share causing a

diminution of the price.

### ii.      <u>March 15, 2016</u>

74.     On March 15, 2016 at 10:23:48.439, the BBO for Concordia shares

trading on the Canadian market was 30.74 bid for 200 shares and 30.88 offered for

1,500.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant CIBC

in coordination with CIBC's Canadian Counterpart intended to create fictitious

selling pressure that would induce other market participants to submit additional

sell orders and drive the price of Concordia shares downward.  Between

10:23:48.447 and 10:23:48.500, CIBC's Canadian Counterpart submitted 30

Baiting Orders to sell on the Canadian market, totaling 6,000 shares, at prices

ranging from 30.92 to 30.80.

75.     The Baiting Orders to sell placed by CIBC's Canadian Counterpart

successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  As a result, between 10:23:48.475 and

10:23:48.500, CIBC's Canadian Counterpart successfully executed 7 Executing Orders on the Canadian market to buy a total of 700 shares of Concordia stock at lower prices, ranging from 30.74 to 30.67, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:23:48.475 | 30.74 | 100 | CIBC World Markets |
| 10:23:48.475 | 30.72 | 100 | CIBC World Markets |
| 10:23:48.475 | 30.72 | 100 | CIBC World Markets |
| 10:23:48.475 | 30.72 | 100 | CIBC World Markets |
| 10:23:48.482 | 30.71 | 100 | CIBC World Markets |
| 10:23:48.482 | 30.71 | 100 | CIBC World Markets |
| 10:23:48.500 | 30.67 | 100 | CIBC World Markets |

Through the Executing Orders, CIBC's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 30.88, which was the natural price before CIBC's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, CIBC's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:23:48.496, as it was submitting and executing the Executing Orders, CIBC's Canadian Counterpart canceled all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:23:48.509.

76.     Concurrent with CIBC's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant CIBC entered 344 Baiting Orders to sell for a total of 64,500 Concordia shares on the U.S. market. Immediately after CIBC's Canadian Counterpart executed its Executing Trades on

the Canadian market, U.S. Spoofing Defendant CIBC canceled its Baiting Orders on the U.S. Market.

77.     These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iii.     <u>March 24, 2016</u>

78.     On March 24, 2016 at 11:11:23.638, the BBO for Concordia shares trading on the Canadian market was 27.38 bid for 100 shares and 27.48 offered for 1,700 shares.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant CIBC in coordination with CIBC's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. Between 11:11:23.703 and 11:11:25.670, CIBC's Canadian Counterpart submitted 21 Baiting Orders to sell on the Canadian market, totaling 5,800 shares, at prices ranging from 27.56 down to 27.45.

79.     The Baiting Orders to sell placed by CIBC's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 11:11:23.624 and 11:11:23.703, CIBC's Canadian Counterpart executed ten Executing Orders on the

Canadian market to buy a total of 1,400 Concordia shares at lower prices ranging

from 27.42 to 27.36, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 11:11:23.624 | 27.42 | 100 | CIBC World Markets |
| 11:11:23.624 | 27.42 | 100 | CIBC World Markets |
| 11:11:23.624 | 27.42 | 100 | CIBC World Markets |
| 11:11:23.639 | 27.39 | 500 | CIBC World Markets |
| 11:11:23.654 | 27.41 | 100 | CIBC World Markets |
| 11:11:23.654 | 27.39 | 100 | CIBC World Markets |
| 11:11:23.654 | 27.39 | 100 | CIBC World Markets |
| 11:11:23.656 | 27.39 | 100 | CIBC World Markets |
| 11:11:23.656 | 27.39 | 100 | CIBC World Markets |
| 11:11:23.703 | 27.36 | 100 | CIBC World Markets |

Through the Executing Orders, CIBC's Canadian Counterpart was able to purchase

shares at prices below the prevailing best offer of 27.48, which was the natural

price before CIBC's Canadian Counterpart entered the Baiting Orders.  Without

the Baiting Orders, CIBC's Canadian Counterpart would have been required to pay

the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at

11:11:23.703, as it was submitting and executing the Executing Orders, CIBC's

Canadian Counterpart began canceling all of its Baiting Orders to sell on the

Canadian market.  The last Baiting Order was canceled at 11:11:25.670.

80.     Concurrent with CIBC's Canadian Counterpart's entry of its Baiting

Orders to sell on the Canadian market, U.S. Spoofing Defendant CIBC entered 404

Baiting Orders to sell on the U.S. market totaling 56,900 shares.  Immediately after

CIBC's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant CIBC. canceled its Baiting Orders on the U.S. market.

81.     These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iv.     March 28, 2016

82.     On March 28, 2016 at 10:25:46.278, the BBO for Concordia shares trading on the Canadian market was 26.29 bid for 300 shares and 400 shares offered at 26.32.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant CIBC in coordination with CIBC's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. Between 10:25:46.360 and 10:25:51.053, CIBC's Canadian Counterpart submitted 23 Baiting Orders to sell on the Canadian market, totaling 3,000 shares, at prices ranging from 26.43 down to 26.30.

83.     The Baiting Orders to sell placed by CIBC's Canadian Counterpart, successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 10:25:46.300 and

10:25:46.344, CIBC's Canadian Counterpart successfully executed four Executing Orders on the Canadian market to buy Concordia shares, totaling 400 shares, at a price of 26.27, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:25:46.300 | 26.27 | 100 | CIBC World Markets |
| 10:25:46.300 | 26.27 | 100 | CIBC World Markets |
| 10:25:46.344 | 26.27 | 100 | CIBC World Markets |
| 10:25:46.344 | 26.27 | 100 | CIBC World Markets |

Through the Executing Orders, CIBC's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 26.32, which was the natural price before CIBC's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, CIBC's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:25:46.360, as it was submitting and executing the Executing Orders, CIBC's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:25:51.053.

84.    Concurrent with CIBC's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant CIBC entered 306 Baiting Orders to sell on the U.S. market totaling 39,340 shares.  Immediately after CIBC's Canadian Counterpart executed its Executing Trades on the Canadian

market; U.S. Spoofing Defendant CIBC cancelled its Baiting Orders on the U.S. market.

86. These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### v.    April 18, 2016

86. On April 18, 2016 at 10:35:40.322, the BBO for Concordia shares trading on the Canadian market was 24.78 bid for 200 shares and 1,400 shares offered at 24.83. By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant CIBC in coordination with CIBC's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. Between 10:35:40.327 and 10:35:40.360, CIBC's Canadian Counterpart submitted 44 Baiting Orders to sell on the Canadian market, totaling 6,500 shares, at prices ranging from 24.94 down to 24.80.

87. The Baiting Orders to sell placed by CIBC's Canadian Counterpart successfully induced the entry of sell orders from other market participants driving the price of Concordia shares downward. As a result, at 10:35:40.360, CIBC's Canadian Counterpart executed six Executing Orders on the Canadian market to

buy Concordia shares, totaling 600 shares, at prices between 24.79 and 24.76, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:35:40.360 | 24.79 | 100 | CIBC World Markets |
| 10:35:40.360 | 24.78 | 100 | CIBC World Markets |
| 10:35:40.360 | 24.78 | 100 | CIBC World Markets |
| 10:35:40.360 | 24.76 | 100 | CIBC World Markets |
| 10:35:40.360 | 24.76 | 100 | CIBC World Markets |
| 10:35:40.360 | 24.76 | 100 | CIBC World Markets |

Through the Executing Orders, CIBC's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 24.83, which was the natural price before CIBC's Canadian Counterpart entered the Baiting Orders.  Without the Baiting Orders, CIBC's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:35:40.358, as it was submitting and executing the Executing Orders, CIBC's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:35:41.104.

88.     Concurrent with CIBC's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant CIBC entered 119 Baiting Orders to sell on the U.S. market totaling 16,179 shares.  Immediately after CIBC's Canadian Counterpart executed its Executing Trades on the Canadian

market; U.S. Spoofing Defendant CIBC canceled its Baiting Orders on the U.S. market.

89.     These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### vi.     <u>April 25, 2016</u>

90.     On April 25, 2016 at 10:27:18.366, the BBO for Concordia shares trading on the Canadian market was 32.52 bid for 300 shares and 800 shares offered at 32.57.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant CIBC in coordination with CIBC's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. Between 10:27:18.381 and 10:27:19.117, CIBC's Canadian Counterpart submitted 30 Baiting Orders to sell on the Canadian market, totaling 4,600 shares, at prices ranging from 32.68 down to 32.52.

91.     The Baiting Orders to sell placed by CIBC's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:27:19.117, CIBC's Canadian

Counterpart executed four Executing Orders on the Canadian market to buy a total of 500 Concordia shares, at prices between 32.52 and 32.47, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:27:19.117 | 32.52 | 200 | CIBC World Markets |
| 10:27:19.117 | 32.50 | 100 | CIBC World Markets |
| 10:27:19.117 | 32.48 | 100 | CIBC World Markets |
| 10:27:19.117 | 32.47 | 100 | CIBC World Markets |

Through the Executing Orders, CIBC's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 32.57, which was the natural price before CIBC's Canadian Counterpart entered the Baiting Orders.  Without the Baiting Orders, CIBC's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 10:27:19.115, as it was submitting and executing the Executing Orders, CIBC's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:27:21.566.

92.     Concurrent with CIBC's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant CIBC entered 87 Baiting Orders to sell in the U.S. markets totaling 11,200 shares.  Immediately after CIBC's Canadian Counterpart executed its Executing Trades on the Canadian market; U.S. Spoofing Defendant CIBC canceled its Baiting Orders on the U.S. market.

93.    These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

**Defendant TD**

     **i.**    **March 17, 2016**

94.    On March 17, 2016 at 1:17:32.437, the BBO for Concordia shares trading on the Canadian market was 29.73 bid for 400 shares and 1700 shares offered at 29.74.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with its Affiliated Canadian Counterpart, TD-Canada ("TD's Canadian Counterpart"), intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 1:17:32.500 and 1:17:32.522, TD's Canadian Counterpart submitted 4 Baiting Orders to sell on the Canadian market, totaling 3,600 shares, at prices ranging from 29.74 down to 29.73.

95.    The Baiting Orders to sell placed by TD's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 1:17:32.522, TD's Canadian Counterpart executed two Executing Orders on the Canadian market to

buy Concordia shares, totaling 110 shares, at prices between 29.73 and 29.72, as

follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:17:32.522 | 29.73 | 10 | TD Securities |
| 1:17:32.522 | 29.72 | 100 | TD Securities |

Through the Executing Orders, TD's Canadian Counterpart was able to purchase

shares at prices below the prevailing best offer of 29.74, which was the natural

price before TD's Canadian Counterpart entered the Baiting Orders.  Without the

Baiting Orders, TD's Canadian Counterpart would have been required to pay the

prevailing best offer price (or higher) to buy Concordia shares.  As it was

submitting and executing the Executing Orders, TD's Canadian Counterpart began

canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting

Order was canceled at 1:17:32.523.

96.     Concurrent with TD's Canadian Counterpart's entry of its Baiting

Orders to sell on the Canadian market, U.S. Spoofing Defendant TD entered 94

Baiting Orders to sell on the U.S. market totaling 23,200 shares.  Immediately after

TD's Canadian Counterpart executed its Executing Trades on the Canadian market,

U.S. Spoofing Defendant TD canceled its Baiting Orders on the U.S. market.

97.     These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### ii.   March 18, 2016

98.     On March 18, 2016 at 9:50:55.978, the BBO for Concordia shares trading on the Canadian market was 28.42 bid for 700 shares and 100 shares offered at 28.46.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with TD's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 9:50:55.981 and 9:50:56.401, TD's Canadian Counterpart submitted 8 Baiting Orders to sell on the Canadian market, totaling 8,200 shares, at prices ranging from 28.51 down to 28.44.

99.     The Baiting Orders to sell placed by TD's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 9:50:56.401, TD's Canadian Counterpart executed six Executing Orders on the Canadian market to buy Concordia shares, totaling 760 shares, at prices between 28.37 and 28.36, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 9:50:56.401 | 28.37 | 100 | TD Securities |
| 9:50:56.401 | 28.37 | 400 | TD Securities |
| 9:50:56.401 | 28.37 | 100 | TD Securities |
| 9:50:56.401 | 28.37 | 60 | TD Securities |
| 9:50:56.401 | 28.37 | 50 | TD Securities |
| 9:50:56.401 | 28.36 | 50 | TD Securities |

Through the Executing Orders, TD's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 28.46, which was the natural price before TD's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, TD's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 9:50:55.981, as it was submitting and executing the Executing Orders, TD's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 9:50:59.069.

100.   Concurrent with TD's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant TD entered 270 Baiting Orders to sell on the U.S. market totaling 75,900 shares. Immediately after TD's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant TD canceled its Baiting Orders on the U.S. market.

101.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iii.   **April 21, 2016**

102.   On April 21, 2016 at 9:47:50.531, the BBO for Concordia shares trading on the Canadian market was 23.63 bid for 200 shares and 1,100 shares offered at 23.66.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with TD's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 9:47:50.531 and 9:47:50.640, TD's Canadian Counterpart submitted 11 Baiting Orders to sell on the Canadian market, totaling 9,000 shares, at prices ranging from 23.65 down to 23.60.

103.   The Baiting Orders to sell placed by TD's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia downward.  As a result, at 9:47:51.341, TD's Canadian Counterpart executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 300 shares, at 23.59, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 9:47:51.341 | 23.59 | 200 | TD Securities |
| 9:47:51.341 | 23.59 | 100 | TD Securities |

Through the Executing Orders, TD's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 23.66, which was the natural

price before TD's Canadian Counterpart entered the Baiting Orders.  Without the Baiting Orders, TD's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  Beginning at 9:47:50.547, as it was submitting and executing the Executing Orders, TD's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 9:47:54.102.

104.   Concurrent with TD's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant TD entered 92 Baiting Orders to sell on the U.S. market totaling 33,700 shares.  Immediately after TD's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant TD canceled its Baiting Orders on the U.S. market.

105.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iv.   August 15, 2016

106.   On August 15, 2016 at 12:10:58.877, the BBO for Concordia shares trading on the Canadian market was 9.19 bid for 100 shares and 11,000 shares offered at 9.20.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with TD's Canadian Counterpart intended to create

fictitious selling pressure that would induce other market participants to submit

additional sell orders and drive the price of Concordia shares downward.  At

12:10:58.905, TD's Canadian Counterpart submitted 1 Baiting Order to sell on the

Canadian market, totaling 10,000 shares, at 9.20.

107.   The Baiting Order to sell placed by TD's Canadian Counterpart

successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  As a result, at 12:10:59.070, TD's

Canadian Counterpart successfully executed three Executing Orders on the

Canadian market to buy Concordia shares, totaling 1,000 shares, at 9.19, as

follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 12:10:59.070 | 9.19 | 700 | TD Securities |
| 12:10:59.070 | 9.19 | 200 | TD Securities |
| 12:10:59.070 | 9.19 | 100 | TD Securities |

Through the Executing Orders, TD's Canadian Counterpart was able to purchase

shares at prices below the prevailing best offer of 9.20, which was the natural price

before TD's Canadian Counterpart entered the Baiting Orders.  Without the

Baiting Orders, TD's Canadian Counterpart would have been required to pay the

prevailing best offer price (or higher) to buy Concordia shares. At 12:10:59.257,

after it had executed the Executing Orders, TD's Canadian Counterpart canceled

its Baiting Order to sell on the Canadian market.

108.   Concurrent with TD's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant TD entered 29 Baiting Orders to sell on the U.S. market totaling 12,900 shares.  Immediately after TD's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant TD canceled its Baiting Orders on the U.S. market.

109.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### v.   November 1, 2016

110.   On November 1, 2016 at 11:52:02.983, the BBO for Concordia shares trading on the Canadian market was 3.18 bid for 6,400 shares and 24,000 shares offered at 3.20.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with TD's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  At 11:52:02.991, TD's Canadian Counterpart submitted 4 Baiting Orders to sell on the Canadian market, totaling 21,400 shares, at prices ranging from 3.20 down to 3.19.

111.   The Baiting Orders to sell placed by TD's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving

the price of Concordia shares downward.  At 11:52:03.024, TD's Canadian Counterpart successfully executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 360 shares, at 3.18, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 11:52:03.024 | 3.18 | 300 | TD Securities |
| 11:52:03.024 | 3.18 | 60 | TD Securities |

Through the Executing Orders, TD's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 3.20, which was the natural price before TD's Canadian Counterpart entered the Baiting Orders.  Without the Baiting Orders, TD's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 11:52:02.991, as it was submitting and executing the Executing Orders, TD's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 11:52:06.560.

112.   Concurrent with TD's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant TD entered 154 Baiting Orders to sell on the U.S. market totaling 55,100 shares.  Immediately after TD's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant TD canceled its Baiting Orders on the U.S. market.

113.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### vi.   November 11, 2016

114.   On November 11, 2016 at 12:33:29.733, the BBO for Concordia share trading on the Canadian market was 2.80 bid for 5,900 shares and 29,700 shares offered at 2.82.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with TD's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  At 12:33:29.726, TD's Canadian Counterpart submitted 1 Baiting Order to sell on the Canadian market, totaling 17,000 shares, at 2.82.

115.   The Baiting Order to sell placed by TD's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 12:33:29.741 and 12:33:29.749, TD's Canadian Counterpart executed eight Executing Orders on the Canadian market to buy Concordia shares, totaling 1,100 shares, at 2.81, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 12:33:29.741 | 2.81 | 100 | TD Securities |
| 12:33:29.741 | 2.81 | 100 | TD Securities |
| 12:33:29.741 | 2.81 | 100 | TD Securities |
| 12:33:29.741 | 2.81 | 100 | TD Securities |
| 12:33:29.741 | 2.81 | 100 | TD Securities |
| 12:33:29.741 | 2.81 | 300 | TD Securities |
| 12:33:29.741 | 2.81 | 200 | TD Securities |
| 12:33:29.749 | 2.81 | 100 | TD Securities |

Through the Executing Orders, TD's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 2.82, which was the natural price before TD's Canadian Counterpart entered the Baiting Orders.  Without the Baiting Orders, TD's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares.  At 12:33:29.875, after it had executed the Executing Orders, TD's Canadian Counterpart canceled its Baiting Order to sell on the Canadian market.

116.   Concurrent with TD's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant TD entered 34 Baiting Orders to sell on the U.S. market totaling 24,300 shares.  Immediately after TD's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant TD canceled its Baiting Orders on the U.S. market.

117.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

**Defendant Merrill**

    i.    **February 3, 2016**

118.   On February 3, 2016 at 10:47:28.784, the BBO for Concordia shares trading on the Canadian market was 27.67 bid for 700 shares and 2,600 shares offered at 27.80.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant TD in coordination with its Affiliated Canadian Counterpart, Merrill-Canada ("Merrill's Canadian Counterpart"), intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 10:47:28.882 and 10:47:28.885, Merrill's Canadian Counterpart submitted 15 Baiting Orders to sell on the Canadian market, totaling 4,300 shares, at prices ranging from 27.82 down to 27.78.

119.   The Baiting Orders to sell placed by Merrill's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 1:03:42.614, Merrill's Canadian Counterpart executed one Executing Order on the Canadian market to buy Concordia shares, totaling 500 shares, at 27.66, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:47:28.885 | 27.66 | 500 | Merrill Lynch Canada |

Through the Executing Order, Merrill's Canadian Counterpart was able to purchase shares at a price below the prevailing best offer of 27.80, which was the natural price before Merrill's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, Merrill's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:47:28.882, as it was submitting and executing the Executing Orders, Merrill's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 10:47:30.348.

120.   Concurrent with Merrill's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant Merrill entered 81 Baiting Orders to sell on the U.S. market totaling 11,900 shares. Immediately after Merrill's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant Merrill canceled its Baiting Orders on the U.S. market.

121.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### ii.    March 24, 2016

122.    On March 24, 2016 at 10:24:09.950, the BBO for Concordia shares trading on the Canadian market was 26.52 bid for 1,200 shares and 2,200 shares offered at 26.65.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant Merrill in coordination with Merrill's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. At 10:24:10.002, Merrill's Canadian Counterpart submitted 23 Baiting Orders to sell on the Canadian market, totaling 5,900 shares, at prices ranging from 26.71 down to 26.65.

123.    The Baiting Orders to sell placed by Merrill's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:24:10.006, Merrill's Canadian Counterpart executed one Executing Order on the Canadian market to buy Concordia shares, totaling 100 shares, at 26.58, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:24:10.006 | 26.58 | 100 | Merrill Lynch Canada |

Through the Executing Order, Merrill's Canadian Counterpart was able to purchase shares at a price below the prevailing best offer of 26.65, which was the natural price before Merrill's Canadian Counterpart entered the Baiting Orders.

Without the Baiting Orders, Merrill's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:24:10.002, as it was submitting and executing the Executing Orders, Merrill's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 10:24:10.284.

124.   Concurrent with Merrill's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant Merrill entered 38 Baiting Orders to sell on the U.S. market totaling 7,600 shares. Immediately after Merrill's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant Merrill canceled its Baiting Orders on the U.S. market.

125.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iii.   April 18, 2016

126.   On April 18, 2016 at 10:35:40.331, the BBO for Concordia shares trading on the Canadian market was 24.75 bid for 100 shares and 700 shares offered at 24.82. By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant Merrill in coordination with Merrill's Canadian Counterpart intended to

create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. Between 10:35:40.344 and 10:35:40.376, Merrill's Canadian Counterpart submitted 30 Baiting Orders to sell on the Canadian market, totaling 5,800 shares, at prices ranging from 24.85 down to 24.80.

127.   The Baiting Orders to sell placed by Merrill's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:35:40.376, Merrill's Canadian Counterpart executed one Executing Order on the Canadian market to buy Concordia shares, totaling 500 shares, at 24.75, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:35:40.376 | 24.75 | 500 | Merrill Lynch Canada |

Through the Executing Order, Merrill's Canadian Counterpart was able to purchase shares at a price below the prevailing best offer of 24.82, which was the natural price before Merrill's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, Merrill's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:35:40.344, as it was submitting and executing the Executing Orders, Merrill's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:35:41.005.

128.   Concurrent with Merrill's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant Merrill entered 121 Baiting Orders to sell on the U.S. market totaling 16,289 shares.  Immediately after Merrill's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant Merrill canceled its Baiting Orders on the U.S. market.

129.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iv.   <u>August 29, 2016</u>

130.   On August 29, 2016 at 10:17:31.849, the BBO for Concordia shares trading on the Canadian market was 8.84 bid for 300 shares and 8,900 shares offered at 8.87.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant Merrill in coordination with Merrill's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward. Between 10:17:31.851 and 10:17:31.896, Merrill's Canadian Counterpart submitted six Baiting Orders to sell on the Canadian market, totaling 10,200 shares, at prices ranging from 8.87 down to 8.86.

131.   The Baiting Orders to sell placed by Merrill's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:17:31.896, Merrill's Canadian Counterpart executed three Executing Order on the Canadian market to buy Concordia shares, totaling 500 shares, at prices between 8.84 and 8.83, as follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:17:31.896 | 8.84 | 200 | Merrill Lynch Canada |
| 10:17:31.910 | 8.84 | 100 | Merrill Lynch Canada |
| 10:17:32.001 | 8.83 | 200 | Merrill Lynch Canada |

Through the Executing Order, Merrill's Canadian Counterpart was able to purchase shares at a price below the prevailing best offer of 8.87, which was the natural price before Merrill's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, Merrill's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:17:31.894, as it was submitting and executing the Executing Orders, Merrill's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:17:32.891.

132.   Concurrent with Merrill's Canadian Counterpart's entry of its Baiting Orders to sell in the Canadian market, U.S. Spoofing Defendant Merrill entered 55 Baiting Orders to sell on the U.S. market totaling 22,600 shares.  Immediately after

Merrill's Canadian Counterpart executed its Executing Trades on the Canadian

market, U.S. Spoofing Defendant Merrill canceled its Baiting Orders on the U.S.

market.

133.   These spoofing cycles continued throughout the course of the trading

day placing continuous downward pressure on Concordia's share causing a

diminution of the price.

### v.   September 15, 2016

134.   On September 15, 2016 at 2:30:23.506, the BBO for Concordia shares

trading on the Canadian market was 6.63 bid for 1,200 shares and 700 shares

offered at 6.64.  By entering multiple Baiting Orders to sell, U.S. Spoofing

Defendant Merrill in coordination with Merrill's Canadian Counterpart intended to

create fictitious selling pressure that would induce other market participants to

submit additional sell orders and drive the price of Concordia shares downward.

Between 2:30:23.515 and 2:30:23.173, Merrill's Canadian Counterpart submitted

30 Baiting Orders to sell on the Canadian market, totaling 58,400 shares, at prices

ranging from 6.64 down to 6.59.

135.   The Baiting Orders to sell placed by Merrill's Canadian Counterpart

successfully induced the entry of sell orders from other market participants, driving

he price of Concordia shares downward.  As a result, between 2:30:23.781 and

2:30:24.173, Merrill's Canadian Counterpart executed four Executing Order to buy

Concordia shares on the Canadian market, totaling 400 shares, at prices between

6.61 and 6.59, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 2:30:23.781 | 6.61 | 100 | Merrill Lynch Canada |
| 2:30:23.952 | 6.60 | 100 | Merrill Lynch Canada |
| 2:30:23.956 | 6.59 | 100 | Merrill Lynch Canada |
| 2:30:24.173 | 6.59 | 100 | Merrill Lynch Canada |

Through the Executing Order, Merrill's Canadian Counterpart was able to

purchase shares at a price below the prevailing best offer of 6.64, which was the

natural price before Merrill's Canadian Counterpart entered the Baiting Orders.

Without the Baiting Orders, Merrill's Canadian Counterpart would have been

required to pay the prevailing best offer price (or higher) to buy Concordia shares.

Beginning at 2:30:23.515, as it was submitting and executing the Executing

Orders, Merrill's Canadian Counterpart began canceling all of its Baiting Orders to

sell on the Canadian market.  The last Baiting Order was canceled at 2:30:25.031.

136.   Concurrent with Merrill's Canadian Counterpart's entry of its Baiting

Orders to sell on the Canadian market, U.S. Spoofing Defendant Merrill entered

425 Baiting Orders to sell on the U.S. market totaling 163,900 shares.

Immediately after Merrill's Canadian Counterpart executed its Executing Trades

on the Canadian market, U.S. Spoofing Defendant Merrill canceled its Baiting

Orders on the U.S. market.

137.   These spoofing cycles continued throughout the course of the trading

day placing continuous downward pressure on Concordia's share causing a

diminution of the price.

### vi.      October 24, 2016

138.   On October 24, 2016 at 9:55:17.128, the BBO for Concordia shares

trading on the Canadian market was 4.16 bid for 400 shares and 10,200 shares

offered at 4.17.  By entering multiple Baiting Orders to sell, U.S. Spoofing

Defendant Merrill in coordination with Merrill's Canadian Counterpart intended to

create fictitious selling pressure that would induce other market participants to

submit additional sell orders and drive the price of Concordia shares downward.

Between 9:55:17.108 and 9:55:17.171, Merrill's Canadian Counterpart submitted

11 Baiting Orders to sell on the Canadian market, totaling 19,000 shares, at prices

ranging from 4.19 down to 4.14.

139.   The Baiting Orders to sell placed by Merrill's Canadian Counterpart

successfully induced the entry of sell orders from other market participants, driving

he price of Concordia shares downward.  As a result, between 9:55:17.124 and

9:55:17.171, Merrill's Canadian Counterpart executed six Executing Order to buy

Concordia shares on the Canadian market, totaling 1,400 shares, at prices between

4.15 and 4.13, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 9:55:17.128 | 4.15 | 100 | Merrill Lynch Canada |
| 9:55:17.128 | 4.14 | 100 | Merrill Lynch Canada |
| 9:55:17.128 | 4.13 | 200 | Merrill Lynch Canada |
| 9:55:17.128 | 4.13 | 100 | Merrill Lynch Canada |
| 9:55:17.128 | 4.13 | 200 | Merrill Lynch Canada |
| 9:55:17.128 | 4.13 | 700 | Merrill Lynch Canada |

Through the Executing Order, Merrill's Canadian Counterpart was able to

purchase shares at a price below the prevailing best offer of 4.17, which was the

natural price before Merrill's Canadian Counterpart entered the Baiting Orders.

Without the Baiting Orders, Merrill's Canadian Counterpart would have been

required to pay the prevailing best offer price (or higher) to buy Concordia shares.

Beginning at 9:55:17.171, as it was submitting and executing the Executing

Orders, Merrill's Canadian Counterpart began canceling all of its Baiting Orders to

sell on the Canadian market.  The last Baiting Order was canceled at 9:55:21.816.

140.   Concurrent with Merrill's Canadian Counterpart's entry of its Baiting

Orders to sell on the Canadian market, U.S. Spoofing Defendant Merrill entered

422 Baiting Orders to sell on the U.S. market totaling 119,200 shares.

Immediately after Merrill's Canadian Counterpart executed its Executing Trades

on the Canadian market, U.S. Spoofing Defendant Merrill canceled its Baiting

Orders on the U.S. market.

141.   These spoofing cycles continued throughout the course of the trading

day placing continuous downward pressure on Concordia's share causing a

diminution of the price.

**Defendant John Doe**

  **i.   February 2, 2016**

142.   On February 2, 2016 at 1:29:17.000, the BBO for Concordia shares

trading on the Canadian market was 28.40 bid for 100 shares and 100 shares

offered at 28.52.  By entering multiple Baiting Orders to sell, U.S. Spoofing

Defendant John Doe in coordination with its Affiliated Canadian Counterpart, John

Doe-Canada ("John Doe's Canadian Counterpart"), intended to create fictitious

selling pressure that would induce other market participants to submit additional

sell orders and drive the price of Concordia shares downward.  Between

1:29:17.713 and 1:29:17.745, John Doe's Canadian Counterpart submitted 46

Baiting Orders to sell on the Canadian market, totaling 12,600 shares, at prices

ranging from 28.66 down to 28.50.

143.   The Baiting Orders to sell placed by John Doe's Canadian

Counterpart successfully induced the entry of sell orders from other market

participants, driving the price of Concordia shares downward.  As a result, between

1:29;17.727 and 1:29:17.745, John Doe's Canadian Counterpart executed eight

Executing Orders on the Canadian market to buy Concordia shares, totaling 1,200

shares, at prices between 28.50 and 28.40, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:29:17.727 | 28.50 | 100 | John Doe |
| 1:29:17.727 | 28.50 | 500 | John Doe |
| 1:29:17.727 | 28.47 | 100 | John Doe |
| 1:29:17.727 | 28.47 | 100 | John Doe |
| 1:29:17.727 | 28.42 | 100 | John Doe |
| 1:29:17.729 | 28.46 | 100 | John Doe |
| 1:29:17.745 | 28.42 | 100 | John Doe |
| 1:29:17.745 | 28.40 | 100 | John Doe |

Through the Executing Orders, John Doe's Canadian Counterpart was able to

purchase shares at prices below the prevailing best offer of 28.52, which was the

natural price before John Doe's Canadian Counterpart entered the Baiting Orders.

Without the Baiting Orders, John Doe's Canadian Counterpart would have been

required to pay the prevailing best offer price (or higher) to buy Concordia shares.

Beginning at 1:29:17.713, as it was submitting and executing the Executing

Orders, John Doe's Canadian Counterpart began canceling all of its Baiting Orders

to sell on the Canadian market.  The last Baiting Order was canceled at

1:29:17.804.

144.   Concurrently with John Doe's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant John Doe entered 100 Baiting Orders to sell on the U.S. market totaling 10,800 shares. Immediately after John Doe's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant John Doe canceled its Baiting Orders on the U.S. market.

145.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### ii.      February 9, 2016

146.   On February 9, 2016 at 10:19:40.630, the BBO for Concordia shares trading on the Canadian market was 26.92 bid for 400 shares and 1,000 shares offered at 26.98.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant John Doe in coordination with John Doe's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 10:19:40.642 and 10:19:40.655, John Doe's Canadian Counterpart submitted 14 Baiting Orders to sell on the Canadian market, totaling 4,600 shares, at prices ranging from 27.05 down to 26.99.

147.   The Baiting Orders to sell placed by John Doe's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, at 10:19:40.655, John Doe's Canadian Counterpart executed four Executing Orders on the Canadian market to buy Concordia shares, totaling 400 shares, at prices between 26.96 and 26.93, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:19:40.655 | 26.96 | 100 | John Doe |
| 10:19:40.655 | 26.94 | 100 | John Doe |
| 10:19:40.655 | 26.94 | 100 | John Doe |
| 10:19:40.655 | 26.93 | 100 | John Doe |

Through the Executing Orders, John Doe's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 26.98, which was the natural price before John Doe's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, John Doe's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:19:40.653, as it was submitting and executing the Executing Orders, John Doe's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:16:41.139.

148.   Concurrent with John Doe's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant John Doe entered 38 Baiting Orders to sell on the U.S. market totaling 6,300 shares. Immediately after John Doe's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant John Doe canceled its Baiting Orders on the U.S. market.

149.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iii.   April 29, 2016

150.   On April 29, 2016 at 1:45:07.926, the BBO for Concordia shares trading on the Canadian market was 29.71 bid for 1,000 shares and 800 shares offered at 29.75.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant John Doe in coordination with John Doe's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 1:45:07.935 and 1:45:08.645, John Doe's Canadian Counterpart submitted 32 Baiting Orders to sell on the Canadian market, totaling 9,400 shares, at prices ranging from 30.50 down to 29.72.

151.   The Baiting Orders to sell placed by John Doe's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 1:45:08.634 and 1:45:08.647, John Doe's Canadian Counterpart executed five Executing Orders on the Canadian exchange to buy Concordia shares, totaling 500 shares, at prices between 29.71 and 29.66, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 1:45:08.634 | 29.71 | 100 | John Doe |
| 1:45:08.634 | 29.71 | 100 | John Doe |
| 1:45:08.647 | 29.66 | 100 | John Doe |
| 1:45:08.647 | 29.66 | 100 | John Doe |
| 1:45:08.647 | 29.66 | 100 | John Doe |

Through the Executing Orders, John Doe's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 29.75, which was the natural price before John Doe's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, John Doe's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 1:45:08.645, as it was submitting and executing the Executing Orders, John Doe's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 1:45:11.347.

152.    Concurrent with John Doe's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant John Doe entered 158 Baiting Orders to sell on the U.S. market totaling 49,166 shares. Immediately after John Doe's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant John Doe canceled its Baiting Orders on the U.S. market.

153.    These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### iv.    <u>May 2, 2016</u>

154.    On May 2, 2016 at 12:22:27.263, the BBO for Concordia shares trading on the Canadian market was 27.25 bid for 700 shares and 1,100 shares offered at 27.30.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant John Doe in coordination with John Doe's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 12:22:27.250 and 12:22:27.282, John Doe's Canadian Counterpart submitted 22 Baiting Orders to sell on the Canadian market, totaling 10,000 shares, at prices ranging from 27.92 down to 27.29.

155.   The Baiting Orders to sell placed by John Doe's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  As a result, between 12:22:27.267 and 12:22:27.282, John Doe's Canadian Counterpart executed four Executing Orders on the Canadian market to buy Concordia shares, totaling 500 shares, at prices between 27.26 and 27.25, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 12:22:27.263 | 27.26 | 100 | John Doe |
| 12:22:27.263 | 27.26 | 100 | John Doe |
| 12:22:27.263 | 27.25 | 200 | John Doe |
| 12:22:27.263 | 27.25 | 100 | John Doe |

Through the Executing Orders, John Doe's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 27.30, which was the natural price before John Doe's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, John Doe's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 12:22:27.267, as it was submitting and executing the Executing Orders, John Doe's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 12:22:28.253.

156.   Concurrently with John Doe's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant John Doe entered 100 Baiting Orders to sell on the U.S. market totaling 24,800 shares. Immediately after John Doe's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant John Doe canceled its Baiting Orders on the U.S. market.

157.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### v.   <u>May 10, 2016</u>

158.   On May 10, 2016 at 10:50:50.541, the BBO for Concordia shares trading on the Canadian market was 23.66 bid for 700 shares and 1600 shares offered at 23.74.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant John Doe in coordination with John Doe's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 10:50:50.591 and 10:50:50.594, John Doe's Canadian Counterpart submitted 30 Baiting Orders on the Canadian market to sell, totaling 7,000 shares, at prices ranging from 24.19 down to 23.71.

159.   The Baiting Orders to sell placed by John Doe's Canadian Counterpart successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:50:50.594, John Doe's Canadian Counterpart successfully executed two Executing Orders on the Canadian market to buy Concordia shares, totaling 200 shares at 23.64, as follows:

| Time | Price | Shares | Buyer |
|------|-------|--------|-------|
| 10:50:50.594 | 23.64 | 100 | John Doe |
| 10:50:50.594 | 23.64 | 100 | John Doe |

Through the Executing Orders, John Doe's Canadian Counterpart was able to purchase shares at prices below the prevailing best offer of 23.74, which was the natural price before John Doe's Canadian Counterpart entered the Baiting Orders. Without the Baiting Orders, John Doe's Canadian Counterpart would have been required to pay the prevailing best offer price (or higher) to buy Concordia shares. Beginning at 10:50:50.591, as it was submitting and executing the Executing Orders, John Doe's Canadian Counterpart began canceling all of its Baiting Orders to sell on the Canadian market.  The last Baiting Order was canceled at 10:50:51.149.

160.   Concurrent with Spoofing John Doe's Canadian Counterpart's entry of its Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant John

Doe entered 57 Baiting Orders to sell on the U.S. market totaling 11,300 shares. Immediately after John Doe's Canadian Counterpart executed its Executing Trades on the Canadian market, U.S. Spoofing Defendant John Doe canceled its Baiting Orders on the U.S. market.

161.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

### vi.   September 2, 2016

162.   On September 2, 2016 at 10:47:04.834, the BBO for Concordia shares trading on the Canadian market was 8.33 bid for 1,300 shares and 3,400 shares offered at 8.35.  By entering multiple Baiting Orders to sell, U.S. Spoofing Defendant John Doe in coordination with John Doe's Canadian Counterpart intended to create fictitious selling pressure that would induce other market participants to submit additional sell orders and drive the price of Concordia shares downward.  Between 10:47:04.828 and 10:47:05.080, John Doe's Canadian Counterpart submitted 20 Baiting Orders on the Canadian market to sell, totaling 4,300 shares, at prices ranging from 8.43 down to 8.32.

163.   The Baiting Orders to sell placed by John Doe's Canadian Counterpart successfully induced the entry of sell orders from other market

participants, driving the price of Concordia shares downward.  At 10:47:05.080,

John Doe's Canadian Counterpart successfully executed three Executing Orders on

the Canadian market to buy Concordia shares, totaling 500 shares at 8.31, as

follows:

| Time | Price | Shares | Buyer |
|---|---|---|---|
| 10:47:04.834 | 8.31 | 100 | John Doe |
| 10:47:04.834 | 8.31 | 100 | John Doe |
| 10:47:04.834 | 8.31 | 300 | John Doe |

Through the Executing Orders, John Doe's Canadian Counterpart was able to

purchase shares at prices below the prevailing best offer of 8.35, which was the

natural price before John Doe's Canadian Counterpart entered the Baiting Orders.

Without the Baiting Orders, John Doe's Canadian Counterpart would have been

required to pay the prevailing best offer price (or higher) to buy Concordia shares.

Beginning at 10:47:04.999, as it was submitting and executing the Executing

Orders, John Doe's Canadian Counterpart began canceling all of its Baiting Orders

to sell on the Canadian market.  The last Baiting Order was canceled at

10:47:05.840.

164.   Concurrent with John Doe's Canadian Counterpart's entry of its

Baiting Orders to sell on the Canadian market, U.S. Spoofing Defendant John Doe

entered 206 Baiting Orders to sell on the U.S. market totaling 63,520 shares.

Immediately after John Doe's Canadian Counterpart executed its Executing Trades

on the Canadian market, U.S. Spoofing Defendant John Doe canceled its Baiting Orders on the U.S. market.

165.   These spoofing cycles continued throughout the course of the trading day placing continuous downward pressure on Concordia's share causing a diminution of the price.

## U.S. and Canadian Spoofing Defendants Acted With Scienter

166.   Based on the alleged facts herein, the U.S. and Canadian Spoofing Defendants acted with "scienter."  The U.S. and Canadian Spoofing Defendants trading activities were approved by corporate officials sufficiently knowledgeable about the company to know that the trading practices of the U.S. and Canadian Spoofing Defendants reflect conscious misbehavior or reckless intent to manipulate the market price of Concordia's Interlisted Securities.

167.   The U.S. and Canadian Spoofing Defendants designed and implemented algorithmic trading programs that executed their spoofing schemes. Their algorithms were programmed to generate trading patterns that involved the placement and cancellation of several hundred thousand Bating Orders to sell in the Market Order Book on U.S. and Canadian exchanges that were never intended to be executed during the Relevant Period.  As registered broker-dealers the U.S. and Canadian Spoofing Defendants knew or should have known that it was unlawful to place Baiting Orders to sell in a Market Order Book that were never

intended to be executed in order to trick market participants into selling shares of
Concordia stock, including short selling, which drove the price of Concordia stock
downward.  The placement and cancellation of these Baiting Orders to sell was not
inadvertent or unintentional.  Rather, the U.S. Spoofing Defendants either
consciously or recklessly placed the Baiting Orders to sell in the Market Order
Book as can be inferred from *inter alia*: the greater average size of the Baiting
Orders to sell during the limited period when each spoofing event occurred; the
short time period between the repeated placement and cancellation of the Baiting
Orders to sell; the concentration of cancelled Baiting Orders to sell during the
limited period when each spoofing event occurred; the greater average size of the
Baiting Orders to sell that were cancelled, in comparison to the average size of the
bona-fide sell orders that were executed; the ratio of cancelled Baiting Orders to
sell,  as compared to the executed bona-fide orders to buy that existed; and the
reoccurrence of the same trading pattern throughout the Relevant Period that
simultaneously occurred by their Affiliated Canadian Counterparts in Canada.  The
U.S. Spoofing Defendants also knew that by coordinating with their Affiliated
Canadian Counterparts they would be manipulating the market price downward of
Concordia's shares in both countries.  Immediately after executing orders to buy,
the U.S. Spoofing Defendants would together with their Affiliated Canadian

Counterparts cancel all of the Baiting Orders to sell that had been previously placed in the Market Order Books in both countries.

168.    The U.S. Spoofing Defendants knew that their statements in FINRA Report 3130 which states that each broker shall "…(A) establish, maintain and review policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations; (B) modify such policies and procedures as business, regulatory and legislative changes and events dictate; and (C) test the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.", were false and misleading.  The U.S. Spoofing Defendants had access to information that they knew contradicted the statements made in their regulatory filings and information that violated the applicable industry rules and regulations.

169.    As registered brokers, the U.S. Spoofing Defendants were required, pursuant to FINRA Rule 2020, to have internal policies, procedures and systems that detected and prohibited manipulative or fraudulent trading devices or schemes. The U.S. Spoofing Defendants were also required, pursuant to FINRA Rules 5210, Supplementary Material .02; Rule 1220 and Exchange Rule 575, Disruptive Practices Prohibited, to detect and prevent manipulative or fraudulent trading that

originated from algorithmic high-speed trading under the supervision and control of their firm.  The U.S. Spoofing Defendants flawed and ineffective internal controls constitute strong circumstantial evidence of conscious misbehavior or recklessness.

## Harrington's Damages Were Caused by A Manipulated Market

170.   Concordia's securities were intended to be traded in an efficient market.  During the Relevant Period, despite Harrington's diligence, it did not discover, nor could a reasonably diligent plaintiff have discovered, the facts constituting the market manipulation claims on the U.S. exchange or the identities of the perpetrators of these market manipulation schemes.  Neither Harrington nor a reasonably diligent plaintiff could have discovered these facts because the U.S. and Canadian Spoofing Defendants were actively concealing their behavior so that they could financially benefit from their unlawful scheme. Therefore, when Harrington sold its shares of Concordia on U.S. exchanges, it did so under the the assumption that it was trading in a market that was free from manipulation, and that the market prices of Concordia's securities were determined by the natural forces of supply and demand, rather than false and misleading pricing information injected into the market by the U.S. and Canadian Spoofing Defendants.

## Injury in Fact and Loss Causation

171.   During the Relevant Period, there were spoofing events that occurred on 193 of 205 trading days.  On 27 of these days, Harrington sold approximately 4.9 million shares of Concordia on the U.S. exchanges and approximately 4.1 million shares of Concordia on the Canadian exchanges at manipulated lower prices.  The U.S. and Canadian Spoofing Defendants fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Concordia's securities.  While the artificially depressed price of a spoofing event may last for up to fifteen minutes before it recovers, it will generally not fully recover to the price that existed prior to the spoofing event.  When the spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the long-term cumulative effect of spoofing places enormous downward pressure on the market price of a security. The U.S. and Canadian Spoofing Defendants executed over 100,00 spoofing events during the 205 trade date Relevant Period which caused the collapse of Concordia's share price from $28.02 to $3.13.  The U.S. and Canadian Spoofing Defendants wrongful conduct either proximately caused Harrington's loss or significantly increased the likelihood of the financial injuries that Harrington suffered when the market price of Concordia shares was being driven downward.

172.   The U.S. and Canadian Spoofing Defendants spoofing scheme deprived Harrington of its right and ability to trade on U.S. exchanges that were free of manipulation.

### Defendants Used National Securities Exchanges and the Mails to Perpetrate Their Market Manipulation Scheme

173.   Each Spoofing Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to trade Concordia's securities by placing, routing, filling, and executing these orders.

174.   The Spoofing Defendants each knowingly employed devices, schemes, or artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud upon Harrington and the market in violation of Section 10(b) and Rule 10b-5 promulgated under the Exchange Act of 1934.

**B.   Second Claim for Relief for Abusive Short Selling in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against UBS-U.S., UBS-Canada, Merrill-U.S., Merrill-Canada, MLPro, SocGen-U.S., SocGen-Canada, John Doe-U.S. and John Doe-Canada**

175.   Plaintiff incorporates by reference paragraphs 1 through 174 as if more fully set forth herein.

176.   During the Relevant Period, the U.S. and Canadian Short Selling Defendants engaged in and employed devices, schemes, illegal acts, practices, and

a course of conduct that were intended to manipulate the price of Concordia shares downward in coordination with the spoofing events that were being perpetrated by the U.S. and Canadian Spoofing Defendants where it was traded, including on the U.S. and Canadian exchanges.  The U.S. and Canadian Short Selling Defendants engaged in an abusive short selling scheme that in coordination with the U.S. and Canadian Spoofing Defendants' scheme injected false pricing signals into the market and created a misleading impression in the market that Concordia's share price was being determined by the natural forces of supply and demand.  The abusive short selling scheme perpetrated by the U.S. Short Selling Defendants consisted of several activities that were designed to manipulate the price of Concordia's shares downward by and including: short selling shares without locating or borrowing legally authorized shares in violation of Reg SHO; failing to deliver legally borrowable shares on the settlement date in violation of Reg SHO; failing to establish a system of supervision that was required by the FINRA Supervision Rule, and the FINRA Security Counting and Verification Rule; and failing to supervise the effective implementation of the supervision and monitoring systems that were required by the FINRA Supervisory Control System Rule.

177.    The Short-Selling Defendants knew that their statements in FINRA Report 3130, which states that each broker shall "…(A) establish, maintain and review policies and procedures reasonably designed to achieve compliance with

applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations; (B) modify such policies and procedures as business, regulatory and legislative changes and events dictate; and (C) test the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.", were false and misleading.  The Short-Selling Defendants had access to information that they knew contradicted the statements made in their regulatory filings and information that violated the applicable industry rules and regulations.

178.    As registered brokers, the Short Selling Defendants were required, pursuant to FINRA Rule 2020, to have internal policies, procedures and systems that detected and prohibited manipulative or fraudulent trading devices or schemes. Defendants flawed and ineffective internal controls constitute strong circumstantial evidence of conscious misbehavior or recklessness.

### The Nature, Purpose, and Effect of Defendants' Short Selling Scheme

179.    The U.S. and Canadian Short Selling Defendants manipulated Concordia's share price by injecting millions of Fictitious Shares into the U.S. and Canadian markets that were not authorized for sale by Concordia.  The effect of injecting millions of unauthorized Fictitious Shares into the markets was, like the spoofing scheme, intended to drive the price downward in order to buy shares at

the lower prices to cover their short sales[15].  The Fictitious Shares are sold at a high

price and are replaced by purchasing in the open market shares that are trading at a

lower price as a result of the manipulation that has occurred.

180.   In its adoption of Reg SHO, the SEC has held that it is unlawful for a

broker to accept a short sale order without locating shares or having a reasonable

basis to believe that shares can be lawfully borrowed, so that they can be timely

delivered on the settlement date.  The objective of Reg SHO is to prevent abusive

or naked short selling that results in the electronic creation of Fictitious Shares and

the failure to deliver legally borrowable shares.  Fictitious Shares provide the

market manipulators with artificial "leverage" to trade unauthorized shares at high

volumes that can be used to depress the price of a security, as was the case with

Concordia stock.

181.   By selling short millions of Fictitious Shares into the market that

Concordia did not issue or authorize, the U.S. and Canadian Short Selling

Defendants in conjunction with the U.S. and Canadian Spoofing Defendants

intentionally created a false impression of how participants in the U.S. and

Canadian markets valued Concordia shares, which misled shareholders like

Harrington into selling their Concordia shares at depressed prices.

---

[15] A short seller profits by selling high and buying low.

182.   In conjunction with the spoofing scheme, the abusive short selling schemes perpetrated by the U.S. and Canadian Short Selling Defendants also interfered with the natural forces of supply and demand, which would have determined the fair and true market price of Concordia's shares.  The spoofing scheme which was intended to drive the market price of Concordia shares downward effectively provided he means for the U.S. and Canadian Short Selling Defendants to carry out their scheme and profit.

183.   Upon information and belief, the U.S. and Canadian Short Selling Defendants were short selling and covering Concordia shares intra-day on a majority of days during the Relevant Period.  The U.S. and Canadian Short Selling Defendants realized a profit by taking advantage of the downward price manipulation caused by the U.S. and Canadian Spoofing Defendants.  By completing the trading cycle within the same day, it avoided the creation of fails to deliver on a sustained basis and therefore avoided triggering the provisions of Reg SHO.  The widespread spoofing scheme triggered the abusive short selling scheme, which signaled to other market participants trading algorithms to sell their Concordia shares.  The false signals generated by the spoofing and short selling schemes triggered a massive selloff that resulted in a devastating price decline of Concordia stock during the Relevant Period that damaged Harrington, who was selling shares in markets including the U.S. market at the same time.

184.   The scheme engaged in by the U.S. and Canadian Short Selling Defendants effectively manufactured millions of unauthorized Fictitious Shares and injected them into the market.  When these Fictitious Shares were sold at high volumes by the U.S. and Canadian Short Selling Defendants, another false signal along with the false signal the spoofing scheme sent to the market that something was fundamentally wrong with Concordia.

185.   Upon information and belief, the U.S. and Canadian Short Selling Defendants knew, or were reckless in not knowing, that their actions were manipulating Concordia's share price on both the U.S. and Canadian exchanges and causing financial loss to investors trading Concordia's shares, including those trading in the U.S. market.  These facts herein demonstrate deliberate illegal behavior or conduct that was highly unreasonable and an extreme departure from industry standards of ordinary care.  Among others, and by way of illustration, these facts are:

(a) During the Relevant Period approximately 236 million interlisted Concordia shares were sold in the U.S, but only 40 million shares were authorized to be traded by Concordia. This represented an astonishingly high turnover rate of 590% for the 40 million shares authorized for trading;

(b) During the Relevant Period, approximately 134 million interlisted Concordia shares sold short the U.S., but only 40 million shares were authorized

for trading by Concordia. This represented a turnover rate of approximately 335% of the 40 million shares authorized for trading, which is inexplicably high for a company with a falling stock price ;

(c) On most days during the Relevant Period, between 50% and 90% of all Concordia shares that were traded were sold short despite an industry average for short selling of 25% of the volume of a particular security on a given day for companies listed on U.S. exchanges;

(d) During the Relevant Period, the trading patterns of the Short Selling Defendants in both Canada and the U.S. were in tandem with each other.  This included both the spoofing activities and the short selling activities that manipulated the price of Concordia shares downward;

(e) As registered brokers, the U.S. and Canadian Short Selling Defendants knew or should have known that industry standards of care and applicable rules and regulations, imposed a duty to monitor their internal trading practices.  The manipulative conduct of the U.S. and Canadian Short Selling Defendants and their failure to maintain sufficient controls to avoid fraud, among other facts, demonstrates conscious misbehavior or recklessness in perpetrating their abusive naked short selling scheme.

186.   As an Interlisted Security, Concordia's shares are considered fungible and intertwined between the Short Selling Defendants on both the U.S. and

Canadian exchanges.  Upon information and belief, short sale orders that were placed with the Canadian Short Selling Defendants were routed to and executed by the corresponding U.S. Short Selling Defendants.  The industry average for short selling in the U.S. is between 20% and 25% of the volume of a particular security on a given day.  The large percentage of short selling that occurred on exchanges in the U.S. more than doubled the industry average for short selling in the U.S.  Based upon the enormous number of shares that were sold short and the limited number of borrowable shares that were available, a strong inference can be drawn from these facts that the U.S. and Canadian Short Selling Defendants were electronically generating and trading Fictitious Shares.

187.   As an Interlisted Stock, the Concordia prices moved in tandem on the Canadian exchanges and the U.S. exchanges.  Therefore, the Canadian Short Selling Defendants knew, or were reckless in not knowing, that their manipulation of the Concordia market price through abusive short selling – even if such abusive short selling occurred on the Canadian exchanges – was simultaneously manipulating the Concordia market price on the U.S. exchanges.  Harrington thus seeks to hold all such Defendants, including those in Canada, liable for their violations of the U.S. securities laws and other misconduct based on Harrington's transactions in Concordia stock at manipulated downward prices on the U.S. exchanges.

**Examples of Defendants Short Selling Activities During the Relevant Period**

188.   The following are examples of abusive short selling by the Canadian Short Selling Defendants, who each sold shares of Concordia stock that they did not have in their inventories.[16]

**Defendant UBS-U.S. and UBS Canada**

189.   During the Relevant Period, Short Selling Defendant UBS-U.S.'s Affiliated Canadian Counterpart, UBS -Canada engaged in the short selling of Concordia's shares.  UBS -Canada is affiliated with Short Selling Defendant UBS-U.S. and both defendants are owned by a common parent, UBS A.G.  As Concordia was an Interlisted Security, the affiliated companies regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

190.   Reflected in the following chart, UBS -Canada sold approximately 343,000 shares short that it did not have in inventory.  As an Interlisted Security, these shares are fungible and were either executed by Short Selling Defendant

---

[16] The identities of the Defendants who engaged in abusive short selling were ascertained from documents that reflect the identity of brokers who trade on the Canadian exchanges.  Until discovery is taken, the identities of the U.S. brokers who engaged in abusive short selling is being determined based on Defendants' IIROC Rule 3300 Best Execution Trading Disclosure statements, wherein each Canadian broker disclosed their authority to route Interlisted Securities to their U.S. Affiliated Counterparts and the trading patterns during the Relevant Period.

UBS-U.S. or UBS -Canada, without the public's knowledge, and these shares

could be included in either country's Concordia short volume totals.

### UBS -Canada – Concordia Short Shares

| A | B | | A | B |
|---|---|---|---|---|
| Date | Shares Sold Short | | Date | Shares Sold Short |
| 3/17/2016 | 130 | | 5/5/2016 | 4,300 |
| 3/18/2016 | 2,850 | | 5/6/2016 | 49,900 |
| 3/21/2016 | 59,616 | | 5/10/2016 | 400 |
| 3/24/2016 | 1,402 | | 5/11/2016 | 36,885 |
| 3/29/2016 | 90,730 | | 5/12/2016 | 463 |
| 3/30/2016 | 4,300 | | 6/7/2016 | 100 |
| 3/31/2016 | 7,095 | | 6/8/2016 | 0 |
| 4/1/2016 | 1,726 | | 6/9/2016 | 100 |
| 4/4/2016 | 24,290 | | 6/10/2016 | 76 |
| 4/27/2016 | 2,719 | | 6/15/2016 | 27,600 |
| 5/2/2016 | 180 | | 6/24/2016 | 21,017 |
| 5/3/2016 | 4,657 | | 6/27/2016 | 500 |
| 5/4/2016 | 1,800 | | | |
| | | | Total | 342,836 |

### Defendants SocGen-U.S. and SocGen-Canada

191.   During the Relevant Period, Short Selling Defendant SocGen-U.S.'s

Affiliated Canadian Counterpart, SocGen-Canada engaged in the short selling of

Concordia's shares.  SocGen-Canada is affiliated with Short Selling Defendant

SocGen-U.S. and both defendants are owned by a common parent, Société

Générale U.S.  As Concordia was an Interlisted Security, the affiliated companies

regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

192.   Reflected in the following chart, SocGen-Canada sold approximately 56,000 shares short that it did not have in inventory.  As an Interlisted Security, Concordia shares are fungible and were either executed by Short Selling Defendant SocGen-U.S. or SocGen-Canada without the public's knowledge.  As a result, these Concordia shares could be included in either country's short volume totals.

**SocGen-Canada – Concordia Short Shares**

| A | B | | A | B |
|---|---|---|---|---|
| Date | Shares Sold Short | | Date | Shares Sold Short |
| 3/17/2016 | 200 | | 5/12/2016 | 2,300 |
| 3/18/2016 | 200 | | 5/13/2016 | 700 |
| 3/21/2016 | 1,800 | | 6/7/2016 | 2,050 |
| 3/22/2016 | 300 | | 6/8/2016 | 2,000 |
| 3/23/2016 | 500 | | 6/9/2016 | 200 |
| 3/24/2016 | 6,900 | | 6/10/2016 | 100 |
| 3/30/2016 | 11,700 | | 6/13/2016 | 4,600 |
| 3/31/2016 | 2,250 | | 6/14/2016 | 500 |
| 4/4/2016 | 3,600 | | 6/15/2016 | 152 |
| 4/27/2016 | 365 | | 6/17/2016 | 4,700 |
| 4/29/2016 | 600 | | 6/20/2016 | 300 |
| 5/2/2016 | 3,500 | | 6/21/2016 | 1,200 |
| 5/3/2016 | 1,250 | | 6/22/2016 | 300 |
| 5/4/2016 | 500 | | 6/23/2016 | 250 |
| 5/5/2016 | 100 | | 6/27/2016 | 3,200 |
| | | | | |
| | | | Total | 56,317 |

**Defendants Merrill-U.S., Merrill-Canada, and MLPro**

193.    During the Relevant Period, Short Selling Defendants Merrill-U.S. and MLPro's Affiliated Canadian Counterpart, Merrill-Canada engaged in the short selling of Concordia's shares.  Short Selling Defendants Merrill-U.S., MLPro, and Merrill-Canada are owned by a common parent, Bank of America Corp.  Since Concordia was an Interlisted Security, the affiliated companies regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

194.    As reflected in the following chart, Merrill-Canada sold approximately 112,000 shares of Concordia short through Canada, although it did not have these shares in its inventory.  As an Interlisted Security, Concordia shares are fungible and were either executed by Short Selling Defendants Merrill-U.S., MLPro or Merrill-Canada without the public's knowledge, and these shares could be included in either country's Concordia short volume totals.

**[INTENTIONALLY LEFT BLANK]**

**Merrill-Canada – Concordia Short Shares**

| A | B |
|---|---|
| **Date** | **Shares Sold Short** |
| 3/17/2016 | 4,333 |
| 3/18/2016 | 3,835 |
| 3/21/2016 | 22,466 |
| 3/22/2016 | 1,211 |
| 3/23/2016 | 59,051 |
| 3/24/2016 | 19,101 |
| 4/1/2016 | 1,949 |
| | |
| Total | 111,946 |

## Defendants John Doe-U.S. and John Doe-Canada

195.   During the Relevant Period, Short Selling Defendant John Doe-U.S.'s Defendants' Affiliated Canadian Counterparts, a/k/a "Anonymous[17]", John Doe-Canada engaged in short selling of Concordia's shares.  Upon information and belief, John Doe-Canada is affiliated with the Short Selling John Doe-U.S. Defendants.  Since Concordia was an Interlisted Security, the Short Selling John Doe-U.S. Defendants and John Doe-Canada, like the other named Short Selling Defendants, regularly routed orders to buy or sell Concordia shares between each other for the seamless execution of these fungible shares in both countries.

---

[17] On the TSX website Member Firm Directory page, reference is made to broker number 001 named "Anonymous".

196.   As reflected in the following chart, the John Doe-Canada sold approximately 2.2 million shares short that they did not have in inventory.  Since Concordia is an Interlisted Security, these shares are fungible and were either executed by the Short Selling John Doe-U.S. Defendants or John Doe-Canada without the public's knowledge.  Therefore, these shares could be included in either country's Concordia short volume totals.

**[INTENTIONALLY LEFT BLANK]**

**John Doe-Canada – Concordia Short Shares**

| A | B | | A | B |
|---|---|---|---|---|
| Date | Shares Sold Short | | Date | Shares Sold Short |
| 3/17/2016 | 181,147 | | 5/10/2016 | 20,578 |
| 3/18/2016 | 292,842 | | 5/11/2016 | 1,226 |
| 3/21/2016 | 58,782 | | 5/12/2016 | 66,198 |
| 3/22/2016 | 26,400 | | 5/13/2016 | 28,074 |
| 3/23/2016 | 8,568 | | 6/7/2016 | 16,201 |
| 3/24/2016 | 234,043 | | 6/8/2016 | 158,803 |
| 3/29/2016 | 41,094 | | 6/9/2016 | 49,795 |
| 3/30/2016 | 147,434 | | 6/10/2016 | 24,500 |
| 3/31/2016 | 7,800 | | 6/13/2016 | 88,180 |
| 4/1/2016 | 2,918 | | 6/14/2016 | 20,287 |
| 4/4/2016 | 1,823 | | 6/15/2016 | 41,893 |
| 4/27/2016 | 2,900 | | 6/16/2016 | 129,554 |
| 4/29/2016 | 1,200 | | 6/17/2016 | 38,677 |
| 5/2/2016 | 1,300 | | 6/20/2016 | 13,123 |
| 5/3/2016 | 34,700 | | 6/21/2016 | 13,529 |
| 5/4/2016 | 55,600 | | 6/22/2016 | 59,299 |
| 5/5/2016 | 74,100 | | 6/23/2016 | 38,050 |
| 5/6/2016 | 6,450 | | 6/24/2016 | 90,039 |
| 5/9/2016 | 57,675 | | 6/27/2016 | 96,681 |
| | | | | |
| | | | Total | 2,231,463 |

197.   Upon information and belief, there was an excessive amount of short

selling that can be deemed naked short selling based on an insufficient supply of

authorized shares that Concordia issued for public trading that were available to

cover the enormous volume of short selling that was occurring.  This resulted from

the unlawful creation of Fictitious Shares which were injected into the market by

the Naked Short Selling Defendants to increase the supply in support of the naked

short selling scheme.

### Scienter – There is Strong Circumstantial Evidence Of Defendants' Conscious Misbehavior or Reckless Conduct

198.    The conduct of the U.S. and Canadian Short Selling Defendants did

not reflect inadvertent anomalies, innocent accidents or "one-off" errors.  Rather,

the trading activities of the U.S. and Canadian Short Selling Defendants and their

failure to comply with industry standards of care when viewed collectively,

evidences that each U.S. and Canadian Short Selling Defendant consciously or

recklessly engaged in unlawful conduct that was approved by corporate officials

sufficiently knowledgeable about the company to know that the U.S. and Canadian

Short Selling Defendants' trading practices intended to deceive Concordia's

investors and financially benefit the U.S. and Canadian Short Selling Defendants to

the financial detriment of Concordia's investors, including plaintiff.

**First**, as registered brokers, each of the Short Selling Defendants knew or

should have known that by continuously and consciously failing to locate, borrow

and deliver authorized Concordia shares by the settlement date of their naked short

sales, they were manipulating the price of Concordia's shares downward;

**Second**, as registered brokers, each of the Short Selling Defendants knew or

should have known that by continuously and consciously reporting false

information, they were manipulating the price of Concordia's shares downward; and

**Third**, as registered brokers, each U.S. Short Selling Defendant knew or should have known that their conduct was an extreme departure from industry standards of care of the securities industry, including, FINRA Rule 3110 (the "FINRA Supervision Rule") which required the U.S. Short Selling Defendants to "establish and maintain a system" of supervision that is "reasonably designed to achieve compliance with applicable securities laws and regulations." This rule requires the U.S. Short Selling Defendants to monitor their internal trading and settlement activities, establish written supervisory procedures, appoint qualified supervisors, and implement reviews at least annually to detect and prevent violations of, and achieve compliance with, the applicable securities laws, regulations, and rules. Under the FINRA Supervision Rule, the compliance program must include periodic examinations regarding designed to detect and prohibit unlawful trading activities. FINRA Rule 3120 (the "FINRA Supervisory Control System Rule") reinforces the requirements of the FINRA Supervision Rule by further requiring that firms test and verify that their supervisory procedures are reasonably designed and operated to achieve compliance with the applicable laws, regulations, and rules.

199.   If properly monitored by the Short Selling Defendants, the interrelated nature of these facts and the corresponding supervisory and compliance obligations would have caused Short Selling Defendants to be aware of the violations described herein.  In this context, a strong inference can be drawn that the Short Selling Defendants consciously or recklessly disregarded their legal obligations and turned a blind eye to their unlawful trading conduct in order to avoid having to take any form of internal corrective actions.

### The Short Selling Defendants Used National Securities Exchanges and the Mails to Perpetrate Their Market Manipulation Scheme In Connection With Trading Concordia Shares

200.   Each Short Selling Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to purchase and sell Concordia securities.

201.   Each Short Selling Defendants knowingly employed devices, schemes, or artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud or deceit upon Concordia and the market.

### Harrington Suffered Damages As A Result Of Short Selling Defendants' Market Manipulation Scheme

202.   As a direct and proximate result of the Short Selling Defendants' schemes, devices and manipulative conduct, Harrington has been damaged in an amount to be proven at trial, but is approximately at least tens of millions of

dollars. The Short Selling Defendants' scheme was sustained and unrelenting, and together with the Spoofing Defendants spoofing scheme proximately caused Concordia's share price to decline during the Relevant Period from $28.02 per share to $3.13 per share. But for the market manipulation schemes of all of the Short Selling Defendants which were concealed from Harrington, it would not have suffered the financial losses that were realized in connection with its sale of Concordia shares into a market that was being manipulated. There is a direct causal link between the damages Harrington suffered in connection with the sale of its Concordia shares and the market manipulation schemes perpetrated by all of the Short Selling Defendants.

203. Concordia securities were intended to be traded in an efficient and fair market free of manipulation. Harrington relied on the assumption that the market was free from manipulation when it sold its Concordia shares and that the market price of these securities was determined by the natural forces of supply and demand rather than the false and misleading information that was secretly injected into the market by the U.S. and Canadian Short Selling Defendants and the U.S. and Canadian Spoofing Defendants.

204. By reasons of the foregoing, Harrington seeks to recover damages for the loss that the Short-Selling Defendants' conduct caused it to suffer, by violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.

**C.**   **Third Claim for Relief for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934 Against CIBC-U.S., CIBC-Canada, TD-U.S., TD-Canada, Merrill-U.S., Merrill-Canada, John Doe-U.S. and John Doe-Canada**

205.   Plaintiff incorporates by reference paragraphs 1 through 174 as if more fully set forth herein.

206.   Based upon the conduct described with regard to U.S. and Canadian Spoofing Defendants' spoofing scheme, their scheme violated Section 9(a)(2) of the Securities Exchange Act of 1934, which makes it unlawful to engage in a series of manipulative transactions "in any security…creating actual or apparent active trading in such a security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

207.   By reason of the conduct described in paragraphs 53 to 174 above, the U.S. and Canadian Spoofing Defendants, their affiliates, subsidiaries, related companies and John Doe entities, directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to affect alone or with one or  more other persons, a series of transactions in Concordia's securities that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others, engaged in the market manipulation strategy of

spoofing which artificially affected the prices of Concordia's securities that Harrington sold.

208.   The U.S. and Canadian Spoofing Defendants conscious misbehavior or recklessness artificially affected the price of Concordia's shares, that Harrington sold during the Relevant Period.  Harrington's financial injuries would not have been as extensive, but for the U.S. and Canadian Spoofing Defendants conscious misbehavior or recklessness.

209.   By reason of the foregoing, U.S. and Canadian Spoofing Defendants violated Section 9(a)(2) of the Exchange Act of 1934.

**D.    Fourth Claim For Relief For Unjust Enrichment
        (Against All Defendants)**

210.   Plaintiff incorporates by reference paragraphs 1 through 209 as if more fully set forth herein.

211.   The Defendants financially benefitted from their unlawful acts.  As alleged herein, the U.S. and Canadian Spoofing Defendants manipulated the market price of Concordia' Interlisted Securities during the Relevant Period by intentionally placing Baiting Orders to sell that were never intended to be executed in order to signal to the market that Concordia's shares were being sold, at prices that were declining.  These Baiting Orders to sell were cancelled after the U.S. and

Canadian Spoofing Defendants executed orders to buy Concordia shares at the artificially low prices that they created by their scheme.

212.   The U.S. and Canadian Spoofing Defendants acted consciously or recklessly to manipulate Concordia shares, resulting in the market share price of Concordia declining and causing Harrington to suffer losses in connection with the sale of its Concordia shares during the Relevant Period.

213.   The U.S. and Canadian Short Selling Defendants benefitted from their unlawful acts.  As alleged herein, the U.S. and Canadian Short Selling Defendants manipulated the market price of Concordia securities during the Relevant Period by unlawfully naked short selling Concordia shares that they neither had in inventory nor located or borrowed as required by Reg SHO.  The unlawful conduct of the U.S. and Canadian Short Selling Defendants injected false and misleading information into the market that interfered with Concordia's share price being determined by the natural forces of supply and demand.  The unlawful conduct of the U.S. and Canadian Short Selling Defendants was consciously or recklessly performed.

214.   These unlawful acts caused Harrington to suffer financial injury during the Relevant Period, by being forced to sell its Concordia Interlisted Securities at artificially low prices.

215.   As a result of the Defendants' spoofing and naked short selling activities as set forth herein, it is unjust and inequitable for the Defendants to have enriched themselves in this manner at the expense of Harrington.  Under the facts and circumstances of this case, equity and good conscience require the Defendants to make restitution.

216.   Each Defendant should pay restitution for its own unjust enrichment to Harrington.

**E.   Fifth Claim For Relief – Common Law Fraud
       (Against All Defendants)**

217.   Plaintiff incorporates by reference paragraphs 1 through 216 as if more fully set forth herein.

218.   By creating and selling Fictitious Shares in their abusive short selling scheme, the Defendants UBS-U.S., UBS-Canada, Merrill-U.S., Merrill-Canada, MLPro, SocGen-U.S., SocGen-Canada, John Doe-U.S. and John Doe-Canada each knowingly or recklessly injected into the market false and misleading information – that Harrington relied upon – concerning the fake supply of Concordia's shares that appeared available for trading.  This interfered with the natural market forces of supply and demand, by artificially driving the price of the shares downward. When Harrington sold its Concordia stock during the Relevant Period, it suffered damages that were directly and proximately caused by Defendants' fraud.

219.   As registered brokers each Defendant – CIBC-U.S., CIBC-Canada, TD-U.S., TD-Canada, Merrill-U.S., Merrill-Canada, John Doe-U.S. and John Doe-Canada – knew or should have known that it was unlawful to place Baiting Orders to sell in a Market Order Book that were never intended to be executed in order to trick market participants into selling shares of Concordia stock, including short selling, which drove the price of Concordia stock downward.  When Harrington sold its Concordia shares during the Relevant Period, it did not possess any specific facts that demonstrating that the market price of Concordia's share was being manipulated and therefore, it relied on the efficiency of the market that had been unlawfully manipulated it suffered damages that were directly and proximately caused by Defendants' fraud.

220.   The affiliated U.S. and Canadian Defendants, CIBC-U.S., CIBC-Canada, TD-U.S., TD-Canada, Merrill-U.S., Merrill-Canada, MLPro, UBS-U.S., UBS-Canada, SocGen-U.S., SocGen-Canada, John Doe-U.S. and John Doe-Canada, acted in concert with one another knowing – or recklessly not knowing – that they would be manipulating.  As a result, Harrington suffered financial losses that were directly and proximately caused by the Defendants' fraud.

221.   Additionally, "U.S. Defendants", CIBC-U.S., TD-U.S., Merrill-U.S., MLPro, UBS-U.S., SocGen-U.S. and John Doe-U.S., knowingly made false statements in FINRA Report 3130, which states that each broker shall "…(A)

establish, maintain and review policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations; (B) modify such policies and procedures as business, regulatory and legislative changes and events dictate; and (C) test the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.", were false and misleading.

222.   The U.S. Defendants had access to information that they knew contradicted the statements made in their regulatory filings and information that violated the applicable industry rules and regulations.

223.   The U.S. Defendants knew that they were required to have internal policies, procedures and systems that detected and prohibited manipulative or fraudulent trading devices or schemes.

224.   Harrington was and is aware that entities trading on U.S. exchanges are subject to certain industry rules and have certain filing obligations.  Without any specific facts that demonstrated Concordia's market price was being manipulated, Harrington traded Concordia stock with the false belief, based on these misrepresentations, that entities trading Concordia stock were complying with industry rules and standards.

225.   Without any specific facts that demonstrated Concordia's market price was being manipulated, Harrington traded Concordia stock with the false belief, based on these false and/or misleading statements, that traders like Defendants were not manipulating the market and that the Concordia stock price reflected natural market forces of supply and demand, relying on those misrepresentations, Harrington traded Concordia stock on the U.S. exchanges, and suffered financial harm as a result of its reliance on Defendants' misrepresentations.

### F.   Sixth Claim For Relief – Conspiracy to Commit Fraud (Against All Defendants)

226.   Plaintiff incorporates by reference paragraphs 1 through 225 as if more fully set forth herein.

227.   The U.S. Spoofing Defendants each conspired with their Affiliated Canadian Counterparts to develop a trading scheme to mislead the market with the common objective to misrepresent the value of Concordia's shares that were being sold on U.S. exchanges.  The Affiliated Canadian Counterparts overt acts in furtherance of the conspiracy included engaging in the unlawful spoofing scheme on the Canadian exchanges that they knew would have a direct impact on the market price of Concordia Interlisted Shares being traded on the U.S. exchanges. In addition to the spoofing schemes that were perpetrated by the U.S. and Canadian Spoofing Defendants on the Canadian and U.S. exchanges, these Defendants

communicated with each other in New York and Canada to coordinate their trading strategy that would manipulate the market price of Concordia in both countries.

228.   Each U.S. Defendant furthered the conspiracy by entering into an agreement with their Affiliated Canadian Counterpart to inject false and misleading information into the market, facilitating the massive sell off, including abusive short selling, that caused Concordia's market share price to decline and caused Harrington financial loss during the Relevant Period.

229.   In furtherance of the conspiracy, the Affiliated Canadian Counterparts coordinated the placement of their Baiting Orders to sell on the Canadian exchanges with each U.S. Spoofing Defendant's placement of its Baiting Orders to sell on the U.S. exchanges.

230.   This conspiracy simultaneously manipulated Concordia's market price on both the U.S. and Canadian markets.  The U.S. Spoofing Defendants and their Affiliated Canadian Counterparts were each other's agents whose overt acts in furtherance of the conspiracy occurred on the U.S. and Canadian exchanges.

231.   The coordinated cross-border activity by each of the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts was necessary to the success of the spoofing scheme in the United States because without the simultaneous spoofing activity in Canada, the pricing manipulation that the U.S.

Spoofing Defendants were injecting into the U.S. markets would have been mitigated by order routing to the unmanipulated market in Canada.

232.    In furtherance of the conspiracy to commit fraud, the coordinated spoofing by U.S. and Canadian Spoofing Defendants communicated to the U.S. and Canadian Short Selling Defendants by sending market signals through their spoofing activity that the market price of Concordia shares was spiraling downward and that it was a propitious time to execute their abusive short selling scheme, which required the downward price movement of Concordia's shares to succeed.

233.    The unlawful acts committed by each of the Defendants to further the conspiracy had a direct and substantial impact on the market price of Concordia shares that were traded on exchanges in the United States.

234.    Upon information and belief, the Defendants acted in concert intentionally to artificially depress the price of Concordia's shares on the U.S. exchanges and to financially harm Concordia's investors who were trading on the U.S. exchanges.

## G.    Seventh Claim For Relief – Aiding and Abetting Fraud (Against All Defendants)

235.    Plaintiff incorporates by reference paragraphs 1 through 234 as if more fully set forth herein.

236.   As alleged above, each of the U.S. Defendants intentionally coordinated with their Affiliated Canadian Counterparts to develop a fraudulent trading scheme to mislead the market by misrepresenting the value of Concordia's Interlisted Shares to the market.

237.   To accomplish the fraud, each U.S. Defendant conspired with their Affiliated Canadian Counterpart to engage in, among other things, spoofing and abusive short selling as detailed herein.  The U.S. Defendants and their Affiliated Canadian Counterparts created and sold Fictitious Shares into the market.  Their numerous transactions detailed herein were misstatements to the market, which Harrington relied on to trade Concordia's stock.

238.   Not only were their trading transactions themselves misstatements, but the transactions injected false and misleading information into the market, which interfered with the natural supply and demand of Concordia's stock.

239.   The U.S. Defendants and their Affiliated Canadian Counterparts executed the transactions in a coordinated effort to fraudulently misrepresent the value of Concordia's stock and drive the share price downward. Their transactions, taken together, helped them present an inaccurate financial picture to Harrington and other traders of Concordia stock.

240.   Upon information and belief, the U.S. Defendants and their Affiliated Canadian Counterparts also substantially assisted with the fraud by communicating

with each other to coordinate their trading strategies and devise an attack on

Concordia stock.  These communications took place in the U.S., including New

York, and in Canada.

241.   To assist with the fraud, the Affiliated Canadian Counterparts

coordinated the placement of their Baiting Orders to sell on the Canadian

exchanges with each U.S. Spoofing Defendant's placement of its Baiting Orders to

sell on the U.S. exchanges.

242.   This fraudulent scheme simultaneously manipulated Concordia's

market price on both the U.S. and Canadian markets.  The U.S. Spoofing

Defendants and their Affiliated Canadian Counterparts' acts assisted each other in

committing fraud on the U.S. and Canadian exchanges.

243.   The coordinated cross-border activity by each of the Affiliated

Canadian Counterparts assisted the U.S. Spoofing Defendants in committing fraud

in the United States because without the simultaneous spoofing activity in Canada,

the pricing manipulation that the U.S. Spoofing Defendants were injecting into the

U.S. markets would have been mitigated by order routing to the unmanipulated

market in Canada.  Upon information and belief, these coordinated acts

demonstrate that the U.S. Spoofing Defendants and their Affiliated Canadian

Counterparts had actual knowledge of the fraud.

244.   The unlawful acts committed by each of the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts to assist with the fraud had a direct and substantial impact on the market price of Concordia shares that were traded in this District in the United States.  The acts of the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts alleged herein were of substantial assistance to the perpetration of the fraud in the Unites States.  Unless the markets were both manipulated, neither market could be manipulated.

245.   Upon information and belief, the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts acted intentionally to artificially depress the price of Concordia's shares on the U.S. exchanges and to financially harm Concordia's investors who were trading on the U.S. exchanges.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.   Finding that Defendants violated the federal securities laws as alleged in this complaint;

B.   Ordering Defendants to pay damages as a result of their unlawful conduct in an amount to be determined at trial;

C.     Awarding reasonable attorney's fees and costs together with all

available pre and post judgment interest; and

D.     Granting such other and further relief as the Court deems just and

appropriate.

## VII.     <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff

demands trial by jury in this action of all issues so triable.

Dated:  April 22, 2021
          New York, New York

                                        Respectfully submitted,

                                        By: /s/ Alan M. Pollack
                                             Alan M. Pollack
                                             Felicia S. Ennis
                                             Warshaw Burstein, LLP
                                             575 Lexington Avenue, 7th Floor
                                             New York, New York 10022
                                             Tel: (212) 984-7700
                                             Fax: (212) 956-2164

                                                    and

                                        By: /s/ James Wes Christian
                                             James Wes Christian
                                             Ardalan Attar
                                             Christian Smith & Jewell, LLP
                                             2302 Fannin, Suite 500
                                             Houston, Texas 77002
                                             Tel: (713) 659-7616

{1338579.1 }                            117