**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED, | Civil Action No.:  1:21-cv-00761-LGS |
| Plaintiff, | Hon. Lorna G. Schofield |
| v. | |
| CIBC WORLD MARKETS CORP.; CIBC WORLD MARKETS INC.; BOFA SECURITIES, INC.; MERRILL LYNCH CANADA INC.; MERRILL LYNCH PROFESSIONAL CLEARING CORP.; TD SECURITIES, INC.; TD SECURITIES(USA) LLC; UBS FINANCIAL SERVICES, INC.; UBS SECURITIES CANADA, INC.; SOCIETE GENERALE CAPITALE CANADA, INC.; SG AMERICAS SECURITIES, LLC; AND JOHN DOES 1 THROUGH 10, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 3

        A.     The Parties ............................................................................ 3

        B.     Harrington's Complaints to Canadian Regulators About Concordia ........ 4

        C.     Harrington's Allegations Here ................................................ 5

ARGUMENT ......................................................................................................... 6

    I.     Harrington cannot establish personal jurisdiction over Foreign Defendants......... 7

    II.    Claims against Foreign Defendants or based on Canadian trading are not actionable under *Morrison*. .................................................................. 11

    III.   Harrington's Exchange Act claims are untimely. ................................. 13

    IV.   Harrington fails to state an Exchange Act claim. ................................. 15

        A.     Harrington fails to plead manipulative conduct by any Defendant. ........ 15

              1.     Harrington improperly assumes Defendants' trades were for their own accounts. ............................................. 15

              2.     Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through spoofing. ............... 16

              3.     Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through short selling. ......... 19

        B.     Harrington fails to plead loss causation. ................................. 22

        C.     Harrington fails to plead reliance. .......................................... 25

    V.    Harrington fails to state a common-law claim. ................................. 26

        A.     Harrington fails to state an unjust-enrichment claim. ........................... 26

        B.     Harrington fails to state a claim for common-law fraud. ........................ 27

        C.     Harrington fails to state a claim for aiding and abetting fraud or conspiracy to commit fraud. ................................................ 29

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019) ............ 8

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,
106 N.E.3d 1176 (N.Y. 2018) ............................................................................ 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................... 6, 15

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ...................................................................... *passim*

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ............................................................................ 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 6

*Bereswill v. Yablon*,
160 N.E.2d 531 (N.Y. 1959) ............................................................................ 30

*Bigio v. Coca-Cola Co.*,
675 F.3d 163 (2d Cir. 2012) ............................................................................ 29

*Bristol-Myers Squibb Co. v. Super. Ct.*,
137 S. Ct. 1773 (2017) ..................................................................................... 7

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ........................................................................ 6, 8, 9

*Christians of California, Inc. v. Clive Christian New York, LLP*,
2015 WL 468833 (S.D.N.Y. Feb. 3, 2015) ..................................................... 10, 21

*Citibank, N.A. v. K-H Corp.*,
968 F.2d 1489 (2d Cir. 1992) ..................................................................... 22, 27

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ............................................................................ 13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ............................................................................ 12

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010) ............................................................ *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Contant v. Bank of Am. Corp.*,
　385 F. Supp. 3d 284 (S.D.N.Y. 2019) ...................................................................... 10

*Copperweld Corp. v. Independence Tube Corp.*,
　467 U.S. 752 (1984).................................................................................................. 21

*CP Stone Fort Holdings, LLC v. John*,
　2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ........................................................... 18

*Daimler AG v. Bauman*,
　571 U.S. 117 (2014)................................................................................................ 6, 7

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
　631 F.3d 42 (2d Cir. 2011) ...................................................................................... 26

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
　135 F.3d 837 (2d Cir. 1998) ............................................................................... 12, 21

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005).................................................................................................. 22

*Fezzani v. Bear, Stearns & Co.*,
　384 F. Supp. 2d 618 (S.D.N.Y. 2004) ................................................................ 15, 23

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
　368 F. Supp. 3d 681 (S.D.N.Y. 2019) ....................................................................... 7

*Fogel v. Wal-Mart de Mexico SAB de CV*,
　2017 WL 751155 (S.D.N.Y. Feb. 27, 2017).............................................................. 13

*Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*,
　2005 WL 736217 (S.D.N.Y. Mar. 30, 2005) ............................................................ 18

*Hatteras Enters., Inc. v. Forsythe Cosm. Grp., Ltd.*,
　2019 WL 9443845 (E.D.N.Y. Jan. 14, 2019) ........................................................... 10

*Ingrami v. Rovner*,
　45 A.D.3d 806 (N.Y. App. Div. 2007) ..................................................................... 13

*In re Aluminum Warehousing Antitrust Litig.*,
　2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015)............................................................. 7

*In re Aluminum Warehousing Antitrust Litig.*,
　90 F. Supp. 3d 219 (S.D.N.Y. 2015) ........................................................................ 10

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re Banco Bradesco S.A. Sec. Litig.*,
 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ..................................................... 22

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
 995 F. Supp. 2d 291 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master
 Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016) .......................... 29

*In re Int. Rate Swaps Antitrust Litig.*,
 261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..................................................... 26

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
 332 F. Supp. 3d 885 (S.D.N.Y. 2018) ................................................ 19, 24, 29

*In re Merrill, BofA, and Morgan Stanley Spoofing Litig.*,
 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ........................................ 23, 24, 26, 27

*In re Platinum & Palladium Antitrust Litig.*,
 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ......................................... 27

*In re Terrorist Attacks*,
 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ...................................................... 9

*Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*,
 363 F.3d 137 (2d Cir. 2004) ............................................................... 26

*Jazini v. Nissan Motor Co.*,
 148 F.3d 181 (2d Cir. 1998) ................................................................ 7

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001) ............................................................... 18

*Kaye v. Grossman*,
 202 F.3d 611 (2d Cir. 2000) ............................................................... 27

*Lattanzio v. Deloitte & Touche LLP*,
 476 F.3d 147 (2d Cir. 2007) ............................................................... 23

*Laydon v. Mizuho Bank, Ltd.*,
 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ......................................... 27

*Leasco Data Processing Equipment Corp. v. Maxwell*,
 468 F.2d 1326 (2d Cir. 1972) ............................................................. 11

*Mandarin Trading Ltd. v. Wildenstein*,
 944 N.E.2d 1104 (N.Y. 2011) ............................................................ 26

# TABLE OF AUTHORITIES
(continued)

Page

*McCullough v. Advest, Inc.*,
   2017 WL 3675787 (W.D. Pa. Aug. 25, 2017) ........................................................... 14

*McIntire v. China MediaExpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013) ...................................................................... 22

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ................................................................................................. 13

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ......................................................................................... 7

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ...................................................................................... 17

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ....................................................................................... 2, 11, 13

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*,
   2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ........................................................... 28

*Nigerian Nat'l Petro. Corp. v. Citibank, N.A.*,
   1999 WL 558141 (S.D.N.Y. July 30, 1999) .............................................................. 29

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ................................................................................ 12, 13

*Pasternack v. Lab. Corp. of Am. Holdings*,
   59 N.E.3d 485 (N.Y. 2016) ....................................................................................... 29

*Penguin Group (USA) Inc. v. Am. Buddha*,
   609 F.3d 30 (2d Cir. 2010) .......................................................................................... 6

*Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Trans., Inc.*,
   730 F.3d 263 (3d Cir. 2013) ...................................................................................... 14

*Robinson v. Overseas Military Sales Corp.*,
   21 F.3d 502 (2d Cir. 1994) .......................................................................................... 7

*Seagrape Inv'rs LLC v. Tuzman*,
   2020 WL 5751232 (S.D.N.Y. Sep. 25, 2020) ........................................................... 28

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*,
   883 N.Y.S.2d 486 (1st Dep't 2009) ........................................................................... 30

# TABLE OF AUTHORITIES
(continued)

**Page**

*Stark Trading v. Falconbridge Ltd.*,
  2008 WL 153542 (E.D. Wis. Jan. 14, 2008) ..................................................... 25, 26

*Sunward Elecs., Inc. v. McDonald*,
  362 F.3d 17 (2d Cir. 2004) ............................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .......................................................................................... 16

*Thea v. Kleinhandler*,
  807 F. 3d 492 (2d Cir. 2015) ............................................................................ 13

*Walden v. Fiore*,
  571 U.S. 277 (2014) .......................................................................................... 11

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
  818 F. Supp. 2d 744 (S.D.N.Y. 2011) .............................................................. 24

## Statutes

15 U.S.C. § 78u-4(b)(2)(A) ..................................................................................... 17

28 U.S.C. § 1658(b)(1) .......................................................................................... 13

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 28

## Other Authorities

SEC Market Structure Report, *available at*
  https://www.sec.gov/marketstructure/research/highlight-2013-01.html ................................. 17

## PRELIMINARY STATEMENT

Plaintiff Harrington Global Opportunity Fund describes an unlikely scheme in which multiple financial institutions located in Canada and the United States supposedly conspired with their own affiliates to manipulate the stock price of Concordia International Corp. through alleged "spoofing" and "abusive naked short selling" on U.S. and Canadian stock exchanges. But nothing in the Complaint explains—let alone plausibly—any benefit Defendants obtained from engaging in such supposed misconduct, or how Harrington was injured as a result. Harrington's claims are not only implausible; they are also untimely and, to the extent based on Canadian trading, impermissibly extraterritorial.  The Complaint should be dismissed for any of several reasons.

First, the claims against Foreign Defendants[1] should be dismissed for lack of personal jurisdiction.  There is no basis to exercise general personal jurisdiction over Foreign Defendants because each has its headquarters and principal place of business outside the United States.  Nor has Harrington alleged facts that would support the exercise of specific jurisdiction, not even one specific trade in the U.S. by any Foreign Defendant.  The Complaint describes no domestic suit-related conduct by any Foreign Defendant—and Foreign Defendants' sworn declarations, which the Court may consider on this Rule 12(b)(2) motion, establish their lack of relevant connections to this forum.  These declarations establish that most Foreign Defendants conducted no suit-related trading during the relevant period, either because they did not trade Concordia at all on U.S. markets, or conducted no proprietary trading of Concordia.  Harrington seeks to establish

---

[1] "Foreign Defendants" refers to Defendants CIBC World Markets, Inc. ("CIBC Canada"); Merrill Lynch Canada Inc. ("ML Canada"); TD Securities, Inc. ("TD Canada"); UBS Securities Canada, Inc ("UBS Canada"); and Société Générale Capital Canada, Inc. ("SG Canada").  "Domestic Defendants" refers to BofA Securities, Inc. ("BofA"); CIBC World Markets Corp. ("CIBC"); Merrill Lynch Professional Clearing Corp. ("ML"); TD Securities (USA) LLC ("TD"); UBS Financial Services, Inc. ("UBS"); and SG Americas Securities, LLC ("SG").

jurisdiction based on Foreign Defendants' alleged Canadian trading, but the Complaint contains no facts suggesting such trading was "expressly aimed" at manipulating securities prices in the United States.  Harrington also cannot ground personal jurisdiction over Foreign Defendants on a theory of conspiracy jurisdiction: The Complaint contains no plausible allegations of conspiracy, and even if it did, Harrington fails to allege any facts permitting Domestic Defendants' in-forum conduct to be imputed to their supposed co-conspirators abroad.

Second, the claims against Foreign Defendants and any claims against Domestic Defendants based on Canadian trading are impermissibly extraterritorial under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  Defendants cannot be held liable under the Exchange Act for trading on Canadian exchanges—trading that Harrington acknowledges is regulated by Canadian law—because the Act applies exclusively to domestic transactions.

Third, Harrington's Exchange Act claims are time-barred.  By its own admission, Harrington complained to Canadian regulators about potential market manipulation in Concordia stock in 2016 and was given access to all the data it needed to draft the Complaint by March 2017.  Harrington was thus required to file its Exchange Act claims by March 2019 at the latest. Its January 2021 filing came two years too late.

Fourth, Harrington fails to plausibly plead the elements of an Exchange Act claim, let alone with the requisite particularity.  Harrington fails to allege any particularized facts supporting a plausible inference that any Defendant actually engaged in spoofing or naked short selling, as opposed to bona fide trading activity.  Harrington also fails to plead loss causation and reliance: Harrington does not allege that it sold Concordia stock during the periods of alleged price depression and cannot plausibly allege that it thought it was selling in an unmanipulated

market.  After all, Harrington concedes that it complained to regulators about potential

manipulation in April 2016, long before it sold any of its Concordia stock.

Fifth, Harrington fails to state any common-law claim.  Among other reasons,

Harrington's unjust enrichment claim fails because the Amended Complaint contains no

allegation that Harrington transacted directly with any Defendant such that any Defendant could

have been enriched at Harrington's expense.  Harrington's claims for fraud, aiding and abetting

fraud, and conspiracy to commit fraud fail for the same reasons as Harrington's Exchange Act

claims.  The Complaint should be dismissed with prejudice.

## BACKGROUND

### A.     The Parties

Harrington is a Bermuda-based hedge fund that invested in shares of Concordia.

(AC ¶ 20.)[2]  Defendants are U.S. and Canadian broker-dealers that allegedly execute securities

transactions for their own proprietary accounts and for the accounts of their customers.  (*Id.*

¶¶ 21–22, 24–26, 28–29, 31–32, 34–35.)  Each Foreign Defendant is headquartered and

maintains its principal place of business in Canada.  (*Id.* ¶¶ 22, 26, 29, 32, 35; *see also* C. Climo

Decl. ¶ 3; G. Duncan Decl. ¶ 3; B. Carignan Decl. ¶ 3; G. Stratis Decl. ¶ 3; L. Petrelli Decl. ¶ 3.)

None of the Foreign Defendants maintains an office or has any employees in the United States.

(*See* C. Climo Decl. ¶ 5; G. Duncan Decl. ¶ 4; B. Carignan Decl. ¶ 4; G. Stratis Decl. ¶ 4;

L. Petrelli Decl. ¶ 4.)  The Complaint does not describe any domestic conduct by any Foreign

Defendant, instead alleging only that Foreign Defendants traded in Concordia securities on the

---

[2] The facts in this section are taken from Harrington's Amended Complaint, cited as "AC," and the December 31, 2018 Ontario Superior Court of Justice's decision in *Harrington Global Opportunities Fund S.A.R.L. v. Investment Industry Regulatory Organization of Canada*, 218 ONSC 7739 (Can.), cited as "Norwich Order," *available at* https://www.canlii.org/en/on/onsc/doc/2018/2018onsc7739/ 2018onsc7739.html.  Unless otherwise stated herein, all emphasis is added and all internal quotation marks and citations are omitted from quoted passages.

Toronto Stock Exchange.  (*See* AC ¶¶ 22, 26, 29, 32, 35.)  And, in fact, most of the Foreign

Defendants have submitted evidence that they either did not conduct any trading or did not

conduct any proprietary trading in Concordia stock on any U.S. exchange during the relevant

period.  (*See* G. Duncan Decl. ¶ 5; B. Carignan Decl. ¶ 5; G. Stratis Decl. ¶ 5.)

     **B.**     **Harrington's Complaints to Canadian Regulators About Concordia**

     Concordia was a Canadian company in the business of acquiring and managing

pharmaceutical companies.  (Norwich Order ¶¶ 34–35.)  In the fall of 2015, Concordia's stock

price fell 79% after financial commentators compared its business model to that of the troubled

company Valeant Pharmaceuticals.  (*Id.* ¶¶ 37–41.)  Concordia's stock price fell again in the

spring of 2016 when it was the subject of other negative commentary, including a false report

that Concordia's auditors were taking a closer look at its earnings.  (*Id.* ¶ 46.)

     Harrington mistrusted these stock-price movements and in April 2016 asked a Canadian

regulator, the Investment Industry Regulatory Organization of Canada ("IIROC"), to investigate

potential manipulation of Concordia's stock.  (AC ¶ 41.)  Harrington also retained a former

British Columbia Securities Commissioner to conduct his own private investigation.  (*Id.*)

IIROC "undertook an extensive investigation and analysis of the trading in Concordia shares"

and after a year-long investigation "concluded that no market manipulation had occurred."

(Norwich Order ¶¶ 51, 64.)  Harrington's expert, meanwhile, conceded that "there may have

been other explanations" for Concordia's price declines besides market manipulation, including

"Valeant's situation," the fact "that U.S. politicians . . . were criticizing the pharmaceutical

industry," and "the Brexit debate in Britain."  (*Id.* ¶¶ 44, 47.)

     In March 2017, IIROC provided Harrington with "unmasked" Trade Order and Quote

Reports ("TOQ Reports") for Concordia stock containing non-public details of orders, trades,

and quotes on Canadian exchanges.  (AC ¶ 42.)  The TOQ Reports identified the "Trade Desk

ID" of the broker-dealers involved, but not the "Client ID" of the underlying clients who initiated the trade.  (*Id.* n.8.)  Harrington's consultant found this data insufficient and discontinued his work, after which Harrington hired a larger consulting firm and demanded more data from IIROC.  (*Id.* ¶¶ 44–45.)  When IIROC refused, Harrington asked an Ontario court to compel production.  (*Id.*)  Harrington complained that the TOQ Reports IIROC had produced were "inadequate for the necessary testing to determine whether there had been illegal market manipulation" because they "aggregated information at the trading desk or dealer level" without client detail.  (Norwich Order ¶ 69.)  The Ontario court denied Harrington's request, and in July 2019 Harrington hired a third consultant, Urvin, to re-analyze the TOQ Reports, along with publicly available trading data it purchased.  (AC ¶¶ 46, 51.)

### C.     Harrington's Allegations Here

Harrington alleges that Defendants manipulated Concordia's stock price downward through separate "spoofing" or "abusive short selling" "schemes" on the Toronto Stock Exchange or NASDAQ between January 27 and November 15, 2016.  (AC ¶¶ 1–2.)  Harrington describes "spoofing" as placing "Baiting Orders" with no intention to actually execute them, but only to "trick" investors into selling their stock.  (*Id.* ¶ 4.)  Harrington alleges that CIBC, TD, and BofA (the "Spoofing Defendants") each conspired with its respective Canadian affiliate to engage in spoofing and drive down Concordia's stock price in Canada and the U.S.  (*See, e.g.*, *id.* ¶ 227.)  No spoofing allegations are made against SG or UBS entities.

Harrington concedes that short selling is lawful, but alleges that it can be "abusive" if it is "naked," *i.e.*, where the seller does not borrow shares to deliver on the settlement date. (AC ¶ 10.)  Harrington alleges that this failure to deliver effectively results in the creation of "Fictitious Shares" that inject false information into the market and drive down prices.  (*Id.*) Harrington accuses UBS, UBS-Canada, BofA, ML, ML Canada, SG, and SG Canada (the

"Short-Selling Defendants") of injecting "millions of Fictitious Shares into the U.S. and Canadian markets . . . intended to drive [Concordia's stock price] downward." (*Id.* ¶ 179.)  No short selling allegations are made against the CIBC or TD entities.

Harrington claims that Defendants' spoofing and abusive short selling together drove down the price of Concordia stock from $28.03 to $3.12.  (AC. ¶ 2.)  Based on this allegation, Harrington brings claims against all Defendants under Section 10(b) and 9(a)(2) of the Exchange Act and common-law unjust enrichment and fraud claims.  (*Id.*)

## ARGUMENT

To survive this motion, Harrington's complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "[a] claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  All of Harrington's claims must also be pleaded with particularity under Rule 9(b).  And Harrington's Exchange Act claims are subject to the PSLRA's heightened pleading standard, requiring Harrington to "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants" as well as "facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007).

In addition, Harrington "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Group (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  The inquiry is defendant-specific, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018), focuses on the contacts the defendant has with the forum, *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014), and must proceed claim by

claim, *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).  Thus, to survive this

motion, Harrington's "prima facie showing . . . must include an averment of facts that, if credited

by the ultimate trier of fact, would suffice to establish jurisdiction over [each] defendant."

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (original

alteration omitted).  The Court need not "draw argumentative inferences in the plaintiff's favor,"

*Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), or accept as true "a

legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 185

(2d Cir. 1998).  And the Court may "look beyond the pleadings to affidavits and supporting

materials submitted by the parties" to assess jurisdiction.  *In re Aluminum Warehousing Antitrust*

*Litig.*, 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015).

## I.      Harrington cannot establish personal jurisdiction over Foreign Defendants.

Courts recognize two types of personal jurisdiction: general and specific.  *Bristol-Myers*

*Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779–80 (2017).  Harrington establishes neither.

Harrington does not dispute that no basis exists to assert general jurisdiction over any of

the Foreign Defendants.  (*See* ECF Nos. 61, 62.)  None is incorporated or has its principal place

of business in the U.S.  (*See* C. Climo Decl. ¶ 3; G. Duncan Decl. ¶ 3; B. Carignan Decl. ¶ 3; G.

Stratis Decl. ¶ 3; L. Petrelli Decl. ¶ 3.)  And Foreign Defendants' domestic operations are not "so

substantial and of such a nature as to render [them] at home" in the U.S.  *See Daimler*, 571 U.S.

at 137, 139 & n.19.  Courts frequently decline to exercise general jurisdiction in these

circumstances.  *See, e.g.*, *Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*, 368 F.

Supp. 3d 681, 711 (S.D.N.Y. 2019) (dismissing claims against Merrill Lynch Canada Inc.; CIBC

World Markets Inc.; and TD Securities Inc. for lack of personal jurisdiction).

Harrington similarly fails to meet its burden to plead a prima facie basis for specific

jurisdiction.  Harrington does not allege that Foreign Defendants engaged in any meaningful

conduct within the forum, let alone suit-related conduct.  And the evidence shows that Foreign

Defendants conducted no trading, or at least no proprietary trading, of Concordia in the U.S.

during the relevant period.  Instead, Harrington advances two implausible theories.  First,

Harrington alleges that Foreign Defendants engaged in Canadian trading that "was intended to

and had a direct impact on the market price of Concordia's Interlisted Securities that were also

traded on the U.S. exchanges."  (AC ¶ 18.)  Second, and relatedly, Harrington alleges that

Foreign Defendants "conspired with the U.S. Spoofing and Short-Selling Defendants in this

District."  (*Id.* ¶ 17.)  Neither theory supports the exercise of specific jurisdiction over any

Foreign Defendant.

Harrington's conclusory allegation that Foreign Defendants' alleged trading in Canada

"w[as] intended to and had a direct impact on" the price of Concordia securities in the United

States (AC ¶ 18) does not provide a basis for specific personal jurisdiction over Foreign

Defendants.  A plaintiff advancing such a "causal effects" theory of personal jurisdiction must

plead plausibly that "the defendant expressly aimed its conduct at the forum."  *Schwab*, 883 F.3d

at 87.  But the Complaint contains no "factual allegations demonstrating" that the market

manipulation Foreign Defendants allegedly committed was perpetrated with the "express aim of

causing an effect in" this forum.  *7 W. 57th St. Realty Co. v. Citigroup*, *Inc.*, 2015 WL 1514539,

at *10–11 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019).  Accepting on this

motion Harrington's assertion that orders entered on a Canadian market have a "direct and

simultaneous impact" on prices in a U.S. market (AC ¶ 6) still does not suggest that Foreign

Defendants ***intended*** such an impact.  Accordingly, Harrington's allegations of Canadian trading

do not support specific personal jurisdiction here.

Harrington also fails to plead plausibly that Foreign Defendants are subject to jurisdiction based on a supposed conspiracy.  To plead personal jurisdiction on a conspiracy theory, Harrington must plead "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Schwab*, 883 F.3d at 87.  But Harrington fails to plausibly allege that a conspiracy existed or that any Defendant participated in it.  "To establish personal jurisdiction on a conspiracy theory, [Harrington] must make a prima facie showing of conspiracy."  *In re Terrorist Attacks*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005).  Harrington merely alleges, in conclusory fashion, that each Defendant conspired with its own affiliate to manipulate the price of Concordia securities through spoofing and naked short selling.  (*See, e.g.*, AC ¶ 237 ("To accomplish the fraud, each U.S. Defendant conspired with their Affiliated Canadian Counterpart to engage in, among other things, spoofing and abusive short selling as detailed herein.").)  The Complaint contains no facts about the supposed conspiracy, let alone what its object was, instead relying on conclusory assertions that Defendants "intentionally coordinated" (*id.* ¶ 236) and undertook a "coordinated effort" (*id.* ¶ 239).  To the extent Harrington alleges a broad conspiracy involving all Defendants, those allegations are implausible on their face—much less supported by any facts.  Harrington offers no explanation of how or why a diverse group of domestic and foreign broker-dealers would have entered into an agreement "to artificially depress the price of Concordia's shares on both the U.S. and Canadian exchanges and to financially harm Concordia's investors."  (*Id.* ¶ 65.)

Moreover, it is implausible that some Defendants engaged in spoofing to "purchase Concordia's shares at artificially manipulated lower prices for either their client's accounts or their own proprietary accounts," while their supposed co-conspirators were driving the price

"even further downward" through short selling in their own proprietary accounts.  (*See id.* ¶¶ 13, 58.)  Nor has Harrington alleged any facts showing that any Defendant was in a position to benefit from a depressed Concordia stock price, much less that the multiple Domestic and Foreign Defendants were all in a similar position.  And Harrington's allegations that each Defendant conspired with its own affiliate are conclusively rebutted by its own contradictory allegation that "[t]he U.S. Spoofing Defendants and their Affiliated Canadian Counterparts were each other's agents."  (*Id.* ¶ 63.)  No Defendant can conspire with its own corporate affiliates "as a matter of law."  *See Christians of California, Inc. v. Clive Christian New York, LLP*, 2015 WL 468833, at *9 (S.D.N.Y. Feb. 3, 2015) (holding that corporate affiliates "cannot conspire with each other as a matter of law").  "[S]ince a corporation can only act through its agents, a claim that the agents collectively agreed to take some unlawful action in the name and on behalf of the corporation is simply another way of saying that the corporation acted unlawfully and therefore does not satisfy the basic requirements of a conspiracy."  *Hatteras Enters., Inc. v. Forsythe Cosm. Grp., Ltd.*, 2019 WL 9443845, at *9 (E.D.N.Y. Jan. 14, 2019).

Finally, even if Harrington had plausibly alleged a conspiracy, Harrington does not allege any acts by Domestic Defendants in furtherance of the supposed conspiracy that can be imputed to Foreign Defendants.  Harrington fails to connect any in-forum conduct of a Domestic Defendant to its foreign counterpart, "for example, by alleging facts to show that [the Foreign Defendant was] aware of [its] co-conspirator's in-forum overt acts."  *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019).  And notwithstanding the Complaint's conclusory allegations of agency (*see id.* ¶ 63), Harrington pleads no facts demonstrating an agency relationship between any Foreign Defendant and its domestic affiliate.  *See In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 234–35 (S.D.N.Y. 2015) (finding

"generalized" allegation that domestic subsidiaries "were [foreign defendants'] agents" insufficient to establish personal jurisdiction).  Under these circumstances, the exercise of conspiracy jurisdiction over Foreign Defendants would be contrary to the holding of *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), that "the mere presence of one conspirator . . . does not confer personal jurisdiction over another alleged conspirator."  *Id.* at 1343.  There must be sufficient factual allegations of a "delegat[ion of] duty" or supervision by the foreign defendant over relevant in-forum acts.  *Id.*  Absent such allegations of direction, control, or supervision, imputing any Domestic Defendant's alleged in-forum conduct to a Foreign Defendant would run afoul of the Supreme Court's direction that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Walden v. Fiore*, 571 U.S. 277, 283–85 (2014).

## II.  Claims against Foreign Defendants or based on Canadian trading are not actionable under *Morrison*.

Personal jurisdiction aside, Harrington also cannot assert claims based on Canadian conduct or trading on Canadian exchanges under *Morrison*.  There the Supreme Court held that Section 10(b) of the Exchange Act does not apply extraterritorially and does not regulate or punish conduct occurring on foreign exchanges.  *See* 561 U.S. at 269 ("[F]oreign countries regulate their domestic securities exchanges . . . [a]nd the regulation . . . often differs from ours as to what constitutes fraud.").

Harrington's Exchange Act claims against Foreign Defendants should be dismissed under *Morrison* because Foreign Defendants are not alleged to have undertaken any activities in the U.S. or any trades on a U.S. exchange.  (*See* AC ¶¶ 70–141 (alleging Foreign Defendants undertook transactions on Canadian exchanges, while U.S. Defendants undertook trades here).)  Harrington's allegation that the Canadian trades affected the U.S. market, where Harrington

11

allegedly sold some of its shares, does not save its claims.  *See Morrison*, 561 U.S. at 257 (rejecting "effects test," which permitted application of Exchange Act "premised upon . . . some effect on American securities markets or investors"); *see also Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014) (applying Exchange Act "to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction" would "conflict with the regulatory laws of other nations" and "seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application").

Harrington likewise cannot avoid dismissal of Foreign Defendants under *Morrison* by asserting that their transactions constituted an overt act in furtherance of a conspiracy with the U.S. Defendants.  (*See, e.g.*, AC ¶ 63.)  There is no cause of action for conspiracy to violate the Exchange Act.  *See, e.g.*, *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998) (rejecting claim of conspiracy to violate Exchange Act).  Simply put, under *Morrison and Parkcentral*, the Foreign Defendants cannot be held liable under the Exchange Act for conduct in Canada on a Canadian exchange.

Harrington's Exchange Act claims against Domestic Defendants should also be dismissed to the extent they are premised on Canadian trading.  Harrington alleges that Canadian transactions were necessary to the success of the alleged manipulative schemes.  (*See* AC ¶ 1 ("[W]ithout the spoofing activity . . . on the Canadian markets, the pricing manipulation that the U.S. Spoofing Defendants induced on the U.S. markets would have been mitigated . . . .").)  Harrington's claims against Domestic Defendants therefore depend on foreign transactions on Canadian exchanges.  But the listing of Concordia shares on both U.S. and Canadian exchanges is insufficient to support the application of the Exchange Act to "foreign-issued shares on a

foreign exchange." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014). The focus of the Exchange Act is "upon purchases and sales of securities in the United States," not "upon the place where the [alleged] deception originated." *Morrison*, 561 U.S. at 266. And even if Harrington could somehow plead a domestic transaction based on trading on Canadian exchanges, Harrington still could not satisfy *Morrison* because such trading is governed by Canadian law and is "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral Global Hub Ltd.*, 763 F.3d at 216.

## III.   Harrington's Exchange Act claims are untimely.

Harrington's Exchange Act claims should be dismissed as untimely. *See Thea v. Kleinhandler*, 807 F. 3d 492, 501 (2d Cir. 2015) (statute of limitations defense "may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint"). Harrington was required to assert them within two years of the date on which a reasonably diligent investor would have discovered the facts constituting the alleged manipulation. *See* 28 U.S.C. § 1658 (b)(1); *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010) (interpreting § 1658(b)(1) to refer "not only to a plaintiff's actual discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered" (emphasis omitted)). A fact is "deemed 'discovered' [when] a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).[3]

Harrington admits that it was aware of potential manipulation by April 2016 and had access to all of the data cited in the Amended Complaint by March 2017, when Harrington

---

[3] Harrington's unjust enrichment claim is likewise untimely. *See, e.g.*, *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (N.Y. App. Div. 2007) (limitations period for unjust enrichment claim seeking monetary relief is three years and "begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution").

received "unmasked" TOQ Reports from the IIROC.  (*See* AC ¶¶ 41–46.)  Harrington was thus

required to bring this suit by March 2019.  Its January 2021 filing was almost two years too late,

and its Exchange Act claims should be dismissed on that basis alone.  *See Fogel v. Wal-Mart de*

*Mexico SAB de CV*, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017) (dismissing Section 10(b)

claim filed more than two years after reasonably diligent plaintiff would have discovered fraud).

Harrington says that to develop its manipulation claim it needed to hire a consulting firm

with the "skill, [] knowledge, and technical expertise to analyze" the data—a process that took

no more than ten months.  (*See* AC ¶¶ 48–52 (describing July 2019 engagement of Urvin and

May 2020 completion of Urvin's analysis).)  But that extra ***ten months*** does not help Harrington,

because its complaint was filed almost ***two years*** too late.  *See Pension Trust Fund for Operating*

*Eng'rs v. Mortg. Asset Securitization Trans., Inc.*, 730 F.3d 263 (3d Cir. 2013).  In *Pension*

*Trust*, the plaintiff tried to avoid dismissal on timeliness grounds by pleading that its consultant

had to "use[] a proprietary process" that involved "combing through court filings and numerous

databases" in order to "construct[] the substantive allegations in the Amended Complaint."  *Id.* at

278.  The consultant's analysis took only two months, so the limitations clock started running no

later than two months after the plaintiff learned about its potential claims and thus should have

begun the consultant's work.  *See id.* at 279.  Based on that timeline, the Third Circuit affirmed

dismissal of the claim as untimely.  *See id.*

Thus, even if Harrington is entitled to the benefit of the ten months Urvin's analysis

allegedly required, Harrington was still required to be diligent in hiring Urvin and filing this

complaint.  Here, Harrington suspected manipulation in April 2016 and had non-public trading

data by March 2017, but did not hire Urvin until July 2019.  Urvin then took ten months to

complete its investigation and Harrington waited an additional seven months to file its claims.

Harrington's claims are thus untimely.  *See McCullough v. Advest, Inc.*, 2017 WL 3675787, at \*5 (W.D. Pa. Aug. 25, 2017) (dismissing Rule 10b-5 claim as untimely because "based on the allegations in the Amended Complaint, there is no reason to believe that Plaintiffs could not have initiated their investigation earlier, or that an earlier investigation would not have yielded the same results in 2007 as it did 2010").

## IV.    Harrington fails to state an Exchange Act claim.

Harrington fails to state a claim under the Exchange Act for three additional reasons: Harrington does not plead (i) manipulative conduct by any Defendant in the U.S. that was intended to drive down Concordia's stock price, (ii) loss causation, or (iii) reliance.  *See ATSI*, 493 F.3d at 101 (Section 10(b) requires manipulative acts, loss causation, and reliance); *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004) (Section 9(a)(2) requires series of manipulative transactions, loss causation, and reliance); *see also Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428 (S.D.N.Y. 2010) (manipulation claims require pleading "with particularity facts giving rise to a strong inference that each defendant acted with scienter").

### A.    Harrington fails to plead manipulative conduct by any Defendant.

#### 1.    Harrington improperly assumes Defendants' trades were for their own accounts.

To survive this motion, Harrington must plead facts permitting a "reasonable inference that [each] defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  But Harrington pleads no facts about who actually placed any of the allegedly manipulative orders or trades.  As Harrington concedes, Defendants are broker-dealers that execute trades initiated by their clients.  (*See* AC ¶¶ 21–36.)  Harrington complained to IIROC in 2018 that the TOQ Reports forming the basis for Harrington's allegations here provided only "aggregated information at the trading desk or dealer level"—*i.e.*, only Trade Desk IDs, rather than Client

IDs—which prevented Harrington from determining which clients were responsible for which trades and who, if anyone, had engaged in the alleged illegal market manipulation.  (*See* Norwich Order ¶ 69 ("Harrington submits that it requires the additional information to identity the wrongdoers and to determine the viability of its claim against them.").)

Harrington eschews this detail here, assuming that any order appearing under a Defendant's Trade Desk ID was entered by that broker ***for its own account***, i.e., in proprietary trading, rather than being entered by a client.  (*See* AC ¶188 n.16 ("The identities of the Defendants who engaged in abusive short selling were ascertained from documents that reflect the identity of ***brokers*** who trade on the Canadian exchanges.").)  There is no basis for that assumption, and it is equally likely that any particular order was entered by one of a Defendant's thousands of clients rather than by a Defendant itself.  That is why Harrington told IIROC that the TOQ Reports were "inadequate for the necessary testing to determine whether there had been illegal market manipulation."  (Norwich Order ¶ 69.)  Harrington therefore has not pleaded sufficient facts to yield a reasonable inference that any Defendant engaged in the allegedly manipulative Concordia trades, much less that any Defendant did so with the requisite scienter.

### 2.  Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through spoofing.

Harrington fails to plead particularized facts supporting a strong inference that the trading activity it characterizes as manipulative spoofing—*i.e.*, entering and then cancelling sell orders— was conducted with the requisite scienter.  This pleading requirement is "particularly important" here because cancelling sell orders is lawful, and thus "scienter is the only factor that distinguishes legitimate trading from improper manipulation."  *ATSI*, 493 F.3d at 102.  The inference of scienter "must be more than merely 'reasonable' or 'permissible'"—it must be "cogent and at least as compelling as any opposing inference" of non-fraudulent intent.  *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007).  Harrington "must plead ***specific facts as to each defendant***," because "generalized allegations of scienter against groups of defendants will not state a claim."  *Cohen*, 722 F. Supp. 2d at 428.

Harrington's allegations are insufficient.  Harrington alleges that the Spoofing Defendants generally used algorithmic trading programs to generate Baiting Orders and trick others into selling their stock, artificially depressing Concordia's stock price.  (*See* AC ¶ 167.)  But Harrington alleges ***no facts*** about those programs: Which Defendant(s)?  How did each Defendant's program operate?  When did each Defendant's program operate?  That silence alone dooms the claims against the Spoofing Defendants.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170,1175 (2d Cir. 1993) (Rule 9(b) requires plaintiff to specify the who, what, where, when, and why of alleged fraud).  And Harrington's vague allegation that these "trading activities were approved by corporate officials sufficiently knowledgeable about the company to know that the trading practices . . . reflect conscious misbehavior or reckless[ness]" (AC ¶ 166) does not move the needle on scienter.  Harrington must plead ***particularized*** "facts giving rise to a ***strong*** inference that [each] defendant acted with" the intent to drive down Concordia's stock price.  15 U.S.C. § 78u-4(b)(2)(A); *see ATSI*, 493 F.3d at 99.  Again, Harrington does not plead who these "corporate officials" are, what positions they held, or the nature of their involvement in these "trading activities," or when this approval supposedly came.

Indeed, while Harrington makes a conclusory allegation that these algorithmic programs caused the trading about which it complains, Harrington does not offer any facts, much less particularized facts, showing that the programs were designed to depress Concordia's stock price.  No such inference can be drawn from the allegedly large volume of placed and cancelled

17

orders because more than 95% of all placed orders are canceled before execution.[4]  That an order was cancelled does not support ***any*** inference about why it was entered, much less the requisite "strong" one, because "there is nothing improper or illegitimate about placing passive orders in the order book and then reversing position." *CP Stone Fort Holdings, LLC v. John*, 2016 WL 5934096, at *5 (N.D. Ill. Oct. 11, 2016) (dismissing manipulation claim as failing to meet heightened pleading standard for scienter).  Nor is Harrington entitled to an inference of scienter from its laundry list of other factors it claims reflect scienter:

> the greater average size of the Baiting Orders to sell during the limited period when each spoofing event occurred; the short time period between the repeated placement and cancellation of the Baiting Orders to sell; the concentration of cancelled Baiting Orders to sell during the limited period when each spoofing event occurred; the greater average size of the Baiting Orders to sell that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; the ratio of cancelled Baiting Orders to sell, as compared to the executed bona-fide orders to buy that existed; and the reoccurrence of the same trading pattern throughout the Relevant Period that simultaneously occurred by their Affiliated Canadian Counterparts in Canada.

(AC ¶ 167.)  As with its other allegations, Harrington pleads no specific facts.  Harrington does not differentiate among Defendants, identify the average size of any particular Defendant's cancelled sell orders, plead how that size compared to the average size of its executed sell orders and unexecuted buy orders during the same period, or plead when or how often this trading pattern allegedly reoccurred.

Harrington's scienter allegations for the Spoofing Defendants are not only too vague, they are also implausible because they do not make economic sense.  *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic

---

[4] *See* SEC Market Structure Report (the daily "trade-to-order volume ratio for stocks is typically between 2.5% and 4.2%," meaning between 95.8% and 97.5% of all orders are cancelled each trading day (*available at* https://www.sec.gov/marketstructure/research/highlight-2013-01.html)).

reason, . . . [it] does not yield a reasonable inference of fraudulent intent."); *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, 2005 WL 736217, at *3 (S.D.N.Y. Mar. 30, 2005) (fundamentally illogical and contradictory scienter allegations fail as a matter of law). Harrington alleges that the Spoofing Defendants used Baiting Orders to momentarily depress Concordia's stock price so that Spoofing Defendants could ***purchase*** Concordia stock at a lower price.  (*See, e.g.*, AC ¶¶ 71, 95, 119 (alleging that Baiting Orders permitted defendant to purchase stock at lower price).)  But once a Defendant owned the stock, its economic interest was in the stock price ***rising***.  *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018) ("Manipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief.").  Harrington cannot explain why any of the Spoofing Defendants would have engaged in a scheme to drive down Concordia's stock price over eleven months to its own financial detriment.

> **3. Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through short selling.**

Harrington contends that the Short-Selling Defendants manipulated Concordia's stock price downward by engaging in "abusive" naked short sales but pleads no facts showing that the Short-Selling Defendants engaged in naked short sales in the U.S. ***at all***.  Harrington relies on market-wide statistics showing that Concordia stock was heavily shorted during the relevant period (*see* AC ¶¶ 185–86), but those statistics say nothing about the Short-Selling Defendants' conduct.  There are thousands of market participants, any one of whom could have engaged in short selling.  As the Second Circuit observed when dismissing similar claims, "[g]eneral allegations ***not tied to the defendants*** or resting upon speculation are insufficient" to allege market manipulation.  *ATSI*, 493 F. 3d at 102.

The only allegations in the Amended Complaint "tied to" the Short-Selling Defendants involve short sales in Canada by Foreign Defendants.  (*See* AC ¶¶ 188–196.)  But those trades are not actionable here for the reasons described above in Section II.A.2.  And while Harrington speculates that some of those Canadian trades *might* have been routed to U.S. exchanges, Harrington does not actually allege that any were.  (*See id.* ¶¶ 190, 192, 194.)  In any event, Harrington alleges no facts suggesting that the trades were illegal or manipulative.  Harrington alleges only that each of the Canadian Short-Selling Defendants "sold shares of Concordia stock that they did not have in their inventories."  (*Id.* ¶ 188.)  But as Harrington concedes that is merely the definition of a lawful short sale: the sale of a stock that the short seller does not own. (*See id.* ¶ 10, n.3 (describing short selling as "lawful trading strategy" in which short sellers sell stock "they do not own").)  As the Second Circuit explained, "short selling—even in high volumes—is not, by itself, manipulative" and such activity "enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic value."  *ATSI*, 493 F. 3d at 101.  Moreover, Harrington's bare allegations of "naked short selling" are insufficient to demonstrate the creation of "phantom" or "counterfeit" shares (AC ¶¶ 10, 180) causing any alleged artificial price.  *See Cohen*, 722 F. Supp. 2d at 425 ("Plaintiffs' general allegation that naked short selling resulted in the creation of 'phantom shares' that artificially depressed the price of SulphCo stock is also insufficient.").

Harrington contends that the U.S. Short-Selling Defendants "manipulated Concordia's share price by injecting *millions* of Fictitious Shares into the U.S. and Canadian markets that were not authorized for sale by Concordia."  (AC ¶ 179.)  But Harrington does not identify a single occasion on which any U.S. Short-Selling Defendant sold Concordia shares short, much less "millions" of them.  Harrington's conclusory allegation does not state a claim for market

manipulation.  *See ATSI*, 493 F.3d at 103 (affirming dismissal of Section 10(b) claim where plaintiff "offered no specific allegations that the defendants did anything to manipulate the market," only "speculative inferences").

Harrington seems to want the Court to impute the Foreign Defendants' trading to their U.S. affiliates, but its only stated basis for doing so is an alleged "conspiracy."  (AC ¶ 227.)  Again, conspiracy liability is not available under the Exchange Act.  *See Dinsmore*, 135 F. 3d at 842.  And members of the same corporate family "cannot conspire with each other as a matter of law."  *Christians of California*, 2015 WL 468833, at *9; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (rejecting intra-corporate conspiracies).  In any event, Harrington alleges only that during the relevant period "UBS Canada sold approximately 343,000 shares short" (AC ¶ 190), SG Canada "sold approximately 56,000 shares short (*id.* ¶ 192), and ML Canada "sold approximately 112,000 shares of Concordia short" shares (*id.* ¶ 194).  But in this Circuit, Harrington cannot simply allege a small volume of short sales with a conclusory allegation that Defendants created the millions of fictitious shares (*id.* ¶ 179) necessary to affect Concordia's stock price—particularized facts are required.  *See ATSI*, 493 F.3d at 102–03 (affirming dismissal of Section 10(b) manipulation claims where "the complaint is devoid of facts supporting [plaintiff's] belief that these defendants had sufficient shares to engage in the high-volume trading alleged").

Harrington also fails to plead sufficient facts to show that any of the Short-Selling Defendants acted with scienter.  Harrington pleads no facts about any particular Short-Selling Defendant's state of mind.  This dooms its claim against all of them.  *See Cohen*, 722 F. Supp. 2d at 430 (dismissing claim of abusive naked short selling because "Plaintiffs have completely failed to plead any particularized facts as to any specific defendant, instead lumping

'Defendants' or 'Defendant Broker/Dealers' together [and t]hese general allegations do not plead scienter against any of the [] Defendants").  Harrington offers a conclusory allegation that "the Short-Selling Defendants knew or should have known" that they were manipulating Concordia's stock price by "continuously and consciously failing to locate, borrow and deliver authorized Concordia shares by the settlement date."  (AC ¶ 198.)  But again, Harrington fails to allege even a single instance in which any Short-Selling Defendant failed to locate, borrow, or deliver Concordia stock, much less a "continuous" pattern of doing so.  And even if Harrington could allege such an occurrence, its conclusory allegation that Defendants "should have known" that their conduct was manipulative is insufficient as a matter of law.  *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 129 (S.D.N.Y. 2013) (allegations that defendants "should have known" about fraudulent conduct insufficient).  Harrington's reference to the Short-Selling Defendants' status as broker-dealers with FINRA regulatory obligations (AC ¶ 198) is likewise insufficient, because that allegation can be made in every case against a broker-dealer.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 665 (S.D.N.Y. 2017) (allegations that "would apply to every defendant in every case" are insufficient because they would "effectively render[] the scienter requirement a nullity").  Indeed, because, as explained above, Defendants are broker-dealers that execute trades at their clients' direction, there is no basis to infer that Defendants intended ***anything*** from a trade—other than perhaps that Defendants wanted to serve their clients' needs.

### B.      Harrington fails to plead loss causation.

Harrington's claims must also be dismissed because the Complaint fails to allege facts establishing a causal connection between each Defendant's alleged misconduct and Harrington's alleged loss.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (plaintiff must plead "causal connection between the [alleged manipulation or] material misrepresentation and the

loss"); *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1497 (2d Cir. 1992) (affirming dismissal of complaint for failure to allege loss causation where it alleged only "in a conclusory fashion . . . that there [was] a direct causal link between defendants' fraud and [plaintiff's] losses," and did "not detail how the alleged fraud directly and proximately resulted" in plaintiff's damage); *Fezzani*, 384 F. Supp. 2d at 637 (dismissing Section 9(a) claim; manipulative act must have "affected plaintiff's purchase or selling price").

For the claimed spoofing scheme, Harrington fails to connect the Spoofing Defendants' alleged conduct to a decline in Concordia's stock price that harmed Harrington.  Instead, Harrington improperly lumps together the Spoofing Defendants' trading activities for purposes of pleading loss causation.  (*See* AC ¶ 171 ("The U.S. and Canadian Spoofing Defendants executed over 100,000 spoofing events during the 205 trade date Relevant Period which caused the collapse of Concordia's share price from $28.02 to $3.13.").)  This type of group pleading provides no basis to (i) infer that any one Spoofing Defendant's trading activity was a proximate cause of Concordia's stock price decline, or (ii) "ascribe some rough proportion of the whole loss" to Defendants' alleged misconduct, as required to plead loss causation.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (dismissing Section 10(b) claim where plaintiffs failed to allege facts showing that defendant's conduct was "the proximate cause of plaintiffs' loss"); *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [plaintiff's] complaint failed to satisfy" federal pleading standards.).

Harrington's loss causation theory on spoofing is also implausible given Harrington's admission that "the artificially depressed price of a spoofing event" lasts fifteen minutes at the most.  (AC ¶ 171.)  Because Harrington does not allege that it sold Concordia shares within

fifteen minutes of any the alleged spoofing event, Harrington has not pleaded how it was injured by any alleged spoofing event. *See In re Merrill, BofA, and Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021) (dismissing spoofing claims under Commodities Exchange Act for failure to plead injury because plaintiffs did not allege that they traded immediately after alleged spoofing transactions).  And because the price effect of each alleged event dissipated quickly, there is no plausible inference that the events could have driven down Concordia's stock price from $28.02 to $3.13 over an eleven-month period. *See id.* ("[E]ven thousands of fraudulent spoofs whose effect lasted only a matter of seconds would not necessarily impact specific trades of others.").  Any such inference would also be inconsistent with Harrington's allegation that Concordia's stock traded in an efficient market.  (*See* AC ¶ 203.)  It is implausible that Concordia's stock could be 90% undervalued without buyers rushing in to purchase it, or that the Spoofing Defendants' alleged strategy of ***buying*** the stock at a slight discount to prevailing market prices before cancelling their sell orders would somehow result in such a massive price decline. *See London Silver*, 332 F. Supp. 3d at 923 (spoofing strategies depend on reversion of prices to the market-level).

As for the alleged short-selling scheme, Harrington likewise fails to connect any Short-Selling Defendant's alleged conduct to any decline in Concordia's stock price that harmed Harrington.  As explained above, Harrington does not even identify an instance in which any Defendant actually engaged in naked short selling of Concordia stock in the U.S.  And Harrington alleges that it first sold Concordia stock on August 12, 2016 (AC ¶ 14), six weeks ***after*** the last alleged short sale by any Defendant on June 27, 2016 (*see id.* ¶¶ 190, 192, 194). The extremely low volume of short-sale transactions, coupled with the passage of time, forecloses any plausible inference that Harrington sold into a manipulated market. *See*

24

*Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 757 (S.D.N.Y. 2011) (dismissing Section 10(b) claims on loss causation grounds because "the overwhelming majority of Plaintiff's purchases took place more than a month after the issuance of the last misstatement, a near eternity in the market that makes his loss particularly attenuated").

C.     **Harrington fails to plead reliance.**

Harrington's Exchange Act claims also fail because it does not plead facts supporting an inference that it "relied in any way on Defendants' alleged wrongdoing." *Cohen*, 722 F. Supp. 2d at 433.  Nowhere does Harrington allege that any Defendant did anything that influenced its conduct.  And Harrington cannot invoke the presumption of reliance under the "fraud on the market" theory because, as Harrington concedes, it was concerned about the manipulation of Concordia stock as early as April 2016, when it requested a regulatory investigation and retained a private consultant to investigate.  (*See* AC ¶ 41.)  This concession eliminates any plausible inference that Harrington thereafter relied on an efficient market.  Indeed, "it would be contrary to the strong public policy in favor of preventing fraud before it occurs to permit a plaintiff who believes a fraud may be occurring and has a remedy available to prevent the fraud from occurring to nonetheless permit the fraud to occur, and then attempt to seek redress under §9(a) [or] §10(b)." *Stark Trading v. Falconbridge Ltd.*, 2008 WL 153542, at *16 (E.D. Wis. Jan. 14, 2008) (dismissing Sections 9(a)(2) and 10(b) claims for failure to plead reliance).

*Stark Trading* is instructive.  There, the plaintiffs raised concerns about potential fraud with, among others, the Ontario Securities Commission, and then "knowingly succumb[ed] to what" the Plaintiff later claimed was fraud by proceeding in the transaction anyway.  *Id.* at *13. The court thus dismissed the complaint for failure to plead reliance.  Harrington's claims should be dismissed for the same reasons: Harrington suspected Concordia stock was being manipulated, alerted Canadian authorities of its suspicions, "knowingly succumb[ed]" to the

purported fraud by trading Concordia shares anyway, and finally, when the trades lost money, elected to file a lawsuit years later seeking relief under Sections 9(a) and 10(b).  As *the Stark Trading* court observed, "[i]t is simply illogical to permit the laws that were designed to protect investors deceived by sophisticated companies engaged in fraudulent schemes to similarly be wielded as a sword by sophisticated investors" like Harrington "who, for whatever reason, knowingly accepted the risk of entering into transactions they suspect were fraudulent."  *Id*. at *13.

**V.     Harrington fails to state a common-law claim.**

      **A.     Harrington fails to state an unjust-enrichment claim.**

      To state an unjust enrichment claim, Harrington must plead facts showing (i) Defendants were enriched; (ii) at its expense; and (iii) equity and good conscience militate against permitting Defendants to retain what Harrington is seeking to recover.  *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (New York law); *In re Merrill,* 2021 WL 827190, at *13.[5]  The first two prongs require a nexus among the parties or "proof that the defendant received a specific and direct benefit from the property sought to be recovered, rather than an indirect benefit."  *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017).  "[A] claim will not be supported if the connection between the parties is too attenuated."  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

      Harrington's unjust enrichment claim should be dismissed because Harrington fails to adequately allege that any Defendant benefitted from the alleged trading, much less that it was at Harrington's expense.  Without any supporting factual allegations, Harrington merely alleges that "defendants financially benefitted from their unlawful acts" (AC ¶ 211), and "[u]pon

---

[5] New York law, as the law of the forum, applies to Harrington's common-law claims.  *See Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

information and belief, the . . . Short Selling Defendants realized a profit by taking advantage of

the downward price manipulation caused by the U.S. and Canadian Spoofing Defendants" (*id.*

¶ 183).  Those conclusory allegations fail to identify a "specific and direct benefit" to any

Defendant at Harrington's expense.  *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)

(reversing jury verdict where evidence showed no direct benefit to defendant); *Laydon v. Mizuho*

*Bank, Ltd.*, 2014 WL 1280464, at *13–14 (S.D.N.Y. Mar. 28, 2014) ("Plaintiff's conclusory

assertions that Bank Defendants 'financially benefited from the unlawful manipulation' . . . fail

to satisfy Plaintiff's pleading burden" for unjust-enrichment claim).

     Harrington also fails to allege a sufficiently direct nexus between the parties.  Harrington

must plead that it traded directly with each Defendant, or at least that there is "a near statistical

certainty" that it directly traded with each Defendant.  *In re Merrill*, 2021 WL 827190, at *13.

Harrington makes no such allegation, so its unjust enrichment claim should be dismissed.  *See id.*

(dismissing unjust enrichment claim for failure to plead direct trading with any defendant); *In re*

*Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *38 (S.D.N.Y. Mar. 28, 2017)

("[B]ecause Plaintiffs do not allege that they transacted directly with Defendants, they have not

adequately pleaded that Defendants were enriched at their expense.").

     **B.**    **Harrington fails to state a claim for common-law fraud.**

     To plead a fraud claim, Harrington must allege with particularity (i) that Defendants

made a misrepresentation or a material omission that they knew to be false, (ii) that Defendants

made it for the purpose of inducing Harrington to rely upon it, (iii) that Harrington justifiably

relied on the alleged misrepresentation or material omission, and (iv) injury.  *See Ambac*

*Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018).

Harrington must also show that its losses were caused "directly and proximately" by the alleged

fraud.  *Citibank*, 968 F.2d at 1497.  "To establish causation with respect to a common law fraud

claim, the plaintiff must show both that defendant's [misconduct] induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Seagrape Inv'rs LLC v. Tuzman*, 2020 WL 5751232, at *17 (S.D.N.Y. Sep. 25, 2020).  And "claims of common law fraud, like federal securities claims, must satisfy the requirements of Rule 9(b)."  *Id.*

Harrington's claim fails at the gate, because Harrington does not allege that any particular Defendant made a misrepresentation or omission.  While Harrington refers to "false signals generated by the spoofing and short selling schemes" (AC ¶ 183), there is no case suggesting that trading, rather than speaking, can constitute a misstatement under New York law.  Moreover, naked short selling alone does not broadcast any false signal to the market.  *See Cohen*, 722 F. Supp. 2d at 424 (naked short selling "is far different from a wash sale or similar transaction in which a manipulator acts as both the buyer and seller in order to give the false appearance of actual trades without assuming any actual risk"); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("Mere sales do not inject false information into the market place, nor can a party inject false information into the marketplace . . . simply by selling stock on the open market.").

Harrington also fails to adequately allege fraudulent intent, loss causation, and reliance for the reasons described in Section II.  *See Seagrape Inv'rs LLC*, 2020 WL 5751232, at *18 ("Where a plaintiff brings both a Section 10(b) claim and a common law fraud claim, and the former is dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6)—including for failure to adequately plead loss causation—courts in this Circuit have dismissed the common law claim as well.").  Harrington fails to plead reliance for the additional reason that New York does not recognize a presumption of reliance under the "fraud on the market theory" and thus requires

Harrington to plead facts showing that it sold its stock in reliance on whatever "false signal" Defendants allegedly sent to the market. *See Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 493 (N.Y. 2016) ("[T]his Court has stated on a number of occasions that a fraud claim requires the plaintiff to have relied upon a misrepresentation by a defendant to his or her detriment."); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 995 F. Supp. 2d 291, 312 (S.D.N.Y. 2014) ("To plead common law fraud, a plaintiff must allege with particularity that it actually relied upon the supposed misstatements."), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016).  Harrington does not allege that it relied on anything Defendants said or did when it decided to sell its Concordia shares, and its fraud claim must be dismissed on this basis as well.

### C.    Harrington fails to state a claim for aiding and abetting fraud or conspiracy to commit fraud.

Harrington's secondary fraud claims fail for the same reasons as its primary fraud claim. But they also must be dismissed because Harrington fails to plead their additional essential elements.  To plead a conspiracy claim under New York law, Harrington must allege (i) a corrupt agreement, (ii) an overt act in furtherance of that agreement, (iii) the party's intentional participation in furthering the plan, and (iv) resulting damages.  *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (New York law).  To state a claim against a Defendant for aiding and abetting fraud, Harrington must allege that the Defendant knew about the fraud and substantially assisted its commission.  *See Nigerian Nat'l Petr. Corp. v. Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999).

Harrington's common-law conspiracy claim fails because, Harrington's vague and conclusory allegations of "coordinated cross border fraudulent trading activity" (AC ¶ 64), with no supporting facts, are insufficient to plead the existence of a "corrupt agreement" with the

requisite particularity.  *See London Silver*, 332 F. Supp. 3d at 897 (rejecting inference of an "overarching conspiracy" where there was not a clear connection between various forms of alleged manipulation).  And again, corporate affiliates cannot "conspire" with each other.  *See supra* Section I; *see also Bereswill v. Yablon*, 160 N.E.2d 531, 533 (N.Y. 1959).

Harrington's aiding-and-abetting claim fails because Harrington does not plead particularized facts suggesting that any Defendant knew about another Defendant's trading activities or provided substantial assistance in that trading.  Harrington merely alleges, on information and belief, that Foreign Defendants and their U.S. affiliates assisted each other, without alleging who assisted whom or what assistance was provided and when.  (*See* AC ¶ 240).  That is insufficient to plead substantial assistance under New York law.  *See Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 883 N.Y.S.2d 486, 489–90 (1st Dep't 2009) (dismissing aiding-and-abetting fraud claim for failure to plead substantial assistance where plaintiff relied on conclusory allegations made "upon information and belief").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.  And because Harrington has already amended its pleading once in response to Defendants' arguments, the dismissal should be with prejudice.

**O'MELVENY & MYERS LLP**

By: */s/Abby F. Rudzin*
     Abby F. Rudzin
     William J. Martin

Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2033
arudzin@omm.com
wmartin@omm.com

*Attorneys for Defendants BOFA Securities,*
*Inc.; Merrill Lynch Canada Inc.; and*
*Merrill Lynch Professional Clearing Corp.*

**WILMER CUTLER PICKERING HALE AND**
**DORR LLP**

By: */s/David Lesser*
     David Lesser
     Jamie Dycus

7 World Trade Center
250 Greenwich Street
45th Floor
New York, New York 10007
(212) 230-8851
david.lesser@wilmerhale.com
jame.dycus@wilmerhale.com

Jenny Pelaez
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
(213) 443-5300
jenny.pelaez@wilmerhale.com

*Attorneys for TD Securities, Inc., and*
*TD Securities (USA) LLC*

31

**ALLEN & OVERY LLP**

By: */s/Todd S. Fishman*
       Todd S. Fishman
       Alexander K. Bussey

1221 Avenue of the Americas
New York, New York 10020
(212) 756-1130
todd.fishman@allenovery.com
alexander.bussey@allenovery.com

*Attorneys for Defendants Societe Generale*
*Capital Canada, Inc., and SG Americas*
*Securities, LLC*

**DENTONS US LLP**

By: */s/Sandra D. Hauser*
       Sandra D. Hauser

1221 Avenue of the Americas
New York, NY 10020
(212) 768-6802
sandra.hauser@dentons.com

*Attorney for CIBC World Markets Corp.*
*and CIBC World Markets Inc.*

**BAKER & MCKENZIE LLP**

By: */s/Perrie M. Weiner*
       Perrie M. Weiner
       Ben W. Turner
       Michael D. Hidalgo

10250 Constellation Boulevard
Suite 1850
Los Angeles, CA 90067
(310) 201-4709
perrie.weiner@bakermckenzie.com
ben.turner@bakermckenzie.com
michael.hidalgo@bakermckenzie.com

*Attorneys for UBS Financial Services, Inc.,*
*and UBS Securities Canada, Inc.*