# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,<br><br>               Plaintiff,<br><br>    v.<br><br>CIBC WORLD MARKETS CORP.; CIBC WORLD MARKETS INC.; BOFA SECURITIES, INC.; MERRILL LYNCH CANADA INC.; MERRILL LYNCH PROFESSIONAL CLEARING CORP.; TD SECURITIES, INC.; TD SECURITIES (USA) LLC; UBS FINANCIAL SERVICES, INC.; UBS SECURITIES CANADA, INC.; SOCIETE GENERALE CAPITALE CANADA, INC.; SG AMERICAS SECURITIES, LLC; AND JOHN DOES 1 THROUGH 10,<br><br>               Defendants. | Index No.: 21-cv-00761 (LGS)<br><br>Hon. Lorna G. Schofield |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   LEGAL STANDARDS .......................................................................... 3

III.  ARGUMENT ......................................................................................... 4

    A.    Plaintiff Has Made a Prima Facie Showing of Personal Jurisdiction Over the Foreign Defendants .................................................................... 4

        i.    Plaintiff Has Adequately Alleged that the Foreign Spoofing and Short Selling Defendants Engaged in Suit-Related Conduct in or Expressly Aimed Actions towards the U.S. ........................................................... 5

        ii.   Plaintiff Has Adequately Alleged that the Foreign Spoofing Defendants Participated in a Conspiracy Connected to the U.S. ................................ 6

    B.    Plaintiff's Claims Against the Foreign Defendants Do Not Exceed the Territorial Reach of the Exchange Act ..................................................... 9

    C.    Plaintiff's Exchange Act Claims Are Timely ......................................... 11

    D.    Plaintiff Has Sufficiently Alleged Scienter as to Defendants' Manipulative Conduct 16

        i.    Plaintiff Has Sufficiently Alleged Scienter as to Spoofing ..................... 17

        ii.   Plaintiff Has Sufficiently Pled Scienter as to Abusive Short Selling ....... 20

    E.    Plaintiff Has Sufficiently Alleged Loss Causation. .................................. 23

    F.    Plaintiff Has Sufficiently Alleged Reliance. ............................................ 27

    G.    Plaintiff Has Stated a Claim For Unjust Enrichment. ............................... 28

    H.    Plaintiff Has Stated a Claim For Common-Law Fraud. ........................... 29

    I.    Plaintiff Has Stated Claims For Aiding And Abetting Fraud and Conspiracy to Commit Fraud. .................................................................................. 30

IV.  CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*7 W. 57th St. Realty Co., LLC v. CitiGroup, Inc.*, No. 13 Civ. 981,
    2015 U.S. Dist. LEXIS 44031 (S.D.N.Y. Mar. 31, 2015) ........................................ 6

*Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*,
    457 F. Supp. 3d 401 (S.D.N.Y. 2020) ........................................................... 4-5, 7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................... 4

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................ 3-4, 18

*Atuahene v. City of Hartford*,
    10 F. App'x 33 (2d Cir. 2001) .................................................................. 24

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir.) .......................................................................... 4

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68, 87 (2d Cir. 2018) .............................................................7, 12

*Christians of Cal., Inc. v. Clive Christian N.Y. LLP*, No. 13 Civ. 275,
    2015 U.S. Dist. LEXIS 13224 (S.D.N.Y. Feb. 3, 2015) ........................................ 8

*City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011) ................................................................... 12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ................................................................... 11

*Deeco Instruments Inc. Secs Litig.*
    235 F.R.D. 220. (S.D.N.Y. 2006) ............................................................. 19

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
    135 F.3d 837 (2d Cir. 1998) ................................................................... 11

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ................................................................... 4, 5

*Hempchain Farms, LLC v. Sack*, No. 119 Civ. 1364,
    2021 U.S. Dist. LEXIS 18329 (N.D.N.Y. Feb. 1, 2021) ........................................ 29

*In re Aluminum Warehousing Antitrust Litig., No.*
    13-md-2481, 2015 U.S. Dist. LEXIS 145598 (S.D.N.Y. Oct. 23, 2015) ......................... 9

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) ........................................................ 22-23, 23

*In re CannaVest Corp. Secs. Litig.*,
   307 F. Supp.3d 222, 246 (S.D.N.Y. 2018).................................................. 19, 22, 30

*In re Carter-Wallace, Inc. Sec. Litig.*
   220 F.3d 36 (2d Cir. 2000) ........................................................................ 19

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580,
   2018 U.S. Dist. LEXIS 87991 (S.D.N.Y. 2018)............................................. 12,13

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789,
   2016 U.S. Dist. LEXIS 44219 (S.D.N.Y. Mar. 31, 2016)............................... 6, 7, 8

*In re Merrill, BofA, and Morgan Stanley Spoofing Litig.*, No. 19 Civ. 6002,
   2021 U.S. Dist. LEXIS 40712 (S.D.N.Y. Mar. 4, 2021)...................................... 25

*In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-02475 (ALC),
   2017 U.S. Dist. LEXIS 88316 (S.D.N.Y. June 8, 2017) .........................................6

*In re Terrorist Attacks on September 11*,
   714 F.3d 659 (2d Cir. 2013) ........................................................................ 7

*In re Zyprexa Prod. Liab. Litig.*,
   549 F. Supp. 2d 496 (E.D.N.Y. 2008) ........................................................ 16

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ........................................................................ 19

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ........................................................................ 24

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ........................................................................ 29, 30

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, *LLC*,
   797 F.3d 160, 187 (2d Cir. 2015) .................................................................23

*McCullough v. Advest, Inc.*, No. 17 Civ. 407,
   2017 U.S. Dist. LEXIS 136634 (W.D. Pa. Aug. 25, 2017)................................. 15

*Merck & Co. Inc. v. Reynolds*,
   559 U.S. 633 (2010) ................................................................................ 12

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ................................................................................ 9, 11

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
   890 F.3d 60 (2d Cir. 2018) ........................................................................ 28

*Nathel v. Siegal,*
    592 F.Supp. 2d 452 (S.D.N.Y. 2008) ................................................................. 19

*No. 3 Ltd. v. Wells Fargo Sec., LLC,*
    797 F.3d 160 (2d Cir. 2015) ............................................................... 23, 24, 25

*Novak v. Kasaks,*
216 F.3d 300, 308 (2d Cir. 2000)........................................................................19

*Nypl v. JPMorgan Chase & Co.,* No. 15 Civ. 9300,
    2018 U.S. Dist. LEXIS 47960 (S.D.N.Y. Mar. 22, 2018)...................................... 7

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE,*
    763 F.3d 198 (2d Cir. 2014) ................................................................................ 10

*Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization*
*Transactions, Inc.,*
    730 F.3d 263 (3d Cir. 2013) .......................................................................... 14, 15

*Sharette v. Credit Suisse Int'l,*
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................................ 26, 27, 30

*Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.,* No. 05-C-1167
    2008 U.S. Dist. LEXIS 2677 (E.D. Wis. Jan. 14, 2008) ...................................... 28

*Tellabs Inc. v. Makor Issues & Rts Ltd.,*
    551 U.S. 308 (2007) .......................................................................................... 17

*U.S., Walden v. Fiore,*
    571 U.S. 277 (2014) ............................................................................................ 4

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,*
    751 F.2d 117 (2d Cir. 1984) ................................................................................ 4

*Wilson v. Merrill Lynch & Co.,*
    671 F.3d 120 (2d Cir. 2011) .............................................................................. 27

**Other Authorities**

15 U.S.C.S. § 78j ...................................................................................... 2, 9, 11

28 U.S.C.S. § 1658.......................................................................................... 12

Fed.R.Civ.P. 9 ................................................................................................. 29

Fed.R.Civ.P. 2 ............................................................................................. 3, 4

FINRA Rule 3110 ............................................................................................ 22

FINRA Rule 3120 ............................................................................................ 22

IROC Rule 3300 ................................................................................... 9, 20, 21

Plaintiff Harrington Global Opportunity Fund, Limited ("Harrington" or "Plaintiff") respectfully submits this Memorandum of Law in opposition to the Motion to Dismiss the Amended Complaint filed by Defendants (ECF Doc. 73) ("Defendants' Motion" or "Def. Mem.").[1]

## I.     PRELIMINARY STATEMENT

This case seeks to hold Defendants[2] accountable for manipulating the market price of Concordia International Corp. ("Concordia") securities during the period January 27, 2016 to November 15, 2016 ("Relevant Period") through two complementary schemes – spoofing and abusive short selling.  Both schemes injected false and misleading information into the marketplace in order to interfere with the natural forces of supply and demand, for the purpose of artificially depressing the price of Concordia's shares.  Harrington suffered an enormous financial loss when it sold 4.8 million shares of Concordia stock into the manipulated market during the Relevant Period.

Now, seeking to avoid litigating this case on the merits and escaping liability for their market manipulation schemes, Defendants have filed the instant Motion.  Defendants' Motion: seeks to hold Plaintiff to a far-higher pleading standard than required at this stage of the litigation; either relies on law that is inapplicable or ignores law that is controlling; and repeatedly overlooks, distorts or misrepresents specific factual allegations contained in the Amended Complaint.

For example, in their arguments that this Court lacks personal jurisdiction over the Foreign Defendants and that the claims against the Foreign Defendants exceed the territorial

---

[1] All capitalized terms herein that are not otherwise defined shall have the same meaning as in the Amended Complaint, filed by Plaintiff on April 22, 2021 (ECF Doc. 56) (the "Amended Complaint" or "AC").

[2] "Defendants" refers to the "Foreign Defendants" (including CIBC-Canada, Merrill-Canada, TD-Canada, and John Doe-Canada (together, the "Foreign Spoofing Defendants"); and Merrill-Canada, UBS-Canada, SocGen-Canada, and John Doe-Canada (together, the "Foreign Short Selling Defendants")) and the "Domestic Defendants" (including CIBC-US, Merrill-US, TD-US, and John Doe-US (together, the "Domestic Spoofing Defendants"); and Merrill-US, MLPro, UBS-US, SocGen-US, and John Doe-US (together, the "Domestic Short Selling Defendants")).

reach of the Exchange Act, Defendants assert that "the Foreign Defendants are not alleged to have undertaken any activities in the U.S. or any trades on a U.S. Exchange." (Def. Mem. 11.) Plaintiff, however, explicitly alleged that the Foreign Defendants traded shares of Concordia on U.S. Exchanges. (AC ¶¶ 23, 27, 30, 33, 36.) Indeed, although each of the five Foreign Defendants submitted a Declaration, three made no attempt to deny that they engaged in trading of Concordia in the U.S. during the relevant time, and two did not even deny having engaged in proprietary trading. In any event, all five Foreign Defendants remain subject to this Court's personal jurisdiction – and Plaintiff's claims remain within the extraterritorial reach of the Exchange Act – on the basis of: (1) the Foreign Defendants' express aiming of manipulative conduct at the U.S.; (2) their participation in a conspiracy aimed at the U.S.; and (3) their use of a "manipulative device or contrivance," 15 U.S.C.S. § 78j, in connection with the trading of U.S shares on U.S. exchanges.

Defendants' argument that Plaintiff's claims are untimely reflects a similar failure to recognize the specific allegations of the Amended Complaint. The Amended Complaint sets forth the full timeline of Plaintiff's investigation in great detail, demonstrating that Plaintiff was as diligent and deliberate as could be expected given the highly sophisticated, highly-technical, and obscure methods of manipulation employed by Defendants.

Defendants fare no better with their arguments that Plaintiff has failed to sufficiently plead scienter. Here, Defendants seek to hold Plaintiff to a pleading standard that would be impossible to satisfy at this early stage of litigation, by suggesting that Plaintiff must plead – without the benefit of discovery – specific details regarding *inter alia* the operation of Defendants' proprietary trading algorithms. The Second Circuit requires no such thing. On the contrary, the Second Circuit recognizes that in a manipulation claim, material facts may be solely within the defendants' knowledge, and thus a complaint need only allege: (1) what manipulative acts were performed by Defendants; (2) when they were performed; and (3) what effect the scheme had on the market for that security. Plaintiff has fully satisfied its pleading burden.

With regard to the spoofing allegations, Plaintiff has alleged multiple examples of spoofing for each Defendant during the Relevant Period. The pervasiveness of these examples demonstrate that Defendants acted with intent to deceive investors by artificially affecting the market price of Concordia securities. Not only is it highly plausible that Defendants designed their trading algorithms to place and cancel orders, it is extremely *implausible* that Defendants did not intend exactly what occurred. And with regard to the abusive short selling allegations, Plaintiff has similarly detailed allegations demonstrating that the high volume of shares sold short is indicative of each Defendants' creation of thousands of Fictitious Shares that they traded.

As to loss causation, the Second Circuit requires that Plaintiff allege that a Defendant engaged in a manipulative scheme, and that the scheme worked by devaluing the stock. Plaintiff has plainly done both, including dollar value estimates regarding the extent to which the share price was lowered. Defendants' arguments to the contrary are based on mischaracterizations of the Amended Complaint. For example, Defendants' assertion that any lowering of the share price was irrelevant given the 15-minute duration of each spoofing event is nonsensical. Plaintiff has referenced over 100,000 spoofing events that occurred during the Relevant Period. Even given the short duration of the effects of each spoofing event, their cumulative effect drove down the price of Concordia shares from \$28.03 to \$3.13 throughout the Relevant Period – during which Plaintiff sold its Concordia shares at artificially depressed prices. And Plaintiff is entitled to demonstrate such harm by allegations that it relied on the assumption of an efficient market free of manipulation. Defendants' arguments for dismissal of Plaintiff's unjust enrichment, common law fraud, and aiding and abetting/conspiracy to commit fraud are based on similar mischaracterizations of the Amended Complaint and misapplication of controlling law. Defendants' motion should be denied.

## II.   <u>LEGAL STANDARDS</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.*

*v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) ("*ATSI*") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).

Additionally, on a motion to dismiss under Rule 12(b)(2) where the issue of personal jurisdiction "is decided initially on the pleadings and without discovery, the plaintiff need show only a *prima facie* case," *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp*., 751 F.2d 117, 120 (2d Cir. 1984).  When evaluating whether a plaintiff has done so, courts must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).  "[T]he plaintiff's *prima facie* showing may be established solely by allegations." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S., 854 (1990).

### III.   <u>ARGUMENT</u>

### A.  **Plaintiff Has Made a Prima Facie Showing of Personal Jurisdiction Over the Foreign Defendants**

Plaintiff has more than adequately made a *prima facie* showing that this Court has personal jurisdiction of the Foreign Defendants by alleging "suit-related conduct" which "create[d] a substantial connection with" the U.S., *Walden v. Fiore*, 571 U.S. 277, 284 (2014), as follows:  (1) the Foreign Defendants conducted suit-related conduct in the U.S. by trading in Concordia shares on U.S. exchanges; (2) the Foreign Defendants "expressly aimed" actions at the U.S. by engaging in acts that had the intent and effect of manipulating the share price of Concordia on U.S. Exchanges; and (3) the Foreign Defendants participated in a conspiracy connected to the U.S. by the Domestic Defendants' acts in furtherance of the conspiracy.  *See Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 408 (S.D.N.Y. 2020)

(Schofield, J.) (explaining bases for asserting *in personam* jurisdiction (citations and quotations omitted)).

> **i.** **Plaintiff Has Adequately Alleged that the Foreign Spoofing and Short Selling Defendants Engaged in Suit-Related Conduct in or Expressly Aimed Actions towards the U.S.**

The five Foreign Defendants here each "conducted continuous activity in New York State . . . by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S." (AC ¶¶ 23, 27, 30, 33, 36.)  Plaintiff has thus explicitly alleged that the Foreign Defendants executed trades of Concordia on U.S. exchanges via routing of orders.  Plaintiff's "prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Dorchester*, 722 F.3d at 86.

In an attempt to overcome Plaintiff's well-pleaded allegations, some of the Foreign Defendants submitted carefully-worded Declarations:  TD-Canada avers that it did not conduct any proprietary trading in Concordia's stock on the NASDAQ exchange during the relevant time period; and SG-Canada and ML-Canada each aver that it did not conduct any trading in Concordia's stock on U.S. exchanges during the relevant time period.  (*See* Duncan Decl. ¶ 5; Carignan Decl. ¶ 5 Stratis Decl. ¶ 5.)  These Declarations do not overcome Plaintiff's allegations of suit-related conduct within New York for two reasons.

*First*, as to CIBC-Canada, UBS-Canada, and TD-Canada, the declaration each submitted glaringly *fails* to make any categorical denial that each traded in Concordia's stock on any U.S. exchange during the Relevant Period.  CIBC-Canada and UBS-Canada, for their part, made no attempt to deny that they engaged in proprietary trading in Concordia's stock on U.S. exchanges during the Relevant Period.  (*See* Petrellin Decl.; Climo Decl.)  As to TD-Canada's denial that it engaged in proprietary trading of Concordia's stock on NASDAQ, it made no attempt to deny that it engaged in non-proprietary trading.  (*See* Stratis Decl. ¶ 5.)  These omissions speak volumes.  Indeed, the Declarations submitted by CIBC-Canada, UBS-Canada, and TD-Canada

should be seen as tacit admissions as to a dispositive fact:  each entity traded in Concordia stock on U.S. exchanges during the relevant period, and this Court has personal jurisdiction over them.

*Second*, Plaintiff's allegations that all five of the Foreign Defendants (including SG-Canada and ML-Canada) expressly aimed conduct at the U.S. by engaging in actions intended to manipulate Concordia's share price provides an additional and independent basis for personal jurisdiction.  *See In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-02475 (ALC), 2017 U.S. Dist. LEXIS 88316 at *34 (S.D.N.Y. June 8, 2017) (jurisdictional discovery revealed that foreign defendants directed trades to be executed in the U.S. as part of a scheme to manipulate prices "although quite indirectly").  There, the court found that plaintiffs had presented sufficient facts to find that the foreign defendant "expressly aimed [its] out of forum trading activities in the United States" and – based on both those facts and plaintiffs' allegations that the foreign defendants' primary purpose was the manipulation of prices in the U.S. – held that it had personal jurisdiction over the foreign defendant.  *Id.* at *35.  Here, Plaintiff has <u>repeatedly</u> alleged that the Foreign Defendants purposefully aimed their conduct toward the U.S. via actions that <u>were intended to</u> and <u>did</u> have the effect of manipulating share prices within the U.S. (AC ¶¶ 18, 54-56, 65, 66, 181.)[3]  The Foreign Defendants' motion should be denied.

### ii.   Plaintiff Has Adequately Alleged that the Foreign Spoofing Defendants Participated in a Conspiracy Connected to the U.S.

Plaintiff has also made a *prima facie* showing of specific jurisdiction over the Foreign Defendants by alleging that they participated in a conspiracy with the aim to cause harm in the United States.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 U.S. Dist. LEXIS 44219, at *24 (S.D.N.Y. Mar. 31, 2016) (Schofield, J.) ("*FOREX*").  To establish a basis for personal jurisdiction over foreign defendants under a conspiracy theory, a

---

[3] *7 W. 57th St. Realty Co., LLC v. CitiGroup, Inc.*, No. 13 Civ. 981, 2015 U.S. Dist. LEXIS 44031 (S.D.N.Y. Mar. 31, 2015) – cited by Defendants to argue that Plaintiff has not alleged sufficient conduct by the Foreign Defendants aimed at the U.S. – is entirely inapposite.  There, the court held that a scheme to manipulate LIBOR rates carried out by foreign banks on foreign soil was not "expressly aimed" at New York solely because the scheme had an indirect and unintended impact on New York municipal bonds.  *Id.* at *36-38.  Here, Plaintiff has alleged that the Foreign Defendants' actions had a direct, intended, and – by virtue of the mechanics of interlisted shares – inevitable effect on the price of Concordia shares on U.S. exchanges.

plaintiff must allege that "(1) a conspiracy existed; (2) the [foreign] defendant participated in the conspiracy; and (3) the [domestic defendant]'s overt acts in furtherance of the conspiracy had sufficient contacts with [the U.S.] to subject that [the Domestic Defendants] to jurisdiction in th[e] U.S." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (citation omitted); *see also In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013).  Plaintiff has met this burden by alleging that:  (1) Defendants conspired with one another; (2) the Foreign Defendants participated in that conspiracy; and (3) the Domestic Defendants furthered the conspiracy via its actions in the U.S. (for which the Domestic Defendants do not contest that this Court lacks personal jurisdiction).  (AC ¶¶ 1, 2, 7, 17-19, 63, 227-233.)

Courts in this district have consistently held that where, as here, a plaintiff alleges that foreign defendants colluded with domestic defendants to manipulate prices within the U.S. via conduct expressly aimed at the U.S., the court will have personal jurisdiction over those foreign defendants.  For example, in *FOREX*, this Court held that it had personal jurisdiction over foreign defendants who were alleged to have participated in a conspiracy to manipulate prices in the foreign exchange currency market, having done so "elsewhere, with the express intent to cause harm in the [U.S]." *FOREX*, 2016 U.S. Dist. LEXIS 44219, at *30.  Similarly, in *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2018 U.S. Dist. LEXIS 47960 (S.D.N.Y. Mar. 22, 2018) (Schofield, J.) this Court held that it had personal jurisdiction over foreign defendants who were alleged to have colluded with domestic defendants to manipulate benchmark rates which – in a manner similar to interlisted securities – bore a "mechanical, direct correlation" to the rates charged plaintiffs.  *Id.* at *14-19; *see also Allianz Glob.*, 457 F. Supp. 3d at 408 (holding that plaintiffs had made a *prima facie* showing of personal jurisdiction by alleging a conspiracy between foreign and domestic defendants to fix foreign exchange rates, "at least part" of which "took place in, or was directed into, the United States" (citation omitted)).

The Foreign Defendants make several arguments that this Court lacks conspiracy jurisdiction over them, none of which have merit.  The Foreign Defendants first argue that Plaintiff's conspiracy allegations are "conclusory" and contain "no facts about the supposed conspiracy."  (Def's Mem. 9.)  Not so.  The Complaint contains numerous detailed allegations about the conspiracy (AC ¶¶ 1, 2, 7, 17-19, 63, 227-233.), and the Foreign Defendants' protestations to the contrary "amount[] to a demand for specifics that are not required and that [Plaintiff] could not be reasonably expected to know, at the pleading stage."  *FOREX*, 2016 U.S. Dist. LEXIS 44219, at *31 (quotation and citation omitted).[4]

Next, the Foreign Defendants argue that this Court cannot have personal jurisdiction over the Foreign Defendants based on a conspiracy theory because "as a matter of law," no defendant can conspire with its own affiliate.  (Def. Mem. 10 (citing *Christians of Cal., Inc. v. Clive Christian N.Y. LLP*, No. 13 Civ. 275, 2015 U.S. Dist. LEXIS 13224, at *27 (S.D.N.Y. Feb. 3, 2015).)  This argument misses the mark by conflating two unrelated concepts:  (1) whether a conspiracy exists for personal jurisdiction purposes; and (2) whether a conspiracy exists as a standalone claim in the absence of an underlying tort.  *Christians of California*, cited by the Foreign Defendants, addresses only the latter and has nothing to do with a personal jurisdiction analysis.  *See id.*  Indeed, the Foreign Defendants have provided no authority for the proposition that conspiracy jurisdiction cannot extend to schemes in which affiliated (but legally distinct) entities collude.  On the contrary, as this Court's prior rulings in *FOREX*, *Nypl,* and *Allianz Global* demonstrate, personal jurisdiction exists in the presence of well-pleaded allegations of a conspiracy aimed at the target forum.

---

[4] In *FOREX*, plaintiff was able to support its conspiracy allegations with extensive chatlogs detailing conversations among the defendants.  *Id.* at 26-29.  To the extent, this Court has any doubts as to whether Plaintiff has alleged conspiracy in sufficient detail, jurisdictional discovery would be appropriate to permit Plaintiff the opportunity to gather such facts.

### B.  Plaintiff's Claims Against the Foreign Defendants
### <u>Do Not Exceed the Territorial Reach of the Exchange Act</u>

Plaintiff's claims fit well within the reach of the Exchange Act, which declares it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" so long as such device or contrivance is "in connection with the purchase or sale of a security listed on an American stock exchange."  15 U.S.C.S. § 78j; *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 262, 273 (2010).  Plaintiff alleges a multitude of connections between the Foreign Defendants' conduct and the purchase or sale of Concordia shares in the U.S.

*First*, as discussed above, Plaintiff has alleged that each of the Foreign Defendants executed trades of Concordia on U.S. exchanges.  (AC ¶¶ 23, 27, 30, 33, 36.)  Plaintiff's allegations are supported by the fact that each of the Foreign Defendants submitted an IIROC Rule 3300 Best Execution Trading Disclosure statement in which it disclosed its authority to route interlisted securities such as shares of Concordia to U.S. counterparts.  (AC ¶ 188 n.16.) Plaintiff's allegations of trading on U.S. Exchanges must be accepted as true, and the Declarations submitted by the Foreign Defendants have no bearing.[5]  In any event, the Declarations submitted by CIBC-Canada, UBS-Canada, and TD-Canada do not dispute that each entity traded shares of Concordia on U.S. Exchanges at a time when those Foreign Defendants were manipulating the price of those shares.  Defendants' *Morrison* arguments are plainly inapplicable as to those three Foreign Defendants.

*Second*, even if the Foreign Defendants had not routed orders or executed trades of Concordia shares on U.S. exchanges, the Foreign Defendants' conduct would <u>still</u> be within the territorial reach of the Exchange Act due to their use of a manipulative device or contrivance – a scheme to engage in market manipulation via spoofing – "in connection with the purchase or sale of a security listed on an American stock exchange."  *Morrison*, 561 U.S. at 273.  Concordia's

---

[5] Although this Court may, in certain circumstances, consider "affidavits and supporting materials submitted by the parties" to assess <u>jurisdiction</u>, *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2015 U.S. Dist. LEXIS 145598, at *27 (S.D.N.Y. Oct. 23, 2015), the Foreign Defendants have provided no authority suggesting that supporting materials such as their Declarations may be considered in connection with their *Morrison* arguments.

shares are "Interlisted Securities" and thus the Foreign Defendants' manipulative scheme had both the goal and effect of manipulating the market price of Concordia's shares on U.S exchanges.  (AC ¶¶ 6, 18.)  Each side of Defendants' scheme involved the trading of Concordia shares on U.S. exchanges, and thus, serves as a basis for personal jurisdiction:  (1) the Foreign Defendants manipulated the price of  Concordia shares on Canadian exchanges (and thus, the price of the Interlisted Securities on U.S. exchanges), which the Foreign Defendants' U.S. affiliates then took advantage of by trading in those shares on U.S. exchanges; and (2) the Domestic Defendants manipulated the price of Concordia shares on U.S. exchanges (and thus, the price of the Interlisted Securities on Canadian Exchanges), which the Foreign Defendants then took advantage of by trading in those shares on Canadian exchanges.

In arguing that the Foreign Defendants' conduct is beyond the territorial reach of the Exchange Act, the Foreign Defendants rely heavily on *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), which is inapposite.  In *Parkcentral*, plaintiffs alleged that a foreign entity made fraudulent statements "primarily in Germany" to manipulate the price of shares that "trade primarily on European exchanges" for the purpose of conducting a hostile takeover.  *Id.* at 201-202.  There, were no allegations that the defendant intended to manipulate the price of shares of any security on any U.S. exchange, much less an interlisted one.  And although the Second Circuit held that the facts underlying plaintiffs' claims were "so predominantly foreign as to be impermissibly extraterritorial," i*d.* at 216, it expressly acknowledged the particular nature of the facts in *Parkcentral* and cautioned courts to "carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases" when determining whether a case is "impermissibly extraterritorial."  *Id.* at 217.  Here, unlike in *Parkcentral*, the Foreign Defendants' participation in a scheme was not "predominantly foreign"; on the contrary, it existed in both the U.S. and Canada.  And here, unlike in *Parkcentral*, the impact of the Foreign Defendants' conduct on the

price of Concordia shares on U.S. exchanges was not an incidental byproduct of a scheme with other aims; it was both the goal and effect of Defendants' scheme.  (AC ¶¶ 65, 66.)[6]

Defendants also appear to argue that this Court should disregard any connection between the trading actions of one Defendant and the coordinated manipulation of share prices undertaken by another Defendant because "[t]here is no cause of action for conspiracy to violate the Exchange Act."  (Def. Mem. 12 (citing *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998)).)  Defendants' argument would lead to the absurd result that companies in different countries could commit securities fraud with impunity by engaging in a *Strangers on a Train*-type scheme whereby each manipulates the price of an interlisted security which the other then trades in its country.  Defendants' argument is, of course, wrong, as it is based on an incomplete reading of *Dinsmore*, 135 F.3d at 842, which holds that "secondary actors who conspire to [violate the Exchange Act] will still be subject to liability so long as they independently satisfy the requirements for primary liability."  As set forth above, each Foreign Defendant has primary liability through its use and employment of a "manipulative or deceptive device or contrivance" that is "in connection with the purchase or sale of a security listed on an American stock exchange."  15 U.S.C.S. § 78j; *Morrison*, 561 U.S. at 273.  The Foreign Defendants' motion should be denied.

## C.  <u>Plaintiff's Exchange Act Claims Are Timely</u>

Defendants have failed to meet their burden of showing that Plaintiff's Exchange Act Claims are untimely.  As this Court has recognized:

> Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiffs failed to plead timely claims.  Dismissal based on an affirmative defense at the complaint stage is warranted only if it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.

---

[6] *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) – also cited by the Foreign Defendants – is equally inapposite.  There, the claims had no connection with the purchase or sale of shares on U.S. exchanges, and although the securities at issue were interlisted such that manipulation of their price on Canadian exchanges had the *effect* of impacting the corresponding price of that security on U.S. exchanges, there were no allegations that the underlying scheme intended to or *had the goal* of manipulating the price on U.S. exchanges.  *Id.* at 180-81.

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580, 2018 U.S. Dist. LEXIS 87991, at *16 (S.D.N.Y. 2018) (Schofield, J.) (quotations and citations omitted); *see also In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580, 2018 U.S. Dist. LEXIS 87991, at *16 (S.D.N.Y. 2018) (Schofield, J.).

Plaintiff was required to assert its Exchange Act claims within "2 years after the discovery of the facts constituting the violation." 28 U.S.C.S. § 1658(b). "Discovery of the facts" occurs (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'--whichever comes first*." Merck & Co. Inc. v. Reynolds*, 559 U.S. 633, 653 (2010). A "reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.,* 637 F.3d 169, 175 (2d Cir. 2011).

A motion to dismiss based on a statute of limitations defense should be denied unless the face of the complaint, taking all inferences in plaintiff's favor, yields the precise moment when the two-year limitations period began to run. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 95 (2d Cir. 2018); *In re Chi. Bridge*, 2018 U.S. Dist. LEXIS 87991, at *17 (denying defendant's motion to dismiss plaintiff's amended complaint as time barred).

Defendants contend that Plaintiff "had access to all of the data cited in the Amended Complaint by March 2017 based on "unmasked" TOQ Reports received from IIROC and argue that Plaintiff was therefore required to file this suit by March 2019. (Def. Mem. 20-21.) Defendants are flat out wrong. First, Defendants ignore the critical fact that the data contained in the "unmasked" TOQ Reports was limited to only three months of trading activities in Canada and contained <u>no</u> information concerning Concordia's trading activity on U.S. Exchanges. (AC ¶ 42.) In fact, a request made to FINRA for information regarding Concordia trades on U.S. exchanges was rejected by FINRA in February 2017. (*Id.* ¶ 43.) Following FINRA's rejection of this information request, IIROC closed its investigation in March 2017 because it claimed it

was unable to determine whether Concordia's share price had been manipulated.  (*Id.* ¶ 44.)
Plaintiff's consultant – a former British Columbia securities commissioner that was retained to
investigate the cause of Concordia's share price volatility – also concluded that there was
insufficient data to proceed with his investigation.  *Id.*  Defendants also ignore the fact that the
TOQ Reports lacked information such as Trade Desk IDs, the names of the brokers, and the
names of clients.  (*Id.* ¶ 46). This information later became the subject of Plaintiff's application
for Norwich Relief that was filed against IIROC in the Ontario Superior Court of Justice in
January 2018.  *Id.*  Although Plaintiff's request for Norwich Relief was denied on December 31,
2018, the court rejected IIROC's argument that Plaintiff did not have a potential claim for market
manipulation.  *Id.*

Next, Defendants argue that Plaintiff failed to act diligently because it did not hire Urvin
– one of three consultants hired by Plaintiff over the course of its investigation - until July 2019
although it had access to non-public trading data in March 2017.  (Def. Mem. 21.)  This
argument is similarly without merit.  Again, Defendants mischaracterize the limited data
contained in the TOQ Reports that Plaintiff received in March 2017, which did not contain
information concerning Concordia's trading activity on U.S. Exchanges and contained
insufficient information for either IIROC or Plaintiff's consultant to determine whether
Concordia stock was manipulated on Canadian exchanges.  (AC ¶ 44)  Because the TOQ
Reports did not contain information concerning Defendants' market manipulation on U.S.
Exchanges, the statute of limitations was not triggered on Plaintiff's Exchange Act claims when
it obtained these reports in March 2017.  Further, as stated in the Amended Complaint, after
Plaintiff retained Urvin in July 2019, Urvin purchased multiple gigabytes of exchange trading
data that ultimately identified the manipulation of Concordia's stock and the identities of the
manipulators.  (AC ¶¶ 48-51.)  Urvin's analysis was not based on the data contained in the TOQ
Reports as Defendants incorrectly suggest, and even if it was, the manipulation and the identity

of the manipulators was only revealed after Urvin developed its Pattern Recognition Analysis Program and applied it to the data.  This analysis was not completed until May 2020.  (AC ¶ 52.)

Defendants' reliance on the Third Circuit's decision in *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc*., 730 F.3d 263, 276-77 (3d Cir. 2013), in support of their argument that Plaintiff failed to act with reasonable diligence is unsupported.  In *Pension Trust*, the Third Circuit concluded that a plaintiff fund's Securities Act claims, which had a one-year statute of limitations, were untimely because the fund delayed in retaining a consultant to investigate potential claims against the defendants until after it was appointed Lead Counsel in October 2010, despite the fact that there was sufficient publicly available information or "storm warnings" – including a state-court action – that should have alerted the fund to the possibility of claims against the defendants in September 2008.  The Third Circuit concluded that a reasonably diligent plaintiff would have begun an investigation in September 2008, could have conducted an analysis in 2008 that was comparable to the analysis conducted by the fund's consultant in 2010 and would have discovered the same facts underlying the fund's claims by November 2008.  Therefore, the Third Circuit concluded that the original complaint, which was not filed until February 2010, was untimely.  *Id.* at 279.

Here, the determinative factor that led the Third Circuit in *Pension Trust* to dismiss plaintiff's securities violation – the failure to respond to a publicly filed complaint against defendants and commence a timely investigation – is not present.  *First*, unlike *Pension Trust*, there was not publicly available information that alerted investors to Defendants' deceptive and manipulative conduct to trigger an investigation.  Defendants concealed their conduct from the public and Plaintiff was unaware of the identities of the manipulators until Urvin completed its analysis of multiple gigabytes of exchange trading data in May 2020.  *Second*, unlike the plaintiff in *Pension Trust*, Plaintiff did not delay or fail to act with reasonable diligence in retaining a consultant even in the absence of specific storm warnings regarding defendants' market manipulative.  To the contrary, Plaintiff first retained a consultant in April 2016 to

investigate the cause of Concordia's stock price volatility.  (AC ¶ 41.)  Plaintiff subsequently

retained two additional consultants – including Urvin – before it was able to uncover

Defendants' concealed manipulative conduct.  (*Id.* ¶¶ 45, 48.)  Defendants have not

demonstrated as a matter of law that Plaintiff failed to conduct its investigation with reasonable

diligence, nor have Defendants identified any publicly filed complaints or other "storm

warnings" that should have alerted Plaintiff to potential claims against the defendants prior to

May 2020.  The fact that Plaintiff's investigation did not immediately yield facts concerning

Defendants' violations, which were concealed from the public, does not diminish Plaintiff's

reasonable efforts nor does it support Defendants' contention that as a matter of law, a

reasonably diligent plaintiff conducting a comparable investigation would have discovered the

necessary elements of Plaintiff's 10(b) claims any earlier.

     Defendants' reliance on *McCullough v. Advest, Inc.*, No. 17 Civ. 407, 2017 U.S. Dist.

LEXIS 136634 (W.D. Pa. Aug. 25, 2017) is similarly misplaced.  In *McCullough*, the district

court concluded that plaintiffs' securities fraud claim was time-barred where plaintiffs waited

until 2010 before commencing *any* investigation in response to the collapse of specific stock

prices that occurred between 2005-2007.  *Id.* at *13.  The *McCullough* court concluded that had

plaintiffs conducted "some" investigation when they initially lost their investments, they would

have discovered the facts of the alleged misrepresentations more than two years before they filed

suit in 2011.  *Id.*  Here, Plaintiff commenced its investigation in April 2016, shortly after noticing

negative social media postings that appeared related to Concordia's stock price volatility.  (AC

¶ 41.)  Unlike in *McCullough*, Plaintiff did not simply ignore Concordia's stock volatility and

wait years before initiating any investigation.  Instead, Plaintiff commenced and continued its

investigation even in the absence of publicly available information and lack of support from

IIROC or FINRA.

     Finally, as an indication of the extent to which diligent investigations of spoofing

allegations can take years, the Court can and should take judicial notice of the time it took the

United States Department of Justice ("DOJ") along with the Securities and Exchange Commission and Commodity Futures Trading Commission ("CFTC") to investigate and settle spoofing fraud charges against JPMorgan Chase for $920 million.  *See* Press Release, Department of Justice, JPMorgan Chase & Co. Agrees To Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets (September 29, 2020), https://www.justice.gov/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us (the "JPMorgan Spoofing Case"); *see also In re Zyprexa Prod. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) (recognizing that the court may take judicial notice of a government agency's press release).  When this settlement was announced in late September 2020, the government noted that the underlying misconduct had "spanned eight years."  *Id.*  Here, without the vast array of pre-action discovery tools available to the government, Harrington vigilantly investigated Defendants' misconduct for several years, using all the tools at its disposal, until late 2020 when it finally knew and in turn was able to plead the elements of its claims.  Thus, while this Court certainly need not rely on the length of time it took the government to investigate the fraudulent spoofing charges against JPMorgan Chase to find Plaintiff's claims timely, the government's case nonetheless presents a compelling and objective example of the complexity and difficultly for Harrington, a private litigant, to ascertain the facts underlying its claims against Defendants.

### D.  Plaintiff Has Sufficiently Alleged Scienter as to Defendants' Manipulative Conduct

Plaintiff has adequately pleaded scienter by (1) alleging that each Spoofing Defendant designed and implemented algorithmic trading programs to place orders to sell that were never intended to be executed (2) failed to establish and enforce risk management systems to monitor internal trading and the use of trading machines by their customers and (3) used unauthorized shares of Concordia to cause unlawful short sales (AC ¶¶ 166-169).

In assessing whether Plaintiff has sufficiently pleaded scienter, this Court should consider whether all of the facts alleged, taken together, give rise to an inference of scienter that is "at

least as compelling as any opposing inference of non-fraudulent intent." *Tellabs Inc.* v. *Makor Issues & Rts* Ltd., 551 U.S. 308 (2007).  Here, Plaintiff has asserted the "conscious misbehavior or recklessness" theory of scienter.  Plaintiff has gone beyond what is required at the pleading stage given the limited broker data that is available to the public and the fact that much of the critical data is in the sole possession of the Defendants.

     i.    <u>Plaintiff Has Sufficiently Alleged Scienter as to Spoofing</u>

A strong inference of scienter follows from the Amended Complaint's allegations regarding the manner in which Defendants employed algorithmic trading to place, cancel and execute hundreds of thousands of orders in furtherance of their spoofing scheme.  Contrary to Defendants' motion, Plaintiff explicitly alleged Defendants intended to drive down Concordia's stock through spoofing and:  (1) "intentionally created a false impression" as to the value of Concordia shares; (2) "designed and implemented algorithmic trading programs" to execute the spoofing schemes; and (3) as registered broker-dealers, "knew or should have known that it was unlawful" to place orders in the Market Order Book they never intended to execute.  (AC ¶¶ 167, 181, 198–99.)  Plaintiff also alleges that the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts placed large volumes of Baiting Orders to sell which were never intended to be executed while simultaneously placing a smaller volume of orders to buy.  (*Id.* ¶ 167.)  The purpose and <u>intent</u> of these Baiting Orders was to create an illusion of market selling activity that would:  (1) drive the price downward; and (2) cause other market participants – who base their trading strategies on their perceptions of supply and demand at various price levels – to also sell their Concordia shares.  (*Id.* ¶¶ 4, 58.)  Once the price was driven downward, Defendants would purchase the shares at the lower manipulated price, profiting at the expense of sellers such as Plaintiff.  Plaintiff further alleges that the placement and cancellation of the Baiting Orders by each Defendant was not inadvertent or unintended, but rather was <u>either</u> intentional <u>or</u> the result of their reckless failure to maintain internal controls and monitor automated trading so as to prevent manipulation.  (*Id.* ¶¶ 169, 178.)  Plaintiff's allegations support a strong inference of

scienter as reflected in the JPMorgan Spoofing Case where the broker paid almost one billion dollars to resolve criminal charges for similar conduct.  *See, DOJ Press Release, supra,* Section III.C.  ("For nearly a decade, a significant number of JP Morgan traders and sales personnel openly disregarded U.S. laws that serve to protect against illegal activity in the marketplace.")

Defendants challenge the sufficiency of these allegations by arguing that Plaintiff has not alleged detailed facts concerning how Defendants' algorithmic trading programs were designed, programmed, and operated.  But at this early stage of this litigation, Harrington is neither required nor expected to possess or allege such details.  *See ATSI*, 493 F.3d at 102 ("A claim of manipulation [] can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.")

Not only is it plausible that the spoofing effects of Defendants' algorithmic trading programs were intentional or reckless, but the alternative defies credulity.  Defendants' systems continuously placed and cancelled a large volume of Baiting Orders for a period lasting over a year.  (AC ¶¶ 56-60.)  Indeed, the Amended Complaint alleges multiple examples of specific spoofing events that occurred during the Relevant Period for each Spoofing Defendant.  (*Id.* ¶¶ 70-165.)  These examples are representative of the approximately 100,000 spoofing events that occurred during the Relevant Period – which collectively demonstrate the coordination of trading between U.S. and Canadian affiliated companies.  Plaintiff has alleged specific facts concerning the date, time, number of shares and price of the Baiting and Executing Orders that were placed on both U.S. and Canadian exchanges.  (*See id.* ¶¶ 70-93 (CIBC); ¶¶ 94-117 (TD); ¶¶ 118-141 (Merrill); and 142-165 (John Doe).)

It is highly implausible that Defendants did not know – or somehow failed to notice — that their systems were placing such a high volume of Baiting Orders.  Thus, a strong inference can be drawn that <u>either</u> Defendants intentionally designed their systems to engage in spoofing <u>or</u> Defendants should have noticed that they were placing and cancelling Baiting Orders and

consciously or recklessly chose to continue to do so.  To the extent it is the latter, Defendants'

failure to maintain system controls and monitor internal trading conduct represents a conscious

departure from the standards of ordinary care that they knew or should have known they were

required to follow.  *See In re Carter-Wallace, Inc. Sec. Litig.* 220 F.3d 36, 39 (2d Cir. 2000).

Such claims "typically" survive motions to dismiss when based on specific allegations

demonstrating "'defendants' knowledge of facts or access to information contradicting their

public statements.'"  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).  A failure

to "check information defendants had a duty to monitor" may also give rise to a strong inference

of recklessness.  *See Novak*, 216 F.3d at 311; *Nathel v. Siegal*, 592 F.Supp. 2d 452, 464

(S.D.N.Y. 2008).

Defendants also argue that Plaintiff's allegations of scienter in the spoofing claim are

"implausible because they do not make economic sense."  (Def. Mem. 18.)  As discussed below,

Defendants' spoofing scheme makes perfect economic sense, especially in conjunction with

Defendants' short-selling.  *See infra*, Section III.D.ii.  Further, Harrington need not allege that

Defendants' scheme make "economic sense"; rather, scienter may be sufficiently alleged through

facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, not

motive and opportunity to commit fraud.  *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.

2001).  Harrington has alleged with specificity and particularity that Defendants failed to

establish and maintain systems of risk management control and supervisory procedures that were

reasonably designed to manage compliance with applicable regulatory and statutory

requirements.  Courts in this district have repeatedly held that a lack of internal controls will

support an inference of scienter.  *In re CannaVest Corp. Secs. Litig.*, 307 F. Supp.3d 222, 246

(S.D.N.Y. 2018); *see also In re: Deeco Instruments Inc. Secs Litig*. 235 F.R.D. 220. 232

(S.D.N.Y. 2006) ("As this court has recognized, a failure to maintain internal controls to avoid

fraud is sufficiently indicative of scienter. . . .")

**ii.   <u>Plaintiff Has Sufficiently Pled Scienter as to Abusive Short Selling</u>**

Defendants fare no better with their arguments that Plaintiff failed to plead facts sufficient to draw an inference that Defendants intended to drive Concordia's stock price down through short selling.

To begin, Defendants' arguments must be viewed in the light of:  the unavailability of broker-level data in the U.S. to the public, including Plaintiff, at this early stage of the litigation; their mischaracterization or misapprehension of the relevance of short selling in Canada to the short selling claims being asserted in U.S.; and their failure to maintain and monitor internal trading systems to ensure compliance with applicable industry rules and regulations.

Unlike in Canada – where broker identities are generally available in public trading data – the identities of U.S. brokers who traded Concordia shares on U.S. exchanges are <u>not</u> available to the public unless discovered during litigation.  The Amended Complaint's allegations regarding the identities of the U.S. brokers who engaged in abusive short selling are based on a comparison of the unlawful trading activities of the Canadian Short Selling Defendants on Canadian exchanges, with the same trading patterns that occurred simultaneously on the U.S. exchanges.  (AC ¶185-188.)  Plaintiff relied upon the Defendants' IIROC Rule 3300 Best Execution Trading Disclosure statements – wherein each Canadian broker disclosed their authority to route Interlisted Securities to their U.S. Affiliated Counterparts and FINRA's Broker Check system that listed each Canadian Defendant as a direct business affiliate of their U.S. counterparts – to determine the identities of the Defendants who engaged in abusive short selling on U.S. exchanges.

At this early stage of the litigation, <u>only</u> market-level data is available to Plaintiff to support its claims of abusive short selling on the U.S. markets.  This market-level data is compelling as it reflects that, during the Relevant Period, there were approximately 236 million Concordia shares sold on the U.S. exchanges and approximately 134 million of these shares were sold short despite there being only approximately 40 million shares that were authorized and available to be traded. (AC ¶ 11.)  Furthermore, on 161 out of 205 trading days during the

Relevant Period, the percentage of shares that were sold short – compared with all shares that were sold – was between 50.45% and 89.76%, which far exceeded the industry average of 20% to 25%.  A strong inference can be drawn that the majority of the approximately 134 million shares that were sold short on U.S. exchanges, included millions of Fictitious Shares that were unlawfully manufactured and sold without the authorization of Concordia.  (*Id.* ¶ 12.)

As set forth in the Amended Complaint, Defendants' abusive short selling and spoofing schemes were complementary forms of market manipulation that together drove the price of Concordia's shares down further than either scheme separately would have during the Relevant Period, during which Plaintiff sold its shares on the U.S. exchanges.  (*Id.* ¶ 13.)  Concordia was an Interlisted Security that traded on both Canadian and U.S. exchanges.  (*Id.* ¶¶ 6, 18, 40.) Whenever a Canadian Short Selling Defendant manipulated the market price of Concordia shares in Canada, it had a direct and immediate impact on the market price of Concordia's shares being sold on U.S. exchanges.  By selling millions of unauthorized shares on the U.S. exchanges, Defendants drove the market price of Concordia shares downward and enabled the Short Selling Defendants to purchase the shares back at the lower price that resulted from their abusive short selling and spoofing trading activities.  By completing the trading cycle within the same day, Defendants avoided creating "fails to deliver" and triggering a Reg SHO violation, while still being able to realize profits from their unlawful trading activities.  (AC ¶ 183.)  Defendants' profits came from first selling short at a high price and then buying at the lower price caused by their market manipulation.  By repeating this cycle, Defendants had an ongoing incentive to drive the market price down and thus realize a profit from their scheme.  In other words, this scheme made perfect economic sense for Defendants.

The abusive short selling scheme perpetrated by the U.S. Short Selling Defendants consisted of several activities designed to manipulate the price of Concordia's shares downward by:  (1) short selling shares without locating or borrowing legally authorized shares in violation of Reg SHO; (2) failing to establish a system of supervision that was required by the FINRA

Supervision Rule and the FINRA Security Counting and Verification Rule; and (3) failing to supervise the effective implementation of the supervision and monitoring systems that were required by the FINRA Supervisory Control System Rule.  (AC ¶ 176.)  The Short Selling Defendants had access to information that they knew contradicted the statements made in their regulatory filings and information that violated the applicable industry rules and regulations.  (AC ¶ 177.)  Defendants' affirmative conduct evinces strong circumstantial evidence of conscious misbehavior or recklessness.  Moreover, a failure to maintain adequate internal controls or monitor internal trading activities to prevent fraud has regularly been found sufficient to support an inference of "scienter" in this District.  *CannaVest*, 307 F.Supp. 3d at 246.

The conduct of the U.S. Short Selling Defendants did not reflect inadvertent anomalies, innocent accidents, or "one-off" errors.  Indeed, as registered brokers, each Short Selling Defendant knew or was reckless in not knowing that its unlawful trading practices were an extreme departure from industry standards of care including FINRA Rule 3110, which required them to "establish and maintain a system" of supervision that is "reasonably designed to achieve compliance with applicable securities laws and regulations."  (AC ¶ 198.)  FINRA Rule 3120 also requires each Defendant to verify and test their supervisory systems and procedures to ensure they are in compliance with industry requirements.  In this context, a strong inference can be drawn that the Short Selling Defendants consciously or recklessly disregarded their compliance obligations and turned a blind eye to potentially unlawful conduct so that they could continue to profit from their unlawful conduct.  (AC ¶ 198.)

Plaintiff alleges that Defendants knew or were reckless in not knowing that: (1) continuous illegal short selling would drive Concordia's stock price down, (2) continuous dissemination of false information would do the same, and (3) their conduct was an extreme departure from industry laws and standards.  (AC ¶¶ 175–204.)  Defendants' arguments to the contrary are misplaced, (Def. Mem. 22 (citing *In re Banco Bradesco S.A. Sec. Litig.*, 277 F.

Supp. 3d 600, 665 (S.D.N.Y. 2017))),[7] and accordingly, Defendants' argument that Plaintiff has

failed to plead particularized facts regarding Defendants' scienter is without merit.

    **E.**  **Plaintiff Has Sufficiently Alleged Loss Causation.**

    The Amended Complaint alleges a "plausible causal link" between Plaintiff's loss and

Defendants' misrepresentations. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797

F.3d 160, 187 (2d Cir. 2015). The Second Circuit has instructed that, "Plaintiffs' burden

[regarding loss causation] is not a heavy one." *Id.* Specifically, at the pleading stage, it is

enough for a plaintiff to allege (1) a "particular misrepresentation" and (2) the devaluation of the

stock." *See id.* at 188. Moreover, the plaintiff is not required to "rule out other contributing

factors or alternative causal explanations." *Id.* at 188 (citation omitted) (holding loss causation

was alleged where defendants represented that certain asset-backed securities were "well built,"

when they were actually "designed to fail"). Plaintiff has sufficiently alleged loss causation for

the spoofing and naked short selling claims as to each of the Defendants.

    *First*, as to spoofing, Plaintiff alleges that Defendants made misrepresentations by

placing hundreds or thousands of baiting orders that they never intended to execute – orders

placed with the intent to drive down Concordia's stock price. (AC ¶¶ 4-8.) Plaintiff alleges this

"particular misrepresentation," as well as alleging the devaluation of the stock as follows:

> When the spoofing events occur continuously throughout the day and continue
> without interruption over a protracted period of time, the long-term cumulative
> effect of spoofing places enormous downward pressure on the market price of a
> security. The U.S. and Canadian Spoofing Defendants executed over 100,000
> spoofing events during the 205 trade date Relevant Period which caused the
> collapse of Concordia's share price from $28.02 to $3.13.

(*Id.* ¶ 171; *see also id.* ¶¶ 53–170, 172–74, 205–09.) Plaintiff also alleges additional facts

regarding the devaluation of Concordia's stock. For example, Plaintiff alleges that:

---

[7] In *Banco Bradesco*, in the context of allegations that the defendants concealed a tax bribery scheme, the court held that "the avoidance of personal liability motive is too speculative and conclusory to support scienter." 277 F. Supp. 3d at 655 (citation omitted). Here, by contrast, Plaintiff alleges facts supporting a strong inference that Defendants had economic and professional motives to create trading opportunities, which Defendants accomplished by short selling shares beyond what they could cover. (AC ¶¶ 166–69, 198–99.)

> [T]he persistent and relentless placement and cancellation of Baiting Orders to sell virtually 'all day, every day' throughout the Relevant Period had the cumulative effect together with abusive short selling of driving Concordia's share price down from $28.03 to $3.13.

(*Id.* ¶ 8).  Plaintiff has more than met its burden to sufficiently allege loss causation.

Defendants argue that Plaintiff has not sufficiently alleged loss causation because it grouped together the Spoofing Defendants' trading activities.  (Def. Mem. 23 (citing AC ¶ 171).)  Defendants cite *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) and *Atuahene v. City of Hartford*, 10 F. App'x 33 (2d Cir. 2001) for their argument, but each is distinguishable.  In *Lattanzio*, the accountant defendants' misstatements, which were different from the other defendants' misstatements, were not the type of statements that could cause plaintiffs' loss.  *See* 476 F.3d at 157.  In *Atuahene*, the complaint did not differentiate among defendants *or* provide any factual basis for the legal claims.  *See* 10 F. App'x at 34.  Here, Plaintiff properly alleges that the Spoofing Defendants engaged in spoofing activity, and that Concordia's stock price fell as a result.  The Amended Complaint contains both an explanation of how spoofing over an extended period of time will devalue a security, and how each defendant engaged in numerous spoofing trades during the relevant period that put downward pressure on the stock that resulted in a price drop.  (AC. ¶ 66.)  (alleging examples of specific spoofing activities, separated by individual defendants).  These allegations are more than sufficient to meet Plaintiff's pleading burden.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015) ("Where a plural author is implied by the nature of the representations . . . . we hold that there is no fixed requirement . . . to identify a single entity within the group on pain of dismissal.").

Defendants also argue that Plaintiff 's loss causation theory is implausible for the spoofing claim because the depressed price caused by each spoofing event is alleged to have lasted only 15 minutes.  This is simply not an accurate characterization of the Amended Complaint.  Putting aside the "over 100,000 spoofing events" alleged in the Amended Complaint, specifically with respect to the spoofing cycle, Plaintiff has explicitly alleged that "[t]he impact of this spoofing activity extended beyond the specific spoofing cycle . . . because

the market neither immediately nor fully rebounded from the manipulated prices once each of the spoofing events were completed." (AC ¶ 62.) Also, as discussed below, the Amended Complaint details how the Spoofing Defendants engaged in this trading practice during the Relevant Period in which Plaintiff was selling shares, thus causing Plaintiff to sell at artificially depressed prices. (*Id*. ¶ 171.)

Defendants further mischaracterize the Amended Complaint by stating that Plaintiff does not allege that it sold Concordia shares within a 15-minute spoofing period. (Def. Mem. 23.) That is untrue. Plaintiff has alleged that it sold shares during active spoofing events. For example, Plaintiff alleges that the U.S. and Canadian Spoofing Defendants "executed over 100,000 spoofing events" over 193 days of the 205-trading-date period, and that Plaintiff sold Concordia shares on 27 of those days. (AC ¶¶ 171–172.) Plaintiff further alleges that the spoofing events occurred "continuously throughout the day . . . without interruption." (*Id.* ¶ 171.) The Amended Complaint even contains a chart showing the downward trend of Concordia's market price when Plaintiff was selling its shares, on days that spoofing events occurred. (*Id.* ¶ 14.) Together these allegations set forth a causal link between Plaintiff's loss and Defendants' scheme. Thus, the Amended Complaint sufficiently alleges loss causation.

Defendants' reliance on *In re Merrill, BofA, and Morgan Stanley Spoofing Litig.*, No. 19 Civ. 6002, 2021 U.S. Dist. LEXIS 40712 (S.D.N.Y. Mar. 4, 2021) is misplaced for several reasons. For one, the case is distinguishable because the *Merrill* court specifically noted that the plaintiffs did not claim that the defendants' spoofing occurred "continuously throughout the class period or in a predictable manner." *Id.* at *47. Here, in contrast, Plaintiff alleges that the spoofing events occurred "continuously" and "without interruption" on 193 of 205 trading days – 27 of which were days that Plaintiff traded at manipulated prices. (AC ¶¶ 171–172.) Moreover, Defendants incorrectly state that the *Merrill* court dismissed the spoofing claim for failure to state a claim, when it in fact did so on statute of limitations grounds. 2021 U.S. Dist. LEXIS 40712, at **46-49 (discussing the spoofing allegations in dicta but declining to address

defendants' argument as to the spoofing claim's validity "in light of the [c]ourt's rulings on the statute of limitations and actual damages").

As to the abusive short selling claims, Plaintiff alleges a causal link between the U.S. and Canadian Short Selling Defendants' misrepresentations and the devaluation of the Concordia stock price:

> By creating and selling Fictitious Shares, the abusive or naked short seller injects into the market false and misleading information concerning the fake supply of a company's shares that appear available for trading.  This interferes with the nature market forces of supply and demand, driving the price of the shares downward.

(AC ¶ 10; *see also* ¶¶ 171–172; ¶¶ 176–178.)

Defendants nonetheless argue that Plaintiff failed to allege causation as to the short selling claim because:  (1) Plaintiff did not identify an instance in which Defendant engaged in short selling in the U.S.; and (2) Plaintiff sold Concordia stock six weeks after the last alleged short sale.  (Def. Mem. 24.)  Defendants again mischaracterize the Amended Complaint. Plaintiff alleges that Short Selling Defendants were short selling "intra-day on a majority of days during the Relevant Period" which "triggered a massive selloff that resulted in a devasting price decline of Concordia stock during the Relevant Period that damaged Plaintiff, who was selling shares in markets including the U.S. market at the same time."  (AC ¶ 183.)  Further, the Amended Complaint's table at paragraph 14 further alleges that the naked short selling scheme caused losses to Plaintiff, as it sold on the days where Defendants' scheme artificially inflated the volume of Concordia shares.  (*Id.* ¶ 14.)  Defendants' selective, gerrymandered quoting of the Amended Complaint is unavailing.

In sum, Plaintiff has sufficiently pled loss causation by "adequately pleading facts giving rise to a plausible inference" that the spoofing and naked short selling "caused a depression in the price of [Concordia] stock from which [Concordia] never recovered."  *Sharette v. Credit Suisse Int'l,* 127 F. Supp. 3d 60, 103 (S.D.N.Y. 2015).  Plaintiff has therefore "made allegations sufficient to support a reasonable inference that the manipulative actions of the [U.S. and Canadian Spoofing Defendants and the U.S. and Canadian Short Selling Defendants] bear upon

the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of

that loss absent the fraud."  *Id.* (quotation marks and citation omitted).

     **F.  Plaintiff Has Sufficiently Alleged Reliance.**

     The Second Circuit has instructed that a market manipulation case requires a different

showing of reliance than other Exchange Act claims:

> Caselaw in this circuit and elsewhere has required a showing that an alleged
> manipulator engaged in market activity aimed at deceiving investors as to how
> other market participants have valued a security.   The gravamen of manipulation
> is deception of investors into believing that prices at which they purchase and sell
> securities are determined by the natural interplay of supply and demand, not rigged
> by manipulators.  In identifying activity that is outside the natural interplay of
> supply and demand, courts generally ask whether a transaction sends a false pricing
> signal to the market.

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (quotations and citations

omitted).  Accordingly, "reliance upon the assumption of an efficient market free of

manipulation" is sufficient to allege reliance in a market manipulation case.  *Sharette*, 127 F.

Supp. 3d at 77-87 (considering plaintiffs' allegations collectively and presuming reliance to hold

that plaintiffs had adequately pled each element necessary to state a market manipulation claim).

     Plaintiff alleges that by placing Baiting Orders that were never intended to be executed

and engaging in abusive short selling of millions of unauthorized shares, Defendants "injected

false and misleading information into the marketplace that interfered with the nature forces of

supply and demand and drove the price of Concordia's shares downward while Plaintiff was

selling its Concordia shares on U.S. exchanges."  (AC ¶ 15.)  Plaintiff also alleges that it

reasonably relied on an assumption that the Canadian and U.S. markets were efficient and free of

manipulation when it sold its Concordia shares.  (*Id.* ¶ 203.)  That is sufficient to plead reliance

under the standard articulated in *Sharette*.  *See* 127 F. Supp. 3d at 77.

     Defendants' contention that Plaintiff's effort to have a Canadian regulator investigate

Defendants' conduct somehow precludes Plaintiff from relying on the efficient markets in the

U.S. ignores that (1) Plaintiff's suspicions were, at that time, limited to activities on the Canadian

exchanges, and (2) the Canadian regulator found insufficient evidence of market manipulation on the Canadian exchanges, justifying continued reliance on an efficient market.  (AC ¶¶ 41–44.)

Defendants' reliance on *Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.*, No. 05-C-1167, 2008 U.S. Dist. LEXIS 2677 (E.D. Wis. Jan. 14, 2008) for the proposition that Plaintiff is not entitled to the presumption of reliance on an efficient market is misplaced.  There, the court dismissed securities fraud claims based on plaintiffs' tender of their shares after becoming aware of the fraud out of fear that they would be forced out of their holdings.  *Id.* at **35-36.  Here, there are no facts demonstrating that Plaintiff knew of Defendants' fraud in the U.S. and sold Concordia shares despite that knowledge.[8]

### G.  Plaintiff Has Stated a Claim for Unjust Enrichment.

Defendants argue that the unjust enrichment claim should be dismissed because Plaintiff does not allege that the Defendants benefitted from the unlawful conduct at Plaintiff's expense.  To state a claim for unjust enrichment, a plaintiff must allege: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (applying New York law).  In New York, an unjust enrichment claim does not require a "direct relationship" between plaintiff and defendant.  *Id.*  "Rather, the requirement of a connection between plaintiff and defendant is a modest one." *Id.*  To illustrate, in *Myun-Uk Choi*, the plaintiffs alleged that "they traded at artificial prices during and due to Defendants' spoofing waves."  *Id.* at 64.  The court found that plaintiffs stated an unjust enrichment claim, as they had alleged that the defendants had continually manipulated the market, and there "remain[ed] a question arising from Plaintiffs' allegations that Defendants' spoofing strategy artificially moved market prices in a way that directly harmed Plaintiffs while benefitting Defendants."  *Id.* at 69.

As discussed above, the allegations in the Amended Complaint create a strong inference that Defendants' unlawful conduct created opportunities for them to trade, which financially

---

[8] Defendants have made no arguments that are exclusive to Plaintiff's § 9(a)(2) claim (AC ¶¶ 205-209), therefore, all of Plaintiff's foregoing arguments apply equally to Defendant's motion to dismiss that claim.

benefitted them at Plaintiff's expense. (AC ¶ 9 (alleging that Defendants' spoofing scheme enabled them to place orders for a number of shares that far exceeded the number available to borrow); ¶ 10 (explaining how naked short selling allows brokers to place orders for shares that were never issued); ¶¶ 213–16 (alleging that Plaintiff was forced to sell its Concordia stock at artificially low prices as a result of Defendants' unlawful spoofing and short selling).)

### H.  <u>Plaintiff Has Stated a Claim For Common-Law Fraud.</u>

To state a claim for fraud in New York, a plaintiff must allege "(1) a misrepresentation or material omission of fact, (2) the falsity of the representation, (3) knowledge of the party making the representation that it was false when made, (4) justifiable reliance by the plaintiff, and (5) resulting injury." *Hempchain Farms, LLC v. Sack*, No. 119 Civ. 1364, 2021 U.S. Dist. LEXIS 18329, at *10 (N.D.N.Y. Feb. 1, 2021) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011)). Rule 9(b) of the Federal Rules of Civil Procedure further requires that a plaintiff plead fraud claims with particularity. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Therefore, the Amended Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quotation marks and citation omitted).

Defendants move for dismissal of the fraud claim because (1) Plaintiff does not allege a particular misstatement and (2) Plaintiff does not allege fraudulent intent, loss causation, and reliance. As argued above, Plaintiff alleges <u>continuous</u> market manipulation. It is sufficient that Plaintiff alleges that by placing baiting orders that were never intended to be executed and engaging in abusive short selling of millions of unauthorized shares, Defendants injected false and misleading information into the market. (AC ¶¶ 14–15 (table showing what percentage of the trading volume of Concordia shares was made up by the short volume and spoofing volume).) As discussed above, Plaintiff sufficiently alleges intent (*id.* ¶¶ 166–69, 198–99), loss causation (*id.* ¶¶ 4–8, 10, 14, 62, 171–72, 183), and reliance. (*Id.* ¶¶ 15, 41–44, 203.)

I. **Plaintiff Has Stated Claims For Aiding And**
   **Abetting Fraud And Conspiracy To Commit Fraud.**

Defendants also move to dismiss Plaintiff's aiding and abetting claim, arguing that Plaintiff has not sufficiently alleged that any Defendant knew about another Defendant's trading activities or provided assistance in that trading.  Similarly, Defendants argue that Plaintiff's conspiracy to commit fraud claim should be dismissed because Plaintiff does not allege a connection between the various forms of alleged manipulation.  These arguments are without merit.  Plaintiff alleges that the U.S. and Canadian entities conspired with each other and aided and abetted each other through timed trades.  (AC ¶ 167 (alleging that the U.S. Spoofing Defendants and their Affiliated Canadian Counterparts cancelled baiting orders at the same time).)  Such coordination was necessary to make the scheme work.  (*Id.* ("The U.S. Spoofing Defendants [] knew that by coordinating with their Affiliated Canadian Counterparts they would be manipulating the market price downward of Concordia's shares in both countries.").)

Defendants argue that Plaintiff did not plead particularized facts giving rise to an inference of scienter.  To the contrary, as discussed above, Plaintiff demonstrated the element of scienter by alleging "strong circumstantial evidence of conscious misbehavior or recklessness." *CannaVest*, 307 F. Supp. 3d at 243; *see also Sharette*, 127 F. Supp. 3d at 96.  As discussed in depth above, *see, supra,* Section III.D, Plaintiff has sufficiently alleged scienter.

## IV.   CONCLUSION

For the foregoing reasons this Court should deny Defendants' motion to dismiss in its entirety.

Dated: New York, New York
      July 9, 2021

By:  /s/ Alan M. Pollack
     Alan M. Pollack
     Felicia S. Ennis
     Leron Thumim
     WARSHAW BURSTEIN, LLP
     575 Lexington Avenue, 7th Floor
     New York, New York 10022
     Tel:  212-984-7700
     apollack@wbny.com
     fennis@wbny.com
     lthumim@wbny.com

     James Wes Christian, Esq.
     Ardalan Attar, Esq.
     Christian Levine Law Group, LLC
     2302 Fannin, Suite 205
     Houston, Texas  77002
     Tel:  (713) 659-7617
     jchristian@christianlevinelaw.com
     aattar@christianlevinelaw.com

     *Attorneys for Plaintiff Harrington Global*
     *Opportunity Fund*