**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED, | Civil Action No.:  1:21-cv-00761-LGS |
| Plaintiff, | Hon. Lorna G. Schofield |
| v. | |
| CIBC WORLD MARKETS CORP.; CIBC WORLD MARKETS INC.; BOFA SECURITIES, INC.; MERRILL LYNCH CANADA INC.; MERRILL LYNCH PROFESSIONAL CLEARING CORP.; TD SECURITIES, INC.; TD SECURITIES(USA) LLC; UBS FINANCIAL SERVICES, INC.; UBS SECURITIES CANADA, INC.; SOCIETE GENERALE CAPITALE CANADA INC.; SG AMERICAS SECURITIES, LLC; AND JOHN DOES 1 THROUGH 10, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

    I.     Harrington cannot establish personal jurisdiction over Foreign Defendants. ........ 2

    II.    Claims based on Canadian trading are not actionable under *Morrison*. ................. 4

    III.   Harrington's Exchange Act claims are untimely. .................................................. 5

    IV.   Harrington fails to state an Exchange Act claim. .................................................. 7

          A.    Harrington fails to plead manipulative conduct by any Defendant. .......... 8

                1.    Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through spoofing. ................ 8

                2.    Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through abusive short selling. ........................................................................................ 10

          B.    Harrington fails to plead loss causation. ............................................... 12

          C.    Harrington fails to plead reliance. ......................................................... 14

    V.    Harrington fails to state a common-law claim. ................................................... 14

          A.    Harrington fails to state an unjust-enrichment claim. ............................. 14

          B.    Harrington fails to state a claim for common-law fraud. ........................ 15

          C.    Harrington fails to state a claim for aiding and abetting fraud or conspiracy to commit fraud. ............................................................... 15

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012) ........................................................................... 4

*Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.,*
  457 F. Supp. 3d 401 (S.D.N.Y. 2020) ........................................................... 4

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ................................................................ 8, 9, 10, 11

*Charles Schwab Corp. v. Bank of Am. Corp.,*
  883 F.3d 68 (2d Cir. 2018) ........................................................................ 7, 12

*Choi v. Tower Research Capital LLC,*
  890 F.3d 60 (2d Cir. 2018) ......................................................................... 14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014) ......................................................................... 5

*CP Stone Fort Holdings, LLC v. John,*
  2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ................................................. 9

*Ellul v. Congregation of Christian Bros.,*
  774 F.3d 791 (2d Cir. 2014) ......................................................................... 6

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976) ...................................................................................... 9

*Gavin/Solmonese LLC v. D'Arnaud–Taylor,*
  639 Fed. Appx. 664 (2d Cir. 2016) ............................................................... 6

*Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.,*
  784 Fed. Appx. 253 (5th Cir. 2019) .............................................................. 6

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.,*
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ............................................... 7

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
  2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ........................................... 3, 4

*In re Merrill, BofA, and Morgan Stanley Spoofing Litig.,*
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ................................................. 13

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re N. Sea Brent Crude Oil Futures Litig.*,
   2017 WL 2535731 (S.D.N.Y. June 8, 2017) ............................................ 3

*Kalnit v. Eichler*,
   264 F. 3d 131 (2d Cir. 2001) ..................................................... 9

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ..................................................... 12

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
   797 F.3d 160 (2d Cir. 2015) ..................................................... 12

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) .......................................................... 1, 4, 5

*Nypl v. JPMorgan Chase & Co.*,
   2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) ........................................ 4

*Pension Trust Fund for Operating Eng'rs v. Mort. Asset Securitization Trans., Inc.*,
   730 F.3d 263 (3d Cir. 2013) ..................................................... 6

**Statutes**

15 U.S.C. § 78u–4(b) ............................................................. 2, 8

Fed. R. Civ. P. 9(b) ............................................................. 2, 8

## PRELIMINARY STATEMENT

This litigation is the culmination of Harrington's five-year effort to find evidence of market manipulation during a ten-month period in 2016 when Concordia stock's price was falling.[1]  By its own account, Harrington suspected market manipulation in April 2016 when it complained to the Canadian securities regulator, IIROC.  IIROC found no manipulation and closed the matter in March 2017.  IIROC gave Harrington detailed Canadian trading data, however, and Harrington engaged multiple consultants to investigate, though none of them found manipulation either.  Harrington then finally found a consultant willing to conclude from "market-level" U.S. trading data that Defendants had engaged in market manipulation in the U.S. in 2016.  But Harrington's action in this Court comes too late.

Nothing in the Opposition rebuts Defendants' showing that Harrington's claims should be dismissed for several reasons.

First, Harrington has not pleaded a basis for the Court to exercise personal jurisdiction over any Foreign Defendant.  (Section I.)

Second, Harrington has not pleaded any basis for liability based on alleged Canadian trading; Harrington's argument that the Exchange Act covers foreign trading as long as it is "connected" to or has "effects" on a U.S. exchange is foreclosed by *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  (Section II.)

Third, Harrington's claims are time-barred.  (Section III.)  Congress gives a securities-fraud plaintiff only two years to commence an action after it has the information necessary to plead a claim.  Harrington had access to market-level U.S. data back in 2016, and Harrington admits it received the more detailed Canadian data in 2017.  Harrington contends that the data it

---

[1] Defendants use the same abbreviations and citing conventions as in their opening brief (Dkt. No. 73), cited as "Mem."  Harrington's Opposition brief (Dkt. No. 82) is cited as "Opp."

had in 2017 was insufficient but does not explain how it suddenly became sufficient in the last two years.  Indeed, Harrington points to no new information it obtained in the last two years, just that it finally found a consultant willing to surmise that Defendants engaged in manipulation in the U.S. based on that market-level data.

Fourth, Harrington fails to state an Exchange Act claim, because Rule 9(b) and the PSLRA do not allow a plaintiff to merely assume manipulation by particular market actors based on market-level data.  As the Second Circuit has made clear, Harrington must plead at least some specifics—e.g., a particular trade undertaken by a particular Defendant.  And Harrington must plead particularized facts yielding a ***strong*** inference that each Defendant engaged in its trading for the purpose of driving down Concordia's stock price.  Harrington responds that such requirements can be presumed to be met because it has alleged "algorithmic trading programs," but does not explain—much less cite supporting authority—how such a generalized allegation could possibly meet the Second Circuit's pleading requirements.  (Section IV.A.)  Harrington also fails to plead other essential elements of its securities claim: loss causation (Section IV.B) and reliance (Section IV.C).

Fifth, Harrington has failed to plead any of its common-law claims.  (Section V.)

## ARGUMENT

**I.    Harrington cannot establish personal jurisdiction over Foreign Defendants.**

Harrington does not dispute that there is no general jurisdiction over Foreign Defendants and does not plead a *prima facie* basis for specific jurisdiction because the Complaint contains no facts suggesting that Foreign Defendants engaged in relevant conduct in the forum.  (*See* Mem. at 7–8.)  Harrington cannot dispute that it bears the burden to plead facts supporting a reasonable inference that Foreign Defendants engaged in manipulative trading here to show specific jurisdiction.  *See, e.g., In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL

1268267, at *1, *4 (S.D.N.Y. Mar. 31, 2016) ("*FOREX*") (dismissing claims against foreign bank where plaintiffs alleged suit-related conduct only against its U.S. affiliate).

Harrington contends that it has met its burden by alleging that Foreign Defendants used "high speed algorithmic computer systems to route and execute trades of Concordia shares" in the U.S.  (Opp. at 5.)  The Complaint contains no particularized facts to support this general allegation, however, and it is disproved by sworn testimony.  (*See* G. Duncan Decl. ¶ 5 (stating that ML Canada did not execute a single Concordia trade in the U.S. during the relevant period); B. Carignan Decl. ¶ 5 (same for SG Canada); *see also* G. Stratis Decl. ¶ 5 (TD Canada executed no proprietary trades in U.S.).)  Harrington notes that some Foreign Defendants do not foreswear any U.S. trades in Concordia.  (*See* Opp. at 5–6.)  But that does not satisfy Harrington's burden because it does not suggest that they engaged in ***manipulative*** trades here.  *See FOREX*, 2016 WL 1268267, at *4 (specific jurisdiction focuses on "the defendant's suit-related conduct").[2]

Harrington also contends that it has established jurisdiction under the "effects test" on the theory that Foreign Defendants "expressly aimed" their conduct here.  (*See* Opp. at 6.)  But again Harrington pleads no facts to back up its conclusory allegation of intentional conduct.  (*See* Section IV.A.)  And *In re North Sea Brent Crude Oil Futures Litigation*, 2017 WL 2535731 (S.D.N.Y. June 8, 2017), does not help Harrington's case.  The court found jurisdiction there because the defendant "concede[d] that it [had] directed at least some of its conduct at the United States," including executing allegedly manipulative trades.  *Id.* at *10–11.  No Foreign Defendant makes a similar concession, and several have submitted evidence to the contrary.

---

[2] Harrington also cannot establish personal jurisdiction based on alleged non-proprietary trading (i.e., trading for a client) by any Foreign Defendant.  (*See* Opp. at 5.)  Trading for clients is not suit-related conduct, because Harrington's claims are premised on Defendants allegedly intending to manipulate the market to "realize[] a profit" from the trading.  (*See* AC ¶¶ 182–3.)  Apart from a vague reference to trading intended to benefit "either [Defendants'] clients' accounts or their own proprietary accounts" (AC ¶ 58), the Complaint does not mention client trading—much less plausibly explain how or why a client's trading could be part of Defendants' alleged scheme.

Harrington next contends that alleging a "conspiracy" among all Defendants establishes jurisdiction over Foreign Defendants.  (*See* Opp. at 6–7.)  But none of the cases Harrington cites is helpful to it because Harrington does not plead facts suggesting a plausible conspiracy.  Harrington cannot explain why competitors would agree with each other to drive down Concordia's stock price—presumably the object of the conspiracy, though Harrington does not specify—or point to even a single communication between any Defendants.  In *FOREX*, the court found jurisdiction because the plaintiffs had "give[n] ***examples of*** each [] Defendants' ***participation*** in the alleged conspiracy" and pointed to ***communications*** among them "in chatrooms."  2016 WL 1268267, at *6.  In *Nypl v. JPMorgan Chase & Co.*, 2018 WL 1472506, at *6 (S.D.N.Y. Mar. 22, 2018), the court found jurisdiction over defendants that had pleaded guilty to a conspiracy and admitted in their plea agreements that the conspiracy was partially carried out here.  The court rejected extending jurisdiction to other alleged co-conspirators because plaintiffs had not pleaded facts to support the conspiracy allegation.  *See id.* at *6–7; *accord Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 414 (S.D.N.Y. 2020) (rejecting conspiracy jurisdiction where "Complaint lacks sufficient non-conclusory and fact-specific allegations regarding the participation of [defendants] in the alleged conspiracy").

## II.   Claims based on Canadian trading are not actionable under *Morrison*.

Harrington's Exchange Act claims premised on Canadian trading fail under *Morrison*.  (*See* Mem. at 11–13.)  Harrington cannot avoid this conclusion merely by claiming "connections between the Foreign Defendants' conduct and the purchase or sale of Concordia sales in the U.S." without specifying any.  (Opp. at 9.)  Likewise, "the mere assertion that transactions took place in the United States is insufficient to adequately plead the existence of domestic transactions" and thus overcome *Morrison*.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012).  That Foreign Defendants had "authority" to route

Concordia shares to their U.S. counterparts because Concordia also trades on NASDAQ (Opp. at 9) does not mean that any of them did so. *Morrison* requires "the **existence** of domestic transactions," not the mere possibility of one. *See Absolute Activist*, 677 F.3d at 70 (U.S. issuer with U.S.-registered securities does "not demonstrate that the [relevant] purchases and sales were made in the United States"). And the Exchange Act does not apply to "foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

Harrington fares no better with its argument that the Exchange Act applies to Canadian trading as long as Harrington alleges—albeit with no factual support—that such trading was part of a "scheme [that] had both the goal and effect" of manipulating price on a U.S. exchange. (Opp. at 9–10.) Harrington cites no authority for the proposition that the "effect" of foreign conduct is sufficient to permit extraterritorial application of the Exchange Act, and *Morrison* explicitly rejected such an "effects test." *See* 561 U.S. at 257–61.

### III.    Harrington's Exchange Act claims are untimely.

Defendants explained in their opening brief that Harrington's Exchange Act (and unjust enrichment) claims are time-barred because the two-year statute of limitations began to run no later than March 2017, when Harrington received the TOQ reports and therefore had access to all the information needed to file the Complaint. (*See* Mem. at 139–15.) Harrington complains that the TOQ Reports were insufficient and a request to FINRA for U.S. trading data was denied. (*See* Opp. at 12–13.) How, then, did Harrington file the Complaint? Harrington hired its third consultant, Urvin, which "purchased multiple gigabytes of exchange trading data that ultimately identified the manipulation of Concordia's stock and the identities of the manipulators." (*Id.* at

13.)  Anyone can purchase that data.[3]  A "reasonably diligent plaintiff" thus would have bought the data in 2017 after FINRA refused to provide it, so the limitations clock began to run then and Harrington's January 2021 filing was two years too late.  *See Gavin/Solmonese LLC v. D'Arnaud–Taylor*, 639 Fed. Appx. 664, 667 (2d Cir. 2016) (affirming dismissal of 10(b) as untimely where "a substantial portion of the information alleged in the complaint and integral documents was either known ***or freely available*** to investors" more than two years before complaint was filed).

As Defendants also explained, Harrington's excuse that it took expert analysis to develop its claim does not hold up because giving Harrington "credit" for the ten months Urvin took to analyze the data it purchased would still make Harrington's January 2021 filing a year too late. (*See* Mem. at 14–15 (citing *Pension Trust Fund for Operating Eng'rs v. Mort. Asset Securitization Trans., Inc.*, 730 F.3d 263 (3d Cir. 2013)).)  Harrington attempts to distinguish *Pension Trust* by noting that the court there found that public information should have put the plaintiff on notice of misconduct.  (*See* Opp. at 14.)  But Harrington admits it suspected market manipulation in April 2016.  (*See id.* at 15.)  That is why it began pursuing information to support a claim—information available to it by no later than March 2017.

Harrington also argues that "Defendants concealed their conduct from the public," but offers nothing to support this contention.  (*Id.* at 14.)  Harrington's claim is based on trading on a public stock exchange, where quotes and trades are public and reports of those quotes and trades are available for purchase.  Nothing was "concealed" from Harrington.  *Cf. Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 784 Fed. Appx. 253, 256–57 (5th Cir. 2019) (data available for purchase is "public information").  Harrington does not point to a single fact it

---

[3] See http://www.nasdaqtrader.com/Trader.aspx?id=itch); https://www.tickdata.com/product/us-equities/?hsCtaTracking=8fafe9fa-5121-4334-aafd-657014336a2a%7Cd7a2dfc3-be5d-426c-8332-8e67a1377d8c.

learned after January 2019—i.e., two years before filing this action—that was necessary for the Complaint it filed, thus warranting dismissal of the Exchange Act claims as untimely.  *See Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (holding claim untimely under discovery rule where plaintiffs had not "identified what previously concealed information was ultimately revealed so as to allow plaintiffs' counsel finally to file this lawsuit").

Harrington contends that dismissal is inappropriate unless the Court can ascertain "the precise moment when the two-year limitations period began to run."  (Opp. at 12 (citing *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 95 (2d Cir. 2018), and *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *5 (S.D.N.Y. May 24, 2018)).)  In *Schwab*, the court held that an SEC filing two years and one month before the complaint was filed did not necessarily start the limitations period simply because it prompted an investigation: "Instead, we must ask when an investigation would have given Schwab sufficient information to plead its claims," a date that could not be ascertained from the face of the complaint.  *See* 883 F.3d at 95. In *Chicago Bridge*, this Court found news reports of accounting irregularities insufficient to begin the limitations clock because defendants explicitly denied the allegations.  *See* 2018 WL 2382600, at *5.  The Court pointed to a specific event—less than two years before the action was commenced—that made "clear to outsiders that the Company's accounting" was misleading.  *Id.* Here, by contrast, the Complaint itself shows that Harrington had access to all the facts on which its Complaint rests by March 2017, and Harrington points to no revelation in the last two years of new information.

## IV.    Harrington fails to state an Exchange Act claim.

Defendants showed in their opening brief that Harrington's claims also should be dismissed because Harrington fails to allege that any Defendant actually initiated any of the allegedly manipulative trades.  (*See* Mem. at 15–16.)  Harrington does not dispute this lapse, but

7

contends that "much of the critical data is in the sole possession of the Defendants."  (Opp. at 17.)  Rule 9(b) and the PSLRA, however, foreclose Harrington's attempt to avoid dismissal by claiming discovery is necessary to state its claim.  Harrington notes that the Second Circuit acknowledged in *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), that manipulation claims can be hard to plead.  (*See* Opp. at 18 ("A claim of manipulation [] can involve facts solely within the defendant's knowledge; therefore . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." (quoting 493 F.3d at 102).)  But Harrington ignores the rest of the decision, which holds that nevertheless even a plaintiff asserting manipulation cannot stand on "[g]eneral allegations not tied to the defendants or resting upon speculation"; instead, "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  493 F.3d at 102.  Rule 9(b) requires allegations of "***what*** manipulative acts were performed, ***which*** defendants performed them, ***when*** the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *Id.*  Harrington cannot ask the Court to merely assume that a broker's trade was for its own account, rather than for a client, because "the mere possibility of misconduct" does not preclude dismissal.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)*.*  Harrington must plead "factual content that allows the court to draw the reasonable inference that [each] defendant is liable for the misconduct alleged."  *Id.* at 678.

### A.      Harrington fails to plead manipulative conduct by any Defendant.

#### 1.      Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through spoofing.

Defendants showed that Harrington's Exchange Act claims premised on alleged "spoofing"—i.e., entering and then cancelling sell orders—should be dismissed because Harrington pleads no facts yielding a strong inference that the Spoofing Defendants placed and

cancelled any orders with the requisite scienter.  (*See* Mem. at 16–19.)  Harrington responds by repeating its refrain that there were a supposedly "large volume" of cancelled orders that must have resulted from unspecified algorithmic trading programs designed to "drive the price downward."  (*See* Opp. at 17–18.)  But Harrington does not identify, much less describe, even a single algorithmic trading program allegedly used by any Defendant.  And Harrington does not dispute that more than 95% of *all* equity orders are canceled before execution, so no inference of Defendant-driven algorithmic trading can be made from the volume of cancelled orders.  (*See* Mem. at 17–18.)  Nor is there any basis to infer that a cancelled order was placed to drive down Concordia's stock price.  *See CP Stone Fort Holdings, LLC v. John*, 2016 WL 5934096, at *5 (N.D. Ill. Oct. 11, 2016) ("[T]here is nothing improper or illegitimate about placing passive orders in the order book and then reversing position.").

Harrington claims that it has pleaded facts yielding a strong inference that Defendants intended to drive down Concordia's stock price because "Defendants should have noticed that they were placing and cancelling Baiting Orders and consciously or recklessly chose to continue to do so."  (Opp. at 17–19.)  But this does not suffice: Market manipulation requires that the actor intended to drive down (or up) a stock's price.  Failing to "notice," or care, that orders were being placed and cancelled does not suggest such intent.  *See ATSI*, 493 F.3d at 100 ("[M]anipulation 'connotes *intentional or willful conduct* designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'") (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)).[4]  And Harrington's assertion that *Kalnit v. Eichler*, 264 F. 3d 131 (2d Cir. 2001), relieves Harrington of its burden to plead a scheme that makes "economic sense" (Opp. at 19) is simply incorrect.  *See* 264 F.3d at 140–41 ("Where plaintiff's

---

[4] Harrington's argument that "a lack of internal controls will support an inference of scienter" (Opp. at 19) likewise fails because Harrington can cite only cases of accounting irregularities, not market manipulation, in support.

view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." (cleaned up)).  Harrington also contends that "Defendants' spoofing scheme makes perfect economic sense, especially in conjunction with Defendants' short-selling."  (Opp. at 19.) But again this is nonsensical because only one of the three identified "Spoofing Defendants" is alleged to have engaged in any short selling.  (*See* AC ¶¶ 7, 9.)  And Harrington still does not explain why ***any*** Defendant would benefit from a lower Concordia stock price.[5]

> ## 2.    Harrington fails to plead particularized facts sufficient to yield a strong inference that any Defendant intended to drive down Concordia's stock price through abusive short selling.

Defendants explained that Harrington's Exchange Act claims premised on allegedly "abusive" naked short sales fail because Harrington pleads no facts showing that any Short-Selling Defendant actually engaged in any short sales in the U.S.  (*See* Mem. at 19–22.) Harrington acknowledges this flaw, saying that it lacks the data to plead anything specific in the U.S. and pointing instead to figures demonstrating that there was a lot of short selling in the U.S. market as a whole.  (*See* Opp. at 20–21.)  But that does not suggest that (1) any particular Defendant had any short sale in its account; (2) any short sale in its account was executed by that Defendant rather than by a broker-dealer client; (3) even if that Defendant executed a short sale, it did so for its own proprietary trading rather than requested by a retail client; (4) any short sale a Defendant executed for its own trading was "naked"; or (5) any naked short sale executed by a Defendant for its own trading was intended to drive down Concordia's stock price.  (*See* Mem. at

---

[5] The Complaint itself is inconsistent with Harrington's contention that Defendants artificially depressed Concordia's stock to buy it at cheaper prices.  Harrington alleges, for example, that CIBC bought Concordia stock at $24.38 on February 11, 2016, and a month later bought more at $30.74—a 25% price increase.  (*See* AC ¶¶ 70–71, 74–75; *see also id.* ¶¶ 87, 91 (alleging purchase at 33% higher price than purchases one week earlier).)  On other occasions, the alleged "Baiting Orders" were entered after shares were purchased and thus could not have influenced the purchase price.  (*See, e.g.,* AC ¶¶ 70–71 (alleging Baiting Orders were placed up to 1:09 p.m., while purchases were completed by 1:05 p.m.); AC ¶¶ 78–79 (alleging purchase began at 11:11:23.624 and Baiting Orders began at 11:11:23.703); AC ¶¶ 138–39 (alleging purchases completed by 9:55:17.128 while Baiting Orders were placed as late as 9:55:17.171).)

19–22.)  *ATSI*, which affirmed dismissal of a similar market manipulation claim, precludes

Harrington from asking for these five inferential leaps to state a claim.  Indeed, *ATSI* explicitly

rejects the argument that improprieties can be inferred from market-level data because such an

"inference . . . is too speculative even on a motion to dismiss."  493 F.3d at 104.

Allegations that some Defendants engaged in short selling in Canada (*see* Opp. at 20–21)

do not change the analysis because they say nothing about whether U.S. affiliates engaged in

similar trading here.  And Harrington still has not pleaded that any Canadian short selling was

executed by a Defendant for its own account, was naked, and was intended to drive down

Concordia's stock price.  Moreover, Harrington alleges that 134 million shares of Concordia

were sold short in the U.S. during the relevant period, but points to only about half a million

Concordia shares sold short by all the Short Selling Defendants combined.  (*See* AC ¶¶ 185(b),

190, 192, 194.)  Harrington provides no basis to jump from half a million shares to 134 million.

Finally, Harrington argues that it has pleaded the requisite manipulative intent by noting

Defendants' regulatory obligations.  (*See* Opp. at 21–22.)  But multiple cases hold that

allegations that can be made against any similarly situated defendant do not yield the requisite

strong inference of scienter.  (*See* Mem. at 21–22.)  And Harrington cites no authority for the

proposition that regulatory burdens—or failure to abide them—can plead the manipulative intent

required for their claims.  Even so, Harrington concedes that the Short Selling Defendants

***satisfied*** their regulatory obligations.  (*See* Opp. at 21 ("Defendants avoided . . . triggering a Reg

SHO violation").)  Short selling is lawful, and "scienter is the only factor that distinguishes

legitimate trading from improper manipulation."  *ATSI*, 493 F.3d at 102.  There is no basis to

infer scienter—much less strongly so—from regulatory obligations.

### B.        Harrington fails to plead loss causation.

Defendants explained that Harrington has not pleaded loss causation because it has not

showed how its alleged loss can be attributed to any particular Defendant or made the temporal

connection to suggest that Defendants' allegedly manipulative trading could have caused

Harrington's loss.  (*See* Mem. at 22–25.)  In response, Harrington cites *Loreley Financing*

*(Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), but misstates its

holding.  (*See* Opp. at 23, incorrectly citing *Loreley* for proposition that Harrington must allege

only a misrepresentation and "the devaluation of the stock" without connecting them).)  While

*Loreley* does not require proof of a causal link, it requires allegations suggesting such a link

might plausibly exist.  *See* 797 F.3d at 188–89; *accord Schwab*, 883 F.3d at 93 ("[T]he complaint

still must give 'some indication of a ***plausible causal link***' between the loss and the alleged

fraud." (quoting *Loreley*, 797 F.3d at 187 (cleaned up))).  Thus, Harrington must plead "enough

facts regarding [its] loss to support the inference that [it] would have been spared all or an

ascertainable portion of that loss absent the fraud."  *Loreley*, 797 F.3d at 189.  Harrington offers

no facts suggesting a link between its supposed loss and any Defendant's trading.

On the spoofing claim, Harrington does not dispute that it cannot point to any particular

Defendant's misconduct as causing a loss, merely asserting in conclusory fashion that it

"properly alleges that the Spoofing Defendants engaged in spoofing activity, and that

Concordia's stock price fell as a result."  (Opp. at 24.)  But *Lattanzio v. Deloitte & Touche LLP*,

476 F.3d 147 (2d Cir. 2007), requires Harrington to allege injury from ***each*** Defendant's alleged

"spoofing activity."  Harrington notes that in *Lattanzio*, the Second Circuit rejected the claim

because "the accountant defendants' [sic] misstatements, which were different from the other

defendants' misstatements, were not the type of statements that could cause plaintiffs' loss."

(Opp. at 24.)  But that is precisely the point: to state a claim against Deloitte, the plaintiffs

needed to plead facts suggesting that **Deloitte's** alleged misconduct caused their loss.  *See* 476 F.3d at 158 ("Plaintiffs have not alleged facts to show that Deloitte's misstatements . . . were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements.  Accordingly, plaintiffs have not alleged loss causation.").  Harrington makes no attempt to meet this standard as to even one of the Spoofing Defendants.

Harrington also fails to connect any alleged spoofing with its losses by not alleging that it traded during or shortly after any of the alleged spoofing events—facts that Harrington certainly could have included in the Complaint, if they existed.  Harrington notes its allegation that there were "over 100,000 spoofing events" in 2016 and that Harrington sold during this period.  (*See* Opp. at 24–25.)  But Judge Liman recently rejected this exact argument.  *See In re Merrill, BofA, and Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *12–13 (S.D.N.Y. Mar. 4, 2021) (rejecting argument "that Defendants manipulated thousands of trades and the Court should therefore infer from the magnitude of the spoof conduct and the fact that the Plaintiffs were in the market that they were injured").  Harrington attempts to avoid *Merrill* by wrongly characterizing its conclusion as dicta and asserting that spoofing here occurred "continuously." (*See* Opp. at 25.); *see also Merrill*, 2021 WL 827190, at *13 (referring to its "ruling" on actual damages).  But Harrington's burden is to plead facts suggesting a causal link, and it has not pleaded a single occasion in which it sold stock immediately after a Defendant placed an alleged spoof order.  Its vague and implausible assertion of "continuous" spoofing does not suffice.[6]

---

[6] Harrington's contention that the alleged spoofing caused a lasting price depression fails for the reasons Defendants explained—and the authorities they cited—in their opening brief.  (*See* Mem. at 23–24.)  Harrington again has no response and makes no attempt to explain how this could happen in an efficient market.

As for the short selling claim, Harrington cannot show that any Defendant's short sale in the U.S. caused an injury because (i) Harrington does not identify a single short sale in the U.S. by a Defendant, and (ii) all identified Canadian short sales were completed well before Harrington undertook its sales. (*See* Mem. at 24–25.) Harrington does not dispute these facts but relies on its general allegations that Defendants sold short "on a majority of days" during the relevant period. (*See* Opp. at 26.) That says nothing about any particular Defendant engaging in any particular short sale in the U.S. that could have caused Harrington a loss.

### C.   Harrington fails to plead reliance.

Defendants explained that the Exchange Act claims fail because Harrington cannot plead that it relied on an unmanipulated market. (*See* Mem. at 25–26.) As early as April 2016, Harrington requested that regulators investigate potential market manipulation in Concordia stock. Harrington responds that (1) its "suspicions were . . . limited to" the Canadian exchange; and (2) IIROC found no manipulation in Canada. (*See* Opp. at 27–28.) Neither excuse succeeds. First, Harrington pleads repeatedly that the Canadian and U.S. exchanges were linked such that trades on one influenced the other (*see, e.g.*, AC ¶¶ 6, 40) and admits that U.S. trading data was requested from FINRA in 2016 (Opp. at 12)—presumably to investigate in the U.S. as well. Second, Harrington's claim is based on its 2016 trading (AC ¶ 60), but it did not learn the results of the IIROC investigation until March 2017 (AC ¶ 42.) IIROC's conclusion cannot retroactively clear Harrington's suspicions to make its reliance reasonable.

## V.   Harrington fails to state a common-law claim.

### A.   Harrington fails to state an unjust-enrichment claim.

Defendants showed that Harrington's unjust enrichment claim fails because Harrington fails to plead any specific and direct benefit received by Defendants or a sufficient nexus between the parties. (*See* Mem. at 26–27.) In response, Harrington cites *Choi v. Tower*

*Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018).  (*See* Opp. at 28.)  But *Choi* supports Defendants' position.  There, plaintiffs alleged facts showing "it to be a near statistical certainty that [the defendant] was **a direct counterparty** with" a plaintiff in a **specific trade**.  890 F.3d at 64, 69.  Harrington does not even mention this aspect of *Choi* and does not dispute that it cannot meet this standard.  (*See* Opp. at 28–29 (arguing only that Defendants "created opportunities for them[selves] to trade" that yielded them financial benefit).)

> **B.     Harrington fails to state a claim for common-law fraud.**

Harrington barely defends its common-law fraud claim, ignoring Defendants' showing that it cannot state a fraud claim with the supposedly nefarious trading activity it alleges.  (*See* Mem. at 27–29.)  Harrington merely declares, without any supporting authority:  "It is sufficient that Plaintiff alleges . . . baiting orders . . . and . . . abusive short selling."  (Opp. at 29.)  Harrington cites no case holding that trading activity alone can satisfy the misrepresentation requirement of a fraud claim under New York law, much less attempt to distinguish the case law Defendants cited foreclosing this claim.

> **C.     Harrington fails to state a claim for aiding and abetting fraud or conspiracy to commit fraud.**

Lacking a fraud claim, Harrington cannot state a claim for aiding and abetting or conspiracy to commit fraud.  But those claims also fail because Harrington does not plead who substantially assisted whom in supposedly committing fraud or facts plausibly suggesting a conspiracy.  Notably, Harrington does not cite a single case in support of these claims and does not address Defendants' case law foreclosing them.  (*Compare* Mem. at 29–30 *with* Opp. at 30.)

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendants' opening brief, the Complaint should be dismissed with prejudice.

Dated:  July 26, 2021

          **O'MELVENY & MYERS LLP**

          By: */s/Abby F. Rudzin*_____
                Abby F. Rudzin
                William J. Martin

          Times Square Tower
          7 Times Square
          New York, New York 10036
          (212) 326-2033
          arudzin@omm.com
          wmartin@omm.com

          *Attorneys for Defendants BofA Securities,*
          *Inc.; Merrill Lynch Canada Inc.; and*
          *Merrill Lynch Professional Clearing Corp.*

          **WILMER CUTLER PICKERING HALE AND DORR LLP**

          By: */s/Jamie Dycus*_____
                Jamie Dycus

          7 World Trade Center
          250 Greenwich Street
          45th Floor
          New York, New York 10007
          (212) 230-8851
          jame.dycus@wilmerhale.com

          Jenny Pelaez
          350 South Grand Avenue, Suite 2400
          Los Angeles, CA 90071
          (213) 443-5300
          jenny.pelaez@wilmerhale.com

          *Attorneys for TD Securities, Inc., and*
          *TD Securities (USA) LLC*

**ALLEN & OVERY LLP**

By: */s/Todd S. Fishman*
        Todd S. Fishman
        Alexander K. Bussey

1221 Avenue of the Americas
New York, New York 10020
(212) 756-1130
todd.fishman@allenovery.com
alexander.bussey@allenovery.com

*Attorneys for Defendants Societe Generale
Capital Canada Inc., and SG Americas
Securities, LLC*

**DENTONS US LLP**

By: */s/Sandra D. Hauser*
        Sandra D. Hauser
        Stephen J. Senderowitz

1221 Avenue of the Americas
New York, NY 10020
(212) 768-6802
sandra.hauser@dentons.com

Stephen J. Senderowitz
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8141
stephen.senderowitz@dentons.com

*Attorneys for CIBC World Markets Corp.
and CIBC World Markets Inc.*

17

**BAKER & MCKENZIE LLP**

By: */s/Perrie M. Weiner*
      Perrie M. Weiner
      Ben W. Turner
      Michael D. Hidalgo

10250 Constellation Boulevard
Suite 1850
Los Angeles, CA 90067
(310) 201-4709
perrie.weiner@bakermckenzie.com
ben.turner@bakermckenzie.com
michael.hidalgo@bakermckenzie.com

*Attorneys for UBS Financial Services, Inc.,
and UBS Securities Canada, Inc.*