UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                 :

HARRINGTON GLOBAL OPPORTUNITY   :
FUND, LIMITED,                         :
                    Plaintiff,   :        21 Civ. 761 (LGS)
                                   :

          -against-          :     OPINION AND ORDER
                                   :

CIBC WORLD MARKETS CORP., et al.,   :
                   Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff Harrington Global Opportunity Fund, Limited, brings this action alleging

(1) violation of § 10(b) of the Exchange Act and Rule 10b-5, (2) violation of § 9(a)(2) of the

Exchange Act, (3) unjust enrichment, (4) common law fraud, (5) conspiracy to commit fraud and

(6) aiding and abetting fraud.  Defendants are five broker-dealers, their Canadian affiliates and

unidentified John Does.[1]  Defendants move to dismiss the Amended Complaint (the

"Complaint") for failure to state a claim pursuant to Rule 12(b)(6).  The Canadian Defendants

also move to dismiss the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2).

For the reasons stated below, the motion to dismiss is denied in part and granted in part.  The

spoofing claims survive, and the short selling and common law claims are dismissed.

---

[1] The U.S. Defendants are CIBC World Markets Corp. ("CIBC US"); BOFA Securities, Inc.
("Merrill US"); Merrill Lynch Professional Clearing Corp. ("Merrill Pro"); TD Securities (USA)
LLC ("TD US"); UBS Financial Services, Inc. ("UBS US"); and SG Americas Securities, LLC
("SocGén US") (collectively, the "U.S. Defendants").  Their Canadian affiliates respectively are
CIBC World Markets, Inc. ("CIBC Canada"); Merrill Lynch Canada Inc. ("Merrill Canada"); TD
Securities, Inc. ("TD Canada"); UBS Securities Canada, Inc. ("UBS Canada") and Société
Générale Capitale Canada, Inc. ("SocGén Canada") (collectively, the "Canadian Defendants").

I.    **BACKGROUND**

The following facts are taken from the Complaint and are assumed to be true for purposes of this motion.  *See R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

Plaintiff is a hedge fund based in Bermuda.  Defendants are U.S. and Canadian broker-dealers that execute securities transactions for their own accounts and for their customers.  The Canadian Defendants are headquartered in Canada.  The U.S. Defendants maintain their principal place of business in New York.  Defendants John Doe Canada and John Doe U.S. are entities comprised of Defendants' customers, market makers, subsidiaries, affiliates and sister companies of Defendants.

Plaintiff owned shares of Non-Party Concordia International Corporation's stock and sold over eight million Concordia shares between January 27, 2016, and November 15, 2016 (the "Relevant Period").  During the Relevant Period, Concordia's share price declined from $28.03 to $3.13.  Concordia is a healthcare company "focused on legacy pharmaceutical products and orphan drugs."  Concordia was incorporated in 2005 under the laws of Ontario, Canada.  Since 2015, Concordia's shares have been registered and traded as interlisted securities on NASDAQ in the United States and the TSX in Canada.  A share of Concordia stock traded in the United States is the same as a share traded in Canada.  Purchasers and sellers of Concordia stock, unless they request otherwise, have no control of whether their orders are routed to the United States or Canada.  Because trading is seamless between the two countries, trades in one country affect trading in the other country.

During the Relevant Period, Defendants engaged in a market manipulation scheme involving spoofing and abusive short selling.  Each U.S. Defendant conspired with its affiliated

Canadian Defendant to manipulate the price of Concordia's shares. Each U.S. Defendant is alleged to have conspired with its Canadian affiliate in separate conspiracies. Three pairs of Defendants are alleged to have engaged in the illegal scheme of spoofing. Three pairs of Defendants are alleged to have engaged in illegal short selling.

Defendants CIBC US, Merrill US and TD US ("U.S. Spoofing Defendants") conspired with their Canadian affiliates, respectively, CIBC Canada, TD Canada and Merrill Canada (the "Canadian Spoofing Defendants" and with U.S. Spoofing Defendants, "Spoofing Defendants") to place thousands of "[b]aiting [o]rders" -- i.e., orders on U.S. and Canadian exchanges that were not intended to be executed and had no legitimate economic purpose. Each set of baiting orders had a "small negative impact" on the price of Concordia's shares that eventually drove the price from $28.03 to $3.13. During the Relevant Period, there were approximately 100,000 spoofing events on the U.S. and Canadian exchanges.

While the aforementioned Defendants perpetuated their spoofing scheme, Defendants UBS US, UBS Canada, Merrill US, Merrill Canada, Merrill Pro, SocGén US and SocGén Canada ("Short Selling Defendants") engaged in excessive and abusive short selling. The abusive short selling involved abusive naked short selling, wherein a short seller does not borrow shares prior to the short sale and fails to deliver any shares on the settlement date to the purchaser. Naked short selling drives the price of shares downward.

Operating in concert, spoofing drove the price of Concordia shares downward, sending a market signal that triggered naked short selling, further driving the price downward by creating an illusion of increased supply. This complementary market manipulation drove the price of Concordia shares down when Plaintiff sold its Concordia shares. The naked short sellers engaged in shorting, and following spoofing events, they purchased the shares necessary to

3

deliver on their naked short sales at reduced prices.

## II.   STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(2), "a plaintiff must make a prima facie showing that jurisdiction exists." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020) (internal quotation marks omitted). "A *prima facie* showing suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *accord Cunningham v. Gen. Motors LLC*, No. 20 Civ. 3097, 2021 WL 827124, at *1 (S.D.N.Y. Mar. 4, 2021). To make out a prima facie case of personal jurisdiction, whether based on general or specific personal jurisdiction, plaintiffs must establish "a statutory basis for personal jurisdiction" and that "the exercise of personal jurisdiction [] comport[s] with constitutional due process principles." *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (internal quotation marks omitted); *accord United States ex rel. TZAC, Inc. v. Christian Aid*, No. 17 Civ. 4135, 2021 WL 2354985, at *2 (S.D.N.Y. June 9, 2021). "Courts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise from the defendants' purposeful contacts with the forum." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (internal quotation marks omitted). In evaluating whether Plaintiff has made out a prima facie case of personal jurisdiction, a court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester*, 722 F.3d at 85; *accord Cunningham*, 2021 WL 827124, at *1.

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and

draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] [] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). To survive dismissal, plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original).

"A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the [PSLRA]." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). The heightened pleading standard of Rule 9(b) requires: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

"The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which [a] belief

that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (alteration in original) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)); *accord In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 148 (S.D.N.Y. 2021).  To establish scienter, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap.*, 996 F.3d at 78.  "A complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

## III.   DISCUSSION

### A.   Personal Jurisdiction

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007); *accord One Techs., LLC v. Amazon.com, Inc.*, 860 Fed. App'x 785, 788 (2d Cir. 2021) (summary order).  Here, for the reasons explained below, the Complaint makes a prima facie showing of specific personal jurisdiction over the Canadian Defendants by alleging that those Defendants engaged in suit-related conduct in or expressly aimed towards the United States.  The five Canadian Spoofing Defendants submitted affidavits, which the Court can consider in relation to their Rule 12(b)(2) argument.  *See*

*Dorchester*, 722 F.3d at 84; *accord Johnson v. UBS AG*, 791 Fed. App'x 240, 241 (2d Cir. 2019) (summary order).

The Complaint makes unrebutted allegations that three of the Canadian Defendants, CIBC Canada, UBS Canada and TD Canada, engaged in suit-related conduct in New York.  In analyzing specific personal jurisdiction, "[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise from the defendants purposeful contacts with the forum." *Charles Schwab Corp.*, 883 F.3d at 84.  Here, the Complaint alleges that the Canadian Defendants "conducted continuous activity in New York State . . . by employing high speed algorithmic computer systems to route orders and execute trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S."  In their declarations, CIBC Canada, UBS Canada and TD Canada do not deny that they engaged in trading in Concordia's stock on a U.S. exchange during the Relevant Period.

Further, even if none of the Canadian Defendants traded on a U.S. exchange, the Complaint makes unrebutted allegations that the Canadian Defendants engaged in suit-related conduct directed at the United States with the intent and effect of manipulating Concordia's share price on U.S. exchanges, including the NASDAQ in New York.  Exercise of jurisdiction under an "effects test" theory of jurisdiction is invoked where "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Id.* at 87 (internal quotation marks omitted).  "Exercise of jurisdiction in such circumstances may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* (internal quotation marks omitted).  The Complaint alleges that the conduct of the Canadian

Defendants on Canadian exchanges was intended to manipulate the price of Concordia shares which were listed and traded on the NASDAQ.  This allegation is sufficient to make out a prima facie case of specific personal jurisdiction over the Canadian Defendants under the effects theory.

### B.    Spoofing

The Complaint states a market manipulation claim for spoofing under § 10(b) and § 9. To state a § 10(b) claim for market manipulation a complaint must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  *Set Cap.*, 996 F.3d at 76 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)).  To state a § 9 claim for market manipulation, a complaint must allege "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others," (4) reliance by plaintiff and (5) an effect on plaintiff's purchase or selling price.  *SEC v. Fiore*, 416 F. Supp. 3d 306, 325 (S.D.N.Y. 2019) (quoting *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004)).  "[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  *ATSI Commc'ns*, 493 F.3d at 102; *accord EMA Fin., LLC v. Vystar Corp.*, No. 19 Civ. 1545, 2021 WL 1177801, at *4 (S.D.N.Y. Mar. 29, 2021).

Defendants argue that the Complaint does not a plead a market manipulation claim as to spoofing for four reasons: (1) the Complaint assumes Defendants' trades were for their own accounts, (2) the Complaint does not adequately plead scienter, (3) the Complaint does not plead

8

loss causation and (4) the Complaint does not plead reliance.  Defendants also argue Plaintiff's claim is untimely and outside the territorial reach of the Exchange Act.  For the reasons explained below, these arguments are unsupported.

### a.  Spoofing Allegations in the Complaint

The Complaint alleges the U.S. and Canadian Spoofing Defendants perpetrated a spoofing scheme to drive down Concordia's share price for the purpose of purchasing Concordia's shares at lower prices.  The scheme was carried out by the simultaneous entry of large quantities of orders to sell by a U.S. Spoofing Defendant and its Canadian affiliate.  The orders were baiting orders -- they had no legitimate purpose and were not intended to be executed.  When the baiting orders were placed, the U.S.[2] and Canadian Spoofing Defendants placed orders they intended to execute to buy Concordia shares at lower prices induced by the baiting orders.  After the order to buy was executed, the U.S. and Canadian Spoofing Defendants removed all of their baiting orders.

The Complaint further alleges that the U.S. and Canadian Spoofing Defendants repeated the spoofing cycle continuously throughout the period.  The Canadian Spoofing Defendants engaged in approximately 100,000 spoofing events and the U.S. Spoofing Defendants engaged in approximately 49,000 spoofing events.  The U.S. and Canadian Spoofing Defendants coordinated their spoofing activities on 263 of 294 trading days.  The Complaint details six examples of many alleged instances of spoofing by each pair of U.S. and Canadian Spoofing Defendants.  In each instance, the U.S. and Canadian Spoofing Defendants placed baiting orders to sell, and the Canadian Spoofing Defendants executed orders to buy at prices lower than the

---

[2]The Complaint also alleges in a conclusory fashion that U.S. Spoofing Defendants purchased Concordia stock in these circumstances, but contains no example or other specific allegation.

best offer that prevailed prior to the placement of the baiting orders.  The baiting orders were intended to mislead other market participants into believing that the downward movement of Concordia's share price was being caused by the forces of supply and demand.  As a result, market participants received a false and misleading pricing signal intended to trick them into executing their own sell orders.  The additional sell orders created a pile-on effect that drove down Concordia's share price, which enabled Defendants to purchase Concordia's shares at lower prices for their own or their client's accounts.  The impact of the spoofing activity extended beyond each individual spoofing event.

The Complaint alleges that the spoofing scheme operated through algorithmic trading programs designed and implemented by each of the U.S. and Canadian Spoofing Defendants. The Complaint alleges the programs either consciously -- i.e., were designed to -- or recklessly "generate[d] trading patterns that involved the placement and cancellation of several hundred thousand [b]aiting [o]rders to sell . . . that were never intended to be executed."

### b.  Manipulation by Defendants

Defendants' argument that the Complaint does not allege "who actually placed any of the allegedly manipulative orders or trades" is unfounded.  The Complaint alleges that the U.S. and Canadian Spoofing Defendants placed the allegedly manipulated orders and specifies the date and time of multiple manipulative orders and trades for each Spoofing Defendant.  The Complaint further alleges that the U.S. and Canadian Spoofing Defendants "designed and implemented algorithmic trading programs that executed their spoofing schemes."

That the Complaint mentions that Defendants trade for their own proprietary accounts and the accounts of their customers does not undercut the Complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed Concordia stock.  Of note, the

Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices for either client or proprietary accounts.

Defendants' focus on a purported comment by Plaintiff to a Canadian regulatory authority in 2018 is beside the point.  Even if the Court could consider the comment on this motion, Plaintiff's beliefs in 2018 do not constrain the well-pleaded allegations of its Complaint three years later.  The Complaint alleges that during those three years, Plaintiff engaged in an extensive investigation into the identities of the manipulators.

### c.  Scienter

The Complaint alleges scienter sufficiently.  "To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."  *Set Cap.*, 996 F.3d at 78 (internal quotation marks omitted).  The Complaint alleges facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  There is little case authority applying the PSLRA's pleading requirements to a spoofing case.  *See CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16 Civ. 4991, 2017 WL 1093166, at *4 (N.D. Ill. Mar. 22, 2017) (recognizing an absence of PSLRA spoofing cases in 2017).  Nonetheless, when looking to indicia that distinguish spoofing from legitimate market activity, courts tend to examine (1) the passage of time between placement and canceling of orders (usually in milliseconds), (2) cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled, (3) parking baiting orders behind smaller legitimate orders placed by other traders and (4) large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer.  *See United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (discussing evidence of fraudulent intent in a criminal

spoofing case and finding that a spoofing program "designed to cancel orders (1) based on the passage of time (usually measured in milliseconds), (2) following the partial filling of the large orders, or (3) following the complete filling of the small orders, suggests, strongly, fraudulent intent"); *CP Stone Fort Holdings*, 2017 WL 1093166, at *4 (finding, in a securities spoofing case, that allegations of parking baiting orders behind smaller legitimate orders allege illegal intent and that allegations of a "consistent pattern of placing thousands of [baiting orders], cancelling those orders" and then placing small, legitimate orders supports a cogent and compelling inference of intent); *U.S. CFTC v. Oystacher*, 203 F. Supp. 3d 934, 945 (N.D. Ill. 2016) (finding sufficient allegations of intent to spoof where complaint portrays a "pattern of [baiting order] placement at or near the best bid or offer price shielded by existing orders, flips, aggressive order placement . . . large order size, and cancellation speed"); *see also SEC v. Masri*, 523 F. Supp. 2d 361, 369 (S.D.N.Y. 2007) (discussing the importance of identifying features of open-market transactions that "give rise to an inference of manipulative intent," such as "timing, size, or repetition of a transaction").

The Complaint pleads particularized facts constituting circumstantial evidence of conscious misbehavior fitting each of the four indicia identified above.  First, as to the placement and canceling of orders in milliseconds, the Complaint pleads that each pair of U.S. and Canadian Spoofing Defendants placed and canceled baiting orders in a matter of milliseconds. The Complaint provides examples of orders on March 15, 17 and 24, 2016, by CIBC Canada, TD Canada and Merrill Canada respectively.

Second, each of the aforementioned examples involves the cancellation of larger baiting orders immediately after the execution of smaller legitimate orders.  For instance, on March 15, 2016, CIBC Canada canceled the last baiting order nine milliseconds after executing its final

purchase order.  TD Canada's cancellation of its last baiting order occurred one millisecond after fulfilling its last purchase order.  Merrill Canada's cancellation of its last baiting order followed the execution of its purchase order by 278 milliseconds.

Third, the Complaint alleges that each Canadian Spoofing Defendant parked baiting orders behind legitimate orders placed by other traders.  For instance, CIBC Canada placed a baiting order to sell for 30.92 when the prevailing best offer to sell was for 30.88.  TD Canada placed a baiting order to sell for 28.51 when the best offer was 28.46.  Merrill Canada placed a baiting order to sell for 26.71 when the best offer was 26.65.

Fourth, the Complaint alleges that each U.S. and Canadian Spoofing pair placed large baiting orders on one side of the market and executed much smaller orders on the other side of the market.  For instance, when CIBC Canada purchased 700 shares, it had placed baiting orders totaling 6,000 shares and CIBC US placed baiting orders totaling 64,500 shares.  When TD Canada purchased 110 shares, it had placed baiting orders totaling 3,600 shares and TD US placed baiting orders totaling 23,200 shares.  When Merrill Canada purchased 100 shares, it had placed baiting orders totaling 5,900 shares and Merrill US placed baiting orders totaling 7,600 shares.

Defendants' argument that these facts are insufficient because the Complaint must plead additional particularized facts is unavailing.  Defendants argue that the Complaint needs to plead additional facts regarding Defendants' algorithmic trading programs and the corporate officials who designed or oversaw those programs.  Defendants' argument is unfounded because "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."  *ATSI Commc'ns*, 493 F.3d at 102; *accord In re*

13

*Tether & Bitfinex Crypto Asset Litig.*, No. 19 Civ. 9236, 2021 WL 4452181, at *33 (S.D.N.Y. Sept. 28, 2021). If Defendants' argument were correct, it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms.

Defendants also argue that the large volume of placed and canceled orders does not support an inference of scienter because more than 95% of all placed orders are canceled before execution. Even if it were permissible to consider that fact on a motion to dismiss, it does nothing to explain the frequent pattern of spoofing alleged in the Complaint. That 95% of placed orders are canceled in the market does not mean spoofing was absent here.

Contrary to Defendants' argument, the Complaint presents a theory of spoofing that makes economic sense, albeit tenuously. The Complaint alleges that the Spoofing Defendants engaged in spoofing to purchase shares of Concordia stock at prices lower than what they would otherwise pay. Ostensibly, when a Spoofing Defendant sold that stock, their profits would be increased, or losses decreased, by the difference of the price they paid versus the price they would have paid had they not engaged in spoofing. The Complaint then contends that the frequent and continuous spoofing had the secondary impact of driving the price of Concordia stock down over time because Concordia's share price never fully recovered from the cumulative impact of the spoofing episodes. That spoofing may have ultimately worked against Defendants' long positions in Concordia stock does not negate their manipulative intent in receiving a benefit by buying shares at artificially lower prices.

### d.  Loss Causation

The Complaint adequately alleges loss causation. Loss causation "is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI*

14

*Commc'ns*, 493 F.3d at 106 (citing *Dura Pharms.*, 544 U.S. at 342); *accord In re Synergy*

*Pharms., Inc. Sec. Litig.*, No. 18 Civ. 873, 2021 WL 4480625, at *8 (S.D.N.Y. Sept. 30, 2021).

A plaintiff's burden in alleging loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3*

*Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms.*, 544 U.S.

at 347). The Complaint alleges that spoofing occurred on 193 of 205 trading days during the

Relevant Period, that Plaintiff traded on twenty-seven of those days and that spoofing depressed

the price for up to fifteen minutes with lingering cumulative effects over the Relevant Period.

The Complaints states, "[w]hen the spoofing events occur continuously throughout the day and

continue without interruption over a protracted period of time, the long-term cumulative effect of

spoofing places enormous downward pressure on the market price of a security." The Complaint

also alleges that over 100,000 spoofing events during the 205 trading days during the Relevant

Period caused the decline in Concordia's share price from $28.02 to $3.13.

Defendants unconvincingly argue that the Complaint engages in impermissible group

pleading as to loss causation. Defendants contend that lumping together all of the Spoofing

Defendants provides no basis for inferring that any one Spoofing Defendant was the proximate

cause of Concordia's stock price decline or ascribing a rough proportion of the whole loss to

each Spoofing Defendant. Defendant relies on cases that are distinguishable. In *Lattanzio v.*

*Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007), the Second Circuit found Plaintiffs

failed to allege loss causation in bringing securities claims against a company's accounting firm

where the complaint did not allege facts to show the accountant's misstatements were the

proximate cause of Plaintiff's loss when the misstatements made by the company were much

more consequential. Here, the case is one of market manipulation and not misstatements, and

the misconduct allegedly committed by each Spoofing Defendant is of such a like character and

so frequent that it would be improper to infer, at this stage of the litigation, that one Defendant contributed disproportionally to the damages alleged.  That is particularly true here because the Complaint alleges a cumulative effect, in part, because spoofing events by different Spoofing Defendants occurred "continuously throughout the day and . . . without interruption over a protracted period of time."

Defendants' attack of the Complaint on plausibility grounds mischaracterizes the allegations in the Complaint.  Defendants argue that there is no loss causation because the Complaint alleges each spoofing event lasted only fifteen minutes.  The Complaint actually alleges that each spoofing event had a lingering effect over the Relevant Period.  Defendants' argument that there is no plausible inference that spoofing could drive down Concordia's stock price from $28.02 to $3.13 over an eleven-month period is similarly misplaced because no such inference is necessary considering the Complaint's allegations.  It would not be proper to draw the inference sought by Defendants -- that individual spoofing events cannot have a long-term cumulative effect on the price of a stock -- at the motion to dismiss stage.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014) (recognizing that "[t]he efficient market hypothesis, premised upon the speed (efficiency) with which new information is incorporated into the price of a stock, does not tell us how long the inflationary effects of an uncorrected misrepresentation remain reflected in the price of a security").  Whether the effects of the alleged market manipulation dissipated is a question of fact that can be answered only upon a more fully developed record.

### e.  Reliance

The Complaint alleges reliance.  The parties do not dispute that alleging reliance for market manipulation claims requires allegations that a plaintiff "reli[ed] on an assumption of an

efficient market free of manipulation," *Set Cap.*, 996 F.3d at 76 (quoting *ATSI Commc'ns*, 493 F.3d at 101). This reliance standard follows from an understanding of market manipulation claims. "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (internal quotation marks omitted). Here, the Complaint alleges that the Spoofing Defendants "injected false and misleading information into the marketplace that interfered with the natural forces of supply and demand and drove the price of Concordia's shares downward" and that Plaintiff relied on an assumption that the market for Concordia shares was efficient and free of manipulation when it sold those shares. These allegations are sufficient to allege reliance. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 101 n.9 (S.D.N.Y. 2015) (quoting *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012)) (recognizing the requirement of alleging "reliance on an assumption of an efficient market free of manipulation" for market manipulation claims).

Defendants' argument that the Complaint does not allege reliance because Plaintiff had concerns about manipulation in 2016 is misplaced. This argument completely disregards the allegations in the Complaint that Plaintiff relied on an efficient market. Defendants contend that because Plaintiff raised concerns about manipulation of Concordia stock as early as 2016, they could not have thereafter relied on an efficient market. But the Complaint alleges that Plaintiff's request for an investigation into Concordia's price volatility was based on "negative social media postings," not any belief by Plaintiff that there was manipulative activity in the market, as Defendants' argument suggests.

###### f.  Timeliness

The spoofing claim is timely.  The applicable statute of limitations for Plaintiff's spoofing-related Exchange Act claim is within "2 years after the discovery of the facts constituting the violation."  28 U.S.C. § 1658(b).  "A securities-law violation is discovered when the plaintiff learns sufficient information about [the violation] to . . . plead it in a complaint with enough detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss."  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (alterations in original) (internal quotation marks omitted); *accord Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 560 (S.D.N.Y. 2021).  "A plaintiff is charged with knowledge of any fact that a reasonably diligent plaintiff would have discovered."  *Fed. Hous. Fin. Agency*, 873 F.3d at 119 (internal quotation marks omitted).  "[T]he limitations period begins to run only when, in the course of [the plaintiff's] investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately."  *Id.*

Here, the Complaint alleges that Plaintiff pursued a lengthy investigation involving an outside consultant, an application in the Ontario Superior Court of Justice, a request to FINRA and a consulting firm to bring its Complaint.  After some of those efforts were unfruitful, Plaintiff retained the firm that analyzed the data sufficient for it to plead the market manipulation claims brought in the Complaint.  Crediting the allegations in the Complaint, there is no reason to conclude that Plaintiff's numerous investigative pursuits were anything but diligent.  Once the final investigation, which included analysis of gigabytes of data, was complete in May 2020, Plaintiff filed the Complaint well within the two-year statute of limitations.

###### g.  Extraterritoriality

The Complaint pleads claims against the Canadian Spoofing Defendants within the reach

of the Exchange Act.  As an initial matter, the question of the extraterritorial reach of the

Exchange Act is a merits question subject to Rule 12(b)(6), *Morrison v. Nat'l Australian Bank*

*Ltd.*, 561 U.S. 247, 253-54 (2010), so the Court does not consider Defendants' declarations for

the purpose of this argument.  Defendants argue that Plaintiff cannot assert claims based on

Canadian conduct or trading under the Supreme Court's decision in *Morrison*.  This argument is

unavailing.

The spoofing claims, as pleaded, fall within the territorial ambit of the Exchange Act.  In

*Morrison*, the Supreme Court held "the focus of the Exchange Act is not upon the place where

the deception originated, but upon purchases and sales of securities in the United States."

*Morrison*, 561 U.S. at 266.  Plaintiff does not seek to hold any Defendant liable for purchases

made on foreign exchanges and instead limits its claims to sales made on U.S. exchanges.

Further, the Complaint alleges that the Canadian Spoofing Defendants engaged in trading on

U.S. exchanges in relation to the manipulative scheme and that Canadian Spoofing Defendants

had the intent to manipulate Concordia stock on U.S. exchanges.  These allegations bring

Canadian Spoofing Defendants' conduct within the reach of the Exchange Act.  The Court does

not need to decide at this time whether Canadian Spoofing Defendants' conduct would be within

the reach of the Exchange Act had those Defendants not transacted on a U.S. exchange in

relation to the scheme and had no intent to impact the price of Concordia's shares within the

United States.

The Court is mindful that *Morrison* provides a necessary, not a sufficient, condition for

finding a securities claim is in the territorial scope of the Exchange Act.  *See Parkcentral Global*

*Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (deeming conduct to

be "so predominantly foreign" as to render the claims impermissibly extraterritorial); *see also*

*Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 106-07 (2d Cir. 2019) (extending *Morrison* to the Commodities Exchange Act and rejecting extraterritorial claim where the alleged misconduct was "entirely foreign").  But, here, as alleged in the Complaint, Canadian Spoofing Defendants engaged in at least some conduct in the United States in their purported effort to manipulate Concordia's stock on U.S. exchanges.  It would require an inference in favor of Canadian Defendants to view the Complaint as alleging the predominance of foreign conduct over conduct within the United States by the Canadian Defendants.

### C.     Naked Short Selling

The Complaint fails to allege the Short Selling Defendants conducted a manipulative act or acted with scienter in relation to short selling.  In a typical short sale, "a person borrows stock from a broker, sells it to a buyer on the open market, and later purchases the same number of shares to return to the broker."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 377 (2016).  "[S]hort selling – even in high volumes – is not, by itself, manipulative."  *ATSI Commc'ns*, 493 F.3d at 101.  In a naked short sale, "the seller has not borrowed (or otherwise obtained) the stock he puts on the market."  *Merrill Lynch*, 578 U.S. at 377 (citing "Naked" Short Selling Antifraud Rule, Securities Exchange Commission Release No. 34-58774, 73 Fed. Reg. 61667 (Oct. 17, 2008)).  But with abusive naked short selling the seller never delivers the promised shares to the buyer, and "[t]hat practice (beyond its effect on individual purchasers) can serve as a tool to drive down a company's stock price—which, of course, injures shareholders."  *Id*. (internal quotation marks omitted).  The SEC defines abusive naked short selling as "selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement cycle."  "Naked" Short Selling Antifraud Rule, 73 Fed. Reg. at 61667.

a.  **Manipulative Conduct**

The Complaint alleges that the Short Selling Defendants intended to manipulate the price of Concordia's shares by "short selling shares without locating or borrowing legally authorized shares" and "failing to deliver legally borrowable shares on the settlement date."  The Complaint adds that the manipulation injected "millions of [f]ictitious [s]hares into the U.S. and Canadian markets that were not authorized for sale by Concordia."  The Complaint lists the number of shares sold short by the Canadian Short Selling Defendants.

The Complaint makes conclusory allegations that the Short Selling Defendants failed to deliver stock without pointing to any specific examples.  The Complaint alleges that the manipulative scheme "avoided the creation of fails to deliver on a sustained basis."  Without any specific factual allegation that any Defendant failed to deliver shares following a short sale, the Complaint fails to allege that abusive naked short selling took place.  Instead, it merely alleges that short selling took place at high volumes, and that naked short selling may have taken place, neither of which is, by itself, manipulative.  *See ATSI Commc'ns*, 493 F.3d at 101.

The Complaint's allegations that Defendants' naked short selling manufactured "fictitious" shares misconstrue the concept of "fictitious shares."  Nothing in the Complaint suggests how fictitious shares were manufactured or that the creation of fictitious shares is even possible.  The hypothetical shares, which the Complaint deems "fictitious shares" are just a concept -- those "fictitious shares" are either eventually delivered, using actual shares, or they are not.  *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 425 (S.D.N.Y. 2010) (holding that a "general allegation that naked short selling resulted in the creation of 'phantom shares' is insufficient" while noting that the SEC has stated that naked short selling does not affect the number of shares outstanding); *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 3 Civ. 3120,

2009 WL 1492196, at *6 n.8 (S.D.N.Y. May 27, 2009) (rejecting as conclusory allegations that short selling resulted in defendants "selling stock they did not own" and "entering into massive counterfeit sales").

The Complaint alleges that the short selling "can be deemed naked short selling based on an insufficient supply." Even if that inference is supported, it would not make the transaction manipulative if those naked short sales were eventually covered -- and the Complaint does not plead with particularity that any naked short sales were not covered by Defendants.

### b.  Scienter

Plaintiff's scienter argument falls short. The allegations related to short selling do not support an "inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Setzer*, 968 F.3d at 212 (quoting *Tellabs*, 551 U.S. at 324).

First, the Complaint alleges scienter based on the high turnover rate of Concordia shares and the high percentage of short sales. These high rates do not support any inference that there was fraudulent or reckless intent because short selling, even some naked short selling, is legal. Further, that spoofing and short selling may have transpired in tandem proves nothing because the alleged spoofing may well have triggered legal short selling.

Second, Plaintiff argues broadly that Defendants violated Regulation SHO and failed to comply with FINRA's Security Counting and Verification Rule and Supervisory Control System Rule. As to FINRA rules, the Complaint alleges only that Defendants did not comply with those rules because they conducted manipulative trading. That allegation is insufficient. As to Regulation SHO, the Complaint does not identify a single example of actual activity that could constitute a Regulation SHO violation. The Complaint alleges that Regulation SHO was promulgated "to prevent brokers from executing short sale orders without possessing or having a

reasonable basis to believe that they are able to locate and borrow shares to make timely delivery by the settlement date of the short sale." The Complaint does not allege a single failure to deliver or any reason why Defendants did not believe they could locate and borrow shares to make timely delivery. Instead, the Complaint alleges Defendants avoided fails to deliver and did not trigger Regulation SHO's restrictions.

### D.   Common Law Claims

Plaintiff brings common law claims for unjust enrichment, fraud, aiding and abetting fraud and conspiracy to commit fraud. For the reasons below, the unjust enrichment claim is untimely, and the Complaint fails to plead any common law fraud claims.[3]

#### a.   Unjust Enrichment

Plaintiff's unjust enrichment claim is dismissed. Defendants argue in their memorandum of law that the unjust enrichment claim should be dismissed as untimely. Plaintiff does not respond to this argument or otherwise assert that the claim is timely. At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to defendant's arguments in support of dismissing that claim. *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 686 (S.D.N.Y. 2021); *Kane v. Mount Pleasant Cent. Sch. Dist.*, No. 20 Civ. 7936, 2021 WL 5112981, at *8 (S.D.N.Y. Nov. 3, 2021) (dismissing claim on statute of limitation grounds where Plaintiff abandoned arguments regarding accrual or equitable tolling).

---

[3] The common law claims are reviewed under New York law because both parties rely on New York law in their memoranda of law. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (applying New York law where the parties' memoranda of law assume that New York law governed the issues); *accord N.Y. Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 485 F. Supp. 3d 398, 404 n.5 (S.D.N.Y. 2020).

### b.  Common Law Fraud

The Complaint's common law fraud claim fails because it is based, at least in part, on the alleged creation and selling of "fictitious shares" underlying Plaintiff's short selling § 10(b) claim, which itself is not plead sufficiently.  Because of the similarities between the elements of a common law fraud claim and a § 10(b) claim, where dismissing § 10(b) claims, courts in this Circuit have dismissed accompanying fraud claims as well.  *Seagrape Inv'rs LLC v. Tuzman*, No. 19 Civ. 9736, 2020 WL 5751232, at *18 (S.D.N.Y. Sept. 25, 2020) (collecting cases).  Here, the Complaint has not alleged an Exchange Act claim based on short selling, so it does not state a fraud claim on that basis.

To the extent the Complaint's fraud claim is based on short selling, the Complaint does not plead a common law fraud claim.  A New York common law fraud claim requires that a plaintiff allege with particularity that, among other things, defendants made "a misrepresentation or a material omission of fact" that they knew to be false.  *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018) (internal quotation marks omitted).  Defendants argue New York law does not recognize fraud claims based on trading activity because trading activity is not a misrepresentation or omission.  Plaintiff provides no case law to suggest that under New York law, trading activity can constitute a misstatement for purposes of fraud, and Plaintiff fails to respond to Defendants' argument that trading activity cannot constitute a misrepresentation or omission for purposes of common law fraud under New York law.

### c.  Conspiracy to Commit Fraud and Aiding and Abetting Fraud

The Complaint does not plead claims of conspiracy to commit, and aiding and abetting, fraud.  Such claims require an underlying common law fraud claim.  *See Oster v. Kirschner*, 905

N.Y.S.2d 69, 72 (1st Dep't 2010) ("A plaintiff alleging an aiding-and-abetting fraud claim must allege the existence of the underlying fraud . . . ."); *Empire Outlet Bldrs. LLC v. Constr. Res. Corp. of N.Y.*, 97 N.Y.S.3d 68, 70 (1st Dep't 2019) ("In any event, 'conspiracy to commit a fraud is never of itself a cause of action.'" (quoting *Brackett v Griswold*, 20 N.E. 376, 378 (N.Y. 1889))); *see also Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) ("To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud . . . ." (internal quotation marks omitted)).  Here, the Complaint does not plead a common law fraud claim.  So it cannot plead conspiracy to commit fraud and aiding and abetting fraud.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  The following claims are dismissed pursuant to Rule 12(b)(6):

- all claims against the Short Selling Defendants, UBS US, UBS Canada, Merrill Pro, SocGén US and SocGén Canada;
- the claims related to short selling against Merrill US, Merrill Canada, John Doe U.S. and John Doe Canada and
- all of the common law claims.

The surviving claims are the § 9(a) and § 10(b) claims related to spoofing against CIBC US, Merrill US, TD US, CIBC Canada, TD Canada, Merrill Canada, John Doe U.S. and John Doe Canada.

The Clerk of Court is respectfully directed to close the motion at Docket No. 72 and to terminate UBS US, UBS Canada, Merrill Pro, SocGén US and SocGén Canada from this case.

Dated:  February 9, 2022
            New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**