**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Civil Action No.: 1:21-cv-00761-LGS

Hon. Lorna G. Schofield

HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,
           Plaintiff,
        v.
CIBC WORLD MARKETS CORP.; CIBC WORLD MARKETS INC.; BOFA SECURITIES, INC.; MERRILL LYNCH CANADA INC.; MERRILL LYNCH PROFESSIONAL CLEARING CORP.; TD SECURITIES, INC.; TD SECURITIES(USA) LLC; UBS FINANCIAL SERVICES, INC.; UBS SECURITIES CANADA, INC.; SOCIETE GENERALE CAPITALE CANADA INC.; SG AMERICAS SECURITIES, LLC; AND JOHN DOES 1 THROUGH 10,
           Defendants.

**THE CIBC DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION OF THE COURT'S FEBRUARY 9, 2022 OPINION AND ORDER**

Defendants CIBC World Markets Corp. and CIBC World Markets Inc. (together, the "CIBC Defendants") respectfully request that this Court reconsider its February 9, 2022 Opinion and Order (ECF #88), and dismiss the claims against the CIBC Defendants with prejudice.

**INTRODUCTION**

On February 9, 2022, this Court issued an Opinion and Order, granting in part and denying in part the Defendants' Motion to Dismiss the Amended Complaint. In summary, the Court dismissed the short selling and common law claims, including the conspiracy to commit fraud

claim, but denied the Defendants' motion to dismiss related to the market manipulation claims for spoofing in violation of § 10(b) of the Exchange Act and Rule 10b-5 and § 9(a)(2) of the Exchange Act. *See generally* (ECF #88) ("Op."). The CIBC Defendants were named solely in Plaintiff's spoofing and common law claims (including Plaintiff's now-dismissed claim of an alleged conspiracy), though were not alleged to have engaged in short selling. The CIBC Defendants seek reconsideration of the Court's Opinion and Order insofar as the Court declined to dismiss the spoofing claims against them, because the timing and nature of the CIBC Defendants' alleged spoofing activities make absolutely clear that Plaintiff cannot support its market manipulation theory against them as a matter of law.

This Court's Local Rules allow for a motion for reconsideration to address "matters or controlling decisions which counsel believes the Court has overlooked." In addressing the Defendants' joint motion to dismiss, the Court was called upon to evaluate the plausibility of seven claims for relief alleged in an 118-page Amended Complaint spelled out in 245 paragraphs against 10 defendants, which it did concisely in a 25-page Opinion and Order. In doing so, the CIBC Defendants respectfully submit that the Court evaluated the spoofing claims in the context of the activities of the spoofing defendants *together*, overlooking the fact that, in the same Opinion and Order, the Court dismissed the common law conspiracy claims. *See* Op. at 24-25. The evidence of spoofing against each defendant therefore had to be evaluated entirely *on their own*.

When the alleged activity of the CIBC Defendants is considered standing alone, Plaintiff's allegations fall short of stating any claim, because Plaintiff cannot, as a matter of law and on the facts as plead, establish the required loss causation and scienter elements for the spoofing claims. Further, as plaintiff suffered no injury plausibly attributable to the CIBC Defendants, it lacks standing to bring this action against the CIBC Defendants.

As to the CIBC Defendants specifically, Plaintiff alleged certain trades and orders allegedly constituting purported spoofing activity on February 11, 2016, March 15, 24 and 28, 2016 and April 18 and 25, 2016.[1]  Two of those days – March 24 and March 28 – cannot support a spoofing claim because the purported baiting orders *followed* the purchase orders – the inverse order of spoofing.  Moreover, Plaintiff does not allege that it sold any Concordia shares until August 12, 2016, nearly four months *after* the last trade alleged by either CIBC Defendant.[2]  See Am. Compl., at ¶14 (table reflecting the timeframe "from August 1, 2016 to November 15, 2016 when Harrington was actively selling its Concordia shares on U.S. Exchanges.") This gap in time is itself fatal to any argument that the CIBC Defendants' specific orders proximately caused Plaintiff's subsequent loss.

Further, during the February to April 2016 time period encompassing the entirety of the alleged activity by the CIBC Defendants, the share price at which the CIBC Defendants actually bought Concordia shares *rose* from $24.35 to $32.47.  This is directly contrary to Plaintiff's theory as pled in the Amended Complaint.  Indeed, when the alleged activity by the CIBC Defendants ceased in April 2016, Concordia's shares were *higher* than the top price at which Plaintiff claims the scheme to depress Concordia's price began.  Am. Compl., ¶ 2 ($28.03).  It therefore is simply not possible to contend that CIBC's trading could have contributed to the price drop alleged in the

---

[1] Plaintiff fails to distinguish between the two CIBC entities named in this lawsuit. While the CIBC Defendants' view is that this failure and lack of specificity alone should be fatal, it accepts the allegations solely for purposes of this Motion.

[2] The CIBC Defendants raised these arguments related to scienter and loss causation in the initial briefing on the motion to dismiss, although the Court did not address them in the Opinion and Order in the context of the CIBC Defendants standing alone, which is necessary at this juncture given that the conspiracy claims did not stand. (ECF #73, at 16-19, 22-25); (ECF #87, at 10, n.5).

complaint, and even more far-fetched to claim that any activity by the CIBC Defendants caused Plaintiff any loss.

As such, Plaintiff has not alleged facts with the required specificity to meet the loss causation and scienter elements required for the spoofing claims or to establish standing. The CIBC Defendants should therefore be dismissed from this case with prejudice.

## THE COURT'S OPINION AND ORDER

While the Court is familiar with the claims and allegations, the CIBC Defendants revisit them here in brief, simply to highlight for the Court the exceptionally narrow and unviable claims that remain against the CIBC Defendants following the Court's Opinion and Order.

The Complaint alleges the "U.S. and Canadian Spoofing Defendants," as the Court referred to them in the Opinion and Order, perpetrated a spoofing scheme to drive down Concordia's share price for the purpose of purchasing Concordia's shares at lower prices. Op. at 9. The scheme was executed, according to Plaintiff, by the placement of large quantities of orders to sell, referred to as "baiting orders," which, according to Plaintiff, "had no legitimate purpose and were not intended to be executed." Op. at 9. When the baiting orders were placed, the U.S. and Canadian Spoofing Defendants placed orders they intended to execute to buy Concordia shares at lower prices induced by the baiting orders. Op. at 9.

In its reasoning denying the motion to dismiss the spoofing claims, the Court highlighted those allegations of the Amended Complaint which stated "particularized facts constituting circumstantial evidence of conscious misbehavior … ." Op. at 12. Addressing scienter, the Court characterized Plaintiff's economic theory of spoofing as "tenuous," but determined that it ultimately passed scrutiny by alleging that "the Spoofing Defendants engaged in spoofing to purchase shares of Concordia stock at prices lower than what they would otherwise pay." Op. at

14.   As to loss causation, the Court found that Plaintiff adequately pled causation, noting that "spoofing occurred on 193 of 205 trading days during the relevant period, that Plaintiff traded on twenty-seven of those days and that spoofing depressed the price for up to fifteen minutes with lingering cumulative effects over the Relevant Period."  Op. at 15.  The Opinion and Order does not tie these allegations to the CIBC Defendants or the time period of their alleged trades many months before Plaintiff's losses and in a vastly different trading market.

## LEGAL STANDARD

A motion for reconsideration should be granted "where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision.' " *Morales v. Quintiles Transnational Corp.*, 25 F.Supp.2d 369, 372 (S.D.N.Y.1998) (citations omitted).[3]  *See also* Local Civ. R. 6.3 (providing that a motion for reconsideration must set forth "concisely the matters or controlling decisions which counsel believes the Court has overlooked").

## ARGUMENT

This Court's ruling significantly altered the landscape of this case by gutting half of Plaintiff's market manipulation scheme, that is, the short selling aspect. What remains are the spoofing claims alone, which this Court narrowed as well by dismissing the common law claims, particularly the conspiracy to commit fraud, which had alleged that the "U.S. Spoofing Defendants each conspired with their Affiliated Canadian Counterparts to develop a trading scheme to mislead the market with the common objective to mispresent the value of Concordia's shares that were being sold on U.S. Exchanges."  Am. Compl., at ¶227.  With no conspiracy claim remaining,

---

[3] The CIBC Defendants do not restate here the elements of a § 10(b) claim or § 9 claim for market manipulation, which the Defendants previously briefed, Defs.' Memo., at 15, and the Court detailed in its ruling, Op. at 8.

Plaintiff's claims for spoofing and market manipulation no longer can be framed around alleged conspiratorial liability.[4]  Instead, the allegations against each spoofing defendant must stand alone *on their own* – a critically important point that the CIBC Defendants contend, respectfully, the Court overlooked, or at minimum failed to focus on in detail to test the Amended Complaint's allegations against each Defendant.  *See e.g.*, Op. at 9 (highlighting the number of spoofing events, baiting orders and trading days engaged in by the "U.S. and Canadian Spoofing Defendants").

As to the CIBC Defendants, the sole remaining question in this case is whether the six days of purported trades in February, March and April, 2016, as specifically alleged, are sufficient to plausibly state a claim for spoofing under §§ 10(b) and 9.  As shown below, the answer is no.

A closer look at the specifics of the CIBC Defendants' alleged activity reveals that it cannot support Plaintiff's claims for no less than four reasons:

*First*, on two days of activity – March 24 and March 28, 2016 – the alleged baiting orders occurred after the executing or purchase orders.  As such, these orders cannot be considered "baiting orders," even under Plaintiff's own definition, and cannot have affected the stock price of the purchases which occurred prior to the "baiting orders."

*Second*, Plaintiff has not alleged that it sold any Concordia shares or suffered any loss during the time that the CIBC Defendants allegedly engaged in spoofing activity.  Rather, Plaintiff did not sell any shares until August 12, 2016, i.e., nearly four months *after* the CIBC Defendants engaged in any purported spoofing activity.  *See* Am. Compl., at ¶14 (Chart). This entirely

---

[4] Conspiracy liability is not available under the Exchange Act. *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998) (explaining that "there is no mention of conspiracy in the text of § 10(b)" and explaining that "implying a cause of action for conspiracy would be inconsistent with settled methodology in § 10(b) cases").

undercuts any legal basis for Plaintiff to claim that the specific orders of the CIB Defendants were a cause of Plaintiff's loss, as the law undeniably requires.

*Third*, the Concordia stock price rose 33% between the start of the CIB Defendants' alleged trading in February and when it concluded in April. More specifically, Concordia's share price rose from $24.35 (February 11, 2016) to $32.47 (April 25, 2016).

*Fourth*, the stock price for Concordia at the *end* of the CIB Defendants' alleged trading in April – $32.47 – was higher than the price – $28.03 – that Plaintiff alleges was the *starting point* for the scheme to depress the Concordia stock price. (Am. Compl., ¶ 2).

<u>March 24 and March 28</u>

The alleged spoofing activity attributed to the CIB Defendants on March 24 and March 28 cannot logically support Plaintiff's claims of market manipulation by way of spoofing. In Plaintiff's Complaint, it sets forth how the scheme purportedly worked:

> If the spoofer's goal is to drive the price down, the spoofer enters Baiting Orders to sell, which are intended to "bait" or "trick" investors into entering their own sell orders to minimize or avoid suffering losses in a downward trending market. At the same time, that the spoofer places the Baiting Orders to sell, the spoofer places orders to buy on the opposite of the Market Order Book, known as "Executing Orders." *These orders to buy are intended to be executed at the manipulated prices generated by the Baiting Orders to sell.* Immediately after the placing an Executing Order to buy in the Market Order Book, the spoofer cancels all of the Baiting Orders to sell, which completes the spoofing cycle.

Am. Compl., at ¶5 (emphasis added).

Here however, the executing orders placed on March 24 and March 28 related to the CIB Defendants *preceded* the purported "baiting orders" on the same day. This is not spoofing. 7 U.S.C. § 6c(a)(5)(c) (defining "spoofing" as "bidding or offering with the intent to cancel the bid or offer *before* execution") (emphasis added). As to March 24 for example: the alleged baiting

orders occurred between 11:11:23.703 and 11:11:25.670, Am. Compl., at ¶78, and the executing

orders occurred between 11:11:23.624 and 11:11:23:703, Am. Compl., at ¶78.  Likewise on March

28: the alleged baiting occurred between 10:25:46.360 and 10:25:51.053, Am. Compl., at ¶82, and

the executing orders occurred between 10:25:46.300 and 10:25:46.344, Am. Compl., at ¶83. It was

temporally impossible for the baiting orders on either day to affect the purchase price at which the

CIBC Defendants bought shares because the baiting orders occurred after, or in one instance

exactly at the same time as, the executing orders. In other words, to borrow from Plaintiff, the

executing orders could not have "intended to be executed at the manipulated prices generated by

the Baiting Orders to sell" because the baiting orders had not yet occurred.

> Plaintiff cannot establish a causal link between the CIBC Defendants' trading activity
> (ended in April 2016) and its earliest injury (August 12, 2016)

As set forth in the Amended Complaint, Plaintiff alleged that it *sold* shares beginning on

August 12, 2016, four months *after* the last alleged spoofing activity by the CIBC Defendants.

(Am. Compl. ¶14) This Court's Order and Opinion recognized that any spoofing is short lived,

perhaps at most 15 minutes, a far cry from four months. Even accepting the general notion that

spoofing could potentially have "lingering cumulative effects," the CIBC Defendants' alleged

conduct did not occur over *any* relevant period – let alone a period of market decline – and are

simply too remote to support a claim here. Therefore, Plaintiff has not plausibly established any

causal link, as required to do, between the CIBC Defendants' specific conduct and Plaintiff's

alleged losses suffered on its stock sales.

Loss causation is the proximate link between the alleged misconduct and the plaintiff's

economic harm. *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 101, 106 (2d Cir. 2007). *See*

*also Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) ("To establish loss causation

a plaintiff must show, that the economic harm that it suffered occurred as a result of the alleged

misrepresentations."). The Second Circuit has likened loss causation to the tort concept of proximate cause: "[t]he causation analysis [in a § 10(b) claim] encompasses two related, yet distinct elements—reliance and causation—elements that, in effect, correspond respectively with common law notions of 'but for' and proximate causation." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir. 1992), as amended (Sept. 23, 1992).

There is no plausible link of loss causation between the CIBC Defendants' activity and Plaintiff's alleged injury. The last activity of the CIBC Defendants as alleged by Plaintiff was on April 25, 2016 when CIBC bought 500 shares between $32.47 and $32.52 per share. These prices were *higher* than the price of $28.03, the starting point for the manipulative activity that allegedly drove the price down. (Am. Compl., at ¶2). Plaintiff alleges no more spoofing activity after that date by the CIBC Defendants. Plaintiff's Amended Complaint does not allege it sold any Concordia shares until August 12, 2016, *107* days after the last date of activity from the CIBC Defendants. (Am. Compl., at ¶ 4) (Chart). Further, Plaintiff's sales on August 12, 2016 were at $10.13 per share. Considering the time between the CIBC Defendants' last trade and Plaintiff's sale of shares, as well as the share price of Concordia at the time of the last CIBC trade alleged by Plaintiff, loss causation is a bridge too far.

The Supreme Court in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) made clear that Plaintiff must show a plausible causal link between a defendant's conduct and the plaintiff's loss. There, the Supreme Court reversed the Ninth Circuit's holding that a plaintiff may satisfy the "loss causation" requirement by alleging in the complaint and subsequently establishing that the price of the security on the date of the plaintiff's purchase was inflated because of the defendant's alleged misrepresentation. Relevant here, the Court noted that the plaintiff suffered no loss at the time of the purchase of the stock: "as a matter of pure logic, at the moment the transaction takes

place, the plaintiff has suffered no loss." *Id*. at 342. The Court went on to explain that loss occurred when the plaintiff sold stock at a loss, and how a myriad of factors could affect the stock price changing over time, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id*. The Supreme Court summarized: "[o]ther things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss." *Id*.

The same logic applies here. Just as the plaintiff in *Dura* suffered no loss at the time of the purchase of stock, Plaintiff here suffered no loss until at the earliest August 12, 2016, when it first sold Concordia shares four months later. In explaining the chart included in its Amended Complaint, Plaintiff does not hide the fact that it did not suffer any injury until August 2016: "[t]he following table reflects the timeframe during the Relevant Period from August 1, 2016 to November 15, 2016 when Harrington was actively selling its Concordia shares on U.S. Exchanges." Am. Compl., at 14. Similarly, just as the longer the time between the plaintiff's purchase and sale in *Dura* allowed for other contributing factors, the more than 100 days between CIBC's last order (alleged by Plaintiff) and Plaintiff's sale of shares makes it implausible to contend that CIBC's activity caused any loss.[5] The Supreme Court in *Dura* made clear that the defendant's conduct must actually *cause* the plaintiff's loss, and any other watered-down, causal

---

[5] Plaintiff's own Amended Complaint points to trading activity at prices below the last price at which the CIBC Defendants traded, by Defendant John Doe on April 29, 2016, May 2, 2016, and May 10, 2016. Assuming truth for present purposes, Plaintiff itself asserts intervening causes more closely tied to its own losses. While beyond the subject of this Motion, the CIBC Defendants note that Plaintiff ignores obvious factors that caused Concordia's stock to drop in the relevant period – much less disaggregate the losses caused by these factors from the conduct it attributes to defendants. For example, selloffs based on its auditor reexamining Concordia's earnings, a failed sale of the company, and a pessimistic earnings report.

connection is insufficient: "[t]o 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." *Dura*, 554 U.S. at 343.

In denying the motion to dismiss on the loss-causation point, the Court relied on the Second Circuit's decision in *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014). That case, however, involved an alleged false statement, not a market manipulation scheme that the Plaintiff alleged here.[6] *Carpenters'* holding assumed that "in general, so long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day." *Id*. at 234 *Carpenters* offers no reason to extend this assumption about uncorrected false statements to spoofing, especially where, in the context of spoofing, the canceling of an order constitutes the corrective disclosure.

In the same way that Plaintiff cannot establish a causal link between the CIBC Defendants' activity and any loss, Plaintiff's claim fails for the additional reason of lack of standing. To plead Article III standing, a plaintiff must allege that it suffered an injury-in-fact traceable to a defendant's challenged action. *See Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010). Just like Plaintiff's inability to establish causation between the CIBC Defendants' activity and its loss, Plaintiff likewise cannot trace its injury to the actions of the CIBC Defendants, for the same reasons articulated above.

Now that the Court has dismissed the common law conspiracy claim, Plaintiff must allege particular facts that show plausibly that the CIBC Defendants' activity, standing alone, caused the

---

[6] The Court also distinguished precedent relied on by the Defendants for the same reason. See Op. at 15.

economic harm suffered by Plaintiff.  The Amended Complaint falls far short of that standard. Accordingly, Plaintiff cannot establish that the CIBC Defendants purported spoofing activity in April 2016 caused Plaintiff's loss in August 2016 and thereafter.

<u>The CIBC Defendants trading activity occurred during an upward trending market</u>

Plaintiff alleges a market manipulation scheme during a "downward trending market," but the purported spoofing activity alleged against the CIBC Defendants (February 11, March 15, April 18, and April 25) occurred during a period of an *upward trending* market in Concordia's share price, which undercuts any argument that the CIBC Defendants acted with the requisite intent.

The Amended Complaint alleges the following purported spoofing activity against the CIBC Defendants (excluding the dates of March 24 and March 28, for reasons noted above):

- February 11, 2016; Best Bid $24.31 (100 shares); CIBC purchase at $24.35 -$24.38, Am. Compl., at ¶¶70-71;
- March 15, 2016; Best Bid $30.74 (200 shares); CIBC purchase at $30.67 - $30.74, Am. Compl., at ¶¶74-75;
- April 18, 2016; Best Bid $24.78 (200 shares); CIBC purchase at $24.76 - $24.79, Am. Compl., at ¶¶86-87;
- April 25, 2016; Best Bid $32.52 (300 shares); CIBC purchase $32.47 - $32.52, Am. Compl, at ¶¶90-91.

As plainly reflected above, the share price of Concordia fluctuated up and down during the CIBC Defendants' alleged spoofing activity, ending at or around $32.52 at the time of the last purported spoofing activity alleged. By Plaintiff's own allegation, this trading activity does not fit within its alleged spoofing allegations. As pled by Plaintiff, "the spoofer enters Baiting Orders to sell, which are intended to 'bait' or 'trick' investors into entering their own sell orders to minimize or avoid suffering losses in a *downward trending market*." Am. Compl., at ¶5 (emphasis added); *see id.* at ¶15 (describing how the market manipulation schemes "drove the price of Concordia's shares down *while* Harrington was selling its Concordia shares on U.S. Exchanges") (emphasis

12

added).[7] Here the CIBC Defendants engaged in trading activity in an *upward* trending market from February to April 2016, and did not engage in any trading activity (per the Amended Complaint) when Concordia's shares trended downward and Harrington began to sell in August 2016. Plaintiff has not alleged trading activity by the CIBC Defendants that fits within its stated theory of market manipulation, i.e., trading during a downward trending market. And Plaintiff's failure to explain price movements contrary to its theory further renders loss causation implausible. *See In re Manulife Financial Corp. Securities Litigation*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("While such a 'rebound' in a stock price after an alleged corrective disclosure does not make the allegation implausible per se, the Lead Plaintiffs' failure to address or explain this rebound renders their loss causation allegation implausible in this case.").

Along the same lines, Plaintiff does not allege any activity by the CIBC Defendants when the market actually trended *downward* in or around August 2016. *See* Am. Compl., at ¶14 (Chart). This fact – the lack of any additional activity alleged after April 2016 related to the CIBC Defendants – cuts strongly against any scienter. Plaintiff must allege facts establishing that the CIBC Defendants acted with a mental state "embracing intent to deceive, manipulate, or defraud," and the inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 324 (2007). Presumably, an entity that engaged in spoofing would seek to reap the benefits of their manipulation by purchasing stock at the depressed price, but Plaintiff does not allege the CIBC Defendants did so here. It defies logic and economic sense that

---

[7] While market manipulation encompasses artificially depressing or raising the price of a stock, Plaintiff here alleged a scheme to *depress* the price of Concordia's shares, which, as noted, the CIBC Defendants specific actions did not do. *See* Am. Compl. at 1 (noting the schemes were intended to "drive Concordia's share price downward"); *id*. at 2 (noting the scheme "put enormous downward pressure on Concordia's shares").

the CIBC Defendants would engage in spoofing on their own up to April 2016 but decline to capitalize on their purported misconduct when the market actually turned downward. This is akin to a bank robber who leaves the money behind – it doesn't make any sense.

> Concordia's stock price was higher at the end of the CIBC trading period than the point at which the alleged manipulation began

From a broader perspective, at the end of the CIBC trading period the Concordia stock price was $32.47.  This is 16% higher than the top price of $28.03, at which Plaintiff claims the scheme to depress Concordia's shares began. *Compare* Am. Compl., at ¶2 (alleging that "Defendants' pressure interfered with the natural forces of supply and demand and drove Concordia's share price downward in steady increments from $28.03 to $3.13").  Clearly, the CIBC Defendants' trading could not possible have had a residual effect on the Concordia stock drop from $28.03 down to the point at which it sold.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with respect to the CIBC Defendants.

By: */s/Sandra D. Hauser*
Sandra D. Hauser
Stephen J. Senderowitz
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6802
sandra.hauser@dentons.com
Stephen J. Senderowitz
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8141
stephen.senderowitz@dentons.com

*Attorneys for CIBC World Markets Corp. and CIBC World Markets Inc.*