UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,<br><br>       Plaintiff,<br><br>   - against-<br><br>CIBC WORLD MARKETS INC., BOFA SECURITIES, INC., MERRILL LYNCH CANADA INC., TD SECURITIES, INC., TD SECURITIES(USA) LLC, and JOHN DOES 1 THROUGH 10.<br><br>       Defendants. | Civil Action: 21-cv-00761 (LGS)<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

# TABLE OF CONTENTS

I. SUMMARY OF CLAIMS ................................................................................................ 1

II. JURISDICTION AND VENUE ..................................................................................... 4

III. THE PARTIES ............................................................................................................... 6

   A.   **Plaintiff** ................................................................................................................. 6

   B.   **Defendants** ............................................................................................................ 6

       1.   CIBC-Canada ................................................................................................ 6
       2.   The Merrill Defendants ............................................................................... 7
       3.   TD Defendants .............................................................................................. 8
       4.   John Doe Defendants .................................................................................... 9

   C.   **Non-Parties** ........................................................................................................ 10

IV. BACKGROUND ........................................................................................................... 10

   A.   **Concordia is an Interlisted Security** ............................................................... 10

   B.   **Defendants' "Direct Market Access" Trading That Has Been Made Available to Its Customers** ........................................................................................................... 11

   C.   **Defendants' Obligations with Respect to the DMA Systems They Offer to Their Customers** ........................................................................................................... 13

   D.   **The Mechanics of a Spoofing Scheme** ........................................................... 16

V. DEFENDANTS' UNLAWFUL SPOOFING SCHEMES ........................................ 18

   A.   **The Nature, Effect, and Mechanism of Defendants' Unlawful Schemes** ............... 18

   B.   **The Specifics of Defendants' Unlawful Manipulation of Concordia's Price** ........... 20

   C.   **The Data Provides Strong Circumstantial Evidence that Defendants' Knew or Recklessly Ignored That Their Conduct was Unlawful** ................................ 23

   D.   **Illustrative Examples of Defendants' Participation in Spoofing Episodes** ........... 30

       1.   Baiting Orders on the Canadian Markets ................................................... 30
           i.   Example Episode: April 12, 2016 - 10:44:45 .................................... 30
           ii.   Example Episode: April 13, 2016 - 09:58:27 ................................... 31
           i.   Example Episode: April 05, 2016 - 13:50:09 .................................... 32
       2.   Baiting Orders on U.S. Markets Through Instinet ..................................... 33
           i.   Example Episode: June 01, 2016 - 10:53:25 .................................... 33
           ii.   Example Episode: June 24, 2016 - 15:27:40 ................................... 34
       3.   Baiting Orders on the U.S. Markets ........................................................... 35
           i.   Example Episode: March 01, 2016 - 15:53:14 .................................. 35
           ii.   Example Episode: March 03, 2016 - 15:41:15 ................................. 36

   E.   **The Impact of Defendants' Unlawful Conduct** ............................................ 37

       1.   The Close-Proximity Effects of Spoofing Episodes .................................. 37
       2.   The Lingering Effects of Accumulated Spoofing Episodes ....................... 40

VI. HARRINGTON'S DILIGENT INVESTIGATION OF DEFENDANTS' MARKET MANIPULATION .......................................................................................................... 41

   A.   **Harrington's Initial Investigation** ................................................................. 41

**B.**    **Harrington's Uncovering of Evidence Sufficient to File Claims against Defendants** ............ **44**

**C.**    **Through Discovery, Harrington Has Uncovered Additional Evidence of Defendants Unlawful Conduct** ............................................................................................................... **46**

**VII. CLAIMS FOR RELIEF** .................................................................................................... **51**

**A.**    **First Claim for Relief for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rules 10b-5(a) and (c) Promulgated Thereunder Against CIBC-Canada, TD-Canada, TD-U.S., Merrill-U.S., ML-Canada, John Doe-Canada, and John Doe-U.S.** ......... **51**

    1.    Defendants Committed Deceptive or Manipulative Acts in Furtherance of Schemes to Defraud............51

    2.    Defendants Acted With Scienter ..............................................................................................52

    3.    Harrington's Damages Were Caused by a Manipulated Market .............................................57

    4.    Injury in Fact and Loss Causation ...........................................................................................58

    5.    Defendants used National Securities Exchanges and the Mails to Perpetrate their Market Manipulation Scheme ..............................................................................................................59

**B.**    **Second Claim for Relief for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934 Against CIBC-Canada, TD-U.S., TD-Canada, Merrill-U.S., ML-Canada,  John Doe-U.S. and John Doe-Canada** ....................................................................... **60**

**VIII. PRAYER FOR RELIEF** .................................................................................................. **61**

**IX. DEMAND FOR JURY TRIAL** ......................................................................................... **62**

Plaintiff Harrington Global Opportunity Fund Limited ("Harrington"), by and through its undersigned attorneys, Warshaw Burstein, LLP and Christian Smith and Jewell LLP, as and for its complaint against CIBC World Markets, Inc. ("CIBC-Canada"), BOFA Securities, Inc. ("Merrill-U.S."), Merrill Lynch Canada, Inc. ("ML-Canada"), TD Securities, Inc. ("TD-Canada"), TD Securities (USA) LLC ("TD-U.S."), and John Does 1 through 10 ("John Doe-Canada," "John Doe-U.S.") (collectively referred to as "Defendants"), alleges upon personal knowledge, information and belief, and an investigation by counsel as follows:

## I. SUMMARY OF CLAIMS

1.      During the period of January 27, 2016, to November 15, 2016 (the "Relevant Period"), Defendants employed an unlawful trading practice known as "spoofing" to manipulate the market price of Concordia International Corp. shares ("Concordia" or the "Company").

2.      During the Relevant Period, when Defendants were employing their unlawful spoofing schemes, Harrington sold approximately 9 million shares of Concordia stock on both the Canadian and U.S. stock exchanges ("Exchanges") at various times, in different amounts, and at artificially depressed prices ranging between $28.03 and $3.13.

3.      This lawsuit seeks to hold all Defendants primarily liable for (1) disseminating and/or effecting on either Canadian or U.S. Exchanges, their

customers' or own orders to **sell** Concordia shares ("Baiting Orders"), when they knew or recklessly ignored that these Baiting Orders had no legitimate economic purpose, were never intended to be executed, were intended to trick other market participants into selling their Concordia shares, and were being used in furtherance of a cross-border or domestic spoofing scheme to manipulate the market price of Concordia securities in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); and (2) disseminating and/or effecting either to intermediary U.S. "Broker-Dealers"[1] or U.S. Exchanges, their customers' or their own traders' Executing Orders to **buy** Concordia shares, when they knew or recklessly ignored that these Executing Orders were also part of a cross-border or domestic spoofing scheme that operated as a fraud on U.S. Exchanges in violation of Rule 10(b)-5(a) and (c), and Section 9(a)(2) of the Exchange Act *See SEC v U.S. Envtl., Inc.*, 155 F.3d 107 (2d Cir. 1998) and *Lorenzo v SEC*, 139 S. Ct. 1094, 1096 (2019)..

4.    Harrington is **not** seeking to hold Defendants "vicariously" or "secondarily" liable for either the conduct of their customers or their own violations of the U.S. and/or Canadian administrative rules and regulations that

---

[1] A Broker-Dealer is a person or firm in the business of buying and selling securities for its own account or on behalf of its customers.  When a Broker-Dealer acts as a broker (or agent) it executes orders on behalf of its clients, and when it acts as a dealer, or principal it trades for its own account.

were promulgated by the Securities and Exchange Commission ("SEC"), Financial

Industry Regulatory Authority ("FINRA"),[2] the Investment Industry Regulatory

Organization of Canada ("IIROC"),[3] or any other regulatory agency.  Rather,

Harrington seeks to hold Defendants primarily liable for their own conduct in

(1) following the directions of their customers to disseminate and/or effect Baiting

Orders on Canadian Exchanges or failing to supervise the dissemination and/or

effectuation of their customers' Baiting Orders on Canadian Exchanges, when they

knew or recklessly ignored that those orders were intended to defraud the market

and (2) disseminating and/or effecting Baiting and Executing Orders to U.S.

Broker-Dealers on U.S. Exchanges, when they also knew or recklessly ignored that

those orders were part of a scheme, device, or course of conduct to manipulate the

market price of Concordia securities.

---

[2] FINRA is a private American corporation that acts as a self-regulatory organization which regulates member brokerage firms and exchange markets. FINRA is the successor to the National Association of Securities Dealers, Inc. as well as the member regulation, enforcement, and arbitration operations of the New York Stock Exchange.  The US government agency which acts as the ultimate regulator of the US securities industry, including FINRA, is the US Securities and Exchange Commission.

[3] IIROC is a non-profit, national self-regulatory organization. Established through the merger of the Investment Dealers Association of Canada and Market Regulation Services Inc. on June 1, 2008, IIROC oversees all investment dealers and trading activity on debt and equity markets in Canada.

## II. <u>JURISDICTION AND VENUE</u>

5.     This Court has jurisdiction over the subject matter of this action

pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]; and [28 U.S.C.

§ 1331].

6.     This court has specific personal jurisdiction over CIBC-Canada, TD-

Canada and ML-Canada (the "Canadian Defendants") because each: (1) conducted

and disseminated and/or effected to this District a substantial part of the unlawful,

"suit-related" trading activities being asserted in this complaint, including

employing high speed computer systems to route orders and execute trades of

Concordia shares throughout the U.S. including in New York, on Exchanges that

are located in the U.S.; and (2) engaged in suit-related conduct on Canadian

Exchanges with the intent and effect of manipulating the price of Concordia shares

which were listed and traded on U.S. Exchanges including the NASDAQ Stock

Market ("NASDAQ").

7.     The Canadian Defendants engaged in <u>cross-border</u> spoofing schemes

by—either pursuant to their customers' directions or for their own principal

accounts—disseminating and/or effecting thousands of Baiting Orders on the

Toronto Stock Exchange ("TSX") and disseminating and/or effecting Executing

Orders to U.S. Broker-Dealers including Virtu Financial DB LLC ("Virtu"),

Instinet, LLC ("Instinet"), Citadel Securities LLC ("Citadel"), and KCG Americas

LLC ("Knight") in furtherance of the scheme to manipulate Concordia's share price.  Orders that were executed by intermediary Broker-Dealers pursuant to the instructions of the Canadian Defendants were then settled and cleared, exchanging stock and money, in the Canadian Defendants' U.S. clearing accounts located at the Depository Trust Clearing Corporation ("DTCC")[4].

8.     This court also has specific personal jurisdiction over Defendants TD-U.S. and Merrill-U.S. (the "U.S. Defendants") because each maintains business offices and has conducted a substantial part of the unlawful suit-related trading activities being asserted in this District.  Indeed, the conduct of Defendants was in furtherance of the spoofing schemes that were intended to manipulate the share price of Concordia shares that were traded on the U.S. Exchanges.

9.     This court also has general personal jurisdiction over the U.S. Defendants because each maintains its principal place of business in New York and trades on Exchanges that are located in this district.

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, in that many of the acts,

---

[4]  The DTCC is the intermediary between buyers and sellers of securities.  "Clearing" is the process of arranging for the transfer of money and securities.  "Settlement" is the actual exchange of securities and money.  The Canadian Defendants were not members of U.S. Exchanges and, therefore were not permitted to directly place or execute trades on U.S. Exchanges.  However, each of the Canadian Defendants had trading accounts at the DTCC, where the clearing and settlement of their Concordia trades occurred.

transactions and occurrences alleged herein occurred in this District.  Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce including the mails and the facility of a national securities exchange located in this district in connection with the conduct alleged herein.  Where claims involve securities listed or traded on domestic stock exchanges, Section 27 of the Exchange Act provides for personal jurisdiction over those parties who trade on these Exchanges.

## III. **THE PARTIES**

### A.    **Plaintiff**

11.    Plaintiff Harrington is a Bermuda based investment company that is wholly owned by its unit holders.  It is managed by Harrington Global Limited, a fund management company.  During the Relevant Period, Harrington sold approximately 4.9 million shares of Concordia on the U.S. markets and approximately 4.1 million shares on the Canadian markets.

### B.    **Defendants[5]**

#### 1. **CIBC-Canada**

12.    Defendant CIBC-Canada is headquartered at 161 Bay Street, Toronto, Ontario, Canada.  It is a registered broker dealer that primarily executes securities

---

[5] Whenever reference is made to any act, device, contrivance, or scheme to manipulate Concordia securities by any of the Defendants, the allegation is intended to also include the

transactions for its customers on the various Exchanges in Canada, including the TSX, and routes to intermediary Broker-Dealers in the U.S orders to be executed for their customers, which are cleared and settled in their account numbered 5030 at the DTCC.  Although CIBC-Canada cannot directly execute an order on a U.S. Exchange because it is not a member of any U.S. Exchange, it <u>can</u> and <u>does</u> clear and settle trades of its customers that are executed by intermediary Broker-Dealers on U.S. Exchanges.

13.     Defendant CIBC-Canada conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Concordia shares throughout the U.S., including in New York, on stock exchanges in the U.S. through intermediary U.S. Broker-Dealers.

## 2. **The Merrill Defendants**

14.     Defendant Merrill-U.S.—formerly known as Bank of America Merrill Lynch—maintains its principal place of business in New York at One Bryant Park, New York, New York.  Merrill-U.S. is a registered broker dealer that executes

---

subsidiaries, affiliates, sister companies, agents and representatives of that Defendant, whose identities and specific involvement in this market manipulation case are unknown by Harrington at this time.  Only after discovery is taken will their identities and involvement become known.

securities transactions on the various exchanges in the U.S., including the NASDAQ, for its own proprietary account and the accounts of its customers.

15.     Defendant ML-Canada has its headquarters located at 181 Bay Street, Toronto, Ontario, Canada.  ML-Canada is a registered broker dealer that executes securities transactions on the various exchanges in Canada including the TSX, for its own proprietary account and the accounts of its customers.

16.     Defendants Merrill-U.S. and ML-Canada conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Concordia shares throughout the U.S., including on stock exchanges in New York.

### 3.  **TD Defendants**

17.     Defendant TD-U.S. maintains its principal place of business in New York at 31 W 52nd Street, New York, NY.  TD-U.S. is a registered broker dealer that executes securities transactions on the various exchanges in the U.S. including NASDAQ, for its own proprietary account and the accounts of its customers.

18.     Defendant TD-Canada is located at 66 Wellington Street West Toronto, Ontario, Canada.  TD-Canada is a registered broker dealer that (1) submits orders and executes securities transactions on the various exchanges in Canada including the TSX, for the accounts of its customers and to a smaller

extent, its own proprietary accounts and (2) routes to intermediary Broker-Dealers in the U.S. orders to be executed for the accounts of its customers and to a smaller extent, its own proprietary accounts —which are cleared and settled in their accounts numbered 5005, 5021, 5036 and 5062 at the DTCC.  Although TD-Canada cannot directly execute an order on a U.S. exchange because it is not a member of any U.S. exchange, it <u>can</u> and <u>does</u> clear and settle trades of its customers that are executed by intermediary Broker-Dealers on U.S. exchanges.

19.    Defendants TD-Canada and TD-U.S. conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Concordia shares throughout the U.S., including in New York, on stock exchanges in the U.S. through intermediary U.S. Broker-Dealers.

### 4. **John Doe Defendants**

20.    Defendants John Doe-Canada and John Doe-U.S. are entities, including subsidiaries, parents, affiliates, and sister companies of the Defendants whose identities are currently unknown, that unlawfully participated in the scheme to manipulate the trading and market price of Concordia securities.

21.    Defendants John Doe-Canada and John Doe-U.S. conducted continuous activity in New York state, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute

trades of Concordia shares throughout the U.S., including in New York, on exchanges in the U.S.

## C.    <u>Non-Parties</u>

22.    Concordia, is currently trading under the name ADVANZ Pharma.  It is a diverse healthcare company, focusing on legacy pharmaceutical products and "orphan drugs."  Concordia was incorporated in 2005 under the laws of Ontario, Canada.  Concordia started trading on the TSX exchange in 2013 and NASDAQ in 2015.  The Company has marketed its portfolio of products in 100 countries including the United States and Canada.  During the Relevant Period, the Company had approximately 51 million shares issued and outstanding, with approximately 40 million of those shares authorized for interlisted public trading.

23.    Non-Parties John Doe-Canada and John Doe-U.S. are entities, including Defendants' customers and subsidiaries, parents, affiliates, and sister companies of Defendants' customers whose identities are currently unknown, that unlawfully participated in the scheme to manipulate the trading and market price of Concordia securities.

## IV. <u>BACKGROUND</u>

## A. <u>Concordia is an Interlisted Security</u>

24.    Since 2015, Concordia has been an interlisted security with its shares listed and traded on both the TSX in Canada and NASDAQ in the United States.

25.     The trading of interlisted securities such as Concordia is facilitated by means of a security identifier known as a CUSIP (Committee on Uniform Securities Identification).  Concordia's CUSIP was 20653P102.  Trades on both the Canadian and U.S. exchanges are electronically executed and settled through the CUSIP number of the security.

26.     A share of Concordia's stock that is traded in the United States is exactly the same share that is traded in Canada.  Because shares of interlisted securities, like Concordia, have identical CUSIP numbers and are fungible in Canada and the United States, they are netted out in the cross-border clearing and settlement process.

27.     Purchasers and sellers of interlisted securities—unless specifically requested—have no control over where their Broker-Dealer disseminates, effects, routes or executes their orders.  As a result of the seamless interconnection between the Canadian and U.S. markets for interlisted securities, trades in either country's markets directly and immediately affect the trading price in the other country's market.

**B.     Defendants' "Direct Market Access" Trading That Has Been Made Available to Its Customers**

28.     Customers who are not members of an Exchange are prohibited from placing orders directly onto that exchange in their own name.  Defendants, acting

in their capacity as Brokers, place orders and execute trades on their customers'
behalf—by directly placing their customer's orders on Exchanges pursuant to their
customer's instructions with Direct Market Access ("DMA") under SEC Rule
15c3-5, the Market Access Rule[6] (U.S. trades) or Direct Electronic Access
("DEA") under Universal Market Integrity Rule ("UMIR") Direct Electronic
Access and Routing Arrangements rule 7.13 (Canadian Trades) through which
their customers can enter orders and/or trades which Defendants then effectuate
and disseminate.

29.     As a matter of general business practice, Defendants provide their
customers with access to the Exchanges through DMA systems.  Defendants are
paid transaction fees for completed customer trades.  When Defendants' customers
use the DMA system, they do not place orders on Exchanges under their own
names; rather, these orders appear to the world as coming from the Defendants—
because they bear the Defendant's Broker-Dealer MPIDs.

---

[6] Rule 15c3-5 recognizes two types of market access arrangements whereby a broker-dealer
allows one of its customers to use its marketplace participant identifier ("MPID") to
electronically access and enter orders into a market.  In a "direct market access" arrangement, the
customer's orders flow though the broker-dealer's trading systems, such that the pre- and post-
trade processes are administered and controlled solely by the broker-dealer whose MPID is used.
In a "sponsored access" arrangement, the customer routes the orders directly to the market,
wholly bypassing the sponsoring broker-dealer's systems.  Under either type of market access
arrangement, the Broker-Dealers continue to have Gate-Keeper responsibilities.

30.    Defendants may also engage in principal trading of securities, such as Concordia, for their own proprietary purposes.

**C.    Defendants' Obligations with Respect to the DMA Systems They Offer to Their Customers**

31.    Broker-Dealers in both Canada and the U.S. are considered by their corresponding regulatory agencies as the "Gate Keepers" of the integrity of trading on the securities exchanges and the stability of the financial system.

32.    When Broker-Dealers such as Defendants either provide DMA or DEA systems access to customers, it is the Broker-Dealers' continuing responsibility to ensure that the customers' order flow—which the Broker-Dealers are disseminating and/or effecting—is in compliance with all applicable rules, regulations and laws.

33.    Under the SEC Market Access Rule 15c3-5 and the IIROC UMIR 7.13, Broker-Dealers are required to establish, document, and maintain a system of risk management controls and supervisory procedures that are reasonably designed to manage the financial, regulatory, other risks of the brokerage industry, and prevent the disruption of a fair and orderly market.

34.    Under FINRA Rule 3110, brokerage firms are also required to "establish and maintain a system to supervise the activity of each associated person

(i.e., customer or internal trading desk) that are reasonably designed to achieve compliance with applicable securities laws and regulations[.]"

35.     In Canada, while there is no national securities regulator comparable to the SEC, all exchanges and Alternative Trading Systems ("ATS") must be members of IIROC and adhere to UMIR.  These rules mirror the SEC and FINRA rules that require that a Broker-Dealer implement and maintain written policies and procedures to be followed by their officers, employees, and customers.

36.     Specifically, UMIR 7.1 requires Broker-Dealers such as the Canadian Defendants to supervise all of their customers' trading activities through automated order systems like the DMA or DEA systems.  Broker-Dealers—such as CIBC-Canada, TD-Canada and ML-Canada, who provides market access to their customers to use its facilities and systems—are held to the highest level of oversight and control and like CIBC-Canada will be sanctioned by IIROC and FINRA for failing to supervise the trading activities of their customers.  *See IIROC v CIBC* Enforcement Notice 22-0049-April 6, 2022.

37.     As registered Broker-Dealers, the U.S. Defendants were also required, pursuant to FINRA Rules 5210, Supplementary Material .01; and NASDAQ Exchange Rule 575, Disruptive Practices Prohibited, to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm.  Indeed, during the

Relevant Period each Defendant filed an "Annual Certification of Compliance and Supervisory Processes," pursuant to FINRA Report 3130, in which they admitted that they (1) established, maintained and reviewed policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations; (2) modified such policies and procedures as business, regulatory and legislative changes and events dictate; and (3) tested the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.

38.     Defendants acknowledged and accepted their role as "Gate Keepers" who are legally obligated to monitor their customers' order flow and prevent— rather than give effect to—any unlawful trading practices, such as spoofing, that their customers attempt to carry out under the shield of Defendants' MPIDs.  In fact, each Defendant has compliance procedures which explicitly confirm and commit to honor their monitoring obligations.  Defendants knew what their Gate-Keeper responsibilities were and yet, have only paid "lip service" to enforcing these responsibilities.

**D.**     **The Mechanics of a Spoofing Scheme**

39.     Spoofing is an insidious form of market manipulation that can

profoundly undermine the integrity and stability of securities markets.  A spoofing

scheme is typically effected by Broker-Dealers for either their own accounts or

their customers' accounts, by utilizing high frequency trading computer systems to

maximize the speed and frequency of their market access and execution of their

trading strategies.

40.     The objective of a spoofing scheme is to distort the publicly available

information concerning the actual supply and demand of a company's securities.

This objective is accomplished by the dissemination and/or effectuation of tens of

thousands of Baiting Orders in the Market Order book that have no legitimate

economic purpose and are never intended to be executed.  The purpose of these

Baiting Orders is to create the illusion of market interest in a security at an

artificial price in order to cause other market participants to follow either the

selling or buying trend created by the Baiting Orders.

41.     If the spoofer's goal is to drive the price down, the spoofer will flood

the Market Order Book[7] with Baiting Orders to sell the targeted company's

---

[7]  A "Market Order Book" is an electronic list of buy and sell orders for specific securities and other financial instruments that is organized by price levels and lists the number of shares being bid or offered at each price point.  The Market Order Book reflects whether the market price for the security is moving upwards or downwards and is visible to every trader on the exchange.  *See* Investopedia, Order Book.

securities.  These Baiting Orders are intended to "trick" or incite investors into entering their own sell orders, to minimize their own trading losses, creating an artificially induced downward trending market.

42.     Shortly after the spoofer disseminates and/or effects the Baiting Orders to sell, the spoofer disseminates and/or effects Executing Orders to buy on the opposite side of the Market Order Book.  These Executing Orders to buy are intended to be executed at the manipulated lower prices caused by the Baiting Orders to sell.

43.     Immediately after placing in the Market Order Book an Executing Order to buy, the spoofer cancels all of the Baiting Orders to sell, which completes the spoofing cycle (and serves as a clear indication that the spoofer never intended those orders to be executed, and that those orders had no purpose other than to manipulate the price of the security).

44.     If the spoofer's goal is to drive the price up, the process is similar except that the spoofer places Baiting Orders to buy and Executing Orders to sell at the manipulated higher price.

45.     Spoofing schemes, such as the above, can be carried out multiple times during a trading day and continuously repeated throughout a protracted trading period.

## V. DEFENDANTS' UNLAWFUL SPOOFING SCHEMES

### A.    The Nature, Effect, and Mechanism of Defendants' Unlawful Schemes

46.    The spoofing scheme employed by Defendants injected false and misleading information into the marketplace in the form of Baiting Orders that had no legitimate financial purpose and were never intended to be executed.  These Baiting Orders were intended to interfere with the forces of supply and demand and drive Concordia's share price downward in order to permit Defendants and/or their customers to purchase Concordia shares at lower prices.

47.    Defendants' spoofing scheme was accomplished through the following three stages:

1) Following the instructions of either their customers or their own proprietary traders, Defendants flooded the Market Order Books of the Canadian and U.S. Exchanges by disseminating and/or effecting large quantities of Baiting Orders to sell.  These orders had no legitimate purpose and when placed, were never intended to be executed.  The sole purpose for the dissemination and/or effectuation of these Baiting Orders to sell was to deceive and mislead other market participants into believing that the market price of Concordia's securities was moving downward based on the natural forces of supply and demand;

2)  Almost simultaneously, when the Baiting Orders to sell were being
    disseminated and/or effected in the Market Order Book, Defendants
    CIBC-Canada and TD-Canada disseminated and/or effected their
    Executing Orders to U.S. intermediary Broker-Dealers and Defendant
    Merrill-U.S. directly placed Executing Orders on the opposite side of the
    Market Order Book in the U.S. to purchase Concordia shares at the lower
    stock prices created by the downward manipulation of their Baiting
    Orders to sell; and

3)  Immediately after the completion of their Executing Orders to buy
    Concordia shares at the lower prices, Defendants cancelled and removed
    all of their Baiting Orders to sell from the Market Order Books.

48.     Once the three stages of this spoofing cycle were completed, the
pattern was repeated by Defendants multiple times a day and continuously
throughout the Relevant Period.

49.     The continuous placement and cancellation of thousands of Baiting
Orders to sell by Defendants was not in furtherance of any legitimate purpose.
Rather, this activity was intended to send a false and misleading pricing signal to
the market in order to trick or bait market participants, like Harrington, into
executing their own sell orders.  This operated as a fraud on the market and created
a "pile-on" effect which drove down Concordia's share price even further, thereby

enabling all Defendants to purchase Concordia's shares at artificially manipulated lower prices for either their customers' accounts or their own proprietary accounts and resulted in Harrington selling its shares at artificially low prices.

**B.** **The Specifics of Defendants' Unlawful Manipulation of Concordia's Price**

50.    During specific periods of time in the Relevant Period—reflecting the data available to Plaintiffs as a result of what is in the public domain, what Harrington has received from certain nonparties, and what Defendants were willing to produce in this action under the claims previously pled (the "Available Period")—Defendants disseminated and/or effected at the direction of their customers and/or own traders Baiting Orders totaling at least 138,678,121 shares on the U.S. and Canadian Exchanges that they knew had no legitimate economic purpose and were never intended to be executed.[8]  By the placement of these Baiting Orders, Defendants intended to send a false and misleading pricing signal to the marketplace that interfered with Concordia's share price being determined by the natural forces of supply and demand.

---

[8] The Available Period is shorter than the Relevant Period and the data produced by Defendants and third parties during the Available Period reflects only a small portion of the total order flow in Concordia's shares during the Relevant Period.  For these reasons, it is highly likely that upon complete discovery from Defendants and their Broker-Dealers, the volume of shares in the Baiting Orders will be underlined considerably more than 138,678,121.

51.     The Baiting Orders were disseminated and/or effected by CIBC-Canada, TD-Canada and ML-Canada on the Canadian Exchanges pursuant to the directions of their customers, with the knowledge that these Baiting Orders were part of a spoofing scheme that was intended to manipulate the market price of Concordia's securities.

52.     Almost simultaneously with the placement of these Baiting Orders, Defendants CIBC-Canada and TD-Canada—also at the direction of their customers—disseminated and/or effected Executing Orders to buy through intermediary U.S. Broker-Dealers including Virtu, Knight, Instinet, and Citadel. Defendants CIBC-Canada and TD- Canada disseminated and/or effected these Executing Orders with the knowledge that these orders were effecting a fraud on the market.  As Canadian Broker-Dealers they were not members of any U.S. Exchanges and therefore could not directly place orders on U.S. Exchanges without intermediary Broker-Dealer representation.  As a U.S. Broker-Dealer and member of the various U.S. Exchanges and trading venues, Merrill-U.S. was lawfully permitted to place orders to buy directly onto U.S. Exchanges, and did place Executing Orders at the direction of their customers which they knew were part and in furtherance of a scheme or device to manipulate the market price of Concordia shares.

53.    Defendants' Baiting Orders led to a substantial sell-side imbalance or "pile-on" effect in Defendants' order flow, which intentionally created artificial selling pressure in order to induce other market participants to submit additional sell orders and artificially drive down the price of Concordia shares.

54.    The Baiting Orders successfully induced the entry of sell orders from other market participants, driving down the price of Concordia shares by 0.8652% on average.  During the Available Period, Defendants—on behalf of themselves and/or their customers—executed Executing Orders to purchase a total of 578,530 shares at these depressed prices below the prevailing best offer prior to entry of the Baiting Orders.  Shortly thereafter, Defendants cancelled all of the fictitious Baiting Orders.

55.    Defendants' Baiting Orders were <u>intended</u> to function as part of a scheme to defraud the market in Concordia securities rather than be executed, and can be reasonably inferred from *inter alia*:  (1) the short time period between the continuous and repeated placement and cancellation of the Baiting Orders; (2) the concentration of cancelled Baiting Orders during the limited period when each spoofing event occurred; (3) the average size of the Baiting Orders that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; (4) the ratio of cancelled Baiting Orders to sell compared to the executed

bona-fide orders to buy that existed; and (5) the reoccurrence of the same trading patterns.

56.     For each Defendant, the following table lists the share volume of Baiting Orders which were subsequently cancelled, share volume of Executing Purchases which were executed at depressed prices, and the resulting price decline in Concordia shares during the Available Period:

| Defendant | No. of Episodes | Baiting Orders | Executing Purchases | Average Price Decline |
|---|---|---|---|---|
| CIBC World Markets and Affiliates | 308 | 53,197,210 | 64,118 | -0.731% |
| Merrill Lynch and Affiliates | 565 | 85,133,679 | 474,612 | -0.8942% |
| TD Securities and Affiliates | 85 | 347,232 | 39,800 | -1.159% |

## C.   The Data Provides Strong Circumstantial Evidence that Defendants' Knew or Recklessly Ignored That Their Conduct was Unlawful

57.     As set forth below, the Available Period data demonstrates that Defendants knowingly participated in spoofing schemes that were intended to— and in fact did—deceive, manipulate or defraud the market for Concordia shares and participants in that market, including Plaintiff.

58.     *First*, Defendants submitted Baiting Orders totaling, on average, 144,758 sell-side shares per spoofing episode which were subsequently cancelled. By contrast, over those periods, Defendants submitted orders for only 2,368 sell-

side shares, on average, which were subsequently cancelled—a difference of

**6,013%**.  Meanwhile, Defendants' purchase of shares at prices artificially

depressed by the spoofing episodes far exceeded their behavior in ordinary market

activity.

59.    *Second*, Defendants purchased far more shares at depressed prices

during the minutes following the spoofing window.  Specifically, over the five

minutes after the spoofing windows, Defendants purchased an average of 469

shares compared to 5 shares over these same windows following non-spoofing

episodes.

60.    *Third*, each Defendant specifically designed and implemented

algorithmic trading programs that executed the spoofing schemes.  Defendants'

algorithms were programmed to—and did, during the Relevant Period—generate

trading patterns that involved the placement and cancellation on the U.S. and

Canadian markets of tens of millions of Baiting Orders to sell that were never

intended to be executed.  Moreover, Defendants—each of which is a sophisticated

entity which use cutting edge technology—closely monitored, modeled, and

analyzed the performance, impact, and effects of their algorithmic trading program

throughout the Relevant Period, including the spoofing pattern which the algorithm

executed again and again on Concordia stock during the Relevant Period with

similar effects each time.

61.     *Fourth*, each Defendant's trading activities were approved by corporate officials sufficiently knowledgeable about the trading practices of each Defendant such that each Defendant knew or recklessly ignored that they were engaging in illegal spoofing.

62.     *Fifth*, as registered Broker-Dealers, Defendants knew and/or were required to know that it was unlawful to place Baiting Orders to sell that were never intended to be executed in order to trick market participants into selling shares of Concordia stock.

63.     *Sixth*, as discussed above, pursuant to applicable regulations (such as applicable FINRA rules) and their own compliance manuals, Defendants were required to have internal policies, procedures and systems that detected and prohibited manipulative or fraudulent trading devices or schemes.

64.     Given Defendants' obligation to monitor, detect, and prevent manipulative or fraudulent trading and their FINRA Report 3130s in which they stated that they did, in fact, do so, Defendants either intentionally manipulated the market through their spoofing scheme, or were highly reckless in allowing such behavior to occur.

65.     *Seventh*, Defendants' Baiting Orders were highly imbalanced to the sell side.  Despite these imbalanced positions, Defendants often did not sell any shares of Concordia after posting Baiting Orders.  This is consistent with the

fictitious nature of the Baiting Orders and indicates that Defendants never intended to execute any of its numerous Baiting Orders; instead, Defendants placed the Baiting Orders in order to create artificial selling pressure and induce other market participants to submit additional sell orders, and thus artificially drive down the price of Concordia shares.  This behavior is contrary to the behavior of an ordinary trader who buys when it thinks the price of a security is likely to go higher and sells when it thinks the price of a security will go lower, and thus rarely, if ever, develops such an imbalance in orders that never are executed.

66.     Among the spoofing episodes, during the Baiting Period preceding the execution of Executing Purchases, Defendants submitted new sell-side orders for an average of 194,064 shares per Executing Purchase.  During the same time window as the Baiting Period prior to non-spoofed purchases, they submitted new sell-side orders for an average of 101,399 shares per purchase.  Among the spoofing episodes, during the Cancellation Period following the Executing Purchases, Defendants cancelled an average of 179,048 shares in sell-side orders, or 92.26% of the created volume of 194,064 sell-side shares.  During the same time window as the Cancellation Period following non-spoofed purchases, they cancelled an average of 74,491 shares in sell-side orders, or 73.46% of the created volume of 101,399 sell-side shares.  That is, on average, there were 91% more sell-side shares created in the Baiting Period prior to Executing Purchases compared to

non-spoofed purchases, and 140% more sell-side shares cancelled in the Cancellation Period following Executing Purchases compared to non-spoofed purchases.

67.     In other words, when spoofing the market, Defendants injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (91% higher); (2) the cancellation of that order flow (140% higher); and (3) the greater share of cancelled sell-side order flow (92.26% vs. 73.46%).  This shows that Defendants repeatedly and intentionally manipulated the market.

68.     *Eighth*, the short time period between the placement and cancellation of their Baiting Orders is further indicative of scienter.  During each Spoofing Episode, Defendants placed and then cancelled the Baiting Orders within seconds and even milliseconds.  This practice, which occurred thousands of times over the Relevant Period, indicates that Defendants never intended to execute the Baiting Orders.

69.     *Ninth*, the concentration of cancelled Baiting Orders during the limited period when each spoofing event occurred is also indicative of scienter. During each Spoofing Episode, Defendants cancelled all of the Baiting Orders, sometimes amounting to tens of thousands of Baiting Orders, in a matter of

seconds and sometimes milliseconds, all of which had been placed by Defendants mere seconds earlier.

70.     *Tenth*, the size of the Baiting Orders that were cancelled—in comparison to the size of bona-fide sell-side orders that were executed by Defendants—is also indicative of scienter.  During each Spoofing Episode, Defendants placed and subsequently cancelled a median of 112,334 shares in Baiting Orders while executing a median of 0 sell-side orders.  The stark contrast between the share volume of Baiting Orders and executed sell-side orders during each Spoofing Episode indicates that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices rather than making a genuine attempt to sell Concordia shares.

71.     *Eleventh*, the ratio of cancelled Baiting Orders compared to executed bona-fide orders to sell is thus also indicative of scienter.  In the median Spoofing Episode, Defendants placed and subsequently cancelled 112,334 sell-side shares in Baiting Orders, while in contrast executing 0 sell-side orders.  A sell-side cancellation rate of 100% is a strong indication that Defendants never intended to execute those Baiting Orders.

72.     *Twelfth*, the size of executed sell-side orders compared to Executing Purchases by Defendants is also indicative of scienter.  In the median Spoofing Episode, Defendants executed 199 shares in Executing Purchases while in contrast

executing 0 sell-side orders.  The stark contrast between the share volume of Executing Purchases and sell-side orders further indicates that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices at which to place Executing Purchases at favorable prices.

73.    *Thirteenth*, the ratio of executed sell-side orders compared to Executing Purchases by Defendants is thus also indicative of scienter.  In the median Spoofing Episode, Defendants executed 199 shares of Executing Purchases while not executing any sell-side orders.  A ratio of 199-to-0 further indicates that Defendants never intended to execute its Baiting Orders to sell.

74.    *Fourteenth*, Defendants carried out thousands of Spoofing Episodes over the Relevant Period, and often multiple episodes per trading day.  The repetition of this pattern of placing fictitious Baiting Orders which created an artificial price, Executing Purchases at the artificial price—and then cancelling all of the Baiting Orders—is indicative of scienter.

75.    *Fifteenth*, Defendants' behavior was inconsistent with bona fide market-making.  Over Cancellation Periods, Defendants cancelled 132% of the sell-side orders created during Baiting Periods, but only 89% of the buy-side orders created during Baiting Periods.  This asymmetry in order cancellation rates is inconsistent with bona fide market-making, which involve purchases and sales in

roughly comparable amounts to provide liquidity to customers or other Broker-Dealers.

76.     Finally, Defendants had a strong motive to spoof the shares of Concordia stock.  By posting the fictitious Baiting Orders, Defendants (1) saved hundreds of thousands of dollars in execution costs alone compared to purchasing shares of Concordia at the prevailing best offer and (2) yielded at least millions of dollars in ill-gotten gains.

77.     The following Sections describe illustrative examples of the hundreds of manipulative spoofing episodes identified over the Relevant Period.

**D.     Illustrative Examples of Defendants' Participation in Spoofing Episodes**

**1.  Baiting Orders on the Canadian Markets**

**(a) CIBC-Canada and its Affiliates**

*i.    Example Episode: April 12, 2016 - 10:44:45*

78.     On April 12, 2016 at 10:44:45, the best bid and offer for Concordia on the U.S. markets were $25.56 and $25.64, respectively.  From 10:44:45 to 10:49:45, Defendant CIBC-Canada and its affiliates placed 154,900 shares of Baiting Orders on the Canadian Markets at prices ranging from CAD $33.10 to CAD $32.94 per share.  Over this Baiting Period CIBC-Canada and its affiliates placed 50% more sell-side orders than buy-side orders—a significant sell-side imbalance.

79.     Between 10:49:45 and 10:54:45, CIBC-Canada and its affiliates did not sell any shares of Concordia, consistent with the fictitious nature of the Baiting Orders.  The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:49:45 CIBC-Canada and its affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 100 shares on the U.S. markets, at a price of $25.55 per share, which was below the prevailing best offer of $25.64 per share.

80.     CIBC-Canada and its affiliates began to cancel these Baiting Orders within 1 second.  By 10:54:45 CIBC-Canada and its affiliates had cancelled all their Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by CIBC-Canada and its affiliates.

   ii.   *Example Episode: April 13, 2016 - 09:58:27*

81.     On April 13, 2016 at 09:58:27, the best bid and offer for Concordia on the U.S. markets were $24.47 and $24.57, respectively.  From 09:58:27 to 10:03:27, CIBC-Canada and its affiliates placed 190,400 shares of Baiting Orders at prices ranging from CAD $31.48 to CAD $31.09 per share.  Over this Baiting Period, CIBC-Canada and its affiliates placed 54% more sell-side orders than buy-side orders—a significant sell-side imbalance.

82.     Between 10:03:27 and 10:08:27, CIBC-Canada and its affiliates did not sell any shares of Concordia, consistent with the fictitious nature of the Baiting Orders.  The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:03:27 CIBC-Canada and its affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 200 shares, at a price of $24.36 per share, which was below the prevailing best offer of $24.57 per share.

83.     CIBC-Canada and its affiliates began to cancel these Baiting Orders within 1 second.  By 10:08:27 CIBC-Canada and its affiliates had cancelled all their Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by CIBC-Canada and its affiliates.

### (b) TD-Canada, TD-U.S., and their Affiliates

#### i.   *Example Episode: April 05, 2016 - 13:50:09*

84.     On April 28, 2016 at 10:48:49, the best bid and offer for Concordia on the U.S. markets were $30.80 and $30.88, respectively. From 10:48:49 to 10:53:49, TD-Canada, TD-U.S., and their affiliates placed 3,400 shares of Baiting Orders at prices ranging from CAD $41.50 to CAD $40.20 per share.  Over this Baiting Period, TD-Canada, TD-U.S., and their affiliates placed 728% more sell-side orders than buy-side orders—a significant sell-side imbalance.

85.      Between 10:53:49 and 10:58:49, TD-Canada, TD-U.S., and their affiliates did not sell any shares of Concordia, consistent with the fictitious nature of the Baiting Orders.  The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:53:49 TD-Canada, TD-U.S., and their affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 100 shares, at a price of $30.71 per share, which was below the prevailing best offer of $30.88 per share.

86.      TD-Canada, TD-U.S., and their affiliates began to cancel these Baiting Orders within 1 seconds.  By 10:58:49 TD-Canada, TD-U.S., and their affiliates had cancelled all of its Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by TD-Canada, TD-U.S., and their affiliates.

## 2. Baiting Orders on U.S. Markets Through Instinet

### (a) CIBC-Canada and its Affiliates

#### i. *Example Episode: June 01, 2016 - 10:53:25*

87.      On June 01, 2016 at 10:53:25, the best bid and offer for Concordia were $30.64 and $30.69, respectively.  From 10:53:25 to 10:58:25, CIBC-Canada and its affiliates placed 600 shares of Baiting Orders on the U.S. Markets through Instinet LLC at prices ranging from $30.67 to $30.66 per share.  Over this Baiting

Period, CIBC-Canada and its affiliates placed 1,100% more sell-side orders than buy-side orders—a significant sell-side imbalance.

88.     Between 10:58:25 and 11:03:25, CIBC-Canada and its affiliates did not sell any shares of Concordia, consistent with the fictitious nature of the Baiting Orders. The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 10:58:25 CIBC-Canada and its affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 100 shares, at a price of $30.65 per share, which was below the prevailing best offer of $30.69 per share.

89.     CIBC-Canada and its affiliates began to cancel these Baiting Orders within 68 milliseconds of its Executing Purchases.  By 11:03:25 CIBC-Canada and its affiliates had cancelled all their Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by CIBC-Canada and its affiliates.

    *ii.*     *Example Episode: June 24, 2016 - 15:27:40*

90.     On June 24, 2016 at 15:27:40, the best bid and offer for Concordia were $21.37 and $21.39, respectively.  From 15:27:40 to 15:32:40 CIBC-Canada and its affiliates placed 28,100 shares of Baiting Orders on the U.S. Markets through Instinet LLC at prices ranging from $21.45 to $21.39 per share.  Over this

Baiting Period, CIBC-Canada and its affiliates placed 69,558% more sell-side orders than buy-side orders—a significant sell-side imbalance.

91.     The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 15:32:40 CIBC-Canada and its affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 100 shares, at a price of $21.37 per share, which was below the prevailing best offer of $21.39 per share.

92.     CIBC-Canada and its affiliates began to cancel these Baiting Orders within 399 milliseconds of its Executing Purchases.  By 15:37:40 CIBC-Canada and its affiliates had cancelled all their Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by CIBC-Canada and its affiliates.

### 3.  Baiting Orders on the U.S. Markets

#### (a) ML-Canada, Merrill-U.S., and their Affiliates

##### i.    *Example Episode: March 01, 2016 - 15:53:14*

93.     On March 01, 2016 at 15:53:14, the best bid and offer for Concordia were $29.61 and $29.65, respectively.  From 15:53:14 to 15:58:14, ML-Canada, Merrill-U.S., and their affiliates placed 302,552 shares of Baiting Orders at prices ranging from $40.05 to $29.36 per share.  Over this Baiting Period, ML-Canada,

Merrill-U.S., and their affiliates placed 198% more sell-side orders than buy-side orders—a significant sell-side imbalance.

94.     Between 15:58:14 and 16:03:14, ML-Canada, Merrill-U.S., and their affiliates did not sell any shares of Concordia, consistent with the fictitious nature of the Baiting Orders. The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward. At 15:58:14 ML-Canada, Merrill-U.S., and their affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 100 shares, at a price of $29.48 per share, which was below the prevailing best offer of $29.65 per share.

95.     ML-Canada, Merrill-U.S., and their affiliates began to cancel these Baiting Orders within 1 milliseconds of its Executing Purchases. By 16:03:14 ML-Canada, Merrill-U.S., and their affiliates had cancelled all their Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by ML-Canada, Merrill-U.S., and their affiliates.

   ii.   *Example Episode: March 03, 2016 - 15:41:15*

96.     On March 03, 2016 at 15:41:15, the best bid and offer for Concordia were $29.35 and $29.38, respectively. From 15:41:15 to 15:46:15, ML-Canada, Merrill-U.S., and their affiliates placed 123,498 shares of Baiting Orders at prices ranging from $39.19 to $29.08 per share. Over this Baiting Period ML-Canada,

Merrill-U.S., and their affiliates placed 197% more sell-side orders than buy-side orders—a significant sell-side imbalance.

97.     Between 15:46:15 and 15:51:15, ML-Canada, Merrill-U.S., and their affiliates did not sell any shares of Concordia, consistent with the fictitious nature of the Baiting Orders.  The Baiting Orders successfully induced the entry of sell orders from other market participants, driving the price of Concordia shares downward.  At 15:46:15 ML-Canada, Merrill-U.S., and their affiliates took advantage of this artificial downward pressure and executed Executing Purchases to buy a total of 11 shares, at a price of $29.11 per share, which was below the prevailing best offer of $29.38 per share.

98.     ML-Canada, Merrill-U.S., and their affiliates began to cancel these Baiting Orders within 1 millisecond of its Executing Purchases.  By 15:51:15 ML-Canada, Merrill-U.S., and their affiliates had cancelled all their Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by ML-Canada, Merrill-U.S., and their affiliates.

E.     **The Impact of Defendants' Unlawful Conduct**

1.   **The Close-Proximity Effects of Spoofing Episodes**

99.     Each spoofing episode was intended to and had a significant immediate impact on the price of Concordia's shares, simultaneously on both the U.S. and Canadian exchanges.  The after-effects of each spoofing episode could be

felt most strongly within a minute of the cancellation of the Baiting Orders, with a significant and observable effect persisting for at least 60 minutes and often longer.

100.   Harrington sold shares of Concordia at prices artificially depressed by Defendants' illegal spoofing activities.  The following chart lists several examples of sales in close proximity in time to Spoofing Episodes:

| Date | Shares Sold | Volume Weighted Average Sale Price | Sale Time | Time of Spoofing Episode | Defendant | Time Difference | Price Decline to Episode |
|---|---|---|---|---|---|---|---|
| 04/04/16 | 100 | $34.490 | 14:13:13 | 14:13:10 | ML-Canada, Merrill-U.S., and their affiliates | 3 seconds | -0.6% |
| 11/02/16 | 100 | $ 3.310 | 13:38:47 | 13:38:44 | ML-Canada, Merrill-U.S., and their affiliates | 3 seconds | -1.21% |
| 11/01/16 | 200 | $ 4.520 | 15:53:21 | 15:53:15 | ML-Canada, Merrill-U.S., and their affiliates | 6 seconds | -5.31% |
| 10/27/16 | 200 | $ 3.685 | 14:22:25 | 14:22:15 | ML-Canada, Merrill-U.S., and their affiliates | 10 seconds | -0.7% |
| 06/24/16 | 100 | $27.740 | 15:32:44 | 15:32:40 | CIBC-Canada and its affiliates | 4 seconds | -0.14% |
| 06/24/16 | 900 | $27.750 | 15:32:49 | 15:32:40 | CIBC-Canada and its affiliates | 9 seconds | -0.14% |
| 06/24/16 | 200 | $27.740 | 15:32:53 | 15:32:40 | CIBC-Canada and its affiliates | 13 seconds | -0.14% |
| 06/24/16 | 4,100 | $27.740 | 15:32:54 | 15:32:40 | CIBC-Canada and its affiliates | 14 seconds | -0.14% |

| Date | Shares Sold | Volume Weighted Average Sale Price | Sale Time | Time of Spoofing Episode | Defendant | Time Difference | Price Decline to Episode |
|---|---|---|---|---|---|---|---|
| 06/24/16 | 4 | $27.728 | 15:33:04 | 15:32:40 | CIBC-Canada and its affiliates | 24 seconds | -0.14% |
| 06/24/16 | 400 | $27.720 | 15:33:15 | 15:32:40 | CIBC-Canada and its affiliates | 35 seconds | -0.14% |
| 06/24/16 | 1,000 | $27.780 | 15:25:47 | 15:24:58 | CIBC-Canada and its affiliates | 49 seconds | -0.47% |
| 06/24/16 | 100 | $27.730 | 15:34:02 | 15:32:40 | CIBC-Canada and its affiliates | 1 minutes | -0.14% |
| 06/24/16 | 200 | $27.785 | 15:26:27 | 15:24:58 | CIBC-Canada and its affiliates | 1 minutes | -0.47% |
| 06/24/16 | 100 | $27.790 | 15:26:35 | 15:24:58 | CIBC-Canada and its affiliates | 2 minutes | -0.47% |
| 06/24/16 | 300 | $27.795 | 15:26:36 | 15:24:58 | CIBC-Canada and its affiliates | 2 minutes | -0.47% |
| 06/24/16 | 1,300 | $27.790 | 15:26:37 | 15:24:58 | CIBC-Canada and its affiliates | 2 minutes | -0.47% |
| 06/24/16 | 700 | $27.785 | 15:26:50 | 15:24:58 | CIBC-Canada and its affiliates | 2 minutes | -0.47% |
| 05/04/16 | 200 | $34.520 | 12:23:51 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 34 minutes | -0.55% |
| 05/04/16 | 100 | $34.480 | 12:24:23 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 34 minutes | -0.55% |
| 05/04/16 | 100 | $34.480 | 12:24:24 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 34 minutes | -0.55% |
| 05/04/16 | 100 | $34.480 | 12:24:25 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 34 minutes | -0.55% |
| 05/04/16 | 100 | $34.450 | 12:24:31 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 34 minutes | -0.55% |

| Date | Shares Sold | Volume Weighted Average Sale Price | Sale Time | Time of Spoofing Episode | Defendant | Time Difference | Price Decline to Episode |
|------|-------------|-----------------------------------|-----------|-------------------------|-----------|-----------------|-------------------------|
| 05/04/16 | 100 | $34.460 | 12:24:59 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 35 minutes | -0.55% |
| 05/04/16 | 100 | $34.460 | 12:25:09 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 35 minutes | -0.55% |
| 05/04/16 | 200 | $34.450 | 12:25:28 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 35 minutes | -0.55% |
| 05/04/16 | 500 | $34.380 | 12:26:08 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 36 minutes | -0.55% |
| 05/04/16 | 100 | $34.375 | 12:26:13 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 36 minutes | -0.55% |
| 05/04/16 | 100 | $34.370 | 12:26:45 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 37 minutes | -0.55% |
| 05/04/16 | 100 | $34.350 | 12:27:08 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 37 minutes | -0.55% |
| 05/04/16 | 100 | $34.320 | 12:27:09 | 11:50:03 | TD-Canada, TD-U.S., and their affiliates | 37 minutes | -0.55% |

## 2. The Lingering Effects of Accumulated Spoofing Episodes

101.  Even after 60 minutes, spoofing can have a lingering impact on the price of a security that persists for a much longer period of time.  And when the volume of spoofing is high enough, those effects can aggregate to a substantial price impact.

102.  Thus, the impact of the collective spoofing activity extended beyond each specific spoofing cycle [i.e., orders, trades, and cancellations], because the market neither immediately nor fully rebounded from the manipulated prices once

each of the spoofing events were completed.  In fact, on at least 111 of the 188

trading days during the Available Period, trading in Concordia stock in the U.S.

took place at manipulated prices.  On some of those days—like April 20, 2016 and

April 21, 2016—more than 20% of the U.S. trading volume occurred at

manipulated prices.

103.   In sum, although each spoofing event had a small continuing negative

impact on the price of Concordia's shares, the cumulative effect of Defendants'

persistent and relentless placement and cancellation of Baiting Orders to sell

virtually "all day, every day" throughout the Relevant Period played a significant

part in driving Concordia's share price down all the way from $28.03 to $3.13.

104.   In addition to Harrington's sales in close proximity to spoofing

episodes, Harrington sold 8,809,720 shares of Concordia stock at prices artificially

depressed by the cumulative effect of these spoofing episodes.  Because the

cumulative price impact of repeated episodes of market manipulation do not

dissipate immediately, those additional sales also occurred at prices artificially

depressed by Defendants' illegal spoofing.

## VI. HARRINGTON'S DILIGENT INVESTIGATION OF DEFENDANTS' MARKET MANIPULATION

### A.   Harrington's Initial Investigation

105.   In April 2016, based on negative social media postings that appeared

related to Concordia's price volatility and the fact that Concordia's price appeared

depressed in relation to the company's fundamentals, Harrington requested that IIROC commence an investigation of whether Concordia's share price was being manipulated on the Canadian Exchanges. At around the same time, Harrington also retained a former British Columbia securities commissioner as a consultant to investigate the cause of Concordia's share price volatility.

106.   During its initial investigation, IIROC provided Harrington in September 2016 with Trade Order and Quote Reports ("TOQ Reports")[9] containing certain trading data with "masked" Trade Desk IDs; in March 2017, IIROC delivered to Harrington TOQ reports with some Trade Desk IDs "unmasked." This data was limited to and focused on trading activities on Canadian exchanges.

107.   As part of IIROC's investigation of the cross-border trading activities of Concordia's interlisted securities, IIROC also sent a request to FINRA seeking the production of documents concerning brokerage companies in the United States that were affiliated with Canadian brokers, where such Canadian brokers were also executing Concordia trades on U.S. exchanges. In February 2017, FINRA objected to IIROC's request for information on the grounds that the disclosure

---

[9] TOQ Reports detail the type of trading activity, when the activity occurred, and the investment dealer that initiated the activity known as Trade Desk ID. The TOQ Report may also identify clients by Client ID, but Client IDs are not mandatory data provided by investor dealers.

would violate the confidentiality of its members and would violate its regulatory objectives.

108.   In March 2017, IIROC reported to Harrington that it had completed its investigation and was closing its file based on its failure to discover sufficient evidence that Concordia's share price had been manipulated on Canadian exchanges.  The former British Columbia securities commissioner also concluded his investigation because he did not have sufficient data to conduct a proper and thorough analysis.

109.   Harrington remained undeterred and continued to diligently pursue information that could help it determine whether Concordia's stock price had been unlawfully manipulated.

110.   In the spring of 2017, Harrington retained the Bates Group, LLC, a financial services consulting firm that conducts regulatory and internal investigations concerning market activities that involve data analysis.  Based on the analysis by the Bates Group, sometime in the Fall of 2017, Harrington again approached IIROC in an attempt to obtain additional information but was denied.

111.   In January 2018, Harrington filed in the Ontario Superior Court of Justice an application for Norwich Relief[10] against IIROC to obtain information it

---

[10] A Norwich Pharmacal Order ("NPO"), also known as a third-party disclosure order, is an equitable form of relief granted (only where necessary) by the court requiring a respondent to

possessed concerning Concordia's trading including the Trade Desk IDs and the names of the brokers and the clients, none of which had been previously provided. This application was denied on December 31, 2018, but the Court rejected IIROC's argument that Harrington did not have a potential claim for market manipulation.

112.   In the immediately ensuing months, Harrington continued its diligent and extensive search for alternative ways of discovering (a) whether Concordia's stock had been manipulated on the Canadian and U.S. exchanges and (b) if so, the identity of the parties who were responsible for the manipulation.

**B.     Harrington's Uncovering of Evidence Sufficient to File Claims against Defendants**

113.   Harrington ultimately located, interviewed and, in July 2019, engaged the services of the firm Urvin.ai ("Urvin") to investigate whether Concordia's share price had been manipulated and if it had been, the identities of the manipulators.

114.   Urvin is a consulting firm that (1) specializes in stock market investigations including high frequency trading and (2) designs software and

---

disclose certain documents or information to an applicant.  Typically, with an NPO, the applicant knows that wrongdoing has occurred, but cannot identify the wrongdoer, but can identify a third party with relevant information.  An NPO can be granted before proceedings, during proceedings, or post-judgment.

systems that help compliance departments concerning market manipulation schemes.  Urvin employs machine learning and artificial intelligence experts who consult with the SEC and CFTC to design rules and regulations that will prevent manipulation through advanced high frequency trading algorithms.

115.   In order to determine whether Concordia's stock had been manipulated, Urvin had to design and create its own "Pattern Recognition Analysis Program," which included complex mathematical modeling, in order to search for market manipulation patterns and the identity of traders who may have been conducting the market manipulation on U.S. exchanges.

116.   Urvin's Pattern Recognition Analysis Program was specifically developed to analyze the voluminous but incomplete publicly available data regarding trades and orders of Concordia.  Urvin's program was able to analyze multiple gigabytes of exchange trading data that it purchased to recreate Concordia's historical Market Order Books of the Relevant Period in both Canada and the U.S.  No other consultant that Harrington was aware of or dealt with possessed the skills or had the knowledge and technical expertise necessary to analyze the voluminous and technical cross-border trading activities of Concordia's interlisted securities.

117.   Urvin completed its analysis of the gigabytes of trading data in May 2020 and for the first time identified both (1) the nature and scope of the market

manipulation schemes of Concordia's interlisted securities; (2) the identities of the manipulators of the price of Concordia on Canadian exchanges; and (3) the likely identities of the manipulators of the price of Concordia on U.S. exchanges, for which the MPIDs of market participants were not publicly available.

118.   It was only after Urvin completed its analysis of the voluminous and highly technical trading data of Concordia for both the U.S. and Canadian exchanges (which IIROC and FINRA had previously refused to provide) that Harrington finally had sufficient information to file its initial Complaint against Defendants and plead with the required specificity and particularity the market manipulation claims being asserted in this case.

C.   **Through Discovery, Harrington Has Uncovered Additional Evidence of Defendants Unlawful Conduct**

119.   The spoofing allegations contained in Harrington's initial Complaint and Amended Complaint were based on the trading information in the Canadian and U.S. public domain.  Such data included trades and order flows in Concordia on both U.S. and Canadian Exchanges and demonstrated that the spoofing identified in the initial Complaint and Amended Complaint was associated with the Canadian Defendants' MPIDs.  However, the publicly available data either: (1) only included Canadian Defendants' MPIDs and therefore contained no information regarding whether the trades or orders were associated with either the

Canadian Defendants' proprietary trading or that of the Canadian Defendants' customers; or (2) did <u>not</u> include MPIDs for the market participants on U.S. Exchanges.

120.   Having commenced this action, Harrington was able to serve subpoenas on various nonparties including NASDAQ, DTCC, FINRA, and Instinet.  Each of these parties have provided documentation and information that is particularly relevant to this case and has enabled Harrington to conduct a more robust and fulsome analysis of the Defendants role in the market manipulation of Concordia securities.  Harrington further supplemented its analysis with information purchased from TSX.

121.   Specifically, the information obtained pursuant to nonparty subpoenas or purchased included, *inter alia*, the following:

- <u>NASDAQ Order and Trade Data:</u> which reflected all orders, cancels and trades, including the Broker-Dealer identifying MPIDs in Concordia shares submitted to NASDAQ by all U.S. Broker-Dealers including the U.S. Defendants Merrill-U.S. and TD-U.S.;

- <u>TSX Order and Trade Data:</u> which reflected all orders, cancels and trades, including the Broker-Dealer identifying MPIDs in Concordia shares submitted to the TSX by all Canadian Broker-Dealers including the Canadian Defendants CIBC-Canada, TD-Canada and ML-Canada;

- <u>FINRA Order Audit Trail Data ("OATS"):</u> which reflected all orders, cancels and trades, including the Broker-Dealer identifying MPIDs in Concordia shares submitted to various U.S. Exchanges and ATS trading venues by all U.S. Broker-Dealers including the U.S. Defendants Merrill-U.S. and TD-U.S. and the intermediary Broker-Dealers used by the Canadian Defendants;

- <u>DTCC Correspondent Clearing Transaction Data:</u> which reflected the transfer of Concordia shares executed by U.S. intermediary Broker-Dealers to and from the U.S. DTCC accounts of the Canadian Defendants CIBC-Canada and TD-Canada;

- <u>DTCC Weekly Position Reports:</u> which reflected the week ending Concordia share positions held at the DTCC on behalf of all U.S. clearing Broker-Dealers, including the shares held on behalf of Canadian Defendants CIBC-Canada and TD-Canada; and

- <u>Instinet Order and Trade Data for Defendant CIBC-Canada:</u> which reflected the orders, cancels and trade messages (Baiting and Executing Orders) of Concordia shares disseminated and/or effected by CIBC-Canada to its intermediary U.S. Broker-Dealer Instinet.

122.   Access to the documents and information obtained pursuant to the nonparty subpoenas that were served has permitted Harrington to "pierce the veil

of silence" that concealed the means and methods Defendants used to orchestrate their cross-border and domestic spoofing schemes.  While Harrington had a reasonable basis to assert its claims in the original and amended complaints, it was not until Harrington obtained nonparty discovery in this case that it learned the specific and particular facts that give rise to the present version of its claims regarding how Defendants manipulated the price of Concordia shares under Section 10b and Rule 10(b)-5 and Section 9(a)(2) of the Exchange Act as proposed in the instant Second Amended Complaint.

123.   This Second Amended Complaint, like the prior complaints, continues to assert spoofing claims against the same Defendants, for the same Relevant Period, using the trading data that Harrington had access to combined with the trading data that was not and could not have been obtained by Harrington prior to the commencement of this lawsuit.  Indeed, the additional trading data obtained through nonparty discovery has demonstrated how Defendants are primarily liable for following the instructions of their customers to disseminate and/or effect Baiting Orders on U.S. and Canadian Exchanges and disseminate and/or effect Executing Orders on the U.S. Exchanges—all of which were part of a scheme,

device and course of conduct that was intended to and did manipulate the market price of Concordia shares.[11]

124.   Thus, this Second Amended Complaint relates back to the prior pleadings, by asserting with greater specificity the same course of conduct arising out of the same series of transactions and occurrences that were alleged in the original complaint.  There is a clear overlap of the facts between the occurrences and events raised in the original pleading and this Second Amended Complaint.

---

[11] Still, the trading data that has been obtained from the Defendants and nonparties remains incomplete.  Initially, Defendants refused to produce any of their customer trading data because they contended that the Amended Complaint solely focused on their proprietary trading and therefore, they were not required to produce any trading data concerning their customers.  In this Court's order dated August 15, 2022, it was held that Harrington had "…not articulated any plausible theory under which any currently named Defendant is liable for their customers' trading activity.  The allegations of the Amended Complaint to which Plaintiffs cite allege only the obvious fact that the named Defendants execute trades for customers, not that those trades give rise to liability."  It is respectfully submitted that based on nonparty discovery that Harrington has obtained, a cognizable theory of liability exists that holds Defendants **primarily liable** for their customers' trading activity (*See supra*, ¶ 3 (citing *U.S. Envtl*. and *Lorenzo*)).  If Harrington is granted leave to file this Second Amended Complaint, it will seek to obtain such customer trading data from Defendants and nonparties and will only then have a complete picture regarding the breadth, scope, and mechanics of Defendants' schemes to manipulate the price of Concordia during the Relevant Period.  The customer trading information will not be used to directly implicate Defendants customers, but rather will be used to demonstrate how Defendants knowingly disseminated and/or effected Baiting Orders on Canadian Exchanges and recklessly disseminated and/or effected Executing Orders on U.S. Exchanges with intent to defraud the market in Concordia securities.  Defendants' conduct gives rise to **primary liability** under Section 10b and Rule 10(b)-5(a) and (c) and Section 9(a)(2) of the Exchange Act.

## VII. <u>CLAIMS FOR RELIEF</u>

A.   <u>**First Claim for Relief for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rules 10b-5(a) and (c) Promulgated Thereunder Against CIBC-Canada, TD-Canada, TD-U.S., Merrill-U.S., ML-Canada, John Doe-Canada, and John Doe-U.S.**</u>

125.   Plaintiff incorporates by reference paragraphs 1 through **124** as if more fully set forth herein.

126.   To state a cognizable claim for "scheme liability," under Rule 10b-5(a) and (c) a Plaintiff must allege with specificity that (1) the Defendant committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter; and (4) reliance.

### 1.   <u>Defendants Committed Deceptive or Manipulative Acts in Furtherance of Schemes to Defraud</u>

127.   During the Relevant Period, Defendants participated in a scheme that was intended to and did manipulate the market price of Concordia shares by following their own traders' and their customers' instructions to disseminate and/or effect Baiting orders on Canadian and U.S. Exchanges—with the Canadian Defendants disseminating and/or effecting Executing Orders through U.S. intermediary Broker-Dealers and the U.S. Defendants disseminating and/or effecting Executing Orders directly on to U.S. Exchanges.  Defendants either knew or were reckless in ignoring that the Baiting Orders were being used to further a

market manipulation scheme that had a direct and immediate adverse impact on the market price of Concordia securities being traded on U.S. markets.

128.    Rules 10b-5(a) and (c) make it unlawful for any party to "(a) employ any device, scheme or artifice to defraud" and "(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit."

129.    Defendants are primarily liable for following the instructions of their traders and customers to disseminate and/or effect false and misleading Baiting Orders on U.S. and Canadian Exchanges that had no legitimate or economic purpose, were never intended to be executed, and were part of a spoofing scheme and following their traders' and customers' instructions to disseminate and/or effect Executing Orders that were intended to complete the spoofing cycle that operated as a scheme to manipulate the market price of Concordia securities.

## 2. __Defendants Acted With Scienter__

130.    Scienter is a required element in asserting a claim of market manipulation under Rule 10b of the Exchange Act.  To establish scienter, a complaint may allege facts that constitute strong circumstantial evidence of "conscious misbehavior or recklessness."

131.    As set forth more fully in paragraphs 57 through 76 above, <u>strong</u> circumstantial evidence exists that Defendants' conduct reflects conscious

misbehavior or recklessness of their unlawful scheme and course of conduct to defraud the market in Concordia securities.  This circumstantial evidence includes:

- Defendants' employment of and participation in a pattern and practice of submitting large numbers of Baiting Orders during spoofing episodes (compared with a small volume of subsequently-cancelled sell-side orders at other times)—which were never intended to be executed and had no legitimate financial purpose, were cancelled within milliseconds of their placement;

- Defendants purchased far more shares (at depressed prices) in the minutes following spoofing episodes than they did at other times;

- Defendants' illegal conduct evaded regulatory detection for at least two reasons.  *First*, cross-border spoofing is virtually impossible for either country's regulator to detect because each country's surveillance captures only a part of the misconduct.  To take one example, FINRA Rule 5210.03 prohibits spoofing in the form a specific sequence: (A) a party enters multiple limit orders on one side of the market at various price levels (the "Displayed Orders"); (B) following the entry of the Displayed Orders, the level of supply and demand for the security changes; (C) the party enters one or more orders on the opposite side of the market of the Displayed Orders (the "Contra-Side Orders") that are subsequently executed; and

(D) following the execution of the Contra-Side Orders, the party cancels the Displayed Orders.  If all four elements of FINRA Rule 5210.03 are not satisfied by the same market participant—*e.g.*, if a given country's regulator observes only Baiting Orders but not Executing Purchases in that country's markets—the regulator may incorrectly conclude that the market participant is not engaged in spoofing.  Similarly, if the second country's regulator observes only Executing Purchases and not Baiting Orders, that regulator may incorrectly conclude that the market participant is simply purchasing shares.  *Second*, when Defendants direct their Baiting Orders and Executing Purchases to the markets via different Broker-Dealers, the regulators observe only those Broker-Dealers and not the underlying beneficial party (which may not be known until clearing and settlement).  Because the regulators only observe the Broker-Dealers, the regulator may incorrectly conclude that Baiting Orders placed by one Broker-Dealer (*e.g.*, Instinet) are independent of Executing Purchases by another Broker-Dealer (*e.g.*, Virtu), even if both occurred on behalf of the Defendants.

132.   The placement and cancellation of Baiting Orders and the placement of Executing Orders in a matter of milliseconds, continuously throughout the entire Relevant Period, constitutes strong circumstantial evidence of conscious behavior

of market manipulation rather than the lawful trading activity of innocent market participants.

133.   Defendants' conscious misbehavior or recklessness is further reflected in (1) the passage of milliseconds between the placement and cancellation of Baiting Orders that were placed on their own behalf or pursuant to their customers' directions, on either Canadian or U.S. Exchanges; (2) the large disparities in volume of Baiting Orders and Executing Orders, for the purchase of shares at a manipulate lower price, on opposite sides of the Market Order Book; and (3) the use of high frequency trading systems that were designed to cancel orders based on the passage of time, usually milliseconds

134.   Further, to the extent the Baiting and Executing Orders were orders and trades that Defendants effected on behalf of their customers, Defendants' flawed and ineffective internal controls constitute strong circumstantial evidence of conscious misbehavior or recklessness.

135.   As Gate-Keepers of the integrity and stability of the markets, Defendants were required to develop, implement, and maintain systems, written policies, and procedures that ensured all transactions that were sent to Exchanges were legitimate trades and not intended to manipulate or deceive the market.

136.   The large and demonstrably unlawful nature of the spoofing conduct alleged above presents three possibilities regarding Defendants' knowledge and

intent:  (1) Defendants recklessly failed to develop and maintain any policies, procedures, and systems that were designed and intended to ensure the integrity of the markets by monitoring and surveilling the trading activities of their customers; (2) Defendants attempted to set up policies, procedures, and systems designed to monitor their customers and identify unlawful conduct, but did so with severe recklessness to the point where such policies, procedures, or systems were inadequate and failed to identify the high volume of demonstrably unlawful spoofing alleged herein; or (3) Defendants' policies, procedures, or systems did successfully identify the manipulative or deceptive practices of their customers in placing orders that are not intended to be executed and by entering orders and executing trades on behalf of their customers but Defendants unlawfully continued to participate in a scheme to defraud by effecting customers' orders and trades that they knew were unlawful.

137.   Under each of the above scenarios, Defendants are primarily liable for following their customer's instructions to disseminate and/or effect Baiting Orders on Canadian and U.S. Exchanges that they knew or recklessly ignored were part of an unlawful cross-border or domestic spoofing scheme and disseminating and/or effecting Executing Orders to U.S. Broker-Dealers that were also in furtherance of their scheme to defraud the market.

138.   Defendants knowingly or recklessly ignored their Gate-Keeping monitoring, and supervisory responsibilities.

### 3. **Harrington's Damages Were Caused by a Manipulated Market**

139.   Concordia's securities were intended to be traded in an efficient market, where all market participants had access to information that was relevant to the fair and orderly trading of a security.  Defendants' cross-border scheme to manipulate was structured in a manner that concealed Defendants' unlawful intentions and prevented a reasonably diligent market participant, like Harrington, from discovering the operative facts constituting the market manipulation scheme or the identities of the perpetrators of these schemes.  During the Relevant Period, despite Harrington's diligence, it did not discover, nor could a reasonably diligent plaintiff have discovered, the facts constituting the market manipulation claims on the U.S. Exchange or the identities of the perpetrators of these market manipulation schemes.  Therefore, when Harrington sold its shares of Concordia on U.S. exchanges, the market prices of Concordia's securities were not being determined by the natural forces of supply and demand but, rather by the false and misleading pricing information injected into the market by the Defendants.

4. **Injury in Fact and Loss Causation**

140.   As set forth more fully above in paragraphs 99 to 104, Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Concordia's securities.

141.   The effects of a spoofing episode are most impactful in the first minute after the Baiting Orders are disseminated and/or effected and are still demonstrably strong for at least 60 minutes following the spoofing episode. Harrington provided multiple examples of sales of Concordia's shares that it made during those windows following spoofing episodes during which the price of Concordia was still artificially depressed, causing Harrington losses.

142.   Further, when, as here, the spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the Relevant Period.  Thus, the long-term cumulative effect of spoofing places enormous downward pressure on the market price of a security.

143.   Defendants placed tens of millions of Baiting Order shares during the Available Period alone, which caused the collapse of Concordia's share price from $28.02 to $3.13.  Defendants' wrongful conduct either proximately caused Harrington's loss or significantly increased the likelihood of the financial injuries

that Harrington suffered when the market price of Concordia shares was being driven downward.

144.   During the Available Period alone, there were Spoofing Episodes on 111 out of 188 trading days.  On 34 of those days, Harrington sold approximately 4.2 million shares of Concordia on the U.S. exchanges and approximately 2.6 million shares of Concordia on the Canadian exchanges at manipulated lower prices.

145.   Defendants' spoofing scheme deprived Harrington of its right and ability to trade on U.S. exchanges that were free of manipulation.

**5. Defendants used National Securities Exchanges and the Mails to Perpetrate their Market Manipulation Scheme**

146.   Each Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to trade Concordia's securities by placing, routing, filling, and executing these orders.

147.   Defendants each knowingly employed devices, schemes, or artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud upon Harrington and the market in violation of Section 10(b) and Rule 10b-5 promulgated under the Exchange Act.

**B.**   **Second Claim for Relief for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934 Against CIBC-Canada, TD-U.S., TD-Canada, Merrill-U.S., ML-Canada, John Doe-U.S. and John Doe-Canada**

148.   Plaintiff incorporates by reference paragraphs 1 through 147 as if more fully set forth herein.

149.   Based upon the conduct described with regard to Defendants' spoofing scheme, their scheme violated Section 9(a)(2) of the Securities Exchange Act, which makes it unlawful to engage in a series of manipulative transactions "in any security . . . creating actual or apparent active trading in such a security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

150.   By reason of the conduct described in paragraphs 60 to 78 above, Defendants, their affiliates, subsidiaries, related companies and John Doe entities, directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to affect alone or with one or  more other persons, a series of transactions in Concordia's securities that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others, engaged in the market manipulation strategy of spoofing which artificially affected the prices of Concordia's securities that Harrington sold.

151.   Defendants' conscious misbehavior or recklessness artificially affected the price of Concordia's shares, that Harrington sold during the Relevant Period.  Harrington's financial injuries would not have been as extensive, but for Defendants' conscious misbehavior or recklessness.

152.   By reason of the foregoing, Defendants violated Section 9(a)(2) of the Exchange Act.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.   Finding that Defendants violated the federal securities laws as alleged in this complaint;

B.   Ordering Defendants to pay damages as a result of their unlawful conduct in an amount to be determined at trial;

C.   Awarding reasonable attorney's fees and costs together with all available pre and post judgment interest; and

D.   Granting such other and further relief as the Court deems just and appropriate.

## IX. <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff

demands trial by jury in this action of all issues so triable.

Dated:  December 19, 2022
      New York, New York

                    Respectfully submitted,

                    By: /s/ Alan M. Pollack
                        Alan M. Pollack, Esq.
                        Leron Thumim, Esq.
                        Madison N. Kelley, Esq.
                        Warshaw Burstein, LLP
                        575 Lexington Avenue, 7th Floor
                        New York, New York 10022
                        Tel: (212) 984-7700
                        Fax: (212) 956-2164

                          and

                    By: /s/ James Wes Christian
                        James Wes Christian, Esq.
                        Ardalan Attar, Esq.
                        Christian Levine Law Group, LLC
                        2302 Fannin, Suite 205
                        Houston, Texas 77002
                        Tel: (713) 659-7617