**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,<br><br>                  Plaintiff,<br><br>     v.<br><br>CIBC WORLD MARKETS INC.; BOFA SECURITIES, INC.; MERRILL LYNCH CANADA INC.; TD SECURITIES, INC.; TD SECURITIES (USA) LLC; and JOHN DOES 1 THROUGH 10,<br><br>                  Defendants. | Index No.: 21-cv-00761 (LGS)<br><br>Hon. Lorna G. Schofield |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT……………………………………………………………………1

FACTUAL AND PROCEDURAL BACKGROUND………………………………………...4

   A.  The FAC's Spoofing Allegations Against Defendants………………………….…4

   B.  During Discovery, Defendants Refuse to Provide Discovery Regarding Baiting and Executing Orders that They Knowingly or Recklessly Placed on their Customers' Behalf……………………………………………..…………………………6

   C.  In Response to this Court's Order, Plaintiff Amends its Complaint to Articulate the Applicable Legal Theory Under Which Defendants are Indeed Primarily Liable for Baiting and Executing Orders they Knowingly or Recklessly Placed on their Customers' Behalf………………………………………………………...…8

LEGAL STANDARDS………………………………………………………………………..9

ARGUMENT………………………………………………………………………..…………10

   I.    PLAINTIFF'S EXCHANGE ACT CLAIMS ARE TIMELY…………………10

      A.  The Statute of Repose Bars Only the Assertion of New Claims……………11

      B.  The SAC Does Not Assert Any New Claims ………………………………12

   II.   PLAINTIFF HAS ADEQUATELY ALLEGED AN EXCHANGE ACT CLAIM………………………………………………………………...…..16

      A.  The SAC Pleads Manipulative Conduct with Sufficient Particularity…..…16

      B.  The SAC Adequately Pleads Facts Yielding a Strong Inference of Scienter………………………………………………………………...19

      C.  The SAC Pleads All the Exchange Act Elements………..………………24

   III.  THE SAC PLEADS SUFFICIENT FACTS TO PERMIT THE EXERCISE OF PERSONAL JURISDICTION OVER THE CANADIAN DEFENDANTS………………………………………………….……….26

   IV.  THE SAC'S CLAIMS DO NOT EXCEED THE TERRITORIAL REACH OF THE EXCHANGE ACT……………………………………………………28

CONCLUSION……………………………………………………………………31

# **TABLE OF AUTHORITIES**

**Cases**                                                                      **Page(s)**

*Albert v. Carovano,*
   851 F.2d 561 ........................................................................................................ 15

*Alki Partners, L.P. v. Vatas Holding GmbH,*
   769 F. Supp. 2d 478 (S.D.N.Y. 2011)..................................................................... 25

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................. 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007)......................................................................... 9, 17, 18

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
   902 F.2d 194 (2d Cir. 1990).................................................................................. 10

*Barilli v. Sky Solar Holdings, Ltd.,*
   389 F. Supp. 3d 232 (S.D.N.Y. 2019)............................................................. 11, 13

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).............................................................................................. 9

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.,*
   137 S. Ct. 2042 (2017).......................................................................................... 11

*Charles Schwab Corp. v. Bank of Am. Corp.,*
   883 F.3d 68 (2d Cir. 2018)................................................................................... 28

*Citibank, N.A. v. K-H Corp.,*
   968 F.2d 1489 (2d Cir. 1992)............................................................................... 24

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
   722 F.3d 81 (2d Cir. 2013)................................................................................... 10

*Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc.,*
   291 F. Supp. 3d 364 (S.D.N.Y. 2018)................................................................... 13

*Fezzani v. Bear, Stearns & Co.,*
   384 F. Supp. 2d 618 (S.D.N.Y. 2004)................................................................... 24

*Flickinger v. Harold C. Brown & Co.,*
   947 F.2d 595 (2d Cir. 1991).................................................................................. 15

*Gamma Traders - I LLC v. Merrill Lynch Commods, Inc.*,
  41 F.4th 71 (2d Cir. 2022) ........................................................................... 20

*Gotham Diversified Neutral Master Fund, LP v. Chicago Bridge & Iron Co. N.V.*,
  2019 WL 3996519 (S.D.N.Y. Aug. 23, 2019) ............................................. 11

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008) ......................................................... 28

*In re Coleco Sec. Litig.*,
  591 F. Supp. 1488 (S.D.N.Y. 1984) ............................................................ 18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  245 F.R.D. 147 (S.D.N.Y. 2007) ................................................................. 25

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013) ................................................... 11, 13

*In re Platinum & Palladium Antitrust Litig.*,
  449 F. Supp. 3d 290 (S.D.N.Y. 2020) ......................................................... 28

*Janke Const. Co. v. Vulcan Materials Co.*,
  386 F. Supp. 687 (W.D. Wis. 1974) ............................................................ 15

*Laydon v. Cooperatieve Rabobank U.A.*,
  55 F.4th 86 (2d Cir. 2022) ........................................................................... 30

*Lorenzo v. SEC*,
  139 S.Ct. 1094 (2019) ............................................................................ 22, 23

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ..................................................................................... 29

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) .................................................................. 29, 30

*Peifa Xu v. Gridsum Holding Inc.*,
  2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) .......................................... 11, 13

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
  721 F.3d 95 (2d Cir. 2013) ........................................................................... 12

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
  937 F.3d 94 (2d Cir. 2019) ........................................................................... 30

*Ross v. A. H. Robins Co.*,
  607 F.2d 545 (2d Cir. 1979) ........................................................................ 18

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
 12 F.4th 337 (3d Cir. 2021) ................................................................ 12

*SEC v. Masri*,
 523 F.Supp.2d 361 (S.D.N.Y. 2007) .................................................. 22

*SEC v. U.S. Envtl., Inc.*,
 155 F.3d 107 (2d Cir.1998) .......................................... 18, 21, 22, 30

*Set Cap. LLC v. Credit Suisse Grp. AG*,
 996 F3d 64 (2d Cir. 2021) ................................................................. 19

*Sharette v. Credit Suisse Int'l*,
 127 F.Supp.3d 60 (S.D.N.Y. 2015) .................................................. 25

*Tellabs, Inc. V. Makor Issues and Rts, Ltd.*,
 551 U.S. 308 (2007) ........................................................................... 19

*Townsend v. Benjamin Enterprises, Inc.*,
 679 F.3d 41 (2d Cir. 2012) ......................................................... 11, 15

*United States v. Coscia*,
 866 F.3d 782 (7th Cir. 2017) ............................................................. 20

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
 751 F.2d 117 (2d Cir. 1984) .............................................................. 10

*Walden v. Fiore*,
 571 U.S. 277 (2014) ........................................................................... 28

## **STATUTES**

15 U.S.C.S. § 78j ............................................................................................ 29

28 U.S.C. § 1658 ............................................................................................ 11

Plaintiff Harrington Global Opportunity Fund, Limited ("Harrington" or "Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss the Second Amended Complaint [ECF No. 136] ("Defendants' Motion" or "Def. Mem.").[1]

## PRELIMINARY STATEMENT

Defendants' Motion represents the third attempt by defendant CIBC-Canada and the second attempt by defendants Merrill-U.S., Merrill-Canada, TD-U.S., and TD-Canada to escape liability for participating in cross-border spoofing schemes that had the intent and effect of manipulating the market price of Concordia shares from January 27, 2016 to November 15, 2016. These schemes injured parties like Harrington who sold their shares at artificially depressed prices during the Relevant Period. Defendants' current attempt to evade responsibility centers around their characterizing the spoofing schemes as being perpetrated by *their customers*. But as set forth in the SAC and explained below, it is time for Defendants' to accept responsibility and face liability for *their own* actions.

In the First Amended Complaint ("FAC"), Harrington asserted claims against Defendants arising from their schemes to manipulate the share price of Concordia in violation of sections 9(a)(2) and 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The FAC alleged that each Defendant employed a spoofing scheme to manipulate the market price of Concordia shares on behalf of their own proprietary accounts *and/or* those of their customers. Defendants moved to dismiss the entire FAC. This Court denied that motion in part, holding, *inter alia*, that: this Court had personal jurisdiction over Defendants; Harrington's claims were

---

[1] All capitalized terms herein that are not otherwise defined shall have the same meaning as in the Second Amended Complaint, filed by Plaintiff on December 19, 2022 [ECF No. 133] (the "SAC").

timely; the FAC had adequately alleged every element of its Exchange Act claims against Defendants for spoofing; and Harrington's claims did not exceed the territorial scope of the Exchange Act.  With respect to whether the FAC's claims encompassed unlawful trading that Defendants carried out on behalf of their customers, this Court unambiguously acknowledged that "the Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices *for either client or proprietary accounts*."  (Feb. 9, 2022 Opinion and Order [ECF No. 88] (the "MTD Decision"), at 10-11 (emphasis added).)

During discovery, Defendants confirmed that a significant portion of the trades and orders at issue were placed, executed, and settled on their customers' behalf.  When Harrington sought discovery regarding that trading activity, Defendants refused, indicating that they "understood" the FAC's claims to be limited to proprietary trading.  When Harrington explained that its claims and discovery requests encompassed manipulative trading that Defendants carried out on behalf of their customers, Defendants made the novel and baseless argument that they bore no responsibility for their role in such manipulation because they were only following their customers' instructions.  Defendants articulated this argument in a letter to the Court—to which Harrington did not have the opportunity to reply—opposing Harrington's request for a pre-motion discovery conference.  On the basis of Defendants' letter, this Court denied Harrington's request, holding that Harrington had not yet articulated a legal theory under which Defendants could be liable for what Defendants had inaccurately characterized as "customer trading."

In response, Harrington filed the SAC for two primary purposes.  *First*, for the avoidance of all doubt—and to address any lingering confusion regarding the scope of Harrington's claims against Defendants—the SAC unequivocally provides that Harrington's claims extend to <u>all</u> of the manipulative trading in which Defendants took part, <u>regardless</u> of whether they did so on

their own behalf or on behalf of their customers.  *Second*, the SAC offers legal authority

demonstrating that Defendants cannot evade liability for their role in spoofing schemes by hiding

behind their customers.  The SAC also serves the purpose of cleaning up the operative pleading

(by removing claims and parties that this Court previously dismissed) and using data discovered

through nonparty discovery to better explain and illustrate the gravamen of Harrington's claims.

Harrington's claims against Defendants for their manipulative trading on behalf of

customers—and Defendants' desperate attempt to evade liability for their spoofing schemes—

should be considered within the following context.  *First*, broker-dealers such as Defendants are

considered "gatekeepers" of the markets and as such are required under caselaw, industry

regulations, and their own internal compliance manuals to monitor, surveil, and prevent unlawful

trading that manipulates the integrity of the marketplace.  *Second*, only brokers that are

registered members of an exchange are permitted to place or execute orders to buy or sell

securities on that exchange.  Defendants work around that restriction by giving their customers

direct market access—in effect, offering to place and execute orders on their customers' behalf—

in exchange for fees.  *Third*,  broker-dealers' "gatekeeping" responsibilities extend to orders and

trades that they place or execute pursuant to the directions of their customers.  *Fourth*, all orders

that are executed on a U.S. exchange are "anonymized," meaning that the identity of the

customer or whether the order is a proprietary trade for the broker's own account or their

customer's account is unknown and—to the outside world—almost indistinguishable.

If brokers such as Defendants cannot be held liable for their own central role in spoofing

schemes—in which they place, execute, settle, and/or route orders that they know or recklessly

ignore were placed by their customers for unlawful purposes—then brokers could grant

unfettered direct market access to their customers and in doing so act as a "liability shield" for

their customers while remaining immune from liability themselves.  Of course, no such "immunity loophole" exists; under the Exchange Act, relevant regulations, and controlling Second Circuit authority, Defendants are primarily liable for the trades and orders they place.

In their attempt to escape primary liability, Defendants:  (1) mischaracterize the SAC as an attempt to "pivot to a new implausible theory" by "abandoning Harrington's prior theory" of liability supposedly solely "based on proprietary trading," and, on the basis of that mischaracterization, argue that Harrington's amendment of the SAC to add further factual development and additional legal arguments is barred by the five year statute of repose; (2) argue that the SAC lacks sufficient specificity to establish scienter, notwithstanding its enumeration of *sixteen different* indicia of intent; (3) assert that the SAC does not plead loss causation or reliance (when, in fact, the SAC does plead both elements); (4) argue that this Court lacks personal jurisdiction to adjudicate (when this Court has already determined it has personal jurisdiction); and (5) mischaracterize the claims as "predominantly foreign" such that they exceed the territorial scope of the Exchange Act (when this Court has already held that they do not).

As will be more fully set forth below, Defendants' arguments misstate or ignore particularized facts in the FAC and SAC and blatantly mischaracterize the limited distinctions between the two; rely upon caselaw that is distinguishable from the instant case and ignore controlling case law to the contrary; and recycle flawed arguments that this Court already rejected in denying Defendants' motion to dismiss the FAC.  Like their previous attempts to dismiss Harrington's spoofing claim, Defendant's Motion should also be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The FAC's Spoofing Allegations Against Defendants

Harrington's FAC asserted claims against Defendants under Sections 9(a)(2) and 10(b) of the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder based on extensive and

detailed allegations that Defendants participated in schemes to manipulate the market prices of Concordia shares via spoofing—a form of market manipulation wherein a broker (1) creates the illusion of excess supply or demand through placement of "Baiting Orders" that have no legitimate economic purpose and are intended not to be executed, but to move the market upwards or downwards as desired by the spoofing party, (2) capitalizes on the illusory supply or demand by placing "Executing Orders" which are executed and ultimately settled at the manipulated price, and finally (3) cancels the Baiting Orders—which, again, were never intended to be executed—and settles the trade.[2]  (FAC ¶¶ 53-174.)  Each of these three steps is a spoofing event, and each sequence of these three steps constitutes a full "spoofing cycle."

The FAC unambiguously alleged that each of the Defendants placed orders <u>both</u> for their own proprietary account(s) <u>and</u> for the accounts of their customers.  (*Id.* ¶¶ 22, 24, 26, 28, 29.) The FAC also alleges that each of the Canadian Defendants:  (a) engaged in "continuous activity in New York state, directly related to [Plaintiff's] claims" by "rout[ing] orders and execut[ing] trades of Concordia shares . . . in New York, on exchanges in the U.S.," (*id.* ¶¶ 23, 27, 30); and (b) placed orders that were intended to and had the effect of manipulating the price of Concordia shares which were listed and traded on NASDAQ.  (*Id.* ¶¶ 17, 54.)  With respect to scienter, the FAC alleged that Defendants placed the Baiting and Executing Orders *either* consciously *or* with reckless intent stemming from Defendants' failure to establish and/or follow adequate "policies, procedures and systems [to] detect[] and prohibit[] manipulative or fraudulent trading devices and schemes" despite their obligation to do so.  (*Id.* ¶¶ 166-69.)

Plaintiff's claims in the FAC—which followed an extensive investigation and in-depth analysis of publicly-available trading data—are based on approximately 100,000 observed

---

[2] "Settlement" is the actual exchange of securities and money.  (*Id.* ¶ 10 n.4.)

spoofing events on Canadian exchanges and approximately 49,000 observed spoofing events on U.S. exchanges, which took place between September 21, 2015 and November 25, 2016. (*Id.* ¶ 60.)[3]  The publicly-available data upon which these allegations were based included identifying information for the Canadian Defendants, but <u>not</u> for market participants on U.S. exchanges. (SAC ¶ 119.)[4]  Subsequent nonparty discovery obtained in this case confirmed that the FAC's factual premise was essentially correct—it was indeed Defendants who were responsible for the spoofing events on U.S. exchanges as alleged in the FAC. (*Id.* ¶¶ 120-123.)

Defendants moved to dismiss the FAC in its entirety, and in the MTD Decision, this Court denied Defendants' motion to dismiss Plaintiff's §§ 9(a)(2) and 10(b) spoofing claims.  In doing so, this Court held that the FAC's allegations, *inter alia*, (a) were sufficient to make a prima facie case of specific personal jurisdiction over the Canadian Defendants, (b) sufficiently plead particularized facts constituting circumstantial evidence of scienter, (c) were timely, and (d) did not exceed the territorial scope of the Exchange Act. (*See* MTD Decision.)

### B.     During Discovery, Defendants Refuse to Provide Discovery Regarding Baiting and Executing Orders that They Knowingly or Recklessly Placed on their Customers' Behalf

Following this Court's denial of Defendants' motion to dismiss the spoofing claims, Plaintiff served Requests for Production of Documents on Defendants, and subpoenas on various nonparties including NASDAQ, DTCC, FINRA, and Instinet. (SAC ¶ 120.)  The information obtained from nonparties illuminated the mechanics of how Defendants' spoofing schemes worked and further revealed *how* Defendants participated in those schemes. (*Id.* ¶¶ 121-123.)

---

[3] Although Harrington's analysis began with trades and orders taking place on September 21, 2015, its claims arose only from those that took place during the Relevant Period (beginning on January 27, 2016). (*Id.* ¶ 60 n.11.)

[4] The identifying information consisted of Market Participant Identifiers ("MPIDs")—four-letter identifiers that are assigned to each market participant by the Financial Industry Regulatory Authority ("FINRA").  MPIDs are used to submit orders and quotes to exchanges and report trades to FINRA. (*Id.* ¶ 29 n.6.)

Defendants, however, refused to provide discovery regarding their participation in all the spoofing cycles alleged in the FAC.  (*Id.* ¶ 123 n.11.)  Instead, they (1) characterized Baiting and Executing Orders that they placed on behalf of their customers as "customer trading"— notwithstanding that *Defendants* were the ones who placed, executed, and settled the orders— (2) contended that the FAC focused on proprietary trading, and (3) argued that Defendants therefore had no obligation to produce any data concerning such orders.  On August 5, 2022, Plaintiff filed a letter with this Court (the "PMC Letter") seeking both an extension of the date to complete document discovery and a pre-motion discovery conference to compel Defendants to produce data regarding orders they placed on behalf of customers.  (ECF No. 116.)  Pursuant to the Court's Individual rules, the PMC Letter covering both requests was limited to three pages, and thus, only one short paragraph (without supporting case law) presented the argument that Defendants were primarily liable for all orders they placed, executed, and/or settled, regardless of whether they did so pursuant to the directions of their customers.

Defendants submitted a responsive letter on August 12, 2022 arguing the opposite (ECF No. 118).  Three days later, on August 15, 2022, this Court issued a short order (ECF No. 120) in which it denied Plaintiff's request for a pre-motion conference and held that Harrington had not yet "articulated any plausible theory under which any currently named Defendant is liable for" trading initiated by their customers.  Prior to that order, Plaintiff did not have the opportunity to (a) respond to Defendants' legal arguments, (b) clarify that the trading for which it seeks to hold Defendants liable are not "customers' orders"—as Defendants misleadingly characterize them— but rather Defendants' own, or (c) provide case law demonstrating that Defendants are indeed liable for participating in spoofing schemes by following the instructions of their customers to

place and execute orders that they knew or were reckless in not knowing were intended to manipulate the market.

C.   **In Response to this Court's Order, Plaintiff Amends its Complaint to Articulate the Applicable Legal Theory Under Which Defendants are Indeed Primarily Liable for Baiting and Executing Orders they Knowingly or Recklessly Placed on their Customers' Behalf**

Harrington drafted and filed the SAC to (a) resolve any lingering confusion or doubt about the scope of its claims by clarifying that they absolutely extend to manipulative trading Defendants carried out on their customers' behalf; and (b) as the Court invited Harrington to do, articulate the legal theory demonstrating that Defendants may indeed be held primarily liable for their participation in spoofing schemes even if they were only following their customers' instructions.  Accordingly, the SAC cites to case law and asserts factual allegations specifically demonstrating that Defendants are primarily liable for their own actions in knowingly or recklessly disseminating and effecting Baiting and Executing Orders regardless of whether they did so in response to instructions from their customers or their own proprietary trading desks. (*See id.* ¶¶ 3, 4, 123 n.11, 129, 137.)[5]

While drafting the SAC to add such components, Plaintiff took the opportunity to make certain cosmetic and stylistic changes to its complaint—such as removing allegations related to the since-dismissed short-selling claims, using discovery obtained from nonparties to provide more illustrative examples of the spoofing events and cycles upon which Plaintiff's claims are based, and adding details regarding *how* Defendants' participated in spoofing.  Despite these changes, the SAC asserts the same causes of action, under the same statutes, against the same

---

[5] There is absolutely no basis whatsoever to Defendants' false and unsupported assertions that in discovery, Harrington did not find "evidence that Defendants engaged in spoofing to benefit their own accounts," (Def. Mem. 4), or that Harrington is somehow "abandon[ing its] prior theory of the case based on proprietary trading."  (*Id.* at 9.) Harrington has obtained evidence regarding spoofing by Defendants on their own behalf and is not abandoning claims based on proprietary trading.  Those claims remain in full effect in the SAC.

parties, based on the <u>same spoofing events and cycles</u> alleged in the FAC.  <u>Each and every</u>
<u>element of every claim alleged in the SAC was alleged in the FAC</u>.

For example, with respect to Harrington's § 10(b) claim, both complaints allege at length:
(1) manipulative acts by Defendants, (*compare* FAC ¶¶ 55-68 *with* SAC ¶¶ 46-56); (2) damage
resulting from those manipulative acts, (*compare* FAC ¶¶ 165, 170 *with* SAC ¶¶ 99-104, 139);
(3) Plaintiff's reliance on an assumption of an efficient market, (*compare* FAC ¶ 170-72 *with*
SAC ¶¶ 139-45); (4) that Defendants acted with scienter, (*compare* FAC ¶¶ 166-69 *with* SAC
¶¶ 57-77, 130-38); (5) that the manipulation was in connection with the purchase or sale of
securities, (*compare* FAC ¶ 1 *with* SAC ¶ 1); and (6) that the scheme was furthered by
Defendants' use of the mails or any facility of a national securities exchange.  (*Compare* FAC
¶¶ 173, 174 *with* SAC ¶¶ 146, 147).  In denying Defendants' motion to dismiss the FAC, this
Court already held that the spoofing allegations in the FAC were well-pleaded.   They are no less
well-pleaded in the SAC, and accordingly, Defendants' motion should be denied.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) must be denied when a complaint contains
"factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI*
*Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) ("*ATSI*") (quoting *Bell Atl.*
*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This standard is met "when the plaintiff pleads
factual content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).
"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a
sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).

Additionally, on a motion to dismiss under Rule 12(b)(2) where the issue of personal
jurisdiction "is decided initially on the pleadings and without discovery, the plaintiff need show

only a *prima facie* case." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d

117, 120 (2d Cir. 1984).  When evaluating whether a plaintiff has done so, courts must "construe

the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their

favor." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).  "[T]he

plaintiff's *prima facie* showing may be established solely by allegations."  *Ball v. Metallurgie

Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied*, 498 U.S., 854 (1990).

## ARGUMENT

## I.   PLAINTIFF'S EXCHANGE ACT CLAIMS ARE TIMELY

Defendants wrongfully argue that the SAC must be dismissed as untimely because it adds

new claims that are barred by the 5-year statute of repose applicable to Exchange Act claims.

Defendants' argument, however, is based on a mischaracterization of the SAC and a fundamental

misunderstanding of what the statute of repose does *and does not* bar.

The statute of repose has never been held to function as an absolute bar on amending

complaints; on the contrary, both the statute itself and the case law interpreting it are

unambiguous on what it precludes—the assertion of new <u>claims</u> after the expiration of the 5-year

repose period.  The SAC, however, adds <u>no new claims</u>.  The SAC asserts the <u>same causes of

action</u> under the <u>same statutes</u> against the <u>same parties</u> based on the <u>same spoofing events and

cycles</u> alleged in the FAC.  As discussed at length above and below, the SAC adds factual

support and legal argument with the purpose of demonstrating to the Court that the trading

initiated by Defendants' customers upon which the FAC's claims are based are not—as

Defendants characterized it during discovery—"customer" trading, but rather, Defendants' *own*

trading, for which they are primarily liable.  No authority cited by Defendants holds that the

statute of repose bars amending pleadings to add legal arguments or facts that particularize

existing claims.  Indeed, it is black-letter law that complaints need not make legal arguments at

all.  *See, e.g., Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 57 (2d Cir. 2012).  Because the SAC's spoofing claims are the same as those asserted in the FAC, this Court's prior holding that they are timely controls, and should not be reconsidered.  (*See* MTD Decision, at 8.)

### A.  The Statute of Repose Bars Only the Assertion of New Claims

There is no basis for Defendants' argument that 28 U.S.C. § 1658 bars amending complaints to add new arguments or facts.  On the contrary, the text of the statute of repose refers only to ***actions*** that may be ***brought*** by plaintiffs:

> (b) Notwithstanding subsection (a), a private ***right of action*** that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . ***may be brought*** not later than [five years after such violation].

*Id.* (emphasis added).  As the case law that Defendants themselves cited demonstrates, Courts have uniformly held that the statute should be interpreted to bar the assertion only of new claims.[6]  *See, e.g., In re Longtop Fin. Techs. Ltd. Sec. Litig.,* 939 F. Supp. 2d 360, 380 (S.D.N.Y. 2013) (discussing the availability of relation back "when a <u>claim</u> is barred by a statute of repose" (emphasis added)); *Barilli v. Sky Solar Holdings, Ltd*., 389 F. Supp. 3d 232, 264 (S.D.N.Y. 2019) (barring a plaintiff from asserting "new claims"); *Peifa Xu v. Gridsum Holding Inc*., No. 18 Civ. 3655, 2021 WL 773002, at *7-8 (S.D.N.Y. Feb. 23, 2021) (barring the assertion of a new "claim").[7]

---

[6] Indeed, the holding of *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017) ("*CalPERS*")—cited by Defendants—is even more limited in a way that <u>undercuts</u> Defendants' arguments.  There, the Supreme Court held that a statute of repose with identical language regarding an "action" that may be "brought" should be interpreted to bar the bringing of a new "proceeding," such as a new "lawsuit."  *Id.* at 2054 ("The term 'action,' however, refers to a judicial 'proceeding,' or perhaps to a 'suit'—not to the general content of claims." (citing  Black's Law Dictionary 41 (3d ed. 1933))).  Thus, under the Supreme Court's interpretation in *CalPERS*, the statute of repose did not even necessarily extend to the assertion of new claims in an existing suit.

[7] Defendants also misleadingly cite this Court's prior ruling in *Gotham Diversified Neutral Master Fund, LP v. Chicago Bridge & Iron Co. N.V.*, No. 18 CIV. 9927, 2019 WL 3996519 (S.D.N.Y. Aug. 23, 2019) (Schofield, J).  *Gotham*, however, had nothing do with statutes of repose and involved entirely different legal principles.  *See id.* at *3 (holding that class action tolling did not apply to the assertion of new claims under different statutes (with "significantly different" legal standards) than those asserted in a prior complaint).

Defendants argue at length that Harrington may not take advantage of "relation back" under Rule 15(c) to assert claims that would otherwise be barred under the statute of repose, and in doing so, cite a trio of decisions in this district.  (Def. Mem. 7-8).  Those opinions are not controlling law, and in fact, the only Circuit Court to weigh in on the issue recently held that new claims which relate back to those asserted in an earlier complaint <u>may</u> be brought after the expiration of the repose period.[8]  However, the fatal flaw with Defendants' argument is that Harrington is not relying upon the "relation back" and does not need its application because, as discussed above and below, the claims in the SAC are the same as those in the FAC.

**B.      The SAC Does Not Assert Any New Claims**

The SAC asserts no new claims because <u>each and every element of every claim</u> alleged in the SAC was alleged in the FAC.  For example, with respect to Plaintiff's § 10(b) claim, both complaints allege at length:  (1) manipulative acts by Defendants, (*compare* FAC ¶¶ 55-68 *with* SAC ¶¶ 46-56); (2) damage resulting from those manipulative acts, (*compare* FAC ¶¶ 165, 170 *with* SAC ¶¶ 99-104, 139); (3) Plaintiff's reliance on an assumption of an efficient market, (*compare* FAC ¶ 170-72 *with* SAC ¶¶ 139-45); (4) that Defendants acted with scienter, (*compare* FAC ¶¶ 166-69 *with* SAC ¶¶ 57-77, 130-38); (5) that the manipulation was in connection with the purchase or sale of securities, (*compare.* FAC ¶ 1 *with* SAC ¶ 1); and (6) that the scheme was furthered by Defendants' use of the mails or any facility of a national securities exchange. (*Compare* FAC ¶¶ 173, 174 *with* SAC ¶¶ 146, 147.)  And critically, the claims in the SAC arise

---

[8]*See Se. Penn. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 350–52 (3d Cir. 2021) (rejecting the identical argument made by Defendants that Rule 15(c) does not apply once the statute of repose period has run, and holding that application of the relation back doctrine does <u>not</u> conflict with a statute of repose as long as the plaintiff's action is pending when the repose deadline expires).  To date, no other Circuit Court has addressed the applicability of relation back to amendments brought after the repose period, and indeed, in *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013)—cited by Defendants—the Second Circuit specifically declined to consider "whether Rule 15(c) allows 'relation back' of claims otherwise barred by a statute of repose."  721 F.3d at 110 n.18.

from the same exact set of spoofing events carried out by the same exact Defendants during the same exact relevant period.  (*Compare* FAC ¶ 60 n.11 (seeking recovery for Defendants' participation in spoofing between January 27, 2016 and November 15, 2016) *with* SAC ¶ 1 (defining Harrington's claims as based on spoofing carried out by Defendants between January 27, 2016 and November 15, 2016).)

Because there is complete and total overlap between the spoofing events upon which the FAC's and SAC's claims are based, the SAC does not expand or enlarge the claims asserted in the FAC in any substantive way.  This fact alone distinguishes Harrington's claims from those asserted by plaintiffs in the cases cited by Defendants—which, as discussed above, are at odds with the only Circuit Court to have weighed in on the issue.  In *Longtop*, for example, the plaintiffs' amended complaint attempted to expand its causes of action to encompass claims based on an audit opinion that did not appear in the case until the amended complaint was filed (which was after the statute of repose had expired).  939 F. Supp. 2d at 379–80.  Similarly, in *Barilli*, the court declined to permit the plaintiff to expand its complaint to new claims based on new misrepresentations and omissions that were not pleaded in the original complaint and were only introduced after the 3-year repose period expired.  389 F. Supp. 3d at 263–64.  Likewise, in *Peifa Xu*, the plaintiffs' original complaint alleged generally that the defendant's financial statements were misleading but otherwise failed to disclose the adverse facts and specific claims that the plaintiff sought to raise for the first time in an amended pleading.  2021 WL 773002, at *7-8.  *See also, Fed. Deposit Ins. Corp. for Colonial Bank v. First Horizon Asset Sec. Inc*., 291 F. Supp. 3d 364, 369 (S.D.N.Y. 2018) (new claims asserted in amended complaint under Section 12(a)(2) of the Exchange Act barred by expired statute of repose where original complaint only asserted two claims under Section 11 and 15).

Ultimately, Defendants appear to concede that the statute of repose bars only the assertion of new <u>claims</u> and attempts to argue that the SAC's claims are nevertheless "new" because the FAC did not "allege facts" regarding Defendants' liability for trades and orders they placed and executed on their customers' behalf.  (Def. Mem. 9).  This is false.  Again, the  FAC unambiguously alleged that each of the Defendants placed orders <u>both</u> for their own proprietary account <u>and</u> for the accounts of their customers, (*see* FAC ¶¶ 22, 24, 26, 28, 29), and it contains numerous allegations not only regarding such trading, but also regarding Defendants' failure to implement policies, procedures, and systems to detect or prevent manipulative trading.  (FAC ¶¶ 168-69.)  Indeed, in its MTD Decision, *this Court already acknowledged* the FAC's allegations regarding manipulative trading Defendants carried out on their customers' behalf.  (*See* MTD Decision, at 10-11 ("Of note, the Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices ***for either client or proprietary accounts***." (emphasis added)).)

Defendants attempt to obfuscate the fact that the FAC's claims extended to manipulative trading carried out by Defendants both on their own behalf and that of their customers by arguing that the illustrative examples included in either the FAC or SAC limit or define the scope of its claims.  (Def. Mem. 9).  Defendants provide no authority whatsoever for this argument.  The illustrative examples are exactly what they purport to be:  <u>examples</u> designed to illustrate <u>how</u> Defendants carried out spoofing, and <u>how</u> the data available demonstrates both their actions and their intent.  It is utterly irrelevant to the scope of Harrington's claims that it updated the examples in the SAC to take advantage of what it learned through nonparty discovery and provide even more illustrative examples for the Court because the scope of complaints are not defined or limited by their illustrative examples; on the contrary, they are defined by <u>their</u>

allegations regarding their scope, and there, the FAC and SAC are identical.[9]  (*Compare* FAC

¶ 60 n.11 (seeking recovery for Defendants' participation in spoofing between January 27, 2016

and November 15, 2016) *with* SAC ¶ 1 (defining Harrington's claims as based on spoofing

carried out by Defendants between January 27, 2016 and November 15, 2016).)

    Nor is there any basis whatsoever for Defendants' argument that the statute of repose

somehow bars the SAC from "articulat[ing a] theory suggesting . . . that Defendants are liable for

routing or executing customer trades," or that the SAC's claims are barred because they're based

on a different "theory" than those in the FAC.  (Def. Mem. 9).[10]  On the contrary, it is hornbook

law that when assessing the claims in a complaint, any legal theories articulated by the complaint

are irrelevant and "'[f]actual allegations alone are what matters.'"  *Townsend*, 679 F.3d at 57

(quoting *Albert v. Carovano*, 851 F.2d 561, 571 n. 3 (2d Cir.1988)).  Indeed, courts—including

the Second Circuit—repeatedly have held that parties may prevail on legal theories ***even if those***

***legal theories were never pleaded in the complaint***.  *See, e.g., Flickinger v. Harold C. Brown &*

*Co.*, 947 F.2d 595, 600 (2d Cir. 1991) (directing judgment be entered for plaintiff based on a

legal theory that was never articulated in a pleading and holding that "federal pleading is by

statement of claim, not by legal theory" (citation omitted));  *Janke Const. Co. v. Vulcan*

*Materials Co.*, 386 F. Supp. 687, 692 n.3 (W.D. Wis. 1974), *aff'd*, 527 F.2d 772 (7th Cir. 1976)

---

[9] The examples in the SAC even better demonstrate the falsity of Defendants' argument that Harrington "never explains how it distinguishes [Baiting Orders] from other orders."  (Def. Mem. 1).  They show precisely how the trading data available to Harrington was used to (a) identify the spoofing cycles from which Plaintiff's claims arise; and (b) the exact order of operations and timing (down to the millisecond) that yields a strong inference of intentional market manipulation underlying each spoofing cycle.  (SAC ¶¶ 77-98.)  This is exactly the type of detailed allegations that this Court already held were adequate to "constitute[] circumstantial evidence of conscious misbehavior."  (MTD Decision, at 12.)

[10] Again, the framing of trades that Defendants carried out on their customers' behalf as "customer trades" is Defendants' own, and Harrington does not accept it.  As it did in the FAC, Harrington seeks only to hold Defendants liable for the trades and orders *they* placed, executed, and settled—*regardless* of whether they did so for their proprietary trading desks or at their customers' behest.

("***The fact that plaintiff misconceived the legal theory of its case does not preclude it from obtaining relief under another legal theory***." (emphasis added)).[11]

When this Court denied Harrington's request for a pre-motion conference for a motion to compel discovery regarding trades and orders that Defendants carried out on their customers' behalf, it did so because Harrington had not yet "articulated any plausible theory under which any currently named Defendant is liable" for that trading activity.  (ECF No. 120.)  In filing the SAC, Harrington has not "pivoted" to assert a new theory of liability against the Defendants, rather, it offered authority to support an existing theory.[12]  But even if Harrington did "pivot to a new theory," Harrington would be permitted to do so regardless of any repose period.[13]  As discussed below, the SAC's legal arguments seek only to explain exactly *why* Defendants are liable for orders they placed, executed, and settled, regardless of on whose behalf they were placed, executed and settled.  Defendants' motion should be denied.

## II.   PLAINTIFF HAS ADEQUATELY ALLEGED AN EXCHANGE ACT CLAIM

### A.  The SAC Pleads Manipulative Conduct with Sufficient Particularity

The 62-page, 152-paragraph SAC—which is replete with multiple tables, (*see* SAC ¶¶ 56, 100), highly specific figures, (*see id.* ¶¶ 50, 54, 58, 59, 66, 67, 70-73, 75, 102-04), and detailed examples, (*see id.* ¶¶ 78-98)—more than adequately alleges Exchange Act claims with

---

[11] In addition to being contrary to the text of the Federal Rules and controlling Second Circuit law, a holding that the statute of repose barred the articulation of new legal theories would lead to absurd results—attorneys would need to consult repose statutes to determine whether they are barred from making new arguments when preparing memoranda of law, or even in the middle of a trial.

[12] Although Defendants attempt to characterize Harrington's claims based on trades and orders placed on behalf of customers as new to the SAC—as distinguished from the FAC, which Defendants incorrectly argue was limited to proprietary trading—Defendants incredibly argue that the SAC's claims based on proprietary trading must *also* be dismissed because the SAC has "abandon[ed]" that theory.  (Def. Mem. 9.)  This is nonsense.  The SAC unambiguously seeks to hold Defendants liable for trading they conducted on behalf of their proprietary accounts. (SAC ¶¶ 14, 15, 17, 18, 30, 47, 49, 119, 123 n.11.)  There is no basis whatsoever for dismissal of such claims.

[13] As Defendants' own brief makes clear, they understood the SAC to be articulating new theories and arguments; indeed, they repeatedly describe it as doing just that.  (Def. Mem. 5 (describing the SAC as "pivot[ing] away from Harrington's original theory]"), *Id.* at 7-8 (referring to "Harrington's ***argument***" in the SAC (emphasis added)).)

sufficient particularity.  Defendants nevertheless argue that the SAC is vague because "[r]ather than attributing alleged orders and trades to specific Defendants, as the FAC did, the SAC repeatedly alleges conduct by 'Defendants' generally."  (Def. Mem. 11).  This argument is factually wrong and directly contradicts this Court's prior ruling.  *First*, the FAC contained considerable general allegations pertaining to all Defendants, as *Defendants themselves* argued in their motion to dismiss it.  (*See* MTD FAC [ECF No. 73] at 17-18 ("Harrington alleges **no facts** about . . . [w]hich Defendant(s)?  [] Harrington does not differentiate among Defendants." (emphasis in original)).)  *Second*, this Court *already rejected those arguments* in the MTD Decision, holding that:

> The Complaint alleges that the U.S. and Canadian Spoofing Defendants placed the allegedly manipulated orders and specifies the date and time of multiple manipulative orders and trades for each Spoofing Defendant.  The Complaint further alleges that the U.S. and Canadian Spoofing Defendants "designed and implemented algorithmic trading programs that executed their spoofing schemes."
>
> That the Complaint mentions that Defendants trade for their own proprietary accounts **and the accounts of their customers** does not undercut the Complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed Concordia stock.  Of note, the Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices **for either client or proprietary accounts**.

(MTD Decision, at 10-11 (emphasis added).)  As this Court correctly recognized, if Defendants participated in schemes to manipulate the price of Concordia, they are liable whether they did so for their clients or their own proprietary accounts.

Defendants fare no better with their argument that the SAC lacks particularity because it does not explain "how Harrington arrived at [the detailed] figures" provided in the SAC, or that the SAC "alleges no facts explaining *why* the trading was unlawful."  (Def. Mem. 12 (emphasis in original).)  Again, the arguments Defendants make now—which rely heavily on *ATSI*, 493 F.3d 87—are the same flawed and rejected arguments that Defendants made in their motion to

dismiss the FAC (which relied so heavily on *ATSI* that its Table of Contents lists its pages as "*passim*").  (MTD FAC at ii, 15-22.)  In doing so, Defendants misread *ATSI*, which held that plaintiffs alleging manipulation claims—as Plaintiff does here—"need not plead manipulation to the same degree of specificity as a misrepresentation claim," and rather, need only "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  493 F.3d at 102.  Again, the SAC alleges each with great specificity and particularity.  (SAC ¶¶ 46-104.)  There is no obligation for Plaintiff to provide a detailed expert-level report or analysis of how it arrived at each of the figures cited in the SAC.  *See In re Coleco Sec. Litig.*, 591 F. Supp. 1488, 1490 (S.D.N.Y. 1984) ("[Rule 9(b)] does [not] require the pleading of expert testimony."); *Ross v. A. H. Robins Co.*, 607 F.2d 545, 557 n.20 (2d Cir. 1979) ("Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter." (quotation and citation omitted)).

All *ATSI* requires is that a complaint "plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities."  493 F.3d at 102.  This is precisely what the SAC does, in providing *sixteen different ways* or 'indicia' in which the available data demonstrates that the orders placed and executed by Defendants were *not* as Defendants argue, "normal order flow," (Def. Mem. 13), but rather Baiting and Executing Orders that were intended to, and did, deceive, manipulate, or defraud the market for Concordia shares and participants in that market.  (SAC ¶¶ 57-77.)[14]  Nor is there any basis in fact or law for Defendants' argument that some further heightened pleading

---

[14] Nor does it matter whether it was *Defendants'* purpose to place those orders for manipulative means.  As the Second Circuit has held, a broker "can be primarily liable under § 10(b) for following a [principal's] directions to execute stock trades that [he] knew, or was reckless in not knowing, were manipulative, even if [he] did not share the [principal's] specific overall purpose to manipulate the market for that stock."  *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 108 (2d Cir.1998).

standard applies because some discovery has taken place.  Defendants cite no support for this proposition, and in any event, the very reason Harrington now seeks to amend is because Defendants *refused* to provide *any* discovery regarding what Defendants inaccurately characterized as "customer trading."  (*See id.* ¶ 123 n.11.)

### B.      The SAC Adequately Pleads Facts Yielding a Strong Inference of Scienter

Defendants have argued that Harrington seeks to establish scienter "mainly through conclusionary allegations" and that the "SAC contains no facts, suggesting that any Defendant knew or recklessly ignored that its customers' orders were fraudulent."  (Def. Mem. 15).  This argument strains the limits of credulity and suggests that Defendants have ignored the specific factual allegations concerning scienter  The SAC alleges—in great depth, and with more than adequate particularity and specificity—that Defendants participated in schemes to manipulate Concordia's share price by knowingly or recklessly ignoring that the orders they were placing for their own accounts and the accounts of their customers were fraudulent.  (*See* SAC ¶¶ 56-98).  Just as this Court rejected Defendants scienter arguments to dismiss the FAC, the Court should similarly reject their scienter arguments concerning the SAC.

It is well-settled that a plaintiff may satisfy its burden to plead scienter under section 10(b) and Rule 10-b5(a) and (c) where its complaint alleges circumstantial evidence of conscious misbehavior or recklessness that permits a strong inference of scienter to be made.  *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F3d 64, 78-80 (2d Cir. 2021).  Indeed, in doing so, courts must consider whether "*all* of the facts alleged, taken collectively," give rise to an inference of scienter that is "at least as compelling as any opposing inference" of non-fraudulent intent. *Tellabs, Inc. V. Makor Issues and Rts, Ltd.*, 551 U.S. 308, 322-324 (2007) (emphasis in original).

In the MTD Decision, this Court stated that "when looking to indicia that distinguish spoofing from legitimate market activity, courts tend to examine":

(1) [T]he passage of time between placement and canceling of orders (usually in milliseconds), (2) cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled, (3) parking baiting orders behind smaller legitimate orders placed by other traders and (4) large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer.

(MTD Decision, at 11 (citing *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017)).)

When this Court denied Defendants' motion to dismiss Harrington's spoofing claims, it held that the FAC "pleads particularized facts constituting circumstantial evidence of conscious misbehavior fitting each of the four indicia." (MTD Decision, at 12.)  The SAC again alleges each factor and several additional factors, with equal (if not greater) specificity.  (*See* SAC ¶ 68 (the passage of only milliseconds between Defendants' placement and cancellation of tens of thousands of Baiting orders that were never intended to be executed); ¶ 71 (Defendants' continuous cancellation and execution of millions of Baiting orders throughout the Relevant Period that they knew had no legitimate financial purpose and were never intended to be executed);  and ¶¶ 65-67, 71 (the enormous imbalances between the Executing Orders and Baiting Orders that Defendants placed to create artificial selling pressure).)[15]

To further demonstrate the strong circumstantial evidence of scienter that exists, the SAC alleges several examples of real-time spoofing events that each Defendant effected, bolstered by trading data obtained through subpoenas from nonparties during discovery.  (*Id.* ¶¶ 78-98.) Contrary to Defendants' absurd assertion that "[t]he SAC contains no facts [] suggesting that any Defendant knew or recklessly ignored that its customers' orders were fraudulent," (Def. Mem.

---

[15] *Gamma Traders - I LLC v. Merrill Lynch Commods, Inc.*, 41 F.4th 71 (2d Cir. 2022)—cited by Defendants for the general proposition that plaintiffs asserting spoofing claims must explain how the orders and trades upon which their claims are based are distinguishable from normal order flow—offers no support to Defendants' arguments.  There, the Second Circuit dismissed spoofing claims solely because they lacked the type of supporting allegations regarding <u>damages</u> that Harrington explicitly included in the SAC.  *Compare id.* at 78-82 (holding that complaints alleging spoofing claims must include specific allegations regarding how the spoofing caused plaintiff's losses) *with* SAC ¶¶ 99-104.)

15), the SAC alleges no less than *sixteen* factual allegations which collectively create, not just a strong, but *overwhelming* inference that Defendants knew or recklessly ignored that the orders and trades they were disseminating and effecting were intended to and had the effect of manipulating the price of Concordia.  (SAC ¶¶ 57-77.)  Likewise, contrary to Defendants' flatly wrong assertion that the SAC alleges no motive, the SAC unequivocally alleges that Defendants derived economic benefit from their participation in their customers' spoofing—they "are paid transaction fees for completed customer trades," "saved hundreds of thousands of dollars in execution costs," and "yielded at least millions of dollars in ill-gotten gains."  (*Id.* ¶¶ 29, 76.)

As discussed at length above, Harrington's primary reason in filing the SAC was to clarify and further particularize its claim against Defendants that they are primarily liable for executing their own orders and/or following the directions of their customers to place, execute, and settle spoofing trades that they knew or recklessly ignored were manipulative.

In *U.S. Environmental*, for example, the Second Circuit unambiguously held that a broker could be primarily liable for following their client's directions to execute stock trades that the broker knew—*or was reckless in ignoring*—were manipulative, *even though the broker did not share the client's overall purpose to manipulate the market*.  155 F. 3d at 111-12 ("[the broker]'s personal motivation for manipulating the market is irrelevant.").  As the Second Circuit held, "[l]ike lawyers, accountants, and banks who engage in fraudulent or deceptive practices of their clients' direction, [a broker] is a primary violator despite the fact that someone else directed the market manipulation scheme."  *Id.* at 112.  Indeed, the Second Circuit reasoned, "if the trader who executes manipulative buy and sell orders is not a primary violator, **it is difficult to imagine who would [be]**."  *Id.* (emphasis added.) The SAC's allegations regarding scienter— that Defendants either knew or were reckless in not knowing that the orders and trades they

placed and executed were part of a manipulative scheme—are identical to those that the Second Circuit found sufficient in *U.S. Environmental*.

Defendants attempt to distinguish *U.S. Environmental* by arguing that (a) a different scienter pleading standard applies; (b) the scheme there was "blatantly deceptive and fraudulent," unlike the scheme in *SEC v. Masri*, 523 F.Supp.2d 361 (S.D.N.Y. 2007); and (c) the broker agreed to participate in the scheme. (Def. Mem. 16). Each of these arguments relies on a blatant misreading of *U.S. Environmental*. *First*, the applicable pleading standard has nothing to do with the question of whether *as a matter of law*, brokers may be liable for trades they knowingly or recklessly place on their customers' behalf. *U.S. Environmental* unambiguously holds that they may, 155 F. 3d at 111-12, and the SAC more than adequately alleges that Defendants did precisely that. (SAC ¶¶ 57-77.)[16]  *Second*, Defendants' attempt to distinguish *U.S. Environmental* by comparing it with *Masri* completely misses the mark. *Masri* was a <u>summary judgment</u> decision in which the court held that there was insufficient <u>evidence</u> to create a genuine issue of fact as to whether the broker "knew, or was reckless in not knowing, that the trades were being conducted by his principal for a manipulative scheme." 523 F.Supp.2d at 375. Here, the SAC repeatedly alleges such knowledge or recklessness, and on a motion to dismiss, its allegations <u>must</u> be accepted as true. *Third*, the court in *U.S. Environmental* went out of its way to hold that allegations regarding the broker's knowing participation in the scheme were <u>not</u> necessary to its holding, and on the contrary, allegations of recklessness were sufficient. 155 F.

---

[16] Defendants' attempt to distinguish *Lorenzo v. SEC* by arguing that it applied a more deferential "pleading standard" is even more nonsensical. (Def. Mem. 16-17). *Lorenzo* has nothing whatsoever to do with pleading standards; on the contrary, it involved a challenge to <u>factual findings</u> in an enforcement action by the Securities and Exchange Commission. *Lorenzo v. SEC*, 139 S.Ct. 1094, 1109 (2019). The holdings of *U.S. Environmental* and *Lorenzo* that Defendants cannot escape are not about particularity of pleading, but rather about <u>whether</u> broker-dealers such as Defendants may be primarily liable for disseminating false information in furtherance of their customers' manipulative schemes. *Lorenzo* plainly holds that they may. *Id.* at 1100. And the SAC plainly alleges that that is precisely what Defendants did.

3d at 111 ("Although we need not rely on this point, we also note that the complaint's claim that [the broker] recklessly participated in the manipulation also alleges sufficient scienter.") (citation omitted).  *U.S. Environmental* is closely analogous and plainly applicable, and Defendants cannot escape its holding.

Ultimately, Defendants are responsible and may be held liable under 10b-5(a) and (c) for their role in "the dissemination of false or misleading information."  *Lorenzo*, 139 S.Ct. at 1100. In *Lorenzo*, an investment banker sent an email that he knew contained false financial information to investors.  The banker argued that because his boss authorized the email, provided its central content, and had ultimate authority over its sending, he lacked the requisite intent and could not be held primarily liable for the email's dissemination.  *Id.*  The Supreme Court disagreed, holding that a disseminator of false information can be primarily liable under Rule 10-b5(a) and (c) for participating in a scheme to defraud, reasoning that if this were not so, "then such a fraud, whatever its intent or consequences, might escape liability altogether.  *This is not what Congress intended*."  *Id.* at 1104 (emphasis added).

Defendants' remaining arguments regarding the sufficiency of the SAC's scienter allegations are a rehash of the same failed arguments this Court already rejected in denying Defendants' motion to dismiss the FAC.  For example, Defendants recycle the silly argument that the SAC fails to meet the PLSRA's pleading standard because it does not specify which of Defendants' corporate officials approved their trading activities, or because it provides "only" seven highly-detailed illustrative examples.  (Def. Mem. 17).  The Court previously dealt with these arguments by holding as follows:

> Defendants' argument that these facts are insufficient because the Complaint must
> plead additional particularized facts is unavailing.  Defendants argue that the
> Complaint needs to plead additional facts regarding  Defendants' algorithmic
> trading programs and the corporate officials who designed or oversaw those

programs.  Defendants' argument is unfounded because a claim of manipulation can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.  If Defendants' argument were correct, ***it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing*** through high-frequency trading algorithms.

(MTD Decision, at 13-14 (quotation and citation omitted; emphasis added).)

The holdings of *U.S. Environmental* and *Lorenzo* are clear:  brokers are primarily liable for orders that <u>they</u> place and execute if they know or recklessly ignore that those orders are part of schemes to illegally manipulate the market.  The SAC alleges in great detail and with more than adequate particularity that Defendants did exactly that.  Defendants cannot hide behind their customers to evade responsibility, and their motion should be denied.

### C.    The SAC Pleads All the Exchange Act Elements

In arguing that the SAC fails to plead loss causation and reliance, Defendants once again trot out the same flawed arguments that they previously made—and that this Court already rejected—in their motion to dismiss the FAC.  With respect to loss causation, Defendants cite to the *same exact cases* they unsuccessfully relied upon in their prior motion—*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) and *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004)—and make the *same exact argument*:  that the SAC engages in impermissible group pleading and fails to draw a link between Defendants' conduct and losses to Harrington. (Def. Mem. 17-18).  This Court already rejected these arguments in the MTD Decision, holding that because Harrington's claims are based on "market manipulation and not misstatements," and because the spoofing cycles in which Defendants are alleged to have participated are "of such a like character and so frequent[,] it would be improper to infer, at this stage of the litigation, that one Defendant contributed disproportionately to the damages alleged . . . [particularly] because the Complaint alleges a cumulative effect."  (*Id.* at 15-16.)  The SAC contains the same exact

allegations of similar and frequent spoofing in which Defendants participated, and a cumulative and devastating impact on the price of Concordia, which harmed Harrington.  (SAC ¶¶ 99-104.)

Nor is there any merit to Defendants' arguments that the SAC's allegations regarding reliance are materially different from those in the FAC that this Court already held were sufficient.  As this Court already held, Harrington met its pleading standard in the FAC by alleging that Defendants "injected false and misleading information into the marketplace and interfered with the natural forces of supply and demand" and that Harrington "relied on an assumption" of an efficient market.  (MTD Decision, at 17 (citing *Sharette v. Credit Suisse Int'l*, 127 F.Supp.3d 60 (S.D.N.Y. 2015).)  The SAC alleges both.  (SAC ¶¶ 47, 50, 139.)  Defendants argue that because Harrington was sophisticated enough to realize that Concordia's price was depressed and have *concerns* that manipulative forces were in play, Harrington was no longer entitled to rely upon the assumption of an efficient market.  (Def. Mem. 18.)  But as this Court already held, *concerns* about potential manipulation are not the same as a *belief, based on concrete facts learned* that manipulation has taken place, (MTD Decision, at 17), and indeed, "it is well-established that an investor's sophistication does not preclude him from relying on the integrity of the market and asserting the fraud-on-the-market presumption."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 164 (S.D.N.Y. 2007), *vacated in part on other grounds*, 574 F.3d 29 (2d Cir. 2009).[17]

---

[17] *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478 (S.D.N.Y. 2011)—cited by Defendants—is utterly inapposite.  There, the court held that plaintiffs were not entitled to rely upon the presumption of an efficient market because the market at issue was <u>not</u>—as it is here—a stock exchange such as NASDAQ which "is recognized as maintaining an efficient market."  *Id.* at 493.  Further, the Court held that plaintiffs could not rely on the presumption of an efficient market because they alleged that *their own trading* caused "a dramatic rise" in the price of the stock.  *Id.*  Here, Harrington does not allege that its own trading had any impact at all on Concordia's stock, nor does Harrington concede that during the Relevant Period, it had anything but generalized concerns that the price of Concordia shares seemed too low.

**III.   THE SAC PLEADS SUFFICIENT FACTS TO PERMIT THE EXERCISE OF PERSONAL JURISDICTION OVER THE CANADIAN DEFENDANTS**

The SAC's allegations regarding the Canadian Defendants' contacts with this forum are indistinct from those that this Court has already held were sufficient to establish personal jurisdiction.  In arguing otherwise, the Canadian Defendants misread the MTD Decision, mischaracterize their own conduct, and make novel arguments utterly devoid of support in existing case law.

Defendants attempt to distinguish the SAC by arguing that the "[m]ost important" change from the FAC for jurisdictional purposes is the removal of conspiracy allegations.  (Def. Mem. 19.)  This is nonsense.  In finding that the FAC adequately alleged personal jurisdiction, this Court did not so much as *mention* the conspiracy allegations.  On the contrary, in the MTD Decision, this Court held that the FAC adequately alleged two other independent bases for the exercise of personal jurisdiction over Defendants:  (1) "[t]he [FAC] makes unrebutted allegations that [] the Canadian Defendants . . . engaged in trading in Concordia's stock on a U.S. exchange during the Relevant Period"; and (2) "the [FAC] makes unrebutted allegations that the Canadian Defendants engaged in suit-related conduct directed at the United States with the intent and effect of manipulating Concordia's share price on U.S. exchanges." (*Id.* at 7.)  The SAC contains virtually identical allegations to the FAC with respect to both bases.  (*Compare* FAC ¶¶ 23, 27, 30 *with* SAC ¶¶ 13, 16, 19 (allegations that each of the Canadian Defendants executes trades of Concordia shares on U.S. exchanges); *compare* FAC ¶ 54 *with* SAC ¶¶ 6, 51, 52 (allegations that each of the Canadian engaged in suit-related conduct with the intent and effect of manipulating the price of Concordia shares on U.S. exchanges).)

In arguing that their contacts with the forum were *de minimis* or not suit-related, the Canadian Defendants engage in a willful mischaracterization of the SAC and make identical

arguments—and rely on substantially similar or identical declarations—to those that this Court already rejected in the MTD Decision.  Contrary to the Canadian Defendants' assertion that the SAC "does not allege how any Canadian Defendant 'reach[ed] out' and engaged in [] suit-related conduct," (Def. Mem. 20), the SAC explicitly alleges that each routed suit-related orders to be executed in the U.S.—exactly the type of contacts this Court held were sufficient in the MTD Decision.  (*See, e.g.,* SAC ¶¶ 6, 12, 18; MTD Decision, at 7.)

The Canadian Defendants attempt to distance themselves from the orders they placed, routed, and executed on U.S. exchanges by characterizing them as "customer trading" and—hiding behind their supposed best execution obligations—disclaiming any role in their decision to project themselves into this forum by disseminating or effecting those orders in New York.  Harrington's allegations, however, preclude any argument that the Canadian Defendants' decisions to route or execute orders on U.S. exchanges were not "a result of any scheme to take advantage of the U.S. market," (Def. Mem. 21), or that the Canadian Defendants had no way of knowing that the orders and trades they placed and executed on their customers' behalf were for an unlawful purpose.  On the contrary, the SAC alleges repeatedly and at length that the Canadian Defendants *knew or recklessly ignored* that the orders and trades they disseminated and effected on U.S. exchanges on behalf of customers were part of unlawful spoofing schemes.  (SAC ¶¶ 57-76, 123, 136-38.)  Broker-dealers have no "best execution" duty to route or place orders on U.S. exchanges when they know or should know that those orders are fraudulent, and the Canadian Defendants cannot avoid liability for their participation in a cross-border spoofing scheme by claiming that "it was their customers' idea."  On the contrary, if a broker-dealer knows or recklessly ignores that a customer is taking advantage of its "best execution" policies and algorithms to perpetrate a cross-border spoofing scheme and *nevertheless routes and*

*executes orders in the U.S. in furtherance of that scheme*, that broker-dealer has "reach[ed] out" and engaged in suit-related conduct in this forum.  *See Walden v. Fiore*, 571 U.S. 277, 285 (2014).  Indeed, the SAC alleges that this conduct was continuous, and had the requisite intent.

Likewise, this Court's ruling in the MTD Decision that the effects test provides a second basis for personal jurisdiction over the Canadian Defendants still fully applies here.  The cases that Defendants cite in arguing to the contrary stand for the proposition that it is not sufficient for a plaintiff to allege that the harm caused by foreign defendants' contacts with the target forum was foreseeable.  *See, e.g., Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) ("[m]ere foreseeability" not enough to satisfy the effects test); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 322 (S.D.N.Y. 2020).  The SAC does not, however, allege merely that the harmful effects of the Canadian Defendants' suit-related conduct were *foreseeable*.   On the contrary, it alleges that the *purpose and intent* of the cross-border spoofing scheme in which Defendants knowingly or recklessly participated was to manipulate the price of Concordia shares in the U.S.  (SAC ¶¶ 3, 4, 8, 123, 127, 129, 137); *cf. In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008) (cited by Defendants) (no basis for personal jurisdiction in the <u>absence</u> of any allegation that the defendant "caused the distribution of" false information or knew of its falsity).  Here, the Canadian Defendants knowingly or recklessly participated in spoofing schemes by projecting false information *into U.S. markets* about the supply of or demand for Concordia shares.  This Court has jurisdiction over them.

## IV.   THE SAC'S CLAIMS DO NOT EXCEED THE TERRITORIAL REACH OF THE EXCHANGE ACT

The SAC's claims fit well within the reach of the Exchange Act, which declares it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" so long as such device or contrivance is "in connection with the purchase or sale of a security listed on an

American stock exchange."  15 U.S.C.S. § 78j; *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 262, 273 (2010).  In the MTD Decision, this Court held that the FAC's claims did not exceed the territorial reach of the Exchange Act because the FAC alleged that (1) the Canadian Defendants "engaged in trading on U.S. exchanges in relation to the manipulative scheme," and (2) their Baiting Orders "had the intent to manipulate Concordia stock on U.S. exchanges."  (MTD Decision, at 19.)  The SAC makes the *exact same* allegations.[18]  (*See* SAC ¶¶ 3, 4, 6, 13, 16, 19, 47, 52, 123, 127, 133 (alleging repeatedly and in depth that the Canadian Defendants "engaged in suit-related . . . with the intent and effect of manipulating the price of Concordia shares" and that they "route[d] and execute[d] trades of Concordia shares throughout the U.S").)

        In arguing that the Canadian Defendants' conduct is beyond the territorial reach of the Exchange Act, the Canadian Defendants rely heavily—just as they did in their rejected argument for dismissal of the FAC—on *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), which remains inapposite.  In *Parkcentral*, the plaintiffs alleged that a foreign entity made fraudulent statements "primarily in Germany" to manipulate the price of shares that "trade primarily on European exchanges" for the purpose of conducting a hostile takeover.  *Id.* at 201-202.  There were no allegations of any intent to manipulate the price of shares of any security on any U.S. exchange, much less an interlisted one, as here.  And although the Second Circuit held in *Parkcentral* that the facts underlying plaintiffs' claims were "so predominantly foreign as to be impermissibly extraterritorial," it expressly acknowledged the

---

[18] Defendants misleadingly attempt to distinguish the allegations in the FAC from those in the SAC by contrasting the FAC's disclaimer that Plaintiff's claims are limited to spoofing schemes involving "sales of Concordia shares on U.S. exchanges only" with the SAC's allegations regarding "'Baiting Orders' on Canadian markets."  (Def. Mem. 23).  Orders and trades are not the same thing, and Defendants' conflation of the two is an attempted sleight of hand. The territorial reach of the Exchange Act comfortably encompasses spoofing schemes in which Baiting Orders in an interlisted security are placed in one country with the *intent* of manipulating the share price of that security in the U.S., after which Executing Orders—that is to say, purchases or sales—are placed, executed, and settled in the U.S.

particular nature of the facts in *Parkcentral* and cautioned courts to "carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases" when determining whether a case is "impermissibly extraterritorial."  *Id.* at 216-17.  Here, unlike in *Parkcentral*, the impact of the spoofing schemes on the price of Concordia shares on U.S. exchanges was not an incidental byproduct of a scheme with other aims; it was both the goal and effect of those schemes in which the Canadian Defendants participated.  (SAC ¶¶ 3, 4, 6, 47, 52, 123, 127.)[19]

Nor can the Canadian Defendants evade the Exchange Act's territorial reach by characterizing their alleged involvement in spoofing schemes as a mere "failure to supervise customer trading in Canada."  (Def. Mem. 24).  As the SAC repeatedly alleges and as argued extensively above, the SAC seeks to hold Defendants liable for *their own* actions—the orders and trades that *they* knowingly placed in furtherance of schemes to manipulate the price of Concordia.  Indeed, as the Second Circuit itself stated in *U.S. Environmental*, "if the trader who executes manipulative buy and sell orders is not a primary violator, it is difficult to imagine who would [be]."  155 F.3d at 112.  Defendants cannot hide behind their customers; they must face liability for their own conduct, and their motion should be denied.

---

[19] *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 97 (2d Cir. 2022)—also cited by Defendants—is equally inapposite.  There, the manipulative scheme was carried out "almost entirely" abroad; the defendants carried out no transactions in the U.S., had no intent to manipulate U.S. markets, and the *only* U.S. transactions alleged were the *plaintiff's* purchases of futures contracts on U.S. exchanges.  *Id.* at 97.  *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019)—cited by Defendants as well—is even more distinguishable.  In *Prime*, there was "no claim that *any* manipulative [] trading occurred in the United States."  *Id.* at 106 (emphasis added).  Indeed, in both *Laydon*, and *Prime*, not even the plaintiffs claimed to have traded in the allegedly manipulated asset itself in the U.S.; they traded in a derivative asset (such as an index or future contract).  Of course, here, the Canadian Defendants are alleged to have participated in a scheme intended to manipulate the price of an asset on U.S. exchanges—shares of Concordia in which Plaintiff also traded—and to have placed or routed orders of that asset on U.S. markets as part of that scheme.  (SAC ¶¶ 3, 4, 6, 13, 16, 19, 47, 52, 123, 127, 133.)

## <u>CONCLUSION</u>

For the foregoing reasons this Court should deny Defendants' motion to dismiss in its

entirety.


Dated:  New York, New York
        March 8, 2023

By:  <u>/s/ Alan M. Pollack</u>
     Alan M. Pollack
     Leron Thumim
     WARSHAW BURSTEIN, LLP
     575 Lexington Avenue, 7th Floor
     New York, New York 10022
     Tel:  212-984-7700
     apollack@wbny.com
     fennis@wbny.com
     lthumim@wbny.com

     James Wes Christian, Esq.
     Ardalan Attar, Esq.
     Christian Levine Law Group, LLC
     2302 Fannin, Suite 205
     Houston, Texas  77002
     Tel:  (713) 659-7617
     jchristian@christianlevinelaw.com
     aattar@christianlevinelaw.com

     *Attorneys for Plaintiff Harrington Global*
     *Opportunity Fund*