UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                  :

HARRINGTON GLOBAL OPPORTUNITY    :
FUND, LIMITED,                            :
                         Plaintiff,   :          21 Civ. 761 (LGS)
                                    :

          -against-          :        **OPINION AND ORDER**
                                    :

CIBC WORLD MARKETS CORP., et al.,   :
                   Defendants. :
---------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

      The Second Amended Complaint (the "SAC"), the operative Complaint, alleges

violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and

Rule 10b-5, and of Section 9(a)(2) of the Exchange Act.  Defendants move to dismiss the SAC

under Federal Rules 12(b)(2) and 12(b)(6).  For the following reasons, Defendants' motion is

denied.

## I.      BACKGROUND

      Familiarity with the facts of this case is assumed.  *See Harrington Glob. Opportunity*

*Fund, Ltd. v. CIBC World Markets Corp.*, 585 F. Supp. 3d 405, 411 (S.D.N.Y. 2022),

*reconsideration denied,* No. 21 Civ. 761, 2022 WL 580787 (S.D.N.Y. Feb. 25, 2022) (hereafter

"*Harrington I*") (motion to dismiss First Amended Complaint).  The following summary is taken

from the SAC and assumed to be true solely for the purpose of this motion.  *See Dixon v. von*

*Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

Plaintiff is a hedge fund based in Bermuda.  The named Defendants -- CIBC US and CIBC Canada; Merrill US and Merrill Canada; and TD US and TD Canada[1] -- are U.S. and Canadian broker-dealers that execute securities transactions for their own accounts and for their customers.  The Canadian Defendants are headquartered in Canada.  The U.S. Defendants maintain their principal places of business in New York.  Defendants John Doe-Canada and John Doe-U.S. are the Canadian Defendants' and U.S. Defendants' respective subsidiaries, parents, affiliates and sister companies.

Plaintiff owned shares of non-party health company Concordia International Corporation ("Concordia") and sold approximately nine million Concordia shares between January 27, 2016, and November 15, 2016 (the "Relevant Period").  During the Relevant Period, Concordia's share price ranged from $28.03 to $3.13.  Since 2015, Concordia has been an interlisted security, with shares listed and traded on the TSX in Canada and the Nasdaq in the United States.  A share of Concordia stock traded in the United States is the same as a share traded in Canada and because of the seamless interconnection between the U.S. and Canadian markets, trades in one country immediately affect the trading price in the other country.  Purchasers and sellers of Concordia stock, unless they otherwise request, have no control over whether their orders are routed to the United States or Canada.

During the Relevant Period, Defendants placed hundreds of baiting orders on U.S. and Canadian exchanges, on behalf of themselves or their customers.  These orders were not intended to be executed and had no legitimate economic purpose.  Each set of baiting orders sent a "false

---

[1] The U.S. Defendants are CIBC World Markets Corp. ("CIBC US"), BOFA Securities, Inc. ("Merrill US") and TD Securities (USA) LLC ("TD US").  Their Canadian affiliates respectively are CIBC World Markets, Inc. ("CIBC Canada"), Merrill Lynch Canada Inc. ("Merrill Canada") and TD Securities, Inc. ("TD Canada").

and misleading price signal to the marketplace" that resulted in a slight downward impact on the price of Concordia's shares.  Defendants then effected executing orders to buy Concordia shares at these artificially diminished prices, either through intermediary U.S. broker-dealers or directly on U.S. exchanges.  Upon the completion of these executing orders, Defendants "cancelled all of the fictitious Baiting Orders."

## II.   STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(2), "a plaintiff must make a prima facie showing that jurisdiction exists."  *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020).  "A prima facie showing suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013); *accord Averbach v. Cairo Amman Bank*, No. 19 Civ. 4, 2023 WL 5016884, at *10 (S.D.N.Y. June 30, 2023).  To make out a prima facie case of personal jurisdiction, whether based on general or specific personal jurisdiction, plaintiffs must establish "a statutory basis for personal jurisdiction" and that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles."  *Fuld v. Palestine Liberation Org.*, No. 22-496-CV, 2023 WL 5808926, at *6 (2d Cir. Sept. 8, 2023).  In evaluating whether Plaintiff has made out a prima facie case of personal jurisdiction, a court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor."  *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85.

On a motion to dismiss, a court accepts "as true … all well-pleaded factual allegations" and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations."  *von Blanckensee*, 994 F.3d at 101.  To withstand a motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, plaintiffs "must provide the grounds upon which their claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019).

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). The heightened pleading standard of Rule 9(b) requires: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The PSLRA expanded on the Rule 9(b) standard, "requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012); *accord In re Qutoutiao, Inc. Sec. Litig.*, No. 20 Civ. 6707, 2023 WL 4977499, at *4 (S.D.N.Y. Aug. 3, 2023).

4

### III.    DISCUSSION

#### A.    Personal Jurisdiction

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007); *accord One Techs., LLC v. Amazon.com, Inc.*, 860 Fed. App'x 785, 788 (2d Cir. 2021) (summary order).  As in their motion to dismiss the First Amended Complaint ("FAC"), the Canadian Defendants contend that the Court lacks personal jurisdiction over them because the SAC fails to plead the necessary contacts with this forum.  *Harrington I* rejected that argument.  585 F. Supp. 3d at 414-15.  For largely the same reasons, that argument fails here too.

In analyzing specific personal jurisdiction, "[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise from the defendant's purposeful contacts with the forum." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018).  The SAC alleges that the Canadian Defendants "conducted continuous activity in New York state . . . by employing high speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Concordia shares throughout the U.S."  The SAC also alleges that Defendants CIBC-Canada and TD-Canada routed orders to intermediary broker-dealers in the U.S. to be executed for their customers.  These allegations are sufficient to make out a prima facie case for a causal relationship between the Canadian Defendant's U.S. contacts and Plaintiff's claims.  *Accord Harrington I*, 585 F. Supp. 3d at 414-15.

The Canadian Defendants submit evidence to dispute the fact or extent of their trades on U.S. exchanges.  However, "until an evidentiary hearing is held, a prima facie showing suffices,

*notwithstanding any controverting presentation by the moving party*, to defeat the motion."
*Dorchester Fin. Sec., Inc.*, 722 F. 3d at 86.  An evidentiary hearing to settle the matter of
personal jurisdiction is "appropriate when the jurisdictional facts are not entwined with the facts
as to merits issues."  *See* 2 Moore's Federal Practice – Civil § 12.31 (2022).  When, as here, the
facts are intertwined, "it is usually preferable that the prima facie method be followed, and the
jurisdictional determination be made at trial."  *Id.*

 A second basis for personal jurisdiction over the Canadian Defendants is the "effects
test."  The "effects" theory of jurisdiction is "invoked where the conduct that forms the basis for
the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with
the forum are therefore in-forum effects harmful to the plaintiff."  *Charles Schwab Corp.*, 883
F.3d at 87.  "Exercise of jurisdiction in such circumstances may be constitutionally permissible if
the defendant expressly aimed its conduct at the forum."  *Id.*; *accord Dental Recycling N. Am.,
Inc. v. Stoma Ventures, LLC*, No. 21 Civ. 9147, 2023 WL 373143, at *5 (S.D.N.Y. Jan. 24, 2023).
While the SAC abandons the allegations of a conspiracy between the U.S. and Canadian
Defendants made in the FAC, it still alleges that the Canadian Defendants engaged in suit-related
conduct directed at the United States with the intent and effect of manipulating Concordia's
share price on U.S. exchanges, including the Nasdaq in New York.

 The SAC alleges participation by the Canadian Defendants "in cross-border spoofing
schemes" that were "*intended* to manipulate the market price of Concordia's securities."
(Emphasis added).  This activity "was *intended* to send a false and misleading pricing signal to
the market in order to trick or bait market participants" and "had a significant immediate impact
on the price of Concordia's shares, simultaneously on both the U.S. and Canadian exchanges."
(Emphasis added).  Because Concordia is an interlisted security on both U.S. and Canadian

exchanges, manipulation of the market price in one country "directly and immediately affects the trading price in the other country's market."  Mere foreseeability of harm cannot confer jurisdiction under the effects test.  *See Charles Schwab Corp.*, 883 F. 3d at 87.  But the SAC alleges that the purpose and intent of the cross-border spoofing scheme was to manipulate the price of Concordia shares in the U.S.  The SAC's allegations are sufficient to make out a prima facie case of specific personal jurisdiction over the Canadian Defendants.

**B.    Statute of Repose**

Plaintiff's claims are not barred by the statute of repose, 28 U.S.C. § 1658(b)(2).  Under that provision, "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than . . . 5 years after such violation."  This provision operates as a statute of repose, and accordingly affords "a substantive right in those protected to be free from liability after a legislatively-determined period of time." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013).  Plaintiff's claims in the SAC are not new claims.  The SAC articulates with greater specificity the claims put forth in the FAC, filed within the five-year limit imposed by § 1658.  Only claims not previously asserted in a timely complaint may be barred by a statute of repose. *See, e.g.*, *Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655, 2021 WL 773002, at *7-8 (S.D.N.Y. Feb. 23, 2021) (dismissing the plaintiff's "new claims" as "beyond the statute of repose").

The FAC alleged, among other things, that Defendants "flooded the markets with large quantities of Baiting Orders to sell" even though the baiting orders "were not intended to be executed" and instead functioned to "deceive and mislead market participants into believing that the market price of Concordia's securities was moving downward."  Parallel to these baiting

orders, the Defendants "also placed their Executing Orders on the opposite side of the Market Book to purchase Concordia shares at the lower stock prices created by the downward manipulation of their Baiting Orders."  Once Defendants' executing orders were completed, Defendants "cancelled and removed all of their Baiting Orders to sell."  The FAC alleged that Defendants partook in this scheme either knowingly or with recklessness stemming from Defendants' failure to deploy "policies, procedures and systems [to] detect[] and prohibit[] manipulative or fraudulent trading devices and schemes."

The SAC does not stray from the fundamental premise of the FAC's allegations.  Instead, it elaborates by alleging that Defendants engaged in this behavior either on behalf of themselves *or* their customers.  Like the FAC, the SAC seeks to hold Defendants liable "for their own conduct."  That Defendants may have been "following the directions of their customers," as alleged in the SAC, does not transform into new claims the spoofing activities first described in the FAC, namely placing sham baiting orders, purchasing Concordia securities at artificially depressed prices and immediately revoking those baiting orders after the discount purchases. The SAC describes different examples of the alleged behavior than those described in the FAC, but these examples provide additional datapoints to illustrate the same claims made in the FAC and are derived from "discovery obtained from nonparties" since the filing of the FAC.  The gravamen of the FAC's spoofing claims remains intact.

Because the SAC presents the same spoofing claims brought in the FAC, this Opinion does not address the doctrines of "relation back" or equitable tolling.

## C. Extraterritoriality

Plaintiff's claims are not impermissibly extraterritorial.  Under *Morrison v. National Australia Bank Ltd.*, 561 US. 247, 267 (2010), Section 10(b) reaches "transactions in securities

listed on domestic exchanges, and domestic transactions in other securities."  Concordia is an interlisted security, listed and traded on both the Nasdaq -- a domestic exchange -- and the TSX. The SAC also alleges that the Canadian Defendants engaged in trading on U.S. exchanges in relation to the spoofing scheme, with the intent to manipulate the price of Concordia stock on U.S. exchanges.  These allegations are sufficient to bring the Canadian Defendants within the reach of the Exchange Act.

Defendants cite *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014), for the proposition that an Exchange Act claim cannot be sustained where the alleged misconduct was "predominantly foreign."  Here, the SAC alleges substantial activity by the Canadian Defendants on both sides of the U.S.-Canada border, with the alleged baiting orders placed "on either Canadian or U.S. Exchanges" and the alleged executing orders placed on U.S. exchanges directly or through intermediary U.S. broker-dealers.  *Parkcentral* explicitly declined "to adopt a 'bright-line' test of extraterritoriality when deciding every § 10(b) case," instead deciding that case based on the "dominance of the foreign elements" apparent in that complaint.  763 F.3d at 217.  The dominance of foreign elements is not so readily apparent from the face of the SAC in this case.  As *Harrington I* observed in rejecting Defendants' earlier extraterritoriality arguments, "[i]t would require an inference in favor of Canadian Defendants to view the [SAC] as alleging the predominance of foreign conduct over conduct within the United States by the Canadian Defendants."  585 F. Supp. 3d at 421.  Drawing reasonable inferences in favor of Plaintiff as the non-moving party, the SAC is not construed to allege predominantly foreign activities.

### D.  Plaintiff's Spoofing Claims

The SAC states a market manipulation claim for spoofing under Sections 10(b) and

9(a)(2).  To state a claim for market manipulation under Section 10(b) and its implementing rule,

Rule 10b-5, a complaint must allege "(1) manipulative acts; (2) damage (3) caused by reliance

on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with

the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility

of a national securities exchange."  *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir.

2022).  To state a Section 9(a)(2) claim for market manipulation, a complaint must allege "(1) a

series of transactions in a security creating actual or apparent trading in that security or raising or

depressing the price of that security, (2) carried out with scienter and (3) for the purpose of

inducing the security's sale or purchase by others."  *Xu v. Direxion Shares ETF Tr.*, No. 22 Civ.

5090, 2023 WL 5509151, at *6 (S.D.N.Y. Aug. 25, 2023).  "Section 9(f) creates a private right of

action for violations of Section 9(a).  Section 9(f) requires that the violation of Section 9(a) be

willful and that the price of the security that is purchased or sold be affected by the violation."

*Id.*

### a.  Manipulative Acts

The SAC alleges manipulative acts.  Under Section 10(b), the term "manipulation"

"refers generally to practices, such as wash sales, matched orders, or rigged prices, that are

intended to mislead investors by artificially affecting market activity."  *ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007); *accord Gomez v. Credit Suisse AG*, No. 22

Civ. 115, 2023 WL 2744415, at *11 (S.D.N.Y. Mar. 31, 2023).  In assessing the existence of

manipulative conduct, "[t]he critical question then becomes what activity 'artificially' affects a

security's price in a deceptive manner."  *ATSI*, 493 F.3d at 100.  While a claim for market

manipulation must be pled with particularity under Rule 9(b), the pleading can involve facts "solely within the defendant's knowledge" and need not, at the early stages of litigation, "plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id.* at 102. "[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* A complaint satisfies this test when it sets forth what manipulative acts were performed and when, which defendants performed them, and the effect these acts had on the market for securities at issue. *See id.*

The SAC alleges that Defendants "injected false and misleading information into the marketplace" by placing baiting orders of at least 138,678,121 Concordia shares that "had no legitimate financial purpose and were never intended to be executed" and were intended to "drive Concordia's share price downward in order to permit Defendants and/or their customers to purchase Concordia shares at lower prices." These baiting orders were effected by Canadian Defendants on Canadian exchanges pursuant to the direction of their customers and had the effect of driving down Concordia shares by, on average, 0.8652%. The Canadian Defendants effected near-simultaneous executing orders through U.S. intermediaries on U.S. exchanges, while the U.S. Defendants effected executing orders directly onto U.S. exchanges. Defendants executed 578,530 executing orders of Concordia shares, purchasing them at depressed prices induced by the flood of baiting orders. The outstanding baiting orders were then cancelled immediately. The SAC also alleges that each Defendant "designed and implemented algorithmic trading programs that executed the spoofing schemes." These allegations are sufficient to plead the "manipulative acts" prong of a Section 10(b) claim for market manipulation.

Defendants' arguments to the contrary are unpersuasive. The SAC's use of "and/or"

language does not cause it to fall short of Rule 9(b)'s particularity requirement, but instead functions to demonstrate the breadth of Defendants alleged conduct -- effecting orders on both Canadian and U.S. exchanges, on behalf of either themselves or their customers, with the objective of manipulating the price of Concordia securities.

Contrary to Defendants' contention that "Harrington fails to associate any order with a specific Defendant," the SAC provides seven illustrative examples of specific Defendants engaged in spoofing cycles involving Concordia shares.  Each example alleges "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *See ATSI*, 493 F.3d at 102.  These illustrative examples represent "the hundreds of manipulative spoofing episodes identified over the Relevant Period."  The SAC also provides a chart of an additional thirty spoofing episodes, specifying the date and time of each spoofing episode, the involved Defendants, the price decline in Concordia shares attributed to each episode, and the number of shares Harrington sold in reliance on the market manipulations generated by Defendants' sham baiting orders.  The SAC alleges the occurrence of over 900 spoofing episodes.  It would be both unwieldy and unreasonable to require Plaintiff to proffer detailed descriptions of each alleged episode in order to plead a sufficient claim.  For this purpose, the seven illustrative examples and the thirty-episode chart are sufficient.

Among other things, the seven examples described by the SAC illustrate "how Harrington distinguishes alleged 'Baiting Orders' from any other sell orders."  In each illustrative example, a Defendant and its affiliates placed sell-side baiting orders in vastly greater quantities than their buy-side baiting orders.  When these baiting orders drove down the price of Concordia securities, Defendants executed buy-side executing orders, but no sell-side executing

orders, before quickly cancelling their sell-side baiting orders.  In other words, Harrington distinguishes baiting orders from other sell orders by the fact that none of the sell orders in the illustrative examples were ever executed, and instead functioned to manipulate the market to enable Defendants' purchase of Concordia securities at lower prices.

Defendants provide no legal support for the argument that "[t]he SAC should not receive the deference afforded to the FAC" because "Harrington has obtained discovery, including voluminous trading data concerning both proprietary and customer trading, from Defendants and third parties."  The time to test the sufficiency of evidence is at summary judgment or trial, not in assessing the sufficiency of the pleading.

### b.  Scienter

The SAC sufficiently alleges scienter.  "To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."  *Set Cap. LLC,* 996 F.3d at 78.  Allegations of conscious misbehavior or recklessness "should be viewed holistically and together with the allegations of motive and opportunity" and "the inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, No. 20-1643-Civ., 2023 WL 5419147, at *12 (2d Cir. Aug. 23, 2023).  "[S]cienter based on conscious misbehavior . . . requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Id.* at *13.  Recklessness as a means of inferring scienter alternatively "entails an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must

have been aware of it." *Id.*

The SAC alleges facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. As *Harrington I* observed, there appears to be little case authority applying the PSLRA's pleading requirements to a spoofing case. Nonetheless, when looking to distinguish spoofing from legitimate market activity, courts tend to examine (1) the passage of time between placement and canceling of orders (usually in milliseconds), (2) cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled, (3) parking baiting orders behind smaller legitimate orders placed by other traders and (4) large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer. *See United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (discussing evidence of fraudulent intent in a criminal spoofing case); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16 Civ. 4991, 2017 WL 1093166, at *4 (N.D. Ill. Mar. 22, 2017) (finding, in a securities spoofing case, that allegations of parking baiting orders behind smaller legitimate orders allege illegal intent and that allegations of a "consistent pattern of placing thousands of [baiting orders], cancelling those orders" and then placing small, legitimate orders supports a cogent and compelling inference of intent); *U.S. Commodity Futures Trading Comm'n  v. Oystacher*, 203 F. Supp. 3d 934, 945 (N.D. Ill. 2016) (finding sufficient allegations of intent to spoof where complaint portrays a "pattern of [baiting order] placement at or near the best bid or offer price shielded by existing orders, flips, aggressive order placement . . . large order size, and cancellation speed"); *see also SEC v. Masri*, 523 F. Supp. 2d 361, 369 (S.D.N.Y. 2007) (discussing the importance of identifying features of open-market transactions that "give rise to an inference of manipulative intent," such as "timing, size, or repetition of a transaction").

The SAC pleads particularized facts constituting circumstantial evidence of conscious

misbehavior fitting the indicia identified above.  The SAC pleads that "[d]uring each Spoofing Episode, Defendants placed and then cancelled the Baiting Orders within seconds and even milliseconds."  The SAC provides examples of the placement and cancellation of baiting orders in rapid succession on March 1 and 3, 2016, by ML-Canada and Merrill-U.S.; on April 12, 13 and 28, 2016, by TD-Canada, TD-U.S. and CIBC-Canada and on June 1 and 24, 2016, by CIBC-Canada.

Each of the examples also illustrates the cancellation of larger baiting orders immediately following the execution of smaller, legitimate orders.  For example, on April 5, 2016, TD-Canada and TD-U.S. began to cancel their sell-side baiting orders (amounting to thousands of Concordia shares) within one second of executing purchases on just 100 Concordia shares.

The SAC also alleges the Defendants placed large baiting orders on one side of the market and executed much smaller orders on the other side of the market.  "Defendants' Baiting Orders were highly imbalanced to the sell side.  Despite these imbalanced positions, Defendants often did not sell any shares of Concordia after posting Baiting Orders."  The examples illustrate this phenomenon.  When CIBC-Canada purchased 100 shares, it had placed baiting orders totaling 154,900 shares.  TD-Canada and TD-U.S. placed 3,400 shares of baiting orders, only to purchase 100 shares.  ML-Canada and Merrill-U.S. placed 302,552 shares of baiting orders, and bought only 100 shares.

Defendants argue that the SAC fails to plead the requisite facts suggesting that any Defendant knew or recklessly ignored that its customers' orders were fraudulent.  The SAC puts forward "three possibilities regarding Defendants' knowledge and intent": that Defendants (1) "recklessly failed to develop and maintain policies, procedures, and systems . . . to ensure the integrity of the markets by monitoring and surveilling the trading activities of their customers";

(2) set up such policies "but did so with severe recklessness" or (3) "did successfully identify the manipulative and deceptive practices of their customers" but allowed them to proceed regardless.  The SAC need not limit itself to just one of these possibilities when any one of them would be sufficient and Defendants point to no caselaw holding otherwise.  *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 302 n.4 (S.D.N.Y. 2018) (noting that plaintiff's "alternative ground for pleading scienter" was unnecessary when the complaint "adequately alleged scienter without relying on the [alternative ground]").

In *S.E.C. v. U.S. Env't, Inc.*, 155 F.3d 107 (2d Cir. 1998), the court held that primary liability for a Rule 10b-5 violation may be found where a broker "was reckless in not knowing" that the trades he executed at another's direction were manipulative.  *Id.* at 108.  This is the case even where the broker "did not share the [customer's] specific overall purpose to manipulate the market for that stock."  *Id.* at 108.  Reckless participation in a manipulation scheme "alleges sufficient scienter."  *Id.* at 111.  That holding gives teeth to the SAC's theory of liability.  *See also S.E.C. v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011) ("Whether one is a primary violator of Section 10(b) . . . and Rule 10b-5 . . . turns on the nature of one's acts, not on one's state of mind when one performs them.").

Defendants correctly assert that the allegations brought by the SEC in *U.S. Environmental* were not subject to the heightened pleading standards that apply to this case, a private civil action.  But the legal holding of the precedent -- primary liability for a broker recklessly acting on behalf of a manipulative client -- does not hinge on a particular pleading standard.  In any case, the SAC's allegations go beyond the SEC's relatively bare allegations in *U.S. Environmental*.  The SAC alleges legal duties on the part of broker-dealers serving as "gate keepers" of trading on security exchanges.  These duties, known and accepted by Defendants,

involve a "continuing responsibility to ensure that the customers' order flow . . . is in compliance with all applicable rules, regulations and laws" and "detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of [the] firm." The SAC details a pattern of spoofing activity that strongly suggests Defendants shirked these duties.

Defendants' reliance on *SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), is inapt here, as *Masri* was a decision on a motion for summary judgment rather than a motion to test the sufficiency of the complaint. 523 F. Supp. at 375. Contrary to Defendants' representations, Plaintiff has offered a "plausible economic rationale for the alleged misconduct." The SAC alleges that Defendants derived economic gain from the spoofing scheme through "paid transaction fees for completed customer trades," hundreds of thousands of dollars in saved execution costs for the baiting orders that were cancelled and "at least millions of dollars in ill-gotten gains." Whether Defendants' alleged misconduct was ultimately economically rational is a matter to be explored at summary judgment or trial.

Defendants restate some of the same objections they made in their motion to dismiss the FAC. They characterize as "conclusory" Plaintiff's allegations that "each Defendant's trading activities were approved by corporate officials." This is unfounded once again, as "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge" and a plaintiff therefore "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI*, 493 F. 3d at 102. Defendants contend that Plaintiff "fail[s] to show how [the alleged] activity differs from ordinary market activity," and that the seven examples offered in the SAC are a paltry showing for the alleged "continuous and repeated pattern" of spoofing. But these arguments ring implausible against the frequent pattern of

17

spoofing alleged in the SAC.

### c. Loss Causation

The SAC alleges loss causation.  Loss causation "is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI*, 493 F.3d at 106.  A plaintiff's burden in alleging loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).  "The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.*  The SAC alleges that spoofing episodes took place on 111 of 188 trading days during the Relevant Period, and that Plaintiff traded on thirty-four of those days, experiencing losses as a result of the artificially depressed market price of Concordia shares.  The SAC states when "spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the" spoofing events.  Over time, Defendants' placement of baiting orders "caused the collapse of Concordia's share price from $28.02 to $3.13."

Defendants unconvincingly contend that the SAC's "broad allegations mak[e] no connection between any Defendant's actions and any alleged harm to Harrington."  The inclusion of unnamed affiliates in the SAC's allegations does not dilute the claims against Defendants or otherwise untether the alleged actions of Defendants from the loss suffered by Plaintiff.  Defendant's argument that the SAC fails to articulate a "unifying theory of liability" is a restatement of its earlier argument moving to dismiss the FAC that Plaintiff engages in impermissible group pleading as to loss causation.  But as the February 9, 2022, Order held, it would be improper to infer, at this stage of the litigation, that one Defendant contributed

disproportionally (or minimally) to the damages alleged.  *See Harrington I*, 585 F. Supp. 3d at 419-20.

### d. Reliance

The SAC alleges reliance.  For market manipulation claims, the plaintiff must allege that it "reli[ed] on an assumption of an efficient market free of manipulation."  *Set Cap. LLC*, 996 F.3d at 76.  The SAC alleges that Defendants "injected false and misleading information into the marketplace in the form of Baiting Orders that . . . were intended to interfere with the forces of supply and demand and drive Concordia's share price downward."  Plaintiff sold its shares of Concordia on the assumption of "an efficient market, where all market participants had access to information that was relevant to the fair and orderly trading of a security."  These allegations are sufficient to satisfy the reliance prong of the market manipulation claims.  *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 101 n.9 (S.D.N.Y. 2015) (recognizing the requirement of alleging "reliance on an assumption of an efficient market free of manipulation" for market manipulation claims).

Defendants' revived argument that the SAC does not allege reliance because Plaintiff had concerns about manipulation in 2016, once again, is misplaced.  The SAC alleges that Plaintiff's request for an investigation into Concordia's price volatility was motivated by "negative social media postings" and "the fact that Concordia's price appeared depressed in relation to the company's fundamentals."  The inclusion of this second cause for the investigation, which was not alleged in the FAC, does not "foreclose[] any plausible inference that [Plaintiff] relied on an efficient market" any more than its concerns about negative social media postings could have foreclosed that reliance.

**IV.   CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the SAC is DENIED.  The

Clerk of Court is respectfully directed to close the motion at Dkt. 135.

Dated:  September 28, 2023
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE