# HOLWELL SHUSTER & GOLDBERG LLP

*425 Lexington Avenue*
*New York, New York 10017*
*www.hsgllp.com*

*Gregory J. Dubinsky*
*(646) 837-5151*
*gdubinsky@hsgllp.com*

**VIA ECF**  February 7, 2024

The Honorable Lorna G. Schofield
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

Re: <u>Harrington Global Opportunity Fund, Ltd. v. BofA Securities, Inc.</u>, No. 21-CV-761

Dear Judge Schofield:

We write on behalf of Plaintiff Harrington Global Opportunity Fund, Limited ("Harrington") pursuant to the Court's order that "[i]f Plaintiff does not have information that identifies the alleged baiting orders with greater specificity than has already been provided to Defendants, Plaintiff shall file a letter stating as much by February 7, 2024." Dkt. 189 at 2. Harrington has provided Defendants "the information described in the [Court's] December 13, 2023, Order, with the level of specificity possessed by Plaintiff," "'including the date and times of placement and cancellation (with the specificity possessed by Plaintiff), the quantity, the price, the trading venue and the broker-dealer that entered the order.'" *Id.* at 1-2 (quoting Dkt. 167 at 2).

Contrary to what Defendants BofA Securities, Inc. and Merrill Lynch Canada Inc. (together, "Merrill") represented to the Court, Harrington did not provide a mere "data dump" and "le[ave] it to [Merrill] to identify the needles in the haystacks." Merrill Ltr. at 1. Harrington explained its position to Merrill in a January 23, 2024 letter, which Merrill failed to even mention in its pre-motion letter to the Court filed six days later. As Harrington explained in that letter, Harrington's identification of the spoofing episodes in the Second Amended Complaint ("SAC") rested on its holistic analysis of ***all*** the market events produced to Defendants—*i.e.*, all market activity within a five-minute window of the spoofing. Accordingly, the data that Harrington produced, including the level of specificity, are exactly the "orders on which the Complaint is based," Dkt. 167 at 2, and "provide to Defendant[s] information identifying each trade upon which the Complaint is based." Dkt. 189 at 1.

**<u>Identification of Baiting Orders.</u>** As Harrington explained to Merrill, to identify spoofing by Defendants as alleged in the SAC, Harrington was required to holistically analyze ***<u>all of the market activity</u>*** immediately preceding and following the Executing Purchases. That holistic analysis allowed Harrington to determine whether an artificial supply signal (*i.e.*, sell signal) had been sent. A comprehensive analysis of *all* market activity within the specific windows was required because spoofing can be achieved in many ways and can likewise be masked in many ways. In other words, contrary to Merrill's unduly simplistic portrayal, spoofing does not occur exclusively on a discrete, one-to-one order-identifier basis.

Consider a few concrete examples of varied spoofing patterns. <u>First</u>, while a spoofer may inject an artificial supply signal by creating a new Baiting Order and then cancelling that ***same*** Baiting Order, she may also inject the same false signal by adding shares to an ***existing*** sell order

1

and, after the Executing Purchase, removing the added volume without cancelling the whole order. Second, the spoofer may add shares to one sell order before the Executing Purchase and then remove that same volume from a different sell order after the Executing Purchase. Third, and showing why post-Executing Purchase activity is relevant, a trader could create Sell Order A for 100 shares at the start of day and Sell Order B for 100 shares just before the Executing Purchase. Right after the Executing Purchase, that trader could cancel Sell Order A and create yet another order, Sell Order C, for 100 shares, to continue the spoofing pattern. Indeed, if a spoofer is not certain when the Executing Purchase will occur, she may continually inject false signals and remove them while purchasing shares at artificially depressed levels.[1]

Each of these examples is a "Baiting Order" because, as the SAC alleges, the orders were "intended to send a false and misleading pricing signal to the marketplace that interfered with [a security's] share price being determined by the natural forces of supply and demand" and "in order to trick or bait market participants[.]" Dkt. 133, ¶¶ 49-50. The SAC broadly describes "Baiting Orders" as "[Defendants'] customers' or own orders to sell Concordia shares" that "had no legitimate economic purpose, were never intended to be executed, were intended to trick other market participants into selling their Concordia shares"—all to effect a "spoofing scheme to manipulate the market price of Concordia securities." *Id.*, ¶ 3. That clearly covers various forms of spoofing, as noted above. As this Court recognized in denying Defendants' motion to dismiss, "[e]ach set of baiting orders [alleged in the SAC] sent a 'false and misleading price signal to the marketplace' that resulted in a slight downward impact on the price of Concordia's shares." Dkt. 147 at 2-3.[2] Thus, the data that Harrington produced—all temporally proximate market activity—is all relevant. To omit any of it would mean to fail to capture spoofing.

To do what Merrill demands would require Harrington to conduct an entirely new analysis—*i.e.*, undertake to isolate and match a limited set of Baiting Orders on a one-to-one order-identifier basis and ignore other forms of spoofing. Moreover, as the Court instructed in its December 13, 2023 Order and reiterated in its February 1, 2024 Order, Harrington was required to "provide information identifying each trade" on which the SAC is based "with the level of specificity possessed by Plaintiff." Dkt. 167 at 2; Dkt. 189 at 2. That is what Harrington has done. For the reasons discussed, Merrill's improper bid to pigeonhole Harrington's case into a single form of spoofing would immunize Defendants from liability for all other spoofing variations, which all work by sending a false pricing signal to the market, as alleged in the SAC.

In sum, Harrington produced all "information identifying each trade upon which the Complaint is based" because ***all*** of the market events it produced are those it analyzed to capture the varied mechanisms by which Baiting Orders can send a false pricing signal and by which spoofers can conceal their manipulations. In other words, the data that Harrington produced include all the underlying data with the requisite specificity that it used to allege that Merrill placed Baiting Orders totaling 85,133,679 shares. Dkt. 133, ¶ 56. While Merrill claimed that it is unable

---

[1] Merrill thus missed the point when it stated that "an order is not a Baiting Order unless it *precedes* the Executing Purchase," Merrill Ltr. at 2, as a spoofer can create a new order ***after*** an Executing Purchase to mask the false supply injected before the Executing Purchase.

[2] Consistent with this Court's decision, courts have held that liability is appropriate for all forms of spoofing. For example, in *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, the court held liability would lie where "Defendants cancelled identically sized and priced prior orders, as opposed to a specific Baiting Order," because "regardless of whether the 'newer' or 'older' orders were cancelled, Defendants . . . sent false pricing signals to the market through their placement of Baiting Orders." 2023 WL 9102400, at *17 (S.D.N.Y. Dec. 29, 2023). So too here.

to replicate Harrington's calculations for assessing artificial supply signals from the data it was sent, that is not a reflection of Harrington withholding any data, but rather Harrington not providing its underlying analysis.[3] If Merrill wishes to contest that Harrington correctly identified spoofing episodes given the data, it may do so at the expert stage.

**Cancellations.** Harrington also provided Defendants with the exact cancellation times for each order on which the SAC is based. Specifically, each new order and order routing report in FINRA's Order Audit Trails and System ("OATS") included in Harrington's production has a column that contains the date and time that each specific order was cancelled. Because the OATS data only have a cancellation column rather than separate cancellation rows, Harrington further prepared additional "Cancel_Record" rows to identify the cancellations, which are labeled with the same order identifier as the Baiting Orders. The Toronto Stock Exchange data similarly contains individual rows for "Cancelled" events that have designated order identifiers that can be matched to the Baiting Orders and contain the date and time of the cancellation event. To the extent that Merrill argued in its pre-motion letter that "an order is, by definition, not a Baiting Order if it was not canceled," Merrill Ltr. at 3, that argument fails for the reasons discussed above.

**Data from Instinet.** For the sake of completeness and in case it would be useful to the Court, Harrington briefly addresses Merrill's contention in its letter with respect to a purported unexplained discrepancy in relation to data Harrington produced from the third party Instinet.[4] In an email to all Defendants on February 1, 2024, Harrington confirmed that the discrepancy pertained only to a handful of CIBC spoofing episodes (unrelated to Merrill). Regardless, Harrington provided a full explanation along with a revised list of the alleged spoofing episodes that resolves the minor discrepancy.

\* \* \*

Should the Court have any concerns with respect to Harrington's compliance with the Court's Order, Harrington is available at the Court's convenience to answer any questions the Court has. If the Court would benefit from any additional information, Harrington will gladly oblige.

---

[3] Against the Court's clear order, Merrill asked Harrington for expert analysis; in a January 17, 2024 email, Merrill demanded Harrington "explain[] the basis" of a specific statistic, including "how Harrington computed it."

[4] Merrill raised this issue with Harrington in a January 17, 2024, email. Harrington informed Merrill in its January 23 letter that it would take a week or two to examine this issue. Rather than awaiting the results of Harrington's analysis, Merrill foisted the issue on the Court prematurely.

Respectfully submitted,

HOLWELL SHUSTER & GOLDBERG LLP

By: /s/ *Gregory J. Dubinsky*
Richard J. Holwell
Gregory Dubinsky
Andrew C. Indorf
Jonathon R. La Chapelle
Aditi Shah
425 Lexington Avenue
New York, NY 10017
Tel.: (646) 837-5151
rholwell@hsgllp.com
gdubinsky@hsgllp.com
aindorf@hsgllp.com
jlachapelle@hsgllp.com
ashah@hsgllp.com

WARSHAW BURSTEIN LLP
Alan M. Pollack
Felicia S. Ennis
Thomas Filardo
Leron Thumim
Matthew A. Marcucci
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 984-7700
apollack@wbny.com
fennis@wbny.com
tfilardo@wbny.com
lthumim@wbny.com
mmarcucci@wbny.com

CHRISTIAN ATTAR
James Wes Christian
Ardalan Attar
2302 Fannin, Suite 205
Houston, Texas 77002
Tel.: (713) 659-7617
jchristian@christianattarlaw.com
aattar@christianattarlaw.com