# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LIMITED,<br><br>                    Plaintiff,<br><br>          v.<br><br>BOFA SECURITIES, INC., *et al.*,<br><br>                    Defendants. | No. 1:21-cv-00761 (LGS) (VF)<br><br>Hon. Lorna G. Schofield<br><br>Hon. Valerie Figueredo |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF JONATHAN BROGAARD

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 4

      A.     Brogaard's Methods ......................................................................... 4

      B.     Brogaard's Opinions ........................................................................ 7

ARGUMENT ......................................................................................................... 8

I.      Brogaard's Opinions Should Be Excluded Under Rule 702 ........................ 8

      A.     Brogaard's Opinions Are Not Based on Sufficient Facts or Data. ........ 8

      B.     Brogaard's Methodologies Are Not Reliable. ..................................... 12

      C.     Brogaard's Methods Are Applied in an Unreliable, Results-Driven Manner. ........................................................................................... 18

      D.     Brogaard's Methods Fail to Adequately Account for Alternative Explanations, Such As Market-Making. ............................................ 20

II.     The Court Should Exclude Any Opinion by Brogaard That Customers Engaged in Actionable Spoofing. ............................................................... 22

CONCLUSION ...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
 185 F. Supp. 3d 401 (S.D.N.Y. 2016)................................................................8, 13

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d Cir. 2002)........................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993)........................................................................3, 8, 9, 13

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
 41 F.4th 71 (2d Cir. 2022) ........................................................................9

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997)........................................................................3

*Highland Cap. Mgmt., L.P. v. Schneider*,
 379 F. Supp. 2d 461 (S.D.N.Y. 2005)........................................................25

*Kessev Tov, LLC v. Doe(s)*,
 2023 WL 4825110 (N.D. Ill. July 27, 2023).............................................24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
 2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ..............................................25

*Laumann v. Nat'l Hockey League*,
 117 F. Supp. 3d 299 (S.D.N.Y. 2015)........................................................13

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
 341 F. Supp. 3d 213 (S.D.N.Y. 2018) ),
  *aff'd sub nom.* 982 F.3d 113 (2d Cir. 2020)........................................20, 22

*Novartis Pharma AG v. Incyte Corp.*,
 2024 WL 3608338 (S.D.N.Y. July 29, 2024) ..........................................25

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
 2025 WL 368717 (S.D.N.Y. Jan. 31, 2025) .............................................25

*In re Rezulin Prod. Liab. Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................25

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*,
 370 F. Supp. 3d 384 (S.D.N.Y. 2019).......................................................24

*Sec. & Exch. Comm'n v. Mudd*,
    2016 WL 2593980 (S.D.N.Y. May 4, 2016) ..........................................................................13

*Sec. & Exch. Comm'n v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................................................8

*U.S. v. Scop*,
    846 F.2d 135 (2d Cir. 1988)................................................................................................10

*Zaccaro v. Shah*,
    746 F. Supp. 2d 508 (S.D.N.Y. 2010)...............................................................................15

*In re: Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    2015 WL 7776911 (E.D. Pa. Dec. 2, 2015) .......................................................................18

**Rules and Regulations**

Fed. R. Evid. 702 ........................................................................................................ *passim*

# INTRODUCTION

Plaintiff Harrington Global Opportunity Fund alleges that one customer of CIBC World Markets, Inc. ("CIBC") and two customers of BofA Securities, Inc. ("Merrill Lynch) "spoofed" the market for stock in Concordia Healthcare Corp. ("Concordia").[1] This is intentional market manipulation, a federal crime, and it requires Harrington to demonstrate that these customers purposefully entered orders not to execute them, but to deceive the market into reacting so they could execute a transaction on the other side at a more favorable and artificial price. Plaintiff's core "evidence" of alleged market manipulation is the opinion of Jonathan Brogaard.

Brogaard has for several years been revising a working paper that uses data filtering to purportedly identify spoofing, yet he does not even use that paper's methods here; instead, he deviates from its methodology and eschews its criteria in order to find maximal alleged spoofing. At every fork in the road, he chooses the path that generates more of what he calls "spoofing episodes" and takes every opportunity to ignore obvious alternative explanations. His results-driven analyses are inherently unsound and his opinions inadmissible under Rule 702.

Brogaard has analyzed Concordia order and trade data for Defendants' customers entered through Defendants' direct market access platforms. From a combined set of 56 customers, Brogaard focused on just three, filtering their data to identify specific sequences of orders and trades to conclude that those sequences are spoofing. His filtering concept to identify spoofing fails—leading authorities have roundly rejected it. Two former chief economists of the Securities and Exchange Commission criticized it for "assuming spoofing" from what is "just a pattern of trading," and Brogaard's working paper remains unpublished.

The criticism of Brogaard's working paper applies with great force to his analysis here.

---

[1]  Harrington has abandoned all allegations that Defendants themselves spoofed the market.

Brogaard takes the available datasets—which by their very nature do not and cannot tell the whole story of Defendants' customers' trading—and cherry-picks trading sequences that fit both Plaintiff's supplied assumptions and his own theory of what constitutes spoofing. Brogaard has not performed any investigation or analysis to confirm that his filters detect actual spoofing. Nor has he performed any analysis to determine how often his filters misidentify legitimate trading as spoofing. All that can be said with certainty about Brogaard's methods is that they spot certain trading sequences. That does not yield a reliable conclusion of "spoofing."

Not only are his filters unproven at detecting spoofing, they reflect embedded biases in both their nature and application that artificially inflate the number of "spoofing episodes." Some of Brogaard's spoofing episodes consist of a trading algorithm placing sell orders for twice as many shares as buy orders, executing a buy trade, and then decreasing the shares being offered for sale (e.g. by cancelling open sell orders). He infers from this that the algorithm placed the sell orders merely to depress the price until its buy order was executed, after which the sell orders are cancelled because the algorithm did not intend for them to be executed. But in calculating the sell-side imbalances needed for his episodes, he applies the criteria with arbitrary parameters to choose which orders get counted and which do not. He even combines the two Merrill Lynch customers' orders to find the pattern more often and ignores a substantial portion of the CIBC's customer's Concordia trading activity, because he lacked data to do a full analysis. He has two different methods for calculating the imbalance, and if the methods yield contradictory results— i.e., one finds the necessary sell-side imbalance and the other finds a buy-side imbalance—he ignores the inconsistency and counts all results anyway. The net result is to increase the total episodes and bolster a preconceived opinion that these customers engaged in spoofing.

Brogaard's data filters are particularly ill-suited to detecting spoofing here given the customers at issue. It is undisputed that all three customers are market-makers. These firms "make a market" in a stock by posting buy and sell orders for other market participants to trade against and by continuously canceling and updating their orders as prices move. Market making is both lawful and essential for financial markets to function. It is also undisputed that, as Brogaard concedes in his working paper, "it is very challenging to empirically distinguish market making from spoofing manipulation." Brogaard fails to adequately account for this obvious alternative explanation. He insists his filters look for sequences in which a trader changes its position in a manner inconsistent with genuine market-making. But the assertion is unsupported by any citations or personal experience in market-making. Meanwhile, the trading data for all three customers exhibits typical characteristics of electronic market-making: ███ posted orders for Concordia on both sides of the market 99% of the time it was trading, and ██████████ did so 97% of the time. Both canceled 99% of their overall order placement volume.

Ultimately, Brogaard's data filters identify trading sequences and nothing more. The inferential leap Brogaard makes from those sequences to his opinion that the customers spoofed the market for Concordia piles assumptions on top of assumptions while blinding himself to contrary data points. His methods are not merely novel—they are deeply unreliable. As the Supreme Court has held: "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Accordingly, Defendants respectfully request that the Court grant their motion and exclude Brogaard's opinions under Rule 702.

## FACTUAL BACKGROUND

Harrington alleges that from January 27 to November 15, 2016, Defendants' customers spoofed the market for Concordia Healthcare Corp., a stock traded on Canadian and U.S. markets. On October 8, 2024, Harrington produced two expert reports by Brogaard, one for CIBC and one for Merrill Lynch.[2] Brogaard has not consulted or testified in a spoofing or market manipulation case nor published any academic articles on spoofing.[3] His working paper remains unpublished after nearly three years of revisions.[4]

### A.    Brogaard's Methods

Harrington directed Brogaard to search the trade and order data produced by CIBC and Merrill Lynch for certain manipulative trading. Specifically, Brogaard's assignment was to opine on whether the direct market access ("DMA") trading systems of CIBC and Merrill Lynch were used during the Relevant Period by the banks or their customers to conduct order-and-trade activity that was "consistent with" spoofing, "specifically with respect to 'downward' spoofing (or layering) of Concordia shares." CR, MLR ¶ 6. At Harrington's instruction, he did not look for "upward spoofing" (CR, MLR ¶¶ 6, 48; Tr. Vol. 1., 239:14-241:15)—i.e., episodes that meet his criteria but involve buy-side imbalances meant to benefit a sell-side execution. In collaboration with Harrington's counsel, Brogaard wrote two computer algorithms to filter the data for sequences of buy and sell orders that fit his criteria.[5] When he found the sequence he

---

[2] The reports are attached to the Declaration of Stephen J. Senderowitz ("SJS Decl.") as Exhibit 1 (cited as "CR") and Exhibit 2 (cited as "MLR"), respectively.

[3] SJS Decl., Ex. 5 (Dep. Tr. of J. Brogaard, May 14, 2025) (cited as "Tr. Vol. 1"), 38:17-19, 36:7-10.

[4] SJS Decl., Ex. 6 (Dep. Tr. of J. Brogaard, May 15, 2025) (cited as "Tr. Vol. 2"), 44:14-17; Tr. Vol. 1, 21:12-16 and 171:7-173:7.

[5] *See* ECF No. 406-2, ¶ 4 (Brogaard attesting: "The algorithms I used to implement these methodologies were developed over time in collaboration with Counsel."). Harrington's counsel was so deeply involved in designing the algorithms that Harrington resisted producing them for weeks on grounds of privilege. *See* ECF Nos. 406 & 406-2, ¶¶ 6-7. The Court overruled the objection.

was looking for, he labeled it a "spoofing episode."

Brogaard's first algorithm, dubbed his "Posting Methodology," focuses on the balance between newly submitted sell and buy orders during the two seconds before and three seconds after a Concordia purchase. Specifically, Brogaard filters the purchases of Concordia shares to first find those purchases for which the trader's submitted orders during the preceding two seconds reflect a ratio of at least 2:1 on shares for sale versus shares for purchase—i.e., in those two seconds, the trader submitted orders to sell at least twice as many shares as it offered to buy. CR, MLR ¶ 60. As an example, under one of his criteria, Brogaard then filters that subset to find the occasions when the trader's orders during two seconds after the purchase reflect a ratio of less than 1.2:1—i.e., where the trader placed orders to sell no more than 20% more shares than the shares it placed to buy (down from at least twice as many). CR, MLR ¶ 65. Brogaard applies additional criteria as well, but he emphasizes that this reduction in the trader's sell-to-buy ratio is "important" because it shows "that the limit order book imbalance in the pre-execution period was deliberate" and therefore "suggest[s] that the intent was not to sell but was instead to buy." CR, MLR ¶ 64.

Brogaard's second algorithm, dubbed his "Quantity Methodology," focuses not on the placement of orders but on the existence of live orders just before the purchase. But rather than take an accurate snapshot of all such orders, Brogaard considers only those pending orders that were placed in the thirty seconds before the purchase and ignores the other resting orders. CR, MLR ¶ 105. Brogaard again requires that the resting-for-less-than-thirty-seconds sell orders have twice as many shares as the buy orders' shares before the purchase, but for that purchase to be considered part of a "spoofing episode," he allows for either of two scenarios after the purchase: (1) the ratio of the shares for sale by the trader to shares for purchase decreases from 2:1 to no

more than 1.2:1, or (2) the number of the shares for sale by the trader decreases by at least half. CR, MLR ¶¶ 76, 81. As with the Posting Methodology, Brogaard applied additional criteria, but he again emphasized the importance of the change in the trader's sell-to-buy ratio in detecting what he believes is order-and-trade activity that was "consistent with spoofing." CR, MLR ¶ 80.

Defendants produced order and trade data generated by customers that traded in Concordia during the relevant period through Defendants' DMA platforms. CR, MLR ¶ 42; Tr. Vol. 1, 218:22-219:7. These DMA customers deploy high-speed trading algorithms rather than human traders to place and execute their orders. Tr. Vol. 1, 219:8-12; Tr. Vol. 2, 26:14-22. Brogaard focused his spoofing search on three customers: ████████████ a customer of CIBC, and ██████ and its subsidiary ██████████, two customers of Merrill Lynch. CR, MLR ¶ 46. He claims that the order and trade activity of ████ and ████ "stood out" to him. Tr. Vol. 1, 249:5-18; Tr. Vol. 2, 116:15-23. Although ██████s activity did not stand out, Brogaard chose to combine it with ████ activity.[6]

Brogaard considered ████ activity only on Canadian markets, where it trades through CIBC; Brogaard did not consider ████ activity in Concordia on U.S. markets, Tr. Vol. 1, 159:10-161:8, where ████ trades under its own executing broker ID. Brogaard based his opinions exclusively on his mining of the customers' trading data. *Id.* at 213:22-218:15. He was not provided documents describing the customers' trading algorithms or customer communications. *Id.* at 219:21-220:7; Tr. Vol. 2, 133:13-24. He was provided testimony from a representative of ████ and ██████ explaining that they did not engage in spoofing, but he dismissed it because he supposedly found it unpersuasive. Tr. Vol. 2, 135:13-136:3-5.

---

[6] MLR ¶ 46 ("As these customers were financially connected, I proceeded to treat them as one entity and to focus my spoofing analysis solely on ████████ and ██████████ (combined '████').").

**B.    Brogaard's Opinions**

Brogaard opines that "████████ used CIBC's platform to engage in ████ episodes of spoofing in Concordia stock" (CR ¶ 9) and that "████████ and ████████████ used Merrill's platform to engage in ████ episodes of spoofing in Concordia stock" (MLR ¶ 9). He further concludes that "[t]he patterns surrounding the Spoofing Episodes demonstrate that the manipulative trading I identified were (a) unlikely to have arisen unintentionally and (b) were not consistent with market making." CR ¶ 111; MLR ¶ 119.

The vast majority of Brogaard's alleged spoofing episodes were identified by his Posting Methodology. Of the ████ alleged ████ episodes, ████ were identified only by the Posting methodology; ████ episodes were identified only by the Quantity Methodology; and only ████ episodes were identified by both. CR ¶ 91. Of the ████ alleged episodes for ████ and ████████ combined, ████ were identified only by the Posting methodology; ████ episodes were identified only by the Quantity Methodology; and only ████ episodes were identified by both. MLR ¶ 99.

Brogaard chose not to analyze how, if at all, his spoofing episodes actually affected Concordia's market price or how, if at all, caused losses suffered by Harrington. Tr. Vol. 1, 224:14-18. Instead, he prepared spreadsheets for Robert Shapiro to use in calculating damages that listed the buy executions in the episodes, along with other data requested by counsel. Tr. Vol. 2, 114:6-115:6. As explained in Defendants' motion to exclude Shapiro's testimony (ECF 509), the two did not communicate about their opinions, their analyses, or these spreadsheets.

On March 7, 2025, Defendants' expert, Terrence Hendershott, served his report in rebuttal to Brogaard's opening reports.[7] On April 25, 2025, Brogaard served his reply report.[8]

---

[7] SJS Decl., Ex. 3 (Rebuttal Expert Report of T. Hendershott, March 7, 2025) (cited as "HRR")

[8] SJS Decl., Ex. 4 (Reply Report of J. Brogaard, April 25, 2025) (cited as "BRR").

## ARGUMENT

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "*Daubert* has 'charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony' and junk science from the courtroom." *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 415 (S.D.N.Y. 2016) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).[9] Harrington "bears the burden of establishing that the proposed expert and his or her testimony meets the requirements of Rule 702 by a preponderance of the evidence." *Sec. & Exch. Comm'n v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).

## I.    Brogaard's Opinions Should Be Excluded Under Rule 702.

The Court should exercise its discretion under Rule 702 to exclude Brogaard's opinions in their entirety. Under Rule 702, expert witness testimony is admissible only if the testimony is "based on sufficient facts or data" and "the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Harrington cannot show that Brogaard's testimony meets any of these requirements.

### A.    Brogaard's Opinions Are Not Based on Sufficient Facts or Data.

Brogaard's opinions fail Rule 702's most basic requirement, that they be "based on sufficient facts or data." Fed. R. Evid. 702. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Brogaard's opinions rest entirely on firm-level trading data that does not show what trader—or, more appropriately here, trading

---

[9] Unless otherwise specified, all internal quotation marks and citations are omitted, and all emphasis is added in quoted passages.

algorithm—entered the orders that Brogaard opines reflect a pattern of spoofing in Concordia. In sell-side spoofing as alleged here, a trader places large sell orders it does not intend to execute for the purpose of artificially moving the price lower to be able to buy the stock at a lower price. After the buy order is executed, the spoofer cancels its unexecuted sell orders to cause prices to rebound at which time the spoofer sells the shares it purchased for a profit. *See Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 75 (2d Cir. 2022). But to give his opinion in this case, Brogaard combines orders and trades without knowing if they were generated by *multiple* traders. While theoretically traders could conspire to spoof and coordinate their trading, there is no evidence that occurred here. Brogaard merely assumed that all the activity he reviewed for a customer or related customers was from a single trader or coordinated. His filtering the data for patterns to label spoofing therefore makes no sense—it is as if a physician made a diagnosis by combining the symptoms of two different patients. It is simply not reliable.

**Combining Data.** Brogaard goes even further to find spoofing by Merrill Lynch customers, combining the data from *two different firms*—█████ and █████ MLR ¶ 46. Not only does Brogaard have no basis to assume they acted together, the undisputed evidence shows the opposite. Specifically, █████ CEO testified that █████ traded only on Canadian markets from a server located in Canada, █████ traded only on U.S. markets from a server located in the U.S., and the algorithms do not coordinate their trading.[10] Brogaard admitted that he had no basis to take issue with this sworn testimony. Tr. Vol. 2, 133:5-24. Instead, he found it "outweighed" by the countervailing evidence of corporate facts: █████ is wholly owned by █████ the firms shared a CEO, the firms have an expense-sharing agreement, etc. *Id.* at 137:12-138:18; BRR ¶¶ 86-89. But there is nothing contradictory about firms having a corporate relationship and yet

---

[10] SJS Decl., Ex. 7 (Declaration of █████ March 7, 2025) ("Second █████ Decl."), ¶¶ 3, 6.

trading from independent computers in different countries. And it is not up to Brogaard to disregard the CEO's sworn testimony: "[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony." *U.S. v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988). Brogaard does not dispute that his decision to combine the two firms' data before running it through his filtering algorithm yields 35% more episodes than running them separately. BRR ¶ 66.[11] Brogaard simply chose the path that led to more spoofing episodes. That is not reliable.

When challenged about his assumption that corporate affiliates were coordinating their order placement, Brogaard responded that "analyzing manipulative trading at the corporate rather than individual level is not only methodologically sound but is often necessary and standard practice in identifying coordinated spoofing activities." BRR ¶ 79. But that is not what Brogaard says when he is not being paid—he acknowledges in his academic research that "work on spoofing . . . typically requires order book data with trader identifying information."[12] His decision to combine unrelated trading in order to find more patterns to label spoofing shows how results-driven his conclusion is.

His ▮▮▮ analysis further demonstrates how arbitrary the assumption is. Brogaard looked only at ▮▮▮ Canadian trading and did not review *the same firm's* U.S. trading data, which did not run through CIBC. *See* Tr. Vol. 1, 160:23-161:3. He therefore calculated order imbalances for ▮▮▮—and thus labeled it spoofing—without considering all of ▮▮▮ order activity. He simultaneously insists that a spoofing analysis cannot properly be performed without taking a

---

[11] Brogaard does not contest this or any other calculations of Hendershott cited herein. Tr. Vol. 1, 226:3-11, 227:4-8, 228:25-229:20; Tr. Vol. 2, 158:21-161:13..

[12] SJS Decl., Ex. 8 (Brogaard et al., "Does High Frequency Market Manipulation Harm Market Quality?" (April 2024)) (cited as "4.04WP"), at 5.

"corporate-level approach" that considers all of a firm's "order book activity," CR ¶ 92, BRR ¶ 79—and yet acknowledges that he lacked data for ▆▆ order book activity in Concordia on U.S. markets, Tr. Vol. 1, 159:23-161:3. At deposition, Brogaard conceded that his ▆▆ analysis might have changed had he considered its U.S. trading activity in Concordia. Tr. Vol. 1, 161:22-162:8. Because under his own premise that a corporate-level approach is required, he cannot reliably opine that ▆▆ was spoofing without knowing its U.S. activity.[13] This time, it is like a physician making a diagnosis by considering only half the patient's symptoms. It is not reliable.

***Assuming the Sequence.*** Brogaard's analysis rests on another unsupported assumption—that sell orders and buy trades with the same millisecond timestamp are sequenced in a way that leads to the identification of more alleged spoofing episodes. This is not an infrequent occurrence—81% of the ▆▆▆▆ spoofing episodes Brogaard found by his Posting Methodology have sell orders with the same timestamp as the alleged buy trade, HRR ¶ 80, which Brogaard acknowledges appears to result from a data insufficiency, Tr. Vol. 2 165:10-20. Because logic dictates that sell orders placed *after* a buy trade cannot have been entered to depress the price of Concordia for the sake of the trade, Brogaard simply assumes that if they have the same millisecond time stamp, the sell orders always came first. MLR ¶ 98. Brogaard's only basis for his assumption is his insistence that "you can't execute before you have an order [placed]." Tr. Vol. 2, 183:23-24. He is correct that for any given order, the order placement must come before the execution, but this is not true when considering *different* orders. When asked

---

[13] In October, the Court ruled that trading outside CIBC cannot be the basis of a market manipulation case against CIBC and denied Harrington's motion to compel ▆▆ US Concordia trading data, stating, "the [Plaintiff's] claim, as pled in the Second Amended Complaint, concerns fraudulent trading activity under CIBC's supervision and control. The data Plaintiff seeks does not concern trades executed through a CIBC channel. It is therefore not relevant to trading activity under CIBC's supervision and control." ECF No. 382 at 4. Plaintiff's framing of this case does not and cannot save its expert's flawed approach that purports to reach conclusions about spoofing without a full picture of ▆▆ trading.

whether his sequencing assumption applies across *different* orders, Brogaard conceded the point: "I don't believe it necessarily has to." *Id.* at 186:6-7. He ultimately admitted the obvious—that if the sell order and purchase execution have the same time stamp, he does not know the sequence of these events. *Id.* at 175:14-23.

In fact, his assumption that the sell orders always precede the executed purchase is wrong. ▇▇ representative identified under oath three examples in which—based on *microsecond* data—the sell orders were placed *after* the buy trades with the same millisecond timestamp. Second ▇▇ Decl., ¶¶ 9-11. Brogaard's response to this evidence was to assume that these are the only three times this occurred (BRR ¶ 107 ("there are three instances of messages with alleged microsecond precision")) and once again question the testimony (*id.* (complaining that ▇▇ did not produce the underlying data files for him to "validate" the testimony)). He refuses to acknowledge that three contrary *examples* show that his assumption that it *always* occurs in the sequence he prefers is flat-out wrong. Making the opposite assumption—i.e. that all order placements occurred *after* trades with the same millisecond timestamp—eliminates 41% and 11% of the Posting-only episodes containing such trading data for ▇▇▇▇▇▇ and ▇▇▇ respectively. HRR ¶¶ 84-85. Making an assumption known to be contrary to fact is not reliable.

"[T]he law is clear: expert opinions are inadmissible if they are not based on sufficient facts or data . . . . This is true no matter how burdensome or difficult collecting relevant data or devising methods to apply to that data may be." *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015). If Brogaard could not perform the analysis requested with the given data, he should have declined the assignment.

### B.    Brogaard's Methodologies Are Not Reliable.

Courts consider four principal factors in determining whether a proffered expert methodology is reliable: (1) whether it can be or has been tested, (2) whether it has been subject

to peer review and publication, (3) whether it has a known error rate, and (4) whether it has received general acceptance in the relevant scientific community. *Almeciga*, 185 F. Supp. 3d at 415 (citing *Daubert*, 509 U.S. at 593-94). These factors are particularly important in assessing a methodology that purports to yield scientific conclusions. *Id.* Brogaard's data-filtering algorithms fail to satisfy any of the four factors and should be excluded on this basis alone. *See Sec. & Exch. Comm'n v. Mudd*, 2016 WL 2593980, at *3 (S.D.N.Y. May 4, 2016) (excluding opinion of SEC's expert whose method was "novel, untested, and not peer reviewed; there is no known error rate; and it has not been generally accepted by the relevant scientific community").

### 1. Brogaard's Filtering Methodologies Have Been Rejected by His Peers and Are Not Generally Accepted

Far from being generally accepted, Brogaard's methods of finding spoofing from data filtering alone are accepted by no one. He can identify no case in which an expert has used either his Posting Methodology or his Quantity Methodology. Tr. Vol. 1, 190:15-193:04. He admits that he has never "studied whether a filtering methodology can, actually, detect market manipulation." Tr. Vol. 2, 41:10-17. He has been working on the concept of finding spoofing from data patterns for years, attempting to get published a working paper that *assumes* that his "methodology is detecting market manipulation." *Id.* at 40:2-10 (explaining that his working paper is "trying to come up with methodologies to identify spoofing"). Brogaard has submitted his working paper to two different academic journals for peer review and publication. Tr. Vol. 1, 25:4-8. The Journal of Finance rejected it outright. *Id.* 31:10-11. Brogaard's rejection notice included a referee report detailing the journal's critiques of his work, but Brogaard says he cannot recall the substance and Harrington refuses to produce a copy. *Id.* at 27:4-28:22. The Review of Financial Studies also declined to publish his paper as submitted, while allowing him the chance to "revise and resubmit." *Id.* at 35:20-25. His data filtering lacks the rigor required for

13

publication in a peer-reviewed journal.

When Brogaard presented his working paper at an SEC conference, it was similarly criticized. *See* Tr. Vol. 2, 19:13-22 (describing feedback at conference as "constructive" but ultimately admitting feedback was "critical"). Specifically, two former chief economists of the Securities and Exchange Commission unequivocally rejected Brogaard's spoofing-detection methods when he presented his working paper. Chester Spatt (SEC Chief Economist, 2004 to 2007) criticized Brogaard for taking a "massive data set," "pick[ing] out certain subsequences" and "interpret[ing] those subsequences in a particular way, as if to divine intent."[14] He outright rejected the notion that data filtering can show intent: "Intent is what we think's between somebody's ears, and the paper *obviously doesn't establish anything* with respect to that." Conf. Tr., 23:1-2. He even cautioned Brogaard against using the word "spoofing" because "just the approach of using subsequences with massive amounts of data invites all kinds of selection issues." *Id.* at 22:21-23:2. Jeffrey Harris (SEC Chief Economist, 2017 to 2018) likewise criticized Brogaard's working paper as "not . . . even-handed from an economics standpoint," because "[t]he paper actually assumes spoofing throughout" based upon what is "just a pattern of trading." *Id.* at 12:16-17, 19:13-14,18-21. Brogaard admits that he has received "constructive criticism" when presenting the paper at other conferences as well. Tr. Vol. 1, 44:15-45:9.

To be admissible, an expert's opinion must "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 516 (S.D.N.Y. 2010). But experts agree that his filtering approach does not. It should be rejected on that basis alone.

---

[14] SJS Decl., Ex. 9 (Transcript of Enforcement Track Session at 11th Annual Conference on Financial Market Regulation, hosted by the SEC, May 9, 2024) (cited as "Conf. Tr."), at 23:14-25.

Brogaard strayed even further from scientific principles here, *relaxing* his filtering criteria from his working paper so that he could find more episodes for Harrington:

- He lowered his bar for identifying sell-side imbalances indicative of spoofing. His working paper version at the time he was completing his analysis for this case looked for traders with orders to sell ten times as many shares as to buy, 4.04WP at 2; he lowered the criterion to just two times here, CR, MLR ¶ 60.

- He expanded the range of decreases in sell-side imbalances indicative of spoofing. In his working paper he requires that the trader decrease its sell-side imbalance after the buy trade to 1.1 times as many sell orders as buy orders;[15] for his opinion here, he requires a decrease to a ratio of only 1.2, CR, MLR ¶ 81.

- He abandoned his rule from his working paper that only if his filtering finds a spoofing pattern at least five times in a day for a given stock would he call it spoofing rather than random chance. 9.04WP at 2. He admitted that "for ▌ on days when there were fewer than five spoofing episodes, that – those spoofing episodes would not be included" under his working paper methodology, yet he has included such episodes for his opinion in this case. Tr. Vol. 2, 90:24-91:7.[16]

Brogaard acknowledged—as he must—that relaxing his parameters increases the number of spoofing episodes identified. Tr. Vol. 1, 195:23-196:4, 207:10-15; Tr. Vol. 2, 87:14-17. He did not try to run the order-and-trade activity he used through the methodology in the April 2024 or September 2024 versions of his paper—even though he was working on his reports for this case at the same time. Tr. Vol. 2, 102:19-103:15. And he admits that both his working paper and his analysis here "are trying to come up with methodologies to identify spoofing." *Id.*, 75:11-21.

Perhaps seeking to stave off the criticism that he relaxed his criteria to find more spoofing for Harrington's cause, Brogaard swore under oath that his methodologies in this case

---

[15] SJS Decl., Ex. 10 (Brogaard et al., "Does High Frequency Market Manipulation Harm Market Quality?" (September 2024)) (cited as "9.04WP"), at 2

[16] According to Shapiro's Merrill Lynch report, the first two spoofing episodes Brogaard found for ▌ each was the only episode to occur on that date. SJS Decl., Ex. 11 (Expert Report of Robert J. Shapiro, Ph.D., October 8, 2024), at 26; *see also* Tr. Vol. 2, 96:15-97:4 (agreeing that "▌ had fewer than five spoofing episodes in the first six or seven months of the relevant period). Under his working paper, Brogaard would not have called these spoofing, yet Shapiro says they are responsible more than half the damages figure he attributes to Merrill Lynch. *See* ECF 509, at 22.

"were not developed as a result [of] or to correspond with my methodology in my academic writing." Tr. Vol. 1, 210:22-25; *accord id.* 211:16-24 (denying he "changed" his methodology for this case "because one wasn't derived off the other"). But when asked to explain his claim to have "a solid foundation" in spoofing, he stated: "I am an expert in spoofing, as a result of my research in spoofing." *Id.* at 41:3-19. His working paper is this "academic research," *id.* at 42:22-24, the only spoofing study he has ever conducted, Tr. Vol. 2, 44:14-17. That Brogaard relaxed the filtering criteria he uses in his academic research for his work in this case confirms that he is pursuing an unreliable, results-driven approach to reach his opinion here. That is not reliable.

### 2. Brogaard's Methods Lack a Known Error Rate

Brogaard's analysis also is unreliable because he provides no error rate—*i.e.*, no basis for determining how often his filters misidentify legitimate trading as spoofing. This is particularly problematic because a simple check suggests that—at best—it has a very high error rate.

Harrington alleges spoofing only in a downward direction—i.e., that Defendants' customers entered non-bona fide sell orders to push the price of Concordia downward so they could buy at a cheaper price—so Harrington instructed Brogaard to search only for patterns consistent with that theory. CR, MLR ¶ 6. But when Brogaard's algorithms are adjusted to look for the opposite—*i.e.*, an "upward" pattern of buy-side orders followed by a sale execution—they yield a comparable number of "spoofing episodes." *See* HRR ¶ 60 (explaining that opposite criteria yields ███ upward episodes for Merrill Lynch's customers and ███ episodes for CIBC's customer). As a matter of logic, this means either that (1) Defendants' customers were engaging in upward spoofing as well—which is not Harrington's theory and would make Shapiro's damages calculations unreliable; or (2) the upward episodes are false positives—which would mean that Brogaard's filters yield thousands of false positives. Brogaard did not run this basic placebo test and has no explanation for the results. BRR ¶¶ 68-69. And he makes no effort

16

to explain how his algorithm could possibly yield thousands of false positives when run on one direction but few if any when run on the other direction; he just declares that running his algorithm for upward spoofing filter is irrelevant. *See* BRR ¶ 72. A methodology that potentially produces that large an error rate is not reliable.

Faced with this criticism, Brogaard suggested for the first time in his reply report that he could calculate an error rate by applying his data filters to Defendants' other DMA customers. BRR ¶¶ 18-20. But that only proves the unreliable nature of Brogaard's filters: He admits that his methodology finds that eleven *other* customers also had spoofing episodes in Concordia, at varying percentages of their trading—what he labels a "spoofing detection rate." *Id.* ¶ 20. He then assumes—with no basis—that only half of those other customers were actually spoofing so he can take the median spoofing detection rate, which is 1%, and call it the error rate. *Id.* Brogaard, of course, has nothing to show that *any* of them is spoofing. Moreover, these other customers may have had an entirely different strategy. Just because a different customer turns up with zero episodes doesn't meant that the ▮▮▮ and ▮▮▮▮▮▮ episodes are correct. All Brogaard's results show is that his filters identify a specific trading sequence in Concordia in the data of ▮▮▮ and ▮▮▮▮▮▮ combined more frequently than in other customers' data. It says nothing about whether the filters are effectively detecting spoofing. As Hendershott notes, a proper error rate could be developed by applying Brogaard's methods to a dataset with specific known episodes of spoofing and by applying it to a dataset where it was known to have no spoofing (e.g., by combining the data of independent traders). HRR n. 72. Brogaard has done neither. As explained above, he did not run it through his working paper algorithms—which he also thinks can detect spoofing. Instead, Brogaard applied the exact same methods to other customers' trading and claims that the results "validate" his methods. When questioned about the

circularity of his assertion on error rate, Brogaard had no response. Tr. Vol. 2, 189:15-196:17.

      **C.**    **Brogaard's Methods Are Applied in an Unreliable, Results-Driven Manner.**

Brogaard's methods are internally inconsistent and applied in a manner designed to maximize the number of alleged spoofing episodes. "It is improper for an expert to take a results-driven approach to a question, molding his methodology and selectively relying upon data so as to confirm his preconceived opinion." *In re: Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 2015 WL 7776911, at \*16 (E.D. Pa. Dec. 2, 2015). Yet that is precisely what Brogaard does.

To begin, Brogaard's Posting Methodology—which accounts for the vast majority of his episodes—is unreliable because it is unsound economics and inconsistent with his own understanding of spoofing. The methodology looks for sell-side imbalances in new orders placed in a 2-second window before each buy trade. *See* CR, MLR ¶¶ 47, 57. According to Brogaard, if the imbalance ratio is reached, it will be a spoofing episode, and the sell orders were "non-bona fide orders," where "the intent was not to sell" but instead "to influence the behavior of other market participants." CR, MLR ¶ 64. But 65% of the sell orders placed by ▮▮ and 77% of the sell orders placed by ▮▮ and ▮▮▮ in those Posting Methodology episodes were canceled or executed *before the buy trade*. HRR ¶ 68.

This does not match the definition of spoofing. As Brogaard himself admits, a non-bona fide order is not cancelled until *after* the buy trade. *See* CR ¶ 44 ("the trader reduces their manipulative activity *shortly after* purchasing the shares so that the limit order book activity of the trader normalizes *shortly after* the purchase"). Even Harrington pleads that the baiting orders are not cancelled until after the buy order is executed. *See* ECF No. 133, ¶ 43 ("Immediately *after* placing in the Market Order Book an Executing Order to buy, the spoofer cancels all of the Baiting Orders to sell, which completes the spoofing cycle."). And Brogaard's assumption that the trader's intent was not to sell and instead be deceptive does not match the facts.

As with Brogaard's other decisions, his methodology appears oriented to finding spoofing whenever possible because it counts episodes that satisfy one of his methodologies but do not look like spoofing under the other. No fewer than 16% of the episodes that exhibit a sell-side imbalance under the Posting Methodology exhibit a countervailing *buy-side* imbalance under the Quantity Methodology. HRR ¶ 71. Brogaard neither explains how the market might interpret these conflicting signals, nor eliminates these episodes as inconsistent with his theory. Instead he merely says they are capturing "different types of spoofing" without explaining what those types might be. Tr. Vol. 1, 237:25-238:5. Different types of spoofing or not, they could not have deceived, much less impacted, the market if they pointed in opposite directions.

Equally unsound is the manner in which Brogaard applies his Quantity Methodology. This methodology purports to look for instances in which just before the execution buy, the trader has orders on the book to sell twice as many shares as to buy. CR, MLR ¶ 76. But Brogaard counts only those orders that were placed less than 30 seconds before the snapshot is taken. CR, MLR ¶ 71. Without explanation, he excludes from his calculations orders placed ahead of his 30-second window that are still resting in the order book at the time of the buy trade. Under Brogaard's spoofing model, that is illogical, because the orders he excludes are "visible" to other traders. This exclusion has a dramatic impact on the results of Brogaard's Quantity Methodology—if the resting orders that have been on the book for more than 30 seconds are included, 82% ▮▮▮▮▮▮▮▮) and 85% (▮▮▮) of the alleged spoofing episodes identified only by the Quantity methodology would no longer qualify as spoofing episodes. HRR ¶ 74. In other words, the vast majority of episodes under the Quantity Methodology vanish if the sell-side imbalances are calculated consistently with Brogaard's premise that visible orders on the order book send a signal to the market. *Id.*

### D.    Brogaard's Methods Fail to Adequately Account for Alternative Explanations, Such As Market-Making.

Brogaard's testimony is also unreliable because it assumes that spoofing is the only possible explanation for the observed trading sequences. "An expert must demonstrate that he has adequately accounted for obvious alternative explanations in order for his testimony to be reliable." *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 289 (S.D.N.Y. 2018) ), *aff'd sub nom.* 982 F.3d 113 (2d Cir. 2020). Brogaard fails to adequately account for the possibility that the trading sequences reflect one or more legitimate strategies or random coincidence.

As discussed above, Brogaard assumes that the order and trade data in each of his episodes result from a single trading strategy or coordination among multiple traders, despite the lack of evidence. It more likely reflects various uncoordinated trading strategies based on independent trading objectives.[17] Even in the case where all of the sell orders and buy trade in a given episode result from a single trading strategy, the most obvious alternative explanation is market-making—as Brogaard notes, "a legitimate trading activity whereby a trader provides liquidity to the market by continuously quoting buy and sell prices for a specific stock." CR, MLR ¶ 49. Brogaard concedes that "it is very challenging to empirically distinguish market making from spoofing manipulation." 9.04WP at 2. He further concedes that ▮▮ and ▮▮ ▮▮ engage in market-making. *See* CR ¶ 49 (referring to "a trader like ▮▮ who engages in market making"); BRR at Table 1A (identifying ▮▮ as market makers).[18] Yet his

---

[17] *See, e.g.*, Second ▮▮ Decl. ¶ 6 (attesting that ▮▮ and ▮▮ trade from different servers in different countries unaware of each other's trading, and thus "it is incorrect to consider ▮▮ and ▮▮s order trading as coordinated in any way or effectively those of a single trader").

[18] *See also* SJS Decl., Ex. 12 (Declaration of ▮▮, Sept. 9, 2024) (cited as "First ▮▮ Decl."), ¶ 10 (attesting that ▮▮ and ▮▮ engaged in "deep market making" and "shallow market making").

attempt to rule out such market-making here fall short.

Brogaard simply asserts that a legitimate market-maker would never carry out the trading sequence he filters for. That is, he asserts that a market-maker with a sell-side imbalance whose buy order gets executed would always subsequently increase and never decrease its selling interest even in a modern day fast-moving electronic trading market. *See* CR, MLR ¶¶ 63, 79 ("[S]uch a change [decrease] would be inconsistent with the limit order book behavior of legitimate trading."). But Brogaard provides no factual basis for this assumption. Presumably he believes that once a purchase is executed, the trader has more to sell and therefore would not decrease its sell orders. But that assumption is not reasonable because it assumes a static market—other market changes could cause the trading algorithm to enter more sell orders. Markets are of course fast-moving and dynamic, so market-makers constantly adapt their trading positions to changing market conditions like a buy trade. HRR ¶¶ 95-96.

Moreover, Brogaard ignores relevant facts tending to show that ██████████████████ were in fact market-making in Concordia. Today's electronic market makers continuously post orders on both sides of the market and cancel their orders very high rates as market prices move and their orders must be repriced. HRR ¶¶ 87-88; BRR ¶ 52. During the relevant period, ███████ and ███████████ maintained orders on both sides of the market 99% and 97% of the time, respectively. HRR ¶ 89. All three customers also cancelled 99% of their orders. *Id.* When questioned about these findings in Hendershott's rebuttal report, Brogaard admitted he had not checked their accuracy, confirming that he ignored these relevant data points in his analysis.[19] His testimony should be excluded. *See In re Mirena*, 341 F. Supp. 3d at 242 ("Where an expert

---

[19] Tr. Vol. 1, 226:3-7 ("I didn't carefully review his analysis. I can't agree or disagree with his calculations."), at 227:4-8 (Q. Did someone you were working with check those numbers to see if they were accurate? Mr. Filardo: Same caution. A. Not to my knowledge).

ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted.").

There are also other legitimate trading strategies that could also explain the sequences Brogaard identifies, particularly arbitrage. In addition, as ███████ has explained, they use several different trading strategies. *See* First ███ Decl. ¶ 10. Brogaard did not consider any of them. Tr. Vol. 1, 150:5-16 (admitting that his reports do not "describe anything about trying to make sure that [he] didn't capture arbitrage trading activity").

Brogaard also fails to account for an even simpler explanation: random coincidence. During the Relevant Period, ███████ orders through CIBC had an order imbalance 39% of the time it had orders on both sides of the market. HRR ¶¶ 89-90.[20] An analysis of the month that Brogaard claims the most alleged spoofing episodes shows that a more holistic analysis of sell-side imbalances finds that only 2% of the sell-side imbalances in ███████ data were followed by a buy trade. *Id.* ¶ 53.[21] Brogaard's filtering methodology therefore could simply reflect coincidences identified through mining vast amounts of data. *Id.* ¶ 11.a. Brogaard analyzed more than 24 million ███████ order messages in Canada to identify his few thousand episodes. His failure to adequately account for random chance as well as legitimate trading counsels exclusion.

## II.    The Court Should Exclude Any Opinion by Brogaard That Customers Engaged in Actionable Spoofing.

As explained more thoroughly in Defendants' motion to exclude Shapiro's testimony, Shapiro believes that Brogaard concluded that Defendants' customers engaged in spoofing—i.e., entered sell orders intending to deceive the market rather than to execute them—and that such conduct successfully drove down Concordia's market price. *See* ECF 509. Brogaard has drawn

---

[20] Similar percentages can be found in the trading data of ███ and ███████ HRR ¶¶ 89-90.

[21] Similar percentages can be found in the trading data of ███ and ███████ HRR ¶ 53.

neither conclusion and any suggestion that he has is inadmissible.

In his opening reports, Brogaard explained that he was tasked only with determining whether Defendants' customer trading "was consistent with manipulative behavior, often called spoofing." (CR ¶ 6.) But in his reply report he suggested that he found actual spoofing—i.e., that the customers entered sell orders not to execute them but to deceive the market. BRR ¶¶ 148-49. Brogaard believes he can infer this intent from the data alone. *Id.* ¶ 149 ("My conclusion that ▮▮▮▮▮▮▮▮▮▮▮▮▮ spoofed is based on inferences about their intent."). As explained above, that notion is precisely the concept that his peers have rejected. But in any event, Brogaard is legally precluded from opining about a trader's intent—"a topic on which no expert is qualified to give an opinion." *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 416 (S.D.N.Y. 2019) (excluding expert where report contained statements about trader's intent to spoof)), *on reconsideration on other grounds*, 2019 WL 2114067 (S.D.N.Y. May 8, 2019).

Apart from his filtering mechanism, Brogaard has no evidence of manipulative intent. Brogaard conceded that the order and trade activity in his alleged spoofing episodes was carried out by customers' trading algorithms, Tr. Vol. 2, 26:14-22, and he agreed that in such circumstances, evidence of the trader's intent depends on the instructions given to the algorithm, *id.* at 26:23-27:9. Brogaard admits that he did not receive any documents describing the customer algorithms and thus has "no evidence whether the [algorithms'] code instructed the customers to or to not engage in 'manipulative trading.'" *Id.* at 27:18-23, 28:9-11. Nor did Brogaard review any customer communications, which might have disclosed the intent behind the activity observed. Tr. Vol. 1, 216:17-217:4. As he put it: "My inference of intent is based off of repeated trading patterns." *Id.* at 93:18-23. Even Harrington concedes that it has no evidence of

manipulative intent apart from Brogaard's data filtering.[22] Brogaard eventually admitted that he could not determine what was in the trader's mind nor that he considered the legal definition of manipulative intent in making his observations. *Id.* at 88:16-20, 272:8-22.

Similarly, Brogaard did not establish any economic motive for the trader to spoof. That is, he did not analyze whether the alleged spoofer profited from the alleged spoofing episodes. Tr. Vol. 2, 204:7-12. But that is essential to establishing a trader's intent to manipulate the market. *See, e.g.*, *Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *5 (N.D. Ill. July 27, 2023) ("[I]t would be difficult to prove intent to deceive if Defendants did not make money off their alleged spoofing."). As explained in Defendants' motion to exclude Shapiro's testimony, he opines that Concordia's stock price *never recovered* from the spoofing, so that the alleged spoofer would be buying stock only to drive it down in value. ECF 509.

Thus, Harrington's experts suggest that the spoofer was acting against its own economic interest. As Judge Stein put it recently in recommending dismissal of a spoofing claim: "No trader would place fake Baiting Orders and then immediately cancel them just for the fun of it. Such conduct would be economically irrational." *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2025 WL 368717, at *16 (S.D.N.Y. Jan. 31, 2025), *report and rec'n adopted*, 2025 WL 934319 (S.D.N.Y. Mar. 26, 2025). There is no basis for Brogaard to opine that any customer acted with intent. He should not be permitted to so testify.

Moreover, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony" because "[t]he question of intent is a classic jury question and not

---

[22] SJS Decl., Ex. 13 (Plaintiff's Sixth Amended and Supplemental Objections and Responses to Defendant BofA Securities, Inc.'s First Set of Interrogatories), at 13-14; SJS Decl., Ex. 14 (Plaintiff's Fifth Amended and Supplemental Objections and Responses to Defendant Merrill Lynch Canada Inc.'s First Set of Interrogatories), at 21-22; SJS Decl., Ex. 15 (Plaintiff's Fifth Amended and Supplemental Objections and Responses to Defendant CIBC World Markets Inc.'s First Set of Interrogatories), at 15.

one for the experts." *Novartis Pharma AG v. Incyte Corp.*, 2024 WL 3608338, at *10 (S.D.N.Y. July 29, 2024); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) ("[T]he opinions of these [expert] witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."). Consequently, "[t]he trial judge should not permit experts to offer opinions on a party or its representatives' state of mind or intent." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *20 (S.D.N.Y. Jan. 30, 2025) (excluding expert's "opinions on the motive or intent of others"); *see also Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (holding that expert may not opine on a party's subjective intent, state of mind, and knowledge).

Finally, Brogaard claims to have found spoofing even though he has not analyzed how the order activity he cites might have affected the market for Concordia stock.  Tr. Vol. 2, 110:12-15 ("Q. You haven't performed any price impact analysis of the alleged spoofing in this case, correct? A. I did not analyze price impact."). Brogaard's reports contain no discussion of whether the observed trading sequences created artificial prices or induced market participants to trade in Concordia. Without establishing this basic tenet, Brogaard cannot possibly conclude that spoofing manipulated the market for Concordia downward, as Harrington instructed Shapiro to assume. Brogaard's testimony is not admissible to support Shapiro's opinions.

## **<u>CONCLUSION</u>**

For these reasons, Defendants respectfully request that the Court exclude Brogaard's opinions under Rule 702.

Dated: July 9, 2025                         Respectfully submitted,
      New York, New York

*/s/ Abby F. Rudzin*                         */s/ Sandra D. Hauser*
Abby F. Rudzin                              Sandra D. Hauser
William J. Martin                           DENTONS US LLP
O'MELVENY & MYERS LLP                        1221 Avenue of the Americas
1301 Avenue of the Americas                 New York, NY 10020
Suite 1700                                  (212) 768-6802
New York, NY 10019                          sandra.hauser@dentons.com
(212) 326-2000
arudzin@omm.com                             Stephen J. Senderowitz
wmartin@omm.com                             Timothy J. Storino
                                            233 South Wacker Drive, Suite 5900
                                            Chicago, IL 60606
*Counsel for Defendants BofA Securities, Inc.*   (312) 876-8141
*and Merrill Lynch Canada, Inc.*              stephen.senderowitz@dentons.com
                                            timothy.storino@dentons.com

                                            Nicholas W. Petts
                                            1900 K Street NW
                                            Washington, DC 20006
                                            (202) 496-7356
                                            nicholas.petts@dentons.com

                                            *Counsel for Defendant CIBC World Markets*
                                            *Inc. (Canada)*

130729135