# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LTD.<br><br>Plaintiff,<br><br>v.<br><br>BOFA SECURITIES, INC., *et al.*,<br><br>Defendants. | No.1:21-cv-00761(LGS)<br>Hon. Lorna G. Schofield |

EXPERT REPORT OF JONATHAN BROGAARD, Ph.D.

# Table of Contents


I. INTRODUCTION ..... 3
A. Qualifications ..... 3
B. Background and Assignment ..... 4
C. Summary of Opinions ..... 6
II. BACKGROUND ..... 6
A. What is Spoofing ..... 6
B. How Spoofing Manipulates Prices ..... 9
III. SPOOFING ACTIVITY ..... 14
A. Overview ..... 14
B. Detecting Spoofing ..... 18
i. Posting Methodology ..... 22
ii. Quantity Methodology ..... 27
iii. Data Batching ..... 33
C. Results ..... 37
D. Further Analysis of Spoofing Episodes ..... 38
i. Fill Ratio Analysis ..... 39
ii. Limit Order Count Analysis ..... 41
iii. Limit Order Size Analysis ..... 43
iv. Limit Order Aggressiveness Analysis ..... 44
IV. CONCLUSIONS ..... 45

# I. INTRODUCTION

## A. Qualifications

1. My name is Jonathan A. Brogaard. I am the Kendall G. Garff Professor of Finance at the David Eccles School of Business at the University of Utah. I received my Doctor of Philosophy (Ph.D.) degree in Finance from the Kellogg School of Management at Northwestern University and my Juris Doctor (J.D.) from the Northwestern University Pritzker School of Law. A detailed summary of my educational background and publications is set out in my curriculum vitae, which is attached as **Exhibit 1**. The curriculum vitae includes my publications over the last 10 years. I have previously testified as an expert witness in two cases and made a declaration in one - a list of my prior testimony is attached as **Exhibit 2**.

2. My expertise and research interests focus on market microstructure. This includes the role of information and noise in financial markets, market manipulation (including spoofing), financial market design, financial market regulation, and different types of market participants, including trading platforms, short-sellers, and algorithmic and high-frequency traders. As part of my research, I have extensive experience analyzing transaction-level data from equity markets. My work has been published frequently in top peer-reviewed finance journals, including the *Journal of Finance*, the *Journal of Financial Economics*, and the *Review of Financial Studies*. My research has also been recognized with numerous awards and financial grants, including the prestigious *Review of Financial Studies, Michael J. Brennan Best Paper Award* for my co-authored work, "High-Frequency Trading and

Price Discovery." At the University of Utah, I have been awarded the David Eccles School of Business Faculty Research Excellence Award for my research achievements.

3. I teach undergraduate- and graduate-level courses at the David Eccles School of Business at the University of Utah. I have taught undergraduate students, Master of Business Administration (MBA) students, and Ph.D. in Finance students on topics including corporate finance, hedge funds and private equity funds, equity and options markets, short-selling, trading strategies, investments, and market structure. As part of my teaching and research roles at the University of Utah, I serve as the Faculty Director of the Ph.D. Program as well as of the Student Investment Fund. In addition, I am the founding Executive Director of the University of Utah's Institute for Advanced Investment Management (IAIM). My contributions to teaching have been recognized nationally by the *Poets and Quants 40 under 40 Best MBA Professors Award*, awarded to business professors from around the country based on nominations received from MBA students.

4. In addition to my academic work, I serve on the Financial Industry Regulatory Authority's (FINRA) Market Regulation Committee. In June 2024, I testified before the U.S. House of Representatives Financial Services Capital Markets Subcommittee as part of the Subcommittee's deliberations on the Securities and Exchange Commission's (SEC) proposed equity market structure reforms.

## B. Background and Assignment

5. I have been retained by Christian Attar and Warshaw Burstein, LLP ("Counsel"), Counsel for Harrington Global Opportunity Fund, Limited ("Harrington" or "Plaintiff"). I have been

instructed to assume the accuracy of the following facts in preparing my report. Harrington is a Bermuda-based investment company that is wholly owned by its unit holders and is managed by Harrington Global Limited. Between January 27, 2016 and November 15, 2016 ("the Relevant Period") Harrington sold 8,931,109 shares[1] of Concordia International Corporation ("Concordia" or the "Company") in the U.S. and Canada. During the Relevant Period, Concordia was considered an "interlisted stock" because its shares traded on exchanges in both Canada and the United States ("U.S."). Whether sold in the U.S. or in Canada, Concordia shares were the same and, therefore, when orders to sell were placed on a Canadian exchange, the effect of those orders directly impacted trading in the U.S. on an essentially immediate basis.[2] Shares of Concordia traded under the ticker CXR in Canada and under the ticker CXRX in the U.S.

6. I have been asked to opine on whether, during the Relevant Period, the trading systems of Merrill Lynch Canada Inc. ("Defendant" or "Merrill") were used by Merrill or its customers to conduct order-and-trade activity that was consistent with manipulative behavior, often called "spoofing" (or "layering," which is a form of spoofing) specifically with respect to "downward" spoofing (or layering) of Concordia shares.

7. In developing my findings, I have relied on my knowledge, experience, academic research, and certain documents, which are listed in **Exhibit 3**. I was instructed by Counsel to make reasonable assumptions when encountering data issues or unclear/absent data descriptions in the Defendant's data. In developing my findings, I have found certain limitations in the data that have required me to make necessary adjustments to the data in order to conduct

[1] HARRINGTON_028371.
[2] *Harrington Global Opportunity Fund, Limited v. CIBC World Markets Inc., et al*, U.S. District Court for the Southern District of New York, Civil Action: 21-cv-00761. Second Amended Complaint. December, 2022.

my analyses. I describe these in **Exhibit 4**. My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that additional information is discovered or provided to me in connection with this matter.

8. For a portion of my work, I am being compensated for my time and services on an hourly basis at my regular rate of $1,100 per hour. For another portion of my work, I am being compensated for my time and services on an hourly basis at a rate of $825 per hour. I was assisted in this matter by the staff of SKS Analytics LLC who worked under my direction. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

### C. Summary of Opinions

9. Based on my analysis I conclude that during the Relevant Period, customers [redacted] LLC and [redacted] LLC used Merrill's platform to engage in [redacted] episodes of spoofing in Concordia stock.

## II. BACKGROUND

### A. What is Spoofing

10. Spoofing is the act of pretending to sell when in fact you intend to buy - or pretending to buy when in fact you intend to sell. In so doing, it is a strategy designed to mislead other market participants about the supply and demand for a stock.

11. More specifically, spoofing is a form of market manipulation where a trader places limit orders[3] with the intention of canceling them before execution, creating a false impression of supply or demand.[4] Stock prices, like other markets, are driven by forces of supply and demand. The greater the demand or lower the supply, the higher the price. Conversely, the lower the demand or greater the supply, the lower the price. Spoofing is employed to distort the supply or demand of a security, misleading other market participants to react in ways that benefit the spoofer.[5] The end result is that the trader engaged in spoofing manipulatively intends for the price to move in their favor.

12. The negative impacts of a market manipulation scheme carried out through practices like spoofing on financial markets include increased volatility, more adverse selection, and worse price efficiency.[6] Spoofing in financial markets distorts prices and harms market quality, interrupting the market's ability to allocate capital efficiently in the economy.

13. High-frequency trading (HFT) and algorithmic trading firms are often scrutinized in the context of spoofing due to their ability to place and cancel orders at rapid speeds.[7] The advanced algorithms and high-speed trading systems used by HFT firms, in particular, can facilitate spoofing by allowing traders to place and withdraw large orders within

---

[3] A limit order is a message that indicates that a trader wants to buy or sell a certain number of shares of a stock at a certain price. By contrast, a "market" order is one that is designed to execute at the then-available price in the marketplace.

[4] In this Report, I use the term spoofing to refer to both spoofing and layering interchangeably. Technically spoofing typically refers to using misleading limit orders placed at one price level, whereas layering refers to using misleading limit orders placed at more than one price level.

[5] Putniņs, T.J., 2020. An overview of market manipulation. *Corruption and Fraud in Financial Markets: Malpractice, Misconduct and Manipulation*, *13*.

[6] Brogaard, J., Li, D. and Yang, J., 2022. Does high frequency market manipulation harm market quality? Working Paper *Available at SSRN 4280120*.

[7] O'Hara, M., 2015. High frequency market microstructure. *Journal of Financial Economics*, *116*(2), pp. 257-270. High frequency trading firms are a subset of algorithmic trading firms that look to specialize in transacting at very high speeds typically measured in milliseconds and microseconds.

milliseconds. That said, spoofing need not be conducted by an algorithmic or high frequency trader but can be conducted via manual trading as well.[8]

14. Spoofing has gained significant attention following the 2010 Flash Crash, during which spoofing was identified as a contributing factor to the sudden 1000-point plunge-and-rebound of the stock market over a brief window of time.[9] Regulators, notably the Commodity Futures Trading Commission (CFTC) and the Securities and Exchange Commission (SEC), have aggressively pursued enforcement actions against spoofers. The Dodd Frank Wall Street Reform and Consumer Protection Act 2010 ("Dodd-Frank Act") makes express and specific provision to prohibit such activity.[10] However, prior to the enactment of the Dodd-Frank Act, regulators routinely sought to punish practices that deliberately distorted prices through the general anti-fraud and anti-manipulation provisions available in securities and commodities regulation.[11]

15. Some high-profile cases include the prosecution of Navinder Sarao, who was implicated in the 2010 Flash Crash.[12] Other significant cases include the $920 million JP Morgan settlement for spoofing in the metals futures and Treasury securities markets,[13] and penalties imposed on Lek Securities, following a jury verdict.[14]

---

[8] https://fortune.com/2022/07/20/former-jpmorgan-trader-reveals-how-his-mentor-taught-him-to-place-and-cancel-bogus-spoof-trades-manipulate-markets/.

[9] https://www.cftc.gov/PressRoom/PressReleases/7156-15. Notably, during the *Flash Crash*, the Dow Jones Index plunged almost a 1000-points before rebounding during a window of time that lasted around 30 minutes; https://www.justice.gov/opa/pr/futures-trader-pleads-guilty-illegally-manipulating-futures-market-connection-2010-flash; https://corporatefinanceinstitute.com/resources/equities/2010-flash-crash/.

[10] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 203, U.S. Statutes at Large 124 (2010): 1376-2223. Section 747(5)(C).

[11] 17.CFR 240.10b5.

[12] https://www.justice.gov/opa/pr/futures-trader-pleads-guilty-illegally-manipulating-futures-market-connection-2010-flash.

[13] https://www.reuters.com/article/jp-morgan-spoofing-penalty-idINKBN26K325/.

[14] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25427.

### B. How Spoofing Manipulates Prices

16. For spoofing to effectively manipulate the share price, several steps must occur. Below, I highlight some of the price dynamics of trading and order submission as context to understanding how spoofing impacts the market.

17. First and foremost, trades in a stock move the price of that stock. The academic literature shows that order messages, not just executed trades, can also move the price of a stock.[15] That is, just the impression of supply and demand for shares, as conveyed by incoming limit orders, can by itself, cause prices to change.

18. A trade can be designated as a "buy-initiated" or "sell-initiated" trade. Every trade involves two parties: one receives stock (buyer) and the other cash (the seller). Whether a trade is labelled a buy-initiated trade or a sell-initiated trade depends on who initiates the trade.[16] A trade only occurs when a buyer and a seller match in accordance with the rules of an exchange or trading platform.[17] The standard market design is one where there is a limit order book that contains the order messages posted by market participants interested in buying or selling a given stock. A trade occurs when a market participant sends a market order (an order with no price condition that will result in immediate execution) or marketable limit order (a limit order that has a price condition but the price is such that is will "cross" or interact with a limit order that is resting in the limit order book and

[15] Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, *74*(4), pp.1621-1658.
[16] The initiating side of the trade is also referred to as the "aggressive" side, as the trader is crossing the bid-ask spread in order to trade.
[17] For example, Nasdaq's Equity Trade Rules:
https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%20Equity%204.

execute).[18] Therefore, a buy-initiated trade is one where a trader who wants to buy shares initiates a trade in a stock by submitting a market or marketable limit order to buy, and matches with a resting sell order.

19. Buy-initiated trades generally signal positive information about the stock. Conversely, sell-initiated trades generally signal negative information about the stock. In the same way, limit order messages to purchase shares ("bid" limit orders) generally signal positive information, while limit order messages to sell shares ("ask" limit orders, also referred to as "offer" limit orders) typically signal negative information.[19]

20. Consequently, the placement of an ask limit order itself can cause a stock's price to decline.[20] In other words, an actual trade is not necessary to affect the price of the stock. When a new limit order is placed, other market participants see it and may assume it is a legitimate trader intending to sell. As such, they will respond accordingly and assume that there is negative information about the stock. When there is a greater interest via limit orders to sell a stock than to buy a stock, the price of the stock will typically decline.

21. Crucially, market participants typically believe the following to be the case when trading: (i) that the limit order is not part of a manipulative strategy; that is, market participants believe that limit orders and the limit order book constitute a true and accurate reflection of actual supply and demand for a stock; (ii) that the limit order book contains information about the stock; a limit order book with information means that limit order messages are

[18] A non-marketable limit order has a price condition, but the price does not cross the spread to result in a trade. Instead, the limit order will join the limit order book until cancelled or executed.
[19] Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, *74*(4), pp.1621-1658.
[20] Id.

assumed to be based on non-public information, or information that is public but that has yet to be fully incorporated into the stock price.

22. Limit orders placed by a spoofer are designed to mislead other market participants into believing that there is significant trading interest at the particular price favored by the spoofer. A non-bona fide limit order is a limit order submitted with the intent to cancel the order before execution. By contrast, a limit order where the trader actually intends for the order to be successfully consummated in a trade represents a bona fide limit order.[21] The mere entry of a limit order by itself conveys information about the trading interest around that stock, and other market participants cannot discern whether a specific limit order is bona fide or not.

23. In addition to the number of limit orders, the aggressiveness of the limit order can matter. An aggressive limit order is one that is closer to the national best price.[22] In a downward spoof, for instance, limit orders placed at the national best ask price will be more impactful than limit orders placed ten cents higher than the national best ask price. This is because the limit order has a higher probability of executing if it is placed at a more competitive price. A trader willing to assume a greater likelihood of execution can be viewed as one who is more eager to trade, which may be due to having private information about the current stock price and where the stock price may go in the future.[23]

24. For the spoofer, there is a trade-off with these more aggressive limit order placements. Limit orders closer to the national best ask price will lead other market participants to think

[21] https://www.finra.org/rules-guidance/guidance/reports/2023-finras-examination-and-risk-monitoring-program/manipulative-trading.

[22] Reg NMS created a national best bid and offer price in the United States at which orders must execute, with some narrow exceptions. See https://www.sec.gov/spotlight/emsac/memo-rule-611-regulation-nms.pdf. The national best bid and offer price represent the highest bid price and the lowest offer price available across numerous exchanges.

[23] Wald, J.K. and Horrigan, H.T., 2005. Optimal limit order choice. *The Journal of Business*, *78*(2), pp.597-620.

there is more information in the limit order. But such aggressive limit orders have a higher risk of executing, which would result in a sale, when the spoofer is actually trying to buy. Limit orders further from the national best ask price will lead other market participants to believe that there is less information in the limit order. But such limit orders have a lower risk of executing, and so are safer for the spoofer to use. The spoofer need not place one ask limit order but can instead place several of them at different prices.

25. Besides the price of the limit order, the limit order contains information about the size of the desired purchase or sale. The size of a limit order refers to the number of shares included in a limit order. Just as a price closer to the national best price is an indicator of the potential amount of information contained in a limit order, and therefore how much the price might move, the size is also an indicator of the potential amount of information contained in the limit order.[24] A larger size suggests the limit order has more information.[25] This is in addition to the fact that a larger limit order size understandably causes a greater impact on in the demand or supply curve of the stock.

26. It is not just the characteristics of the specific limit orders that matter, but instead the relation between the ask (sell) limit orders and bid (buy) limit orders that influence whether on net the limit order book appears to have greater supply (ask) of shares or greater demand (bid) of shares. I refer to the relative activity between limit orders on the ask side of the limit order book relative to the bid side of the limit order book as the “imbalance.” The higher the imbalance ratio the greater the relative ask limit order activity relative to the bid limit order activity.

[24] Easley, D. and O'Hara, M., 1987. Price, trade size, and information in securities markets. *Journal of Financial Economics*, *19*(1), pp. 69-90.
[25] Id.

27. In addition to the impact resulting from the spoofer's limit order book behavior, other market participants might also place bona fide limit orders themselves, based on the perceived change in demand or supply. For example, they may put in ask limit orders if they see the arrival of a new large ask limit order on the limit order book. They may also withdraw their bid limit orders if they see a new large ask limit order being placed, as they perceive that another trader with potential private information is trying to sell. Consequently, they may decide that they do not want to purchase the stock, or they may only want to purchase the stock at a lower price than a bid limit order they had previously placed.

28. In a downward spoof, the non-bona fide ask limit orders are intended to decrease the price. The spoofer can then benefit from this decrease by placing one or more bona fide bid limit orders. The timing of the bona fide order placement need not be specific, it may occur before, at the same time, or after the non-bona fide ask limit orders have been placed.

29. If the spoofer is successful, then their non-bona fide ask limit orders will drive the price down and drive the price down to such a degree that the spoofer's bona fide buy order is executed at the spoofer's preferred price.

30. In sum, the spoofer will generally look to reduce risk. Even if a limit order is not intended to execute, the fact that it is resting on the limit order book means that it is at risk of execution. Therefore, once the bona fide limit order is executed, the spoofer will want to adjust their outstanding non-bona fide limit orders. They may want to completely remove the non-bona fide limit orders, they may want to remove a portion of them, or they may want to change their quoting behavior on the other side of the limit order book. The limit order book adjustment is usually done shortly after the bona fide limit order executes to

reduce the risk of an execution, minimizing the risk to the spoofer. However, if the spoofer is trying to execute multiple bona fide limit orders, then they may want to continue their non-bona fide limit order book activity even after the execution. By not immediately cancelling the non-bona fide limit orders, the spoofer will maintain the distorted supply and demand for the stock, which could lead to more bona fide limit orders executing.

## III. SPOOFING ACTIVITY

### A. Overview

31. Detecting spoofing episodes requires detailed data. Such data requirements include order level information with account identities and accurate timestamps. At a high level, I must be able to do the following: (i) track the limit order book activity of a particular trader; (ii) observe such information as the symbol, trading venue, price, quantity, order type, date, time, and special order-handling instructions for the limit orders; and (iii) track the life-cycle of a limit order from its creation to its completion, which includes the original placement, the amendments or replacements, executions, and cancellations.

32. Merrill's data is comprised of new orders, amendments, cancellations, and executions made by Merrill and its customers during the Relevant Period. Beyond the basic order placement and execution details, there are details regarding the limit order message that allow for a more detailed recreation of the trader's activity.

33. The first is distinguishing "lit" versus "dark" trading venues. Lit venues, also known as lit markets or exchanges, are trading platforms where orders are visible to all market

participants before they are executed. This transparency allows traders to see the prices and quantities of buy and sell orders. Major stock exchanges such as the New York Stock Exchange (NYSE) and NASDAQ are prime examples of lit venues. These platforms publish limit order book data in real-time, enabling traders to make informed decisions based on the available market information.[26] Dark venues, also known as alternative trading systems or, colloquially, dark pools, are operated by major financial institutions and include platforms such as Liquidnet, ITG Posit, and Goldman Sachs' Sigma X. Unlike lit venues, these platforms do not display limit order book data to the public.[27] Lit and dark venues coexist in the financial markets, serving different needs of market participants. While lit venues provide transparency and efficient price discovery, dark venues offer greater privacy and reduced market impact for large trades. Traders can use a combination of both to balance the benefits of liquidity and immediacy.

34. In lit venues, the visibility of limit orders makes it easier for spoofers to manipulate market perceptions. Spoofers can place visible limit orders to create the illusion of buying or selling interest. When other traders see these limit orders, they may react by placing their own limit or market orders, moving the market price in a direction favorable to the spoofer.

35. In dark venues, lack of pre-trade transparency can make it difficult for spoofers to influence market perceptions. Since limit orders placed in dark venues are not visible until they are executed, spoofers cannot use the same tactics of displaying large limit orders to manipulate other market participants' actions. Spoofers may use a combination of lit and dark venues to execute their strategies. For example, a spoofer might place a large visible

[26] For instance, Nasdaq provides the TotalView-ITCH data: https://www.nasdaqtrader.com/Trader.aspx?id=Totalview2.

[27] Aquilina, M., Foley, S., O'Neill, P. and Ruf, T., 2024. Sharks in the dark: Quantifying HFT dark pool latency arbitrage. *Journal of Economic Dynamics and Control*, *158*, p. 104786.

limit order in a lit venue to move the market price and then execute a trade in a dark pool to benefit from the manipulated price. As such, I restrict the possible spoofing detection to limit order book message on lit markets, while allowing for executions to occur either on a lit venue or a dark venue.

36. Other methods exist by which limit orders can be sent to a lit venue but do not result in a visible limit order. On lit venues it is common for there to be an option for the trader to place a limit order that is not displayed on the publicly disseminated limit order book.[28] This is commonly referred to as a "hidden" limit order. A hidden limit order, as the name suggests, is completely invisible to other market participants. No part of the limit order is displayed on the limit order book. The limit order sits on the exchange's internal limit order book and only becomes visible when it matches with an incoming marketable limit order. Traders use hidden lit orders to avoid revealing their trading intentions, thus preventing market impact or front-running by other traders. However, because hidden limit orders are not visible, they usually have lower priority for execution compared to visible limit orders at the same price level. The fact that the limit order is hidden also means that other traders will not be influenced by it and so it should not be considered in a spoofing scheme.

37. Many lit venues also have an option for the trader to place a limit order that is only partially displayed on the limit order book. This is commonly referred to as a reserve limit order or an "iceberg" limit order. An iceberg order reveals only a small portion of the total limit order's actual quantity to the public, with the bulk of the limit order's quantity hidden from view. The visible part of the limit order is known as the "tip" of the iceberg. Once this visible portion is executed, another segment of the hidden portion is automatically

[28] Bessembinder, H., Panayides, M. and Venkataraman, K., 2009. Hidden liquidity: an analysis of order exposure strategies in electronic stock markets. *Journal of Financial Economics*, *94*(3), pp. 361-383.

displayed. This process continues until the entire order is filled. Iceberg limit orders give traders the ability to gradually execute large trades without significantly affecting the market price. They strike a balance between maintaining some level of anonymity and ensuring a higher priority of execution compared to completely hidden limit orders.[29]

38. Spoofers may use hidden and iceberg limit orders as part of their spoofing scheme. By placing hidden or iceberg limit orders alongside visible spoofing limit orders, they can further obscure their true trading intentions and manipulate market perceptions more effectively. This can create a biased impression of market conditions, leading other participants to make decisions based on incomplete information. To the extent possible I categorize limit orders as being lit, hidden, or iceberg. Unless I could determine otherwise, I assumed a limit order and a venue was lit.

39. In addition, there are special limit order types that behave differently than normal order types: immediate or cancel ("IOC") and "post-only." An IOC limit order has the property that it either needs to execute immediately or it is cancelled. How trading venues handle these orders is nuanced. It is my understanding that if the IOC order does not execute then the cancellation occurs before it is ever displayed on the limit order book. Therefore, unfulfilled IOC limit orders should not be included in the visible limit order book.

40. Post-only limit orders have nearly an opposite set of properties. If a post-only limit order entered by a trader would cross the bid-ask spread and result in an execution it is cancelled immediately. If the post-only limit order is entered but would not result in an execution, it is placed on the limit order book. When a post-only limit order is cancelled because it would result in an execution, it is my understanding that the cancellation occurs before it

[29] https://www.nasdaq.com/docs/2020/01/20/Factsheet_Reserve_Order_Iceberg_GTMS.pdf.

is ever displayed on the limit order book. Therefore, post-only limit orders that are immediately cancelled should not be included in the visible limit order book.

41. As the data I examined are at the broker level, I did not include in my analysis limit order book dynamics that occur at the exchange level. For example, I did not incorporate the order book dynamics associated with a "pegged" limit order. A pegged limit order automatically adjusts its price based on some conditional change, such as a change in the national best bid price.

### B. Detecting Spoofing

42. I have relied on the Merrill data to determine whether spoofing occurred during the Relevant Period. I have focused my analysis on the data that appears to come from the direct market access system of the Defendant.[30] These are a combination of eight productions.[31]

43. In practice, operationalizing the detection of this simple behavior was a complex endeavor. Concordia trades in the U.S. in U.S. dollars (ticker = CXRX) and in Canada in Canadian dollars (ticker = CXR). I proceed as follows.

44. There is not one single approach by which a trader can manipulate a stock price by spoofing the market. There needs to be three general criteria to determine whether a trader is engaging in spoofing. First, I require that before purchasing the stock, the trader appears to

[30] Baebler TR., 79:8-80:10.
[31] Production 05 - MERRILL_02880 - MERRILL_03049; Production 06 - MERRILL_03051 - MERRILL_03133; Production 09 - MERRILL_03538 - MERRILL_03693; Production 10 - MERRILL_03694; Production 16 - MERRILL_04541 - MERRILL_04773; Production 21 - MERRILL_06733 - MERRILL_06793; Production 23 - MERRILL_06863 – MERRILL_06910; Production 26 - MERRILL_06918 - MERRILL_06933.

manipulate the visible supply and demand balance of the stock in a way that other market participants will artificially believe there to be greater interest to sell. Second, I require that the trader purchased the stock shortly thereafter. Third, I require that the trader reduce their manipulative activity shortly after purchasing the shares so that the limit order book activity of the trader normalizes shortly after the purchase.

45. Unlike many manipulation-based cases that I am familiar with, this matter does not focus ex-ante on a specific trader as the potential spoofer. I therefore initially considered all clients and their orders as potential spoofers.

46. The anonymized Client ID "7490184da31a7fa84bdc5a29c9f1d4cbf1752a781d4394487e6 6303e5b262220" stood out in its limit order book behavior. Previous discovery revealed that this Client ID was associated with the firm [redacted] LLC.[32] Furthermore, [redacted] LLC has a wholly owned subsidiary named [redacted] LLC, which was also in the data that I analyzed using the anonymized Client ID of "3880ef84b6db80f9db694c0433a84dfe1105448 495197e586d0468601a8827b9."[33,34] As these customers were financially connected, I proceeded to treat them as one entity and to focus my spoofing analysis solely on [redacted] LLC and [redacted] LLC ( combined "[redacted]").

47. As mentioned earlier, there is no single defined way by which spoofing can occur and therefore there is not one spoofing detection algorithm that can uncover such behavior. I thus implemented two methodologies to detect spoofing, which I refer to here as the Posting and the Quantity methodologies. Posting is meant to capture a quoting-based approach to distort the supply and demand of the limit order book. The idea is that the

[32] Merrill_04484.
[33] Id.
[34] September 9, 2024 [redacted] Declaration.

activity of posting limit orders itself may drive other market participants' reactions. The Quantity methodology is meant to capture the number of shares resting on the limit order book approach to distorting the limit order book's supply and demand information. The idea is that as the resting quantity on the ask side and on the bid side changes, other market participants may be influenced to change their behavior.

48. I was asked by Counsel to focus on downward spoofs. A downward spoof is one where the trader intends to push the stock price down so as to execute a purchase at a lower price.

49. I proceed by describing a series of basic steps that, in their totality, capture activity consistent with limit order book behavior intended to move prices in favor of the trader. Based on my understanding of the literature, I developed definitions of spoofing that capture the economic intuition of a spoof while conforming to the activity of a trader like [redacted] who claimed to engage in market making.[35] Market making is a legitimate trading activity whereby a trader provides liquidity[36] to the market by continuously quoting buy and sell prices for a specific stock. Traders who engage in market making are referred to as "market makers." Market makers facilitate trading by being ready to buy or sell shares at publicly quoted prices, ensuring that a counterparty is available for other traders. Market makers generate profit from the price difference between the bid and ask prices, or from earning rebates paid by exchanges to have its resting limit orders execute.

50. Traders that engage in a market making strategy are generally very active market participants, and so the notion of a clearly identifiable start and end to limit order book activity that looks like spoofing does not apply. For example, a market maker will regularly

[35] September 9, 2024 [redacted] Declaration.
[36] Liquidity refers to the ease at which a stock can be bought or sold without significantly impacting the price. In a more liquid market trades occur with only a small impact on price. In a less liquid market trades occur with a larger impact on price.

have quotes outstanding at both bid and ask prices. To require that a trader engaged in spoofing have no limit orders resting on the limit order book at the start or end of a spoof would virtually eliminate the possibility that a market maker could be spoofing.

51. Identifying spoofing activity therefore must take into account what normal market making behavior should look like and what behavior instead is more consistent with spoofing activity. For example, after a downward spoof resulting in a purchase of a stock one should not expect a market maker who is also spoofing to cancel all their ask limit orders. Instead, one should expect the spoofing trader to return to their normal behavior. For example, normal behavior under certain conditions would be to provide roughly similar amounts of liquidity on both sides of a market.[37]

52. Generally, a spoofing episode contains three elements. First, as detailed above, the trader must influence the natural forces of supply and demand of a stock. They do this by placing non-bona fide orders. The purpose of these non-bona fide orders is to distort the visible limit order book and alter the price path of the stock being manipulated. Second, the trader executes their intended bona fide trade. Third, the spoofer undoes their misleading limit order book activity, causing the supply and demand of the stock to no longer be distorted by their participation. Each one of these three components is necessary to identify a spoofing episode.

53. For a spoofing scheme to be successful, a trader's limit orders must be visible so as to persuade other traders that there is price pressure trending in a certain direction. As a result, for each methodology, I excluded limit orders that appeared to be sent to a dark venue. Also, if the limit order appeared to be sent to a lit venue but was labelled as hidden, I

[37] Later I address in more detail what limit order book behavior one would expect to observe from a market maker after a buy execution.

excluded the limit orders from my tracking. If I could determine that a limit order was an iceberg, I included the displayed portion of the limit order. If a limit order was an iceberg order but I did not know how many shares were to be displayed at a given time, I assumed all shares were displayed.

54. I also restricted the limit orders I considered to only new limit orders that were within ten cents of the best bid or offer price for the ticker being quoted.[38] I did so given that, as discussed above, limit orders near the top of the limit order book should have had more of an impact on other traders' behavior. I wanted to avoid considering limit orders that are far from the best bid and offer price.

55. To the best of my understanding, the Merrill data did not contain information on hidden or iceberg orders. Unless I could establish otherwise, I have assumed that a limit order was fully displayed. I excluded IOC limit orders from displaying on the limit order book. I also excluded post-only limit orders that were immediately cancelled from displaying on the limit order book.[39,40]

### i. Posting Methodology

56. I first describe the Posting methodology that I have implemented to detect spoofing.

[38] For CXRX limit orders I use best bid and offer price data from the Trade and Quote ("TAQ") NBBO database. For CXR limit orders I use best bid and offer price data from OneTick's Canadian NBBO database.

[39] I followed the FIX 4.2 and FIX 4.3 nomenclature for the "Timeinforce" variable and identified a limit order as post-only if Timeinforce was equal to GTX. I could not find definitions for the values "PST" or "S" in Timeinforce and so conservatively treated them as post-only. In a robustness check, I found that not treating "PST" and "S" as post-only orders slightly increased the number of Spoofing Episodes.

[40] I also excluded limit orders whose value for "Ordtype" was equal to "LOC" and limit orders whose value for Timeinforce was "OCL."

57. I began by considering each [redacted] buy trade. I considered the timestamp of that trade to be represented by time "t." I used a window of time two seconds before the trade to three seconds after the trade.[41] This was the period of time that I evaluated to determine whether the trader's overall behavior fits the definition of a spoof. I referred to the five second window as the "Episode." If specific criteria were met, then I labeled this a "Spoofing Episode" and the buy trade associated with it as an "Executing Purchase." From the start of the Episode to the end of the Episode, I tracked the new orders placed along with their associated cancels and replacements of [redacted].

58. I therefore developed an algorithm to systematically detect spoofing engaged in by [redacted]. There were six components to the algorithm and all six had to be met to flag the purchase as an Executing Purchase arising from a Spoofing Episode.

59. I only considered limit orders that appeared to be part of the visible limit order book. Unseen limit orders would have had a difficult time impacting others' behavior as they were not directly observable. However, I considered all the trader's executions, regardless of venue or display status.

60. First, I required that prior to the trade (t-2 seconds to t) that the sum of new ask limit order shares placed by the trader be twice as many as the sum of new bid limit order shares placed by the trader.[42, 43] This created a limit order book activity imbalance. An order imbalance greater than two signaled that there was much more interest to sell than to buy. It would have appeared to other market participants that someone was hoping to sell the stock. Note,

---

[41] The precise windows that I used are: t-2 seconds to t+3 means t-2000 milliseconds to t+3000; t-2 seconds to t means t-2000 milliseconds to t; t seconds to t+1 means t+1 milliseconds to t+999; t+1 seconds to t+3 means t+1000 milliseconds to t+3000 milliseconds; finally t-2 seconds to t+.01 means t-2000 milliseconds to t+10. I refer to the closest whole second in the text for convenience.
[42] If the trader placed no bid limit orders during t-2 seconds to t I set the order imbalance to greater than two.
[43] Here and throughout the analysis I treated amended limit orders as a cancel limit order and a new limit order.

that many of these orders were short lived.[44] Posting a limit order that is cancelled shortly thereafter is a way for a trader to reduce accidental execution risk. The longer a trader's limit order stays on the limit order book the greater the chance it can execute. In addition, longer lived orders will maintain or improve their positioning in the queue, which means that if another trader crosses the bid-ask spread to execute a trade, the longer-lived orders will have priority over more recently placed orders at the same price.

61. For a spoofing scheme to move prices, it is not enough for the t-2 seconds to t order imbalance to be large, as it may be that the magnitude of both the sum of the visible ask and the sum of the visible bid limit shares are small. A limit order imbalance of two can be established with ask limit order shares summing to one hundred and with bid limit order shares summing to fifty, but such small magnitudes would likely fail to influence the behavior of other traders and so would not be likely to induce a stock price change. Therefore, second, I required that the cumulative number of ask limit order shares placed by the trader in the t-2 seconds to t interval sum up to twice the Canadian time-weighted average number of shares at the best ask price for CXR on that day.[45]

62. Third, I required there to be a purchase by [redacted].

63. Fourth, I required that after the purchase, that the trader significantly changed their limit order posting activity. If the trader was expecting the price to decline and they purchase, that purchase would then have given the trader more of a motivation to sell. As such, one would have expected, all else being equal, that the trader would have wanted to continue trying to sell, which would have been reflected in a continuation of their visible ask limit

[44] Much of trading during the Relevant Period was likely automated, and so even extremely short-lived limit orders can have an impact on other market participants.

[45] CXR ask quantity of shares came from OneTick's Canadian NBBO database. The best ask order sizes used to create the average were winsorized at the 5% level on the right tail.

order activity being similar or larger than prior to the trade.[46] Such a continuation would be consistent with legitimate trading and I wanted to avoid labelling such activity as spoofing. If instead, the trader quickly changed their limit order book activity to put less pressure on the ask side, such a change would be inconsistent with the limit order book behavior of legitimate trading.

64. Observing a change in the trader's limit order book behavior in the post-execution period was important. The change showed that the limit order book imbalance in the pre-execution period was deliberate and done in a way that was consistent with spoofing. It suggested that the intent was not to sell but was instead to buy. That is, the ask limit orders were non-bona fide limit orders and were being used to influence the behavior of other market participants.

65. As it is possible that [redacted] attempted to execute more than one purchase during the Spoofing Episode, I allowed for a short time delay. Instead of immediately beginning to evaluate the post-execution behavior, I skipped over one second, from t to t+1. This one second delay allowed for [redacted] to continue the spoofing pressure to execute more than one purchase without distorting the post-execution evaluation. I used the two seconds t+1 to t+3 to re-evaluate the limit order book activity of [redacted]. For it to be consistent with spoofing, I required that the sum of the post-execution ask shares to be no more than half of the sum of the pre-execution ask shares. This would be consistent with the trader meaningfully reducing their ask limit order activity. Alternatively, I required that in the post-execution period from t+1 to t+3 that the sum of new ask limit order shares placed by the trader be

[46] At the end of Section III.B.ii I discuss how a market maker would be expected to behave.

no more than 1.2 as much as the sum of new bid limit order shares placed by the trader.[47] An order imbalance close to one or less signaled that there was no longer an asymmetric preference to sell. This was consistent with the trader returning to a close-to-balanced ask limit order and bid limit order posting activity, or even having their limit order posting activity shift towards a preference to buy.

66. Fifth, to ensure that I did not simply capture market making activity whereby the trader was posting ask limit orders and then engaging in both selling and buying, I required that during the interval t-2 to t+.01 that the trader purchased at least twice as many shares as it sold. A downward spoof is meant to drive the price down and conclude with a purchase. If instead the trader is posting more ask limit orders than bid limit orders, but also selling shares regularly, it is inconsistent with the trader engaging in spoofing.

67. Sixth, I required many of the ask limit orders placed during the t-2 to t pre trade period to be cancelled. Specifically, I required at least half of the pre-execution ask order shares placed to be cancelled before the end of the t+3 Episode window.

68. As detailed above, in order to be a Spoofing Episode under the Posting methodology, all six criteria had to be met. If a Spoofing Episode was found, I referred to the purchase as an Executing Purchase.

69. There were many times during which a trader executed more than one purchase in a very short period of time. If the Episode was a Spoofing Episode, this led to overlapping Spoofing Episodes. These overlapping Spoofing Episodes could result in double counting. To avoid such double counting, I only allowed for one Spoofing Episode per five second interval, 2.5 seconds before or after the Executing Purchase.

---

[47] If the trader placed ask limit orders but no bid limit orders during t+1 to t+3 I set the order imbalance to greater than 1.2. If the trader placed no ask and no bid limit orders during t+1 to t+3 I set the order imbalance to less than 1.2.

### ii. Quantity Methodology

70. Next, I describe the Quantity methodology that I have implemented to detect spoofing.

71. I began by considering [redacted] buy trades. I considered the timestamp of the trade to be represented by time "t." I used a window of time thirty seconds before the trade to three seconds after the trade.[48] This is the period of time that I evaluated to determine whether the trader's overall behavior fit the definition of a spoof. I refer to the thirty-three second window as the "Episode." If specific criteria were met, then I labeled this a "Spoofing Episode" and the buy trade associated with it as an "Executing Purchase." From the start of the Episode to the end of Episode, I tracked [redacted]'s new orders placed along with their associated cancels, replacements, and executions.

72. I therefore developed a second algorithm to systematically detect spoofing engaged in by [redacted]. There were five components to the algorithm and all five had to be met in order to flag the purchase as an Executing Purchase arising from a Spoofing Episode.

73. I only considered limit orders that appeared to be part of the visible limit order book. Unseen limit orders would have had a difficult time impacting others' behavior as they were not directly observable. However, I considered all of the trader's executions, regardless of venue or display status.

74. Starting 30 seconds prior to the purchase and ending 3 seconds after the trade, I tracked the visible new limit orders of the [redacted].

[48] The precise windows that I used are: t-30 seconds to t+3 means t-30000 milliseconds to t+3000; t-0.5 seconds to t means t-500 milliseconds to t; t seconds to t+2.5 means t+1 milliseconds to t+2499; t + 2.5 seconds to t+3 means t+2500 milliseconds to t+3000 milliseconds; finally t-30 seconds to t+.01 means t-30000 milliseconds to t+10. I refer to the closest half second in the text for convenience.

75. That is, I followed the new visible limit orders placed within ten cents of the best bid or ask price. I tracked the life-cycle of their activities. I did this for all visible new limit orders placed between time t-30 and t+3. I then calculated the average quantity of shares that the trader had resting on the limit order book at two different times.

76. For the first criteria, I took the first time-weighted average quantity of shares that [redacted] had on the limit order book during the period t-0.5 to t. That is, I took the time weighted average quantity of shares that [redacted] had on the limit order book for the last half-second prior to it purchasing the stock. I did this separately for [redacted]'s quantity of shares on the ask side of the limit order book and for [redacted]'s quantity of shares on the bid side of the limit order book.[49] I required that, prior to the trade (t-0.5 seconds to t), [redacted] have on average twice as many visible shares available to sell on the limit order book as they had to buy.[50] This created a limit order book imbalance. An order imbalance greater than two signaled that there was much more interest to sell than to buy. It appeared to other market participants that someone was hoping to sell the stock.

77. For a spoofing scheme to potentially move prices it is not enough for the pre-execution order book quantity of shares imbalance to be large, as it may be the case that the magnitude of both the visible ask and visible bid limit order quantity of shares are small. A limit order imbalance of two can be established with an ask limit order quantity of shares averaging one hundred and with bid limit order quantity of shares averaging fifty, but such small magnitudes may fail to influence the behavior of other traders and so would not likely induce a stock price change. Therefore, second, I required that the trader's average time-

[49] If in the 30 seconds prior to the trade the trader only placed a bid (ask) limit order in the t-0.5 to t interval I took the time-weighted average quantity of shares for the bid (ask) side of the limit order book starting from the placement of the limit order to time t.

[50] If the trader placed no bid limit orders during t-30 to t I set the order imbalance to greater than two.

weighted number of shares on the ask limit order book in the pre-execution period be at least 0.75 of the time-weighted average number of shares at the best ask price for CXR on that day.[51]

78. Third, I required there to be a purchase by [redacted].

79. Fourth, I required that after the purchase, the trader significantly changed their visible limit order resting quantity of shares. If the trader was expecting the price to decline and they purchased, that purchase would then have given the trader more of a motivation to sell. As such, one would have expected, all else being equal, that the trader would want to continue trying to sell, which would have been reflected in a continuation of their ask limit order quantity of shares being similar or larger than prior to the trade. Such a continuation of beliefs would be consistent with legitimate trading and I wanted to avoid labelling such activity as spoofing. If instead, the trader quickly changed their limit order book quantity of shares to put less pressure on the ask side, such a change would have been inconsistent with the limit order book behavior of legitimate trading.

80. Observing a change in the trader's limit order book position in the post-execution period was important. The change showed that the limit order book imbalance was deliberate and done in a way that was consistent with spoofing. It suggested that the intent was not to sell but was instead to buy. That is, the ask limit orders were non-bona fide limit orders and were being used to influence the behavior of other market participants.

81. As it was possible that [redacted] attempted to execute more than one purchase after the spoofing orders, I allowed for a short time delay. Instead of immediately beginning to evaluate the post-execution behavior, I skipped over 2.5 seconds, from t to t+2.5. This delay allowed

[51] The best ask order sizes used to create the average are winsorized at the 5% level on the right tail.

for [redacted] to continue the spoofing pressure to execute more than one purchase without distorting the post-execution evaluation. I used the t+2.5 to t+3 interval to re-evaluate the limit order book quantity of shares of [redacted]. I took the time-weighted average quantity of shares of [redacted]'s visible resting sell limit order shares and buy limit order shares during this period. For such behavior to be consistent with spoofing I required the post-execution ask quantity of shares average to be no more than half the pre-execution ask quantity of shares average. This would be consistent with the trader meaningfully reducing their ask limit order activity. Alternatively, I required that in the post-execution period from t+2.5 to t+3 that [redacted] have a time-weighted average resting ask limit order book quantity of shares no more than 1.2 as much as its time-weighted average resting bid limit order book quantity of shares.[52] An order imbalance close to one or less signals that there is no longer an asymmetric preference to sell. This would be consistent with the trader returning to a close-to-balanced ask limit order and bid limit order behavior, or even having their limit order behavior shift towards a preference to buy.

82. Fifth, to ensure I did not simply capture market making activity whereby [redacted] was posting ask limit orders and then engaging in both selling and buying I required that, during the interval t-30 to t+.01, [redacted] purchased at least twice as many shares as it sold. A downward spoof is meant to drive the price down and conclude with a purchase. If instead the trader is posting more ask limit orders than bid limit orders, but also selling shares regularly, its behavior is inconsistent with the trader engaging in spoofing.

[52] If the trader had resting ask limit orders but no resting bid limit orders during t+2.5 to t+3 I set the order imbalance to greater than 1.2. If the trader had no resting ask or bid limit orders during t+2.5 to t+3 I set the order imbalance to less than 1.2.

83. As detailed above, in order to be a Spoofing Episode under the Quantity methodology, all five criteria had to be met. If a Spoofing Episode was found, I referred to the purchase as an Executing Purchase.

84. There were many times during which a trader executed more than one purchase in a very short period of time. If the Episode was a Spoofing Episode, this would lead to overlapping Spoofing Episodes. These overlapping Spoofing Episodes could result in double counting. To avoid such double counting, I only allowed for one Spoofing Episode per five second interval, 2.5 seconds before or after.

85. Both the Posting methodology and the Quantity methodology are designed to detect Spoofing Episodes that were inconsistent with legitimate trading, such as market making. Both methodologies require a large imbalance in behavior on the ask side of the limit order book relative to the bid side. A limit order book imbalance itself is not necessarily inconsistent with standard market making behavior. For example, under an inventory explanation, if a market maker had a large positive inventory, they may have wanted to offload shares by posting more limit orders on the ask side of the limit order book than on the bid side.

86. Alternatively, under an informed trader explanation, if a market maker believed that there was an asymmetric likelihood that an informed trader would want to sell rather than buy, then the market maker would post more shares on the ask side of the limit order book than on the bid side.[53] Therefore, an imbalanced limit order book activity prior to the Executing Purchase was not sufficient to rule out the trader was simply engaging in legitimate market making.

[53] When a market maker provides liquidity to an informed trader the market maker will generally incur a loss. The risk of a market maker providing liquidity to an informed trader is called "adverse selection" risk.

87. After the Executing Purchase, I required the limit order book behavior imbalance to decline to 1.2 or lower, such that the bid and ask side behavior change was roughly equal or showed a preference to buy, or that the ask limit order activity declined by at least half. Such a change in limit order book behavior was necessary to rule out legitimate market making. In the inventory explanation for having a large limit order book imbalance prior to the Executing Purchase, the trader was trying to sell to reduce their inventory position. In the end though, the trader purchased. The trader therefore increased their inventory position, and so should have had a greater incentive to sell. However, to meet the spoofing requirement, I required the trader's ask limit order book activity to show a decreased interest in selling, either absolutely or relative to their bid limit order book activity.

88. In the informed trader explanation for having a large limit order book imbalance prior to the Executing Purchase, the trader was trying to sell instead of buy as they believed prices were going to decline. In the end though, the trader purchased. The trader therefore increased their shares in the stock when they expected the price to decline. As a result, the trader should have had a greater incentive to sell. Instead, their ask limit order book activity showed a decreased interest in selling, either absolutely or relative to their bid limit order book activity.

89. When a trader has an order imbalance in favor of the ask side, it suggests that trader has a stronger desire to sell than to buy. However, in both methodologies the trader ends up buying. If the trader had a desire to sell prior to the purchase, then after purchasing additional shares the desire to sell should be greater. However, both methodologies require that, after the purchase, the trader change their limit order book behavior, either by

engaging in near balanced bid and ask behavior or even having their limit order activity shift towards a preference to buy, or by reducing their ask side behavior by at least half.

90. In addition, both the Posting and the Quantity methodologies require a trade imbalance. That is, even though the trader has a limit order imbalance that is heavy on the ask side in the pre-execution period, it conducted more buys than sells. Specifically, both methodologies require that there be at least twice as many shares bought as sold. Such a trade imbalance is the opposite of what one would expect given the limit order book imbalance.

### iii. Data Batching

91. As previously noted, the Merrill data had numerous deficiencies, as outlined in **Exhibit 4**. In addition to these deficiencies, there appeared to be an issue with some of Merrill's timestamps. From my understanding of how the eight Merrill data productions interact, these timestamp issues were never corrected. I must and do, however, rely on the data provided.

92. At times multiple events occurred within the same millisecond. This is to be expected in modern high frequency financial markets. My analysis focused on [redacted], I therefore focused on the timestamps associated with its messages. Typically, a trader has a random or near random likelihood of wanting to submit a new message on any particular millisecond within a second. That is, of the 1,000 milliseconds in a second, a trader would be equally likely to by chance land on any one of them. As such, a distribution of the frequency of a

trader's message should be roughly uniform across the 1,000 milliseconds. The graph below reports [redacted]'s millisecond message frequency based on the Merrill data.




93. The graph shows that the vast majority of milliseconds followed a uniform distribution. However, the millisecond 999 stands out. I calculate that approximately 20% of [redacted]'s messages had a 999 millisecond timestamp. This suggests that Merrill bunched data together into a single timestamp. To a smaller degree there was also unusually high message activity at millisecond 000.

94. To determine whether the high message activity in millisecond 999 happened near the high message activity in millisecond 000 of the next second, I calculated the correlation coefficient between the 999 millisecond and the 000 millisecond from the next second. The correlation

coefficient can range between -1 and 1, with a negative value indicating the two data series move in opposite direction and a positive value indicating the two data series move in the same direction. The larger the magnitude of the coefficient, the more closely the two data series move together, with a positive coefficient indicating the two data series move in the same direction and a negative coefficient indicating the data series move in the opposite direction. A coefficient close to zero indicates that the two data series move independent of each other. I calculated that the correlation coefficient between the 999 millisecond and the 0 millisecond from the next second was -0.048. That is, there was almost no relationship between the 999 millisecond message count and the message count in the next millisecond, the 000 millisecond in the next second. The near zero correlation coefficient suggested that the millisecond 000 high message activity and the millisecond 999 high message activity were unrelated.

95. It is possible that [redacted] was frequently sending messages at millisecond 999 and that the data reflected the reality of the limit order book dynamics.[54] If this were to have been the case, I would have expected to observe a near-normal distribution of message activity surrounding the 999 millisecond. A near-normal distribution of message frequency would have a bell-shaped distribution. That is, I would have expected that the milliseconds 998 and 000 would exhibit considerably higher message activity than average, albeit not as high as millisecond 999. And milliseconds 997 and 001 would similarly have shown higher message activity, but less so than milliseconds 998 and 000. Such a distribution could occur for various reasons, such as variation in network latencies or when the trader entered messages at different times within the millisecond.

[54] For instance, Hasbrouck and Saar (2013) report irregular frequencies at certain milliseconds as well. Hasbrouck, J., and Saar, G. (2013). Low-latency trading. *Journal of Financial Markets*, *16*(4), 646-679.

96. Next, I considered every [redacted] timestamp with a 999 millisecond. I kept the 10% of the 999 millisecond observations with the most messages in that timestamp. In the graph below, I set these most active 10% of 999 milliseconds to be centered at event time 0 and I reported the average message frequency of the 100 milliseconds before and after these highly active 999 milliseconds. If the millisecond accuracy and message activity reflected reality, then I would have expected to see a bell-shaped distribution of message frequency. If the millisecond accuracy and message activity reflected batching, I would have expected to see a relatively uniform distribution of message frequency with the exception of the 999 millisecond.




97. The graph is consistent with a batching interpretation. This led me to conclude that the messages in the Merrill are at times artificially bunched together.

98. The Merrill data show that there were limit order messages that occurred at the same millisecond as purchases. With the data I was provided I am unaware of a method to order messages within the same millisecond, much less to correct for the likely Merrill timestamp batching, I have therefore assumed that new orders occurred first, followed by cancels, and then, executions. Also, the concern that investors may not have been able to respond within the same millisecond are alleviated as the data appears to have been batched and the timestamps simply combined together into one instant.

### C. Results

99. The table below shows the frequency of spoofing activity for Merrill. The exhibit is broken down by month and shows the frequency of Spoofing Episodes by [redacted]. I only counted a Spoofing Episode if the Executing Purchase did not happen within five seconds of another Spoofing Episode (2.5 seconds before or after). Merrill's Executing Purchases were a mix of U.S. and Canadian Executing Purchases. In total I observed [redacted] non-duplicate Spoofing Episodes.[55] [redacted] of the Spoofing Episodes were detected by only the Posting methodology. [redacted] Spoofing Episodes were detected only by the Quantity methodology. [redacted] Spoofing Episodes were detected by both methodologies.

| Month | Downward Spoofing Episodes (non-duplicate) |
| --- | --- |
| January | [redacted] |

[55] The date and time of the Executing Purchases are included in the associated electronic file submitted with this report (Merrill_Spoofing_Purchases.xlsx).

| | |
|---|---|
| February | [redacted] |
| March | [redacted] |
| April | [redacted] |
| May | [redacted] |
| June | [redacted] |
| July | [redacted] |
| August | [redacted] |
| September | [redacted] |
| October | [redacted] |
| November | [redacted] |
| **Total** | [redacted] |

### D. Further Analysis of Spoofing Episodes

100. I performed additional analyses to further explore [redacted]'s limit order book behavior during the Spoofing Episodes. The analyses below were conducted on the visible limit order book activity of [redacted]. The following analyses are not necessary to determine whether spoofing occurred. However, they provide context to show how the spoofing occurred. In the following exhibits, I report values separately for Spoofing Episodes detected using the Posting methodology and the Quantity methodology. In instances where the Spoofing Episode was detected using both methodologies, I included it in the Quantity results.

101. I used a t-test to determine whether certain values were statistically significantly different from each other. The t-test looks at whether two data sets are similar to each other. The null hypothesis is the expectation that the two data sets are similar and so their average values are not far apart from each other. A statistic called the p-value is used to determine if the average of the two datasets differ randomly or systematically. A p-value of less than 0.05 is the typical cutoff to determine statistical significance and is interpreted as there being less than a 5% chance that the two data sets' average values differ by chance. If the p-value is greater than 0.05, the interpretation is that the difference between the two data sets' average values is statistically insignificant and differs by chance.

### i. Fill Ratio Analysis

102. I examined the Fill Ratio during Spoofing Episodes to see whether there was a difference between the fill rate of ask limit orders versus that of bid limit orders. The Fill Ratio is the ratio of shares executed from new limit orders placed by the trader during the Spoofing Episode over the number of shares posted by the trader during the Spoofing Episode.

103. Given that a trader engaged in downward spoofing is trying to move the price down by submitting non-bona fide ask limit orders, they may be nimbler with their ask limit order placements and cancellations, resulting in a lower Fill Ratio for ask limit orders than for bid limit orders.

104. As discussed earlier, on many equity venues, there is a price time priority for limit orders.[56] All else being equal, limit orders that are placed at a better price get priority in trading, and

[56] For example, https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%20Equity%204.

limit orders that have been on the limit order book longer get higher priority. A trader engaging in downward spoofing does not want their ask limit orders to execute. Thus, they prefer to have a lower priority in the limit order book queue. As a result, they have an incentive to cancel more often, leading to a lower fill rate for ask limit orders than for bid limit orders.

105. For the Posting methodology, I included limit orders that were placed between two seconds prior to the Executing Purchase and three seconds after the Executing Purchase. For the Quantity methodology, I included limit orders that were placed between thirty seconds prior to the Executing Purchase and three seconds after the Executing Purchase.[57] I calculated the Fill Ratio as the trader's number of limit order shares executed divided by the number of new limit order shares placed by the trader during the Spoofing Episode. The calculation was done separately for bid limit orders/buy trades and ask limit orders/sell trades. The table below shows the fill ratios for ask limit orders and bid limit orders separately.

| Limit Order Type | Fill Ratio | |
|---|---|---|
| | Posting | Quantity |
| Bid Limit Orders | [redacted] | [redacted] |
| Ask Limit Orders | [redacted] | [redacted] |

[57] The precise windows I used are t-2000 milliseconds to t+3000 for Posting, and t-30000 milliseconds to t+3000 for Quantity. I refer to the closest whole second in the text for convenience.

106. For both the Posting and the Quantity methodology, the results show that [redacted] was much more likely to execute a buy per bid limit order placed rather than a sell per ask limit order placed. The Posting methodology Fill Ratio of bid limit orders was over 10 times higher than ask limit orders, while the Quantity methodology Fill Ratio of bid limit orders was over 5 times higher than ask limit orders. The Fill Ratio results showed that both methodologies captured the essence of spoofing – a displayed preference for selling but with an outcome of buying.

107. I used a * in the Ask Limit Orders cell to denote whether the t-test between the Bid Limits Order and Ask Limit Orders Fill Ratio is statistically significant at the 5% level or higher.

### ii. Limit Order Count Analysis

108. Next, I examined how frequent new bid limit orders and ask limit orders were placed by the trader. I continue to treat amend limit orders as a cancel limit order and a new limit order. The table below shows the results broken down by limit order type. For the Posting methodology the Pre-Executing Purchase window is 2 seconds prior to the Executing Purchase to time t and the Post-Executing Purchase window is time t+1 to t+3 after the Executing Purchase. For the Quantity methodology the Pre-Executing Purchase window is 30 seconds prior to the Executing Purchase to time t and for the Post-Executing Purchase window is time t+1 to t+3 after the Executing Purchase.[58] So as to provide comparable numbers, the table reports the number of new limit orders per second.

[58] The precise windows that I used are: t-2 seconds to t means t-2000 milliseconds to t; t+1 seconds to t+3 means t+1000 milliseconds to t+3000; t-30 seconds to t means t-30000 milliseconds to t. I refer to the closest whole second in the text for convenience.

| Time Window | Limit Order Type | New Limit Orders per Second | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | [redacted] | [redacted] |
| | Ask Limit Orders | [redacted] | [redacted] |
| Post-Executing Purchase | Bid Limit Orders | [redacted] | [redacted] |
| | Ask Limit Orders | [redacted] | [redacted] |

109. [redacted]

110. [redacted]

111. For this table and the remaining tables I used a * in the Ask Limit Orders row to denote whether the t-test on the variable of interest is statistically significant at the 5% level or higher. I did this for both the Pre-Executing Purchase window and the Post-Executing Purchase window. For this table and the remaining tables I used a + in the Post-Executing Purchase - Ask Limit Order row to denote whether the t-test between the Ask Limit Order

value in the Pre-Executing Purchase window and Post-Executing Purchase window on the variable of interest was statistically significant at the 5% level or higher.

112. [redacted]

### iii. Limit Order Size Analysis

113. Next, I examined the average size of new limit order postings during the Spoofing Episode by [redacted]. Recall that larger limit orders are more likely to move the stock price. I used the same layout as in the previous table but report average bid and ask limit order sizes.

114. The table below shows the results.

| Time Window | Limit Order Type | Limit Order Size | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | [redacted] | [redacted] |
| | Ask Limit Orders | [redacted] | [redacted] |
| Post-Executing Purchase | Bid Limit Orders | [redacted] | [redacted] |
| | Ask Limit Orders | [redacted] | [redacted] |

115. [redacted]

[redacted]

### iv. Limit Order Aggressiveness Analysis

116. I also examined the average aggressiveness of the new limit orders. Recall that aggressiveness can be gauged with regards to what price the trader places limit orders at relative to the national best bid and ask prices at the time of the order placement. I quantified the aggressiveness of an order at the time of placement. For a bid limit order, it was the national best bid price minus the price of the bid limit order. For an ask limit order, it was the price of the ask limit order minus the national best ask price. If the limit order was for CXR, I divided the aggressiveness by the US/CAD foreign exchange rate so all units were in U.S. dollars.[59] Thus, a positive value means the trader was away from the national best price, and a larger number means they were further away. I used the same layout as in the previous table.

117. The table below shows the results.

| Time Window | Limit Order Type | Limit Order Aggressiveness |
| --- | --- | --- |

[59] https://fred.stlouisfed.org/series/DEXCAUS.

| | | Posting | Quantity |
|---|---|---|---|
| Pre-Executing Purchase | Bid Limit Orders | [redacted] | [redacted] |
| | Ask Limit Orders | [redacted] | [redacted] |
| Post-Executing Purchase | Bid Limit Orders | [redacted] | [redacted] |
| | Ask Limit Orders | [redacted] | [redacted] |

118. For both the Posting methodology and the Quantity methodology, the results showed that the trader, on average, posted more aggressive ask limit orders than bid limit orders in the Pre-Executing Purchase window. All else being equal, more aggressive orders have a greater impact on prices, increasing the likelihood that the price declines. However, the trader ended up buying. For both methodologies, the limit order aggressiveness of ask limit orders decreased in the Post-Executing Purchase window. In the Posting methodology, the aggressiveness of the ask limit orders remained higher than the bid limit orders in the Post-Executing Purchase window. In the Quantity methodology, the aggressiveness difference of the bid and ask limit orders was not statistically significantly different from zero (at the 5% level). The inconsistency across the bid and the ask limit orders and between the Pre-Executing Purchase window and the Post-Executing Purchase window was consistent with [redacted] using limit order aggressiveness to engage in downward spoofing.

## IV. CONCLUSIONS

119. [redacted]

[redacted]

120. My research into the matters discussed in this report is ongoing, and I reserve the right to modify or supplement my opinions as additional information becomes available, including in response to the opinions of any experts retained by Defendants.

Respectfully Submitted,

Jonathan Brogaard

October 8, 2024

**Exhibit 1**

Curriculum Vitae

# Jonathan A. Brogaard

David Eccles School of Business
University of Utah
8123 SFEBB
Salt Lake City, UT 84112

Office: (801) 581-7463
brogaard@eccles.utah.edu
brogaard.utah.edu
Updated 9/2024

## CURRENT AFFILIATIONS

David Eccles School of Business, University of Utah
- Kendall D. Garff Chair in Business Administration 2022 - Current
- Professor of Finance 2020 - Current
- Associate Professor of Finance (tenured) 2018 - 2020
- David Eccles Faculty Professor 2021 - 2022
- David Eccles Faculty Fellow 2018 - 2021

Institute of Advanced Investment Management
- Executive Director 2023 – Current

Chartered Financial Analyst (CFA)® Charterholder
Chartered Alternative Investment Analyst (CAIA)® Charterholder

Stockholm Business School, Stockholm University
- Affiliated Professor 2021 – Current
- Affiliated Researcher 2015 - 2021

Australian National University
- Visiting Professor 2017 - Current

Norwegian School of Economics (NHH)
- Adjunct Professor 2020 – Current
- Center for Asset Management Affiliate 2022 – Current

FINRA
- Market Regulation Committee 2022 – Current

FIRM Labs (Machine Learning /Artificial Intelligence in Asset Management)
- Senior Advisor 2022 – Current

Salt Lake Education Foundation
- Board of Directors (2024 – Current)

## PROFESSIONAL EXPERIENCE

Stepwise Investments LLC
Founder 2018 - Current

Expert Witness and Consulting Expert
Various cases involving market manipulation and market structure 2019 - Current

Government and Regulatory Work
Various unpaid assignments with different U.S. and international agencies 2012 - Current

Quant Work
Various assignments with different asset management firms 2009 - Current

## EDUCATION

2012 Ph.D. in Finance - Kellogg School of Management, Northwestern University

2011 J.D. - Northwestern University School of Law

2006 B.A. in Economics, Politics - Occidental College

## PUBLISHED PAPERS

[26] How do extreme price movements end? (with Konstantin Sokolov and Jiang Zhang). 2024. *Management Science*, forthcoming

[25] The effect of female leadership on contracting from capitol hill to main street (with Nataliya Gerasimova and Maximilian Rohrer). 2024. *Journal of Financial Economics*, forthcoming (Lead Article).

[24] On the causal effect of fame on citations (with Joseph Engelberg, Sapnoti Eswar, and Ed Van Wesep). 2023. *Management Science*, forthcoming.

[23] Does shareholder litigation risk cause public firms to delist? Evidence from securities class action lawsuits (with Nhan Le, Duc Duy Nguyen, and Vathunyoo Sila). 2023. *Journal of Financial and Quantitative Analysis*, forthcoming.

[22] Does floor trading matter? (with Matthew Ringgenberg and Dominik Rosch). 2023. *Journal of Finance*, forthcoming.

[21] Machine learning and the stock market (with Abalfazl Zareei). 2023. *Journal of Financial and Quantitative Analysis*, 58(4): 1431-1472.

[20] What moves stock prices? The role of news, noise, and information (with Thanh Huong Nguyen, Talis Putnins, and Eliza Wu). 2022. *Review of Financial Studies*, 35(9): 4341-4386.

[19] Dark pool trading and information acquisition (with Jing Pan). 2022. *Review of Financial Studies*, 35(5): 2625-2666.

[18] Political influence and the renegotiation of government contracts (with Matthew Denes and Ran Duchin). 2021. *Review of Financial Studies*, 34(4): 3095-3137.

[17] A BIT goes a long way: Bilateral investment treaties and cross-border mergers (with Vineet Bhagwat and Brandon Julio). 2021. *Journal of Financial Economics,* 140(2): 514-538.

[16] Global political uncertainty and asset prices (with Lili Dai, Phong Ngo, and Bohui Zhang). 2020. *Review of Financial Studies*, 33(4): 1737-1780.

[15] The economic impact of index investing (with Matthew Ringgenberg and David Sovich). 2019. *Review of Financial Studies*, 32(9): 3461-3499.

[14] Price discovery without trading: Evidence from limit orders (with Terrence Hendershott and Ryan Riordan) 2019. *Journal of Finance*, 74(4): 1621-1658 (Lead Article).

[13] High frequency trading competition (with Corey Garriott). 2019. *Journal of Financial and Quantitative Analysis*, 54(4): 1469-1497 (Lead Article).

[12] Risk and return in high frequency trading (with Matthew Baron, Bjorn Hagstromer and Andrei Kirilenko). 2019. *Journal of Financial and Quantitative Analysis*, 54(3): 993-1024 (Lead Article).

[11] Do upgrades matter?: Evidence from trading volume (with Jennifer Koski and Andrew Siegel). 2019. *Journal of Financial Markets*, 43(1): 54-77.

[10] Institutions and deposit insurance: Empirical evidence (with Kathryn Dewenter and Alan Hess). 2018. *Journal of Financial Services Research*, 54(3): 269-292 (Lead Article).

[9] Do economists swing for the fences after tenure? (with Joseph Engelberg and Edward van Wesep). 2018. *Journal of Economic Perspectives*, 32(1): 179-194.

[8] High frequency trading and extreme price movements. (with Ryan Riordan, Andriy Shkilko, Konstantin Sokolov, Allen Carrion, and Thibaut Moyaert). 2018. *Journal of Financial Economics*, 128(2): 253-265.

[7] Stock liquidity and default risk (with Dan Li and Ying Xia). 2017. *Journal of Financial Economics*, 124(3): 486-502.

[6] High frequency trading and the 2008 short sale ban (with Terrence Hendershott and Ryan Riordan). 2017. *Journal of Financial Economics,* 124(1): 22-42.

[5] Trading fast and slow: Colocation and liquidity (with Bjorn Hagstromer, Lars Norden, and Ryan Riordan). 2015. *Review of Financial Studies*, 28(12): 3407-3443.

[4] The asset pricing implications of government economic policy uncertainty (with Andrew Detzel). 2015. *Management Science,* 61(1): 3-18 (Lead Article).

[3] High-frequency trading and the execution costs of institutional investors (with Terrence Hendershott, Stefan Hunt, and Carla Ysusi). 2014. *Financial Review*, 49(2): 345-369 (Winner of the Outstanding Publication Award).

[2] High frequency trading and price discovery (with Terrence Hendershott and Ryan Riordan). 2014. *Review of Financial Studies,* 27(8): 2267-2306 (Lead Article and Winner of the Michael J. Brennan Best Paper Award).

[1] Network position and productivity: Evidence from journal editor rotations (with Joseph Engelberg and Christopher Parsons). 2014. *Journal of Financial Economics,* 111(1): 251-270.

## UNDER REVIEW

Competition and exchange data fees (with James Brugler and Dominik Rosch)

The heterogeneous effects of passive investing on asset markets (with Davidson Heath and Da Huang)

Preventing information leakage (with Dan Li, Matthew Ma, and Ryan Riordan)

## WORKING PAPERS

Advising the advisors: Evidence from ETFS (with Nataliya Gerasimova and Ying Liu)

Dark trading and corporate cash holdings (Woo Leung, Khaladdin Rzayev, and Xuan Tian)

Does high frequency market manipulation harm market quality? (with Dan Li and Jeffrey Yang)

How does 0DTE options trading affect the volatility of underlying assets? (with Jaehee Han and Peter Won)

Noisy stock prices and capital allocation efficiency (with Thanh Huong Nguyen and Talis Putnins)

The broken bond market (with Yesha Yadav)

## FELLOWSHIPS AND AWARDS

Testimony in front of the House Financial Services Capital Markets Subcommittee (06/2024)
Poets & Quants' Best 40 Under 40 MBA Professors Recipient (05/2021)
Jan Wallander and Tom Hedelius foundation Grant (for SEK 2.1 million) (05/2021)
David Eccles School of Business Faculty Research Excellence Award (05/2020)
Research Incentive Seed Grant Recipient (02/2020)
David Eccles School of Business Doctoral Faculty Teaching Excellence Award (05/2019)
Jan Wallander and Tom Hedelius foundation Grant (for SEK 3 million) (05/2018)
Affiliated Researcher, Stockholm Business School (09/2017 - Current)
Emerald Group Publishing Citations of Excellence for "High-Frequency Trading and Price Discovery" (07/2017)
Research Fellow for the Center of Finance, USTC-UW Institute for Global Business and Finance Innovation (05/2017 – Current)
GM Nameplate Endowed Faculty Fellowship (07/2016 – 06/2018)
Review of Financial Studies, Michael J. Brennan Best Paper Award for "High-Frequency Trading and Price Discovery" (05/2015)
Jan Wallander and Tom Hedelius foundation Grant (for SEK 2 million) (05/2015)
Financial Review, Outstanding Publication Award for "High-Frequency Trading and the Execution Costs of Institutional Investors" (04/2015)
Distinguished Teaching Award Nominee (04/2015)
Visiting Fellow, Australian National University (2014 - 2018)
Investment Industry Regulatory Organization of Canada Grant to conduct research on high frequency trading (04/2014)
PhD Program Mentoring Award (06/2013)
Best Paper Award at the Northern Finance Association Annual Meeting (10/2012)
Bank of Canada research partnership (09/2012)
UK Foresight Fellowship Grant to conduct research on high frequency trading (10/2011)
CFTC Research Grant (10/2011)

## OTHER PUBLICATIONS

The Effect of Female Leadership on Contracting from Capitol Hill to Main Street, Harvard Law School Forum on Corporate Governance (05/2024) (with Nataliya Gerasimova and Maximilian Rohrer)
Economic Analysis of the SEC's Proposed Best Execution and Order Competition Rules, Comment Letter (07/2023)
An Academic Critique of the SEC's GameStop Report, The CLS Blue Sky Blog (02/2022) (with Joshua Mitts, Robert Battalio, Matthew Cain, Lawrence Glosten, and Brent Kochuba)
Tax Heist Using American Depositary Receipts, The FinReg Blog, Duke University School of Law (with Dominik Roesch) (02/2022)
A Report by the Ad Hoc Academic Committee on Equity and Options Market Structure Conditions in Early 2021 (02/2022) (with Joshua Mitts, Robert Battalio, Matthew Cain, Lawrence Glosten, and Brent Kochuba)
Colocation, Notre Dame's Center for the Study of Financial Regulation (01/2014)
Foster finance workshop explores the abcs of HFTs. (02/2013)

High-frequency trading and the execution costs of institutional investors, UK Government Office for Science, The Future of Computer Trading in Financial Markets - Foresight Driver Review (09/2012) (with Terrence Hendershott, Stefan Hunt, Torben Latza, Lucas Pedace, and Carla Ysusi)

Regulatory impact assessment, UK Government Office for Science, The Future of Computer Trading in Financial Markets - Foresight Driver Review (03/2012)

High frequency trading, information, and profits, UK Government Office for Science, The Future of Computer Trading in Financial Markets - Foresight Driver Review (09/2011)

High frequency trading: What we have learned and where we're headed, World Federation of Exchanges (03/2011)

High frequency trading, Notre Dame's Center for the Study of Financial Regulation (11/2010), (Reprinted in Markets Media Magazine (01/2011))

## MEDIA AND REGULATORY COVERAGE

Truth Social Slips into the Red as Trump Media Stock Hits Turbulence, USA Today (3/2024)
Reddit's Biggest Risk at IPO is its Own Users, Vox (3/2024)
Zero-Day Options Are Reordering the Way the Stock Market Behaves, Bloomberg (5/2023)
Meme-Stock Frenzy Gets a Fresh Look That Questions SEC Narrative, Bloomberg (2/2022)
Wall Street's 'Model Portfolio' Boom Gets Slammed in New Paper, Bloomberg (1/2022)
Asset manager models use ETFs with higher prices, lower returns: study, Financial Planning (1/2022)
Special episode: A trip to the NYSE trading floor, News Briefing Podcast, Financial Times (10/2021)
How index funds may hurt the economy, The Atlantic (4/2021)
6 Changes for Your Finances Under President Biden, U.S. News & World Report (1/2021)
The fundamental dangers of index investing, Seeking Alpha (9/2020)
A $10 trillion corporate debt bomb is waiting to explode the U.S. economy, Newsweek (7/2020)
"When One Floor Closes…": The Empirical Evidence on The NYSE Floor Closure, Traders Magazine (6/2020)
NYSE: The floor is unrivaled in key auction events, Traders Magazine (6/2020)
Les courtiers du parquet de wall street, maillons essentiels ou reliques du passé?, La Presse (6/2020)
Will the SEC bust Facebook for drugs?, Bloomberg (5/2020)
Posttenure benchwarmers?, Inside Higher Ed (12/2017)
How DFA Is Superior To Index Funds: An Analysis, Seeking Alpha (03/2017)
Politics matters – sometimes, CFA Institute Blog (03/2017)
Wall street's speed demons are heros, Bloomberg (10/2016)
Does tenure encourage risk-taking?, Marginal Revolution (06/2016)
Does tenure work?, The American Interest (06/2016)
Presentation on Algorithmic Trading to French Senators (04/2016)
The high frequency trading vs. human reasoning debate, The Market Mogul (03/2016)
Is passive investment actively hurting the economy?, The New Yorker (03/2016)
Wait a minute: Is the government self-interested or isn't it?, The Adam Smith Institute (06/2015)
Controversial high-frequency trading study says practice boosts liquidity, MarketWatch (12/2014)
Here's the HFT Paper that has Wall St freaking out, CNBC (12/2014)
HFT Groundhog Day, Themis Trading (12/2014)

HFT stabilises modern markets, Automated Trader (12/2014)
Putting Technology and Competition to Work for Investors, Harvard Law Blog (06/2014)
CFTC Weighs High-Speed Trader Registration for Oversight, Bloomberg (05/2014)
High-Frequency Trading: Winner Takes All?, Chief Investment Officer (05/2014)
High-Speed Traders Need Oversight, Ex-CFTC Economist Says, Bloomberg (05/2014)
Flash Boys for the People, New York Times (04/2014)
Don't Curb 'Efficient' High-Speed Trading, says ECB Report, CNBC (11/2013)
High Frequency Traders Are a Little too Slow, Bloomberg (11/2013)
High-Speed Trading 'Aids Efficiency', ECB says, Financial Times (11/2013)
In Defense of High Frequency Trading via the ECB, Wall Street Journal (11/2013)
High-Frequency Traders Seen Profiting at Small-Firm Expense, Businessweek (12/2012)
High Frequency Trading Arms Race Has Plenty of Drawbacks, Wall Street Journal (12/2012)
High Frequency Trading Prospers at Expense of Everyone, Bloomberg (12/2012)
High-Speed Traders Profit at Expense of Ordinary Investors, a Study Says, New York Times (12/2012)
High-Speed Traders Race to Fend Off Regulators, Wall Street Journal (12/2012)
Retail Investors Square Off Against High-Frequency Traders, U.S. News & World Report (12/2012)
Con il Trading ad alta Velocità il Mercato Diventa Affare per Pochi, Linkiesta (09/2012)
Pointless, Painful Uncertainty, The Economist Blog (07/2012)
Academics determine that just being swift is not risky, Financial Times (10/2011)
Australian equity market structure: Further proposals, Australian Securities and Investments Commission (10/2011)
Impact Assessment on the MiFID II Proposal, EU Regulation (10/2011)
Some Secrets of HFT Revealed, Themis Trading Blog (09/2011)
Study: Tax Credit Had Fleeting Effect on Housing Markets, Wall Street Journal Blog (07/2011)
The Maturation of High-Frequency Trading, Markets Media Magazine (03/2011)
Towards an Understanding of High Frequency Trading, Instinet (03/2011)
Australian equity market structure, Australian Securities and Investments Commission (11/2010)
Das Digitale Herz des Kapitalismus, Neue Zurcher Zeitung (11/2010)
Relativistic Trading: The speed of light isn't fast enough for some market transactions, Inside Science News Service (11/2010)
Disputing the Northwestern Brogaard Study, Themis Trading Blog (10/2010)
A new paper on high-frequency trading, Marginal Revolution Blog (09/2010)
We Should Clone Robo-Traders rather than Revile them, Financial Times (09/2010)

## SEMINAR AND CONFERENCE PRESENTATIONS

Due to the number of conferences, seminars, and other presentations this section is no longer updated.

## CONFERENCE ACTIVITIES

Program Committee, FIRN Conference (11/2024)
Program Committee, Northern Finance Association Conference (09/2024)
Program Committee, European Finance Association Conference (08/2024)

Program Committee, Financial Intermediation Research Society Conference (06/2024)
Program Committee, Western Finance Association Conference (06/2024)
Speaker, Young Investors Society of Utah (04/2024)
Program Committee, Finance Down Under Conference (03/2024)
Program Committee, Utah Winter Finance Conference (02/2024)
Program Committee, Colorado Finance Summit (12/2023)
Program Committee, Sydney Market Microstructure and Digital Finance Conference (12/2023)
Program Committee, FIRN Conference (11/2023)
Program Committee, Northern Finance Association Conference (09/2023)
Program Committee, European Finance Association Conference (08/2023)
Session Chair, Western Finance Association Conference (06/2023)
Program Committee, Western Finance Association Conference (06/2023)
Program Committee, Financial Intermediation Research Society Conference (06/2023)
Discussant, Wisdom of the institutional crowd: Implications for anomaly returns, 5th Future of Financial Information Conference (05/2022)
Discussant, Value-enhancing effects of female independent directors in companies with overconfident CEOs, Vanderbilt 25th Annual Law and Business Conference (04/2023)
Program Committee, Napa Conference on Financial Markets (03/2023)
Program Committee, Finance Down Under Conference (03/2023)
Program Committee, Consortium on Asset Management (03/2023)
Program Committee, Utah Winter Finance Conference (02/2023)
Program Committee, Colorado Finance Summit (12/2022)
Keynote Speaker, New Zealand Finance Meeting (12/2022)
Program Committee, Northern Finance Association Conference (09/2022)
Program Committee, SAFE Microstructure Conference (08/2022)
Program Committee, European Finance Association Conference (08/2022)
Program Committee, Western Finance Association Conference (06/2022)
Discussant, Financial regulation and automation adoption: Evidence from stock trading firms, 4th Future of Financial Information Conference (05/2022)
Discussant, ETFs, illiquid assets, and fire sales, Notre Dame Investment Management Conference (05/2022)
Discussant, Enough potential repudiation: Economic and legal aspects of sovereign debt in the pandemic era, Vanderbilt 24th Annual Law and Business Conference (03/2022)
Program Committee, Napa Conference on Financial Markets (03/2022)
Program Committee, Consortium on Asset Management and Fintech (03/2022)
Program Committee, Finance Down Under Conference (03/2022)
Program Committee, Utah Winter Finance Conference (02/2022)
Program Committee, New Zealand Finance Meeting (12/2021)
Program Committee, Colorado Finance Summit (12/2021)
Discussant, Hiding behind the veil: Informed traders and pre-trade paucity, IIM Calcutta-NYU Stern India Research Conference (10/2021)
Committee Chairperson, FMA Best Paper in Market Microstructure (10/2021)
Program Committee, Northern Finance Association Conference (09/2021)
Co-Chair, UT Austin PhD Symposium, Technology and Trading (08/2021)
Program Committee, European Finance Association Conference (08/2021)
Program Committee, SAFE Microstructure Conference (08/2021)
Program Committee, Western Finance Association Conference (06/2021)
Program Committee, World Symposium on Investment Research (05/2021)

Program Committee, Northern Finance Association Conference (09/2020)
Program Committee, SAFE Microstructure Conference (08/2020)
Program Committee, European Finance Association Conference (08/2020)
Session Chair, Western Finance Association Conference (06/2020)
Program Committee, Western Finance Association Conference (06/2020)
Program Committee, World Symposium on Investment Research (05/2020)
Program Committee, Napa Conference on Financial Markets (03/2020)
Program Committee, Finance Down Under Conference (03/2020)
Program Committee, Consortium on Asset Management (02/2020)
Program Committee, Utah Winter Finance Conference (02/2020)
Program Committee, New Zealand Finance Meeting (12/2019)
Program Committee, Colorado Finance Summit (12/2019)
Program Committee, Northern Finance Association Conference (09/2019)
Program Committee, SAFE Microstructure Conference (08/2019)
Program Committee, European Finance Association Conference (08/2019)
Program Committee, Western Finance Association Conference (06/2019)
Program Committee, Napa Conference on Financial Markets (03/2019)
Program Committee, Finance Down Under Conference (03/2019)
Program Committee, Midwest Finance Association Meeting (03/2019)
Program Committee, Consortium of Factor Investing (02/2019)
Program Committee, Utah Winter Finance Conference (02/2019)
Program Committee, New Zealand Finance Meeting (12/2018)
Program Committee, Colorado Finance Summit (12/2018)
Program Committee, Financial Management Association Conference (10/2018)
Program Committee, Northern Finance Association Conference (09/2018)
Program Committee, SAFE Microstructure Conference (08/2018)
Program Committee, European Finance Association Conference (08/2018)
Program Committee, Western Finance Association Conference (06/2018)
Program Committee, McGill's Symposium on Investment Research (05/2018)
Program Committee, Napa Conference on Financial Markets (03/2018)
Keynote Speaker, Sydney Market Microstructure Meeting (03/2018)
Program Committee, Finance Down Under Conference (03/2018)
Program Committee, Midwest Finance Association Meeting (03/2018)
Program Committee, Consortium on Trading Strategies and Institutional Investing (02/2018)
Program Committee, Colorado Finance Summit (12/2017)
Program Committee, Auckland Finance Meeting (12/2017)
Program Committee, Financial Management Association Conference (10/2017)
Program Committee, SAFE Microstructure Conference (08/2017)
Program Committee, European Finance Association Conference (08/2017)
Program Committee, Western Finance Association Conference (06/2017)
Discussant, Order anticipation around predictable trades, Conference on the Econometrics of Financial Markets (05/2017)
Program Committee, Napa Conference on Financial Markets (03/2017)
Program Committee, Midwest Finance Association Meeting (03/2017)
Discussant, Do high frequency traders need to be regulated? Evidence from trading on macroeconomic announcements, American Finance Association Conference (01/2017)
Program Committee, Auckland Finance Meeting (12/2016)
Program Committee, Colorado Finance Summit (12/2016)

Program Committee, Financial Management Association Conference (10/2016)
Program Committee, Northern Finance Association Conference (09/2016)
Program Committee, European Finance Association Conference (08/2016)
Program Committee, Western Finance Association Conference (06/2016)
Discussant, Relative tick size and the trading environment, Western Finance Association Conference (06/2016)
Program Committee, Napa Conference on Financial Markets (04/2016)
Program Committee, Finance Down Under Conference (03/2016)
Program Committee, Auckland Finance Meeting (12/2015)
Program Committee, Financial Management Association Conference (10/2015)
Program Committee, European Finance Association Conference (08/2015)
Discussant, Do regulatory hurdles on algorithmic trading work?, Conference on the Industrial Organization of Securities and Derivatives Markets: High Frequency Trading (07/2015)
Program Committee, Conference on the Industrial Organization of Securities and Derivatives Markets: High Frequency Trading (07/2015)
Discussant, Asymmetry in Stock Comovements: An Entropy Measure, Tsinghua Finance Workshop (06/2015)
Discussant, Institutional Trading and Asset Pricing, McGill Global Asset Management Conference (06/2015)
Discussant, A Blessing or a Curse? The Impact of High Frequency Trading on Institutional Investors, SEC Conference on Financial Market Regulation (05/2015)
Program Committee, Finance Down Under Conference (03/2015)
Program Committee, Napa Conference on Financial Markets (03/2015)
Discussant, Early peek advantage, American Finance Association Conference (01/2015)
Program Committee, European Finance Association Conference (08/2014)
Discussant, Exploratory trading, Workshop on HFT and AT City U. Hong Kong (06/2014)
Session Chair, International Finance and Banking Conference (06/2014)
Program Committee, Napa Conference on Financial Markets (04/2014)
Program Committee, European Finance Association Conference (08/2013)
Discussant, The pre-FOMC announcement drift, Western Finance Association Conference (06/2013)
Program Committee, Napa Conference on Financial Markets (04/2013)
Discussant, Competing on speed, Western Finance Association Conference (06/2012)
Panelist, Market Quality, Futures Industry Association (04/2012)
Discussant, What is not there: The odd-lot bias in TAQ data, SFS Cavalcade (05/2012)
Discussant, Strategic liquidity supply in a market with fast and slow traders, NBER Market Microstructure Meeting (12/2011)
Panel Chairperson, HFT, Chicago HFT Quant Invest (10/2011)
Discussant, A model of liquidity hoarding and term premia in Inter-Bank Markets, Financial Intermediation Research Society Conference (06/2011)
Panel Chairperson, HFT, Notre Dame Conference on Financial Regulation (06/2011)
Discussant, Adverse selection, equity issues, and compensation signaling, Finance Down Under Conference (03/2011)

## PHD COMMITTEES

Committee Chair – Jaehee Han, University of Utah (2023)
Committee Chair – Da Huang, University of Utah (2023)

Committee Member – Raj Parajuli, University of Utah (2021)
Committee Member – Austin Hill-Kleespie, University of Utah (2021)
Committee Member – David Sovich, Washington University (2019)
Committee Member – Hyo Sonn, University of Washington (2019)
Committee Member – Matthew Denes, University of Washington (2017)
Committee Member – Fan Wang, University of Illinois, Chicago (2016)
Committee Member – Ying Xia, University of Hong Kong (2016)
Committee Member - Syed Galib Sultan, University of Washington (2015)
Committee Member – Thibaut Moyaert, Universite Catholique de Louvain (2014)
Outside Evaluator - Dong Zhang, Stockholm University (2013)

## REFEREE

Associate Editor

Journal of Empirical Finance (06/2016 – Current)

Ad Hoc Grant Evaluation

Canada Research Chairs Program; German Israeli Foundation for Scientific Research and Development; European Commission – European Research Council; Hong Kong Research Grants Council; National Science Foundation; Natural Sciences and Engineering Research Council of Canada; Social Sciences and Humanities Research Council of Canada; Swiss National Science Foundation

Ad Hoc Referee

Algorithmic Finance; American Economic Review; China Finance Review International; Economic Modelling; European Financial Management; European Journal of Finance; Financial Management; International Monetary Fund Economic Review; International Review of Economics and Finance; Journal of Banking and Finance; Journal of Empirical Finance; Journal of Finance; Journal of Financial and Quantitative Management; Journal of Financial Economics; Journal of Financial Markets; Journal of Political Economy; Management Science; Market Microstructure and Liquidity; North American Journal of Economics and Finance; Review of Economics and Statistics; Review of Finance; Review of Financial Studies; Quarterly Review of Economics and Finance

## COURSES TAUGHT

Advanced Asset Pricing - PhD

Advanced Finance (Investments) - Executive MBA

Alternative Investments: Hedge Funds and Private Equity - MBA and Undergraduate

Honors Financial Management - Undergraduate

## NOTABLE RECENT UNIVERSITY SERVICE

Executive Director of the Institute of Advanced Investment Management (2023 – Current)
Emma Eccles Jones Endowment committee (2023 – Current)
Finance Ph.D. Director (2020 - Current)
Grad School Strategy committee (2024 – Current)
University Senator (2021-2023)

## PAST AFFILIATIONS

Michael G. Foster School of Business, University of Washington

- GM Nameplate Endowed Faculty Fellowship, 2016 - 2018
- Assistant Professor of Finance, 2011 – 2016

**Exhibit 2**

Previous Testimony

*Farmland Partners inc., v. Rota Fortunae et al.* United States District Court for the District of Colorado, Case No. 1:18-cv-02351-RBJ, February 2021.

*Don Brokop et. al. v. Farmland Partners Inc., Paul A. Pittman, and Luca Fabbri*, United States District Court for the District of Colorado, Case No. 1:18-cv-02104-DME-NYW. September 2021.

*In Re Slack Technologies, Inc. Shareholder Litigation*, Superior Court of the State of California County of San Mateo, Lead Case No. 19-CIV-05370. January 2022.

**Exhibit 3**

Documents Considered

**Academic Articles**

Putniņs, T.J., 2020. An overview of market manipulation. *Corruption and Fraud in Financial Markets: Malpractice, Misconduct and Manipulation*, *13*.

Brogaard, J., Li, D. and Yang, J., 2022. Does high frequency market manipulation harm market quality?. Working Paper *Available at SSRN 4280120*.

O'Hara, M., 2015. High frequency market microstructure. *Journal of Financial Economics*, *116*(2), pp.257-270.

Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, *74*(4), pp.1621-1658.

Wald, J.K. and Horrigan, H.T., 2005. Optimal limit order choice. *The Journal of Business*, *78*(2), pp.597-620.

Easley, D. and O'Hara, M., 1987. Price, trade size, and information in securities markets. *Journal of Financial Economics*, *19*(1), pp.69-90.

Aquilina, M., Foley, S., O'Neill, P. and Ruf, T., 2024. Sharks in the dark: Quantifying HFT dark pool latency arbitrage. *Journal of Economic Dynamics and Control*, *158*, p.104786.

Bessembinder, H., Panayides, M. and Venkataraman, K., 2009. Hidden liquidity: an analysis of order exposure strategies in electronic stock markets. *Journal of Financial Economics*, *94*(3), pp.361-383.

Hasbrouck, J., and Saar, G. (2013). Low-latency trading. *Journal of Financial Markets*, *16*(4), 646-679.

**Legal Documents**

Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 203, U.S. Statutes at Large 124 (2010): 1376-2223. Section 747(5)(C)

*Harrington Global Opportunity Fund, Limited v. CIBC World Markets Inc., et al*, United States District Court of New York, Civil Action: 21-cv-00761. Second Amended Complaint. December, 2022

17.CFR 240.10b5

**Websites and Other Public Sources**

https://fred.stlouisfed.org/series/DEXCAUS

https://fortune.com/2022/07/20/former-jpmorgan-trader-reveals-how-his-mentor-taught-him-to-place-and-cancel-bogus-spoof-trades-manipulate-markets/

https://www.cftc.gov/PressRoom/PressReleases/7156-15

https://www.justice.gov/opa/pr/futures-trader-pleads-guilty-illegally-manipulating-futures-market-connection-2010-flash

https://corporatefinanceinstitute.com/resources/equities/2010-flash-crash/

https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25427

https://www.reuters.com/article/jp-morgan-spoofing-penalty-idINKBN26K325/

https://www.finra.org/rules-guidance/guidance/reports/2023-finras-examination-and-risk-monitoring-program/manipulative-trading

https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%20Equity%204

https://www.nasdaq.com/docs/2020/01/20/Factsheet_Reserve_Order_Iceberg_GTMS.pdf

https://www.nasdaqtrader.com/Trader.aspx?id=Totalview2

https://www.onixs.biz/fix-dictionary/4.2/index.html

https://www.onixs.biz/fix-dictionary/4.3/index.html

https://www.nasdaq.com/articles/nasdaqs-canadian-dark-pool-launching-october-31st-2016-10-05

https://www.bidstrading.com/about/company/

https://www.kezarmarkets.com/level-ats/

https://www.osc.ca/sites/default/files/2021-01/com_20160527_triact.pdf

https://www.tradersmagazine.com/departments/brokerage/merrills-electronic-trading-is-king-in-bofa-merrill-combo/

https://www.tradersmagazine.com/news/ubs-says-sec-has-been-investigating-its-dark-pool-since-2012/

https://www.sec.gov/spotlight/emsac/memo-rule-611-regulation-nms.pdf

**Data**

TAQ

OneTick

**Produced Data**

Merrill Ex. 37

MERRILL_02347

MERRILL_02349

MERRILL_02350

MERRILL_02351

MERRILL_02417

MERRILL_02880-03049

MERRILL_03051-03133

MERRILL_03538-03693

MERRILL_03694

MERRILL_04541-04773

MERRILL_04484

MERRILL_06733-06793

MERRILL_06863 – 06910

MERRILL_06918 - 06933

MERRILL_04484

September 9, 2024 [redacted] Declaration

Baebler, Todd Deposition Transcript, June 7, 2024

HARRINGTON_028371

Sept 8, 2022 FINRA Production of OATS data

February 3, 2024 Letter from Bill Martin to Alan Pollack

February 10, 2024 Letter from Bill Martin to Alan Pollack

March 1, 2024 Letter from Bill Martin to Alan Pollack

March 8, 2024 Letter from Bill Martin to Alan Pollack

May 18, 2024 Letter from Bill Martin to Alan Pollack

June 13, 2024 Letter from Bill Martin to Alan Pollack

June 20, 2024 Letter from Bill Martin to Alan Pollack

July 2, 2024 Letter from Bill Martin to Alan Pollack

# Exhibit 4

Data Deficiencies and Assumptions

Below I outline data deficiencies I observed in the Merrill data productions. I also discuss key data processing choices I made.

## A. Data Deficiencies

1. Different Variable Names in Same Column

**Issue:** The files Merrill produced contained information on orders and trades. The variable names for messages containing orders were different than the variable names for messages containing trades.

**Solution:** I separated the trades and orders from each raw csv file, assigned the relevant column headers, and appended these data together.

**Example:** Screenshot of "Merrill_03058.csv" from Volume 06 rows 2834-2838.

| OrderExecI | EventType | ClientId_A | Account_A | ClOrdId | TradeDate | Side | Symbol | OrderQty | Price | Rule80A | OrderRece | OrderSent | OrdStatus | RoutedVer | OrdType | TimeInForce |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 3880ef84b | 294763754 | 802752523 | 20160907 | B | CXRX | 400 | 7.93 | Agency | 20160907- | 20160907- | NEW | bx23tsys | LMT | GTX |
| Order | CL | 3880ef84b | 294763754 | 802752523 | 20160907 | B | CXRX | 400 | 7.93 | Agency | 20160907- | 20160907- | CANCELED | bx23tsys | LMT | GTX |
| OrderExecI | EventType | ClientId_A | Account_A | ClOrdId | TradeDate | Side | Symbol | OrderQty | Price | LastCapaci | ExecutionT | ExecType | OrdStatus | ExecBroke | LiquidityIn | ExecVenue |
| Exec | EX | 3880ef84b | 294763754 | 802752523 | 20160907 | B | CXRX | 100 | 7.93 | 1 | 20160907- | 1 | 1 | | Adding | bx23tsys |

2. Leading Zeroes on ID Variables

**Issue:** Some messages had leading zeros in front of the Clordid and/or Canceledorderid in one production, but in later productions the same message did not have leading zeros in front of the Clordid and/or Canceledorderid. For messages that I discovered to have this issue, the leading zeros came in pairs (e.g., "00restOfID" vs. "restOfID")

**Solution:** I remove leading zeros on Clordid or Canceledorderid if the leading zeros came in pairs.

**Example:** Screenshot of raw data "Merrill_02996" and "Merrill_04546" rows 136476 and 103301, from volumes 05 and 16, respectively.

| orderexecl... | eventt... | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | ad49778dbc5bf9b1d83b54... | 114500245 | 20160203 | SX | CXRX | 100.00 | 27.6400 | 20160203-11:05:07.166 | 20160203-11:05:07.166 |
| Order | NW | ad49778dbc5bf9b1d83b54... | 00114500245 | 20160203 | SX | CXRX | 100.00 | 27.6400 | 20160203-16:05:07.166 | 20160203-16:05:07.166 |

3. Different Time Zones

**Issue:** The timestamps from productions 05, 06, 09, and 10 were provided in Eastern Time, but the timestamps from productions 16, 21, 23, and 26 were provided in UTC.

**Solution:** I converted the time zone for the timestamp variables from productions 16, 21, 23, and 26 to Eastern Time from UTC. Messages before March 13, 2016 and after November 06, 2016 were shifted back 5 hours. Messages between those two dates were shifted back 4 hours.

**Example:** Screenshot of raw data "Merrill_04597" and "Merrill_03033" rows 48434 and 45574, from volumes 16 and 05, respectively.

| orderexecl... | eventt... | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 300bd61fc04a25d6957bc1... | 00200005408 | 20160418 | B | CXRX | 700.00 | 24.7000 | 20160418-11:33:26.504 | 20160418-11:33:26.500 |
| Order | NW | 300bd61fc04a25d6957bc1... | 00200005408 | 20160418 | B | CXRX | 700.00 | 24.7000 | 20160418-15:33:26.504 | 20160418-15:33:26.500 |

4. Identifying Usable, Unique Messages

i. IDs in Scientific Notation

**Issue:** Some messages contained Clordid and/or Canceledorderid values that were in scientific notation. Being in scientific notation renders these IDs unusable.

**Solution:** I identified messages in which the Clordid and/or Canceledorderid were in scientific notation. These messages were excluded from my analysis.

**Examples:** Screenshot from file "Merrill_03548" row 70-79, from volume 09.

| orderexecl... | eventt... | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 5841a1f35f13f363db30183c... | 1,60127E+12 | 20160127 | B | CXR | 300.00 | 40.4800 | 20160127-11:43:54.961 | 20160127-11:43:54.954 |
| Order | CL | 5841a1f35f13f363db30183c... | 1,60127E+12 | 20160127 | B | CXR | 300.00 | 40.4800 | 20160127-11:46:54.534 | 20160127-11:43:54.954 |
| Order | NW | 905edab61a0d65afe8e999... | 1,60127E+11 | 20160127 | SL | CXR | 300.00 | 41.3500 | 20160127-09:49:27.413 | 20160127-09:49:27.405 |
| Order | CL | 905edab61a0d65afe8e999... | 1,60127E+11 | 20160127 | SL | CXR | 300.00 | 41.3500 | 20160127-09:49:47.153 | 20160127-09:49:27.405 |
| Order | NW | 905edab61a0d65afe8e999... | 1,60127E+12 | 20160127 | B | CXR | 1000.00 | 39.3000 | 20160127-15:59:13.376 | 20160127-15:59:13.374 |
| Order | CL | 905edab61a0d65afe8e999... | 1,60127E+12 | 20160127 | B | CXR | 1000.00 | 39.3000 | 20160127-15:59:21.198 | 20160127-15:59:13.374 |

ii. Duplicate Orders Within Productions

**Issue:** Some messages found within the same production were duplicated.

**Solution:** For each production, I identified unique messages using a combination of variables[60] which must be unique for each message. For each instance of a duplicate message within each production, I kept just one copy of the duplicates. The only exception to this was execution messages, which were tagged as duplicates but that I kept at this stage.

**Example:** Screenshot of Clordid "633_937872", from file Merrill_02905.csv, rows 59716 & 59714, from volume 05.

| orderexecl... | eventt... | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | c23ea2bf2a744d6518a909... | 633_937872 | 20160506 | B | CXR | 500 | 31.72 | 20160506-15:59:39.999 | 20160506-15:59:40.021 |
| Order | NW | c23ea2bf2a744d6518a909... | 633_937872 | 20160506 | B | CXR | 500 | 31.72 | 20160506-15:59:39.999 | 20160506-15:59:40.021 |

iii. Duplicate Orders Between Productions

[60] The variables used for identification are: Orderexeclevel, Eventtype, Clientid_Anonymized, Clordid, Tradedate, Side, Orderqty, and Price. In addition to these, I used Orderreceivedtime for new orders, Canceledorderid and Canceltime for cancels and cancel/replaces, and Executiontime for executions.

**Issue:** The data productions were not self-contained. Simply appending all of the productions together would lead to duplicate messages coming from different productions. In addition, there was minimal guidance regarding which new production rows were meant to be replacements and which were previously missing observations.

**Solution:** Looking at all productions together, I identified unique messages using a combination of variables[61] which must be unique for each message. For duplicate messages originating from different productions, I kept a single copy of the message from the latest production.

**Example:** Screenshot of Clordid "PE02900534736", from file Merrill_03096.csv, row 62706, from volume 06, & file Merrill_04753.csv, row 14438, from volume 16.

| orderexec... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 3880ef84b6db80f9db694c0... | PE02900534736 | 20161018 | B | CXRX | 400 | 3.62 | 20161018-11:54:56.579 | 20161018-11:54:56.579 |
| Order | NW | 3880ef84b6db80f9db694c0... | PE02900534736 | 20161018 | B | CXRX | 400.00 | 3.6200 | 20161018-15:54:56.579 | 20161018-15:54:56.579 |

iv. Edge Case Duplicates Between Productions

**Issue:** There were instances where I observed a message from an early production (05-10) being nearly identical to a message in a later production (16-26) except for the timestamp in Orderreceivedtime, Executiontime, or Canceltime for new order, execution, or cancel messages, respectively. Cancel/Replace messages were not included in this step as I could not determine whether they exhibited this deficiency.

**Solution:** I isolated messages which were not already flagged as being between-production duplicates and that also had identical essential message information except for the relevant timestamp. I treated these as the same as between-production duplicates by keeping only the message coming from the latest production.

[61] The variables used for identification are: Orderexeclevel, Eventtype, Clientid_Anonymized, Clordid, Tradedate, Side, Orderqty, and Price. In addition to these, I used Orderreceivedtime for new orders, Canceledorderid and Canceltime for cancels and cancel/replaces, and Executiontime for executions.

**Example:** Screenshot of Clordid "100015609", from file Merrill_03048.csv, row 22305, from volume 05 & file Merrill_04602.csv, row 30771, from volume 16.

| orderexec... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 5332a8a1ce1cacac6ebd49... | 00100015609 | 20160422 | B | CXRX | 100.00 | 31.1500 | 20160422-12:11:06.101 | 20160422-12:11:06.096 |
| Order | NW | 5332a8a1ce1cacac6ebd49... | 00100015609 | 20160422 | B | CXRX | 100.00 | 31.1500 | 20160422-16:11:06.100 | 20160422-16:11:06.096 |

5. No New Order Associated with Cancel, Execution, or Cancel/Replace

**Issue:** There were instances where there was a cancel, execution, or cancel/replace message with no initial new order message.

**Solution:** For each of these cases, I created a synthetic new order message with the same timestamp as the earliest message that was part of that limit order's life-cycle. If the earliest message with the synthetic new order message was a cancel/replace message, then the synthetic new order message was given an order quantity of 100. If there was no cancel/replace message or execution message, the synthetic new order message was given an order quantity equivalent to the canceled quantity. If there was no cancel/replace and no cancel, then the new order message was given an order quantity equivalent to the executed quantity.

**Example:** Screenshot of Cancel message for Clordid "233_10322", Canceledorderid "233_10182", file Merrill_06863.csv, row 120825, from volume 23.

| orderexec... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | canceledorderid | canceltime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | CL | c23ea2bf2a744d6518a909... | 233_10322 | 20160127 | B | CXR | 100.00 | 40.7700 | 233_10182 | 20160127-14:36:21.000 |

6. Execution before New Order

**Issue:** There were instances in which the Executiontime came before the Orderreceivedtime of the new order associated with that trade.

**Solution:** First, I isolated the timestamp of the earliest execution for each order. If the earliest execution time was before the order's associated new order message, I changed the new order message's timestamp to be equivalent to the execution timestamp.

**Example:** Screenshot of Clordid "1601291512470" Volume 23, file Merrill_06864.csv, rows 1303 and 101107.

| orderexecl... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | executiontime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 5841a1f35f13f363db30183c... | 1601291512470 | 20160129 | B | CXR | 900.00 | 38.4200 | 20160129-17:13:50.097 | |
| Exec | EX | 5841a1f35f13f363db30183c... | 1601291512470 | 20160129 | B | CXR | 900.00 | 38.4200 | | 20160129-17:13:50.095 |

7. Missing Cancels

**Issue:** There were instances where there was no cancel associated with a new order that was not entirely executed.

**Solution:** For each order, I found the sum of the shares placed, cancelled, and executed. If there was no canceled quantity, and the difference of the quantity placed and quantity executed was greater than 0, then I created a synthetic cancel message. I set the timestamp to the latest time associated with the order in the raw data, and the order quantity was set to the difference of quantity placed and quantity executed.

**Example:** Screenshot of Clordid "700310523", Volume 23, file Merrill_06863.csv, row 49896.

| orderexec... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime |
|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 9f514c2e5afa175f331bed31... | 700310523 | 20160127 | B | CXR | 100.00 | 40.3100 | 20160127-15:21:02.457 | 20160127-15:21:02.000 |

8. Defining Dark Pool Venues

**Issue:** The data Merrill produced does not indicate whether the venue an order was sent to was a dark pool or not.

**Solution:** After reviewing the venues seen in the data, I found that the following venues were dark pools: ITGTCM, BIDS, G1XMLXN, GTSZMLXN, LEVELATS, MLXN, MLXNCONDS, MLXNSAC, MLXNSIG, and UBSS.[62] I flagged messages with Routedvenue/Execvenue equal to any of these venues as being routed to a dark pool.

[62] https://www.nasdaq.com/articles/nasdaqs-canadian-dark-pool-launching-october-31st-2016-10-05 ; https://www.bidstrading.com/about/company/ ; https://www.kezarmarkets.com/level-ats/ ; https://www.osc.ca/sites/default/files/2021-01/com_20160527_triact.pdf ; https://www.tradersmagazine.com/departments/brokerage/merrills-electronic-trading-is-king-in-bofa-merrill-combo/ ; https://www.tradersmagazine.com/news/ubs-says-sec-has-been-investigating-its-dark-pool-since-2012/.

9. Identifying Iceberg and Hidden Orders

**Issue:** Merrill did not provide information about iceberg or hidden orders.

**Solution:** I attempted to enhance the data provided by Merrill using OATS data to try to determine iceberg and hidden order information. I first isolated the Merrill orders in OATS by restricting the messages to those which contained MLCO or MLEX. The Dsply_sz variable would provide information about the publicly displayed size of iceberg orders and whether an order was hidden or not. However, it did not appear the Dsply_sz field was filled out for the Merrill orders. As such, all orders were treated as fully displayed.

10. Execution Quantity Being Greater than New Order Quantity when there were Execution Duplicates

**Issue:** There were instances where the total execution quantity for an order was greater than the new order quantity.

**Solution:** For execution orders that were tagged as a duplicate (See Point 4.ii), I kept only one copy of the execution duplicates. If the remaining execution quantity was more than the new order, and there was only one execution message left, I set the execution quantity equal to the new order quantity. If the execution quantity was less than the new order quantity I treated it as a partial fill.

**Example:** Screenshot of Clordid "KGIiCX," Volume 05, file Merrill_02993, rows 48998 & 49000-19002.

| orderexec... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | executiontime | messagetime |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 7490184da31a7fa84bdc5a... | KGliCX | 20160205 | B | CXR | 400.00 | 41.5600 | 20160205-09:29:59.767 | | |
| Exec | EX | 7490184da31a7fa84bdc5a... | KGliCX | 20160205 | B | CXR | 400.00 | 41.5600 | | 20160205-09:30:00.018 | 20160205-09:30:00.057 |
| Exec | EX | 7490184da31a7fa84bdc5a... | KGliCX | 20160205 | B | CXR | 400.00 | 41.5600 | | 20160205-09:30:00.018 | 20160205-09:30:00.057 |
| Exec | EX | 7490184da31a7fa84bdc5a... | KGliCX | 20160205 | B | CXR | 400.00 | 41.5600 | | 20160205-09:30:00.018 | 20160205-09:30:00.057 |

11. Execution Quantity being Greater than New Order Quantity when there were no Execution Duplicates

**Issue:** After handling the instances in which the total execution quantity was greater than the total new order quantity for orders which contained execution messages tagged as duplicates, there were still orders which have total execution quantity greater than total new order quantity.

**Solution:** For orders that still have greater execution quantity than new order quantity, and no execution duplicates, I found execution messages with the same quantity. I removed one instance of these at a time until the total execution quantity was less than or equal to the new order quantity, removing executions with earlier timestamps first.

**Example:** Screenshot of Clordid "633_545094", Volume 09, file Merrill_03541.csv, rows 179512, 179514, 179515

| orderexec... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | executiontime | messagetime |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | c23ea2bf2a744d6518a909... | 633_545094 | 20160128 | SL | CXR | 500.00 | 38.0400 | 20160128-12:13:18.824 | | |
| Exec | EX | c23ea2bf2a744d6518a909... | 633_545094 | 20160128 | SL | CXR | 500.00 | 38.0400 | | 20160128-12:13:18.831 | 20160128-12:13:18.831 |
| Exec | EX | c23ea2bf2a744d6518a909... | 633_545094 | 20160128 | SL | CXR | 500.00 | 38.0400 | | 20160128-12:13:18.833 | 20160128-12:13:18.833 |

12. Orders Being Fully Cancelled, but having Execution Messages

**Issue:** There were instances when the total number of shares from cancel messages was greater than the difference of the total new order quantity and the total execution quantity.

**Solution:** For orders which had a cancel message greater than the difference of the total new order quantity and the total execution quantity, I adjusted the order quantity of the cancel message to be equal to be the difference between the total new order quantity and the total execution quantity.

**Example:**

Example 1: Full execution

Screenshot of Clordid "800020122", Volume 23, File Merrill_06863.csv, rows 51196, 129661, 51197.

| orderex... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | canceledorderid | canceltime | executiontime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 9f514c2e5afa175f3... | 800020122 | 20160127 | SL | CXR | 200.00 | 41.2000 | 20160127-14:33:13.982 | | | |
| Order | CL | 9f514c2e5afa175f3... | 800020122ClHNDAA | 20160127 | SL | CXR | 200.00 | 41.2000 | 20160127-14:33:14.345 | 800020122 | 20160127-14:33:14.345 | |
| Exec | EX | 9f514c2e5afa175f3... | 800020122 | 20160127 | SL | CXR | 200.00 | 41.2000 | | | | 20160127-14:33:13.982 |

Example 2: Partial execution

Screenshot of Clordid "800027866". Volume 23, file Merrill_06863.csv, rows 18633, 18640, 129409

| orderex... | eventtype | clientid_anonymized | clordid | tradedate | side | symbol | orderqty | price | orderreceivedtime | ordersenttime | canceledorderid | canceltime | executiontime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Order | NW | 9f514c2e5afa175f3... | 800027866 | 20160127 | B | CXR | 200.00 | 41.0900 | 20160127-14:34:34.276 | 20160127-14:34:34.000 | | | |
| Order | CL | 9f514c2e5afa175f3... | 800027866CLHOFAA | 20160127 | B | CXR | 200.00 | 41.0900 | 20160127-14:35:01.960 | 20160127-14:34:34.000 | 800027866 | 20160127-14:35:01.960 | |
| Exec | EX | 9f514c2e5afa175f3... | 800027866 | 20160127 | B | CXR | 100.00 | 41.0900 | | | | | 20160127-14:34:57.073 |

## B. Data Processing Decisions

1. Choosing an account ID or client ID variable

**Issue:** The analysis could be done by Clientid_anonymized, Account_anonymized, or by treating all messages as if they all came from the same account.

**Solution:** I focused my analysis on the Clientid_anonymized level.

2. Separating Cancel/Replace

**Issue:** Cancel/replace orders have a similar effect on the limit order book as a cancel and new order.

**Solution:** To accurately capture this behavior, I separated cancel/replace orders into one cancel order and one new order. The cancel message was given an order quantity equal to the originating new order (or last cancel/replace) message minus any quantity executed before the cancel/replace message. The new message was given a quantity equal to the cancel/replace message.[63]

3. Creating a Unified Time Variable

**Issue:** The messages from Merrill contain five timestamp variables: Orderreceivedtime, Executiontime, Canceltime, Ordersenttime, and Messagetime. I do not recall observing a definition of the five time variables anywhere, and so based on the naming of the variables I

[63] Cancel/replace orders time-price priority may be handled differently by different trading venues and depending on whether quantity or price is being changed. This does not impact my analysis as I do not analyze the queue position of the limit order book.

use Orderreceivedtime, Executiontime, Canceltime as they seemed to more closely align with when a message would be observed by other market participants.

**Solution:** My Time variable used Orderreceivedtime for new orders, Canceltime for canceled orders, and Executiontime for executions. For cancel/replace orders that were replaced by a cancel and new order, I used the Orderreceivedtime.