# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRINGTON GLOBAL OPPORTUNITY FUND, LTD.<br><br>Plaintiff,<br><br>v.<br><br>BOFA SECURITIES, INC., *et al.*,<br><br>Defendants. | No.1:21-cv-00761(LGS)<br>Hon. Lorna G. Schofield |

REPLY REPORT OF PROFESSOR JONATHAN BROGAARD, PH.D.

April 25, 2025

# Table of Contents

I. Background and Qualifications ........ 4

II. The Methodologies I Propose for Detecting Spoofing Events are Impartial and Supported by Current Literature ........ 7

A. My analysis does not suffer from "selection bias" and does not argue that the presence of an imbalance always indicates spoofing ........ 7

B. Focusing on recent orders in the Quantity Methodology is well supported in the academic literature ........ 13

C. The Posting Methodology is well supported in the academic literature and does account for cancellations ........ 18

D. Posting and Quantity Methodologies are distinct spoofing detection techniques ........ 24

E. My analysis is careful to distinguish market making activity from spoofing and establishes intent ........ 26

III. My Analysis was Conducted to the Extent Permitted by Available Data and within the Scope Provided by Counsel so as to be Reliable ........ 35

A. Upward spoofs are irrelevant for liability ........ 35

B. A corporate-level analysis is a valid and a more conservative approach to analyzing the data than would be an intra-firm approach ........ 40

C. Removal of Minimum Quantity Threshold (MQT) orders as suggested by the Hendershott Report is incorrect ........ 47

D. The Hendershott Report fails to provide systematic evidence of any mishandling of same-millisecond ordering that would meaningfully change my conclusions ........ 50

E. Latency between the US and Canadian markets are excluded by design so as to more accurately analyze the Defendant's data ........................................................................ 55

F.. Non-visible sell-side orders during some spoofing episodes are overstated and irrelevant ....57

i. The Hendershott Report misconstrues and/or ignores the data .................... 58

ii. The Hendershott Report's Non-Visible Order contentions are inaccurate ... 60

IV. The Hendershott Report makes Numerous Imprecise and Inaccurate Statements ........... 63

V. Addendum regarding Mischaracterizations of my Initial Reports by Defendants' Compliance Experts ........................................................................................................ 68

VI. Conclusion ........................................................................................................ 71

## I. Background and Qualifications

1. Previously in this matter, I submitted the Expert Reports of Jonathan Brogaard, Ph.D., dated October 8, 2024 (the "Initial Reports"). In the Initial Reports, I opined that the customers of Merrill Lynch Canada Inc. and BofA Securities, Inc. (together, "Merrill") and CIBC World Markets Inc. ("CIBC")[1] engaged in spoofing in the Concordia International Corporation ("Concordia" or the "Company") stock between January 27, 2016 and November 15, 2016 ("the Relevant Period").[2]

2. A detailed summary of my educational background and publications is set out in my curriculum vitae, which is attached as Exhibit 1 to my Initial Reports. The curriculum vitae includes my publications over the last 10 years. I have previously testified as an expert witness in two cases and made a declaration in one—a list of my prior testimony is attached as Exhibit 2 to my Initial Reports. The facts and data I considered in my Initial Reports in forming the opinions I expressed therein are set forth in my Initial Reports, in Exhibits 3 and 4 thereto. I have been asked by counsel for the Harrington Global Opportunity Fund, Limited ("Harrington" or "Plaintiff") to review and evaluate certain portions of the Expert Report of Terrance Hendershott, Ph.D., dated March 7, 2025 (the "Hendershott Report") in response to the Initial Reports. In developing my findings and forming my opinions in connection with this report ("Reply Report"), I have relied on my knowledge, experience, academic research, and certain documents, facts, and data, which are listed in **Exhibit 1**. The portion of the Hendershott Report that was provided to me by counsel is annexed

---

[1] Collectively I refer to Merrill and CIBC as the "Defendants."

[2] When referring to specific parts of the Initial Reports I will use the paragraphs and exact wording from the report for Merrill, unless indicated otherwise.

hereto as **Exhibit 5**. Excerpts of the March 7, 2025 reports of James Overdahl, Ph.D., and Michael Prior are annexed hereto as **Exhibit 6.**

3. As it relates to the Initial Reports, the Hendershott Report is a deeply flawed piece of analysis, masquerading ungrounded speculation as scientific rigor. Rather than engaging substantively with the careful and empirically supported Methodologies employed in my Initial Reports, it resorts to a series of superficial and misleading criticisms. The Hendershott Report misconstrues my Methodologies, makes incorrect claims about alleged selection bias, and constructs irrelevant analogies that misrepresent the analysis in the Initial Reports. The Hendershott Report's analysis is an exercise in imaginative arguments that are riddled with unsupported assumptions, conceptual confusions, and misguided assertions, making its analysis unreliable.

4. In this Reply Report, I address several key areas demonstrating that my Methodologies for detecting spoofing events are impartial and firmly supported by current economic literature. Among these, I:

   a. show that my analysis is free from "selection bias," clarifying that I never asserted that imbalances necessarily indicate spoofing;

   b. justify my Posting Methodology, which is rooted in contemporary research and explicitly accounts for cancellations;

   c. clarify that the Posting and Quantity Methodologies serve distinct analytical purposes and are not interchangeable, as each addresses unique aspects of spoofing behavior;

   d. explain why focusing on recent orders in the Quantity Methodology provides more accurate insights than approaches that include older, stale orders,

e. and emphasize my careful efforts to differentiate genuine market making activity from spoofing;

f. explain why the analysis of upward spoofs is irrelevant for establishing liability in this context;

g. highlight that conducting a corporate-level analysis is not only valid but represents a more conservative approach than examining intra-firm trading;

h. demonstrate the glaring error with the Hendershott Report's contention to remove Minimum Quantity Threshold (MQT) orders from consideration, detailing why these orders are appropriately included;

i. refute the Hendershott Report's claim regarding mishandling same-millisecond ordering, showing that Prof. Hendershott provides no systematic evidence affecting my conclusions, and explain my deliberate decision to exclude latency between the U.S. and Canadian markets as part of accurately analyzing the Defendants' data;

j. explain that the presence of non-visible sell-side orders during certain spoofing episodes is irrelevant and does not negate findings of manipulative intent;

k. illustrate that my analysis has been conducted rigorously and reliably within the available data constraints and the scope of my assignment; and

l. address numerous additional imprecise and inaccurate statements made in the Hendershott Report.

5. As a preliminary note, the Hendershott Report does not contest the analysis in Section III.D of my Initial Reports ("Further Analyses of Spoofing Episodes").[3] Nor does the

[3] All that is said in the Hendershott Report regarding the extensive additional tests in the Initial Reports Section III.D is that his unfounded quibbles in Section III.A preclude him from interpreting the results. [Hendershott Report, Footnote 79.] The Hendershott Report is completely silent as to the legitimacy of the techniques used in the additional tests.

Hendershott Report contest the validity of most of the criteria in the Methodologies established in the Initial Reports. I focus solely on the limited set of contested issues discussed in the Hendershott Report.

## II. The Methodologies I Propose for Detecting Spoofing Events are Impartial and Supported by Current Literature

### A. My analysis does not suffer from "selection bias" and does not argue that the presence of an imbalance always indicates spoofing

6. In this section, I address concerns raised by the Hendershott Report regarding alleged "selection bias" in my analysis. Specifically, I clarify that my methodological approach is impartial and consistent with rigorous economic principles, countering claims that my analysis inherently assumes any imbalance necessarily indicates spoofing. By systematically evaluating order imbalances around buy-side executions, my Methodologies logically identify relevant trading patterns without selectively biasing results. This approach, rather than constituting "selection bias," represents a conservative and systematic strategy for detecting manipulative behavior, carefully distinguishing spoofing from other non-manipulative trading activities.

7. The Hendershott Report states that my analysis suffers from "selection bias" because it focuses the analysis around buy executions.[4] This claim is unsupported and unfounded. Given that a buy execution is a necessary condition for a downward spoof, it introduces no

[4] Hendershott Report, ¶ 49.

bias by focusing the analysis around such a condition. That is, it is not an example of "selection bias," but rather a sensible place to begin the investigation as a downward spoofing episode must conclude in a buy execution. Thus, instead of applying the criteria of the Methodologies (whether Posting or Quantity) at any and every possible timeframe, and then checking for a buy execution, I begin with the buy executions and check if the surrounding activities meet the spoofing criteria. In fact, such an approach is inherently conservative, as it excludes any instances of manipulation of the stock price that did not result in an execution.

8. The Hendershott Report (i) inexplicably asserts that sell-side imbalances necessarily need to be followed by a buy execution by [redacted] on the one hand, or [redacted] and/or [redacted] (unless specified otherwise, individually and collectively, [redacted] on the other,[5] and yet (ii) still without support, argues that the clearly identified spoofing episodes are somehow instead "likely just the results of searching through millions of rows of data to cherry-pick specific examples that fit a particular theory."[6]

9. First, this is a mischaracterization of the Initial Reports as a large sell-side imbalance is but one of many criteria necessary to be considered a spoofing episode. The criteria used in the Initial Reports for the two Methodologies consider other factors such as cancellation rate, execution ratio, and impact of orders on the limit order book.[7]

10. Second, the Hendershott Report's own analysis shows that my approach is conservative, in that I am excluding the vast majority of sell-side imbalance activity that may be part of a spoofing scheme, but that does not meet the other criteria the Initial Reports required to

---

[5] "He does not analyze whether sell-side imbalances, a key component to his identification of alleged spoofing episodes, always, or even often, lead to purchase executions." Hendershott Report, ¶ 49.

[6] Hendershott Report, ¶ 54.

[7] See the Initial Reports Section III for the precise definition.

distinguish legitimate market making from spoofing.[8] That is, the Methodologies are conservative because they exclude trading activity that may be attempted spoofing or spoofing by other customers.

11. Third, the Hendershott Report's claim that "observable sell-side imbalances [being] highly unlikely to be followed by a purchase execution directly contradicts the causal inference Prof. Brogaard attempts to draw" is simply incorrect because it misunderstands what a "causal inference" is.[9] A "causal inference" is not a hard-and-fast rule akin to a "law," with "if-then" direct consequences that necessarily follow. A "law," such as Newton's Second Law of Motion whereby force equals mass multiplied by acceleration, always and necessarily applies. A "causal inference," by contrast, shows a *pattern*. Here, a pattern was clearly identified. There is no support for the accusation of cherry-picking.

12. That there is no "selection bias" here is made further evident by Prof. Hendershott's approach in the *Lek Securities* case.[10] Indeed, my approach mirrors the one Prof. Hendershott used in the *Lek Securities* case, where he developed a criteria for identifying "Layering Loops," detected such *patterns*, and then performed further analysis to assess whether those patterns were indicative of manipulation.[11] At no point in his *Lek Securities* expert witness report on "Layering Loops" did he compare "Layering Loop" activity to "non-Layering Loop" activity in the way he now claims is necessary to avoid "selection bias."

---

[8] "For his Quantity methodology, only 1% and 2% of sell-side imbalances were followed by a buy-side execution for [redacted] and [redacted] respectively. For his Posting methodology, only 5% and 2% of sell-side imbalances were followed by a buy-side execution for [redacted] and [redacted] respectively." Hendershott Report, ¶ 53.

[9] Hendershott Report, ¶ 54.

[10] Hendershott Lek Securities Expert Witness Report, ¶ 18-20.

[11] Hendershott Lek Securities Expert Witness Report, ¶ 22.

13. The Hendershott Report provides two irrelevant analogies regarding the efficacy of a vaccine.[12] The first where the researchers select healthy patients instead of randomly selecting patients; the second is selecting patients who are known to have avoided the sickness. There is no attempt to relate the analogies to the Methodologies at hand. A better analogy to help clarify the analysis done in the Initial Reports is as follows. Suppose a doctor observes a rash. The doctor will then go through a standard checklist to determine whether the rash is chickenpox and contagious, or a benign irritation of the skin.[13] If it meets certain criteria, it is determined to be one or the other. In this apt analogy that describes the approach in the Initial Reports, the "rash" is a buy execution and the "chickenpox" identification criteria are the spoofing identification criteria. The analogies in the Hendershott Report are inapt and unrelated to the question at hand.

14. The Hendershott Report also argues that, "[b]y starting with purchase executions and then looking for sell-side imbalances, Prof. Brogaard's analysis cherry-picks data patterns that are more likely to support his conclusions."[14] This is a misuse of the concept of cherry-picking. As the rash analogy above clarifies, the analysis in the Initial Reports is designed to isolate spoofing episodes. In it, I require that <u>all</u> of the criteria identified in the Initial Reports be present; I do not just cherry-pick only pieces of criteria be present at select times. For example, a sell-side imbalance is not the only ingredient required for a spoof episode. Similarly, a buy execution is also not the only ingredient required for a spoof episode. Both are <u>necessary</u> conditions, but neither is <u>sufficient</u>. Focusing on periods

---

[12] Hendershott Report, ¶ 50-51.
[13] This example is a simplification and assumes the rash can only be one of these two types.
[14] Hendershott Report, ¶ 49.

around buy executions is a conservative way to narrow the search, given that a buy execution is a necessary condition for the spoofing Methodologies.[15, 16]

15. The Hendershott Report also argues without support that the focus on specific customers is even more "problematic."[17] While Prof. Hendershott is correct that I focused on a subset of customers,[18] this was not due to "selection bias" but rather to my decision to conservatively focus on the most egregious misconduct.

16. In conducting my initial analysis, I reviewed trading activity across all customers of the Defendants. I selected [redacted] and [redacted] for further and more detailed analysis because they exhibited the highest levels of suspicious activity, specifically in terms of the percentage of buy executions that appeared to be part of spoofing episodes.

17. To provide a counter-analysis which demonstrates that I was not cherry-picking, I present the results of my analysis across all customers to assess the presence, or lack thereof, of spoofing activity among the other customers. I applied the Posting and Quantity Methodologies, as tweaked in accordance with the alternative sequencing method described in **Section III.D,** to each customer's activity and compared the suspected downward spoofing episodes to their total number of buy-side executions.[19] **Exhibit 2** shows the results. 26.45% of [redacted] 's purchases, and 9.56% of [redacted] purchases, were the result of spoofing activity, respectively. Consistent with the approach described in my Initial Reports, I grouped individual customer accounts by their affiliated corporate entity

---

[15] It is worth nothing again, spoofing may occur that does not result in a buy execution, but the Initial Reports conservatively did not include such activity in its Methodologies.

[16] The Hendershott Report at times makes a less supported approach of non-overlapping 2.5 second windows for portions of its analysis (for example, see Hendershott Report, Footnotes 77 and 78). Such an approach arbitrarily breaks up the day based on calendar time instead of taking into account market activity. The Initial Reports' approach of focusing around a buy execution avoids this arbitrary segmentation.

[17] Hendershott Report, ¶ 55.

[18] Hendershott Report, ¶ 55.

[19] The analysis is conducted utilizing the sequencing method described in this Reply Report **Section III.D**.

prior to conducting the spoofing analysis. This aggregation reflects the economic and operational reality that related accounts within the same corporate family should be treated as a single entity as discussed in **Section III.B**.

18. This analysis is consistent with the suggestion in the Hendershott Report that other customers' spoofing activity could be used as a way to test the Methodologies' error rate.[20] If the Posting and Quantity methodologies were simply picking up normal trading by market makers and other participants, then one would expect that the rate of spoofing episodes would be correlated with trading volume across all customers. By focusing on the percent of buy executions that are identified as spoofing episodes one would therefore expect similar detection rates across customers. If the percent of purchases that are identified as spoofing episodes varies, it supports the opinions expressed in the Initial Reports that I am detecting spoofing, not normal market making.

19. Across customers for both Defendants, **Exhibit 2** confirms wide heterogeneity in detected spoofing, thereby rejecting the notion that the Posting and Quantity methodologies are simply a proxy for volume.

20. Applying methodologies across all customers can also be useful for establishing a type I error rate, wherein the methodologies incorrectly purport to detect spoofing when in fact there was no spoofing.[21, 22] The other customers' spoofing detection rate can serve as a reasonable benchmark, with the assumption that spoofing is not truly an endemic problem across all customers.[23] The analysis reported in **Exhibit 2**, which used the Posting and

---

[20] Hendershott Report, ¶ 55.

[21] The all customer analysis therefore also serves as a counter-analysis to the Hendershott Report's concern regarding there being a testable error rate. [Hendershott Report, ¶ 47.]

[22] It is also worth noting that Prof. Hendershott in his *Lek Securities* Expert Witness Report does not include an error rate analysis.

[23] The purpose of focusing on one customer per Defendant in the Initial Reports was also intended to avoid misclassifying the one-off detection of spoofs from systematic activity consistent with spoofing.

Quantity Methodologies, confirms that the majority of both Defendants' customers exhibited no meaningful spoofing-like behavior. Using the median spoofing detection rate as a type I error rate is strong evidence that the spoofing methodologies utilized in the Initial Reports were reliable.[24, 25]

21. In conclusion, the concerns articulated in the Hendershott Report about "selection bias" fundamentally misunderstand my methodological framework. As demonstrated, my analysis intentionally begins from buy executions because this event logically represents the necessary concluding step of a potential downward spoofing episode. Far from biasing the analysis, this strategy explicitly ensures that only genuine manipulative patterns are considered. Consequently, my approach remains robust, conservative, and well-grounded in economic reasoning, effectively differentiating between legitimate market-making activity and manipulative spoofing behavior.

## B. Focusing on recent orders in the Quantity Methodology is well supported in the academic literature

22. In this section, I address the criticism from the Hendershott Report regarding my Quantity Methodology, particularly the choice to focus on recent orders placed within a 30-second window prior to execution, rather than considering older, stale orders. Contrary to the claim that this choice lacks an economic basis, I demonstrate through extensive references to the

---

[24] Even if considering only market makers, the median spoofing detection rate is under 1%.

[25] The analysis identifies three additional customers with elevated levels of potential spoofing behavior, [redacted] and an unknown CIBC customer "9ef53b9…," which showed 7.8%, 5.67%, and 5.23%, respectively, of their buy-side executions being identified as spoofing. This furthers my claim that focusing on a single customer engaging in spoofing per Defendant is a conservative approach. The focus on a single customer per Defendant was based on instructions from Counsel given limited time and resources. I do not concede that other customers of the Defendants were not spoofing as well.

established academic literature that this approach is not only well-supported but also superior for accurately capturing price impacts from recent order flow information. The use of short-term windows, such as 30-seconds, is consistent with contemporary research on market microstructure, which shows that recent order flows have a significantly stronger predictive power for short-term price movements compared to static snapshots of the entire order book.

23. The Hendershott Report provides a critique of the Quantity Methodology in which it claims that the choice of focusing on "orders placed in the 30 seconds before the executing purchase and ignores all outstanding orders that were placed earlier"[26] has "no economic basis."[27] Such a statement ignores well-established literature from which I rely on to best capture information in the order book.[28]

24. For example, Cont, Kukanov, and Stoikov (2014) focus on the price impact of order flow imbalance ("OFI").[29] OFI is defined as "the net order flow at the best bid and ask," adjusting by "increasing every time the bid size increases, the ask size decreases or the bid/ask prices increase" and "decreas[ing] every time the bid size decreases, the ask size increases or the bid/ask prices decrease" for short periods of time.[30] OFI measures the *change* in the order book from one time period to another, rather than the static state of the

---

26 Hendershott Report, ¶ 72.

27 Hendershott Report, Section VI.C.3.

28 Modern equity markets operate at extraordinarily high speeds, characterized by trading activity on timescales of milliseconds or even microseconds. Brogaard, Hendershott, and Riordan (2014) highlight this rapidity by demonstrating that high-frequency traders routinely place, modify, or cancel orders within fractions of a second. [Brogaard, J., Hendershott, T. and Riordan, R., 2014. High-Frequency Trading and Price Discovery. The Review of Financial Studies, 27(8), pp.2267-2306.] Therefore, the further one looks back from the event time, the less relevant those orders are in relation to market price dynamics. The choice of a 30-second window is not arbitrary [Hendershott Report, ¶ 73] but a choice meant to take into account the order flow approach with the fact that markets operate remarkably quickly.

29 Cont, R., Kukanov, A., and Stoikov, S., 2014. The Price Impact of Order Book Events. *Journal of Financial Econometrics 12*(1), pp. 47-88.

30 Cont, R., Kukanov, A., and Stoikov, S., 2014. The Price Impact of Order Book Events. *Journal of Financial Econometrics 12*(1), p. 49.

resting orders in the order book in totality. This publication provides solid support for the Initial Reports choice to focus on order flow information, not snapshots of the entire limit order book. The paper demonstrates OFI's importance by showing it closely approximates short-term price changes and captures the instantaneous price impact of order book events. Specifically, it shows that 30-second negative pre-execution OFI on average leads to negative subsequent price changes.[31]

25. Hopman (2007) also focuses on short-term price impacts arising from order flow information by examining how stock prices are driven predominantly by the imbalance between buy and sell orders. Hopman (2007) emphasizes the role of this imbalance at various intervals, establishing a strong contemporaneous correlation between order flow and price movements. The article provides further support to the empirical validity of how price dynamics are driven by short term supply and demand order flow.[32]

26. Yet another example is Kolm, Turiel, and Westray (2023) who expand on the Cont, Kukanov, and Stoikov (2014) measure of OFI. Importantly, they not only choose this order flow approach instead of a snapshot approach. They provide evidence that order flow is a superior measure a snapshot of the limit order book to forecast future returns, stating, "models trained on [order flow] significantly outperform most models trained directly on the order book."[33]

27. Thus, the Hendershott Report's claims that I provide "no basis for excluding from his analysis resting limit orders that are active and displayed to the market" is wrong.[34] The

---

[31] Cont, R., Kukanov, A., and Stoikov, S., 2014. The Price Impact of Order Book Events. *Journal of Financial Econometrics 12*(1), p. 84.
[32] Hopman, C., 2007. Do supply and demand drive stock prices? *Quantitative Finance*, *7*(1), pp. 37-53.
[33] Kolm, P., Turiel, J., and Westray, N., 2023. Deep order flow imbalance: Extracting alpha at multiple horizons from the limit order book. *Mathematical Finance, Wiley Blackwell, 33*(4), p. 1071.
[34] Hendershott Report, ¶ 73.

choice to focus on order flow imbalance within the 30-second window is squarely based in the academic literature and is purposefully designed to capture manipulative behavior that has been shown to be relevant, and in fact superior to the measure of the state of the order book. The Hendershott Report points out that one of my academic articles focuses on snapshots of the order book instead of order flows.[35] As I will explain in detail in **Section II.D**, there is not one methodology that is applicable to detecting spoofing. In fact, in the very same article evaluating data from 2010-2011 referenced in the Hendershott Report Footnote 103, I write: "To discourage spoofing activity regulators strategically make the definition ambiguous."[36] If this were not clear enough, the same academic article clarifies the methodology used is not the only possible one, stating that a contribution of the paper is to "provide *another* tractable spoofing detection method."[37]

28. Regulators may want to purposefully leave spoofing definitions vague. Cumming, Johan, and Li (2011) point out that, "One could argue that detailed regulations create inefficiency as investors and traders are able to take advantage of inevitable loopholes."[38] This makes logical sense—if there were a concrete definition of manipulation, manipulators would simply ensure they do not trigger those thresholds, while continuing to manipulate markets.

29. The Hendershott Report contradicts with the previous expert work conducted by Prof. Hendershott. For instance, in his *Lek Securities* expert witness report, he defines "Layering

[35] Hendershott Report, Footnote 103: "I note that Prof. Brogaard's academic research on spoofing does not appear to implement a 30-second cutoff when assessing order imbalances but considers the entire visible limit order book. In particular, the methodology evaluates order imbalances over a 30-second period but does not mention the exclusion of orders that were placed more than 30 seconds before the genuine trade. *See* Brogaard, Li, and Yang (2024), p. 2."

[36] Brogaard, J., Li, D., and Yang, J., 2024, Does High Frequency Market Manipulation Harm Market Quality? *Available at SSRN 4280120*. December 2024. p. 2.

[37] Brogaard, J., Li, D., and Yang, J., 2024, Does High Frequency Market Manipulation Harm Market Quality? *Available at SSRN 4280120*. December 2024. p. 5 (emphasis added).

[38] Cumming, D., Johan, S., and Li, D., 2011. Exchange trading rules and stock market liquidity. *Journal of Financial Economics 99*(3). p. 652.

Loops" in Section III.A.[39] In that Section of Prof. Hendershott's report, not a single reference to a previous case or academic paper is made. As far as I can tell, the methodology was developed for the particular facts and circumstances of the case.

30. The Hendershott Report dismisses more academically-grounded methodologies as lacking "economic sense"[40] in its critique of the 30-second window used in the Quantity Methodology, which he describes as "arbitrary."[41] This critique overlooks both precedent and context. In his own analysis in the *Lek Securities* case, Prof. Hendershott selected a 60-second window to define "Layering Loops," later justifying this choice as a "reasonable amount of time"[42] and a "round number."[43] In contrast, my use of a 30-second window is not arbitrary, it is based on the academic literature. For example, Cont, Kukanov, and Stoikov (2014) consider 30-second windows in their robustness analysis.[44] The inconsistency in standards—where Prof. Hendershott's own decisions are framed as reasonable while similar or more rigorously justified, conservative choices are labeled arbitrary—undermines the credibility of his critique. It is a consistent theme throughout the Hendershott Report.

31. Furthermore, the Hendershott Report contradicts itself on whether it is the total quantity of shares available on the visible limit order book or the flow of information on the limit order book that matters. Section VI.C.3 of the Hendershott Report is dedicated to the notion that the state of the order book is what matters. Elsewhere, the Hendershott Report agrees

---

[39] Hendershott Lek Securities Expert Witness Report ¶ 16-21.
[40] Hendershott Report, ¶ 73.
[41] Hendershott Report, ¶ 73.
[42] Deposition Transcript of Prof. Hendershott in *Sec. & Exch. Comm'n v. Lek Sec. Corp.* (the "Hendershott Lek Deposition"), 338:2-11.
[43] Hendershott Lek Deposition, 338:12-20.
[44] Cont, R., Kukanov, A., and Stoikov, S., 2014. The Price Impact of Order Book Events. *Journal of Financial Econometrics 12*(1), pp. 47-88.

squarely with the approach in the Initial Reports that it is order flow that influences market participants. The Hendershott Report states that "[m]arket makers constantly adjust their orders depending on their assessment of the *order flows*,"[45] that "[m]arket makers therefore constantly adjust the price and quantity of orders placed on either side of the market based on their assessment of the *order flows*,"[46] and (referencing another paper), "[market makers] seem to exploit *order flow information* and generate trading signals on a very short time scale."[47]

32. In summary, my decision to focus on recent orders within the Quantity Methodology is firmly rooted in empirical findings and current market microstructure research. The extensive academic literature reviewed here supports the superiority of order flow-based measures over static order book snapshots, validating the appropriateness and accuracy of the 30-second window used in my analysis. Consequently, the Hendershott Report's criticism that this choice was arbitrary or economically unfounded is clearly contradicted by well-documented economic theory and empirical evidence.

## C. The Posting Methodology is well supported in the academic literature and does account for cancellations

33. In this section, I respond directly to critiques in the Hendershott Report regarding my Posting Methodology, specifically addressing the unfounded claims that my approach lacks economic justification and improperly disregards the impact of order cancellations.

---

[45] Hendershott Report, ¶ 31 (emphasis added).
[46] Hendershott Report, ¶88 (emphasis added).
[47] Hendershott Report, Footnote 128, referencing Ait-Sahalia, Y., and Sağlam, M., 2024. High Frequency Market Making: The Role of Speed, *Journal of Econometrics 239*(2). 105421, p. 2 (emphasis added).

To the contrary, I demonstrate that the Posting Methodology is well-supported by robust economic literature and explicitly accounts for cancellations in assessing manipulative trading practices. By reviewing foundational and contemporary research, I illustrate how new order placements exert a significantly greater influence on price dynamics compared to cancellations, justifying my focus on order postings as a crucial indicator of potential spoofing.

34. The Hendershott Report says "Prof. Brogaard's Posting methodology, which as I discuss in greater detail below, is a novel approach that effectively rests on the faulty premise that the market only responds to order placements and ignores cancellations."[48] The Posting Methodology is not only well supported by economic literature, but it does not ignore cancellations. The Hendershott Report is thus simply incorrect on both counts.

35. To begin with, the Hendershott Report contradicts itself and this statement later in the report, when it states that "Prof. Brogaard's filter criteria … assess sell orders and executed purchases, sell-side order imbalances, *and sell order cancellations*."[49] Quite clearly (and as Prof. Hendershott thus acknowledges) my Posting Methodology does not ignore sell order cancellations, as its definition requires that at least 50% of the sell-side orders are cancelled prior to the end of the episode.[50] However, the impact of cancellations is of questionable value when analyzing the impact of fleeting orders, as the economic literature reveals.

36. The Hendershott Report misunderstands the premise of this approach, which is predicated on the fact that order placement has a larger impact on price than order cancellation and

---

[48] Hendershott Report, ¶45.
[49] Hendershott Report, ¶90 (emphasis added).
[50] See the Initial Reports Section III.B.i for the precise definition of the Posting Methodology.

therefore makes economic sense to focus on. The academic literature squarely supports this choice.

37. For example, Prof. Hendershott, in his own work, has shown how new orders are more important to price dynamics than order cancellations. Table VII of Brogaard, Hendershott, and Riordan (2019) shows that new orders at the NBBO or better have a much larger impact than cancels at the NBBO or better.[51] Also, the differential effect clearly shows up in the Simple Price Impact result found in Table VI. [52] In the simple model for Orders in Column 3 and Cancels in Column 5, the Intercept is 0.69 and -0.07, respectively, which indicates that Orders have a much larger impact on prices than do Cancels**.** [53] The analysis in Prof. Hendershott's own work thus clearly shows that cancellations play a diminished role relative to new orders.

38. In further support, Hopman (2007) does not consider cancellations.[54] Yet, he concludes that even without the cancellations, "the approximation already yields very good results."[55] More recent academic work shows Hopman's necessity of ignoring cancellations is supportable.

39. Sitaru, Calinescu, and Cucuringu (2023) introduce the Decomposed Order Flow Imbalance ("Decomposed OFI").[56] It separates the OFI into three distinct components based on the type of order book event: new orders, order cancels, and trades. The paper emphasizes that

---

[51] Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, 74(4), p. 1644.
[52] Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, 74(4), p. 1641.
[53] Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, 74(4), p. 1641.
[54] Hopman, C., 2007. Do supply and demand drive stock prices? Quantitative Finance, 7(1), pp. 37-53.
[55] Hopman, C., 2007. Do supply and demand drive stock prices? Quantitative Finance, 7(1), p. 39.
[56] Sitaru, B., Calinescu, A., and Cucuringu, M., 2023. Order Flow Decomposition for Price Impact Analysis in Equity Limit Order Books. *Available at SSRN 4572510.* September 2023.

"the standard OFI is the sum of the three components of the decomposed OFI," allowing researchers to understand more precisely the contribution of each event type to price impacts.[57] The article concludes that, "the add component of the Decomposed OFI is highly relevant for forecasting (followed by quite a margin by the cancel component, and, to a much smaller extent, by the trade component)."[58]

40. In addition, fleeting orders—orders that are entered and cancelled very quickly—have been shown to influence prices.[59] Figueiredo, Jain, and Mishra (2023) define fleeting orders as orders that are "canceled within two seconds,"[60] following the definition originally provided by Hasbrouck and Saar (2009).[61] An alternative, tighter definition in the article considers orders canceled within just "fifty milliseconds after submission."[62] Thus fleeting orders match closely the definition used in the Initial Reports Posting Methodology. In essence, it is the study of limit orders, knowing that the order will be cancelled, while not explicitly modeling the cancellation.

41. The study provides clear empirical evidence that fleeting orders influence prices: specifically, it shows that such orders "impact subsequent NBBO [prices] and increase the likelihood of stock prices crossing option strike prices on option expiration days."[63] The article argues, "[b]ecause of their large numbers, low costs, and high visibility, in aggregate

---

[57] Sitaru, B., Calinescu, A., and Cucuringu, M., 2023. Order Flow Decomposition for Price Impact Analysis in Equity Limit Order Books. *Available at SSRN 4572510*. September 2023, p. 6.
[58] Sitaru, B., Calinescu, A., and Cucuringu, M., 2023. Order Flow Decomposition for Price Impact Analysis in Equity Limit Order Books. *Available at SSRN 4572510*. September 2023, p. 18.
[59] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), pp. 1511-1529.
[60] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), p. 1511.
[61] Hasbrouck, J., and Saar, G., 2009. Technology and Liquidity Provision: The Blurring of Traditional Definitions. *Journal of Financial Markets*, *12*(2), pp. 143-172.
[62] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), p. 1511.
[63] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), p. 1511.

fleeting order strategies are much more effective in influencing prices than other strategies involving actual trades."[64, 65] It nicely summarizes why fleeting orders, again new orders that will be cancelled shortly without modeling the cancellation, influence prices:[66]

> "One reason fleeting orders could be used to influence price or NBBO movement is that they can ignite momentum and herding behavior. Traders or automated trading algorithms who see a high-priced buy order flash in the limit order book may cancel their lower priced buy order and resubmit a higher priced buy order themselves to win the ongoing competition to buy before prices go up too much. Momentum ignition and herding may occur even if the original fleeting order is canceled because it is often difficult in real time to know for sure whether the fleeting order disappeared due to cancelation or because of trade execution. Markets may be misled by a lack of clarity or misleading information as in Allen and Gale (1992).[67]"

42. The Hendershott Report incorrectly claims that there is no economic basis for focusing on new limit order placements exclusively in the order imbalance for the Posting Methodology.[68] As shown above, this is false and fails to consider the existing literature. This line of critique is particularly inconsistent given Prof. Hendershott's approach in the *Lek Securities* case. In his deposition, he acknowledged that "the elements and the types of

---

[64] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), p. 1511.
[65] This observation also explains why most spoofing episodes come from the Posting Methodology, as the Hendershott Report notes in ¶ 70.
[66] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), p. 1512.
[67] Allen, F., and Gale, D., 1992. Stock-Price Manipulation. *The Review of Financial Studies*, *5*(3), pp. 503-529.
[68] Hendershott Report, ¶ 68 - 69.

analyses" underlying his definition of "Layering Loops" had not previously been "put together in exactly this way for exactly this purpose."[69] Like Prof. Hendershott claimed in *Lek Securities*, here there was a synthesis of techniques. But, while the methodology used in the *Lek Securities* lacked a foundation, my Methodologies incorporate a robust examination of academic research and the underlying structure and rationale are an improvement over the analytical approach Prof. Hendershott employed in *Lek Securities*.[70]

43. Intuitively, the Posting Methodology is very basic and simple to understand. A new order matters more to market participants than a new cancel. Imagine you are selling your home, and suddenly multiple "For Sale" signs appear on houses all around yours. Potential buyers notice these signs, assume supply is high and it is a buyer's market. While the signs are shortly thereafter taken down, buyers have already become cautious, believing property values are falling, leading them to negotiate lower offers with you. Thus, for the Posting Methodology, which detects a spoofing strategy that hinges on placing many non-bona fide sell-side orders shortly prior to a buy execution, the most important part is the new order messages because those are most strongly signaling to the market the trader's apparent intent (to sell), thus putting downward pressure on price. As Figueiredo, Jain, and Mishra (2023) show, the fact that these orders are fleeting does not mean that they do not have a material impact on price.[71]

44. In summary, the critique presented by the Hendershott Report—that my Posting Methodology is economically unjustified and disregards cancellations—is clearly

---

[69] Hendershott Lek Deposition, 31:13-20.

[70] The synthesis of techniques and academic research statements apply equally to the use of order flow information discussed in the previous section.

[71] Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), pp.1511-1529.

disproven by both empirical evidence and established academic literature. The extensive analysis and scholarly support presented in this section confirm that my approach is methodologically sound, does consider cancellations, and accurately captures manipulative behavior. Therefore, my Posting Methodology remains a reliable and economically justified approach to identifying spoofing in financial markets.

### D. Posting and Quantity Methodologies are distinct spoofing detection techniques

45. In this section, I address the Hendershott Report's erroneous contention that my Posting and Quantity Methodologies are flawed because they sometimes produce differing outcomes. This critique fundamentally misunderstands the nature and purpose of these methodologies. These two methodologies are deliberately designed as distinct and complementary analytical tools, each targeting different aspects and forms of spoofing behavior. Relevant academic literature and previous regulatory cases demonstrates that spoofing encompasses diverse tactics, thereby necessitating multiple, context-specific detection strategies rather than a single unified approach.

46. The Hendershott Report argues that my use of two distinct methodologies to detect spoofing is invalid because they sometimes yield seemingly opposing results—one identifying buy-side imbalance while the other identifies sell-side imbalance.[72] This argument is fundamentally flawed and misrepresents the nature of both spoofing and the analytical techniques used to detect it. Simply put, the Hendershott Report attempts to make a false comparison.

---

[72] Hendershott Report, ¶ 71.

47. Spoofing is not a monolithic or uniform strategy. Instead, it encompasses a range of behaviors. In addition, just because all the criteria for both the Posting and Quantity methodologies are not satisfied does not mean a spoof had not occurred. Such a criteria as suggested by the Hendershott Report incorrectly implies that both methodologies must be satisfied to be considered a spoof. As an analogy, suppose a cyclist only goes on bike rides when there is no precipitation. It would be wrong to conclude that because it is only raining, and not also snowing—another form of precipitation, that the cyclist would go for a ride. In the same way that precipitation can take different forms, so can spoofing. The fact that not all forms of precipitation occurred does not therefore mean there was no precipitation. In the same way, the fact that not both forms of spoofing took place at the same time does not mean there was no spoofing.

48. The Hendershott Report incorrectly thought it was useful to apply the "reasonings and criterion [Prof. Brogaard] uses in the Quantity methodology to his Posting methodology."[73] This is a misguided exercise. It is worth repeating the name of this section, "Posting and Quantity Methodologies are distinct spoofing detection techniques." The Methodologies are independent and thoughtfully crafted. The notion of mixing and matching components without thought is misleading and a futile exercise. In the precipitation analogy it would be the same as mixing and matching the qualities of rain and snow. For example, stating that to define precipitation you will require all the properties of rain plus the property that it be white like snow. Of course, such a type of precipitation will not be found. In the same way, mixing and matching the Posting and Quantity methodologies is nonsensical, making the idea of "us[ing] these methods to cross-check his work" misleading.[74] The

---

[73] Hendershott Report, ¶ 94.
[74] Hendershott Report, ¶ 44.

independence of the two methodologies also alleviates any concerns about supposed contradictions, such as when the two methodologies "identif[y] episodes that have a sell-side imbalance based on his Posting methodology but a buy-side imbalance based on his Quantity methodology."[75] The existence of a buy-side imbalance under one Methodology does not in any way contradict the fact that a different, independent Methodology detects spoofing.

49. In conclusion, the criticism that the Posting and Quantity Methodologies yield inconsistent results is misguided and overlooks their intended purpose as separate and distinct detection tools. The analysis provided in this section clearly establishes that spoofing is inherently multifaceted, and thus, multiple tailored methodologies are essential to robustly identify various manipulative practices. Rather than indicating methodological weakness, differences in outcomes between these two methods validate their effectiveness in capturing different forms of spoofing activity, ensuring a comprehensive and accurate assessment of market manipulation.

## E. My analysis is careful to distinguish market making activity from spoofing and establishes intent

50. In this section, I address the hollow criticism raised by the Hendershott Report regarding distinguishing legitimate market-making behavior from spoofing and to establish intent. Contrary to these assertions, I demonstrate that my analysis is explicitly designed to separate bona fide market-making activities from manipulative spoofing behavior through

[75] Hendershott Report, ¶ 71.

carefully defined, rigorous criteria. Additionally, I explain how my Methodologies appropriately infer manipulative intent based on systematic, observable trading patterns. This approach aligns with both regulatory precedents and scholarly literature, ensuring that my conclusions about spoofing activity are robust and methodologically sound.

51. The Hendershott Report states that the Posting and Quantity Methodologies "cannot reliably differentiate between legitimate market making behavior and the alleged spoofing behavior he attempts to capture."[76, 77] He makes such a statement—without any supportive evidence—to posit that the manipulative activity found in the Initial Reports was instead due to market making.

52. While the Hendershott Report does correctly state that I believe "it is very challenging to empirically distinguish market making from spoofing manipulation,"[78] by no means, however, should one mistake challenging for impossible. Rather, because it is challenging, the Posting and Quoting Methodologies used are carefully designed as very narrow tests to focus only on the most egregious instances. The approach taken in the Initial Reports are two, but not the only two, ways to disentangle legitimate market making from spoofing. I do not dispute that market makers frequently place orders on both sides of the market, have a high ratio of order cancellations, and manage their inventory.[79] This is why the Methodologies described and deployed in the Initial Reports are very careful to craft strict criteria that distinguish market making from spoofing.

---

[76] Hendershott Report, ¶90.

[77] The Hendershott Report, ¶95, makes similar sweeping statements with no support. To the contrary in the Initial Reports and in this response, I have shown repeatedly how my reasoning and methods are solidly grounded in academic literature.

[78] Brogaard, J., Li, D., and Yang, J., 2024, Does High Frequency Market Manipulation Harm Market Quality? *Available at SSRN 4280120*. December 2024. p. 2.; Hendershott Report ¶87.

[79] Hendershott Report, ¶ 88.

53. The Hendershott Report in Paragraph 88 provides a list of behaviors of market makers. It then states, "Prof. Brogaard appears to acknowledge these likely scenarios but then fails to reliably account for them in his results."[80] There is no specific complaint made besides this sweeping statement with no support. I have already addressed these concerns in the Initial Reports[81] as the Hendershott Report acknowledges.[82]

54. The Hendershott Report does provide one specific example, "a legitimate strategy for an algorithmic market maker could be to rapidly react to an execution on the buy-side by placing additional orders on the sell-side to adjust its liquidity provision or manage their risk."[83] This supposed counterexample in fact bolsters my Methodology. Recall that in the Quantity Methodology that one of the ingredients is that after the buy execution the trader adjusts their imbalance so it is less heavy on the sell-side (e.g. adjust to an imbalance of 1.2 or lower). However, in the example shared, the trader places additional sell-side orders, and therefore would likely fail the post-execution order imbalance criteria, one of several such criteria set in place to distinguish legitimate market making from spoofing. It is also worth noting that not only do all the criteria need to be met to be considered a spoofing episode, they need to be met over and over again throughout the Relevant Period as I conservatively only focused on the most prolific spoofer for each Defendant.

55. Again, the Hendershott Report mischaracterizes the Posting and Quantity Methodologies utilized in the Initial Report when it states, "neither frequent order placements and cancellations nor an imbalance between buy-side and sell-side orders necessarily means

---

[80] Hendershott Report, ¶ 88.
[81] See Initial Reports, ¶¶ 50-51, 85-87.
[82] Hendershott Report, ¶ 87.
[83] Hendershott Report, ¶ 81.

the trader is attempting to influence the market."[84] Neither Methodology has a criteria that there "be frequent order placements and cancellations."[85] In addition, the imbalance criteria is but one of several components necessary to identify a spoofing episode. As stated, the Hendershott Report's statement is inaccurate and misleading.

56. While the Hendershott Report asserts that [redacted] and [redacted] were employing algorithmic market making strategies,[86] this is not the same as operating as a registered market maker with affirmative trading obligations, such as Marketplace Trading Obligations.[87] Nonetheless, the Hendershott Report asserts that [redacted] and [redacted] maintain a high level of trading activity and often exhibit imbalances on the limit order book.[88] However, just because they claim to employ market making strategies, does not mean they are immune to the laws and regulations surrounding market manipulation.

57. The Hendershott Report, without support, states: "Without accounting for [redacted] and [redacted] general trading characteristics (e.g., how frequently they quote asymmetrically and the typical order imbalance magnitude when they quote asymmetrically), Prof. Brogaard's methodology cannot reliably differentiate between legitimate market making behavior and the alleged spoofing behavior he attempts to capture."[89] In fact, I provide several relevant characteristics in the Initial Reports showing just such support.[90, 91]

---

[84] Hendershott Report, ¶ 88.
[85] Hendershott Report, ¶ 88.
[86]Hendershott Report, ¶ 88.
[87] *See, e.g.*, IIROC Notice 11-0251, 34 OSCB 9025, August 26, 2011. *Available at*: https://www.osc.ca/sites/default/files/2021-01/srr-iiroc_20110826_nca-umir-amd.pdf. Last Visited April 24, 2025.
[88] Hendershott Report, ¶ 88.
[89] Hendershott Report, ¶ 90.
[90] Initial Reports, Section III.D.
[91] Instead of considering these supporting facts the Hendershott Report ignores them by declaring "the 'Further Analyses of Spoofing Episodes' that Prof. Brogaard claims to have performed are not meaningful because they are based on the data patterns that he cherry-picked to fit a particular theory." Hendershott Report, Footnote 79.

58. The Hendershott Report at times simply conjures up non-existing statements regarding the Initial Reports. For example, there is no requirement in either the Posting Methodology or the Quantity Methodology that there be a decrease in selling interest.[92] Thus, analysis such as that found in the Hendershott Report Paragraph 94 showing a lack of decrease in selling interest is a non-sequitur, or at worst misleading.[93, 94]

59. Another particularly notable mischaracterization of my analysis appears in Hendershott Report's claim that it "fails to reliably account for"[95] how market makers "constantly adjust the price and quantity of orders placed on either side of the market based on their assessment of the order flows."[96] The Hendershott Report further asserts that my analysis equates "frequent order placements and cancellations" and "an imbalance between buy-side and sell-side orders" with the conclusion that "the trader is attempting to influence the market."[97] These statements do not accurately reflect the Methodologies or conclusions presented in my Initial Reports.

60. First, my Methodologies were meticulously developed to ensure that the order flow imbalance also resulted in an opposite-side trading imbalance. It is important to note here that this is very similar to the approach that Prof. Hendershott used in the *Lek Securities* case.[98] Prof. Hendershott explains that the execution imbalance criterion "eliminates trading strategies such as market making that place similar orders on both sides of the

---

[92] The requirement that the Hendershott Report is likely confused about is that after the buy execution that the customer adjusts their limit order activity to be close to balanced. However, this does not mean the customer must decrease their selling interest, the customer could also increase their buying interest.
[93] Furthermore, The Hendershott Report, ¶94 (a) and (b), ambiguously states "Applying this filter…" with no specification as to what filter is being applied.
[94] The futileness of the exercise conducted in the Hendershott Report ¶ 94(a) and (b) is addressed above in **Section II.D**.
[95] Hendershott Report, ¶ 88.
[96] Hendershott Report, ¶ 88.
[97] Hendershott Report, ¶ 88.
[98] Hendershott Lek Securities Expert Witness Report, ¶ 20.

market or have imbalanced order submissions."[99] This is an important distinction that directly addresses the concern he raises. This feature helps distinguish potentially manipulative behavior from standard market making activity.

61. Second, I take multiple steps to rule out legitimate market making behavior. These include requiring evidence of a trading imbalance, examining disappearance of the order flow imbalance (thereby addressing inventory rebalancing by market makers), and conducting detailed statistical analysis of the episodes identified as spoofing. Furthermore, I explicitly state clearly in my Initial Reports that "[a] limit order book imbalance itself is not necessarily inconsistent with standard market making behavior."[100] The Hendershott Report does not acknowledge this qualification.

62. Despite the thoroughness of the analysis in the Initial Reports, the Hendershott Report jumps to the conclusion that "[redacted] and [redacted] trading data are consistent with these common features of market making."[101] However, this conclusion is not supported by any independent analysis. Rather, it appears to rest on the presence of orders on both sides of the market and high cancellation rates—characteristics that, on their own, are not sufficient to confirm legitimate market making activity. The Hendershott Report accepts [redacted] and [redacted] descriptions of their strategies at face value and provides no quantitative evidence to support the assertion.[102] In doing so, the Hendershott Report applies a much lower

[99] Hendershott Lek Securities Expert Witness Report, Footnote 15.
[100] Initial Reports, ¶ 85.
[101] Hendershott Report, ¶ 89.
[102] Hendershott Report, ¶ 34.

standard of evidence to support its own conclusion than the one used to critique the Initial Reports' conclusion.[103]

63. The Hendershott Report correctly states that, "algorithmic market making strategies—such as those employed by [redacted] and [redacted] involve frequent order placements on both sides of the market and a high ratio of order cancellations."[104] However, this in no way addresses the specific criteria used in either the Posting Methodology or the Quantity Methodology that the Initial Reports' analysis relies on. The Posting and Quantity Methodologies carefully rely on multiple inputs that distinguish legitimate market-making activity from manipulative behavior. Therefore, statements such as, "neither frequent order placements and cancellations nor an imbalance between buy-side and sell-side orders necessarily means the trader is attempting to influence the market" have no point regarding the analysis the Hendershott Report is supposed to be addressing.[105, 106]

64. The Hendershott Report makes sweeping claims about how market makers manage risk. There are two hypotheticals provided but with no empirical support.[107] They are in effect saying the same thing—that market conditions change and so the trader would adjust their order book activity. The Hendershott Report fails to claim that under either of its hypotheticals the necessary criteria in the spoofing detection Methodologies would be met.

---

[103] The Hendershott Report makes additional unfounded claims. For instance, stating with no support that, "Prof. Brogaard's methodology cannot reliably differentiate between legitimate market making behavior and the alleged spoofing behavior he attempts to capture." [Hendershott Report, ¶ 90.] As well as "Prof. Brogaard cannot exclude legitimate market making activity using these requirements." [Hendershott Report, ¶ 92.] The Hendershott Report summarizes the clear economic reasoning provided in the Initial Reports, but fails to point out any flaw in their intuition. [Hendershott Report, ¶ 91.] [It is worth nothing that several times The Hendershott Report refers to "selling interest" in ¶ 91-95 without defining what is meant by this vague term.]

[104] Hendershott Report, ¶ 88.

[105] Hendershott Report, ¶ 88.

[106] The Hendershott Report Footnote 75 makes note that, [redacted] Declaration, September 9, 2024, ¶ 10." The Initial Reports neither state nor imply that quoting asymmetrically constitutes spoofing.

[107] Hendershott Report, ¶ 95.

In fact, on its face it is directly opposite to the informed trader argument. Given the short time window and the presence of a trader wanting to sell to the market maker, the informed trader who arrived was a seller, not a buyer, providing further fodder for why a legitimate market maker would want to have sell orders, not buy orders, on the limit order book.

65. The Hendershott Report hedges its bets by stating, "And even if Prof. Brogaard were able to 'rule out legitimate market making,' that does not necessarily mean that the orders were entered for manipulative purposes."[108] Such a blanket and unsupported argument, with no alternative explanations proposed, simply does not stand up to the robust analysis and measured conclusions reached in the Initial Reports.

66. The Hendershott Report falsely state that the Initial Reports do not, "claim to have any evidence that any trader at [redacted] or [redacted] actually had this intent."[109] The Hendershott Report also incorrectly argues that intent was not established and so the use of the term non-bona fide orders is "misleading."[110] Such vague and sweeping statements are easy to refute. If it was not clear, the observed pattern described in the Posting and Quantity Methodologies establishes intent. Such an approach of deriving intent through actions is in fact consistent with the approach established by Prof. Hendershott in the *Lek Securities* case. Intent can be inferred through statistical analysis of trading behavior—a method that Prof. Hendershott himself has endorsed. In the *Lek Securities* case he stated: "the only evidence I have on the trader's intent is what happens across many, many, many loops … that would be evidence about what the trader's intent may be."[111] Notably, in that

[108] Hendershott Report ¶ 96.
[109] Hendershott Report ¶ 41.
[110] Hendershott Report ¶ 43.
[111] Hendershott Lek Deposition, 240:7-20.

same case, he did not review any code nor interview the traders involved.[112] As the judge ultimately declared in that case, "[i]t is for the jury to determine whether Avalon or any individual had the intent to manipulate the market through layering activity."[113] It also consistent with case law. Mark (2020) summarizes:[114]

> "Detecting spoofing and later proving intent are two of the primary hurdles confronted by the government in a spoofing case. Absent cooperating witnesses or contemporaneous direct evidence in the form of emails, instant messages, or telephone recordings[115]–which may never have existed or may have disappeared before the government begins its investigation–the government generally will be required to prove intent using only circumstantial evidence. This evidence might 'include the number and pattern of orders submitted, the length of time orders remained active before being cancelled, [and] the nature of the trading methodology …'[116] 'Circumstantial evidence of intent is just as probative as direct evidence.'[117]"

67. In summary, the criticisms articulated in the Hendershott Report regarding differentiation between legitimate market-making and spoofing, as well as the inference of manipulative

---

[112] Hendershott Lek Deposition, 355:8-356:6.
[113] *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 410 (S.D.N.Y. 2019), *on reconsideration in part*, No. 17CV1789 (DLC), 2019 WL 2114067 (S.D.N.Y. May 8, 2019).
[114] Mark, G., 2020. Spoofing and Layering. *The Journal of Corporation Law 45*(2), p. 445 [Original footnotes numbered 420, 421, and 422].
[115] See Waldman, D., April 7, 2017. Has the Law of Manipulation Lost its Moorings? *LAW360*, *Available at:* https://www.law360.com/articles/911280. Last Visited April 24, 2025. ("[W]ith the emergence of email, texting, tape recording and social media, gathering evidence of intent has never been easier.").
[116] Kluchenek, M., and Kahn, J., 2013. Deterring Disruption in the Derivatives Markets: A Review of the CFTC's New Authority Over Disruptive Trading Practices, *Harvard Business Law Review Online 3*, pp. 120-132.
[117] *United States v. Cunningham*, 54 F.3d 295, 299 (7th Cir. 1995).

intent, are unfounded. My detailed analysis clearly shows that the criteria employed effectively separate spoofing from typical market-making behavior. Moreover, the inference of intent through objective, systematic analysis of trading patterns is consistent with established regulatory and academic practices. Thus, my approach reliably identifies spoofing activity and provides the necessary evidence to establish manipulative intent, rendering the critiques in the Hendershott Report unsupported.

## III. My Analysis was Conducted to the Extent Permitted by Available Data and within the Scope Provided by Counsel so as to be Reliable

### A. Upward spoofs are irrelevant for liability

68. In this section, I respond to criticisms in the Hendershott Report suggesting that my analysis lacks robustness because it exclusively examines downward spoofing, not upward spoofing. Here, I clarify that the presence or absence of upward spoofing is irrelevant to the identification of downward manipulation, either in terms of recognizing specific spoofing episodes or establishing intent. My objective was to determine if customers of the Defendants engaged in downward spoofing of Concordia stock. The analysis in the Initial Reports conclusively demonstrates that such downward manipulation occurred, and its validity does not hinge upon evaluating other forms of market manipulation. The analysis I performed is thorough, comprehensive, and stands independently, irrespective of whether upward spoofing also occurred.

69. The Hendershott Report argues that my analysis lacks robustness because it only considers downward spoofing, not upward spoofing.[118] This critique overlooks the clearly defined objective of my engagement. I was specifically retained to evaluate whether there was evidence of downward spoofing during the Relevant Period and by specific customers. That scope was clearly delineated in my report.[119] Bigger picture, an examination of potential upward spoofs is not necessary, nor relevant, to a wholly reliable and sufficient methodology to determine whether downward spoofs occurred. The analysis set forth in the Initial Reports is complete, grounded in both basic economics and academic literature,[120] and the literature is further detailed in this Reply Report. Whether upwards spoofs occurred in the Concordia stock during the Relevant Period is irrelevant to whether downward spoofs occurred.

70. The Hendershott Report states that, "if the allegations of a downward spoofing scheme are true, a reliable methodology applied to the data in a comprehensive way would identify only (or mostly) downward episodes."[121] This assertion is wholly unsubstantiated.[122] While there may have been other nefarious activities occurring in the trading of Concordia, investigation of them was neither germane to my analysis, nor necessary to establish a reliable and comprehensive analysis of whether downward spoofing occurred, as I did in the Initial Reports.

71. Whether upwards spoofs occurred in the Concordia stock during the Relevant Period is independent of whether downward spoofs occurred. This is akin to a patient who has a

[118] Hendershott Report, ¶ 56.
[119] Initial Reports, ¶ 48.
[120] See Section III of the Initial Reports.
[121] Hendershott Report, ¶ 58.
[122] Incidentally, I am unaware of any allegations in the pleadings which state that there were no upward spoofing episodes.

broken arm and also experienced a concussion, visiting a neurologist for the latter ailment. The fact that the neurologist focuses exclusively on the head trauma does not undermine the appropriateness or reliability of their diagnosis. In fact, given the scope of the health issue for which the patient saw the neurologist, it would be unreasonable for the neurologist to address the broken arm, even if the doctor had learned in medical school how to treat broken arms. In the same way, the Initial Reports focus on downward spoofing episodes because that is what was reasonable to do to determine whether such activity occurred.

72. The presence or absence of upward spoofing has no bearing on the validity of the Methodologies used in the Initial Reports. The Initial Reports does not claim that there were no upward spoofs. It also does not claim that the Methodologies could not be applied to upward spoofs. The statement that, "Checking to see whether there are upward episodes is akin to a 'placebo test' that an economist can use to test whether the spoofing detection methodology results in false positives" is simply false.[123]

73. The Hendershott Report falsely claims that if there are comparable numbers of upward spoofs and downward spoofs that, "makes it harder to reject the null hypothesis" that "the trading data reflected a market making strategy rather than downward spoofing."[124] Prof. Hendershott, in the *Lek Securities* case for example, found roughly an equal number of downward spoofs as he did upward spoofs[125] yet that did not deter Prof. Hendershott's ultimate conclusion regarding downward spoofs that the "patterns… identif[ied] are unlikely to have arisen unintentionally and are not consistent with market making."[126]

[123] Hendershott Report, Footnote 84.
[124] Hendershott Report, Footnote 88.
[125] Hendershott Lek Securities Expert Witness Report, Exhibit 4.
[126] Hendershott Lek Securities Expert Witness Report, ¶ 48.

74. To the contrary, instead of a test of market making, the contention in the Hendershott Report that upward spoofs are found when applying the Posting and Quantity Methodologies to a different setting serves to bolster the validity of my Methodologies. Previous court cases have shown that in certain circumstances downward spoofers have also engaged in upward spoofing.[127] Thus, the fact that the two Methodologies may also detect upward spoofing provides external validation to the Methodologies.

75. Furthermore, when Prof. Hendershott suggests that the potential finding of upward spoofing is somehow inconsistent with Harrington's downward spoofing claims,[128] he fails to take into account that the presence of upward spoofs could further drive the price down, even if by design they are meant to have a short-term positive price impact. As Prof. Hendershott states in his *Lek Securities* expert witness report:[129]

> Layering can harm other traders and the market as a whole in several ways. First, limit orders that are not intended to execute can create false information, and increase uncertainty about true supply and demand. As most market makers are risk-averse, the imbalances created by layering expose them to more risk.[130] As a result, market makers may quote a wider spread. As market orders arrive, the prices at which they execute will be worse. Such a reduction in market liquidity is a possible economic harm of layering. This can lead liquidity providers to place smaller orders and/or orders at inferior prices, and can also make it harder for other traders to fill

---

[127] See, for example, Securities and Exchange Commission v. Lek Securities Corporation, et al (2019) (612 F. Supp. 3d 287 (S.D.N.Y. 2020)).
[128] Hendershott Report, ¶ 62.
[129] Hendershott Lek Securities Expert Witness Report, ¶ 45 [Original footnotes numbered 35 and 36].
[130] Hendershott, T., and Menkveld, A., 2014. Price Pressures. *Journal of Financial Economics 114*(3), pp. 405-423.

> their orders at desirable prices. This decreases market liquidity and increases trading costs for investors.[131]

76. And:[132]

> Third, false information about supply and demand may degrade market integrity, as investors are less certain that they can observe accurate prices. In deciding whether to buy stocks, investors factor in the risk of being cheated.[133] Reduced trust in the market can lead to reduced participation (or complete withdrawal) by investors.[134] Lower market participation causes direct harm to the withdrawing investors, and indirect harm to all other investors (due to fewer investors with whom they can trade).[135] In an attempt to quantify the impact of reduced trust, the academic literature indicates that the lack of trust amplifies the effect of costly participation. In particular, if an investor thinks that there is a 2% probability that he will be cheated, the threshold level of wealth beyond which he invests in the stock market will increase fivefold.[136]

77. It is a small extension, that is well grounded in academic work, to see how the increase in information ambiguity, can harm the stock price.[137] Importantly, market participants

---

[131] Cumming, D., Johan, S., and Li, D., 2011. Exchange trading rules and stock market liquidity. *Journal of Financial Economics 99*(3), p. 665 find that stock exchanges with rules prohibiting spoofing and layering have higher liquidity and lower trading costs.

[132] Hendershott Lek Securities Expert Witness Report, ¶ 47 [Original footnotes numbered 37-40].

[133] Guiso, L., Sepienza, P., and Zingales, L., 2008. Trusting the Stock Market. *Journal of Finance 63*(6), p. 2557.

[134] See: Giannetti, M., and Wang, T., 2016. Corporate Scandals and Household Stock Market Participation. *Journal of Finance 71*(6), p. 2628.

[135] Mendelson, H., 1982. Market behavior in a clearing house. *Econometrica 50*(6), pp. 1505-1524

[136] Guiso, L., Sepienza, P., and Zingales, L., 2008. Trusting the Stock Market. *Journal of Finance 63*(6), p. 2558.

[137] See, for example, Epstein, L., and Schneider, M., 2008. Ambiguity, information quality, and asset pricing. *Journal of Finance 63*(1). pp. 197-228.

respond to ambiguity about positive and negative news differently. They “react more strongly to bad news than to good news” and so “shocks to information quality can have persistent negative effects on prices even if fundamentals do not change.”[138]

78. In conclusion, the argument presented in the Hendershott Report—that my analysis is somehow incomplete or unreliable due to the exclusive focus on downward spoofing—is unsubstantiated and misguided. The Methodologies I employed accurately and comprehensively address the specific allegations of downward spoofing behavior pertinent to this litigation. The presence or absence of upward spoofing events does not impact the integrity or reliability of my findings regarding downward spoofing. Thus, my analysis provides robust, reliable conclusions relevant to the issues at hand.

## B. A corporate-level analysis is a valid and a more conservative approach to analyzing the data than would be an intra-firm approach

79. In this section, I address the criticisms in the Hendershott Report concerning my choice to conduct a corporate-level analysis rather than an intra-firm or individual trader-level analysis. Specifically, the Hendershott Report argues that aggregating the trading activities of affiliated entities or different traders within a firm undermines the validity of my analysis. Contrary to these assertions, I explain why a corporate-level approach is both valid and conservative, supported by regulatory precedent, and particularly appropriate given the realities of trading practices within interconnected corporate entities. I further demonstrate, through concrete examples and previous enforcement cases, that analyzing

---

[138] Epstein, L., and Schneider, M., 2008. Ambiguity, information quality, and asset pricing. *Journal of Finance 63*(1), p. 197.

manipulative trading at the corporate rather than individual level is not only methodologically sound but is often necessary and standard practice in identifying coordinated spoofing activities.

80. The Hendershott Report argues that performing this analysis at the corporate level for [redacted] is invalid, and that treating the trading activities for [redacted] and [redacted] together is likewise invalid.[139] However, once again this blanket assertion by the Hendershott Report misrepresents the choices that I made in performing my analysis, ignores concrete evidence regarding the relationship between [redacted] and [redacted] and completely disregards well known evidence from past enforcement actions and spoofing cases.

81. Before examining those unsupported assertions, it is important to recognize that by performing my analysis at the corporate level, my approach is more conservative. An entity has responsibility for ensuring that it has designed its strategies (and those of the other entities it controls) in such a way that they avoid market manipulation, and failure to do so (*i.e.*, when strategies coincide in a manipulative manner) still reflects intent to manipulate markets.[140] Thus, it does not matter whether this analysis is done on an individual-level or corporate-level, because it results in manipulative behavior regardless.

82. To better understand why my approach is more conservative, consider a situation in which one trader at a company is engaged in spoofing, but the rest are not. The spoofing trader's order book imbalance, and before and after a buy execution behavior, will be harder to

---

[139] Hendershott Report, ¶ 64-65.

[140] *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980) (finding that an employer can be liable for the actions of its employees where the acts of the employee can fairly be considered to be within the scope of their employment); *see also In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (imputing scienter to a parent company based on allegations demonstrating the parent company's familiarity with the subsidiary's operations and, ultimately, its misconduct); Commodity Futures Trading Commission, September 29, 2020. Order in the Matter of JPMorgan Chase & Co., et al. p 4. *Available at:* https://www.cftc.gov/media/4826/enfjpmorganchaseorder092920/download. Last Visited April 24, 2025.

detect as it will be masked by the activity of the other traders. In such a hypothetical, if the spoofing is occurring by one trader when there are many traders in a security, my Methodologies would only detect and isolate spoofing when the spoofer's activities overwhelm the activities of the other traders, or when there is concerted and coordinated activity between traders.

83. The Hendershott Report begins this line of reasoning by stating that because I "lack[] trader-level information"[141] that I am "unable to discern whether the allegedly non–bona fide sell orders and executing buy transactions can be linked to the same strategy or trader."[142] However this is an inaccurate conclusion—a sleight of hand. As discussed above, entities are responsible for ensuring that their trading is not manipulative, and I have clearly shown that these corporate entities used non-bona fide sell orders to benefit themselves in executing their buy transactions.

84. The Hendershott Report makes two specific claims about the firms I have identified as involved in spoofing. The first is that [redacted] and [redacted] cannot be treated "as if they belong to a single decision-maker"[143] and the second that it is "without basis that all of [redacted] trading activities reflect a single trading strategy."[144]

85. The mere assertion of the existence of two separate entities in no way proves that these entities were not inextricably intertwined whether in their personnel, operations, trading strategies, or otherwise, and the Hendershott Report fails to provide any evidence that these

[141] Hendershott Report, ¶ 64.
[142] Hendershott Report, ¶ 64.
[143] Hendershott Report, ¶ 64.
[144] Hendershott Report, ¶ 64.

entities were operating independently. He also failed to provide any evidence or analysis that these firms were "using independent strategies;" he simply claims it to be true.[145]

86. To start with, [redacted] is a "wholly owned subsidiary" of [redacted] with the same CEO, the same CTO and additional executive overlap.[146] They both operated from the same physical address, and even from the same floor in that building.[147] Further, [redacted] and [redacted] "were customers of BofA Securities and sent their orders to BofA Securities."[148]

87. In a comment letter to the SEC, [redacted] described itself as "[redacted] through its wholly-owned subsidiary [redacted] is an automated, quantitative trading firm."[149] A 2018 NYSE disciplinary filing (covering the 2015–2016 period) explicitly notes "[redacted] does not have customers, and trades only on a proprietary basis."[150] Given that [redacted] is a wholly owned subsidiary of [redacted] this means that [redacted] was trading solely for the benefit of [redacted]

88. As per [redacted] audited financial statements, the firm had an "expense sharing agreement with its Parent" that provided [redacted] with intellectual property (software and trading algorithms), administrative services and office space.[151] [redacted] would reimburse [redacted] for

---

[145] Hendershott Report, ¶ 64.

[146] [redacted] May 27, 2021. SEC Comment Letter. *Available at:* [redacted] Last Visited April 23, 2025.

[147] [redacted] May 27, 2021. SEC Comment Letter. *Available at:* [redacted] Last Visited April 23, 2025.; [redacted] Contact Us Webpage. *Available at:* [redacted] Last Visited April 24, 2025; [redacted] FINRA BrokerCheck Report. *Available at:* [redacted] Last Visited April 24, 2025.

[148] Late [redacted] Declaration, ¶ 3.

[149] [redacted] May 27, 2021. SEC Comment Letter. *Available* [redacted] Last Visited April 23, 2025.

[150] [redacted] December 6, 2018. NYSE Letter of Acceptance, Waiver, and Consent. *Available at:* [redacted] Last Visited April 23, 2025.

[151] [redacted] December 31, 2016. Statement of Financial Condition. *Available at*: [redacted] Last Visited April 24, 2025.

these costs.[152] Based on this language, it appears that [redacted] trading strategies either derived from [redacted] algorithms or that [redacted] provided the algorithms and [redacted] provided the execution services and strategies.[153] This is further bolstered by the language in the comment letter cited above, that [redacted] operated as an "automated quantitative trading firm" "through its wholly-owned subsidiary [redacted]."[154]

89. "[redacted] and [redacted] utilized the same general trading strategies,"[155] according to the [redacted] Declaration, and the Hendershott Report explains that "[redacted] traded only in the Canadian equity markets while [redacted] traded only in the U.S. equity market."[156]

90. Counsel has informed me that Harrington argued, and the court agreed, it was highly unlikely that orders would be submitted at the exact same millisecond without some level of coordination or shared trading strategies. The de-anonymized indicators for [redacted] and [redacted] were made available after an analysis showed matched-millisecond orders coming from the two entities. That is, orders from [redacted] and [redacted] were observed to be arriving at Merrill in the same millisecond. I agree with that argument, and as Merrill's subsequent deanonymization revealed, the argument was correct, in that [redacted] and [redacted] were separate entities but in fact related.

91. Given the representations in the [redacted] Declaration, the description of their relationship in the [redacted] comment letter, the millisecond-level matched orders, and the geographic

---

[152] [redacted] December 31, 2016. Statement of Financial Condition. *Available at*: [redacted] Last Visited April 24, 2025.

[153] [redacted] December 31, 2016. Statement of Financial Condition, *available at*: [redacted] Last Visited April 24, 2025.

[154] [redacted] May 27, 2021. SEC Comment Letter. *Available at:*[redacted] Last Visited April 23, 2025.

[155] [redacted] Declaration, September 9, 2024.

[156] Hendershott Report, Footnote 30.

separation claimed by the Hendershott report, the evidence quite clearly points to shared trading strategies that were coordinated between the two entities.

92. The Hendershott Report also claims that [redacted] trading activities cannot be analyzed at a corporate level,[157] and that to allege spoofing one must analyze each trader or strategy separately.[158] In fact, it is quite the opposite — CIBC's view of [redacted] trading would have been at the firm-level. This is a case about a broker's gatekeeping responsibility, and as such I must analyze the data as the broker saw it. Since I have the raw data that CIBC provided, and there are no individual trader or desk IDs, CIBC would have been unable to analyze data at any level other than the corporate level, unless it conducted a further investigation. Likewise, with respect to [redacted] it is not appropriate to analyze the raw data that Merrill provided at a level more granular than the corporate level (given that it would not have been seen and analyzed by Merrill at any other level, unless Merrill conducted a further investigation) and, as previously discussed, it is appropriate to treat [redacted] as a singular entity. In any event, there are previous examples of spoofing enforcement that span traders, trading desks, and geographic locations. These include JP Morgan's spoofing of precious metals and US treasuries markets and Swift's spoofing of equities. These examples support my approach to analyze behavior at the corporate level, given that spoofing can span multiple traders and even occur across geographic locations.

93. In the JP Morgan case, the Department of Justice described how "numerous traders and sales personnel on JPMorgan's precious metals desk located in New York, London, and Singapore engaged in a scheme to defraud in connection with the purchase and sale of gold, silver, platinum, and palladium futures contracts (collectively, precious metals futures

[157] Hendershott Report, ¶ 64.
[158] Hendershott Report, ¶ 65.

contracts) that traded on the New York Mercantile Exchange Inc. and Commodity Exchange Inc."[159] The CFTC describes JP Morgan's misconduct in detail, describing how it was "carried out by numerous traders."[160] Swift Trading similarly was found to be involved in spoofing based on an analysis at the corporate level.[161, 162] The FCA found that "the manipulative trading was undertaken by many individual traders, sometimes acting in concert with each other, and was widespread across many trading locations worldwide. Swift Trade disseminated this trading strategy to individual traders and trading locations."[163] This manipulation was only detected by the LSE when analyzing the totality of Swift's behavior via its DMA provider — a similar approach to the one that I have taken. In one example, "Swift Trade's trading activity involved three different office locations (two in China, and one in Canada) and 19 individual traders."[164] The Swift Trading example is thus further evidence that an analysis at the corporate level is not only sufficient, but also at times necessary.

94. Finally, Merrill and CIBC only provided entity level data, not by trader- or strategy-level. They were responsible for monitoring their platforms for manipulative behavior, and I have

---

[159] JP Morgan Chase & Co. Agrees To Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets, September 29, 2020. *Available at:* https://www.justice.gov/archives/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us. Last Visited April 23, 2025.

[160] Commodity Futures Trading Commission, September 29, 2020. Order in the Matter of JPMorgan Chase & Co., et al. p 4. *Available at:* https://www.cftc.gov/media/4826/enfjpmorganchaseorder092920/download. Last Visited April 23, 2025.

[161] Financial Conduct Authority, May 6, 2011. Decision Notice for Canada Inc. formerly carrying on business as Swift Trade Inc c/o BRMS Holdings Inc. *Available at*: https://www.fca.org.uk/publication/decision-notices/swift_trade.pdf. Last Visited April 23, 2025.

[162] Note that the Swift Trading case refers to Layering, which, as outlined in the Initial Reports, is a type of spoofing.

[163] Financial Conduct Authority, May 6, 2011. Decision Notice for Canada Inc. formerly carrying on business as Swift Trade Inc c/o BRMS Holdings Inc. p. 2. *Available at*: https://www.fca.org.uk/publication/decision-notices/swift_trade.pdf. Last Visited April 23, 2025.

[164] Financial Conduct Authority, May 6, 2011. Decision Notice for Canada Inc. formerly carrying on business as Swift Trade Inc c/o BRMS Holdings Inc. 4.24. *Available at*: https://www.fca.org.uk/publication/decision-notices/swift_trade.pdf. Last Visited April 23, 2025.

demonstrated that, using the data they had access to, there was evidence of spoofing. In conclusion, the criticisms in the Hendershott Report regarding my corporate-level analysis are fundamentally misplaced and ignore both regulatory practice and the realities of institutional trading behaviors. My analysis appropriately treats affiliated corporate entities and interconnected trading activities within a firm as cohesive units, consistent with past enforcement actions and market norms. This corporate-level approach ensures a comprehensive and conservative evaluation of spoofing behavior, effectively capturing coordinated manipulative practices. Therefore, my methodological choices are valid, justified, and align with established regulatory standards, rendering the Hendershott Report's objections invalid.

## C. Removal of Minimum Quantity Threshold (MQT) orders as suggested by the Hendershott Report is incorrect

95. In this section, I respond directly to the criticisms raised by the Hendershott Report regarding the inclusion of Minimum Quantity Threshold (MQT) orders in my analysis. The Hendershott Report incorrectly asserts that I "erroneously include[d] MQT orders."[165] Here, I clarify the misunderstanding and provide empirical evidence demonstrating that an order being MQT does not mean it was hidden. I support my argument with detailed data analysis, showing how MQT orders functioned in practice, thereby justifying their inclusion in my spoofing detection Methodologies where they were indicated as visible (e.g. not post-only, Immediate-or-Cancel, hidden, or dark pools).

[165] Hendershott Report, ¶ 75.

96. The Hendershott Report asserts that "Because MQT orders cannot be executed unless the minimum quantity threshold is reached, the order quantity cannot be shown on the visible limit order book."[166] This assertion is factually incorrect and reflects a fundamental misunderstanding of how the MQT orders in the Merrill data functioned in practice. Below I present analysis that shows, contrary to the Hendershott Report's claim that 0% of MQT orders in my analysis were visible on the limit order book, that more than 74% of these orders can be reliably traced from the Merrill data to publicly available data.[167, 168]

97. The Hendershott Report relies on the exchange definitions for how MQT designated orders behave at the exchanges. However, the data are from the Defendants, which are brokers. The exchange definitions therefore do not control what actually occurred. Instead, my analysis evaluated how these orders were ultimately handled.

98. To evaluate the visibility of MQT New Order messages[169], I tested whether they are observable in the public limit order book. I began by evaluating all Merrill New Order messages with the MQT designation. To identify a match, I required that date, price, size, and side variables be identical, and that the timestamp be within one millisecond of the corresponding public limit order book timestamp. Applying these criteria, I found that

---

[166] Hendershott Report, ¶ 75.

[167] The tracing could very well be higher but for the Merrill timestamp issues discussed in detail in the Initial Report for Merrill Section III.B.iii and in **Section III.D** in this Reply Report.

[168] A publicly disseminated limit order book refers to the real-time display of limit orders submitted to an exchange or trading venue that are made publicly available to market participants. Importantly, the public order book only reflects orders that are eligible for dissemination under exchange and regulatory rules. Orders that are non-displayed or held in dark pools do not appear in the publicly disseminated limit order book (see https://www.ecfr.gov/current/title-17/chapter-I/part-43. Last Visited April 25, 2025); The publicly disseminated limit order book data I relied on came from OneTick; The trading data provided by Merrill refers to the order book data provided by Merrill in Discovery.

[169] This includes the New order portion of a Cancel/Replace.

406,777 of the 547,985[170] messages, or 74.23%, matched entries on the public limit order book.

99. As over half of the MQT orders take on common share sizes, such as 100, 200, or 500, it is possible that the results with incorrectly matching with other orders in the visible limit order book. I therefore repeated the same analysis as in the previous paragraph, but excluded the common share sizes of 100, 200, and 500. The results show an increased match rate of 77.2% for the 203,571 messages.

100. I further tested the validity of the analysis by restricting the sample of MQT designated New Order messages to odd-lot sizes—those not evenly divisible by 100. This Odd lots only analysis yielded a 97.18% match rate of the 29,934 Odd lot MQT New Order messages.

101. To further validate the visibility of the MQT orders, I conducted additional analysis for each test. Specifically, for each public order that had been successfully matched to an MQT order, I examined whether that same public order could plausibly be attributed to any other visible Merrill order in the provided data. This secondary matching process was designed to test the exclusivity of the initial match.

102. In the first test, which included all MQT orders, I found that only 10.3% of the matched public orders could have originated from other Merrill orders. In the second test, which excluded common order sizes (100, 200, and 500 shares), this number dropped to 8.4%. In the third test, limited to odd-lot orders (sizes not evenly divisible by 100), there were no

[170] There are 547,985 MQT-designated New Order messages after excluding IOC, Post-Only, Hidden, Dark Pool, and orders with timestamps suspected to be impacted by order batching (those with a timestamp ending in 999 or 000).

alternative Merrill orders that matched. These results reinforce the conclusion that the MQT orders were indeed visible in the public market data.

103. Examples of these matches at each test level can be found in **Exhibit 3.** This exhibit presents examples of the three matching tests conducted to compare the MQT-designated New Order messages with entries in the public limit order book. Each table corresponds to a matching criterion. Table 1 includes all MQT orders, Table 2 is limited to orders with non-common sizes, and Table 3 uses solely odd-lot orders. Each table provides side-by-side comparisons of matched orders from Merrill and the public limit order book. They illustrate representative examples of how closely the MQT orders align with public market activity under each test condition.

104. In conclusion, the Hendershott Report's suggestion that MQT orders should be excluded from my analysis is incorrect and based on a fundamental misinterpretation of their visibility in actual trading environments. My thorough empirical examination confirms that MQT orders were indeed not always hidden, making their inclusion essential for an accurate and comprehensive analysis. As a result, my decision to incorporate these orders was methodologically sound and correct, discrediting yet another unsubstantiated assertion presented in the Hendershott Report.

## D. The Hendershott Report fails to provide systematic evidence of any mishandling of same-millisecond ordering that would meaningfully change my conclusions

105. In this section, I address the criticism from the Hendershott Report regarding my handling of same-millisecond message ordering, specifically the allegation that my sequencing

assumptions are flawed and significantly impact the reliability of my analysis. Here, I explain why my original assumptions regarding the sequencing of New Order, Cancel Order, and Execution messages at identical timestamps were both reasonable and methodologically sound given the data provided. Moreover, I provide new analyses using alternative sequencing assumptions, demonstrating that the conclusions in my Initial Reports remain robust and materially unaffected even when adjusting the order of these messages. I further highlight critical inaccuracies and logical flaws in the alternative assumptions presented by the Hendershott Report.

106. The Hendershott Report mistakenly purports that the sequencing of same-timestamp data in the Initial Reports are flawed.[171] As I was not provided an explanation on how to accurately sequence same-timestamp data from either of the defendants, the Initial Reports made a reasonable assumption regarding the sequencing of messages. Far from being a "baseless assumption"[172] as Prof. Hendershott claims, I assumed that messages occurring at the same millisecond were sequenced as New Order messages coming first, then Cancel Order messages, and finally Execution messages. This is in line with the standard lifecycle of an order in which the New Order message must come before the order can be canceled or executed.

107. The Hendershott Report uses new information from a declaration made by [redacted] on March 7, 2025 (the "Late [redacted] Declaration") regarding the sequencing of messages that was not available at the time of the Initial Reports. Specifically, there are three instances of messages with alleged microsecond precision (the "Excerpts") that occurred during

---

[171] Hendershott Report, ¶ 78.
[172] Hendershott Report, ¶ 78.

episodes the Initial Report for Merrill found to be consistent with spoofing.[173] Importantly, [redacted] has provided only the alleged Excerpts, and not the underlying data files themselves, neither as it relates to the Excerpts specifically, nor, more importantly, for all of [redacted] trading activity in Concordia during the Relevant Period; as such I have no way of testing the validity of these belated claims as the data were not provided. In any event, even if the Excerpts in the Late [redacted] Declaration are accurate, they do not serve to undermine the analysis set forth in the either of the Initial Reports (of course, the Late [redacted] Declaration does not relate to [redacted] trading activity through defendant CIBC, but only to [redacted] trading activity through defendant Merrill).

108. Despite there being only three examples, Prof. Hendershott claims that the Late [redacted] Declaration represents, "evidence show[ing] that Prof. Brogaard's assumption that order placements always precede executions within the same millisecond is incorrect."[174] However, the other [redacted] spoofing episodes found for [redacted] were not questioned. In addition, neither Defendant provided additional information on a more accurate approach to sequence the same millisecond data.

109. The Hendershott Report first criticizes my approach to sequencing as "baseless,"[175] despite being grounded in the standard lifecycle of an order, and then offers a completely arbitrary alternative, detached from the reality of order lifecycles. For the purpose of addressing the Hendershott Report's criticism, I performed a counter-analysis, which is a slightly tweaked application of the same-millisecond sequencing. In so doing, I used a different assumption than the one made by the Hendershott Report in which it nonsensically assumes that, where

[173] There are 1,000 microseconds in a millisecond. The data provided by the Defendants had millisecond timestamp precision.
[174] Hendershott Report, ¶ 81.
[175] Hendershott Report, ¶ 78.

orders and executions had the same timestamps down to the millisecond, "executions occurred *before* all order placements rather than after."[176] In an attempt to preserve the original order in which the data was provided, I created a simple numbering system—what I'll refer to as an "index"—to track the sequence of records across all the data files sent by Merrill.

110. This was necessary due to the manner in which Merrill produced trade and order data in a series of separate productions of data in varying formats, each consisting of multiple CSV files with order and trade records. The various productions mixed together previously shared messages with new messages. Because some files had duplicates or unusable entries, the analysis in the Initial Reports needed to merge the usable data into a single, clean dataset for analysis.[177] Given that Merrill did not itself disclose a way to "correctly" sequence data that have the same millisecond, I simply used the order in which Merrill provided the data to the Plaintiffs.

111. To do this, I assigned a unique index number to each row based on where it appeared in the original files. For example, the very first row in the first file received the index value of 1. If that first file had 53,135 rows, then the first row in the second file would receive an index value of 53,136—picking up exactly where the previous file left off. I continued this approach through all the files, right up to the final record in the last file, which received the index value of 48,658,962.[178] I also created this index for the CIBC data, although it

---

[176] Hendershott Report, ¶ 84.

[177] I discuss the data deficiencies and assumptions made for creating a clean dataset in Exhibit 4 of the Initial Report for Merrill.

[178] While enhancing the sequencing method, I also introduce a sequencing approach for the code (make_nbbo_dataset.do at lines 11-12, & 38) used in creating the NBBO file nbbo_2016_one_taq.dta. Specifically, I created a similar index variable using the original sequencing of the data provided by OneTick and TAQ. These adjustments (i) alleviate the randomization component that was previously observed in the Stata code and (ii) accordingly, ensure exact reproducibility. To be clear, the variability that had exists had a

does not appear to suffer from most of the complications present in the Merrill productions.[179]

112. This index allowed me to sort and analyze the data in a way that mirrors the order in which the Defendants originally produced it.[180] When there were multiple records with the exact same timestamp, I used this index to preserve the (presumably) intended sequence of events. When I used the Posting and Quantity Methodologies from the Initial Reports on these datasets in which order and execution messages with identical timestamps messages were sorted using this sequencing index, I found no material difference on the results or conclusions found in the Initial Reports. The results show that [redacted] of the spoofing episodes reported in the Initial Reports for [redacted] were no longer identified, but [redacted] other spoofing episodes were identified for a net decrease of [redacted] spoofing episodes. Further, [redacted] of the spoofing episodes reported in the Initial Reports for [redacted] are no longer identified, and [redacted] other spoofing episode was identified for a net decrease of [redacted] spoofing episodes. These results confirm the soundness of my approach in the Initial Reports.[181]

113. Finally, The Hendershott Report thinks it is a worthwhile exercise to assume that "if the messages shared a timestamp, the executions occurred *before* all order placements rather than after."[182] This suggested alternative sequencing of the data from the defendants

---

*de minimis* effect on the precise spoofing episodes and no effect on the conclusions drawn in the Initial Reports. Nonetheless, this tweaked approach addresses the concern about exact replicability raised in the Hendershott Report, Footnote 73 and Footnote 107, and under this approach, those concerns are no longer applicable.

[179] The creation of this variable is created at the very beginning of the CIBC_Dataset_Cleaning_Final.do and Tagging_Merrill.do files at lines 19-32 and 26-43 respectively.

[180] In the first step of the analysis, which transforms the data produced by the Defendants into usable datasets, if multiple messages for the same order occur in the same millisecond, I order the New Order coming before a Cancel and/or an Execution. Note, that a Cancel/Replace message is a distinct order whose index ordering is unchanged by the operations described in the previous sentence. Thereafter, the code uses the new sequencing assumption to sort the same-millisecond data.

[181] Exhibit 4 replicates the tables from the Initial Reports Sections III.C and III.D.

[182] Hendershott Report, ¶ 84.

ignores the lifecycle of an order, and is an example of the unreliability of the empirical analysis conducted in the Hendershott Report.[183] An execution of a given order cannot occur before the New Order message. While the sequencing assumed in the Initial Reports is sensible, particularly given the lack of clarity provided by the Defendants, the one emphasized and analyzed in the Hendershott Report is impossible if the entire lifecycle of an order occurred within the same timestamp.

114. In conclusion, the Hendershott Report's criticism regarding same-millisecond message sequencing is fundamentally unsupported by both logic and empirical analysis. My careful evaluation and alternative sequencing scenarios clearly demonstrate that my original conclusions regarding spoofing activity remain robust and consistent, even under different sequencing assumptions. The minor adjustments resulting from alternative sequencing are immaterial to the overall findings, underscoring the reliability of my Methodologies. Therefore, the Hendershott Report's assertions regarding sequencing inaccuracies are both overstated and demonstrably incorrect.

## E. Latency between the US and Canadian markets are excluded by design so as to more accurately analyze the Defendant's data

115. In this section, I respond to the Hendershott Report's claim that my analysis improperly excluded considerations of latency between the U.S. and Canadian markets. The criticism suggests that my decision to omit latency adjustments potentially undermines the accuracy

[183] The Hendershott Report, in Footnote 111 shows some awareness of the issue, stating, "an order cannot be canceled or executed before it is placed." Nonetheless, Prof. Hendershott chose to proceed anyway.

and reliability of my analysis. Here, I explain why explicitly incorporating cross-border latency was unnecessary and would not have materially affected my conclusions.

116. The Hendershott Report incorrectly claims that assumptions were made in my Initial Report that were never made Specifically in this case that my "analysis incorrectly assumes that orders are instantaneously shown to the market and that market participants also can see the order information and react to it instantaneously."[184] Neither of these supposed assumptions were made. My arguments do not require instantaneous appearance of data or reaction times by participants—they simply require that those times are not material to the timestamp resolution of the data I have received. High-frequency trading systems can respond to order flow in well under a millisecond,[185] and the Merrill timestamps were millisecond-level timestamps.

117. Merrill, on the other hand, did have trading of Concordia on both the US and Canadian markets. The Initial Reports purposefully did not make an adjustment for lead-lag time between Canada and US messages. As discussed in the Initial Report for Merrill, the data was suspected of batching messages into timestamp buckets. Because of the timestamp batching, it was not appropriate to make a latency adjustment for a likely single-digit millisecond cross-border message latency.

118. The Hendershott Report fails to show any examples of spoofing episodes that would be invalidated by a latency adjustment on the order of magnitude of the cross-border latency between the US and Canada.

---

[184] Hendershott Report, ¶ 76.

[185] "[A]nalysis suggests that HFT response times are on the order of microseconds" - Menkveld, A., 2016. The Economics of High-Frequency Trading: Taking Stock. *Annual Review of Financial Economics 8*, p. 8.

119. All of the message activity for CIBC were exclusively occurring in the Canadian markets. As such, cross-border latency is irrelevant. While a latency still exists within Canada, the Hendershott Report correctly ignores this as it is extremely likely to be so small as to be immaterial. The Hendershott Report therefore implicitly agrees that the CIBC timestamps were handled correctly in the Initial Report.

In conclusion, the assertion made in the Hendershott Report regarding the need to account for latency between the U.S. and Canadian markets is unfounded. My methodological choice to omit latency adjustments was both deliberate and appropriate. Consequently, my approach remains sound, justified, and materially unaffected by the criticisms raised by the Hendershott Report.

## F. Non-visible sell-side orders during some spoofing episodes are overstated and irrelevant

120. In this section, I address and correct significant mischaracterizations made in the Hendershott Report regarding the prevalence and implications of non-visible sell-side orders, such as hidden, iceberg, and immediate-or-cancel ("IOC") orders, ("Non-Visible Orders") in my spoofing analysis. The Hendershott Report significantly mischaracterizes and overstates the presence and importance of Non-Visible sell-side Orders during several alleged spoofing episodes, resulting from fundamental data misclassifications and analytical errors. The Hendershott Report erroneously classifies MQT and Iceberg orders in the Defendants' data as hidden or partially hidden, inflating their frequency. Beyond these data inaccuracies, the Report's broader contention that the mere presence of hidden,

IOC, or partially executed sell orders inherently indicates genuine intent to sell is fundamentally flawed. Such orders may be placed for reasons unrelated to genuine execution intent, and their existence alone neither disproves nor nullifies spoofing behavior. Ultimately, the mere presence of Non-Visible Orders should not immunize traders from spoofing liability or overshadow more compelling evidence derived from broader trading behaviors and message patterns.

### i. The Hendershott Report misconstrues and/or ignores the data

121. The numerical claims presented by the Hendershott Report substantially overstate the presence of Non-Visible Orders due to fundamental data misclassifications, leading to a misleading portrayal of trading activity. The Hendershott Report asserts that "the presence of hidden sell orders…suggests the customer had a genuine intent to sell during the majority of alleged spoofing episodes."[186] This conclusion is flawed.

122. The Hendershott Report misclassified order types. The Hendershott Report treated MQT orders as hidden which I have shown to be false in **Section III.C.** and mischaracterizes the designation of Iceberg orders in my Initial Reports. The Iceberg designation in my Initial Reports arises solely from [redacted] population of the FIX protocol field *MaxFloor* setting the display quantity equal to the total order size, which falsely triggers an iceberg classification.[187]

[186] Hendershott Report, ¶ 99.
[187] CIBC Initial Report, Footnote 35.

123. The Hendershott Report claims that 94% of the [redacted] spoofing episodes contained Hidden Orders.[188] However, this claim is patently false because Prof. Hendershott includes MQT-designated orders in his definition of a Hidden Orders. As discussed in **Section III.C** the MQT-designated orders in the data provided by Merrill are not necessarily hidden to other market participants. Handling MQT-designated orders correctly by not classifying them as Hidden, shows that only 54% of the [redacted] spoofing episodes contained a hidden or dark pool sell-side order.

124. The Hendershott Report mischaracterizes the Iceberg variable that I created in my initial analysis as flagging orders that contain “both 'hidden' and 'displayed' liquidity, with only a portion of the overall quantity displayed to the market.”[189] While that is indeed the definition of an Iceberg order, it does not consider the nuance of the data provided by CIBC and my analysis.

125. I defined the Iceberg variable for the CIBC data as equal to the *MaxFloor* variable, if the *MaxFloor* variable is filled in with a value greater than 0.[190] The Hendershott Report appears to have incorrectly used the *MaxFoor* variable to determine what percentage of spoofing episodes contained iceberg orders. This shows a lack of basic understanding of data. The CIBC data for [redacted] shows that in every instance where an order was flagged as an Iceberg, the display size was in fact equivalent to the total order size. This means that there were no orders from [redacted] that were partially hidden. The Hendershott Report’s claim, that 82% of [redacted] spoofing episodes contained sell-side orders with “both ‘hidden’

---

[188] Hendershott Report, Figure 2.
[189] Hendershott Report, ¶ 98(b).
[190] Initial Report for CIBC, Footnote 35.

and 'displayed' liquidity,"[191, 192] is therefore fundamentally flawed. When considering the actual nature of the data, I find that 0% of [redacted] spoofing episodes contained sell-side orders with partially hidden sizes.

126. After taking into account the true behavior of [redacted] MQT orders and [redacted] Iceberg orders, the percentage of spoofs with hidden or dark pool sell-side quantity are 54% and 2% respectively. The percentage of spoofs with sell-side IOC orders are 17% and 6% of [redacted] and [redacted] respectively. And there were no genuine sell-side iceberg orders in the spoofing episodes of either customer. The Hendershott Report vastly overstates the frequency of Non-Visible Orders.

### ii. The Hendershott Report's Non-Visible Order contentions are inaccurate

127. The mere use of hidden, IOC, iceberg, or partially executed orders does not invalidate findings of spoofing. There are reasons to employ these orders beyond genuine execution intent. Moreover, allowing the mere presence of hidden orders to serve as a shield against spoofing liability would effectively grant manipulators immunity from accountability.

128. Non-Visible Orders can also be used for reasons other than a desire to execute. For instance, they could be used to search for hidden liquidity. For example, Hautsch and Huang (2012) describe why IOCs may be regularly used for reasons other than an intent to execute. Hautsch and Huang (2012) state, "HFT trading algorithms also embed strategies for detecting hidden depth, such as 'pinging', where visible (e.g., so-called Immediate-or-

[191] Hendershott Report, Figure 2.
[192] Hendershott Report, ¶ 98(b).

Cancel; IOC) limit orders are posted in the spread in order to test whether they might get executed."[193] Thus, there are other possible explanations for Non-Visible Orders which clearly undermine the unsupported contention in the Hendershott Report that "the presence of hidden sell orders … cannot be spoofing"[194] and that such orders suggest "that the customer had a genuine intent to sell during the majority of alleged spoofing episodes."[195] The Hendershott Report performs no substantiative analysis of the characteristics of these Non-Visible Orders—such as examining their size, duration, or aggressiveness—that would provide indications of the purpose these orders.

129. The Hendershott Report alleges that the presence of partially executed sell-side orders in 1% or fewer spoofing episodes indicates genuine intent to sell.[196] However, the presence of some partially executed sell-side orders does not, by itself, establish genuine intent to sell. In my analysis outlined in the Initial Reports I only included orders that were placed within 10 cents of the National Best Bid/Offer. I did this to ensure that I only included orders that would have a significant effect on the market.[197] As discussed in detail in the Initial Reports, more aggressive orders should impact prices more.[198] Not surprising, sometimes these orders are executed. The fact that some of the sell-side orders may execute is accounted for in the Methodologies whereby I require at least a two-to-one buy execution to sell execution ratio.[199] That 1% or less of spoofing episodes contains a partially executed

[193] Hautsch, N., and Huang, R., 2012. On the Dark Side of the Market: Identifying and Analyzing Hidden Order Placements (No. 2012-014). SFB 649 Discussion Paper, p. 11.
[194] Hendershott Report, ¶ 99.
[195] Hendershott Report, ¶ 99.
[196] Hendershott Report, ¶ 101.
[197] Initial Reports, ¶ 54.
[198] Initial Reports, ¶ 23.
[199] Initial Reports, ¶¶ 66, 82.

sell-side order is negligible and given it still met all of at least one of the Methodology's criteria, must have been overshadowed by the amount of purchase executions.[200]

130. Even if some Non-Visible Orders or partially executed sell orders existed, their mere presence does not nullify intent found based on other message activity. If the mere presence of a Non-Visible Order or partially executed sell order was sufficient to nullify spoofing liability, it would essentially give a free pass to any future spoofer.

131. In addition, such orders could originate from other traders or desks within the firm. The firm may be engaging in a mixed strategy where some in the firm are engaged in spoofing while others are not. The fact that the firm does not only engage in spoofing does not nullify the fact that some in the firm did engage in spoofing.[201]

132. In conclusion, the Hendershott Report's contention that Non-Visible sell-side Orders indicate genuine selling intent and thus contradict my spoofing analysis is both inaccurate and unsupported by the data and academic literature. The Hendershott Report mishandles and mischaracterizes the data and therefore makes unreliable and unsupportable conclusions.[202] The Hendershott Report fails to detail any, "contradicting evidence in the trading data."[203] Contrary to, "ignor[ing] evidence,"[204] my detailed examination clearly demonstrates that hidden, iceberg, and IOC orders do not inherently indicate legitimate trading intent, nor do they undermine the detection of manipulative behavior. Consequently, the presence of such Non-Visible Orders does not alter or diminish the

---

[200] Prof. Hendershott, in his *Lek Securities* expert witness report, similarly allows for there to be some executions on the sell-side for downward spoofs. [Hendershott Lek Securities Expert Witness Report, ¶ 20.]
[201] Analyzing the data at the firm level is discussed in detail in **Section III.B** of this Reply Report.
[202] Such as that there are, "there are other factors present in the vast majority of alleged episodes that are consistent with legitimate trading." Hendershott Report, ¶ 102.
[203] Hendershott Report, ¶ 102.
[204] Hendershott Report, ¶ 102.

reliability of my conclusions regarding spoofing activity, making the criticisms presented by the Hendershott Report fundamentally flawed and irrelevant to the issues at hand.

## IV. The Hendershott Report makes Numerous Imprecise and Inaccurate Statements

133. In this section, I address numerous inaccurate and imprecise statements made throughout the Hendershott Report. This not an exhaustive list, as similar issues appear throughout the Hendershott Report. These inaccuracies include fundamental misunderstandings of my Methodologies, unsupported assertions about data handling, and misleading representations of both the scope and intent of my analysis. By methodically identifying and correcting these statements, I illustrate how the Hendershott Report's criticisms lack empirical foundation and logical consistency, thereby reinforcing the reliability and validity of my own Methodologies and conclusions.

134. The Hendershott Report places significant emphasis on the possibility of error rates and false positives. For example, it states that "[t]he occurrence of false positive episodes is particularly likely for the current matter because, as I explain below, firms engaging in algorithmic market making strategies tend to have trading characteristics that can easily be misinterpreted as spoofing."[205] Despite this assertion, the Hendershott Report does not provide a single example of the Methodologies giving a false positive, nor does it define what "particularly likely" means in this context or offer any quantification of such likelihood.

---

[205] Hendershott Report, ¶ 46.

135. The Hendershott Report suggests that my Methodologies "could be tested by applying it to a dataset with specific known episodes of spoofing."[206] However, this suggestion is not practical implementable and lacks context. The Hendershott Report does not address the central challenge that no such dataset of confirmed spoofing episodes currently exists. Without a reliable, independently validated benchmark of known spoofing instances, his proposed approach is misleading as it is not feasible in practice.

136. Although the issue of MQT orders is addressed in **Section III.C** above, it is worth highlighting the language used in The Hendershott Report. The Hendershott Report states that I "erroneously include[] MQT orders."[207] That is a strong claim, but one that is factually incorrect. There is no attempt to empirically test the assertion. There was no methodological error in including MQT orders. The issue I would like to highlight is that the Hendershott Report makes this assertion without conducting any apparent analysis or offering supporting evidence besides exchange-level definitions. This is an example of how the Hendershott Report makes categorical statements without empirical backing.

137. Shortly thereafter, in discussing the potential effects of latency on my analysis, the Hendershott Report references a quote from the Initial Reports stating that "the effect of those [Canadian] orders directly impacted trading in the U.S. on an essentially immediate basis."[208] The Hendershott Report counters that this claim is "not correct, because it takes time for information to travel from Canada to the U.S. and vice versa, which means that the market cannot react to such order information instantaneously."[209] However, this rebuttal misrepresents the original statements. I did not describe the impact as

[207] Hendershott Report, ¶ 75.
[207] Hendershott Report, ¶ 75.
[208] Initial Reports, ¶ 5.
[209] Hendershott Report, ¶ 77.

"instantaneous" —the Initial Report clearly uses the term "essentially immediate," a deliberate and accurate phrasing. The Hendershott Report's critique relies on a mischaracterization of my language and overlooks the technical accuracy of the statement as written.

138. The Hendershott Report incorrectly conflates the Quantity and Posting Methodologies by applying the criteria from the Quantity Methodology to the Posting Methodology.[210] This comparison is inappropriate. As discussed in **Section II.D**, the Quantity and Posting Methodologies are designed to detect different forms of manipulative behavior and are based on distinct analytical frameworks. As such, they use different criteria to assess changes in trading interest. Applying the assumptions or metrics from one Methodology to the other obscures their respective purposes and undermines the integrity of the analysis. The Hendershott Report's attempt to merge the two frameworks suggests a fundamental misunderstanding of the structure and intent of my Methodologies.

139. In discussing the two Methodologies used in the Initial Reports, the Hendershott Report claims that "each methodology relies on a different mechanism and often arrives at conflicting conclusions when analyzing the same trading data."[211] This statement is imprecise and misleading. Discrepancies in the magnitude or direction of a single criteria, pre-buy execution order imbalance, identified by the Methodologies do not indicate a conflict. Rather, they reflect that each Methodology is designed to measure different aspects of trading behavior, as discussed in **Section II.D**.

140. With regard to the question of intent to manipulate markets, the Hendershott Report makes two principal claims. First, it asserts that I do "not claim to have any evidence that any

[210] Hendershott Report, ¶ 94.
[211] Hendershott Report, ¶ 44.

trader at [redacted] or [redacted] actually had this intent."[212] Second, it also states that I have "not examined the trading algorithms [redacted] or [redacted] used during the Relevant Period, much less the corresponding computer code."[213] Both statements are misleading. The data and my analysis of the data is evidence of intent, similar to the approach that Prof. Hendershott took in the *Lek Securities* case, as discussed in **Section II.E.**

141. Regarding the second statement above, The Hendershott Report seems to suggest a lack of due diligence on my behalf when it asserts that I have "not examined the trading algorithms [redacted] or [redacted] used during the Relevant Period, much less the corresponding computer code. Therefore, he cannot evaluate the algorithms' logic or determine why they submitted the trading instructions they did (i.e., what kinds of events trigger an order submission or cancellation, etc.)."[214] In reality, neither defendants nor their customers provided the code for me to examine, and, in any event, I did not need to examine the code, just as Prof. Hendershott did not examine the relevant code in the *Lek Securities* case.[215]

142. The Hendershott Report asserts that "[redacted] and [redacted] had order imbalances more than a third of the time when trading on both sides of the market, presumably as part of their market making strategies."[216] This is yet another imprecise claim. It provides no calculations or empirical evidence to support the assertion that these imbalances are indicative of legitimate market making. It also does not substantiate that [redacted] and [redacted] were, in fact, acting as market makers. Rather than independently analyzing the trading behavior, the Hendershott Report appears to rely uncritically on [redacted] and [redacted] own

---

[212] Hendershott Report, ¶ 41.
[213] Hendershott Report, ¶ 42.
[214] Hendershott Report, ¶ 42.
[215] Hendershott Lek Deposition, pp. 354-356.
[216] Hendershott Report, ¶ 52.

characterization of their activities.[217] In contrast, my analysis includes a detailed and quantitative assessment specifically designed to differentiate potentially manipulative behavior from legitimate marker making, as discussed in **Section II.E.**

143. Another instance of imprecise language in The Hendershott Report arises where it refers to the three examples from the March 7th Late [redacted] Declaration as "evidence"[218] of broader flaws in what the report terms my "implicit assumptions."[219] This characterization is both inaccurate and misleading. The assumptions he refers to were not implicit; they were explicitly stated and discussed at length why the assumption was necessary.[220]

144. Further, the Hendershott Report dismissed the comprehensive analytical work I conducted as merely "cherry-picked to fit a particular theory,"[221] while treating a small number of hand-selected examples from a third party as sufficient empirical counter-evidence. He further claims that I "ignore[] the real possibility,"[222] that the sequencing of messages may not be accurate. The claim is also incorrect. I dedicated an entire section of my Initial Reports to addressing issues regarding timestamps, and clearly articulated the necessary methodological choice I made and how there was no self-evident perfect solution.[223]

145. Later in the same section, he refers to my sequencing as "unreliable,"[224] describing the sequencing assumption as "baseless,"[225] and asserts that it is "critical"[226] to the analysis. He then makes the completely opposite assumption and claims it would eliminate 41% of

---

[217] Hendershott Report, ¶ 34.
[218] Hendershott Report, ¶ 81.
[219] Hendershott Report, ¶ 81.
[220] Initial Reports, Section III.B.iii.
[221] Hendershott Report, Footnote 79.
[222] Hendershott Report, ¶ 78.
[223] Merrill Initial Report, Section III.B.iii.
[224] Hendershott Report, ¶ 84.
[225] Hendershott Report, ¶ 84.
[226] Hendershott Report, ¶ 84.

the spoofing episodes for [redacted][227] His alternative assumption—that "the executions occurred before all order placements rather than after"[228] —is logically inconsistent with the basic structure of order lifecycles. Under these assumptions, an order could be executed or canceled before it was ever submitted to the market, which is not possible. This approach does not offer a meaningful critique of my assumption; instead, it relies on a counterfactual sequence of events that undermines the integrity of his conclusion.

146. In conclusion, while the Hendershott Report asserts that my analysis "is fraught with conceptual and methodological flaws, biases, and errors."[229] and that "[t]hese flaws make his methodologies unreliable and his resulting opinions incorrect,"[230] in fact this Reply Report has demonstrated otherwise. My Methodologies are grounded in rigorous analysis, clearly articulated assumptions, and empirical validation. In contrast, the Hendershott Report contains numerous misrepresentations, unsupported assertions, and methodological inconsistencies. These issues significantly undermine its credibility and reliability as a critique of my work.

## V. Addendum regarding Mischaracterizations of my Initial Reports by Defendants' Compliance Experts

147. I understand from counsel that Defendants' compliance experts Michael Prior and Dr. James Overdahl have submitted the following reports in response to the initial expert report

[227] Hendershott Report, ¶ 84
[228] Hendershott Report, ¶ 84.
[229] Hendershott Report, ¶ 103.
[230] Hendershott Report, ¶ 11.

of Harrington's compliance expert: the March 7, 2025 report of Michael Prior submitted on behalf of CIBC (the "Prior CIBC Report"); (ii) the March 7, 2025 report of Michael Prior submitted on behalf of Merrill (the "Prior Merrill Report" and, with the Prior CIBC Report, the "Prior Reports"); (iii) the March 7, 2025 report of James Overdahl submitted on behalf of Merrill-US (the "Overdahl Report" and, with the Prior Reports, defendants' "Compliance Reports"). Counsel has provided me with excerpts from defendants' Compliance Reports that reference, characterize, and criticize the Initial Reports. I offer the following opinions in response to these excerpts.

148. All three Compliance Reports characterize the Initial Reports as not having found spoofing, but only order and trade activity that is "consistent with" spoofing.[231] This is a mischaracterization of the Initial Reports in which I concluded that [redacted] used CIBC's platform and [redacted] and [redacted] used Merrill's platform to engage in [redacted] of episodes of spoofing.[232] My conclusions were based on the results of the application of the Methodologies, which identified trade activity from [redacted] and [redacted] that was not just "consistent with" spoofing, but *more* consistent with spoofing than non-manipulative trading.

149. The Merrill Prior Report falsely states that in the Initial Reports, I did not "state an opinion that [redacted] placed an order to manipulate the market rather than execute it, which is required to determine that trading constitutes spoofing" under applicable Canadian regulations.[233] The Overdahl Report similarly makes the incorrect statements that (i) I do not "cite any evidence [] of manipulative intent on [redacted] or [redacted] part," and (ii) I offer "no opinion

---

[231] Prior CIBC Report, ¶ 40; Prior Merrill Report, ¶¶ 13, 39; Overdahl Report, ¶¶ 14, 46.
[232] Initial Reports, ¶ 9.
[233] Prior Merrill Report, ¶ 40.

as to trader intent."[234] This is not correct. Intent can be inferred through statistical analysis of trading behavior, and the Methodologies are designed to make inferences about trader intent based on their trade and order activity. My conclusion that [redacted] and [redacted] spoofed is based on inferences about their intent.

150. The Prior Reports refer to the Methodologies as "a post-hoc data filtering exercise that ignores relevant context (including, for example, the trading strategy and activity in the broader order book)."[235] The Overdahl Report similarly refers to the Methodologies as "an ex post filtering of order and trade data" or a "filtering method."[236] In describing the Methodologies as engaging in "filtering," the Compliance Reports appear to be analogizing them to compliance-related trade surveillance tools such as SMARTS, which are designed to filter large volumes of trade and order data to identify instances of potential manipulation which may warrant further follow-up and escalation. The Overdahl Report even goes so far as to describe the outcome of the Methodologies as "alerts."[237]

151. It is clear that the Compliance Reports have either misunderstood or are purposefully mischaracterizing the nature of the Methodologies. The Methodologies were not designed to be a trade surveillance tool that could be used by compliance personnel to generate alerts for potential instances of spoofing, which would then be reviewed and investigated. Rather, the Methodologies were designed to identify spoofing, any comparison between the Methodologies and trade surveillance tools such as [redacted] is incorrect.

---

[234] Overdahl Report, ¶¶ 14, 46.
[235] Prior Merrill Report, ¶ 14; Prior CIBC Report, ¶ 41.
[236] Overdahl Report, ¶¶ 41, 51.
[237] Overdahl Report, ¶ 51.

152. Nor is it correct for the Merrill Reports to describe the Methodologies as failing to take into account "relevant context (including, for example, the trading strategy and activity in the broader order book)."[238] My analysis absolutely took that context into account.

153. The Compliance Reports also describe the Initial Reports as "not consider[ing] whether the episodes" I identified were "false positives," or "not show[ing] how [my] filtering mechanism precludes false positives . . . or what investigation was done to rule out false positives among [my] results."[239] This Reply Report takes into account and addresses the possibility of "false positives."[240]

## VI. Conclusion

154. I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully Submitted,

Jonathan Brogaard

April 25, 2025

[238] Prior Merrill Prior Report, ¶ 14; Prior CIBC Report, ¶ 41.
[239] Prior Merrill Report, ¶ 44; Prior CIBC Report, ¶ 44; Overdahl Report, ¶ 52.
[240] See **Section II.A** in this Reply Report.

**Exhibit 1**

Additional Documents Considered

**Academic Articles**

Ait-Sahalia, Y., and Sağlam, M., 2024. High Frequency Market Making: The Role of Speed, *Journal of Econometrics 239*(2). 105421.

Allen, F., and Gale, D., 1992. Stock-Price Manipulation. *The Review of Financial Studies, 5*(3), pp. 503-529.

Brogaard, J., Hendershott, T. and Riordan, R., 2014. High-Frequency Trading and Price Discovery. *The Review of Financial Studies*, *27*(8), pp. 2267-2306.

Brogaard, J., Hendershott, T. and Riordan, R., 2019. Price discovery without trading: Evidence from limit orders. *The Journal of Finance*, *74*(4), pp. 1621-1658.

Brogaard, J., Li, D., and Yang, J., 2024, Does High Frequency Market Manipulation Harm Market Quality? *Available at SSRN 4280120.* December 2024.

Cont, R., Kukanov, A., and Stoikov, S., 2014. The Price Impact of Order Book Events. *Journal of Financial Econometrics, 12*(1), pp. 47-88.

Cumming, D., Johan, S., and Li, D., 2011. Exchange trading rules and stock market liquidity. *Journal of Financial Economics, 99*(3), pp. 651-671.

Epstein, L., and Schneider, M., 2008. Ambiguity, information quality, and asset pricing. *Journal of Finance, 63*(1), pp. 197-228.

Figueiredo, A., Jain, P., and Mishra, S., 2023. The role of fleeting orders on option expiration days. *Quantitative Finance*, *23*(10), pp. 1511-1529.

Giannetti, M., and Wang, T., 2016. Corporate Scandals and Household Stock Market Participation. *Journal of Finance*, *71*(6), pp. 2591-2636.

Guiso, L., Sepienza, P., and Zingales, L., 2008. Trusting the Stock Market. *Journal of Finance, 63*(6), pp. 2557-2600.

Hautsch, N., and Huang, R., 2012. On the Dark Side of the Market: Identifying and Analyzing Hidden Order Placements (No. 2012-014). SFB 649 Discussion Paper.

Hasbrouck, J., and Saar, G., 2009. Technology and Liquidity Provision: The Blurring of Traditional Definitions. *Journal of Financial Markets*, *12*(2), pp. 143-172.

Hendershott, T., and Menkveld, A., 2014. Price Pressures. *Journal of Financial Economics*, *114*(3), pp. 405-423.

Hopman, C., 2007. Do supply and demand drive stock prices? *Quantitative Finance*, *7*(1), pp. 37-53.

Kluchenek, M., and Kahn, J., 2013. Deterring Disruption in the Derivatives Markets: A Review of the CFTC's New Authority Over Disruptive Trading Practices, *Harvard Business Law Review Online 3*, pp. 120-132.

Kolm, P., Turiel, J., and Westray, N., 2023. Deep order flow imbalance: Extracting alpha at multiple horizons from the limit order book. *Mathematical Finance, Wiley Blackwell*, *33*(4), pp. 1044-1081.

Mark, G., 2020. Spoofing and Layering. *The Journal of Corporation Law*, *45*(2), pp. 399-470.

Mendelson, H., 1982. Market behavior in a clearing house. *Econometrica*, *50*(6), pp. 1505-1524.

Menkveld, A., 2016. The Economics of High-Frequency Trading: Taking Stock. *Annual Review of Financial Economics 8*, pp. 1-24.

Sitaru, B., Calinescu, A., and Cucuringu, M., 2023. Order Flow Decomposition for Price Impact Analysis in Equity Limit Order Books. *Available at SSRN 4572510.* September 2023.

**Customer Market Making Status**

[redacted] [redacted] FINRA BrokerCheck Report, 2025. *Available at:* [redacted] Last Visited April 21, 2025.

[redacted] [redacted] FINRA BrokerCheck Report, 2025. *Available at:* [redacted] Last Visited April 21, 2025.

[redacted] Website Our Company Page 2025. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] Client Offerings Webpage. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] Statement of Financial Condition, December 31, 2018. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] SEC Letter, September 22, 2017. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] SEC Letter, June 1, 2015. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] Website Homepage 2016. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] Declaration, September 9, 2024.

[redacted] FINRA BrokerCheck Report, 2025. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] FINRA BrokerCheck Report, 2025. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] [redacted] FINRA BrokerCheck Report, 2025. *Available at:* [redacted] Last Visited April 22, 2025.

[redacted] [redacted] SEC Letter, August 18, 2017. *Available at:* [redacted] *Last Visited April 22, 2025.*

[redacted] Website Homepage 2016. *Available at:* [redacted] Last Visited April 22, 2025.

**Legal Documents**

*Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980)

*Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006)

*Securities and Exchange Commission v. Lek Securities Corporation, et al* (2019) (612 F. Supp. 3d 287 (S.D.N.Y. 2020))

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 410 (S.D.N.Y. 2019), *on reconsideration in part*, No. 17CV1789 (DLC), 2019 WL 2114067 (S.D.N.Y. May 8, 2019).

*United States v. Cunningham, 54 F.3d 295, 299* (7th Cir. 1995)

**Expert Reports, Depositions, and Declarations**

Deposition Transcript of Prof. Hendershott in *Sec. & Exch. Comm'n v. Lek Sec. Corp.* (the "Hendershott Lek Deposition")

Expert Reports of Jonathan Brogaard, Ph.D. in Harrinton Matter. (the "Initial Reports")

Expert Report of Terrence Hendershott, Ph.D. in *Sec. & Exch. Comm'n v. Lek Sec. Corp*. (the "Hendershott Lek Securities Expert Witness Report")

Late [redacted] Declaration, March 7, 2025

[redacted] Declaration, September 9, 2024

Redacted Rebuttal Expert Report of Terrence Hendershott, Ph.D. in Harrington Matter. (the "Hendershott Report")

Excerpts from March 7, 2025 report of Michael Prior submitted on behalf of CIBC

Excerpts from March 7, 2025 report of Michael Prior submitted on behalf of Merrill

Excerpts from March 7, 2025 report of James Overdahl submitted on behalf of Merrill-US

**Websites and Other Public Sources**

Code of Federal Regulation, January 9, 2012. Part 43 Real-Time Public Reporting. *Available at:* https://www.ecfr.gov/current/title-17/chapter-I/part-43. Last Visited April 25, 2025

Commodity Futures Trading Commission, September 29, 2020. Order in the Matter of JPMorgan Chase & Co., et al. *Available at:* https://www.cftc.gov/media/4826/enfjpmorganchaseorder092920/download. Last Visited April 23, 2025.

Financial Conduct Authority, May 6, 2011. Decision Notice for Canada Inc. formerly carrying on business as Swift Trade Inc c/o BRMS Holdings Inc. *Available at*: https://www.fca.org.uk/publication/decision-notices/swift_trade.pdf. Last Visited April 23, 2025.

IIROC Notice 11-0251, 34 OSCB 9025, August 26, 2011. *Available at:* https://www.osc.ca/sites/default/files/2021-01/srr-iiroc_20110826_nca-umir-amd.pdf. Last Visited April 24, 2025.

[redacted] Contact Us Webpage. *Available at:* [redacted] Last Visited April 24, 2025

JP Morgan Chase & Co. Agrees To Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets, September 29, 2020. *Available at:* https://www.justice.gov/archives/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us. Last Visited April 23, 2025.

[redacted] December 6, 2018. NYSE Letter of Acceptance, Waiver, and Consent. *Available at:* [redacted] Last Visited April 23, 2025.

[redacted] May 27, 2021. SEC Comment Letter. *Available at:* [redacted] Last Visited April 23, 2025.

[redacted] December 31, 2016. Statement of Financial Condition. *Available at*: [redacted] Last Visited April 24, 2025.

Waldman, D., April 7, 2017. Has the Law of Manipulation Lost its Moorings? *LAW360*, *Available at:* https://www.law360.com/articles/911280. Last Visited April 24, 2025.

**Data**

OneTick
TAQ

**Produced Data**

CIBC_3840-CIBC_4041

MERRILL_02347
MERRILL_02349
MERRILL_02350
MERRILL_02351
MERRILL_02417
MERRILL_02880-03049
MERRILL_03051-03133
MERRILL_03538-03693
MERRILL_03694
MERRILL_04541-04773
MERRILL_04484
MERRILL_06733-06793
MERRILL_06863-06910
MERRILL_06918-06933
MERRILL_04484

**Exhibit 2**

Spoof Detection Rates for All Customers in Merrill and CIBC

[redacted]

| [redacted] | [redacted] | [redacted] |
| --- | --- | --- |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

[redacted]

| [redacted] | [redacted] |
| --- | --- |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | |
| [redacted] | |

**Exhibit 3**

Table 1: Example Matches of MQT Orders on the Publicly Disseminated Limit Order Book (Common Sizes)

| Date | Public Exchange | Merrill Exchange | Public Time | Merrill Time | Public Price | Merrill Price | Public Size | Merrill Size | Public Side | Merrill Side | Public OrderId | Merrill OrderId |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016-03-10 | BATS | bz40mlco | 12:12:42.672227 | 12:12:42.672 | 32.23 | 32.23 | 400 | 400 | B | B | 7A187Y02B9140 | 203150035 |
| 2016-03-10 | EDGX | bx25tsys | 12:12:42.672323 | 12:12:42.672 | 32.34 | 32.34 | 100 | 100 | B | B | 7D1KTC01QR3D0 | 203150036 |
| 2016-03-10 | BATS | bz41mlco | 12:12:42.672328 | 12:12:42.672 | 32.34 | 32.34 | 400 | 400 | B | B | 7A187Y02B9150 | 203150038 |
| 2016-03-10 | BATS | bz39mlco | 12:12:42.672334 | 12:12:42.672 | 32.51 | 32.51 | 400 | 400 | S | S | 7A187Y02B9160 | 203150039 |
| 2016-03-10 | EDGX | bx38tsys | 12:12:42.672340 | 12:12:42.672 | 32.51 | 32.51 | 100 | 100 | S | S | 7D1KTC01QR3E0 | 203150037 |
| 2016-03-10 | BATS | bz40mlco | 12:12:42.672418 | 12:12:42.672 | 32.5 | 32.5 | 400 | 400 | S | S | 7A187Y02B9170 | 203150041 |
| 2016-03-10 | EDGX | bx37tsys | 12:12:42.672429 | 12:12:42.672 | 32.5 | 32.5 | 100 | 100 | S | S | 7D1KTC01QR3F0 | 203150040 |
| 2016-03-10 | BATS | bz40mlco | 12:12:42.746056 | 12:12:42.746 | 32.22 | 32.22 | 400 | 400 | B | B | 7A187Y02B92G0 | 203150134 |
| 2016-03-10 | EDGX | bx38tsys | 12:12:42.952047 | 12:12:42.952 | 32.21 | 32.21 | 100 | 100 | B | B | 7D1KTC01QR5G0 | 203150187 |
| 2016-03-10 | BATS | bz39mlco | 12:12:42.967579 | 12:12:42.967 | 32.21 | 32.21 | 400 | 400 | B | B | 7A187Y02B94B0 | 203150192 |
| 2016-03-10 | EDGX | bx25tsys | 12:12:43.395027 | 12:12:43.395 | 32.5 | 32.5 | 100 | 100 | S | S | 7D1KTC01QRD20 | 203150410 |
| 2016-03-10 | BATS | bz40mlco | 12:12:43.395034 | 12:12:43.395 | 32.5 | 32.5 | 400 | 400 | S | S | 7A187Y02B9E10 | 203150412 |

Table 2: Example Matches of MQT Orders on the Publicly Disseminated Limit Order Book (Uncommon Size)

| Date | Public Exchange | Merrill Exchange | Public Time | Merrill Time | Public Price | Merrill Price | Public Size | Merrill Size | Public Side | Merrill Side | Public OrderId | Merrill OrderId |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016-08-31 | EDGX | bx20tsys | 10:12:55.545365 | 10:12:55.545 | 8.79 | 8.79 | 400 | 400 | S | S | 7Y1KTA00BAJ90 | 800834823 |
| 2016-08-31 | BATS | bz42mlco | 10:13:40.018283 | 10:13:40.018 | 8.79 | 8.79 | 1300 | 1300 | S | S | 7V187X00GR3E0 | 800858308 |
| 2016-08-31 | EDGX | bx20tsys | 10:13:40.230582 | 10:13:40.230 | 8.79 | 8.79 | 900 | 900 | S | S | 7Y1KTA00BJ250 | 800858380 |
| 2016-08-31 | EDGX | bx20tsys | 10:14:00.071879 | 10:14:00.071 | 8.79 | 8.79 | 900 | 900 | S | S | 7Y1KTA00BLPO0 | 800867140 |
| 2016-08-31 | BATS | bz42mlco | 10:14:00.071884 | 10:14:00.071 | 8.79 | 8.79 | 600 | 600 | S | S | 7V187X00GWKJ0 | 800867141 |
| 2016-08-31 | BATS | bz34mlco | 10:17:53.882162 | 10:17:53.882 | 8.78 | 8.78 | 700 | 700 | B | B | 7V187X00IGZO0 | 800953956 |
| 2016-08-31 | BATS | bz42mlco | 10:17:53.882187 | 10:17:53.882 | 8.77 | 8.77 | 600 | 600 | B | B | 7V187X00IGZQ0 | 800953957 |
| 2016-08-31 | EDGX | bx20tsys | 10:17:53.882187 | 10:17:53.882 | 8.76 | 8.76 | 400 | 400 | B | B | 7Y1KTA00CF9D0 | 800953954 |
| 2016-08-31 | BATS | bz33mlco | 10:17:53.882195 | 10:17:53.882 | 8.79 | 8.79 | 800 | 800 | B | B | 7V187X00IGZR0 | 800953955 |
| 2016-08-31 | BATS | bz33mlco | 10:17:53.882200 | 10:17:53.882 | 8.76 | 8.76 | 700 | 700 | B | B | 7V187X00IGZS0 | 800953958 |
| 2016-08-31 | BATS | bz34mlco | 10:17:53.890092 | 10:17:53.890 | 8.81 | 8.81 | 800 | 800 | B | B | 7V187X00IH1C0 | 800953971 |
| 2016-08-31 | BATS | bz42mlco | 10:17:53.898879 | 10:17:53.898 | 8.86 | 8.86 | 1100 | 1100 | S | S | 7V187X00IH2T0 | 800953981 |
| 2016-08-31 | BATS | bz34mlco | 10:17:53.899806 | 10:17:53.899 | 8.87 | 8.87 | 900 | 900 | S | S | 7V187X00IH310 | 800953983 |
| 2016-08-31 | EDGX | bx18tsys | 10:17:53.899820 | 10:17:53.899 | 8.87 | 8.87 | 1200 | 1200 | S | S | 7Y1KTA00CFBJ0 | 800953982 |
| 2016-08-31 | EDGX | bx19tsys | 10:17:53.906208 | 10:17:53.906 | 8.88 | 8.88 | 1100 | 1100 | S | S | 7Y1KTA00CFC10 | 800953986 |
| 2016-08-31 | BATS | bz33mlco | 10:17:53.935817 | 10:17:53.935 | 8.88 | 8.88 | 700 | 700 | S | S | 7V187X00IH3N0 | 800953991 |
| 2016-08-31 | BATS | bz34mlco | 10:17:53.956478 | 10:17:53.956 | 8.95 | 8.95 | 600 | 600 | S | S | 7V187X00IH3W0 | 800953992 |
| 2016-08-31 | BATS | bz42mlco | 10:17:53.956543 | 10:17:53.956 | 8.82 | 8.82 | 800 | 800 | B | B | 7V187X00IH3X0 | 800953993 |
| 2016-08-31 | BATS | bz33mlco | 10:17:54.009482 | 10:17:54.009 | 8.83 | 8.83 | 600 | 600 | B | B | 7V187X00IH4K0 | 800953996 |
| 2016-08-31 | EDGX | bx20tsys | 10:17:54.009487 | 10:17:54.009 | 8.83 | 8.83 | 1000 | 1000 | B | B | 7Y1KTA00CFCT0 | 800953995 |

Table 3: Example Matches of MQT Orders on the Publicly Disseminated Limit Order Book (Odd Lots)

| Date | Public Exchange | Merrill Exchange | Public Time | Merrill Time | Public Price | Merrill Price | Public Size | Merrill Size | Public Side | Merrill Side | Public OrderId | Merrill OrderId |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016-08-12 | EDGX | bx41tsys | 14:18:27.088335 | 14:18:27.088 | 10.59 | 10.59 | 138 | 138 | B | B | 7F1KT50189S20 | 401388058 |
| 2016-08-12 | EDGX | bx41tsys | 14:18:27.218355 | 14:18:27.218 | 10.59 | 10.59 | 134 | 134 | B | B | 7F1KT50189SR0 | 401388059 |
| 2016-08-12 | BATS | bz91tsys | 14:22:16.212952 | 14:22:16.212 | 10.5 | 10.5 | 137 | 137 | B | B | 7C187Y01NLMF0 | 401394245 |
| 2016-08-12 | EDGX | bx41tsys | 14:22:16.214471 | 14:22:16.214 | 10.54 | 10.54 | 133 | 133 | B | B | 7F1KT5018MGT0 | 401394246 |
| 2016-08-12 | EDGX | bx41tsys | 14:22:16.401572 | 14:22:16.401 | 10.53 | 10.53 | 132 | 132 | B | B | 7F1KT5018MHY0 | 401394256 |
| 2016-08-12 | EDGX | bx41tsys | 14:22:36.817053 | 14:22:36.817 | 10.53 | 10.53 | 134 | 134 | B | B | 7F1KT5018NBH0 | 401394755 |
| 2016-08-12 | EDGX | bx41tsys | 14:22:58.558018 | 14:22:58.558 | 10.57 | 10.57 | 135 | 135 | B | B | 7F1KT5018O7F0 | 401395274 |
| 2016-08-12 | EDGX | bx41tsys | 14:23:04.056786 | 14:23:04.056 | 10.58 | 10.58 | 135 | 135 | B | B | 7F1KT5018OF90 | 401395431 |
| 2016-08-12 | EDGX | bx41tsys | 14:23:08.757953 | 14:23:08.757 | 10.57 | 10.57 | 135 | 135 | B | B | 7F1KT5018OLF0 | 401395567 |
| 2016-08-12 | EDGX | bx41tsys | 14:24:14.311120 | 14:24:14.311 | 10.57 | 10.57 | 135 | 135 | B | B | 7F1KT5018S4Y0 | 401397957 |
| 2016-08-12 | EDGX | bx41tsys | 14:24:14.332809 | 14:24:14.332 | 10.57 | 10.57 | 137 | 137 | B | B | 7F1KT5018S580 | 401397958 |
| 2016-08-12 | EDGX | bx41tsys | 14:24:17.705683 | 14:24:17.705 | 10.57 | 10.57 | 138 | 138 | B | B | 7F1KT5018SAE0 | 401398094 |
| 2016-08-12 | EDGX | bx41tsys | 14:24:22.309047 | 14:24:22.309 | 10.57 | 10.57 | 137 | 137 | B | B | 7F1KT5018SIS0 | 401398238 |
| 2016-08-12 | EDGX | bx41tsys | 14:24:24.514632 | 14:24:24.514 | 10.59 | 10.59 | 131 | 131 | B | B | 7F1KT5018SLD0 | 401398318 |
| 2016-08-12 | BATS | bz91tsys | 14:26:13.648588 | 14:26:13.648 | 10.6 | 10.6 | 137 | 137 | B | B | 7C187Y01O4N80 | 401402616 |
| 2016-08-12 | EDGX | bx41tsys | 14:26:13.656968 | 14:26:13.656 | 10.61 | 10.61 | 134 | 134 | B | B | 7F1KT50190AS0 | 401402617 |
| 2016-08-12 | EDGX | bx41tsys | 14:26:20.650195 | 14:26:20.650 | 10.6 | 10.6 | 134 | 134 | B | B | 7F1KT50190KV0 | 401402779 |
| 2016-08-12 | BATS | bz91tsys | 14:31:57.966870 | 14:31:57.966 | 10.65 | 10.65 | 135 | 135 | B | B | 7C187Y01OZE10 | 401416044 |
| 2016-08-12 | BATS | bz91tsys | 14:41:44.043264 | 14:41:44.043 | 10.72 | 10.72 | 138 | 138 | B | B | 7C187Y01Q26D0 | 401434407 |
| 2016-08-12 | BATS | bz91tsys | 14:42:01.349439 | 14:42:01.349 | 10.71 | 10.71 | 134 | 134 | B | B | 7C187Y01Q3D70 | 401435015 |

**Exhibit 4**

The Tables in this Exhibit replicate the tables from the Initial Reports Sections III.C and III.D using the alternative sequencing approach.

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

Table 2: Merrill Fill Ratios

| Limit Order Type | Fill Ratio | |
|---|---|---|
| | Posting | Quantity |
| Bid Limit Orders | 3.41% | 3.97% |
| Ask Limit Orders | 0.28%* | 0.59%* |

Table 3: Merrill Limit Order Counts per Second

| Time Window | Limit Order Type | New Limit Orders per Second | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | 1.40 | 0.39 |
| | Ask Limit Orders | 5.45* | 0.63* |
| Post-Executing Purchase | Bid Limit Orders | 0.76 | 1.27 |
| | Ask Limit Orders | 0.62[+] | 0.93 |

Table 4: Merrill Limit Order Sizes

| Time Window | Limit Order Type | New Limit Size | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | 526.09 | 1,092.39 |
| | Ask Limit Orders | 2,128.90* | 2,151.64* |
| Post-Executing Purchase | Bid Limit Orders | 822.98 | 1356.56 |
| | Ask Limit Orders | 933.52[+] | 996.06[+] |

Table 5: Merrill Limit Order Aggressiveness

| Time Window | Limit Order Type | Limit Order Aggressiveness | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | \$0.024 | \$0.012 |
| | Ask Limit Orders | \$-0.002* | \$0.0007* |
| Post-Executing Purchase | Bid Limit Orders | \$0.020 | \$0.009 |
| | Ask Limit Orders | \$0.005[*,+] | \$0.013[+] |

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

Table 7: CIBC Fill Ratios

| Limit Order Type | Fill Ratio | |
|---|---|---|
| | Posting | Quantity |
| Bid Limit Orders | 1.95% | 1.55% |
| Ask Limit Orders | 0.08%* | 0.12%* |

Table 8: CIBC Limit Order Counts per Second

| Time Window | Limit Order Type | New Limit Orders per Second | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | 4.40 | 2.55 |
| | Ask Limit Orders | 12.08* | 3.25* |
| Post-Executing Purchase | Bid Limit Orders | 7.51 | 6.58 |
| | Ask Limit Orders | 6.07*,+ | 5.66*,+ |

Table 9: CIBC Limit Order Sizes

| Time Window | Limit Order Type | New Limit Size | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | 264.50 | 343.84 |
| | Ask Limit Orders | 341.50* | 376.46* |
| Post-Executing Purchase | Bid Limit Orders | 310.24 | 367.67 |
| | Ask Limit Orders | 292.73*,+ | 320.44*,+ |

Table 10: CIBC Limit Order Aggressiveness

| Time Window | Limit Order Type | Limit Order Aggressiveness | |
|---|---|---|---|
| | | Posting | Quantity |
| Pre-Executing Purchase | Bid Limit Orders | $0.045 | $0.035 |
| | Ask Limit Orders | $0.042* | $0.042* |
| Post-Executing Purchase | Bid Limit Orders | $0.043 | $0.037 |
| | Ask Limit Orders | $0.055*,+ | $0.052*,+ |