# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

HARRINGTON GLOBAL OPPORTUNITY
FUND, LIMITED,

                              Plaintiff,

          v.

BOFA SECURITIES, INC., *et al.*,

                              Defendants.

Index No.: 1:21-cv-00761 (LGS) (VF)

Hon. Lorna G. Schofield

Hon. Valerie Figueredo

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO EXCLUDE TESTIMONY OF JONATHAN BROGAARD, PH.D.**

## <u>TABLE OF CONTENTS</u>

Page

Preliminary Statement .................................................................................................... 1

Relevant Facts ............................................................................................................... 2

Legal Standard .............................................................................................................. 5

Argument ...................................................................................................................... 6

    I.    Dr. Brogaard's Opinions Are Based on the Available Data and Reasonable Inferences

    Therefrom. .................................................................................................................. 6

        A.    The Data and Reasonable Inferences Drawn Therefrom Are More Than Adequate to

        Support Dr. Brogaard's Conclusions. ................................................................... 6

            1.    "Perfect Data" is Not the Standard and is Almost Never Available. ......................... 6

            2.    Dr. Brogaard's Inferences Regarding Aggregate Order Flow are Reasonable. ........... 8

            3.    Dr. Brogaard's Inferences Regarding Order Timing are Reasonable. ....................... 8

        B.    The Sufficiency of Nonparty Data Must Be Considered in Context. ........................... 10

        C.    Neither Dr. Brogaard Nor This Court are Required to Accept as True the Self-Serving

        (and Post-Fact Discovery) ███████ Declaration. ....................................... 12

    II.    Dr. Brogaard's Methodology is Reliable and Based on Well-Settled Principles. ........... 13

        A.    The Supposed Novelty of Dr. Brogaard's Approach is no Bar to Admissibility. ........ 13

            1.    The Novelty of the Case Required that Dr. Brogaard Develop a Methodology to Use

            in This Litigation. ................................................................................................. 13

            2.    Dr. Brogaard's Approach Was Not Actually Novel. ............................................... 14

        B.    Peer Review Status of Dr. Brogaard's Paper is No Bar to his Testimony Here. .......... 15

C.    The Comments of a Discussant and Audience Member at a Discussion Panel Do Not Bar the Admission of Dr. Brogaard's Report. ...................................................................... 16

D.    The Application of a Verification Analysis Akin to an Error Rate Analysis Further Demonstrates the Reliability of Dr. Brogaard's Methodology. ............................................ 17

1.    An Error Rate Analysis as Defendants Propose Is Not Necessary or Even Possible Here. ....................................................................................................................... 17

2.    Dr. Brogaard's Methodology Has Been Subjected to a Test to Ensure its Reliability and has Passed. .......................................................................................................... 18

3.    The Possible Existence of Upward Spoofing is Irrelevant to the Results of Dr. Brogaard's Analysis. ................................................................................................ 19

E.    Dr. Brogaard's Posting Methodology is Reliable. ....................................................... 20

F.    Dr. Brogaard's Quantity Methodology is Reliable. ..................................................... 21

G.    Dr. Brogaard's Methodologies Reliably Identify Different Types of Spoofing. ....... 22

H.    Defendants' Meritless Accusation that Dr. Brogaard Engaged in a Results-Driven Approach is Not a Basis for the Exclusion of his Opinions. ................................................. 23

I.    Dr. Brogaard Methodology is Reliable Because He Accounted for Alternate Explanations such as Market-Making. ................................................................................... 24

III.    Dr. Brogaard's Opinions Regarding Inferences of Intent are Admissible. ................... 25

Conclusion .............................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                    <u>Page(s)</u>

*Amorgianos v. Amtrak,*
303 F.3d 256 (2d Cir. 2002) ..................................................................... 10, 13, 15, 23

*Athena Art Fin. Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982,*
No. 20-CV-04669, 2024 WL 1116083 n.2 (S.D.N.Y. Mar. 14, 2024) .................................... 11

*Capri Sun GmbH v. Am. Beverage Corp.,*
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ..................................................................... 11

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................... 23

*Cayuga Indian Nation of N.Y. v. Pataki,*
83 F. Supp. 2d 318 (N.D.N.Y. 2000) ..................................................................... 14

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,*
769 F. Supp. 2d 269 (S.D.N.Y. 2011) ..................................................................... 8, 10, 11, 24

*Chavez v. Dolgencorp of Texas, Inc.,*
No. 7:22-CV-00199, 2023 WL 4679004 (S.D. Tex. July 21, 2023) ...................................... 12

*Crawford v. Franklin Credit Mgmt. Corp.,*
758 F.3d 473 (2d Cir. 2014) ..................................................................... 11

*Daubert v, Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993) ..................................................................... 5, 15, 18

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
104 F.Supp.3d 441 (S.D.N.Y. 2015) ..................................................................... 13

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,*
No. 14-MD-2542 (VSB), 2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .................................... 19

*In re Omnicom Grp., Inc. Sec. Litig.,*
No. 02 Civ. 4483, 2007 WL 2376170 (S.D.N.Y. Aug. 10, 2007) ...................................... 11

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,*
714 F. Supp. 3d 65 (E.D.N.Y. 2024) ..................................................................... 13

*Kochert v. Greater Lafayette Health Servs., Inc.,* No. 4:01CV0027 AS,
2004 WL 5508677, at *2 (N.D. Ind. Nov. 15, 2004) ..................................................................... 15

*Lassen v. Hoyt Livery, Inc.,*
No. 13-CV-1529 (VAB), 2016 WL 7165716 (D. Conn. Dec. 8, 2016) ...................................... 7

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995)................................................................................ 5, 15

*Molly C. v. Oxford Health Ins., Inc.*,
    No. 21-CV-10144 (PGG) (BCM), 2024 WL 4850813 (S.D.N.Y. Nov. 21, 2024)................ 7, 8

*New York City Transit Auth. v. Express Scripts, Inc.*,
    588 F. Supp. 3d 424 (S.D.N.Y. 2022)........................................................................ 5

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)................................................................................................ 11

*Rosario v. City of New York*,
    No. 18-CV-4023, 2021 WL 1930293 (S.D.N.Y. May 13, 2021) ............................ 12

*SEC v. Lek Sec. Corp.*,
    370 F. Supp. 3d 384 (S.D.N.Y. 2019) *on reconsideration in part,* No. 17 Civ. 1789,2019 WL
    2114067 (S.D.N.Y. May 8, 2019)........................................................ 14, 15, 17. 18

*SEC v. Lek Sec. Corp.*,
    612 F. Supp. 3d 287 (S.D.N.Y. 2020)...................................................................... 19

*Tedone v. H.J. Heinz Co.*,
    686 F. Supp. 2d 300 (S.D.N.Y. 2009)...................................................................... 23

*United States v. Asare*,
    No. 15-CV-3556, 2019 WL 5693477 (S.D.N.Y. Nov. 4, 2019).............................. 12

*Zeolla v. Ford Motor Co.*,
    No. 09–40106–FDS, 2013 WL 308968 (D.Mass. Jan. 24, 2013)............................ 10

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009)...................................................................................... 9

Plaintiff Harrington Global Opportunity Fund, Ltd. ("Harrington") respectfully submits this Memorandum of Law in opposition to Defendants' Motion in Limine to Exclude Testimony of Jonathan Brogaard, Ph.D. ("Dr. Brogaard") [ECF 513-518] (the "Motion").[1]

## PRELIMINARY STATEMENT

In the face of relentless obstruction from Defendants, Harrington obtained customer-level order and trade data regarding Defendants' customers and, when Harrington's liability expert Dr. Brogaard analyzed it (using an approach almost identical the one used by Defendants' rebuttal expert when *he* was retained by the SEC in a spoofing case), he identified ▉▉▉ spoofing episodes carried out by CIBC customer ▉▉▉▉▉▉▉ and Merrill customers ▉▉▉▉▉▉▉ and ▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

In moving to exclude Dr. Brogaard's testimony, Defendants seek to impose obstacles that are contrary to the Federal Rules' liberal approach to the inclusion of expert testimony. For example, Defendants argue that Dr. Brogaard's methodology must be excluded because no court has yet to approve it—which of course, would make it impossible for *any* plaintiff pursuing claims based on a new form of market manipulation. For another, Defendants argue that flaws in *their own data* render any analysis of it unreliable, even when the analysis is based on reasonable inferences, a widely accepted common practice given that no data set is perfect. Defendants also brazenly argue that, in the face of a declaration from a customer averring – only after the close of fact discovery—that it did not spoof, *no* reasonable inferences of intent may be made in the absence of still yet additional information from Defendants' customers. Yet Defendants *opposed*

---

[1] Herein, "Mem." shall refer to Defendants' Memorandum of Law in support of the Motion [ECF 515]; the "Initial Reports" shall refer collectively to Dr. Brogaard's October 8, 2024 expert reports relating to the Merrill Defendants (the "Merrill Report") and CIBC (the "CIBC Report") [ECF 517-1, 517-2] and "Reply Report" shall refer to Dr. Brogaard's April 24, 2025 report rebutting the arguments of Defendants' expert Terrance Hendershott, Ph.D. [ECF 517-4]. All capitalized terms not otherwise defined shall have the meanings set forth in the Initial Reports. All references to "Ex." refers to those annexed to the Declaration of Alan Pollack in Opposition to Defendants' Motion *In Limine* to Exclude Testimony of Jonathan Brogaard, Ph.D.

Harrington's efforts to obtain the very same type of information from Defendants' customers, arguing, at the time, that it was *irrelevant*.

When Judge Schofield denied Defendants' motion to dismiss Harrington's Second Amended Complaint, she held that Defendants could be liable for their role in placing customer orders or trades that they knew, *or were reckless in not knowing*, were part of unlawful spoofing schemes.  Yet in their motion, Defendants seek to render Judge Schofield's decision a dead letter by erecting unsanctioned obstacles that would make it impossible for *any* plaintiff to successfully pursue a civil spoofing case against a broker.  Defendants' motion must be denied.

## RELEVANT FACTS

### *Harrington's Claims*

In Harrington's First Amended Complaint, filed on May 6, 2021, Harrington alleged that Defendants engaged in the relatively new form of high-frequency market manipulation known as spoofing, in which the manipulator places non-bona fide orders that it does not intend to execute with the goal of creating an inaccurate impression of supply and demand to move the share price of a security—in this case, shares in Concordia International Corp. ("Concordia").  [ECF 63.]  On February 9, 2022, Judge Schofield denied Defendants' motion to dismiss, finding that Harrington adequately alleged a "frequent pattern of spoofing" by Defendants.  *Id.* at 14.  The parties then engaged in a first round of discovery in which Defendants revealed that the orders and trades in the spoofing episodes Harrington identified were initiated not by them, but by *their customers*. Defendants refused to produce *any* discovery related to what they described as "their customers' spoofing" and argued that "[t]here is no legal theory upon which Plaintiff may hold Defendants liable for customer trades."  [ECF 118 at 2.]  Judge Schofield denied Harrington's motion to compel, holding that Harrington had "not articulated any plausible theory under which any currently named Defendant is liable for their customers' trading activity."  [ECF 120.]

On December 19, 2022, Harrington filed its Second Amended Complaint (the "SAC"), in which it alleged how Defendants could be liable for *their own conduct* in placing customer trades that they knew—or were reckless in not knowing—were part of unlawful schemes to manipulate the markets by spoofing. [ECF 133.] On September 28, 2023, Judge Schofield denied Defendants' motion to dismiss the SAC, holding that Defendants <u>could</u> be liable for sending customer orders to markets. [ECF 147 at 8.] In doing so, Judge Schofield held that Harrington "detail[ed] a pattern of spoofing activity that strongly suggests Defendants shirked [their] duties [to detect and prevent manipulative or fraudulent trading by their customers]." *Id.* at 17.

**Harrington's Efforts to Obtain Discovery Related to Defendants' Customers' Trading**

The parties then engaged in a second round of fact discovery in which Harrington *vigorously* pursued customer-related order and trade data from both nonparties and Defendants, who at every turn obstructed Harrington's efforts to obtain it.[2] One challenge Harrington faced was that at the outset of discovery, Harrington did not know *who Defendants' customers were*, and accordingly, could not pursue any discovery from them directly. Defendants agreed <u>only</u> to produce data with "customer identifiers" (strings of numbers unique to each customer in lieu of their names) and only after Harrington analyzed Defendants' customer trading data and provided a short list of customers who spoofed, might they unmask those customers. Harrington made clear to Defendants that time would be of the essence—it needed to make sure that it would have the unmasked identities of the spoofers with sufficient time to subpoena and seek discovery from them. *See, e.g.,* ECF 152 at 3 (noting that Harrington "anticipate[d] the need for further subpoenas that it will only be in a position to issue after Defendants produce the requested trading data").

---

[2] In fact, although Defendants made representations to the Court on March 1, 2024 that they had "substantially completed" their document productions [ECF 197-198], Merrill continued to make corrected data disclosures to Harrington as late as July 2024, well past the ostensible June 10, 2024 fact discovery deadline. [ECF 298-328, 329.]

Despite Harrington's timing constraints, Defendants delayed production and *repeatedly* produced inaccurate or incomplete data. It was not until April 2024—after countless letters, meet-and-confers, and motion practice—that Harrington had enough data to be able to perform a customer-level analysis of Defendants' data. [ECF 214.] Harrington immediately performed an expedited preliminary analysis and identified several customers whose trading patterns stood out as indicative of spoofing on a mass scale. Defendants did not reveal the names of those customers until May 2024, mere weeks before the deadline for the completion of fact discovery. [*See* ECF 329 at 3.] With the names *finally* in hand, Harrington *immediately* issued nonparty subpoenas seeking documents and data from those customers.

Defendants' customers—with Defendants' support—resisted or outright refused to provide the discovery sought, and Harrington moved to compel CIBC's customer ███. [*See* ECF 345.] This motion was vigorously opposed by not just ███, but CIBC as well. During a lengthy September 26, 2024 oral argument before this Court, Harrington argued that data related to ███ trading in the U.S. was highly relevant to its claims because even though such trading was not through CIBC, the U.S. trading would help to illuminate ███ intent in placing the orders and trades it placed through CIBC. [*See* ECF 384 at 47:13-18.] CIBC *vociferously* argued that this case was only about what *Defendants* knew, and information into which Defendants had "no visibility" was <u>*irrelevant,*</u> regardless of whether it was relevant to their customers' intent. *Id.* at 50:18-25. This Court agreed, denying Harrington's motion to compel. [ECF 382.]

### Dr. Brogaard's Methodology

Harrington retained Dr. Brogaard to analyze all available data regarding Defendants' customers trading to determine the extent to which they spoofed, if at all. Because there are multiple ways in which a trader can manipulate the market via spoofing, Dr. Brogaard used two methodologies, each of which was designed to detect a different type of spoofing (the

"Methodologies"). Initial Reports ¶ 44. The "Posting Methodology" was designed "to capture a quoting-based approach to distort the supply and demand of the limit order book" based on the idea "that the activity of posting limit orders itself may drive other market participants' reactions." *Id.* ¶ 47. The "Quantity Methodology" was designed "to capture the number of shares resting on the limit order book approach to distorting the limit order book's supply and demand information," based on the idea "that as the resting quantity on the ask side and on the bid side changes, other market participants may be influenced to change their behavior." *Id.* Dr. Brogaard describes each methodology in detail in his reports. *Id.* ¶¶ 56-90. When he applied his Methodologies to the data, Dr. Brogaard identified ▮▮▮ spoofing episodes by CIBC customer ▮▮▮ and ▮▮▮ spoofing episodes by Merrill customer ▮▮▮▮▮ [*See* ECF 517-1 ¶ 91, 99.]

## LEGAL STANDARD

Under Rule 702, expert testimony should not be excluded unless (1) the testimony is not grounded in sufficient facts or data, (2) the testimony is not the product of reliable principles and methods, or (3) the witness has not applied the principles and method's reliability to the facts of the case. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 3037 3d. 286, 265 (2d Cir. 2002). This assessment of admissibility "is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 at 580 (1993). Disputes as to the strength of "[an expert's] faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Indeed, exclusion of expert testimony "remains the exception rather than the rule." *New York City Transit Auth. v. Express Scripts, Inc.,* 588 F. Supp. 3d 424, 443 (S.D.N.Y. 2022).

## ARGUMENT

**I.**    **Dr. Brogaard's Opinions Are Based on the Available Data and Reasonable Inferences Therefrom.**

Dr. Brogaard's analysis was based on order and trade data that was more than adequate to support his opinions.  Even so, the sufficiency of such data must be considered in light of the history of discovery proceedings in this action.  For *months*, Defendants repeatedly produced incomplete and inadequate order and trade data, forcing Harrington to write countless letters and engage in ceaseless meet-and-confers and motion practice to obtain the data to which it was entitled—which, in the end, was still incomplete and flawed.

As this Court well knows, Defendants also opposed Harrington's efforts to obtain discovery from nonparties.  Through their delays, Defendants left Harrington with mere weeks between the close of fact discovery and the day on which Harrington finally learned the names of the customers suspected of spoofing.  Defendants then worked closely with their nonparty customers to oppose Harrington's discovery efforts, arguing that nonparty information Defendants did not have was *irrelevant*.  Defendants now argue that the very same information is so *critically important* that Harrington cannot sustain its claims without it.  Defendants should not be permitted to have it both ways.  Ultimately, Dr. Brogaard conducted the best analysis possible on the information he had, making reasonable inferences where necessary, as is common practice.  *See* Ex. B at 209:20-210:8; Ex. C at 183:12-191:6.  Dr. Brogaard's opinions are based on sufficient facts and Defendants' motion should be denied.

**A.**    **The Data and Reasonable Inferences Drawn Therefrom Are More Than Adequate to Support Dr. Brogaard's Conclusions.**

1.    **"Perfect Data" is Not the Standard and is Almost Never Available.**

It is not uncommon for data used in an expert analysis to be flawed, incomplete, or otherwise imperfect (*see id.*), and it is well-settled that experts may draw reasonable inferences

when confronted with gaps in data. *See, e.g., Lassen v. Hoyt Livery, Inc.,* No. 13-CV-1529 (VAB), 2016 WL 7165716, at *9 (D. Conn. Dec. 8, 2016) ("given all of the flaws and gaps in Defendants' record-keeping . . . any method of determining the hours that [Defendants'] drivers worked would require drawing certain inferences and using methods that may be imperfect."). Here, flaws and gaps in Defendants' data (and the absence of information Defendants prevented Harrington from obtaining) should not be Defendants' ticket to excluding experts and evading potential liability.

*Lassen* is instructive, as there, the court rejected defendants' argument that plaintiff's expert's methodology was unreliable because he relied on inaccurate and incomplete data produced by the defendants. *Id.* The court held that the plaintiff "should not be penalized for problems that arise solely from the Defendants' recordkeeping." *Id.* Indeed, rewarding parties like Defendants for maintaining inaccurate and incomplete records would give them incentive to keep poor records. Here, as in *Lassen*, Defendants' flawed data "require[d] any expert witness, or even the jury as fact-finder, to draw inferences, make assumptions, and extrapolate from the incomplete data that is available, as well as take steps to account for the flaws and gaps in the data." *Id.* This is precisely what Dr. Brogaard did, when it was necessary and reasonable.

In any event, there is "a distinction between insufficient data and imperfect data." *Molly C. v. Oxford Health Ins., Inc.*, No. 21-CV-10144 (PGG) (BCM), 2024 WL 4850813, at *12 (S.D.N.Y. Nov. 21, 2024). An expert's testimony may be excluded if he or she lacks basic information required by professionals in the field to form an opinion; imperfect data, on the other hand, "goes to the weight of the expert's opinion, not its admissibility, and is not grounds for exclusion." *Id.* Indeed, the question on a *Daubert* motion is whether testimony is based on sufficient facts and data, *not* "whether the expert employed the best possible input data to form her testimony[.]" *Id.* Here, the former is true.

2.    Dr. Brogaard's Inferences Regarding Aggregate Order Flow are Reasonable.

Defendants argue that because their customers *may* have had multiple traders placing orders through Defendants' systems, no inference of manipulative intent can be drawn from an analysis of aggregate, firm-level trading data.  Mem. 8-9.  This is nonsense.  Dr. Brogaard's aggregation offers no basis for excluding his opinion.  *See, e.g., Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F. Supp. 2d 269, 286 (S.D.N.Y. 2011) ("[C]ontentions that assumptions are unfounded go to the weight, not the admissibility of the testimony").  Defendants' surmising that orders and trades in Concordia placed by their customers *might* have come from different traders is just that:  unsupported speculation, which is no basis for exclusion.  *See Molly C.,* 2024 WL 4850813, at *12 (finding defendant failed to show plaintiff's expert's opinions were based on insufficient data and assumptions where defendant "present[ed] no inconsistent data or contradictory research.").  Dr. Brogaard fully explained the bases for his corporate-level analysis and provided ample support for his approach from other regulatory contexts and Defendants' own behavior.  [*See* ECF 517-4 ¶¶ 79-94.]  Defendants simply disagree with Dr. Brogaard's decision to aggregate; Defendants' disagreement is no basis for excluding Dr. Brogaard's opinion.

3.    Dr. Brogaard's Inferences Regarding Order Timing are Reasonable.

One of the many flaws in Merrill's data productions is that the order message timestamps inaccurately show multiple order and trade messages occurring within the same millisecond, such that the *actual* sequence of each order message was unclear.  [ECF 517-4 ¶¶ 91-98.]  In analyzing this data, Dr. Brogaard made the reasonable inference—based on logic, which he explained—that new orders occurred *first*, followed by cancels (given that you cannot cancel an order that has not yet been placed), and then executions.  *See id.*  Defendants argue not only that this inference was unreasonable, but that *no* reasonable inference could be drawn with respect to sequencing, creating

an insurmountable obstacle to any expert who would try to analyze their data.  Defendants are thus attempting to turn the flaws *in their own data* into an immunity shield.

It is well-settled that experts' assumptions are <u>only</u> a basis for exclusion where they are "so speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 213–14 (2d Cir. 2009) (quotations and citations omitted).  Dr. Brogaard's sequencing inference does not come close to meeting that standard.  To the contrary, when in his Reply Report, he conducted counter-analysis, it demonstrated that the sequencing inference in his initial report was robust, reasonable, and methodologically sound, and that an alternate assumption would have resulted in, at most, *de minimus* deviations from his results.  [ECF 517-4 ¶¶ 105-114.]

Defendants also attack Dr. Brogaard's sequencing inference with a <u>March 7, 2025</u> declaration from Merrill customer ██████ based on *microsecond*-level ██████ order and trade data that had been repeatedly requested by Harrington during discovery yet *never* previously disclosed by Merrill or ██████.  [ECF 517-7 ¶¶ 9-11.]  Ironically, this declaration confirms the reasonableness of Dr. Brogaard's inference.  In the ██████ ██████ spoofing episodes, Dr. Brogaard's sequencing inference was utilized 15,425 times.  The ██████ declaration, however, offers only <u>three</u> instances in which the inferred sequence does not match ██████'s claimed records; it does not dispute the accuracy of the inference for the remaining 15,422 (***99.98%***).  *See id.*  This is compelling evidence that Dr. Brogaard had "good grounds" for his assumption which, in any event, goes "to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp.*, 571 F.3d at 213–14. (citations omitted). Simply, experts are permitted

to make reasonable inferences, and under controlling law, their opinions may <u>not</u> be excluded solely because those inferences did not turn out to be 100% accurate in all instances.[3]

### B. **The Sufficiency of Nonparty Data Must Be Considered in Context.**

Perhaps most shocking of all is Defendants' argument that Dr. Brogaard's approach is not based on sufficient fact or data because he "looked only at ███ Canadian trading and did not review *the same firm's* U.S. trading data, which did not run through CIBC." Mem. 10 (emphasis in original). ███ U.S. trading data was <u>exactly</u> the information that CIBC argued— successfully, in defeating Harrington's motion to compel [*see* ECF 344]—was "*irrelevant*." [ECF 357 at 1 (emphasis added).] During lengthy oral argument on the motion, CIBC fervently argued that nonparty information that CIBC did not itself possess was not relevant to Harrington's claims against CIBC, notwithstanding that it might bear on demonstrating ███ manipulative intent. [ECF 384 at 33:18-34:15.] This Court *agreed*, holding that "Plaintiff's argument concerning CIBC's scienter does not require it to examine the trading data of the Non-Party Customer." [ECF 382 at 5.] Now, Defendants have done an about-face and brazenly argue that the *very same* information is *so critically relevant* to assessing ███ intent that Dr. Brogaard's liability analysis must be excluded in its entirety in the absence of it! This argument is not just shameless; it is barred by <u>both</u>: (i) judicial estoppel, which "'generally prevents a party from prevailing in one

---

[3] As the Second Circuit has held, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will <u>not</u> render an expert's opinion *per se* inadmissible," and to the contrary, testimony should <u>only</u> be excluded where the "flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Amorgianos,* 303 F.3d at 267 (quotations and citations omitted; emphasis added). According to the Second Circuit, the sharp limit on when expert testimony should be excluded "accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony," because "[a]s the Supreme Court has explained, <u>vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.</u>" *Id.* (quotations and citations omitted; emphasis added); *see also Cedar Petrochemicals,* 769 F. Supp. 2d at 287 ("[G]rounds for the expert's opinion merely have to be good, they do not have to be perfect." (citation omitted)); *Zeolla v. Ford Motor Co.,* No. 09–40106–FDS, 2013 WL 308968, at *9-10 (D.Mass. Jan. 24, 2013) ("[W]hile an expert's methodology must be reliable and scientifically sound, there is no requirement that the analysis be perfect.").

phase of a case on an argument and then relying on a contradictory argument to prevail in another phase,'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 485–86 (2d Cir. 2014) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)); and (ii) the law-of-the-case doctrine. *See In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483, 2007 WL 2376170, at *7 (S.D.N.Y. Aug. 10, 2007) (holding that when a "litigant takes contrary positions within the same proceeding," and "the court ruled on and upheld the initial position, that ruling constitutes law of the case" (citation omitted)). Because Defendants prevailed on a motion based on the argument that it was irrelevant, the nonparty data must be considered irrelevant here.

In any event, an expert opinion is not inadmissible simply because there are gaps in the underlying data.[4] Dr. Brogaard's conclusions are reliably drawn from the data available, and the absence of the nonparty data goes, at most, to the weight of Dr. Brogaard's testimony. *See, e.g., Athena Art Fin. Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982,* No. 20-CV-04669, 2024 WL 1116083, at *5 n.2 (S.D.N.Y. Mar. 14, 2024) (Figueredo, J.) ("Athena's objection that Plummer failed to consider these documents goes to the weight, not the admissibility, of his testimony."). Here, Dr. Brogaard made clear that, although he did not have any customer code or algorithms, they were not necessary for him to reach his conclusions. [ECF 517-4 ¶ 141.] He testified that he was comfortable with the conclusions he drew based on the

---

[4] *Cedar Petrochemicals* is particularly instructive. There, the defendant moved to exclude the plaintiff's expert, arguing that gaps in the information on which plaintiff's experts relied rendered the expert's testimony inadmissible. 769 F. Supp. 2d at 284-28. The court denied the motion, finding that experts "commonly extrapolate from existing data" and questions over "whether there is a sufficient factual basis for an expert's testimony may go to weight, not admissibility." *Id.* at 284-285 (quotations omitted). To the contrary, the court found it was to the experts' "credit" that they discussed—as Dr. Brogaard did here—the limited available data and why such data was not necessary to their conclusions. *Id.* (noting that where, in the absence of complete information, an expert makes "limited assertions tied directly to the limited evidence they had available to them," and has been "upfront about the limitations of their analysis," the expert's upfrontness "is, in [the court's] view, *to their credit*, and will allow for a more frank assessment of the weight that should be afforded to their conclusions." *Id.* at 285 (emphasis added). Whether those facts are sufficient to render their opinions persuasive is a question for the finder of fact. *Id.*; *see also Capri Sun GmbH v. Am. Beverage Corp.,* 595 F. Supp. 3d 83, 135 (S.D.N.Y. 2022).

data that was available to him, and he could not say whether any additional data would have affected his opinion. Ex. B at 199:14-25. Defendants' argument merely goes to the probative value of Dr. Brogaard's opinion and is not a basis for its exclusion.

    **C.**   <u>Neither Dr. Brogaard Nor This Court are Required to Accept as True the Self-Serving (and Post-Fact Discovery)</u> ███████████ <u>Declaration.</u>

    Defendants fare no better with their attempt to exclude Dr. Brogaard's testimony for combining the trading activity of apparent alter egos ███ and ███████ for the purposes of his spoofing analysis. Dr. Brogaard had ample basis to address them in the collective; to name just a few examples: the employee who ran Merrill's direct market access system testified that ███ and ██████ were related entities, and that ███████ was the U.S. broker-dealer for ███ (Ex. D at 421:17-24); ██████ is a wholly-owned subsidiary of ███ [ECF 517-4 ¶ 86]; and ███ and ██████ operated from the same physical address (*id.*). In addition, ████████ has no customers, meaning it trades on a proprietary basis. Because ████████ is a wholly-owned subsidiary of ███, it thus trades *for the benefit of* ████. *Id.* ¶ 87. In his report, Dr, Brogaard set forth each of these bases for his factual assumption. *Id.* ¶¶ 86-91. Experts are permitted to base their opinions on contingent facts to be decided by the factfinder at a later date, and whether or not ███ and ██████ trading was coordinated is just such a factual question. *See United States v. Asare*, No. 15-CV-3556, 2019 WL 5693477, at *5 (S.D.N.Y. Nov. 4, 2019) ("Experts regularly provide opinions based on facts they assume to be true."); *Rosario v. City of New York*, No. 18-CV-4023, 2021 WL 1930293, at *5 (S.D.N.Y. May 13, 2021) (same) *Chavez v. Dolgencorp of Texas, Inc.,* No. 7:22-CV-00199, 2023 WL 4679004, at *2 (S.D. Tex. July 21, 2023) (same).

    There is also no basis whatsoever for Defendants' argument that Dr. Brogaard must now accept as true the *ex post facto*, self-serving statement submitted by ████████ shared CEO, asserting that the entities' trading is not coordinated and that they did not spoof. Mem. 9. Simply

put, neither Dr. Brogaard nor this Court are required to accept as true such a declaration. *See, e.g.,* *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,* 714 F. Supp. 3d 65 (E.D.N.Y. 2024) (finding expert was "not required to include or agree with witness testimony concerning the objects of his analysis."). As set forth above, and at further length in his reports, Dr. Brogaard fully explained the substantial factual bases for the inferences and assumptions that he made, and his conclusions were reliably drawn therefrom.

**II.**    **Dr. Brogaard's Methodology is Reliable and Based on Well-Settled Principles.**

    **A.**    **The Supposed Novelty of Dr. Brogaard's Approach is no Bar to Admissibility.**

        1.    The Novelty of the Case Required that Dr. Brogaard Develop a
            Methodology to Use in This Litigation.

It is unsurprising and unremarkable that Dr. Brogaard has not identified another case in which an expert has applied either his Posting or Quantity Methodologies. This is because *this case is the most advanced civil spoofing case in the country.* There was no blueprint for Harrington's experts to follow. Dr. Brogaard had no choice but to develop a methodology to determine if spoofing was present, which he did using reasonable assumptions and inferences based on methodologies that courts have blessed. The notion that an expert's methodology should be deemed inadmissible simply because it is "new" defies logic. If that were the case, then no plaintiff in a civil spoofing action (or in any as yet un-litigated market manipulation matter) could *ever* recover (which, Harrington suspects, is Defendants' aim).

Of course, the claimed novelty of Dr. Brogaard's Methodologies is no basis for its exclusion. Courts in this Circuit consistently hold that novel methodologies should not be excluded. *See, e.g., Amorgianos v. Amtrak*, 303 F.3d 256, 266-267 (2d Cir. 2002) ("[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion," lack of textual support may "go to the weight, not the admissibility" of the expert's testimony); *Fed. Hous. Fin. Agency*

*v. Nomura Holding Am., Inc.*, 104 F.Supp.3d 441, 502-03 (S.D.N.Y. 2015) (permitting the use of a new automated valuation model that had not been peer reviewed and was developed for litigation); *Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 323-28 (N.D.N.Y. 2000) (permitting the use of novel valuation methodology to address a unique appraisal situation that older valuation models were not conducive to). Any methodology that is now accepted as standard by courts was necessarily, at one time, "new." As set forth below, while Dr. Brogaard's methodology may be new, it is still reliable and relevant and therefore admissible.

> ## 2.  Dr. Brogaard's Approach Was Not Actually Novel.

And in fact, Dr. Brogaard's Methodologies for detecting spoofing are <u>not</u> entirely novel; in fact, there is <u>significant overlap</u> between the criteria and approach used by Dr. Brogaard here and those used by *Defendants'* own expert, Dr. Terrence Hendershott, when *he* was retained as a plaintiff's expert (by the SEC) to identify trading patterns consistent with layering, which is a form of spoofing. The *general* approach used by Dr. Hendershott to detect "layering loops" (a form of spoofing) in *SEC v. Lek Sec. Corp.,* 370 F. Supp. 3d 384 (S.D.N.Y. 2019), *on reconsideration in part,* No. 17 Civ. 1789, 2019 WL 2114067 (S.D.N.Y. May 8, 2019) (denying a motion to exclude Dr. Hendershott's methodology) is *identical* to that of Dr. Brogaard here:  both experts looked for limit order imbalances before an execution, an execution on the opposite side of the imbalance, and an easing of the imbalance following the execution.

And although the *details* of Dr. Brogaard's approach here differ from that of Dr. Hendershott in *Lek*, the difference is of degree, not substance (especially for the Quantity Methodology). For example, Dr. Hendershott incorporated an "execution imbalance" criteria of at least three-to-one to "eliminate trading strategies such as market making from the Loops." *Id.* at 391. Dr. Brogaard's Posting and Quantity Methodologies both similarly utilized imbalances as criteria to distinguish manipulative activity from market-making. [ECF 517-4 ¶ 60.] For another

example, one of Dr. Hendershott's criteria for identifying layering loops was a 60-second window for orders to be resolved through cancellation or execution. *Lek*, 370 F. Supp. 391. For the Quantity Methodology, Dr. Brogaard used an *even more conservative* 30-second window, which he explained is a criterion better-supported by academic literature. [ECF 517-4 ¶ 30.] As discussed above, novelty is no bar to admissibility, but here, Dr. Brogaard's approach is not actually novel—it mirrors the court-approved approach used by Dr. Hendershott in *Lek*.

### B. Peer Review Status of Dr. Brogaard's Paper is No Bar to his Testimony Here.

That an expert's approach has not been published in a peer-reviewed journal is no bar its admissibility.[5] *See Kochert v. Greater Lafayette Health Servs., Inc.,* No. 4:01CV0027 AS, 2004 WL 5508677, at *2 (N.D. Ind. Nov. 15, 2004). Lack of textual support for a methodological approach goes, again, to weight, not admissibility. *See Amorgianos v. Amtrak*, 303 F.3d at 266-267; *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995) (holding that "[g]eneral acceptance in the relevant scientific community" is <u>not</u> a "determinative" factor). Indeed, as the Supreme Court acknowledged in *Daubert*, "some propositions are too particular, too new, or of too limited interest to be published." *Daubert*, 509 U.S. at 593. Spoofing is a fairly recent form of high-frequency market manipulation, and detection methods are in their infancy.

Defendants nevertheless argue at length that because Dr. Brogaard's working paper has not yet been published in a peer-reviewed journal, his testimony here must be excluded. Defendants are wrong. Defendants' characterization of the methodology used by Dr. Brogaard in his working paper—which in any event, is distinct from the Methodologies[6]—as having been "rejected" by his

---

[5] Indeed, the methodology Hendershott developed in *Lek* was reliable under *Daubert* despite not having been peer-reviewed. Ex. C at 115:14-117:10.

[6] While there is some overlap, it is not an apples-to-apples comparison, and if anything, the approach Dr. Brogaard took in this case was in most respects far *more conservative* than the one set forth in his working paper. *See* Ex. A at 41:3-14, 189:3-190:5, 210:22-25. A partial list of these distinctions are as follows: (i) whereas here, Dr Brogaard

peers, Mem. 13-16, is risibly false.  Dr. Brogaard submitted his paper for publication to a total of two journals.  *Id.* at 25:2-8.  While one journal declined to publish the paper, the second journal provided feedback and requested a "revise and resubmit" (*id.* at 35:18-23), which, according to Dr. Hendershott, *typically leads to publication*.  Ex. C at 57:12-58:9.  Indeed, Dr. Hendershott confirmed that those submitting papers for publication in peer-reviewed journals often receive criticism prior to publication.  *Id.* at 55:14-58:9.  For from being "rejected," at least one peer-reviewed journal indicated openness to publishing Dr. Brogaard's paper, and it is entirely possible that it will be accepted for publication by the time the Court rules on this motion.

## C.  The Comments of a Discussant and Audience Member at a Discussion Panel Do Not Bar the Admission of Dr. Brogaard's Report.

Defendants fare no better with their attack on Dr. Brogaard's methodology as having been "rejected" by his peers when his working paper was discussed at the SEC's 11th Annual Conference on Financial Market Regulation (the "SEC Conference").  Indeed, in order to even be discussed, a paper must be of outstanding quality and highly regarded by peers—in this year's SEC Conference, for example, the current paper acceptance rate is just 4%.[7]  The fact that Dr. Brogaard's paper was on the program at the SEC Conference is a signifier of its quality and acceptance by his peers.  But still, the constructive criticism Dr. Brogaard received from a discussant and an audience member (the "Criticizers") is not pertinent here for several reasons.

---

only considered the resting limit orders in the two seconds before execution, in the working paper, the applicable filter used a 30-second window; (ii) whereas here, Dr. Brogaard only considered orders within ten cents of the NBBO, in his working paper, all orders were considered; (iii) whereas here, the number of buy shares executed needed to be at least twice that of the number of sell shares executed, in the working paper, any ratio over 1:1 was sufficient; and (iv) whereas here, the post-trade window was 3 seconds, in the working paper, it was 10 seconds.  *See* Exs. F, G; Initial Reports.

[7] *See Annual Conference on Financial Market Regulation (CFMR),* Lehigh University: College of Business, https://business.lehigh.edu/centers/center-financial-services/news-and-events/annual-conference-financial-market-regulation (last visited Sept. 12, 2025).

*First*, the Criticizers' questioning of whether the paradigm in Dr. Brogaard's academic paper could be used to infer manipulative intent was a general point regarding whether intent could *ever* be inferred *in an academic context*.  The Criticizers were *not* opining on the specifics of the methodology used in Dr. Brogaard's paper, much less whether any methodology could be used to infer manipulative intent and identify spoofing in the context of an expert analysis in a spoofing litigation.  Of course, Defendants' expert Dr. Hendershott disagrees with the Criticizers; he made precisely the same inference in *Lek*.  *See Lek*, 370 F. Supp. at 391.

*Second*, receiving critical yet constructive feedback on a working paper is a normal part of the publication process, as even Dr. Hendershott acknowledged.  *See* Ex. C at 55:14-58:9; Ex. A at 174:10-20.  *Third*, if the Criticizers were correct as Defendants suggest, then the thrust of their criticism would apply not only to Dr. Brogaard's methodology in this case, but to *every* spoofing analysis conducted in *every* spoofing case—an insurmountable barrier for *any* expert to infer manipulative intent based on observed patterns in trading data consistent with spoofing.  An academic point raised by a professor in an academic setting regarding the very concept of inferring intent cannot serve as the basis for disqualifying Dr. Brogaard *in this case* under Rule 702.

### D.  The Application of a Verification Analysis Akin to an Error Rate Analysis Further Demonstrates the Reliability of Dr. Brogaard's Methodology.

#### 1.  An Error Rate Analysis as Defendants Propose Is Not Necessary or Even Possible Here.

Defendants argue—without citing any supporting authority—that Dr. Brogaard's testimony must be excluded because he did not calculate "a proper error rate" by applying his Methodologies to a control sample of trading data "known to have no spoofing."  Mem. 17. This argument represents another instance in which Defendants are attempting to impose an impossible-to-satisfy test that would not only exclude Dr. Brogaard's testimony but that of *any* spoofing liability expert because *no such control sample exists*.  As even Dr. Hendershott acknowledged

during his deposition "it would be difficult to know whether or not there's no spoofing" in any given dataset.  Ex. C at 205:21-206:11.  Perhaps that is why, in *Lek*, Dr. Hendershott failed to provide any quantifiable error rate to support *his* novel approach to detecting spoofing.  *Lek*, 370 F.Supp.3d at 404-05.  And although the defendant in *Lek* moved to exclude Dr. Hendershott's testimony for lack of an error rate, the court <u>denied</u> that motion.  *See id.*

2.    <u>Dr. Brogaard's Methodology Has Been Subjected to a Test to Ensure its Reliability and has Passed.</u>

Critically, error rate analyses are not *parts* of methodologies, but rather, *ways to test* the reliability of a methodology.  *See Daubert*, 509 U.S. at 594.  Because no true error rate analysis was possible here, Dr. Brogaard employed another approach to test the reliability of his Methodologies:  he ran them on the trading data for other of Defendants' customers to establish a type I error rate (wherein a methodology might generate false positives).  [ECF 517-4 ¶ 20.]  Dr. Brogaard's reliability analysis confirms that the vast majority of Defendants' customers exhibited no meaningful spoofing-like behavior.  [ECF 517-4 ¶¶ 16-20]  In contrast, 9.56% of ███ buy-side trades and 26.45% of ████████ buy-side trades were flagged as indicative of spoofing— more than all other market participants (many of whom were market makers) combined.  *Id*.  This self-evident disparity is consistent with the assumption that spoofing behavior is not endemic in the markets, and it rules out Defendants' suggestion that the Methodologies are merely labeling market making behavior "spoofing."  Rather, Dr. Brogaard's analysis finds something unique to these customers that is absent in their comparators' trading data.[8]

---

[8] Rather than reckon with or address this finding, Defendants cynically argue that it should not be considered because it was introduced in his Reply Report.  Mem. 17.  Dr. Brogaard, however, made it clear that he included this analysis in his Reply Report to respond to specific criticisms raised in Hendershott's rebuttal report.  [ECF 517-4 ¶¶ 17, 105, 109.]

3.    The Possible Existence of Upward Spoofing is Irrelevant to the Results of Dr. Brogaard's Analysis.

In responding to Dr. Hendershott's suggestion that Dr. Brogaard's analysis was unreliable because it only looked for downward spoofing, Dr. Brogaard explained that the presence or absence of upward spoofing is irrelevant to the identification of downward manipulation.  [ECF 517-4 ¶ 68-78.]  Dr. Brogaard clearly stated that the objective of his initial analysis was to determine if Defendants' customers were engaged in downward spoofing of Concordia's stock during the Relevant Period—a question his Methodologies conclusively answered in the affirmative—and he makes no claim that his Methodologies are equally applicable to the detection of upward spoofing.  *Id*. at 68-69.  It is well-settled that the reliability of experts' methodologies is gauged against the question that the expert was actually requested to answer, not ones the other party believes should have been addressed.  *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB), 2025 WL 354671, at *56 (S.D.N.Y. Jan. 30, 2025) (denying a motion to dismiss based on arguments that when an expert's methodology was applied to different questions than asked, it produced implausible results, holding that "[i]f the expert has built a car, that car is not unreliable because [opposing counsel] shows that it makes a poor boat").

In any event, although Defendants suggest that applying Dr. Brogaard's Methodologies to check whether there were upward spoofing episodes is akin to a "placebo test" that can be used to test whether Dr. Brogaard's Methodologies result in false positives, Mem. 16—with the implication being that a spoofer is unlikely to spoof both upwards and downwards in the same timeframe—the opposite is true.  Previous court cases have shown that downward spoofers often *also engage in upward spoofing* to help drive up the price as they unwind their positions.  *See e.g., SEC v. Lek Sec. Corp.*, 612 F. Supp. 3d 287 (S.D.N.Y. 2020); [ECF 517-4 ¶ 74].  Thus, if Dr. Brogaard's Methodologies also detect upward spoofing that is an indicator of their *reliability*.

Defendants also argue that if the upward spoofing episodes detected by Dr. Brogaard's Methodologies are not false positives, it would be inconsistent with "Harrington's theory and would make Dr. Shapiro's damages calculations unreliable." Mem. 16. This misunderstands Harrington's theory of the case and is misplaced. It is not Harrington's position that there was no upwards spoofing—indeed, as outlined above, upward spoofing may be consistent with a downward spoofing strategy—and the potential implications of damages for upward spoofing are addressed separately in the appropriate place: Harrington's opposition to Defendants' motion to exclude Dr. Shapiro's testimony, which is being filed concurrently herewith.[9] For *this* motion, Dr. Brogaard's opinions about downward spoofing stand on their own merits and are reliable.

**E.  Dr. Brogaard's Posting Methodology is Reliable.**

Defendants argue the Posting Methodology is unreliable because in the spoofing episodes identified through it, at least some sell orders were canceled before the buy execution. Mem. 18. This critique overweights the impact of cancellations and misunderstands the purpose of the Posting Methodology and the type of spoofing it is intended to capture.[10] As set forth in Dr. Brogaard's initial reports, "[t]here is not one single approach by which a trader can manipulate a stock price by spoofing the market." Initial Reports ¶ 44. The Posting Methodology is "meant to capture a quoting-based approach to distort the supply and demand of the limit order book" in which the spoofer is trying to "drive other market participants' reactions." *Id.* ¶ 47. This type of

---

[9] It is worth noting that the impact of upward spoofing is not necessarily reciprocal and has not been modeled by any party's expert in this case. Defendants' argument fails to consider, for example, that upward spoofs could further drive Concordia's stock price *down*, even if, by design, they are intended to have a short-term positive price impact. [ECF 517-4 ¶ 75-77.] The downward price pressures that could result from upward spoofing include a decrease in market confidence and market liquidity, an increase in trading costs for investors, and increased volatility. *Id.*

[10] The critique also misunderstands how spoofing works outside the context of the Posting Methodology, in that in other circumstances, a spoofer may begin to unwind its manipulative behavior prior to the execution of its intended order, such as when its baiting orders are at risk of execution, or when the baiting orders have induced enough other sell orders that they can be canceled with minimal impact. Initial Reports ¶ 24.

spoofing may involve "fleeting orders"—orders that are entered and cancelled very quickly—for which the impact of cancellations is of "questionable value." [ECF 517-4 ¶¶ 35, 40].

Once the desired market activity has been induced, the spoofer can begin to unwind the sell orders with little downside because it is well-settled that order placement has a larger impact on price than order cancellations, and a new order matters more to market participants than a new cancel. *Id.* ¶¶ 36, 43. Accordingly, other experts have also discounted the importance of cancellations. *See id.* ¶ 38 (citing Ex. E). In fact, Dr. Hendershott's own work further establishes the diminished role that cancellations play relative to new orders. [ECF 517-4 ¶ 37]. And fleeting orders have been shown to impact subsequent NBBO prices by igniting momentum and herding behavior, wherein traders or automated trading algorithms react to the appearance of new orders in the limit book. *Id.* ¶¶ 40, 41. Accordingly, empirical evidence and established academic literature support the deemphasis on cancellations in Dr. Brogaard's Posting Methodology.

### F. Dr. Brogaard's Quantity Methodology is Reliable.

Defendants argue that the Quantity Methodology is flawed because it ignores "resting" orders placed more than 30 seconds before the execution rather than considering the entirety of the order book when looking for order imbalances. Mem. 19. But the methodology's focus on recent orders placed within a 30-second window prior to execution "is consistent with contemporary research on market microstructure, which shows that recent order flows have a significantly stronger predictive power for short-term price movements compared to static snapshots of the entire order book." [ECF 517-4 ¶ 22.] In his Reply Report, Dr. Brogaard extensively cited literature from Drs. Carl Hopman, Rama Cont, Arseny Kukanov, Sasha Stoikov, Petter N. Kolm, Jeremy D. Turiel, and Nicholas Westray in which those experts, like Dr. Brogaard, focus on metrics other than the static state of the resting orders in the order book, such as: (i) the *change* in the order book from one time period to another, rather than the static state of the resting orders

in the order book in totality; (ii) short-term price impacts arising from order flow information, which Dr. Hopman used to establish "a strong contemporaneous correlation between order flow and price movement;" and (iii) order flow rather than the order book because "models trained on [order flow] significantly outperform most models trained directly on the order book." *Id.* ¶¶ 24-26. Dr. Brogaard's use of a 30-second window "is squarely based in the academic literature and is purposefully designed to capture manipulative behavior that has been shown to be relevant, and in fact superior to the measure of the state of the order book." *Id.* ¶ 27.

### G. **Dr. Brogaard's Methodologies Reliably Identify Different Types of Spoofing.**

As discussed above, because spoofers may spoof in different ways designed to induce different reactions in different market participants, multiple detection methodologies are necessary to capture multiple spoofing methodologies. Accordingly, Dr. Brogaard designed (i) the Posting Methodology to "capture a quoting-based approach" through fleeting orders intended to distort perceptions of supply and demand and (ii) the Quantity Methodology to capture "resting" orders on the limit book intended to influence other market participants. Initial Reports ¶¶ 42-55.

Yet although they were plainly designed to detect different methods of spoofing, Defendants absurdly argue that Dr. Brogaard should have *combined* the Posting and Quantity Methodologies and weeded out all instances that did not satisfy both Methodologies at the same time. *See* Mem. 19. This argument represents either a gross misunderstanding or intentional mischaracterization of Dr. Brogaard's opinions and the reasons he applied two Methodologies. *See* [ECF 517-4 ¶¶ 45-49.] Nor is there any basis to Defendants' argument that spoofing episodes identified through one methodology should be eliminated if the signals viewed by the other differ. Some market participants might respond to spoofing carried out by fleeting orders entered and cancelled very quickly, even as others respond to spoofing carried out over a longer time horizon. *Id.* ¶ 40. Rather than indicating methodological weakness, differences in outcomes between these

two methods validate their effectiveness in capturing <u>different forms of spoofing activity</u>, ensuring a comprehensive and accurate assessment of market manipulation. *Id*. ¶ 49. Defendants have not demonstrated that Dr. Brogaard made any error. Rather, they are arguing that Dr. Brogaard's conclusions are wrong, which is an argument for cross-examination at trial, not the preclusion of testimony. *See Amorgianos,* 303 F.3d at 267.

### H. <u>Defendants' Meritless Accusation that Dr. Brogaard Engaged in a Results-Driven Approach is Not a Basis for the Exclusion of his Opinions.</u>

Defendants' accusation that Dr. Brogaard engaged in a results-driven approach is an *ad hominem* attack on his alleged bias that has no relevance to assessing the reliability of his Methodologies. *See Tedone v. H.J. Heinz Co.,* 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (holding expert's bias goes to weight and not admissibility of testimony); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 n.137 (S.D.N.Y. 2015) (same). As importantly, it is simply not true. Dr. Brogaard fully explained the basis for every criterion used by his Methodologies, *see* Initial Reports ¶¶ 56-90, and demonstrated that his approach was impartial, supported by current literature, and well-grounded in economic principles. *See* [ECF 517-4 ¶¶ 6-67.] Dr. Brogaard testified that (1) he decided upon the Methodologies' criteria *before* he knew how much spoofing they might find, (2) he conducted stress testing of his Methodologies to ensure they "were not particularly sensitive to small variations in the criteria," (3) such stress testing did not result in any material changes in the criteria he originally selected, and (4) he never adjusted his criteria based on the amount of spoofing they generated. *See* Ex. B at 205:10-207:19. Dr. Brogaard explained every facet of his approach and how he developed it, and vigorously disputed that his analysis was outcome-driven. If Defendants wish to make baseless accusations regarding Dr. Brogaard's motivation, the time for that is cross-examination.

## I.    Dr. Brogaard Methodology is Reliable Because He Accounted for Alternate Explanations such as Market-Making.

An expert is not required to "categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Cedar Petrochemicals,* 769 F. Supp. 2d at 287 (citation omitted).  However, it is <u>demonstrably false</u> to suggest that the possibility of Defendants' customers engaging in market-making was overlooked.  *Entire sections* of Dr. Brogaard's reports were devoted to explaining how his Methodologies endeavor to distinguish spoofing from market-making.[11]  Initial Reports ¶¶ 50-51, 85-87; [ECF 517-4 ¶¶ 50-67].  Dr. Brogaard explicitly addressed the possibility that Defendants' customers might legitimately be placing orders on both sides of the market at the same time.  [ECF 517-4 ¶¶ 42, 52, 60, 62-63.]  In fact, the possibility of market-making was baked into his Methodologies' criteria—they were *designed* to separate bona fide market-making strategies from spoofing.  *See* Initial Reports ¶¶ 50-51; [ECF 517-4 ¶¶ 52, 54, 60-63.]

Defendants simply disagree with Dr. Brogaard's conclusions because they proffer as immutable fact that their customers were market-makers and therefore could not spoof.[12]  For one thing, registration as a market-maker is done on a security-by-security basis, and Defendants have not shown (and could not show) that ████████ or ████ were registered market-makers *in Concordia*.  And even if they were acting as market-makers, or engaging in trading strategies akin to market-making, market-makers can also spoof.  Dr. Brogaard's Methodologies are reliable, and adequately considered alternative explanations.[13]  Defendants' motion should be denied.

---

[11] Market-making is referenced in Brogaard's Initial Reports a total of 12 times and in his Reply Report, 37 times.

[12] Defendants' customers employ algorithmic market-making strategies, which is different from operating as a registered market maker.  [*See* ECF 517-4 ¶ 56.]  Defendants are relying on their customers' own characterization of their activities.  *See id.* ¶ 142.

[13] Dr. Brogaard's analysis also addressed the possibility of "random coincidence."  Dr. Brogaard tested his methodology by applying it to *other* market-making customers and found that ████ and ████████ all spoofed at materially higher rates compared to Defendants' other market-making customers.  *See* Section II.D.2., *supra*.

III.    **Dr. Brogaard's Opinions Regarding Inferences of Intent are Admissible.**

In his initial reports, Dr. Brogaard opined that Defendants' customers' trading behavior is *more* consistent with spoofing than non-manipulative trading.  Initial Reports ¶ 9.  In all three of Defendants' <u>compliance</u> rebuttal reports—in excerpts Dr. Brogaard was provided—Defendants' <u>compliance</u> experts criticized Dr. Brogaard for failing to affirmatively opine that any spoofing occurred.  [ECF 517-4 ¶¶ 147-150.]  Accordingly, in his Reply Report, Dr. Brogaard responded to those criticisms by opining that based on the patterns of trading he identified, ███  and ███  spoofed.  *Id.* ¶¶ 148, 149.  Defendants now move to strike that response.

In a classic case of "heads I win/tails you lose," Defendants seek to have their compliance experts make a liability argument (*i.e.*, incorrectly asserting that Dr. Brogaard did not opine on whether spoofing occurred), while simultaneously barring Dr. Brogaard from clarifying his views.  The Court should not entertain this sideshow.  Particularly when Defendants' experts accuse Dr. Brogaard of not opining on intent, Dr. Brogaard should be permitted to clarify and correct them.

Equally baseless are Defendants' arguments that additional information regarding their customers' algorithms and internal communications are necessary for *any* meaningful inference regarding intent.  Aside from being an argument more suited for summary judgment, it is also an argument that—as discussed above, *see supra*, Section I.B—Defendants are barred from making under the law of the case doctrine.  Defendants argued that nonparty discovery to which they were not privy was irrelevant and *this Court agreed*, issuing an order preventing Harrington from obtaining nonparty discovery.  [ECF 382.]  Defendants are now attempting to argue that without nonparty discovery to which Defendants contend they had no access and for which Harrington was not afforded access, the intent of the nonparty traders is unknowable.  Mem. 23-24.  Stated another way, Defendants are admitting they were reckless in not obtaining such information before allowing their customers to trade through their platforms.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

Dated: New York, New York
September 12, 2025

By:  /s/ Alan M. Pollack
Alan M. Pollack
Thomas Filardo
Leron Thumim
Felicia S. Ennis
WARSHAW BURSTEIN, LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel:  212-984-7700
apollack@wbny.com
tfilardo@wbny.com
lthumim@wbny.com
fennis@wbny.com

*Attorneys for Plaintiff Harrington Global
Opportunity Fund*