UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HARRINGTON GLOBAL OPPORTUNITY
FUND, LIMITED,

        Plaintiff,

  v.

BOFA SECURITIES, INC., *et al.*,

        Defendants.

No. 1:21-cv-00761 (LGS) (VF)

Hon. Lorna G. Schofield

Hon. Valerie Figueredo

**REPLY IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE TESTIMONY OF JONATHAN BROGAARD**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

I.   Brogaard's Opinions Should Be Excluded Under Rule 702. ............................................. 2

    A.   Brogaard's Opinions Are Not Based on Sufficient Facts or Data. .......................... 2

    B.   Brogaard's Methodologies Are Not Reliable. ......................................................... 6

        1.   Brogaard's Filtering Methodologies Have Been Rejected by His Peers and Are Not Generally Accepted ........................................................ 6

        2.   Brogaard's Methods Lack a Known Error Rate ........................................ 8

    C.   Brogaard's Methods Are Applied in an Unreliable, Results-Driven Manner. ................................................................................................................... 9

    D.   Brogaard's Methods Fail to Adequately Account for Alternative Explanations, Such As Market-Making. ................................................................ 11

II.  The Court Should Exclude Any Opinion by Brogaard That Customers Engaged in Actionable Spoofing. ....................................................................................................... 11

III. Brogaard's Opinions Are Disconnected from Harrington's Legal Theory and Therefore Unhelpful to the Jury ....................................................................................... 13

CONCLUSION .............................................................................................................................. 13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...................................................................................................6

*Bellis v. New York City Dep't of Educ.*,
   2024 WL 1177232 (S.D.N.Y. Mar. 19, 2024) .........................................................................3

*Lassen v. Hoyt Livery, Inc.*,
   2016 WL 7165716 (D. Conn. Dec. 8, 2016) ...........................................................................5

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) .......................................................................13

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018) ...................................................................................11

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ..................................................................................................13

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997) ....................................................................................................13

*SEC v. Lek Sec. Corp.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019) .......................................................................7, 8, 9, 12

*SEC v. Lek Sec. Corp.*,
   612 F. Supp 3d 287 (S.D.N.Y. 2020) .....................................................................................8

**Rules and Regulations**

Federal Rules of Evidence
   Rule 702 ..............................................................................................................................1, 2

**PRELIMINARY STATEMENT**

Brogaard's opinions that CIBC and Merrill Lynch customers "spoofed" the market for Concordia stock are inadmissible under Rule 702 because they rest on made-for-litigation, results-driven methodologies that are unreliable. Brogaard's data-filtering methods find only specific trade sequences—the precise critique from leading experts when he introduced them in his still-unpublished working paper. He offers no analysis confirming that the sequences are actual spoofing or evaluating how often his methods misidentify legitimate trading as spoofing.

Harrington's opposition barely addresses Defendants' arguments and spins Brogaard's speculation as appropriate "assumptions." Harrington insists, for example, that Brogaard may apply his homemade spoofing detector to aggregated data from a firm *and its corporate affiliates*, even when Brogaard says in his working paper that spoofing analyses require trader-level data, and the record here forecloses his contrary assumption. When Brogaard mistakenly includes episodes where the sell orders were cancelled before the buy trade, Harrington assumes that they are just a different kind of spoofing, albeit one neither described nor demonstrated.

When Brogaard's methods yield contradictory results—both a sell-side imbalance and a buy-side imbalance—he ignores the inconsistency and counts the results anyway. Harrington defends this lack of rigor with only another assumption, citing no supporting fact or market principle, that market participants "might respond" to the sell-side imbalance indicated by one methodology while ignoring the buy-side imbalance indicated by the other. Harrington asserts that Brogaard's application of his methods across all customer data shows "something unique" for these customers, but that speculation does not entitle him to blind himself to contrary data points. And it does not satisfy Harrington's burden to establish that Brogaard's opinions can be presented to a fact finder. As Courts in this District routinely hold, exclusion is mandatory where

1

an expert cannot justify a methodology other than by *ipse dixit* and fails to provide sufficient facts and data to distinguish between competing explanations.

Nor can Harrington justify Brogaard's flawed methods with complaints about discovery and data productions. Harrington had nearly two years to take discovery, and this Court's door was always open. Harrington's excuses do not relieve it of its burden under Rule 702.

The same goes for Harrington's heavy reliance on Judge Schofield's decision denying Defendants' motion to dismiss. Holding that Harrington had met its *pleading* burden says nothing about whether it can meet its *evidentiary* burden. And Harrington's claims have changed since then anyway. In addition to dropping all claims that Defendants themselves spoofed, Harrington abandoned spoofing episodes alleged in its complaint and relies solely on Brogaard as its basis for claiming that customers spoofed. Nothing in the Court's motion to dismiss decision helps Harrington at this stage or saves Brogaard's flawed methods.

I.      **Brogaard's Opinions Should Be Excluded Under Rule 702.**

A.      **Brogaard's Opinions Are Not Based on Sufficient Facts or Data.**

Brogaard's decision to combine firm, and even affiliate, data before analyzing it, regardless of the trading computer or trading country is not reliable. Mem. 8-9. Harrington responds that Brogaard was entitled to make this assumption, and his assumptions, no matter how baseless, go to weight rather than admissibility. Opp. 8. But that is not the law after the 2023 amendments to Rule 702. *See* Fed. R. Evid. 702, 2023 adv. comm. notes.

In his reply report, Brogaard defended his assumption by saying that a "corporate-level" approach was the correct one. BRR ¶¶ 79, 82, and 93. Brogaard did not take this approach for ▮▮▮ however, considering only its Canadian trading and not U.S. trading even though both he and Harrington believed ▮▮▮ Canadian and U.S. Concordia trading were interrelated. Mem.

2

10-11.[1] Harrington responds by blaming CIBC for this failure, going so far as to say that CIBC should be estopped from arguing that his report relies on insufficient data. Opp. 10-11. But the Court decided that Harrington had not shown that ▨ U.S. trading is relevant because it was not conducted through CIBC and therefore CIBC could not possibly be liable for such trading. ECF 382 at 4. Under Brogaard's own reasoning, his opinion resting only on ▨ Canadian trading rests on insufficient data, regardless of how it got that way. It fails the basic requirement of "sufficient facts or data" set forth in Rule 702(b).

As for Merrill Lynch, Harrington defends Brogaard's assumption that ▨ trade as a single trader by claiming that they are "apparent alter egos" because they have a parent/subsidiary relationship and share corporate headquarters. Opp. 12. That does not even legally make them "alter egos," much less establish that they coordinated their trading such that one can infer intent from the trades. Harrington also argues that whether they coordinated their trading is a factual question and Brogaard is permitted to assume facts as he likes. Opp. 12-13. But Harrington knew that ▨ traded only in Canada and ▨ traded only in the U.S.,[2] making an assumption that they traded together unreasonable on its face. More important, the only evidence in the record on the topic is undisputed testimony from ▨ that the two companies trade from different servers located in different countries with no contact between them. SJS Decl. Ex. 7 ¶¶ 3, 6. Harrington argues that Brogaard can ignore ▨ declaration because it is "self-serving," even though ▨ is not a party and has no potential liability to Harrington. Opp. 12. That is not the law: If there is no contrary evidence, there is no issue of

---

[1] Harrington, based upon DTCC data it had acquired months before Brogaard proffered his opinions, argued to the Court on June 4, 2024, that correspondent clearing transfers of Concordia stock positions by ▨ from its U.S. account to its Canadian account at CIBC demonstrated that the accounts were interconnected. Declaration of Stephen J. Senderowitz, dated October 10, 2025 ("SJS Reply Decl."), Ex. 1 (Dep. Tr. of J. Brogaard, May 14, 2025) (cited as "Tr. Vol. 1"), 110:24-111:25 and 114:18-115:9.

[2] Declaration of Abby F. Rudzin, dated October 10, 2025 ("AFR Decl."), ¶ 2.

3

fact. *See, e.g., Bellis v. New York City Dep't of Educ.*, 2024 WL 1177232, at *2 (S.D.N.Y. Mar. 19, 2024) (Party's "assertion that 'self-serving' deposition testimony is not competent evidence to establish a fact for purposes of a summary judgment motion is plainly wrong. Indeed, a party can secure summary judgment in his favor if his deposition testimony supports summary judgment and is unrebutted by other evidence."). That ▓▓▓▓ traded separately in different countries is an *established fact*, and Brogaard's assumption to the contrary renders his opinion unreliable.

Harrington had every opportunity to collect evidence on this topic—it issued document subpoenas to ▓▓▓▓ and a deposition subpoena to ▓▓ AFR Decl. ¶ 3. Harrington chose to accept a declaration and small data production from ▓▓▓▓ rather than pursue the subpoenas further, even after this Court extended discovery for Harrington to do so and granted its request to take three customer depositions. *Id.* ¶ 4. Harrington did not produce the declaration to Defendants until October 8—a month after it was signed and the same day Harrington served Brogaard's report. *Id.* ¶ 5. Merrill Lynch then sought an additional clarifying declaration from ▓▓ and served that declaration on Harrington on the day ▓▓ provided it. *Id.* ¶ 6. This chronology makes Harrington's complaint that the second declaration was provided post-fact discovery disingenuous at best—it was obtained in response to the declaration Harrington served on Merrill Lynch months after discovery had closed. Harrington goes even lower by suggesting that Merrill Lynch "worked closely with their nonparty customers to oppose Harrington's discovery efforts." Opp. 6. But Merrill Lynch did not speak to anyone at ▓▓ or ▓▓▓▓ or with their counsel until after receiving Brogaard's report and the first declaration, which Harrington chose to obtain unilaterally in lieu of a deposition at which Merrill Lynch could also ask questions.

4

Harrington also cannot justify Brogaard's other unsupported assumption—that ▮ sell orders and buy trades with the same millisecond timestamp are 100% of the time sequenced as all the sell orders are placed before the buy execution. Mem. 11-12. Harrington defends this assumption, which ▮ microsecond data proves is contrary to fact, by noting that ▮ disproved it for only three examples, and Brogaard made this assumption more than ▮ times. Opp. 9-10. But Harrington has it backwards: Harrington bears the burden of proof, both on this motion and at summary judgment. It is not Merrill Lynch's obligation—and certainly not third-party ▮ obligation—to check all ▮ times Brogaard made this assumption.

Harrington again tries to blame Merrill Lynch for this failure, complaining that "microsecond-level ▮ order and trade data . . . had been repeatedly requested by Harrington during discovery yet never previously disclosed by Merrill or ▮." Opp. 9. But as ▮ explained, the microsecond data came from its own files—it was not withheld by Merrill Lynch. SJS Decl. Ex. 7 ¶ 7. Nor is there evidence that Merrill Lynch did something to create so many entries with the same millisecond time stamp.³ And Harrington's assertion that it "repeatedly requested" miscrosecond data from ▮ is false. Harrington served a single subpoena on ▮ and then chose to accept a limited amount of data in response and not pursue the requests further. AFR Decl. ¶¶ 3-5. That decision does not entitle Brogaard to make unwarranted assumptions.

---

³ This makes Harrington's citation to *Lassen v. Hoyt Livery, Inc.*, 2016 WL 7165716 (D. Conn. Dec. 8, 2016), unavailing. Opp. 7. That case involved the defendant's failure to pay overtime wages, and the defendant failed to keep time records—i.e., the poor record keeping was intertwined with the tort itself. And unlike Brogaard, the expert there did not rely on assumptions alone: his "methodology accounted for Defendants' flawed recordkeeping" by "opting to recalculate it" using records of the employee's actual tasks. *See* 2016 WL 7165716, at *9.

### B. Brogaard's Methodologies Are Not Reliable.

#### 1. Brogaard's Filtering Methodologies Have Been Rejected by His Peers and Are Not Generally Accepted

Harrington does not dispute that the Posting and Quantity Methodologies have not been applied in any other case or published in any journal. Harrington notes that novelty alone does not dictate exclusion, though it concedes that Brogaard must "otherwise reliably utilize[] scientific methods to reach a conclusion." Opp. 13 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).[4] But experts have roundly criticized Brogaard's data-filtering methodology as unscientific. Mem. 13-14. Harrington responds that the critique at the SEC conference last year did not address "the specifics of the methodology." Opp. 17. But the critique is fatal because the problem is more fundamental than the "specifics": Brogaard finds trading sequences in massive datasets and infers manipulative intent from those sequences alone. Mem. 14.[5] Harrington cannot blunt this flaw by asserting that Defendants' expert Hendershott "made precisely the same inference in *Lek*," Opp. 17, because he did not. *See infra* at 12. Nor was the critique of Brogaard merely "an academic point raised by a professor in an academic setting," Opp. 17—his critics were two former SEC chief economists speaking at an SEC-sponsored event, in the context of adverse policy and legal implications of Brogaard's research.

Harrington downplays that two journals declined to publish Brogaard's working paper by quoting from *Daubert*—"some propositions are too particular, too new, or of too limited interest to be published." Opp. 16. But Harrington has not shown—and refuses to show—the evidence explaining why the journals rejected his work or any other criticism his methodology received.

---

[4] *Amorgianos,* cited four times by Harrington, supports Defendants here. The court there excluded unreliable opinion testimony where, like here, it rested on faulty assumptions due to the expert's failure to apply his stated methodology "reliably to the facts of the case." 303 F.3d 256 at 269.
[5] Although it might may be a "normal part of the publication process" to receive constructive criticism, Opp. 17, Brogaard made no effort to modify his approach in response, presumably also "normal."

Harrington claims that Brogaard had to develop new methods for this litigation because there is no earlier civil spoofing case that has advanced this far and thus "there was no blueprint." Opp. 14. That is of course not true, as Harrington's repeated citations to *Lek* make clear. But in any event, Brogaard had the "blueprint" from his own working paper, written and rewritten over years outside the litigation context. Brogaard has no explanation for his deliberate decision to eschew that work and relax several criteria in his data-filtering approach to increase the number of spoofing episodes identified. Mem. 14-15. Brogaard claims that he stress tested his new criteria, Tr. Vol. 1, 198:9-25, but did not mention such tests in his report or provide evidence of them. Brogaard claimed, for example, that he performed stress testing of various ratios to evaluate his dramatic change in the ratio for sell-side imbalance from 10-1 down to 2-1. *Id.* When pressed as to why the stress test results were not produced in discovery, Brogaard admitted he destroyed them.[6] Brogaard acknowledged that this change could have resulted in more episodes being identified by him as spoofs. Tr. Vol 1., 207:10-15.

Brogaard's methodologies are not, in any event, like Hendershott's in *Lek.* Opp. 14. Hendershott did not employ anything like the Posting Methodology, and Harrington does not contend otherwise. As for the Quantity Methodology, Hendershott did something similar in *Lek*, where the defendant was not engaged in automated high-frequency trading.[7] But unlike Brogaard, Hendershott performed—and described and produced evidence of—stress tests showing the robustness of his methodology to alternative parameters.[8] Unlike Brogaard, Hendershott studied execution patterns of broader sets of orders rather than only orders and trades that fit his filter criteria from a large amount of data. He also conducted additional

---

[6] Tr. Vol. 1, 202:22-204:3; SJS Reply Decl. Ex. 2 (Dep. Tr. of J. Brogaard, May 15, 2025) (cited as "Tr. Vol. 2"), 222:22-25.
[7] SJS Reply Decl. Ex. 3 (Reply Report of T. Hendershott in *Lek*, June 22, 2018), ¶ 44.
[8] SJS Reply Decl. Ex. 4 (Report of T. Hendershott in *Lek*, April 3, 2017), ¶¶ 42-44.

7

analyses that were independent from his selection criteria to confirm that the trading sequences he identified were consistent with layering and not simply market making. *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 392 (S.D.N.Y. 2019). And most important, Hendershott did not infer intent from the data alone. *Id.* at 410.

### 2. Brogaard's Methods Lack a Known Error Rate

It is undisputed that Brogaard has not determined the rate at which his methods misidentify legitimate trading as spoofing. Instead, Harrington argues that the Court should ignore this failure because no error rate was possible because "no such control sample exists." Opp. 17. But Brogaard could have constructed a control sample by combining buy and sell orders from unrelated customers into a dataset that by definition could not contain spoofing.

That Harrington asked Brogaard to look only for downward spoofing does not make episodes that his methods identify in the upward direction irrelevant. Opp. 19. The comparable number of upward episodes demonstrates the unreliability of his approach—*i.e.*, that the methods are not accurately detecting downward spoofing but instead yielding ▓▓▓▓ of false positives. Mem. 16. Harrington notes that "previous court cases have shown that downward spoofers often also engage in upward spoofing to help drive up the price as they unwind their position." Opp. 19. But neither Brogaard nor Harrington contends that is what happened here. And if it did, Shapiro's damages calculation relying on downward-spoofing only would make no sense.

Harrington contends that Brogaard's application of his methods to customers other than ▓▓▓▓▓▓▓▓▓▓ "finds something unique to these customers that is absent in their comparators' trading data." Opp. 18. But that does not mean that the "something unique" is spoofing. Brogaard's "verification analysis," Opp. 17, merely finds that the trading sequence he looks for occurs more often in the ▓▓▓▓▓▓▓▓ data than in data of other customers. That says nothing about whether the identified sequences are actually spoofing. Mem. 17.

Brogaard's lack of an error rate is problematic in a way that it was not in *Lek*. Opp. 18. There, Hendershott's methodology confirmed that defendants' trading was consistent with a layering scheme that was independently proven through inculpatory communications and testimonial evidence. *SEC v. Lek Sec. Corp.*, 612 F. Supp 3d 287, 297 (S.D.N.Y. 2020). Brogaard's methodologies do not serve a confirmatory purpose because there is no other evidence of spoofing. An error rate in this case might have given assurance that his methodologies were able to reliably identify actual spoofing and do not simply identify innocuous sequences of legitimate trading. And Hendershott performed further analyses that were independent of his selection criteria to confirm that his methodology accurately identified trading consistent with layering. *See Lek*, 370 F. Supp. 3d at 392-93. Brogaard does nothing similar.

C. **Brogaard's Methods Are Applied in an Unreliable, Results-Driven Manner.**

Brogaard's Posting and Quantity Methodologies are defective in design and application. A Posting episode is a sell-side imbalance in new orders placed in a 2-second window before a buy trade that decreases post-trade; Brogaard infers that the sell orders were non-bona fide orders entered only to induce others to sell. Mem. 18. But the majority of the sell orders in his Posting episodes were cancelled or executed before the buy trade rather than after. *Id.*

Conceding that core point, Harrington claims that these episodes "may involve" orders that are "entered and cancelled very quickly" "once the desired market activity has been induced." Opp. 20-21. But Brogaard provides no analysis that the sell orders in his Posting episodes were in fact cancelled after the inducement or that the inducement occurred at all. Harrington also contends that the Posting Methodology can safely ignore cancellations because new orders have a "larger impact on price" when placed. Opp. 21. But Harrington mischaracterizes the Hendershott article that it cites, which found that a cancellation might have

9

less measured impact *on average* simply because cancellations tend to be *followed by placement of a more aggressively priced* new order. The article does not suggest that for the same order, its cancellation has less impact than its submission.[9] Even if cancellations generally have less impact, that does not support ignoring them as if they have no impact at all.

Harrington's defense of the Quantity Methodology fares no better. A Quantity episode is any instance in which the trader has orders on the book to sell twice as many shares as to buy in a 30-second window before the buy trade. Mem. 19. Brogaard excludes orders placed ahead of the window that are still resting in the order book, still visible to other traders, and still exerting price pressure, and the effect is dramatic: if all resting orders were included, the vast majority of Quantity episodes lose their sell-side imbalance and vanish. *Id.* Harrington responds that older order flows have less price impact, Opp. 21, but even if true that does not mean *no* impact, and Brogaard did not analyze the question. Even if some window were appropriate, Brogaard provides no sensitivity analysis to indicate that thirty seconds is the appropriate window rather than an arbitrary cutoff designed to maximize episodes.

Harrington also fails to resolve the contradictory results of Brogaard's two methodologies. Multiple episodes exhibit a sell-side imbalance under the Posting Methodology but a countervailing buy-side imbalance under the Quantity Methodology. Mem. 19. Harrington speculates that "[s]ome market participants might respond to spoofing carried out by fleeting orders entered and cancelled very quickly, even as other respond to spoofing carried out over a longer time horizon." Opp. 22. But again, Brogaard has not done any analysis to substantiate this theory and does not explain why market participants respond to sell-side imbalances but ignore

---

[9] *See* SJS Reply Decl. Ex. 5 (Brogaard, Hendershott, and Riordan, "Price discovery without trading: Evidence from limit orders," *The Journal of Finance* (2019)), at 1643 ("[A] trader may decide to cancel an order because the NBBO has moved away from their order and then submit a new, more aggressively priced order. This would lead the initial cancelled order to have a below average price impact.").

10

buy-side imbalances. Brogaard also did not mention "fleeting orders" in his opening report and merely offers this as a *post hoc* justification for his inconsistent results.

### D. Brogaard's Methods Fail to Adequately Account for Alternative Explanations, Such As Market-Making.

Brogaard's methods do not reliably account for legitimate trading and random coincidence. He conceded that ▆▆▆▆▆▆▆▆ engage in market-making yet ignored the characteristics of their trading data that indicated they were doing so. Mem. 20. Brogaard also conceded that a trader can engage in market-making without being a "registered market-maker," BRR ¶ 56, rendering Harrington's retort, Opp. 24, meaningless. Harrington contends that the superficial discussion of market-making in Brogaard's report shows he did not "overlook" it. Opp. 24. But the law requires him to "adequately account" for it. *See In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 289 (S.D.N.Y. 2018). Harrington claims that Brogaard's methods were "designed" to separate market-making from spoofing. Opp. 24. But his methodology just filters for sequences that he thinks market-makers would never carry out. Mem. 21. He never tests whether his filters in fact properly exclude market-making or other legitimate trading.

In a footnote Harrington asserts that Brogaard accounted for random coincidence by applying his methods to other customers, Opp. n. 13, yet that still cannot provide a rate at which the identified trading sequences occur by coincidence. And Brogaard still ignores that considering ▆▆ U.S. data might yield a very different picture of its trading and cause Brogaard's filtering to find far fewer episodes. Mem. 22. Harrington offers no response here.

### II. The Court Should Exclude Any Opinion by Brogaard That Customers Engaged in Actionable Spoofing.

At his deposition Brogaard conceded that his findings about spoofing were not in the context of the legal elements a plaintiff must prove in a 10b-5 private action. Tr. Vol. 1, 222:22-

11

224:19. For example, he did not make findings as to whether the "spoofing" episodes he identified actually manipulated the market by creating an artificial price in Concordia stock, Tr. Vol. 2, 110:12-15, or whether Harrington was injured or suffered a loss. Brogaard did make an effort in his reply report to brand Defendants' customers as acting with manipulative intent, BRR ¶¶ 67, 140, but failed for two reasons: (1) an expert in a securities fraud case is not allowed to opine on intent and (2) even if Brogaard were permitted to give such an opinion, he had no facts to support it.

Brogaard tried to justify his inference of intent by claiming that Hendershott opined on intent in *Lek*. BRR at ¶ 66. But Brogaard, and Harrington, misread *Lek*. Judge Cote held in *Lek* that Hendershott did not opine on intent and an expert is not allowed to do so:

> Hendershott does not purport to testify as an expert about any individual's intent, nor could he. His testimony is that he has located trading patterns that are consistent with layering activity. It is for the jury to determine whether Avalon or any individual had the intent to manipulate the market through layering activity. To determine the state of mind . . . of an individual who does not testify . . . , the trier of fact must rely on the relevant direct and circumstantial evidence that sheds light on the individual's state of mind; she may not rely on an expert's assessment.

370 F. Supp. 3d at 410 (internal quotation marks omitted).

Nor is there any factual basis for Brogaard to opine that any customer acted with intent. Brogaard claimed to have inferred intent from the trading sequences alone, but later admitted that the sequences were entered by algorithms and that evidence of their intent is really in the instructions the algorithms are given—which he did not have. Mem. 23; Tr. Vol.1, 219:8-25; Tr. Vol. 2, 27:6-23 and 28:3-1.[10] Harrington presents no algorithms, communications, deposition testimony, or other direct evidence of intent from Defendants' customers. And it is undisputed

---

[10] CIBC on the other hand conducted a yearly review of ▅ trading algorithms and determined that ▅ had satisfied regulatory standards and properly operated as a market-maker. SJS Reply Decl. Ex. 6 (Dep. Tr. of ▅ ▅, at 51:12-54:5 and 283:1-294:16. Brogaard ignores this evidence.

that Brogaard *chose* not to analyze their trade data to determine whether they profited from the alleged spoofing. Tr. Vol. 1, 220:10-15.

Indeed, Brogaard conceded that whoever programmed defendants' trading algorithms could have done so without having any intent to spoof. Tr. Vol. 2, 32:15-33:7. He also conceded that "Well, like, I can't speak for the state of mind, specifically." Tr. Vol. 1, 88:16-17.

### III. Brogaard's Opinions Are Disconnected from Harrington's Legal Theory and Therefore Unhelpful to the Jury

Brogaard's opinions should also be excluded because they are unhelpful to the trier of fact. Harrington seeks to hold Defendants liable for failing to detect alleged customer spoofing, which was accomplished by the customers' self-directed trading through Defendants' respective portals. But there is no way that Defendants could have or should have "detected" Brogaard's episodes—*i.e.*, intuited Brogaard's newly minted data filters and methods and applied them in a compliance program back *in 2016* to identify spoofing. Yet that is the context in which Harrington seeks to offer Brogaard's testimony. As another Court in this District made clear in rejecting an antitrust plaintiff's economic expert, an expert's testimony is not helpful to the jury and therefore inadmissible where the expert's methods are disconnected from the conduct plaintiff is challenging. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2025 WL 2733020, at *26 (S.D.N.Y. Sept. 25, 2025) (rejecting testimony as unhelpful to the fact finder, among other things) (citing *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005), and *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

### **CONCLUSION**

For these reasons and the reasons set forth in their opening brief, Defendants respectfully request that the Court grant their motion and exclude Brogaard's opinions under Rule 702.

Submitted: October 10, 2025

/s/ *Sandra D. Hauser*
Sandra D. Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6802
sandra.hauser@dentons.com
Stephen J. Senderowitz
Timothy J. Storino
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8141
stephen.senderowitz@dentons.com
timothy.storino@dentons.com

*Counsel for Defendant CIBC World Markets Inc. (Canada)*

/s/ *Abby F. Rudzin*
Abby F. Rudzin
William J. Martin
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
(212) 326-2000
arudzin@omm.com

*Counsel for Defendants BofA Securities, Inc. and Merrill Lynch Canada Inc.*

14