**VIA ECF** February 13, 2026

The Honorable Valerie Figueredo
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    **Harrington Global Opportunity Fund, Ltd. v. BofA Securities, Inc., et al., No. 1:21-cv-761**

Dear Judge Figueredo,

      We write to address the Court's question about whether Brogaard should be permitted to correct his error in combining ▇ Canadian trading with ▇ U.S. trading to opine on "spoofing episodes." We believe that "it is not the function of this Court to fix the errors in an expert's report in order to save it for purposes of admission." *In re Med Diversified, Inc.*, 346 B.R. 621, 642–43 (Bankr. E.D.N.Y. 2006).[1] Harrington and its counsel made their choices about what discovery to take from the customers and what facts to be developed. And then Harrington chose not to have Brogaard correct his report under Rule 26(e) when it learned the facts that Merrill Lynch developed. Neither Harrington nor Brogaard should get another chance.

      "Since *Daubert* was decided in 1993, 'parties relying on expert evidence have had notice of the exacting standards of reliability that expert evidence must meet.'" *Exist, Inc. v. Tokio Marine Am. Ins. Co.*, 2023 WL 7117369, at *4 (S.D.N.Y. Oct. 5, 2023) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 445 (2000)). So "courts around the country have routinely declined to grant" a plaintiff's request for its expert to submit a second report. *Exist, Inc.*, 2023 WL 7117369, at *4 (collecting cases).

      ***Background***. Brogaard has opined that Merrill Lynch clients ▇ should be treated as a single entity and trader such that their order and trade data should run through his filtering algorithm in combination, which then finds ▇ "episodes of spoofing." (¶ 9.) Only ▇ "stood out in its limit order book behavior," and Brogaard's only stated basis for combining their data as if they were a single trader is that they "were financially connected." (¶ 46; *cf.* Reply ¶ 85 (suggesting incorrectly that ***Defendants bear the burden*** to prove "that these entities were operating independently" and stating that there is "no evidence" of that fact).)

      In May 2024, Harrington served a Rule 30(b)(6) subpoena on ▇ for a deposition to occur on June 26, 2024, though discovery had officially closed on June 10. Harrington then chose not to take a deposition and instead obtained a declaration "in lieu of depositions." (ECF 517-12.) The "First Declaration" was signed on September 9 (*id.*) but not provided to the Defendants until October 8, when Harrington provided it alongside Brogaard's reports (ECF 550, Ex. 1). The First Declaration does not contain testimony about any interplay between ▇ trading (only in Canada) and ▇ trading (only in the U.S.).

---

[1] In this letter, we omit internal citations, quotation marks, and original alterations. We also add all emphasis in quoted passages. Citations to paragraph numbers alone are to Brogaard's opening report, submitted as ECF 517-2. Brogaard's reply, cited as "Reply," has been submitted as ECF 517-4.

After receiving the First Declaration and Brogaard's report treating ▆▆▆▆ as a single trader, Merrill Lynch's counsel reached out to ▆▆ counsel and asked for an additional declaration (the "Second Declaration"). The same ▆ representative signed the Second Declaration on March 7, 2025, and it was provided to Harrington that day. It has thus been nearly a year, and Harrington has made no motion to the Court seeking to prohibit Merrill Lynch from using the declaration or testimony contained therein.[2] The ▆ representative swears under oath in the Second Declaration that all of ▆ trading is conducted by algorithms run on a computer in Canada, while all of ▆▆▆ trading is conducted by algorithms run on a computer in the U.S. (ECF 517-7, ¶ 6.) He further testified that the computers did not coordinate their trading, so "it is incorrect to consider ▆▆▆▆▆ order trading as coordinated in any way or effectively those of a single trader." (*Id.*)

Harrington did not seek to supplement Brogaard's opinion under Rule 26(e), which is designed for this scenario because this evidence became known to Brogaard and showed him that his analysis was now "incorrect." Brogaard instead continued to treat all the ▆▆▆ data as if it were that of a single trader, deciding that the testimony "wasn't enough to outweigh all the other pieces of evidence that suggested otherwise." (ECF 517-6 at 135:3–136:5.) The only "evidence" Brogaard could cite, however, is the corporate facts in his reply report, none of which suggests that the server in Canada and the server in the U.S. trade together or otherwise coordinate their actions. (ECF 517-6 at 141:6–11; Reply ¶¶ 86–89.)

**Brogaard's opinion as to Merrill Lynch should be excluded.** As Brogaard explains, "spoofing is a form of market manipulation where a trader places limit orders with the intention of canceling them." (¶ 11.) He describes his effort to find spoofing using the word "trader" repeatedly:

> There needs to be three general criteria *to determine whether a trader is engaging in spoofing*. First, I require that before purchasing the stock, *the trader appears* to manipulate the visible supply and demand balance of the stock in a way that other market participants will artificially believe there to be greater interest to sell. Second, I require that *the trader purchased* the stock shortly thereafter. Third, I require that *the trader reduce* their manipulative activity shortly after purchasing the shares so that the limit order book activity of the trader normalizes shortly after the purchase.

(¶ 44.) He uses data filters to make judgments about what the trader was thinking. (*See, e.g.*, ¶ 60 (requiring twice as many new sale orders as new buy orders "placed by the trader" because that "signaled that there was much *more interest* to sell than to buy"); ¶ 79 (explaining that he required trader to cancel sell orders after purchase to assess "*a continuation of beliefs*"); ¶ 80 ("Observing a change in the trader's limit order book position in the post-execution period was

---

[2] Harrington's counsel has suggested that it might move to strike the Second Declaration containing this sworn testimony because it was not provided to Harrington "during discovery." (*See* Ex. A, Jan. 13, 2026 Hearing Tr. 231:10–233:12.) But Harrington can cite no rule requiring witness declarations—particularly those that do not yet exist—to be produced during discovery. Harrington did not produce the First Declaration during discovery, and in fact held it for a month before producing it to Defendants. Merrill Lynch obtained the Second Declaration for this motion after receiving the First Declaration.

important. The change showed that the limit order book *imbalance was deliberate* . . . . It suggested that the *intent was* not to sell but was instead to buy.").)

As a matter of logic, none of these tests work if they are applied to two traders (computers) trading independently.[3] That is why, as Brogaard himself put it, he "require[d] detailed data" that allowed him to "track the limit order book activity *of a particular trader*." (¶ 31; *see also* ECF 517-10 at 6 (noting importance of ability "to track *individual trader positions*" because that "is *crucial* for spoofing identification").) Nevertheless he assumed that ▮▮▮ were "one particular trader" because they had a corporate affiliation. That was not a reliable assumption in the first place, but it certainly cannot stand in the face of the undisputed evidence that each firm had its own computer trading in its own country independently of the other. Nor is this a "jury question" or a "contested" issue of a fact—there has never been *any evidence at all* that ▮ coordinated its Canadian trading with ▮ U.S. trading.

***Harrington should not be given a second chance.*** The Court should not permit Brogaard to "supplement" his report by re-running his filters on ▮ data alone.[4] As an initial matter, Harrington has not even asked for permission to do so. This is no accident—Harrington likely would not have a claim under the Exchange Act if the only alleged misconduct occurred in Canada.[5] Judge Schofield denied Defendants' motion to dismiss on the ground of extraterritoriality based on Harrington's allegation "that the Canadian Defendants engaged in trading on U.S. exchanges in relation to the spoofing scheme." (ECF 147 at 9.) As she explained it, Harrington's allegation is that "baiting orders were effected . . . on Canadian exchanges" and then engaged in "near-simultaneous executing orders . . . on U.S. exchanges." (ECF 147 at 11.) An opinion from Brogaard that ▮ trading in Canada alone constituted spoofing would not fit Harrington's theory of the case and would be excluded under *Daubert* for that reason. *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) (economic model must match theory of proponent's case).

Brogaard made his choices—using his expertise and professional judgment to give an opinion that Merrill Lynch's clients engaged in ▮ spoofing episodes. (*See* Reply ¶ 80 (rejecting Hendershott's criticism of Brogaard's decision to combine ▮▮ data because that is "the choice[] that I made in performing my analysis").)[6] This is not a case of a calculation error, a data correction, or merely striking a portion of his opinion. Brogaard chose to combine customer data with full knowledge of the facts. Having used his expertise to reach that conclusion, the Court should not tell him to change it.

Harrington also made its litigation choices—choosing not to seek sufficient discovery from ▮ to give Brogaard the facts he needed and then choosing not to seek to supplement Brogaard's report after Merrill Lynch developed the facts. Harrington should not be relieved of

---

[3] Defendants do not believe that it is ever reliable for an expert to opine on a person's intent merely from looking at his trading data, but it is particularly unreliable to do so from incorrectly combined data.

[4] As explained, Brogaard did not find anything concerning about ▮ trading on its own.

[5] Harrington already has this problem in its claim against CIBC.

[6] Brogaard, of course, has no "expertise" in ascertaining whether computers in different countries are coordinating with each other, but he acted as if he did.

the consequences of its choices. As then district-court judge Nathan put it: Plaintiffs "made a tactical decision to [offer the expert opinion they did] and, having transgressed the boundaries of *Daubert* and Rule 702(b), they are **not now entitled to a second bite at the apple**." *On Track Innovations, Ltd. v. T-Mobile USA, Inc.*, 2015 WL 14072083, at *6 (S.D.N.Y. July 24, 2015). "This is not the way the Federal Rules of Civil Procedure work. **Plaintiffs do not get a 'do-over.'**" *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 386 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *accord In re HHE Choices Health Plan, LLC*, 2019 WL 6112679, at *8 (Bankr. S.D.N.Y. Nov. 15, 2019) ("Giving parties a 'do-over' if and when their reports are found to be unreliable would just encourage parties and experts to cut corners and to submit substandard work in the first go-round."); *Brown v. China Integrated Energy, Inc.*, 2014 WL 12577131, at *3–4 (C.D. Cal. Nov. 21, 2014) ("Plaintiffs are not entitled to a 'do-over' after their expert witness is disqualified.") (collecting cases). And there should certainly be no second chance where Harrington "was on notice ***every step of the way*** that [Merrill Lynch] was challenging [Brogaard, yet] made no attempt to add or substitute other evidence." *Weisgram*, 528 U.S. at 456.

As then-district court judge Chin has explained in denying the plaintiffs' motion to supplement their expert case:

> [I]t would be ***fundamentally unfair*** to require defendants to go through the process again, to delay the final resolution of this very difficult and burdensome case, solely because ***plaintiffs made some ill-advised tactical choices and refused to adjust when it was apparent that they should***. When a party loses at trial or when it loses a summary judgment motion, it does not get to do it again. It does not get a chance to come up with more evidence or to try to make a more persuasive presentation or to try to write a more coherent brief. That is not the way our system of justice works. The party's recourse is to appeal, and only if it prevails on appeal will it get another chance. ***A Daubert motion is no different***.

*Lippe*, 249 F. Supp. 2d at 386. *See also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) ("[F]airness does not require that a plaintiff, whose expert witness testimony has been found inadmissible under *Daubert*, be afforded a second chance . . . .").

Here, too, it would be fundamentally unfair to Defendants to give Harrington an opportunity it chose not to take nearly a year ago. After five years, Defendants are ready to move for summary judgment, which can be easily granted upon resolution of their *Daubert* motions. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 271 (2d Cir. 2002) ("In the absence of any expert evidence as to general causation . . . defendant was entitled to summary judgment because of plaintiffs' failure to present any admissible evidence in support of their theory of causation."). If Brogaard is permitted to revise his opinion, he would have to give new spreadsheets to Shapiro, who would then have to revise his calculations. And then Hendershott would have to prepare a new rebuttal report. The prejudice to Defendants in delaying summary judgment motions further and requiring additional expert work is obvious. As one court put it: "this Court does not believe that it falls within the sound exercise of its discretion to redo [the expert's] patently unreliable report." *In re Med Diversified, Inc.*, 346 B.R. at 643. Defendants respectfully ask this Court to similarly conclude that permitting Harrington a re-do would exceed the bounds of the Court's discretion.

          Respectfully submitted,

| | |
|---|---|
| /s/ Abby F. Rudzin | /s/ Sandra D. Hauser |
| Abby F. Rudzin | Sandra D. Hauser |
| O'MELVENY & MYERS LLP | DENTONS US LLP |
| 1301 Avenue of the Americas | 1221 Avenue of the Americas |
| New York, NY 10019-6022 | New York, NY 10020-1089 |
| *Counsel for the Merrill Lynch Defendants* | *Counsel for Defendant CIBC World Markets, Inc.* |

cc: All counsel of record via ECF