**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

HARRINGTON GLOBAL OPPORTUNITY FUND,
LIMITED,

                                        Plaintiff,                    **21-CV-761 (LGS) (VF)**

                        -against-
                                                                     **OPINION & ORDER**

BOFA SECURITIES, INC., et al.,

                                        Defendants.

----------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge:**

Pending before the Court are two motions by Defendants BofA Securities, Inc. and

Merrill Lynch Canada Inc. (collectively, "Merrill") and CIBC World Markets Inc. ("CIBC," and

together with Merrill, "Defendants"), seeking to exclude the testimony of two experts for

Plaintiff Harrington Global Opportunity Fund, Ltd. ("Harrington) as inadmissible under Federal

Rule of Evidence 702. See ECF Nos. 507, 513. Defendants seek to exclude the testimony of Dr.

Jonathan Brogaard and Dr. Robert Shapiro. For the reasons explained in Part I of this opinion,

Defendants' motion as to Dr. Brogaard is **DENIED**. See infra pp. 6-42. For the reasons explained

in Part II of this opinion, Defendants' motion as to Dr. Shapiro is **GRANTED**. See infra pp. 43-

77.

**BACKGROUND**[1]

This case concerns a form of market manipulation known as spoofing. Spoofing is the act

of pretending to sell when you really intend to buy or conversely pretending to buy when you

---

[1] Familiarity with the factual and procedural background of this case is presumed. The
factual allegations have been detailed by the Honorable Lorna G. Schofield in two decisions on

1

really intend to sell. ECF No. 517-1 ("Brogaard Rep.") at ¶ 10.[2] More specifically, spoofing involves a trader placing a limit order with the intention of canceling the order before execution, thereby creating a false impression of supply or demand.[3] See id. at ¶ 11. A trader employs spoofing "to distort the supply or demand of a security," because stock prices are "driven by forces of supply and demand." Id. Put simply, the trader engaged in spoofing "manipulatively intends" for the stock price to move in their favor. Id. Although spoofing can be used to drive the share price of a particular stock up or down, Harrington's allegations concern only downward spoofing, which occurs when a trader intends to push the stock price down to execute a purchase at a lower price. See, e.g., ECF No. 133 at ¶¶ 46, 79, 82, 85, 88, 91, 94, 97, 143; see also Brogaard Rep. at ¶ 48.

Here, the alleged market manipulation concerns shares of Concordia International Corporation ("Concordia"), a health company. ECF No. 133 at ¶ 1. Concordia is an interlisted security, meaning that it is traded on the TSX in Canada and on Nasdaq in the United States. Id. at ¶ 24. Harrington alleges that one of CIBC's customers, █████████████ and two of Merrill's customers █████████████ and █████████████████ engaged in spoofing in

_____

Defendants' motions to dismiss. Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp., 585 F. Supp. 3d 405, 411-12 (S.D.N.Y. 2022); Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp., No. 21-CV-761 (LGS), 2023 WL 6316252, at *1 (S.D.N.Y. Sept. 28, 2023). Only the relevant factual and procedural background is discussed herein.

[2] Dr. Brogaard wrote two reports, one for CIBC's customers (ECF No. 517-1) and one for Merrill's customers (ECF No. 517-2). Because of the substantial overlap between the two reports, citations to Dr. Brogaard's report herein are to the CIBC report, unless otherwise noted.

[3] A limit order is a message to the market which "indicates that a trader wants to buy or sell a certain number of shares of a stock at a certain price." Brogaard Rep. at 7 n.3. A limit order is different than a market order, which "is designed to execute at the then-available price in the marketplace." Id.

2

Concordia stock between ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (the "Relevant Period"). Id. at ¶¶ 50-52, 54; see also id. at ¶ 123 n.11. According to Harrington, these customers placed thousands of baiting orders that sent false and misleading price signals into the market, resulting in a downward pressure on the price of Concordia's stock. Id. at ¶¶ 46-49. During the Relevant Period, Harrington, a hedge fund, sold approximately ▆▆▆▆▆ Concordia shares. Id. at ¶ 11. The Second Amended Complaint, which is the operative Complaint, alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and of Section 9(a)(2) of the Exchange Act. Id. at ¶¶ 125-152.

The undersigned was referred the Daubert motions on June 26, 2025. ECF No. 499. On July 9, 2025, Defendants filed two motions in limine, seeking to exclude the testimony of Dr. Robert Shapiro (ECF No. 507) and Dr. Jonathan Brogaard (ECF No. 513), two experts for Harrington. On September 12, 2025, Harrington filed its opposition to the motions. ECF No. 528 (Dr. Shapiro opposition); ECF No. 531 (Dr. Brogaard opposition). On October 10, 2025, Defendants filed their reply briefs in further support of their motions. ECF No. 543 (Dr. Shapiro); ECF No. 549 (Dr. Brogaard). On October 30, 2025, Plaintiff filed a sur-reply in further support of its opposition to the motion to exclude Dr. Brogaard. ECF No. 561. The Court held oral argument on Defendants' Daubert motions on January 12 and January 13, 2026. See ECF No. 597 ("1/12/26 Tr."); ECF No. 602 ("1/13/26 Tr."). On February 13, 2026, the parties filed additional letters addressing certain questions that were raised during the oral argument. See ECF Nos. 577, 582-584, 586.

## LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify regarding an area of

3

specialized knowledge provided that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of expert testimony must establish its admissibility under this rule by a preponderance of the evidence, although "the district court is the ultimate gatekeeper." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks and citation omitted).

An expert's opinion must have "a reliable basis in the knowledge and experience of his discipline." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993). In general, a court should consider "the extent to which the expert's theory has been subjected to peer review and publication, whether the technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." United States v. Ulbricht, 858 F.3d 71, 116 n.50 (2d Cir. 2017) (internal quotation marks, alteration, and citation omitted). This "Daubert reliability assessment" is a "flexible" inquiry, however, and "Daubert is not a definitive checklist or test for the reliability of expert testimony." Id. (internal quotation marks and citations omitted). "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the [court] broad latitude to determine." Id. (citation omitted).

There is no requirement that all expert testimony express opinions or conclusions that have been "established to a degree of scientific certainty." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017). All experts, including "economists[,] may express professional opinions that fall short of definitive proof" as long as their "testimony [is] reliable under Rule 702[.]" Id. at

576 (citation omitted). Instead, a court must "assess whether the expert employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[.]" Id. at 577 (citation omitted).

As the Second Circuit has recognized, "Daubert reinforces the idea that there should be a presumption of admissibility of evidence." Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995). Rule 702 "embodies a liberal standard of admissibility for expert opinions[.]" Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note; accord Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004).

However, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002); accord Ruggiero v. Warner–Lambert Co., 424 F.3d 249, 253 (2d Cir. 2005). Expert testimony admitted under Rule 702 must be relevant and rest on a reliable foundation. Daubert, 509 U.S. at 597. When evaluating the reliability of expert testimony, "it is critical that an expert's analysis be reliable at every step." Amorgianos, 303 F.3d at 267. "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." Id. (emphasis omitted).

"[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) (internal quotation marks and citation omitted). "[N]othing in either Daubert or the Federal Rules

of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). A contention that an expert's assumptions are unfounded, however, may "go to the weight, not the admissibility, of the testimony." Restivo, 846 F.3d at 577 (citation omitted). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Amorgianos, 303 F.3d at 267 (internal quotation marks and citation omitted). This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." Id. "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert, 509 U.S. at 596).

## DISCUSSION

I.    Dr. Jonathan Brogaard

*A.  Dr. Brogaard's expert reports*

Dr. Brogaard, who holds a Ph.D. in Finance from Northwestern University, focuses his research interests and expertise in market microstructures. Brogaard Rep. at ¶¶ 1-2. He was retained by Harrington to opine on whether, during the Relevant Period, between ███████████ ███████████ the trading systems of CIBC and Merrill were used by their respective customers "to conduct order-and-trade activity that was consistent with" spoofing, specifically downward spoofing. Id. at ¶ 6; ECF No. 517-2 ("Brogaard Merrill Rep.") at ¶ 6. In reaching his opinion, Dr. Brogaard assumed that because Concordia is an interlisted stock, "when

orders to sell were placed on a Canadian exchange, the effect of those orders directly impacted trading in the U.S. on an essentially immediate basis."[4] Id. at ¶ 5.

According to Dr. Brogaard, detecting spoofing requires the ability to do the following: (1) track the limit order book activity of a particular trader;[5] (2) observe such information as the symbol, trading venue, price, quantity, order type, date, time, and special order-handling instructions for the limit orders; and (3) track the lifecycle of a limit order from its creation to its completion. Id. at ¶ 31. A "market order" is an order to immediately buy or sell a stock at the best price currently available on the other side of the market. Brogaard Rep. at ¶ 11 n.3; see also ECF No. 603 ("Hendershott Rep.")[6] at ¶ 23. A "limit order" is an order to trade at a price that is no worse than the limit price specified by the trader. Brogaard Rep. at ¶ 11 n.3; Hendershott Rep. at ¶ 23. For a buy order, if the specific limit price is greater than or equal to the best available offer to sell, then the limit order is marketable and executes immediately. Hendershott Rep. at ¶ 23. Similarly, for a sell order, if the limit price is less than or equal to the best available bid to buy, the limit order executes immediately. Id. An exchange has a "limit order book" which is a record of all outstanding unfilled limit orders that the exchange could match against future incoming orders. Id. at ¶ 24. A limit order remains on the limit order book until it is executed or canceled. Id.

---

[4] An interlisted stock has shares traded on exchanges in both Canada and the United States. Brogaard Rep. at ¶ 5.

[5] A limit order book contains the order messages posted by market participants interested in buying or selling a given stock. Brogaard Rep. at ¶ 18.

[6] Dr. Hendershott, an expert for Defendants, wrote a rebuttal report to Dr. Brogaard's and Dr. Shapiro's reports. ECF No. 603.

Dr. Brogaard explains that there needs to be three general criteria to determine whether a trader is engaged in spoofing. Brogaard Rep. at ¶ 44. First, before purchasing a stock, the trader appears to manipulate the visible supply and demand balance of the stock in a way that other market participants will artificially believe there to be greater interest to sell. Id. Second, the trader purchased the stock shortly thereafter. Id. And third, the trader reduced their manipulative activity shortly after purchasing the shares so that the limit order book activity of the trader normalizes shortly after the purchase. Id. In his analysis, Dr. Brogaard looked at limit order book activity on "lit markets," because an order message, and not just executed trades, can move the price of a stock and thus a spoofer can place a visible limit order to create the illusion of buying or selling interest, which in turn impacts the stock price.[7] Id. at ¶¶ 17, 19-20, 34-35, 59, 73. He therefore excluded from his analysis limit orders that were sent to a dark venue or limit orders that were sent to a lit venue but were labeled as hidden. Id. at ¶ 53. Additionally, Dr. Brogaard was asked by Harrington's counsel to "focus on downward spoofs." Id. at ¶ 48. He considered only new limit orders that were within 10 cents of the best bid or offer price for the stock being quoted. Id. at ¶ 54.

Dr. Brogaard opined that, during the Relevant Period, ███ used CIBC's platform to engage in ███ episodes of spoofing in Concordia stock and ███ and ███ used Merrill's platform to engage in ███ episodes of spoofing in Concordia stock. Brogaard Rep. at ¶ 9; Brogaard Merrill Rep. at ¶ 9. According to Dr. Brogaard, a spoofing episode (as opposed to legitimate market making) has three elements: (1) the trader influences supply and demand of a stock by placing non-bona fide orders; (2) the trader then executes their intended bona fide trade;

---

[7] A lit market is a market or exchange where orders are visible to all market participants before they are executed. Brogaard Rep. at ¶ 33.

and (3) the trader undoes the misleading limit order book activity, causing the supply and demand of the stock to no longer be distorted by their participation. Brogaard Rep. at ¶ 52. The three components must be present to identify a spoofing episode. Id.

To reach his opinion, Dr. Brogaard used two methodologies, each of which he designed to detect a different type of spoofing: the Posting Methodology, which "is meant to capture a quoting-based approach to distort the supply and demand of the limit order book," and the Quantity Methodology, which "is meant to capture the number of shares resting on the limit order book approach to distorting the limit order book's supply and demand information." Brogaard Rep. at ¶ 47. In applying his methodologies, Dr. Brogaard focused on "downward spoofs," which is "where the trader intends to push the stock price down so as to execute a purchase at a lower price." Id. at ¶ 48. Both methodologies are designed to detect spoofing episodes that are inconsistent with legitimate trading, such as market making. Id. at ¶ 85.

To that end, both methodologies require a large imbalance in behavior on the ask side of the limit order book relative to the bid side. Id. But because a limit order book imbalance itself is not necessarily inconsistent with standard market making behavior, Dr. Brogaard required that the limit order book behavior imbalance after the executing purchase decline to 1.2 or lower, such that the bid and ask side behavior change was roughly equal or showed a preference to buy, or that the ask limit order activity declined by at least half. Id. at ¶¶ 85, 87, 89. Dr. Brogaard acknowledges that market making is a legitimate trading activity, whereby a trader provides liquidity to the market by continuously quoting buy and sell prices for a specific stock. Id. at ¶ 49. And he also acknowledges that "traders that engage in a market making strategy are generally very active market participants." Id. at ¶ 50. Additionally, both methodologies require that there be at least twice as many shares bought as sold, indicating a trade imbalance. Id. at ¶ 90.

Dr. Brogaard's Posting Methodology is premised on the idea "that the activity of posting limit orders itself may drive other market participants' reactions." Id. at ¶ 47. Dr. Brogaard began by considering trades by Defendants' customers. Id. at ¶ 57; Brogaard Merrill Rep. at ¶ 57. To determine whether the trader's overall behavior fit the definition of a spoof, Dr. Brogaard used a window of time of two seconds before the trade to three seconds after the trade. Brogaard Rep. at ¶ 57. That five-second window is referred to as an "episode" by Dr. Brogaard. Id. From the start of the episode to the end of the episode, Dr. Brogaard tracked new orders placed along with their associated cancellations and replacements. Id. If specific criteria were met, Dr. Brogaard labeled the activity a spoofing episode and the buy trade associated with that episode an executing purchase. Id. He developed an algorithm with six components to detect spoofing, and all six components had to be met to flag the purchase as an executing purchase arising from a spoofing episode. Id. at ¶¶ 58, 68.

As the first component of his algorithm, Dr. Brogaard required that prior to the trade (t-2 seconds to t), the sum of new ask limit order shares placed by the trader be twice as many as the sum of new bid limit order shares placed by the trader. Id. at ¶ 60. This created a limit order book activity imbalance, and an imbalance greater than two signaled that there was much more interest to sell than to buy. Id.

Second, to ensure that the limit order book imbalance would have an impact on the stock price, the imbalance must be large and thus Dr. Brogaard required that the cumulative number of ask limit order shares placed by the trader in the relevant time interval (t-2 seconds to t) sum up to twice the Canadian time-weighted average number of shares at the best ask price for Concordia on that day. Id. at ¶ 61.

10

Third, Dr. Brogaard required that there be a purchase by Defendants' customers. Id. at ¶ 62; Brogaard Merrill Rep. at ¶ 62. And fourth, he required that after the purchase, the trader significantly changed their limit order posting activity, as the change showed that the limit order book imbalance in the pre-execution period was deliberate and done in a way that was consistent with spoofing. Brogaard Rep. at ¶¶ 63-64. As Dr. Brogaard explains, if the trader was expecting the price of the stock to decline and they purchased shares, that purchase would have given the trader more of a motivation to sell, such that one would expect the trader to have continued trying to sell, as reflected in a continuation of visible ask limit order activity rather than a cancellation of that order activity. Id. at ¶ 63. Dr. Brogaard used a period of two seconds (t+1 to t+3) to reevaluate the limit order book activity of the alleged spoofer, and for it to be consistent with spoofing, he required that the sum of the post-execution ask shares be no more than half of the sum of the pre-execution ask shares. Id. at ¶ 65. Alternatively, Dr. Brogaard required that in the post-execution period (from t+1 to t+3) the sum of new ask limit order shares placed by the trader be no more than 1.2 as much as the sum of new bid limit order shares placed by the trader. Id.

Fifth, to ensure that he did not capture market making activity, Dr. Brogaard required that during the interval t-2 to t+.01 that the trader purchased at least twice as many shares as it sold. Id. at ¶ 66. Because a downward spoof is meant to drive the price down and conclude with a purchase, if the trader is instead posting more ask limit orders than bid limit orders, but also selling shares regularly, than the conduct is inconsistent with spoofing. Id.

Sixth, and final, Dr. Brogaard required that at least half of the pre-execution ask order shares placed be cancelled before the end of the t+3 episode window. Id. at ¶ 67.

11

According to Dr. Brogaard, there were many times during which a trader executed more than one purchase in a very short period of time, which could lead to overlapping spoofing episodes. Id. at ¶ 69. To avoid double counting, Dr. Brogaard only allowed for one spoofing episode per five second interval, 2.5 seconds before and after the executing purchase. Id.

Dr. Brogaard's other methodology, the Quantity Methodology, is premised on the idea "that as the resting quantity on the ask side and the bid side changes, other market participants may be influenced to change their behavior." Id. at ¶ 47. Dr. Brogaard's Quantity Methodology has five components, all five of which need to be present for an episode to be labeled a spoofing episode. Id. at ¶ 72. As he did with the Posting Methodology, Dr. Brogaard began by considering trades by Defendants' customers. Id. at ¶ 71; Brogaard Merrill Rep. at ¶ 71. For this methodology, he used a window of 30 seconds before the trade to three seconds after the trade. Brogaard Rep. at ¶ 71. The 30-second window is an "episode," and if specific criteria were met, then the episode was a "spoofing episode" and the trade associated with it is an "executing purchase." Id. Dr. Brogaard tracked visible new limit orders starting 30 seconds prior to the purchase and ending 3 seconds after the trade (t-30 and t+3). Id. at ¶¶ 74-75. He followed the new visible limit orders placed within 10 cents of the best bid or ask price, and he calculated the average quantity of shares that the trader had resting on the limit order book at two different times. Id. at ¶ 75.

For his first criteria, Dr. Brogaard took the first time-weighted average quantity of shares that the customer had on the limit order for the last half-second prior to the purchase of stock (t-0.5 seconds to t). Id. at ¶ 76. He required that prior to the trade (t-0.5 seconds to t), the customer have on average twice as many visible shares available to sell on the limit order book as the

12

customer had to buy, which created a limit order book imbalance. Id. An order imbalance greater than two would have signaled that there was much more interest to sell than to buy. Id.

Second, Dr. Brogaard required that the trader's average time-weighted number of shares on the ask limit order book in the pre-execution period be at least 0.75 of the time-weighted average number of shares at the best ask price for Concordia stock on that day. Id. at ¶ 77.

Third, Dr. Brogaard required that there be a purchase by the customer of Concordia shares. Id. at ¶ 78; Brogaard Merrill Rep. at ¶ 78. Fourth, Dr. Brogaard required that after the purchase, the trader significantly changed their visible limit order resting quantity of shares, because the change showed that the limit order book imbalance was deliberate and done in a way that was consistent with spoofing. Brogaard Rep. at ¶¶ 79-80. He used a time period of t+2.5 to t+3 to reevaluate the limit order book quantity of shares of the customer. Id. at ¶ 81. He required the post-execution ask quantity of shares average to be no more than half the pre-execution ask quantity of shares average, which he believed was consistent with the trader meaningfully reducing his ask limit order activity. Id. Alternatively, he required that in the post-execution period (t+2.5 to t+3) the customer have a time-weighted average resting ask limit order book quantity of shares of no more than 1.2 as much as its time-weighted average resting bid limit order book quantity of shares. Id.

Fifth, to ensure he did not capture market making activity, he required that during the interval t-30 to t+.01, the customer purchased at least twice as many shares as it sold. Id. at ¶ 82. As he did with his Posting Methodology, because there were many times during which a trader executed more than one purchase in a very short period of time, he allowed for only one spoofing episode per five second interval, 2.5 seconds before and after the executing purchase. Id. at ¶ 84.

Applying his methodologies, Dr. Brogaard observed ▓ non-duplicative spoofing episodes for CIBC's customer—▓ of the spoofing episodes were detected by the Posting Methodology; ▓ spoofing episodes were detected by the Quantity Methodology; and ▓ spoofing episodes were detected by both methodologies. Id. at ¶ 91. For Merrill's customers, Dr. Brogaard observed ▓ non-duplicative spoofing episodes—▓ of the spoofing episodes were detected by the Posting Methodology; ▓ spoofing episodes were detected by the Quantity Methodology; and ▓ spoofing episodes were detected by both methodologies. Brogaard Merrill Rep. at ¶ 99.

To test his results, Dr. Brogaard performed three calculations—a Fill Ratio, a Limit Order Count Analysis, a Limit Order Size Analysis, and a Limit Order Aggressiveness Analysis. Brogaard Rep. at ¶¶ 94-110.

Beginning with the Fill Ratio, it is the ratio of shares executed from new limit orders placed by the trader during the spoofing episode over the number of shares posted by the trader during the spoofing episode. Id. at ¶ 94. The Fill Ratio looks at whether there is a difference between the fill rate of ask limit orders versus that of bid limit orders. Id. If a trader is engaged in downward spoofing, then he does not want their ask limit orders to execute, which would result in a lower Fill Ratio for ask limit orders than for bid limit orders. Id. at ¶¶ 95-96. The Fill Ratio calculated by Dr. Brogaard shows that the customers were much more likely to execute a buy per bid limit order placed rather than a sell per ask limit order placed. Id. at ¶ 98; Brogaard Merrill Rep. at ¶ 106. For both methodologies, the Fill Ratio of bid limit orders was over 10 times higher than ask limit orders. Brogaard Rep. at ¶ 98; Brogaard Merrill Rep. at ¶ 106. As Dr. Brogaard explains, the results of the Fill Ratio demonstrate that both methodologies "captured the essence

14

of spoofing—a displayed preference for selling but with an outcome of buying." Brogaard Rep. at ¶ 98; Brogaard Merrill Rep. at ¶ 106.

Turning to the Limit Order Count Analysis, it examines how frequently new bid limit orders and ask limit orders were placed by the trader. Brogaard Rep. at ¶ 100. Dr. Brogaard found that there was a "sizeable difference" in the pre-executing purchase window between the number of bid and ask limit orders placed. Id. at ¶ 101. On average, in a spoofing episode there were many more ask limit orders placed per second than bid limit orders placed per second in the period pre-execution purchase, but the trader ended up purchasing stock. Id. And for both methodologies, the ratio flipped in the period post-execution purchase, such that more bid limit orders were posted per second relative to ask limit orders in that post-execution period. Id. at ¶ 102. Dr. Brogaard opined that the behavior of new limit orders per second for the bid and ask limit orders in the pre-executing purchase window and the change in behavior between the pre-executing purchase window and the post-executing purchase window is consistent with new limit order activity being used to engage in downward spoofing. Id. at ¶ 104.

Next, Dr. Brogaard conducted a Limit Order Size Analysis, which examined the average size of new limit order postings during the spoofing episode. Id. at ¶ 105. This analysis showed that for both methodologies, in the pre-executing purchase window, the trader posted on average larger ask limit orders than bid limit orders, suggesting an interest in selling, but in the post-executing purchase window, there was no longer a preference to post substantially larger ask limit orders than bid limit orders and the size of the ask limit orders decreased. Id. at ¶ 107; Brogaard Merrill Rep. at ¶ 115. Dr. Brogaard opined that this was consistent with limit order size being used to engage in downward spoofing. Brogaard Rep. at ¶ 107; Brogaard Merrill Rep. at ¶ 115.

Finally, Dr. Brogaard performed a Limit Order Aggressiveness Analysis, which looked at what price the trader places limit orders at relative to the national best bid and ask prices at the time of the order placement. Brogaard Rep. at ¶ 108. Dr. Brogaard quantified the aggressiveness of an order at the time of placement. Id. His analysis showed that for both methodologies, the trader on average posted more aggressive ask limit orders than bid limit orders in the pre-executing purchase window. Id. at ¶ 110; Brogaard Merrill Rep. at ¶ 118. According to Dr. Brogaard, more aggressive orders have a greater impact on prices, increasing the likelihood that the price declines. Brogaard Rep. at ¶ 110. For both methodologies, the aggressiveness of ask limit orders decreased in the post-executing purchase window. Id.

Ultimately, Dr. Brogaard opined that the ▮▮ spoofing episodes for CIBC's customer and ▮▮ spoofing episodes for Merrill's customers "were (a) unlikely to have arisen unintentionally and (b) were not consistent with market making." Id. at ¶ 111; Brogaard Merrill Rep. at ¶ 119.

### B. Defendants' criticisms of Dr. Brogaard's analysis

Defendants attack Dr. Brogaard's opinion on several grounds. First, Defendants contend that Dr. Brogaard's opinion is not based on sufficient facts or data, as required by Rule 702. ECF No. 515 at 8-9.[8] This attack has multiple components. Defendants contend that Dr. Brogaard improperly combined data such that he assumed that all trading activity he reviewed from a particular customer came from a single trader or traders that coordinated their activities. Id. Stated differently, Dr. Brogaard looked at firm-level trading data without determining whether the trades were generated by a single trader. Id. Additionally, as to Merrill's customers,

---

[8] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents, including deposition transcripts.

Defendants contend that Dr. Brogaard improperly combined the trading data of *two* different

firms, ███ and ███████, despite the lack of evidence that the two firms coordinated their

conduct. Id. at 9-10. As to CIBC's customer, ████, Defendants fault Dr. Brogaard for not looking

at corporate-level data, because Dr. Brogaard examined the firm's Canadian trading in Concordia

stock, and did not review the firm's U.S. trading in Concordia stock. Id. at 10-11.

Second, Defendants aver that Dr. Brogaard's analysis rests on the unsupported

assumption that when sell and buy orders have the same millisecond timestamp, the sell order

always came before the buy order. Id. at 11. Defendants rely on a declaration from Merrill's

customer that they contend demonstrates that Dr. Brogaard's assumption was unreasonable,

because based on a review of millisecond timestamp data, there are at least three instances where

the buy order reviewed by Dr. Brogaard preceded the sell order with the same time stamp. Id. at

12; see also ECF No. 517-7 at ¶¶ 7-11.

Third, Defendants attack Dr. Brogaard's two methodologies, arguing that the

methodologies have been rejected by his peers and are not generally accepted. ECF No. 515 at

13-16. Relatedly, Defendants point to the lack of a known error rate for the methodologies as

further evidence that his analysis is unreliable. Id. at 16-17. Defendants aver that when Dr.

Brogaard's algorithms are adjusted to look at patterns of upward spoofing, both methodologies

yield a comparable number of spoofing episodes, which Defendants contend is inconsistent with

Harrington's theory that the customers engaged in downward spoofing. Id.

Fourth, Defendants fault Dr. Brogaard's application of his methodologies to the trading

data. They contend that for ████ of the sell orders placed by CIBC's customer and ████ of the

sell orders placed by Merrill's customers in the Posting Methodology, the sell orders were

canceled or executed before the buy trade, contrary to Dr. Brogaard's definition of spoofing,

which requires that the non-bona fide order is cancelled after the buy trade. Id. at 18. For the Quantity Methodology, Defendants argue that Dr. Brogaard counts only those orders that were placed less than 30 seconds before the buy, even though there are older, visible sell orders on the limit order book at the time of the purchase. Id. at 19. Defendants contend that the exclusion of the older sell orders is unsupported, and their inclusion in the analysis results in a significant number of spoofing episodes identified for Defendants' customers to no longer qualify as spoofing episodes. Id.

Fifth, Defendants argue that Dr. Brogaard has failed to account for alternative explanations for the pattern observed in the trading data, such as market making or random coincidence. Id. at 20-21. Defendants criticize Dr. Brogaard because he assumes that a market maker with a sell-side imbalance whose buy order gets executed would always subsequently increase and never decrease their selling interest, but Dr. Brogaard has no factual basis for this assumption. Id. at 21. And Defendants point to the fact that for all three customers, ███ of their orders were canceled. Id.

Finally, Defendants argue that any opinion by Dr. Brogaard that customers engaged in actionable spoofing should be excluded, because Dr. Brogaard has no evidence of manipulative intent, and he is legally precluded from opining on intent, which is a classic jury question. Id. at 22-23.

1.  Dr. Brogaard is qualified to testify as an expert.

Under Daubert and Rule 702 of the Federal Rules of Evidence, the first step in determining the admissibility of expert testimony is determining "whether the expert is qualified to testify." Arista Recs. LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (citing Zaremba v. General Motors Corp., 360 F.3d 355, 360 (2d Cir. 2004)). Defendants do not

challenge Dr. Brogaard's qualifications to testify as an expert in market manipulation. Nor could they reasonably do so.

Dr. Brogaard's area of expertise—market microstructure—bears directly on the issue he was retained to opine on: whether the trading patterns of Defendants' clients is consistent with spoofing, a form of market manipulation. Brogaard Rep. at ¶ 2. Dr. Brogaard, who has a doctorate in Finance, focuses his research on market manipulation and different types of market participants, including high-frequency traders, which is the type of trading that is alleged to have occurred here. Id. Additionally, he has extensive experience analyzing transaction data from equity markets, and his work on high-frequency trading has been published in peer reviewed finance journals. Id. In short, Dr. Brogaard has ample expertise to render his opinions here, and Defendants do not contend otherwise.

2. Dr. Brogaard's opinion is admissible.

Dr. Brogaard opined that, between ███████████, and ███████████, Merrill's customers engaged in ████ episodes of spoofing in Concordia stock (Brogaard Merrill Rep. at ¶ 9), and CIBC's customer engaged in ████ episodes of spoofing in Concordia stock (Brogaard Rep. at ¶ 9). Dr. Brogaard further opined that "the patterns surrounding the Spoofing Episodes demonstrate that the manipulative trading [he] identified were (a) unlikely to have arisen unintentionally and (b) were not consistent with market making." Brogaard Rep. at ¶ 111; Brogaard Merrill Rep. at ¶ 119. Defendants attack both the sufficiency of the data underlying that opinion and the reliability of the methodologies created by Dr. Brogaard to reach his conclusion. As discussed below, none of Defendants' arguments necessitate exclusion of Dr. Brogaard's opinion.

>    i.    *Dr. Brogaard's opinion is based on sufficient data and reasonable inferences drawn from that data.*

>    (a)  Dr. Brogaard's use of firm-level trading data

Defendants fault Dr. Brogaard because he based his opinion on firm-level trading data from Defendants' customers, and as it applied to CIBC's customer, Dr. Brogaard did not even have complete firm-level data because he lacked the U.S. trading activity of ████. ECF No. 515 at 8-11. As it concerns the former criticism, Defendants contend that Dr. Brogaard combined order and trade data without knowing whether the orders and trades were generated by a single trader or multiple traders within Defendants' customers. Id. at 8-9. And as it concerns the latter critique, Defendants argue that Dr. Brogaard was inconsistent because although he said that a spoofing analysis requires all of a firm's order book activity, he performed his analysis without the U.S. trading data of CIBC's customer. Id. at 10-11. According to Defendants, because Dr. Brogaard did not have trader-level data, he cannot determine whether the allegedly non-bona fide sell orders and executing buy transactions are part of the same trading strategy. Hendershott Rep. at ¶ 64. This is not a basis to exclude Dr. Brogaard's opinion, however.

The lack of trader-level data was a function of how the data was maintained by Defendants and provided to Harrington; Dr. Brogaard did not elect to disregard such data. ECF No. 517-4 ("Brogaard Reply Rep.") at ¶ 94. The lack of U.S. trading data for ████ also was outside Dr. Brogaard's control. Harrington attempted to obtain that data from CIBC's customer, filing a motion to compel in this Court. ECF No. 344. But Harrington was unsuccessful because the Court agreed with CIBC that such nonparty information was irrelevant. See ECF No. 382.

There is a distinction between imperfect data and insufficient data, only the latter of which requires exclusion of an expert's opinion. Molly C. v. Oxford Health Ins., Inc., No. 21-CV-10144 (PGG) (BCM), 2024 WL 4850813, at *12 (S.D.N.Y. Nov. 21, 2024) (explaining that

20

"[i]mperfect data" unlike "insufficient data" is a question that "goes to the weight of the expert's opinion, not its admissibility, and is not grounds for exclusion"). "The question for Daubert purposes is not whether the expert employed the best possible input data to form [his] testimony, but whether 'the testimony is based on sufficient facts or data.'" In re Int. Rate Swaps, No. 16-MD-2704 (JPO), 2023 WL 8675625, at *4 (S.D.N.Y. Dec. 15, 2023) (quoting Fed. R. Evid. 702). Having been confronted with imperfect data, Dr. Brogaard was entitled to rely on that data, which he explained was sufficient for his analysis (Brogaard Reply Rep. at ¶¶ 83, 141), and make reasonable inferences to fill in the gaps. See Lassen v. Hoyt Livery, Inc., No. 13-CV-1529, 2016 WL 7165716, at *8-10 (D. Conn. Dec. 8, 2016) (refusing to exclude expert testimony in FLSA case concerning daily compensable time for employee where employer's "poor recordkeeping" did not include hourly time records and expert was required to rely on estimates generated by Google Maps to calculate overtime wages allegedly owed).

It was reasonable for Dr. Brogaard to use corporate-level data, because, as he explains, Defendants themselves would have been relying on corporate level data, absent further investigation, in fulfilling their gatekeeping responsibilities to prevent manipulative activity. Brogaard Reply Rep. at ¶¶ 79-83, 92-94; see also 1/13/26 Tr. at 137. Indeed, Harrington alleges that Defendants failed to fulfill their gatekeeping obligations, and in that capacity, Defendants would have examined the data at the firm level. ECF No. 133 at ¶ 38. And as it concerns CIBC's customer, CIBC would have had no visibility into the customer's U.S. trading data, which was "on a different market wholly outside of CIBC." See ECF No. 384 at 33:18-34:15. Dr. Brogaard also explained why his use of corporate-level data was a conservative approach. As he explained, if one trader is engaged in spoofing, that trader's activity will be masked by the activity of other traders within the company, meaning that the trader's activity will be detected at the corporate

21

level only when it overwhelms the activity of other traders or when there is concerted activity among traders. Brogaard Reply Rep. at ¶ 82. He further added that there are documented examples of spoofing involving multiple traders, which further supported his approach of examining the data at the corporate level. Brogaard Reply Rep. at ¶ 92-93.

Defendants speculate that the orders and trades by their customers could have come from different traders. But Dr. Brogaard was entitled to reach a contrary assumption. Molly C., 2024 WL 4850813, at *12 (rejecting argument that expert opinion was inadmissible based on insufficient data where moving party presented no "inconsistent data or contradictory research" to undermine expert's reliance on the data). Put simply, Defendants' arguments about the nature of the data Dr. Brogaard relied on goes to the weight a trier of fact should attribute to his opinion, not its admissibility. See JBrick, LLC v. Chazak Kinder, Inc., No. 21-CV-02883 (HG) (CLP), 2023 WL 6372970, at *3 (E.D.N.Y. Sept. 28, 2023) (admitting expert's testimony based on assumption of how many products would be purchased because "contentions that the assumptions are unfounded go to the *weight*, not the admissibility, of the testimony") (emphasis in original).

(b) The combination of trading data for Merrill's two customers

For Merrill, Dr. Brogaard combined the trading data of the two customers, ▋ and ▋, and treated them as one entity when assessing whether their trading patterns were consistent with spoofing. Dr. Brogaard did so because the two entities "were financially connected." Brogaard Merrill Rep. at ¶ 46. Defendants fault that assumption because ▋ and ▋ are distinct corporate entities that trade separately and thus cannot be treated as a "single decision-maker." ECF No. 515 at 9-10; Hendershott Rep. at ¶ 64.

In his reply report, Dr. Brogaard clarified his basis for analyzing the trading data of ███ and ███ together. Dr. Brogaard relied on the fact that ███ is a wholly owned subsidiary of ███, and they both have the same CEO, the same CTO, and other "executive overlap." Brogaard Reply Rep. at ¶ 86. The two entities share workspace, operating from the same floor at the same address. Id. In a public regulatory filing, ███ stated that it did not have customers and "trades only on a proprietary basis." Id. at ¶ 87. Additionally, in a letter to the SEC, ███ stated: "███, through its wholly-owned subsidiary ███ LLC, is an automated, quantitative trading firm." Id. Dr. Brogaard thus reasoned that because ███ is a wholly owned subsidiary of ███ ███ was trading solely for the benefit of ███. Id. Dr. Brogaard also relied on the fact that ███ financial statements indicated that it had an expense sharing agreement with ███ that provided ███ with intellectual property (such as software and trading algorithms) and ███ reimbursed ███ for those costs. Id. at ¶ 88. From this arrangement, Dr. Brogaard inferred that "███ trading strategies either derived from ███ algorithms or that ███ provided the algorithms and ███ provided the execution services and strategies." Id. Dr. Brogaard additionally relied on a September 9, 2024 declaration from ███, a member of the Board of Managers of ███ and ███, stating that ███ and ███ "utilized the same general trading strategies." Id. at ¶ 89; see also ECF No. 517-12 at ¶ 11. Finally, Dr. Brogaard pointed to the fact that it would be "highly unlikely that orders would be submitted at the exact same millisecond without some level of coordination or shared trading strategies." Brogaard Reply Rep. at ¶ 90. The combination of these facts suggested to Dr. Brogaard that the two entities had "coordinated" trading strategies. Id. at ¶ 91.

In a subsequent declaration dated March 7, 2025, ███ explained that ███ and ███ conduct algorithmic trading; ███ trading in Canada and ███ trading in the United States.

23

ECF No. 517-7 at ¶¶ 3, 5. ▮▮▮ stated that ▮▮ and ▮▮▮▮ are "separate entities that traded and submitted orders independent of one another." Id. at ¶ 6. ▮▮▮ added that "if both entities submitted orders in the same underlying company," such as Concordia, the two entities "did not coordinate with each other because each entity operated using separate trading servers," and each trading server was unaware of orders placed on the other server. Id. ▮▮▮ further explained that "[a]t any given time, each entity's trading algorithms assess that entity's own market view and each entity's algorithms engage with the market according to such independent assessment and view." Id.

Attacking the reliability of Dr. Brogaard's analysis, Merrill argues that Dr. Brogaard had no basis to combine the trading data of ▮▮ and ▮▮▮▮. 1/13/26 Tr. at 155, 221-222. Harrington disagrees, arguing that there is ample evidence to support Dr. Brogaard's assumption of coordination, and whether ▮▮ and ▮▮▮▮ coordinated their trading is a factual question for the jury. Id. at 230, 235. Relying on ▮▮▮ declaration, Defendants contend that there is no evidence in the record to raise an issue of fact, because nothing contradicts ▮▮▮ assertion that ▮▮ and ▮▮▮▮ were "separate entities that traded and submitted orders independent of one another," and the two entities "did not coordinate with each other because each entity operated using separate trading servers." ECF No. 517-7 at ¶ 6; see also 1/13/26 Tr. at 153, 242-243. Harrington, however, avers that ▮▮▮ March 2025 declaration was produced by Defendants after the close of fact discovery and Harrington therefore intends to move for its exclusion.[9] 1/13/26 Tr. at 231, 233. Defendants nevertheless argue that even if both ▮▮▮ declarations are

---

[9] Defendants received ▮▮▮ September 2024 declaration along with Dr. Brogaard's expert report in October 2024, after the close of fact discovery. 1/13/26 Tr. at 219-221, 244-245. Defendants subsequently procured ▮▮▮ March 2025 declaration. Id. at 221.

excluded, Dr. Brogaard did not have a reliable basis to combine the trading data of ▮ and ▮, because the law recognizes them as separate corporate entities and their mere affiliation is not a basis from which to infer coordination. Id. at 247-248.

At bottom, Dr. Brogaard assumed that ▮ and ▮ coordinated their trading, a necessary assumption given his decision to combine their trading data. Without the ▮ declarations, Dr. Brogaard points to facts in the public record from which he could have reasonably assumed coordination. And although Defendants disagree with the inference Dr. Brogaard drew from those available facts, the inference is not so speculative as to render Dr. Brogaard's assumption unrealistic, contradictory, or in bad faith. Zerega Ave. Realty Corp., 71 F.3d at 214. Additionally, the law permits an expert to provide an opinion "based on facts they assume to be true," including factual findings that can only be made by a factfinder. United States v. Asare, No. 15-CV-3556 (AT), 2019 WL 5693477, at *5 (S.D.N.Y. Nov. 4, 2019); United States v. Scop, 846 F.2d 135, 139 (2d Cir. 1988) (explaining that "testimony in the form of an opinion . . . is not objectionable because it embraces an ultimate issue to be decided by the trier of fact" so long as it does not embody a legal conclusion) (internal quotation marks and citation omitted). Indeed, an expert may ground his opinion on "hypotheticals based on assumptions about testimony," allowing the expert to give his opinion "but leaves the credibility issues to the jury." Scop, 846 F.2d at 143. Thus, although the question of whether ▮ and ▮ coordinated their trading is for the jury to answer, Dr. Brogaard was entitled to assume coordination for purposes of his analysis given the information he reviewed.

However, if ▮ March 2025 declaration is admissible, Dr. Brogaard's assumption of coordination becomes more problematic. That assumption is contradicted by ▮ statements. ▮ stated that ▮ and ▮ are "separate entities that traded and submitted orders

25

*independent* of one another." ECF No. 517-7 at ¶ 6 (emphasis added). ▮ also explained that "if both entities submitted orders in the same underlying company," such as Concordia, the two entities "did not coordinate with each other because each entity operated using separate trading servers," and each trading server was unaware of orders placed on the other server. Id. But even if the ▮ declaration is not excluded, Harrington is entitled to argue based on other available information that the jury should disregard ▮ statements.

Ultimately, if Harrington establishes liability and the trier of fact finds no coordination between Merrill's customers, the jury will need an assessment of how many spoofing episodes occurred, so it can determine damages. Accordingly, Dr. Brogaard should be permitted to submit a supplemental report, opining on the number of spoofing episodes for Merrill's customers when their trading data is examined separately. Cf. Amorgianos, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible."). As Harrington's counsel noted at oral argument, such an analysis would impact only "a small percentage of the episodes." 1/13/26 Tr. at 230. And Dr. Hendershott, Defendants' expert, appears to have already conducted such an analysis. Hendershott Rep. at ¶ 66. Further, because this revised assessment will use the same methodologies and underlying data already extensively probed by Defendants, permitting Dr. Brogaard to submit a supplemental report on this limited issue will not prejudice Defendants or delay resolution of this case.

(c) The sequencing of orders with the same millisecond timestamp

Defendants also contend that Dr. Brogaard improperly sequenced sell and buy orders with the same millisecond timestamp, assuming that the sell order always came first. ECF No. 515 at 11-12. Defendants point to ▮ declaration, where he identified three examples of

26

instances where the sell order was placed after the buy trade, despite both having the same millisecond timestamp. Id. at 12 (citing ECF No. 517-7 at ¶¶ 9-11). This is not a basis to exclude Dr. Brogaard's testimony.

Here, too, Dr. Brogaard was faced with insufficient data based on how the data was maintained by Defendants. Brogaard Rep. at ¶ 91; Brogaard Reply Rep. at ¶¶ 106, 110; see also 1/13/26 Tr. at 272-273. Merrill did not disclose how it sequenced trading data with the same millisecond timestamp. Brogaard Reply Rep. at ¶¶ 110-112. And Harrington was unable to obtain the microsecond trading data from Defendants' customers. See 1/13/26 Tr. at 74, 138-139, 273. To address this flaw in the data, Dr. Brogaard applied a reasonable assumption based on logic: when order data had the same timestamp, he assumed new orders came first, followed by cancellations, and then executions. Brogaard Reply Rep. at ¶¶ 106-109. Although Defendants criticize that assumption, it is not a basis to exclude his opinion because the assumption is not so "speculative or conjectural" to be "unrealistic or contradictory." Zerega Ave. Realty Corp., 571 F.3d at 213-14 (explaining that an experts' assumptions are a basis for exclusion only where they are "so speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison") (internal quotation marks and citation omitted). Indeed, Dr. Brogaard conducted a counter-analysis, which demonstrated that the sequencing inference in his initial report was reasonable and reliable. As that alternative analysis shows, a different sequencing of the trading data would have resulted in, at most, de minimis deviations from his original results. Brogaard Reply Rep. at ¶¶ 109-112. And to the extent Dr. Hendershott would have applied a different assumption (Hendershott Rep. at ¶ 81)—for all orders bearing the same millisecond timestamp, he assumed that the executions came first, followed by new orders, and then cancellations—that is not a

more reasonable assumption, as it would require sequencing a new order after the order was executed. Regardless, an attack on Dr. Brogaard's sequencing assumption is a basis to cross-examine Dr. Brogaard about his findings, but not grounds for exclusion of his opinion. Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992) (finding that because expert's assumptions on plaintiff's wage increase had a reasonable basis, defendant's arguments regarding the adequacy of the assumption went "to the weight, not the admissibility, of the testimony").

ii.      Dr. Brogaard's methodologies are reliable.

In reaching his opinion, Dr. Brogaard relied on two methodologies, each of which is distinct and designed to detect different forms of spoofing, because spoofing encompasses a range of behaviors. Brogaard Rep. at ¶ 47; Brogaard Reply Rep. at ¶¶ 45, 47-48. The Posting Methodology was designed "to capture a quoting-based approach to distort the supply and demand of the limit order book" based on the idea "that the activity of posting limit orders itself may drive other market participants' reactions." Brogaard Rep. at ¶ 47. Conversely, the Quantity Methodology was designed "to capture the number of shares resting on the limit order book," based on the idea "that as the resting quantity on the ask side and on the bid side changes, other market participants may be influenced to change their behavior." Id. Simply put, although both methodologies looked at an order imbalance, the imbalance was assessed at different time frames because different market participants react differently to information. See 1/13/26 Tr. at 116-120. Both methodologies, however, were designed to differentiate between legitimate market-making activity and spoofing behavior. Brogaard Rep. at ¶¶ 49-51, 85-90. Consistent with the well understood definition of spoofing, Dr. Brogaard required that the trader place a non-bona fide order affecting "the natural forces of supply and demand of a stock"; the trader executed their

28

bona fide trade; and the trader undoes the misleading limit order book activity, causing the supply and demand of the stock to no longer be distorted. Brogaard Rep. at ¶¶ 44, 52; see, e.g., Mullen Automotive, Inc. v. IMC Financial Markets, No. 23-CV-10637 (LLS), 2025 WL 951501, at *4 (S.D.N.Y. Mar. 28, 2025) (discussing "indicia of spoofing" that distinguishes such trading from legitimate trading activity). Defendants mount various attacks on the reliability of these two methodologies, none of which warrant exclusion of Dr. Brogaard's opinion.

First, Defendants contend that Dr. Brogaard's methodology has been rejected by his peers and is not generally accepted. ECF No. 515 at 13-15. Defendants argue that Dr. Brogaard can identify no case in which an expert used either methodology to identify manipulative behavior, and his working paper, which advances a methodology for detecting market manipulation, has been criticized by his peers and rejected for publication by academic journals. Id. at 13-14. All of these contentions go to the weight a trier of fact should afford Dr. Brogaard's opinion.

Beginning with Defendants' claim that Dr. Brogaard's methodology has not been used by an expert in another case, that alone is not disqualifying. An expert need not "back his or her opinion with published studies that unequivocally support his or her conclusions." Amorgianos, 303 F.3d at 266. Indeed, the Second Circuit has affirmed the admission of expert testimony even where the expert "could not point to a single piece of medical literature" that specifically supported the expert's opinion. See McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043-44 (2d Cir. 1995). In any case, the lack of use of Dr. Brogaard's methodology is not surprising, given that Harrington brought a novel claim involving a relatively new form of market manipulation. As Harrington points out, spoofing is a somewhat recent form of market manipulation and detection methods are in their infancy. ECF No. 531 at 15. Dr. Brogaard thus had to develop a novel methodology because this case is the most advanced civil spoofing case in the country. Id.

29

at 13. It is thus understandable and far from disqualifying that Dr. Brogaard's methodology has not yet been used by an expert in another spoofing case.

Likewise, the fact that Dr. Brogaard's methodology has not been published or is not supported by a published study goes to weight, not admissibility. "Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony." Amorgianos, 303 F.3d at 267 (internal quotation marks and citation omitted); see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441, 502-03 (S.D.N.Y. 2015) (permitting use of methodology that was "developed recently" and had not been subject to "independent testing" or peer review where methodology was otherwise sound); McCullock, 61 F.3d at 1042 ("General acceptance in the relevant scientific community is also an important factor, although it is no longer determinative."); see also Daubert, 509 U.S. at 593 (recognizing that "some propositions [ ] are too particular, too new, or of too limited interest to be published"). As the Supreme Court recognized in Daubert, a "reliability assessment *does not require . . .* an express determination of a particular degree of acceptance within" the relevant scientific community. Id. at 594 (internal quotation marks and citation omitted) (emphasis added). However, where a methodology is "known" and has "attract[ed] only minimal support with the community," that may support viewing the methodology with "skepticism." Id. (internal quotation marks and citation omitted).

Here, an attack on the novelty of Dr. Brogaard's methodology ignores the novelty of Harrington's claim and the need for the development of a novel methodology. Yet, despite the novelty of Dr. Brogaard's methodology, in many significant respects it is like the methodology employed by Dr. Hendershott, who testified as an expert in Securities & Exchange Commission v. Lek Securities Corp., 370 F. Supp. 3d 384 (S.D.N.Y. 2019), on reconsideration in part by, 2019

30

WL 2114067 (S.D.N.Y. May 8, 2019), further underscoring the reliability of Dr. Brogaard's approach. And significantly, Dr. Hendershott's methodology in Lek was deemed admissible despite not having been peer reviewed. See ECF No. 533-3 at 115:14-117:10. Indeed, the Lek court admitted Dr. Hendershott's opinion despite arguments that the methodology "has never been published, and he has not cited any basis in 'law, regulation, practice, or academic literature' for it." 370 F. Supp. 3d at 404. As Dr. Brogaard points out, Dr. Hendershott in Lek did not cite or reference a prior case or academic article in his report detailing his layering methodology. Brogaard Reply Rep. at ¶ 29; see also 1/13/26 Tr. at 115 (arguing that Dr. Hendershott conceded in his deposition in Lek that his methodology was novel, had not been used before, and was not peer reviewed).

In Lek, a case involving a type of market manipulation called layering, the expert looked for a limit order imbalance before an execution, an execution on the opposite side of the imbalance, and an easing of the imbalance following the execution. See 370 F. Supp. 3d at 391-92. Dr. Brogaard used a similar process with both his methodologies, each of which looked at imbalances to distinguish between manipulative activity and market making. Brogaard Reply Rep. at ¶¶ 60-61. In Lek, Dr. Hendershott also applied a criteria of a time period (60 seconds), and only considered orders that were cancelled or executed in that period of time. 370 F. Supp. 3d at 391. In his Quantity Methodology, Dr. Brogaard similarly applied a time window (30 seconds), examining orders that were canceled or executed within that period. Brogaard Rep. at ¶ 100. Although Dr. Brogaard used a smaller window of time than Dr. Hendershott, Dr. Brogaard selected that period based on academic literature. Brogaard Reply Rep. at ¶ 30. To be sure, Dr. Brogaard's approach is not identical to Dr. Hendershott's approach in Lek, and Defendants fault the ways in which Dr. Brogaard tested his results. ECF No. 515 at 16-17. But as even Dr.

Hendershott acknowledged (ECF No. 533-3 at 203:10-206:11), there is not one permissible method for detecting spoofing, and any differences between the approach used by Dr. Hendershott and that created by Dr. Brogaard is properly the subject of cross-examination.

Nor has Dr. Brogaard's methodology been rejected, Defendants' contentions to the contrary notwithstanding. As an initial matter, the methodology in Dr. Brogaard's working paper, which he submitted for publication, is different than his two methodologies here. See ECF No. 531 at 15 n.6. What's more, Dr. Brogaard submitted his working paper to two journals. ECF No. 599-3 at 25:2-8. One journal declined to publish the paper and the second journal gave him feedback so that he could revise and resubmit it. Id. at 35:18-23. As Dr. Brogaard testified, such a process of revising and resubmitting typically leads to publication. ECF No. 599-3 at 26, 44; see also 1/13/26 Tr. at 57. And Dr. Hendershott admitted that criticism and constructive feedback prior to publication is not uncommon when submitting papers for publications in peer-reviewed journals. ECF No. 533-3 at 55:14-58:9.

Additionally, the criticism of Dr. Brogaard's working paper made at an SEC conference on Financial Market Regulation (ECF No. 515 at 14), which Defendants also point to, does not suggest that Dr. Brogaard's methodologies are not generally accepted or unreliable. At that conference, one commentator questioned whether intent could ever be inferred from a pattern of trading. See ECF No. 517-9 at 23-24. But that is not a criticism of the underlying methodology; it is a fundamental disagreement with whether trading patterns may constitute circumstantial evidence of intent. As is evident from Lek, the law permits an expert to opine that a pattern of trading is consistent with the alleged manipulative behavior, as Dr. Brogaard seeks to do here. See Lek, 370 F. Supp. at 391 (expert permitted to opine that his "criteria create[d] a conservative data set reflecting patterns of layering activity" that was "consistent" with layering, a form of

32

market manipulation). Of course, in Lek there was other circumstantial evidence that the plaintiff could rely on to prove intent, and Dr. Hendershott's opinion about trading patterns was one piece of that evidence. See Sec. & Exch. Comm'n v. Lek Sec. Corp., No. 17-CV-1789 (DLC), 2019 WL 1375656, at *2-3 (S.D.N.Y. Mar. 26, 2019) (discussing e-mails involving "individual trader who was seeking to engage in layering"). But Defendants argument that "there is no other evidence" of intent besides Dr. Brogaard's analysis (ECF No. 549 at 9, 12) is an argument that goes to the merits of Harrington's claim, not the admissibility of Dr. Brogaard's opinion.

Second, Defendants argue that Dr. Brogaard's methodologies are results-driven because he relaxed the standards from his working paper in ways designed to capture more spoofing episodes. ECF No. 515 at 15-16; 1/13/26 Tr. at 29-31. But Dr. Brogaard explained in his deposition that the methodologies in his report "were not developed as a result of or to correspond with [his] methodology in" his working paper. ECF No. 599-3 at 210. Dr. Brogaard testified that the methodologies were created for "different settings," "[o]ne is not derived from the other," and thus he did not change aspects of his methodology in the working paper to create his methodologies here. ECF No. 599-4 at 72-73, 75, 91; ECF No. 599-3 at 210-211). As additional explanations for why the criteria between the methodologies differed, Dr. Brogaard explained that he was "not following a particular entity or market participant" in his working paper, and the data there was at a "ten millisecond time horizon" unlike the data here. ECF No. 599-4 at 91, 103-104, 107. Although there is no "one universal definition of spoofing" or market manipulation, he explained that the methodologies are "trying to come up" with ways to identify different types of spoofing. Id. at 72-73, 75, 78.

Dr. Brogaard also testified that he did not adjust his criteria because he was unsatisfied with the amount of spoofing episodes. Id. at 207. To the extent Dr. Brogaard used less restrictive

33

criteria here than in his working paper, that is a basis for cross-examination. Danaby Rentals, Inc. v. Mt. Hawley Ins. Co., No. 24-CV-03481 (JPC) (RFT), 2026 WL 125634, at *21 (S.D.N.Y. Jan. 16, 2026) ("[A]rguments that an expert's permissible methodology could have been improved by focusing on other factors and approaches go to the weight rather than the admissibility of the testimony."); Sec. & Exch. Comm'n v. Ripple Labs, Inc., No. 20-CV-10832 (AT), 2023 WL 5670711, at *8 (S.D.N.Y. Mar. 6, 2023) (allowing expert's testimony but noting that at trial defendants could question the expert about "his limited sample and failure to consider other data").

Third, Defendants take issue with the lack of a known error rate for Dr. Brogaard's methodologies, arguing that he should have applied his methodologies to a control sample of trading data "known to have no spoofing." ECF No. 515 at 17; see also ECF No. 549 at 8-9. But as even Dr. Hendershott acknowledged, "it would be difficult to know whether or not there's no spoofing" in any given data set. ECF No. 533-3 at 206:7-8; see also Brogaard Reply Rep. at ¶ 135 (explaining that no known data set exists). Further, in responding to Dr. Hendershott's criticism about the lack of an error rate, Dr. Brogaard tested the reliability of his methods by applying the methodologies to the trading data of Defendants' other customers, to determine if they generated false positives. Brogaard Reply Rep. at ¶¶ 16-20, Ex. 2. Tellingly, Dr. Brogaard conducted the same test that Dr. Hendershott indicated should have been performed to assess the reliability of the analysis. See Hendershott Rep. at ¶ 55 (explaining that applying methodology "across many customers who are known to be market makers" can demonstrate whether the "number of episodes simply correlated with the volume of a given customer's trading"). This test confirmed that Defendants' other market making clients did not exhibit meaningful spoofing-like behavior, which supports Dr. Brogaard's analysis that the conduct exhibited by Defendants'

34

customers was not consistent with market making. Id. Defendants' contention that Dr. Brogaard should have combined data across different clients, rather than assessing the actual trading data of specific clients as he did here, goes to weight. See 1/13/26 Tr. at 202-205. At bottom, Defendants disagree with how Dr. Brogaard tested the reliability of his results, but nothing suggests that the means used by Dr. Brogaard were unreasonable or unreliable.

Fourth, Defendants argue that Dr. Brogaard's methodology, when applied to detect upward spoofing, yields a comparable number of spoofing episodes, which is inconsistent with Harrington's theory of the case and means that Dr. Brogaard's filters yield thousands of false positives. ECF No. 515 at 16. Downward spoofing, however, may be accompanied by upward spoofing, which helps to drive up the price of the stock and allows the spoofer to unwind his position. See Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC, No. 22-CV-10185 (GHW) (GS), 2025 WL 368717, at *16 (S.D.N.Y. Jan. 31, 2025) ("Unless the price moves back in the opposite direction of the artificial price resulting from the spoofed orders, the spoofer would be unable to profit from the spoofing."); Choi v. Tower Rsch. Cap. LLC, No. 14-CV-9912 (KMW), 2022 WL 4484485, at *3 n.2 (S.D.N.Y. Sept. 27, 2022) (noting a "two-sided" form of spoofing whereby defendant "placed orders on both sides of the market in order to entice other traders into placing additional orders on the order book" which permitted defendant "to execute a greater number of favorable trades when it sought to buy or sell").

Regardless, Dr. Brogaard explained that his methodology was not designed to detect upward spoofing. Brogaard Reply Rep. at ¶¶ 69-72. But the fact that his methodologies detected a comparable number of upward spoofs bolsters their validity, because upward and downward spoofing may occur together, as Dr. Brogaard explained. Brogaard Reply Rep. at ¶¶ 73-78. Fundamentally, Defendants' arguments go to the weight, not admissibility of Dr. Brogaard's

opinion. DPWN Holdings (USA), Inc. v. United Air Lines, Inc., No. 11-CV-0564 (BMC) (PK), 2019 WL 1515231, at *6 (E.D.N.Y. Feb. 21, 2019) (allowing expert's opinion even though the expert's opinion "does not align with defendants' theory of the case does not make it inherently unreliable or irrelevant" and that "the purported flaws that defendants have identified may serve as excellent material for cross-examination").

Similarly unavailing is Defendants' argument that Dr. Brogaard did not use his methodologies as a "cross check" against each other. 1/13/26 Tr. at 24; ECF No. 515 at 19. As Dr. Brogaard testified (ECF No. 599-3 at 235, 237-238), the methodologies were designed to capture different manipulative behavior, because different market participants react to different signals and thus one strategy may try to bait one type of participant but not another. The Posting Methodology was aimed at algorithmic trading that involves the placing of many non-bona fide sell-side orders shortly before execution (Brogaard Reply Rep. at ¶ 43), whereas the Quantity Methodology was designed to capture the number of shares resting on the limit order book because market participants may change their behavior based on the resting quantities on the ask and buy side. Brogaard Rep. at ¶ 47. And because they are aimed at different audiences, the two methodologies could not act as a cross check for each other. See Brogaard Reply Rep. at ¶¶ 48-49.

Moreover, as he explained in his report, Dr. Brogaard conducted four analyses to check the reliability of his methodologies. Brogaard Rep. at ¶¶ 94-110. Dr. Brogaard also conducted various "stress tests" on his selection of a two-to-one imbalance to "feel comfortable that the results were not driven by particular variables." See ECF No. 599-3 at 204:25-207:6; Brogaard Rep. at ¶ 76. Defendants' attack on the adequacy of those tests (1/13/26 Tr. at 43-45) is best reserved for cross-examination. See Dover v. British Airways, PLC (UK), 254 F. Supp. 3d 455,

461 (E.D.N.Y. 2017) (explaining that expert's "election not to use a regression" analysis—"or some other method endorsed by peer-reviewed or published studies"—goes to weight where analysis expert used was "reasonable and sufficiently reliable method" to support opinion).

Fifth, as it concerns the Posting Methodology, Defendants argue that the methodology is unreliable because many sell orders were cancelled before the buy execution, contradicting Dr. Brogaard's definition of spoofing, which requires a non-bona fide order to be cancelled after the buy trade. ECF No. 515 at 18; Brogaard Rep. at ¶ 44. This argument too is unavailing. As an initial matter, Dr. Brogaard did not ignore sell order cancellations, as his methodology required "that at least ███ of the sell-side orders are cancelled prior to the end of the episode." Brogaard Reply Rep. at ¶ 35. He examined overall order imbalance and ensured that even with cancellations prior to execution, there was an overall imbalance in the order book at the time of the executing purchase, and a subsequent unwinding of that imbalance after the execution. 1/13/26 Tr. at 85-87; Brogaard Rep. at ¶¶ 60-65, 76-80.

Nevertheless, Dr. Brogaard explained that research from others in the field of market microstructure indicates that order placement has a greater impact on the stock price and cancellations play a lesser role when compared to new orders. The Posting Methodology was created to capture distortions in the supply and demand of the limit order book where the spoofer is trying to drive the reactions of other market participants, based on a theory that posting limit orders itself may drive those reactions. Brogaard Rep. at ¶ 47. The type of spoofing the Posting Methodology was designed to detect includes "fleeting orders" which are orders that are entered and cancelled very quickly, without "modelling" the cancellation because the impact of the cancellation is "questionable." Brogaard Reply Rep. at ¶¶ 35, 40-41. Other experts who have studied fleeting orders have likewise concluded that such orders impact prices by "ignit[ing]

37

momentum and herding behavior." Id. at ¶¶ 40-41. Dr. Brogaard thus noted that "just the impression of supply and demand for shares, as conveyed by incoming limit orders, can by itself, cause prices to change." Brogaard Rep. at ¶ 17; see also id. at ¶¶ 20, 22. Other experts (including Dr. Hendershott) also agree that order placements have a larger impact on price than order cancellations, and a new order is more significant to market participants than a new cancellation. Brogaard Reply Rep. at ¶¶ 36-38, 43. Experts have thus discounted the importance of cancellations, as Dr. Brogaard did here. Id. at ¶ 38. What's more, Dr. Brogaard's approach is consistent with the view that the baiting alleged to have occurred here is "not just baiting the counterpart across the spread" but also baiting the market to think that "somebody wants to sell, the price is going to drop," and therefore other market participants are baited into placing their own sell orders. 1/13/26 Tr. at 85; Brogaard Reply Rep. at ¶ 41.

Defendants' attack on the reliability of Dr. Brogaard's Quantity Methodology fares no better. Defendants fault Dr. Brogaard's selection of a 30-second window of time, arguing that it is illogical to exclude orders placed outside this window if the orders are still resting on the order book at the time of the buy trade. ECF No. 515 at 19. But Dr. Brogaard amply explains that this methodology is focused on recent orders because "contemporary research on market microstructure" shows that "recent order flows have a significantly stronger predictive power for short-term price movements compared to static snapshots of the entire order book." Brogaard Reply Rep. at ¶¶ 22-27. Dr. Brogaard further cites research studies, all of which support his focus on recent order flow and the greater impact those recent orders have on price. Id. Thus, although orders may remain visible to the market, Dr. Brogaard explained that he concentrated on the order flow imbalance within a 30-second period because the academic literature supports an assumption that there is a strong correlation between price dynamics and short-term supply and

38

demand order flow. Id. To the extent Defendants suggest that the 30-second window is too brief, that is a point for cross-examination of Dr. Brogaard.

Sixth, Defendants contend that Dr. Brogaard's methodologies fail to adequately exclude the potential that the trading patterns are market making behavior. ECF No. 515 at 20-22. But this criticism ignores Dr. Brogaard's analysis, which explains how he attempted to distinguish between potential spoofing and market making. Brogaard Rep. at ¶¶ 50-51, 85-87; Brogaard Reply Rep. at ¶¶ 51-67. And as already discussed, Dr. Brogaard applied his methodology to the trading data of Defendants' other market-making customers and determined that those market-making customers exhibited "no meaningful spoofing-like behavior." Brogaard Reply Rep. at ¶¶ 16-20, Ex. 2. Instead, Dr. Brogaard's analysis illustrated that the trading pattern he identified was unique to ███████████████, which belies an argument that the conduct was coincidental or consistent with lawful market making. Id. at Ex. 2. To the extent Defendants point to facts that they claim shows their clients were engaged in market making (ECF No. 515 at 21), that is an argument best made to the trier of fact.

Defendants' final attack on Dr. Brogaard concerns a statement by Dr. Brogaard in his reply report, where he responded to criticism by Defendants' experts. There, Dr. Brogaard opines that "intent can be inferred through statistical analysis of trading behavior," and his conclusion that Defendants' customers "spoofed is based on inferences about their intent." Brogaard Reply Rep. at ¶¶ 148-149. Defendants argue that an expert cannot testify about a trader's intent (ECF No. 515 at 23), and embedded in Dr. Brogaard's opinion is a conclusion about the intent of Defendants' customers (1/13/26 Tr. at 7-8, 13-14, 68). Defendants also fault Dr. Brogaard's use of the term "manipulative trading," arguing that the phrase implicitly requires a finding of intent.

1/13/26 Tr. at 34-36. Although valid, these concerns can be addressed through means short of exclusion of Dr. Brogaard's opinion.

In his opening report, Dr. Brogaard opined that the "patterns surrounding the Spoofing Episodes demonstrate that the manipulative trading . . . identified were (a) unlikely to have arisen unintentionally and (b) were not consistent with market making." Brogaard Rep. at ¶ 111. Defendants' compliance experts criticized Dr. Brogaard's opinion on the grounds that he did not find spoofing and merely found trading patterns that were consistent with spoofing. Brogaard Reply. Rep. at ¶¶ 147-148. Responding to that criticism, Dr. Brogaard explains in his reply report that he concluded that Defendants' customers "engage[d] in thousands of episodes of spoofing" and their trading activity was "more consistent with spoofing than non-manipulative trading." Id. at ¶ 148 (emphasis omitted).

There is nothing impermissible about Dr. Brogaard's opinion that the trading patterns he identified were "unlikely to have arisen unintentionally" and were "not consistent with market making." Brogaard Rep. at ¶ 111. Even defense counsel conceded that Dr. Brogaard's opinion that the trading is "unlikely to be unintentional" and is "not consistent with market making" is permissible. 1/13/26 Tr. at 174-176, 190. Equally permissible is Dr. Brogaard's opinion that the trading pattern he identified was "more consistent with spoofing than non-manipulative trading." Brogaard Reply Rep. at ¶ 148 (emphasis omitted). This opinion is nearly identical to the opinion admitted in Lek, where Dr. Hendershott opined that the order and execution activity was "frequently consistent with layering." 370 F. Supp. 3d at 391; see also Sec. & Exch. Comm'n v. Lek Sec. Corp., No. 17-CV-1789 (DLC) (S.D.N.Y. July 21, 2017), ECF No. 88-1 at ¶¶ 11(b)-(c) (expert report of Dr. Hendershott opining that the "execution activity is frequently consistent with layering" and that "such characteristics are unlikely to arise unintentionally or as part of a

40

non-layering trading strategy"). Layering, like spoofing, is a form of market manipulation and thus inherent in Dr. Hendershott's opinion that the trading pattern was consistent with layering was an implicit finding that the conduct was manipulative. Yet, the court in Lek determined that Dr. Hendershott was not offering an opinion about intent. See Lek, 370 F. Supp. 3d at 410 ("Hendershott does not purport to testify as an expert about any individual's intent, nor could he. His testimony is that he has located trading patterns that are consistent with layering activity.").

Defendants take issue with Dr. Brogaard's use of the word manipulative, arguing that it implies a finding of intent. See 1/13/26 Tr. at 175, 178. But as long as Dr. Brogaard states that the trading patterns are more *consistent* with manipulative trading, that is no different than an opinion that the trading patterns are more consistent with spoofing, an opinion consistent with Lek. And to the extent Defendants take issue with Dr. Brogaard's opinion that the trading patterns he identified were "unlikely to have arisen unintentionally" (1/13/26 Tr. at 192), that too is permissible because of the inclusion of the word "unlikely." It is also consistent with Lek, where Dr. Hendershott was permitted to testify that the trading patterns he identified were "unlikely to arise unintentionally." See Lek, No. 17-CV-1789 (DLC), ECF No. 88-1 at ¶¶ 11(b)-(c) (Dr. Hendershott opining that the "execution activity" was "unlikely to arise unintentionally or as part of a non-layering trading strategy"); Lek, 370 F. Supp. 3d at 405.

There is no merit to Defendants' argument that Dr. Brogaard's opinion is fundamentally flawed because a finding of intent is "critical" and "baked-in" to his methodology. See, e.g., 1/13/26 Tr. at 189. His mathematical calculations can be divorced from his statement in his report, eliminating any opinion that he found intent.

Defendants also argue that Dr. Brogaard could have looked at the algorithms used by Defendants' customers, which Defendants seemingly acknowledge could be evidence of intent.

41

1/13/26 Tr. at 67-68. But Dr. Brogaard did not ignore the algorithms; they simply did not exist by the time Harrington sought them. As Harrington's counsel explained at oral argument, in response to a subpoena, Defendants' clients indicated that the "algorithms change over time" and they did not "have a snapshot of what [the algorithm] was during the relevant period." See 1/13/26 Tr. at 70-71, 138-39.

Defendants are correct, however, that Dr. Brogaard cannot testify that Defendants' customers "engage[d] in thousands of episodes of spoofing" or that he identified "manipulative trading." Brogaard Reply Rep. at ¶ 148; Brogaard Rep. at ¶ 111. Implicit in a finding of spoofing (which is a form of manipulative trading) is a finding that the trader did not intend to execute the baiting orders. See Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC, No. 22-CV-10185 (GHW) (GS), 2023 WL 9102400, at *2 (S.D.N.Y. Dec. 29, 2023) (explaining that spoofing occurs "where a market participant submits and cancels buy and sell orders without the intention to trade in order to manipulate other traders") (cleaned up), adopted sub nom. by, Nw. Biotherpeutics, Inc. v. Canaccord Genuity LLC, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024); see also Brogaard Rep. at ¶ 10 (defining spoofing as "an act of pretending to sell when you intend to buy—or pretending to buy when in fact you intend to sell"). Accordingly, Dr. Brogaard's opinion that the customers engaged in spoofing or manipulative trading necessarily implies a finding of intent. But this can be corrected at trial by limiting Dr. Brogaard's testimony; it does not require the exclusion of his opinion that the trading patterns he identified were "unlikely to have arisen unintentionally," were "not consistent with market making," and were "more consistent with spoofing than non-manipulative trading."

II.     Dr. Robert Shapiro

A. *Dr. Robert Shapiro's expert reports*

Robert J. Shapiro is an economic advisor that co-founded an advisory and analysis firm that provides counsel to governments, non-profits, and businesses. See ECF No. 511-1 ("Shapiro Rep.")[10] at Ex. A. He holds Ph.D. and M.A. degrees from Harvard University, an M.Sc. degree from the London School of Economics, and an A.B. degree from the University of Chicago. Dr. Shapiro previously served as U.S. Under Secretary of Commerce for Economic Affairs in the Clinton Administration. Id.

Dr. Shapiro was retained by Harrington to answer the following questions. As it concerns CIBC, Dr. Shapiro was asked to determine whether the conduct of CIBC's customer, ███, including ███ episodes of spoofing of Concordia stock between ████████████ ██████████, caused harm to Harrington. Additionally, Dr. Shapiro was asked to determine Harrington's damages caused by the conduct of CIBC's customer. Shapiro Rep. at ¶ 7. As it concerns Merrill, Dr. Shapiro was asked to determine whether the conduct of Merrill's customers, ██████████, including ███ episodes of spoofing of Concordia stock between ████████████████████████, caused Harrington harm, and if so, "what is the amount of damages Harington suffered that was caused by" the conduct of Merrill's customers. ECF No. 511-2 ("Shapiro Merrill Rep.") at ¶ 7.

In preparing his report, Dr. Shapiro was asked to assume that during the Relevant Period, Harrington sold ████████ shares of Concordia stock "into a market that was being manipulated downward" by Defendants' customers. Shapiro Rep. at ¶ 8(d). As to CIBC, Dr. Shapiro

---

[10] Dr. Shapiro wrote two reports, one specific to CIBC (ECF No. 511-1) and one specific to Merrill (ECF No. 511-2). Because of the substantial overlap between the two reports, all citations herein are to the CIBC report, unless otherwise noted.

43

concluded that Harrington suffered ███████ in damages from its sale of ███████ Concordia shares during the Relevant Period, when the market price of Concordia shares was manipulated downward through ████ spoofing episodes. Id. at ¶ 9. As to Merrill, Dr. Shapiro concluded that Harrington suffered ███████ in damages from its sale of ███████ Concordia shares through ████ spoofing episodes. Shapiro Merrill Rep. at ¶ 9. To reach that conclusion, Dr. Shapiro used a spreadsheet provided by Harrington's counsel (which Dr. Shapiro understood was a spreadsheet submitted along with Dr. Brogaard's report). Shapiro Rep. at ¶ 15. That spreadsheet, as Dr. Shapiro explains, contains trading records relating to ████ spoofing episodes during the relevant period, "including the date, time, price, and quantity of CIBC's executed buy trades and non-bona fide sell orders based on the definition of spoofing, and, also, the date, time, and price of trades that are not related to CIBC's spoofing activities around the time of CIBC's spoofing activities."[11] Id. The same is true for the data underlying the ████ spoofing episodes of Merrill's customers. Shapiro Merrill Rep. at ¶ 15. Harrington's counsel also provided Dr. Shapiro the trading records for Harrington, including the dates and sales of ███████ Concordia shares on trading venues in Canada during the Relevant Period. Shapiro Rep. at ¶ 16. Dr. Shapiro acknowledges that Concordia is a cross-listed security, and thus a share of Concordia stock traded in the United States is the same stock traded in Canda. Id.

Dr. Shapiro examined the spoofing episodes for Defendants' clients for the Relevant Period. Id. at ¶ 29. Relying on Dr. Brogaard's analysis, there were ████ spoofing episodes on ████ trading days by CIBC's customer (id.; see also id. at Table 1), and ████ episodes of spoofing on ██ trading days by Merrill's customers (Shapiro Merrill Rep. at ¶ 29; see also id. at

---

[11] Although Dr. Shapiro states in his report that the spreadsheet contained the quantity of non-bona fide sell orders, Dr. Shapiro admitted in his deposition that the spreadsheet he relied on did not contain any sell orders. ECF No. 599-1 at 117, 136, 313.

Table 1). As to CIBC's customer, the largest number of purchases in a single day (███) occurred on ███████████, and the smallest number of purchases in a single day (█) occurred on ███ ███████████████████████. Shapiro Rep. at Table 1. As to Merrill's customers, the largest number of purchases in a single day (████) occurred on ████████████, and the smallest number of purchases in a single day (█) occurred on ████████████████████████████████ ██████████████████████. Shapiro Merrill Rep. at Table 1. Dr. Shapiro acknowledges that on a given day—████████████ for instance—when there were "██ spoofs at different times throughout a single day," there also was "other good and bad news" that may have entered the market on that day. Shapiro Rep. at ¶ 36.

In his report, Dr. Shapiro began by reviewing the non-bona fide sell orders, purchases, and buy trades. Id. at ¶ 30. In his deposition, however, Dr. Shapiro admitted that he did not conduct an analysis to determine if the orders were non-bona fide, the spreadsheet he relied on from Dr. Brogaard did not include non-bona fide orders, and he did not use the price of the non-bona fide sell order in his calculation. ECF No. 599-1 at 115-118, 136, 206-208, 214-215.

According to Dr. Shapiro, the non-bona fide sell orders intentionally injected false information into the market to depress the price of Concordia shares, thereby "manipulating downward the national best offer price."[12] Shapiro Rep. at ¶ 30. In his report, Dr. Shapiro explained that to calculate the price impact of each spoofing episode, he took the difference

---

[12] In an exchange, the best (or highest) price at which a buyer is willing to purchase is the "bid." Hendershott Rep. at ¶ 25. The best (or lowest) price at which a seller is willing to sell at is the "offer" or "ask." Id. When an exchange receives limit orders from market participants, the exchange submits these orders as quotes to be published in a consolidated feed. Id. The consolidated feed includes the best displayed bid across all exchanges in a given market (the National Best Bid or "NBB") and the best displayed offer across all exchanges in a given market (the National Best Offer or "NBO"). Id.; see also Brogaard Rep. at ¶ 23 n.22 ("The national best bid and offer price represent the highest bid and lowest offer price available across numerous exchanges.").

between the ask price of the first non-bona fide sell order and the price at which CIBC's and Merrill's customers purchased the Concordia shares. Id. at ¶ 31. That difference, according to Dr. Shapiro, is the financial gain to the customers and is equivalent to the financial damage to Concordia stock caused by each spoofing episode. Id. In his deposition, however, Dr. Shapiro acknowledged that CIBC's and Merrill's customers were not counterparties to the spoofing episode such that he could not have used the price at which CIBC's or Merrill's customers purchased the shares, and he clarified that price he used instead was the national best offer price at the time of the first non-bona fide order. ECF No. 599-1 at 124, 138, 171-173, 215, 336-337.

Next, Dr. Shapiro looked at the number of spoofing episodes on any given day during the Relevant Period. Shapiro Rep. at ¶ 32. As to CIBC, he determined that the price impact from the ▮▮▮ spoofing episodes (that is, the difference between the ask price of the first baiting sell order and the purchase price) ranged per episode from ▮▮▮▮▮▮▮▮. Id. Of the ▮▮▮ spoofing episodes, ▮▮▮ episodes had a price impact greater or equal to zero, and ▮▮ episodes (or ▮▮▮) had a price impact of less than zero, meaning that they failed to depress Concordia's share price. Id. at ¶¶ 32, 33. As to Merrill, Dr. Shapiro determined that the price impact from the ▮▮▮ spoofing episodes ranged per episode from ▮▮▮▮▮▮▮. Shapiro Merrill Rep. at ¶ 34. Of the ▮▮▮ spoofing episodes, ▮▮▮ had a price impact greater or equal to zero, and ▮ episodes (or ▮▮▮) had a price impact of less than zero. Id. at ¶¶ 34, 35.

Dr. Shapiro calculated the daily price effect of the spoofing episodes for each day during the Relevant Period. As to CIBC, he determined the average price effect for the days (▮▮) when more than ▮▮ spoofing episode occurred. Shapiro Rep. at ¶ 34. And for the ▮▮ spoofing episodes that failed to depress the price of Concordia stock, Dr. Shapiro calculated the negative price effect. Id. In his report, Dr. Shapiro includes a table that illustrates the average price impact

by day of the spoofing episodes, which ranged from ████ on ████████, to ████ on ████████████. Shapiro Rep. at Table 2. The average price effect of the spoofing episodes was ████ per day. Id. at ¶ 34. As to Merrill, he determined the average price effect for the days (██) when more than one spoofing episode occurred. Shapiro Merrill Rep. at ¶ 36. And for the █ spoofing episodes that failed to depress the price of Concordia stock, Dr. Shapiro calculated the negative price effect. Id. In his report, the daily average price impact of the spoofing episodes ranged from ████ on ████████, to ████ on ████████. Id.; see also id. at Table 4. The average price effect of the spoofing episodes was $████ per day. Id. at ¶ 36.

Because Concordia shares are traded in two currencies—U.S. dollars (USD) in the United States and Canadian dollars (CAD) in Canada—Dr. Shapiro converted the prices of all sell orders and purchases that were made in CAD to USD. Shapiro Rep. at ¶ 35. To calculate the damages to Harrington, Dr. Shapiro explained that he determined the "but-for price" of Concordia stock—that is, the price the stock would have traded at absent the spoofing episodes. Id. at ¶ 37. To calculate the but-for price, Dr. Shapiro added the average daily price effect from the spoofing episodes to the manipulated market price of Concordia stock on the days that the stock was spoofed. Id.

Dr. Shapiro calculated the damage per share sold by Harrington based on the difference between the manipulated market price and the but-for (or non-manipulated price) for each day that Harrington sold shares. Id. at ¶ 38. According to Dr. Shapiro, Harrington sold Concordia shares on ██ days during the Relevant Period, at prices depressed by the spoofing, for a total of ████████ shares. Id. He aggregated the number of Concordia's shares sold by Harrington per day during the Relevant Period. Id. And to calculate the financial damage to Harrington, Dr. Shapiro multiplied the number of shares sold by Harrington in a day by the damage per share on

47

that day. Id. This calculation is reflected in Table 5 of Dr. Shapiro's report, which shows the shares sold on a particular day, the market price and the but-for prices for Concordia shares on that day, and the damages for the shares sold by Harrington on that particular day. Id. at Table 5.

As to CIBC, Dr. Shapiro opines that Harrington suffered ▪▪▪▪ in damages (id. at ¶ 39), and as to Merrill, Dr. Shapiro opines that Harrington suffered ▪▪▪▪ in damages (Shapiro Merrill Rep. at ¶ 41), both stemming from the sale of ▪▪▪ shares of Concordia stock on ▪ days during the Relevant Period, when the price of Concordia stock was artificially depressed due to the spoofing episodes.

B. *Defendants' criticisms of Dr. Shapiro's damages analysis*

Defendants raise several arguments in support of their contention that Dr. Shapiro's damages analysis is inadmissible. Beginning with Dr. Shapiro's qualifications, Defendants argue that Dr. Shapiro lacks expertise in the relevant field of market microstructure and therefore cannot opine on Harrington's alleged damages from spoofing. ECF No. 509 at 9-11. Defendants contend that Dr. Shapiro's background in macroeconomics (not financial markets) does not suffice to permit him to render an opinion on causation and damages, and he has no expertise in the specific areas in which he seeks to opine—market microstructure and spoofing. Id.

Turning to his analysis, Defendants argue that Dr. Shapiro's opinion on causation and damages is flawed for several reasons: he incorrectly equates the gains to the spoofer with the losses to Harrington; he does not calculate the price Harrington would have obtained for its sale of shares absent the spoofing; and he conducted no analysis to determine how the spoofing affected the market price for Concordia stock. ECF No. 509 at 5-9. According to Defendants, this means that Dr. Shapiro has not connected his calculation to Harrington's losses and therefore he

48

does not offer an opinion on whether and how much Harrington was damaged by the alleged spoofing in Concordia stock. Id. at 8-9.

Next, Defendants fault Dr. Shapiro for relying on Dr. Brogaard's spreadsheet and work product without understanding it and questioning it. ECF No. 509 at 15-16. Defendants also contend that Dr. Shapiro's opinion is based on unsupported assumptions, such as his assumption that the market for Concordia stock was being manipulated downward. Id. at 16. Because Dr. Shapiro did not independently ascertain whether there was a negative price impact on Concordia stock due to the alleged spoofing, and because Dr. Brogaard also did not reach that conclusion, Defendants argue that Dr. Shapiro's assumption that the price of the stock was manipulated downward is unsupported. Id. at 16-17. Defendants also fault Dr. Shapiro for assuming that any price impact of spoofing is lasting and does not quickly dissipate, and because he did nothing to isolate the price impact from spoofing versus any potential price impact from other new information that entered the market before, during, or after an alleged spoofing episode. Id. at 19-21. Finally, Defendants argue that Dr. Shapiro did not account for any purchases made by Harrington during the relevant time at the artificially depressed price and thus his damages formula was not reliably applied to the facts of the case. Id. at 23-24.

1.  Shapiro is qualified to testify as an expert in this case.

Defendants contend that Dr. Shapiro is not qualified to opine on the damages Harrington sustained. Such an opinion, Defendants aver, necessarily requires an opinion on causation (because Dr. Brogaard did not opine on causation), and Dr. Shapiro's lack of knowledge or experience in the relevant field of market microstructure or spoofing render him incapable of giving an opinion on causation. ECF No. 509 at 9-10, 15; see also 1/12/26 Tr. at 95. Defendants' arguments are unavailing.

"Courts in this Circuit have liberally construed the qualification requirements of Rule 702, 'at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.'" 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 642-43 (S.D.N.Y. 2014) (quoting In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004)). Where an expert "has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that [he] lacks expertise in the specialized areas that are directly pertinent." Arista Recs. LLC v. Lime Grp. LLC, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011).

To start, Dr. Shapiro holds Ph.D. and M.A. degrees from Harvard University, an M.Sc. degree from the London School of Economics, and an A.B. degree from the University of Chicago. Shapiro Rep. at ¶ 2. Dr. Shapiro "train[ed] in economics both at the London School of Economics . . . [and] at the University of Chicago, as an undergraduate." ECF No. 599-1 at 89. His doctorate from Harvard is in political economy. Id. at 9, 90. During the Clinton administration, Dr. Shapiro was the Undersecretary of Commerce, where his duties included oversight of the U.S. Bureau of Economic Analysis and U.S. Census Bureau. Shapiro Rep. at ¶ 2. In that role, he was "responsible for the preparation and integrity of critical measures of the nation's economic performance, including the GDP measure and its components" and was the "chief economic advisor for the U.S. Commerce Department and the Commerce Department representative to White House task[ ] forces involving economic and financial matters." Id.

Dr. Shapiro has served as a fellow at Harvard University, the National Bureau of Economic Research, the Brookings Institution, and the Fujitsu Institute. Id. at ¶ 5. He was the principal economic advisor to Bill Clinton in his 1991-1992 presidential campaign, a senior

economic advisor to Hillary Clinton in her 2015-2016 presidential campaign, and an economic advisor to the campaigns of Joseph Biden, Jr., Barack Obama, John Kerry, and Albert Gore, Jr. Id. Dr. Shapiro is also the chairman of Sonecon LLC, an economic and financial advisory firm. Id. at ¶ 1. As chairman, he has "analyzed U.S. and global economic and financial conditions and advised senior officials and executives of governmental, business, legal, and non-profit entities." Id. at ¶ 4. This action is Dr. Shapiro's second time serving as a testifying expert. ECF No. 599-1 at 13.

His extensive background in economics aside, Dr. Shapiro has experience with market manipulation specifically. As he details in his report, he spent "the past two decades . . . stud[ying] and perform[ing] extensive economic analysis of the impact of various types of stock manipulation, including naked short selling and spoofing," and has "advised numerous high ranking public officials regarding the impact of manipulation on U.S. securities markets[.]" Shapiro Rep. at ¶ 3. Dr. Shapiro has performed "initial analyses of possible naked short selling for probably 10 or 15 cases in which attorneys asked [him] for an initial opinion," and naked short selling is a form of market manipulation. ECF No. 599-1at 33. He has also conducted studies on market manipulation more broadly, specifically "prepar[ing] memos for the SEC" and "testif[ying] to the SEC on market manipulation." Id. at 35.

Further, Dr. Shapiro has "advised companies and shareholders on litigation involving price manipulation of their stocks, including cases involving OverStock, Nanopierce, Northwest Biotherapeutics, Novastar, and Raser." Shapiro Rep. at ¶ 3. He has "done extensive work on market manipulation including as a testifying expert in a market manipulation case . . . the Overstock case," where he was a damages expert, and has "consulted with business executives . . . about manipulation including spoofing." ECF No. 599-1 at 10-12, 26, 30-33. He

has testified before Congress concerning market manipulation and has written for his clients at least four analyses on various market microstructure and trading topics. ECF No. 528 at 7; see ECF Nos. 535-4, 535-5, 535-6, 535-7. Dr. Shapiro has also "read extensively the literature" on spoofing, "read SEC findings on spoofing," "discussed spoofing with attorneys," and "discussed spoofing with executives of corporations and as well as other forms of market manipulation." ECF No. 599-1 at 17-20.

That Dr. Shapiro's background is predominantly in macroeconomics does not render him unqualified to testify in this case. First, "[d]isputes as to the strength of [Dr. Shapiro's] credentials," or lack thereof, "go to the weight, not the admissibility," of his expert opinion. McCullock, 61 F.3d at 1044 (citation omitted); see also United States v. Joseph, 542 F.3d 13, 21-22 (2d Cir. 2008) (emphasizing that "the place to quibble with [an expert's] academic training is on cross-examination and goes to his testimony's weight . . . not its admissibility") (internal quotation marks and citation omitted) (alterations in original), abrogated on other grounds by, United States v. Ferguson, 676 F.3d 260, 276 n.14 (2d Cir. 2011); McCullock, 61 F.3d at 1043 (district court did not err in admitting expert where expert did not have formal training as to the precise scientific issue in dispute because expert's "alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility"). And, as Dr. Shapiro's testified, his "expertise in economics" is pertinent to spoofing and "critical" to accurately assessing damages in a particular case. ECF No. 599-1 at 8-9, 13. To the extent Defendants disagree, it can be a subject of cross-examination.

Moreover, Dr. Shapiro has sufficient relevant knowledge as it concerns spoofing to permit him to testify as an expert, despite the lack of formal training in the field of market microstructure. [T]he court must examine the totality of the [expert's] background to determine

whether he or she exhibits any one or more of the qualifications listed in Rule 702—knowledge, skill, experience, training, or education—with respect to a relevant field." Wash. v. Kellwood Co., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) (citation omitted); Russo v. Keough's Turn of the River Hardware, LLC, No. 11-CV-994 (VB), 2012 WL 4466626, at *3 (S.D.N.Y. Sept. 25, 2012) (determining that expert was qualified, due to his background education and experiences, despite lacking "a degree or training narrowly matching the point of dispute"), aff'd by, 529 F. App'x 50 (2d Cir. 2013); Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 339-340 (E.D.N.Y. 2011) (denying motion to exclude experts' opinions because "the expert ha[d] educational and experiential qualification in a general field closely related to the subject matter in question" and identified a mechanism "based on his professional understanding of the relevant literature"). Dr. Shapiro has educated himself on spoofing, has advised corporate clients on spoofing, has testified as an expert in a market manipulation case, and has testified before Congress on market manipulation. All of this experience suffice to render him qualified here.

Defendants' reliance on Lek, 370 F. Supp. 3d 384, is misplaced. In that spoofing case, the court concluded that a proposed expert was not qualified to testify about "layering and the Cross-Market Strategy" because he had no "educational background," "work experience," or "prior work as an expert" in market manipulation or layering. Id. at 407-08. By contrast, Dr. Shapiro testified to his work experience as an expert in a market manipulation case and as a consultant to corporate clients addressing the issues of market manipulation and spoofing. He has also testified before the SEC and Congress on market manipulation, and has acquired knowledge about spoofing through extensive reading of the literature on the subject. As the Court recognized in Lek, "[i]t is unquestionably true that one can acquire expertise through study and application without a formal degree in the area or even relevant work experience." Id. at 408.

Finally, any difficulties encountered by Dr. Shapiro in explaining his analysis during his deposition (see ECF No. 509 at 11-14; ECF No. 543 at 4-5) do not necessitate his disqualification as an expert. Defendants point to Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006), where the Second Circuit explained that "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." In Riegel, the expert "essentially provided no explanation as to how he had reached his conclusion" in his report and then "backed away from [his] conclusion in his deposition." Id. Riegel is inapposite. Dr. Shapiro walks through his analysis in his report, points to the data he relied upon, and explains how he arrived at his conclusions. Simply put, Dr. Shapiro provides a thorough explanation of his opinion in his report, and any inconsistencies in his deposition testimony can be used, if necessary, by Defendants at trial on cross-examination.

2. Shapiro's damages analysis is inadmissible.

Harrington asserts claims for market manipulation based on spoofing in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, and of Section 9(a)(2) of the Exchange Act. ECF No. 133 at ¶¶ 125-152. As an element of those claims, and as Judge Schofield explained in her two motions to dismiss decisions,[13] a party seeking to recover under the Exchange Act must prove loss causation, which "is the proximate causal link between the alleged misconduct and [Harrington's] economic harm." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007); see also Phunware, Inc. v. UBS Sec. LLC, No. 23-CV-6426 (DEH), 2024 WL 1465244, at *3, 7-8 (S.D.N.Y. Apr. 4, 2024) (observing that loss

---

[13] See Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp., 585 F. Supp. 3d 405, 419 (S.D.N.Y. 2022); Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp., No. 21-CV-761 (LGS), 2023 WL 6316252, at *8 (S.D.N.Y. Sept. 28, 2023).

causation is a required element of spoofing claims under Section 10(b), Section 9(a), and fraud under New York common law).

Dr. Shapiro was asked by Harrington to opine on whether the conduct by Defendants' clients "caused harm to Harrington," and if so, to determine the amount of Harrington's damages. See Shapiro Rep. at ¶ 7. Shapiro opined that Harrington suffered damages of ███████ as to CIBC (id. at ¶ 9) and ███████ of damages as to Merrill (Shapiro Merrill Rep. at ¶ 9) through the sale of ██████ Concordia shares during the Relevant Period. As explained below, Dr. Shapiro's opinion on loss causation and damages relies on assumptions that are not generally accepted and contrary to Second Circuit precedent. The opinion is thus unreliable and inadmissible.

In Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc., 41 F.4th 71 (2d Cir. 2022), the Second Circuit discussed two ways in which loss causation may be pled in a spoofing case.[14] A plaintiff may allege (1) that it traded "so close in time to Defendants' spoofing as to permit [an inference] as a matter of common sense that the market prices were artificial when

---

[14] As the Honorable Gary Stein explained in Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC, the Second Circuit in Gamma Traders addressed a market manipulation claim based on spoofing under the Commodity Exchange Act ("CEA"). Although the CEA does not impose a loss causation requirement like the Securities Exchange Act of 1934, it does require a plaintiff to show "actual damages." 2025 WL 368717, at 5 n.5 (S.D.N.Y. Jan. 31, 2025). And "actual damages" requires a plaintiff to show that "the defendant took an action that had an impact on the plaintiff's position, and that that impact was negative." Id. (quoting Gamma Traders, 40 F.4th at 77). Consequently, the Court in Gamma Traders analyzed whether the plaintiff had alleged "a plausible connection between their trading and Defendants' spoofing" and whether it was "harmed as a result of Defendants' spoofing," an analysis akin to loss causation under the Exchange Act. 40 F.4th at 81. Other courts in this District have likewise applied Gamma Traders to assess loss causation for a market manipulation claim under the Exchange Act. See Phunware, Inc. v. UBS Sec. LLC, No. 23-CV-6426 (DEH), 2024 WL 4891891, at *2 (S.D.N.Y. Nov. 26, 2024) (applying Gamma Traders to loss causation analysis for spoofing claims brought under Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934).

[the plaintiff] traded," or (2) provide a factual basis to "justify an inference that the market price was still artificial" when the plaintiff traded, such that a court could "reasonably infer that spoofing's effects last throughout the day." Id. at 80-81. Beginning with the first option, there is no dispute that Harrington was not a counterparty to the alleged spoofing episodes identified by Dr. Brogaard. See ECF No. 599-1 at 336:19-337:9. In fact, on ▮ occasions, Harrington sold shares on a day when no spoofing episode was identified by Dr. Brogaard. Compare Shapiro Merrill Report at Table 4 (identifying spoofing episodes) with id. at Table 5 (identifying days Harrington sold shares). Harrington thus did not transact with the alleged spoofer. See Gamma Traders, 41 F.4th at 78 (explaining that the "most direct way to plead" injury is to plead "that the defendant directly traded with the plaintiff while manipulating the market price"). Nor does Shapiro point to any day where Harrington sold its shares while the spoofing episode was ongoing because, for example, Harrington sold shares during the interval between the placement of the baiting order and the cancellation of that order. See Nw. Biotherapeutics, Inc., 2025 WL 368717, at 7 (discussing "archetypal victim" of spoofing).

Consequently, the first option identified in Gamma Traders for establishing loss causation is not applicable here, because Harrington was not a counterparty to the alleged spoofer and there is no other indication that Harrington traded "so close in time" to the alleged spoofing episode to support an inference that the market price was still artificial at the time Harrington sold its shares. As such, to assist the trier of fact in finding that Harrington has proven loss causation, Dr. Shapiro would necessarily have had to conclude that a spoofing episode affected the "market price" for Concordia and the market price was "still artificial" when Harrington sold its shares during the Relevant Period—the second option for proving loss causation in Gamma Traders. 41

56

F.4th at 80-81. As discussed below, Dr. Shapiro conducted no analysis to reach such a conclusion.

i.    *Shapiro's damages calculation is not connected to Harrington's sale of Concordia stock.*

As is well understood, the measure of damages for a securities law violation "is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." Affiliated Ute Citizens v. U.S., 406 U.S. 128, 155 (1972); Acticon AG v. China N. E. Petrol. Holdings Ltd., 692 F.3d 34, 38 (2d Cir. 2012); see also RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., No. 94-CV-5587 (PKL) (RLE), 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000) ("[D]amages in a securities fraud case are measured by the difference between the price at which the stock sold and the price at which the stock would have sold absent the alleged misrepresentations and omissions[.]") (citation omitted), aff'd by, 2000 WL 420548 (S.D.N.Y. Apr. 18, 2000). Dr. Shapiro did not analyze whether a spoofing episode had a marketwide price impact on Concordia stock. Dr. Shapiro also did not determine what Harrington would have received absent the spoofing. Further, although Harrington purchased shares of Concordia during the Relevant Period, Dr. Shapiro did not offset any benefit Harrington received from those sales (presumably at an artificially depressed price) against the losses Harrington allegedly suffered. Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1313-14 (2d Cir. 1977) (explaining that recovery under Rule 10b-5 is denied "to a complainant for any amount in excess of his actual damages on account of the act complained of") (internal quotation marks and citation omitted); see also Jaffe Pension Plan v. Household Int'l, Inc., 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010) (noting that the Second, Fifth, Ninth and Tenth Circuits "require that plaintiffs' losses be netted against their profits attributable to the same fraud" and collecting cases). Collectively, these errors make Dr. Shapiro's assessment of

the amount of damages Harrington allegedly suffered unreliable. See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., No. 11-CV-6201 (DLC), 2015 WL 640875, at *3 (S.D.N.Y. Feb. 16, 2015) (excluding expert's damages calculation because the calculation was based on interpretation of a statute that was "incorrect as a matter of law, and conclusions drawn therefrom cannot help the trier of fact . . . to determine a fact in issue") (internal quotation marks and citation omitted).

Beginning with price impact, Dr. Shapiro's opening report contains no discussion of an analysis of a marketwide price impact. Instead, Dr. Shapiro explains that he was told by counsel to "assume" that Harrington sold Concordia stock "into a market that was being manipulated downward" by Defendants' customers. Shapiro Rep. at ¶¶ 8, 8(d). Dr. Shapiro confirmed in his deposition that he did not examine whether the spoofing identified by Dr. Brogaard had a marketwide impact on price. In his deposition, Dr. Shapiro testified that the "reduction in price" that arose from a spoof was merely the reduced price the counterparty in the spoof had to pay. ECF No. 599-1 at 233:1-21. He admitted that the movement in the price from the national best offer price ("NBO") to the executing purchase price (i.e., the price paid by the spoofer's counterparty) was not an impact to the market price as a whole; it was "an impact to the price the spoofer paid." ECF No. 599-1 at 170:4-9. Dr. Shapiro further confirmed that he did not analyze how the reduction in price paid by the spoofer affected the market price of Concordia stock as a whole. ECF No. 599-1 at 233:12-15; see also 1/12/26 Tr. at 30-31. He testified that his analysis "was focused on damages to Harrington, not whether the market was in some way affected." ECF No. 599-1 at 274:22-275:2. In short, Shapiro did not determine whether the spoofing episodes identified by Dr. Brogaard had a marketwide impact on the price of Concordia stock

58

and he did not assess or opine that the gain to the spoofer was equivalent to a marketwide impact on the price of Concordia stock.

During oral argument, Harrington's counsel argued that Dr. Shapiro relied on Dr. Brogaard, who counsel claimed had opined that the spoofing episodes had "a marketwide impact." See 1/12/26 Tr. at 59-60. According to counsel, "marketwide impact is observed by market activity" and Dr. Brogaard identified instances where "a participant in the market executed at the spoofer's price" and that "is marketwide impact." Id. at 77-78. Harrington's counsel also argued that Dr. Brogaard's opinion "goes to causation" because it is a reasonable inference that the "spoofing counterparty crossed the spread to execute at the NBV as a result of the spoofers' baiting orders." Id. at 101; see also id. at 77-82.

Like Dr. Shapiro, nowhere in his report does Dr. Brogaard state that he conducted an analysis on the marketwide impact of spoofing on the price of Concordia shares. There is also no statement by Dr. Brogaard that he found a marketwide impact on the price of Concordia stock caused by any spoofing episode. Nor does Dr. Brogaard discuss or mention loss causation in his report.

During oral argument, Harrington's counsel identified paragraphs 61 and 77 of Dr. Brogaard's report as instances where Dr. Brogaard explained that the alleged spoofing had a marketwide impact. 1/12/26 Tr. at 60. But neither of those paragraphs contains an explicit statement that the spoofing episodes impacted the market price for Concordia stock. Instead, in paragraph 61 of Merrill's report, Dr. Brogaard discusses one of six components to his Posting Methodology: a requirement that the "cumulative number of ask limit order shares placed by the trader in the t-2 seconds to t interval sum up to twice the Canadian time-weighted average number of shares at the best ask price for [Concordia] on that day." Brogaard Merrill Rep. at ¶

59

61. As Dr. Brogaard explains, that component was necessary to ensure that the order imbalance was large enough to "induce a stock price change." Id. Importantly, Dr. Brogaard does not state that any order imbalance successfully induced a marketwide price change; he simply states that his algorithm "looked for big orders" within the limited context of the order book activity of Defendants' clients. See 1/12/26 Tr. at 138.

Likewise, Paragraph 77 of Dr. Brogaard's report also does not contain a statement that he conducted a marketwide analysis and found a marketwide price impact. That paragraph concerns Dr. Brogaard's Quantity Methodology. It discusses a component of that algorithm which required that "the trader's average time-weighted number of shares on the ask limit order book in the pre-execution period be at least 0.75 of the time-weighted average number of shares at the best ask price for [Concordia] on that day." Brogaard Rep. at ¶ 77. Here, too, Dr. Brogaard does not opine that the limit order imbalance successfully induced a marketwide price impact. Dr. Brogaard merely indicates that it was a filter he applied to detect a potential spoofing episode; he does not express an opinion as to whether it successfully induced a market participant to act.

The absence of any explicit analysis in Dr. Brogaard's report should suffice, but there is more. Tellingly, Dr. Brogaard was asked if he "performed any price impact analysis of the alleged spoofing," and he testified, "I did not analyze price impact." ECF No. 599-4 at 110:12-15. Dr. Brogaard was also asked if he identified "any specific traders that were induced to enter into certain trades, as a result of any actions by customers" of Defendants, and Dr. Brogaard testified that he "didn't do the analysis." ECF No. 599-3 at 274:24-275:9.

In short, neither of Harrington's experts assessed whether any of the spoofing episodes had a marketwide impact on the stock price of Concordia. Harrington's counsel averred that when the spoofer's counterparty crossed the spread to execute at the spoofer's price, "that is a

marketwide impact."[15] 1/12/26 Tr. at 65. But if that were so, then Dr. Brogaard or Dr. Shapiro could have said so, in their respective reports or depositions. Both experts instead unequivocally testified that they performed no marketwide price analysis. Consistent with the lack of such an analysis, neither expert examined whether other information entering the market during the Relevant Period may have impacted the price of Concordia shares. See ECF No. 599-1 at 259:5-260:21; see also ECF No. 599-4 at 110-112; ECF No. 511 at ¶ 8; 1/12/26 Tr. at 88-89; Shapiro Rep. at ¶ 36 (acknowledging that "other good and bad news" may have entered the market during a spoofing episode).

Harrington acknowledges that Dr. Brogaard's methodology "did not model the *extent* of the downward price impact." ECF No. 528 at 17 (emphasis in original). Harrington nevertheless contends that Dr. Brogaard "include[d] controls to ensure the *existence* of a downward price impact." Id. at 17 (emphasis in original). But as already discussed, Dr. Brogaard testified that he did not analyze price impact. More importantly, neither expert analyzed whether any downward price impact was still in effect when Harrington sold its shares, which is significant here because Harrington sold some shares on days with no spoofing episode. Although Harrington claims that Dr. Shapiro "modeled the extent of the impact" to Harrington of the spoofing, that claim is not borne out by Dr. Shapiro's testimony. ECF No. 528 at 17 (emphasis omitted). Dr. Shapiro testified that he did not determine what price Harrington would have sold Concordia shares absent the spoof, and he testified that his calculation of damages did not include "the price that

---

[15] As Dr. Hendershott explained, it is flawed to assume that Defendants' customers "would always have purchased shares aggressively by crossing the 'bid-ask spread.'" See Hendershott Rep. at ¶ 121. And, indeed, they "generally did not cross the spread." Id. at ¶ 122 (███ did not need to cross the spread ███ of the time and ███ did not cross the spread ███ of the time); see also ECF No. 544 at ¶ 6.

Harrington obtained" for the sale of its shares. ECF No. 599-1 at 337:6-338:16; ECF No. 599-2 at 473:12-21.

Instead of analyzing the impact on market price, Dr. Shapiro used the "gain to the spoofer as a proxy for the share price impact." 1/12/26 Tr. at 13-14. But the spoofer's gain cannot be a reliable proxy for the damages suffered by Harrington without an analysis by Dr. Brogaard or Dr. Shapiro as to how the spoofing episode impacted the market price (*i.e.*, was there an impact, how big was the impact, and how long did the impact last) because Harrington was not the spoofer's counterparty. See In re Valeant Pharms. Int'l, Inc. Sec. Litig., No. 15-CV-07658, 2023 WL 9750813, at *7 (D.N.J. May 22, 2023) (admitting expert report where expert "examined the price movement on days when fraud related information entered the market and its impact on the securities' price," "controlled for abnormal returns (meaning movement not related to marketwide or industry-specific factors), [and] analyzed the degree to which confounding information impacted the price and disaggregated the stock price decline"), adopted as modified by, 2024 WL 708831 (D.N.J. Jan. 2, 2024).

What's more, Dr. Shapiro's calculation of the gain to the spoofer (even if it could serve as a proxy for market impact) was grounded on an unsupported assumption and therefore could not support his statement that the gain to the spoofer is "equivalent to the financial damage to Concordia stock caused by each spoofing episode." Shapiro Rep. at ¶ 31. Dr. Shapiro used the NBO at the beginning of the spoofing episode and the price paid by the alleged spoofer during the episode to assess the gain to the spoofer. ECF No. 599-1 at 225:5-11; Shapiro Rep. at ¶¶ 30-31. The NBO was thus Dr. Shapiro's "but for price"—the price a buyer would have had to pay for the Concordia stock absent the spoofing. See Shapiro Rep. at ¶ 37; ECF No. 599-1 at 156:25-157:17; 216:25-218:18; 352:11-20. But Dr. Shapiro admitted that the NBO is not necessarily the

price a party would have to pay for the stock, because a party can pay a price lower than the NBO. See id. at 216:25-224:25. Dr. Shapiro nevertheless believed the NBO was the price that the spoofer would have had to pay absent spoofing, because Dr. Brogaard had identified spoofing episodes. See id. at 223:4-224:25; see also id. at 158:24-159:18. But Dr. Shapiro could not rely on Dr. Brogaard's identification of spoofing episodes, because Dr. Brogaard, as already explained, did not conduct a price impact analysis and he did not examine whether a counterparty was actually induced to trade with the spoofer. ECF No. 599-4 at 110:12-15; ECF No. 599-3 at 274-275. Dr. Brogaard also did not look at the NBO or NBB and how either of those figures moved during the alleged spoofing episodes. See ECF No. 599-4 at 79:13-80:15; ECF No. 599-3 at 210:13-211:13. Dr. Brogaard could therefore provide no foundation for Dr. Shapiro's assumption that the spoofer would have had to pay the NBO, absent the spoofing.

Dr. Shapiro's testimony belies counsel's contention that Dr. Shapiro used "the well-settled approach of identifying the 'but-for' price at which Concordia would have traded" absent the spoofing. ECF No. 528 at 3. Dr. Shapiro admitted that his analysis of Concordia's share price was limited to assessing "the gain that the spoofer had secured relative to what [the spoofer] would have secured, if [the spoofer] had bought" before the spoofing episode. ECF No. 599-1 at 335:12-336:12. Dr. Shapiro did not determine what price Harrington would have sold Concordia shares absent the spoof, and his calculation of damages did not include "the price that Harrington obtained" for the sale of its shares. ECF No. 599-1 at 337:6-338:16; ECF No. 599-2 at 473:12-21. Dr. Shapiro testified that he calculated "the difference between what Harrington received and what [Harrington] would have received in the absence of spoofing." ECF No. 599-2 at 469:8-16. But he admitted that his calculation of the "but for price" Harrington would have received was the "closing price" on the day the shares were sold, even on days Harrington made multiple

63

sales, and he could not determine whether Harrington in fact received the closing price on the days it sold shares. Id. at 414:23-418:18, 438:6-441:23, 561:19-563:25. Nor did Dr. Shapiro examine whether Harrington obtained a price higher than the day's closing price.[16] See id. at 473:12-475:14.

Finally, although trading records demonstrate that Harrington purchased shares during the Relevant Period (ECF No. 511 at ¶ 9), Dr. Shapiro took no account of any potential gain to Harrington from the purchase of shares at the allegedly artificially depressed price. In other words, Dr. Shapiro assessed Harrington's alleged damages without offsetting any gains from its purchases of Concordia shares. This is contrary to case law in this District concerning how damages are calculated in a securities fraud case. See Acticon, 692 F.3d at 38 (explaining that in Section 10(b) cases "a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got") (citation omitted); Set Capital LLC v. Credit Suisse Group, AG, No. 18-CV-2268 (AT), 2023 WL 2535175, at *5 (S.D.N.Y. Mar. 16, 2023) (endorsing expert's analysis of damages in securities fraud case that calculated "total out-of-pocket losses and nothing more") (internal quotation marks omitted); Minpeco, S.A. v. Conticommodity Servs., Inc., 676 F. Supp. 486, 490 (S.D.N.Y. 1987) (concluding that plaintiff's "claimed damages on its [ ] positions must be offset by the measure of the increase in value which accrued to its own [positions] . . . as a result of defendants' allegedly manipulative behavior").

---

[16] Harrington's counsel argues that Dr. Shapiro's use of the daily closing price to calculate Harrington's damages was a reliable assumption given the lack of information about the time of day of Harrington's sales, and any difference between the price Harrington sold and the closing price is de minimis. ECF No. 528 at 11-12. Even so, for the other reasons discussed herein, a correction in Dr. Shapiro's calculation using a different price does not suffice to save his analysis and reliably establish Harrington's damages.

In short, the gain to the spoofer, as calculated by Dr. Shapiro, cannot be a reliable proxy for the alleged damages Harrington suffered from the sale of shares of Concordia during the Relevant Period.

> ii.    *Shapiro's assumption of a lasting price impact from a spoofing episode is unsupported and contrary to Second Circuit precedent.*

Relying on the work of Eugene Fama, a Nobel Laureate in economics, Dr. Shapiro reasoned that a spoofing episode reduced the price of Concordia stock, the reduced price was incorporated into the stock price, and any subsequent movement in the price of the stock occurred "from the base of the manipulated share price." 1/12/26 Tr. at 14; see also id. at 16 (explaining that Fama's work established that "every price change is the result of new information, [and] each change is independent of those preceding it"); ECF No. 511-3 ("Shapiro Reply Rep.") at ¶¶ 17-20. Put simply, Dr. Shapiro assumed that a spoofing episode in ▮▮▮▮ ▮▮▮▮ affected the calculation of Harrington's alleged damages from a sale several months later, in ▮▮▮▮▮▮▮. See 1/12/26 Tr. at 14; see also id. at 17 ("Dr. Shapiro incorporated the average daily price impact of all spoofs up to and including the day Harrington sold shares"). An example illustrates this point.

As it concerns Merrill, Dr. Shapiro calculated that the spoofing episode on ▮▮▮▮▮▮ ▮▮▮, had an "average price impact" of $▮▮.[17] See Shapiro Merrill Rep. at Table 4. Harrington did not sell Concordia stock on ▮▮▮▮▮; it sold ▮▮▮ shares on ▮▮▮▮▮. See id. at Table 5. To calculate Harrington's damages from the sale on ▮▮▮▮▮, Dr. Shapiro took the average price impact of ▮▮▮ that occurred on ▮▮▮▮▮ and multiplied it by the number of shares Harrington

---

[17] To calculate that "average price impact," Dr. Shapiro took the NBO price "at the beginning of the spoofing episode and the execution price at the close of the spoofing episode, and he [looked] at the differential between the two." 1/12/26 Tr. at 122; see also Shapiro Merrill Rep. at ¶¶ 33, 40, Table 5.

sold on ██████ (████), yielding a damages amount of █████ for the sale on ████████. See id. Another spoofing episode that occurred on █████████, had an average price impact of ████. See id. at Table 4. Harrington did not sell shares on ███████; Harrington did not sell shares until █████████. See id. at Table 5. On ██████, Harrington sold █████ shares. Id. To calculate Harrington's damages from the sale on ██████, Shapiro took the average price impact from the preceding two spoofing episodes, on ███████ (████) and ████████ (████, and added them together (for a sum of ████), and multiplied the sum (████ by the number of shares Harrington sold on █████ (██████), resulting in damages of █████ for the █████ sale.[18] See id. After Harrington's sale on ██████, Harrington sold shares again seven times between █████ and ████████. See id. To calculate Harrington's alleged damages from those seven sales, Dr. Shapiro used the sum of the average price impact from ████████ and ███████ (████ and multiplied that sum by the number of shares sold on a specific day. See id.

As the above discussion illustrates, Dr. Shapiro assumed that a "price impact" from a spoofing episode that occurred at the start of the relevant time period, █████████, continued to affect the price of Concordia stock for all of Harrington's sales throughout the Relevant Period, such that the price impact from a spoofing episode on ██████ determined the damages suffered by Harrington from a sale on ██████████. The necessary implication of Dr. Shapiro's analysis is that even a single spoofing episode has an indefinite impact on the market price, as Harrington's counsel acknowledged during oral argument. 1/12/26 Tr. at 118; see also id. at 13-17; id. at 26 (explaining that based on Fama's work, "the price can go up or down, but

---

[18] As counsel explained at oral argument, the figures in Table 4 of Dr. Shapiro's report are rounded. See 1/12/16 Tr. at 6.

there is never a world in which the embedded impact from the spoof is erased"); Shapiro Reply

Rep. at ¶¶ 17-20. This assumption is unreliable and contrary to law.

To begin, Dr. Shapiro points to Fama to support his assumption of a lasting price impact.

See Shapiro Reply Rep. at ¶ 17. But Dr. Shapiro did not do so until his reply report; Dr. Shapiro's

opening reports do not mention or cite Fama. When asked during oral argument where Dr.

Shapiro explained in his opening report his reliance on Fama, Harrington's counsel cited

paragraphs 39 and 41 of Dr. Shapiro's opening report. See 1/12/26 Tr. at 19-20. But as even

counsel acknowledged, none of those sections cite or mention Fama. Id. at 20. Instead, counsel

explained that "[t]hat's what [Dr. Shapiro] is doing in those paragraphs" and "that's where the

cites *would have been*."[19] Id. (emphasis added).

All that is evident from paragraphs 39 and 41 is that Dr. Shapiro added the average daily

price impact and used the cumulative price impact throughout the relevant time period to

calculate Harrington's damages on each day it sold Concordia stock. Dr. Shapiro provides no

---

[19] Defendants take issue with Dr. Shapiro's failure to identify his reliance on Fama in his opening report, arguing that Dr. Shapiro was required to set forth the grounds for his opinion in his opening report, and the Court cannot consider any new arguments or facts advanced by Dr. Shapiro in his reply report. See ECF No. 577 at 1-2. Defendants ask that Dr. Shapiro's discussion of Fama in his reply report be stricken. Id. at 1. Harrington contends that Dr. Shapiro merely clarified an underlying assumption in his damages model in response to Dr. Hendershott's criticism. ECF No. 586 at 3-4. Harrington acknowledges that the reference to Fama "could have been included in Dr. Shapiro's initial report." Id. at 3. But even without it, Defendants had an opportunity to address Dr. Shapiro's reliance on Fama in their reply brief on this Daubert motion, and Dr. Shapiro discussed Fama in his deposition. Dr. Hendershott in his rebuttal report also addressed Dr. Shapiro's underlying assumption of a persistent price impact (Hendershott Rebuttal Rep. ¶¶ 123-125), explaining that it is not supported by academic literature. And Defendants did not seek to strike Dr. Shapiro's discussion of Fama in their Daubert motion, raising it for the first time at oral argument and in post-argument letters to the Court. All this weighs in favor of considering Dr. Shapiro's reliance on Fama in assessing the reliability of his analysis. See Brink's Glob. Servs. USA, Inc. v. Bonita Pearl Inc., No. 22-CV-6653, 2024 WL 4227760, at *6 (S.D.N.Y. Sept. 18, 2024) (explaining that a court has "wide discretion" and even where a reply report presents new legal arguments, court may permit it if it causes no prejudice).

explanation to support his assumption that the price impact is forever embedded in the stock price. He does not even explicitly acknowledge that he is assuming a lasting price impact. And in responding to criticism by Dr. Hendershott, faulting him for assuming that any price impact persists indefinitely, Dr. Shapiro confirmed that his opening report "contains no claim that Defendants' spoofing had a persistent impact on Concordia's share price." Shapiro Reply Rep. at ¶ 16.

Although this explanation confirms what is apparent from his opening report, it is troubling for several reasons. First, it is squarely contracted by Dr. Shapiro's analysis, which used an "average price impact" from ███████████, to calculate damages from a sale of Concordia stock on ███████████. Implicit in that calculation is an assumption that the price impact persists. Second, Dr. Shapiro's statement is at odds with his deposition testimony, where he claims that those who found that the impact of spoofing on the stock price is temporary "use the wrong framework." ECF No. 599-2 at 464:24-465:25. Stated differently, Dr. Shapiro disagrees with the theory that the price impact from spoofing is temporary. And third, Dr. Shapiro's statement is contrary to the representations of Harrington's counsel, indicating that Dr. Shapiro's damages calculation relies on an assumption that spoofing had a lasting price impact.[20] 1/12/26 Tr. at 13-17, 26, 118.

---

[20] In his deposition, Dr. Shapiro attempted to distinguish between a "persistent impact" and his opinion that under Fama's framework "[a]nything that moves the stock price is embedded in the price." ECF No. 599-2 at 514:15-515:24; 459:16-22. According to Dr. Shapiro, persistent is "different" from "embedded" because "persist" suggests that "one piece of information has an additional or serial effects," which Dr. Shapiro believes is distinguishable "from being a permanent effect." Id. at 514:15-515:24. However, Dr. Shapiro acknowledged that "embedded in the price"—which is his description of Fama's framework for stock price movement—means the same as "permanently in the price." Id. at 460:8-13. Semantics aside, whether described as persistent or embedded, it is plain from Dr. Shapiro's analysis that the "average price impact" from a spoofing episode in ████████ determined the amount of Harrington's damages from a sale of shares in ██████████.

Regardless, Dr. Shapiro's reliance on Dr. Fama cannot save his damages calculation. In his reply report, Dr. Shapiro discussed the economic theories of Fama which he contends establishes that "subsequent movements in a stock's price do not follow the effect of the preceding movement," because "a stock's subsequent price is independent of the factors that determined the previous price." Shapiro Reply Rep. at ¶ 17.

In the 1960s, Fama developed the random walk theory of stock prices and the efficient markets hypothesis to explain "how a stock price changes based on how investors respond to new information that is injected into the marketplace." ECF No. 528 at 19; see, e.g., Eugene F. Fama, The Behavior of Stock-Market Prices, 38 J. Bus. 34 (1965) (establishing the "Random Walk" theory); Eugene F. Fama, Random Walks In Stock Market Prices, 21 Fin. Analysts J. 55 (1965) (proposing the "Efficient Market" hypothesis); Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383 (1970); In re Computer Scis. Corp. Sec. Litig., 288 F.R.D. 112, 118 (E.D. Va. 2012) (describing Dr. Fama as "the individual largely credited with developing the efficient market hypothesis"). Since then, Fama's analysis has become a bedrock principle in economics, representing the notion that "[i]n an efficient market, stock returns follow what is known as a 'random walk,' meaning that investors cannot use past stock price movements to predict the next day's stock price movement." See Strougo v. Barclays PLC, 312 F.R.D. 307, 317-18 (S.D.N.Y. 2016), aff'd but criticized sub nom. by, Waggoner v. Barclays PLC, 875 F.3d 79 (2d Cir. 2017) (citing generally Eugene F. Fama and Kenneth R. French, Permanent and Temporary Components of Stock Prices, 96 J. Political Econ. 2 (1988)); Villella v. Chem. & Mining Co. of Chile Inc., 333 F.R.D. 39, 54-55 (S.D.N.Y. 2019) ("In an efficient market, the price change for one day has no predictive power for an investor attempting to determine what the next day's price change will be. This phenomenon is called a

random walk.'") (internal quotation marks and citation omitted); <u>Billhofer v. Flamel Techs., S.A.</u>, 281 F.R.D. 150, 162 (S.D.N.Y. 2012) ("As stated in often-cited finance text: If markets are efficient in the weak sense, then it is impossible to make consistently superior profits by studying past returns. Prices will follow a random walk.") (internal citations omitted).

On its face, however, discussions of Fama's random walk theory concern whether past stock prices have any predictive power for future price movement. Fama's random walk theory is also not addressed at market microstructure, market manipulation, or spoofing. Dr. Shapiro agreed that "[s]poofing is market microstructure." ECF No. 599-1 at 9. The field of market microstructure, which examines "the trading mechanisms of financial markets," is the relevant field for forms of manipulative trading like spoofing. <u>See</u> <u>Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.</u>, 708 F. Supp. 3d 450, 463 (S.D.N.Y. 2023). Dr. Shapiro acknowledged that Fama "did not know of spoofing." ECF No. 599-2 at 462-64. Nor could he. Fama's work dates back to the 1960s, and the field of market microstructure did not exist until the 1980s. 1/12/26 Tr. at 119. Additionally, Dr. Shapiro could not identify an article or study that applied Fama's random walk theory to spoofing and supported a conclusion that the price impact from spoofing is lasting.[21] <u>See</u> ECF No. 599-2 at 462-66. Dr. Shapiro's reliance on Fama's widely accepted but inapplicable analytical framework does not save his opinion.

---

[21] Notably, in the securities fraud context, at least one court has rejected application of a random walk analysis to support an argument that "purportedly misleading statements were incorporated into a company's stock price," suggesting that it similarly would not be applicable here to support Dr. Shapiro's assumption that baiting orders have a lasting effect. <u>See</u> <u>McNamara v. Bre-X Mins., Ltd.</u>, No. 97-CV-159, 2002 WL 32076175, at *6 (E.D. Tex. Sept. 30, 2002) (excluding portion of expert opinion relying on "random-walk analysis" where expert was unaware "of any instance in which the random walk analysis was utilized in the context of a securities case involving fraud on the market") (internal quotation marks and citation omitted).

Fama aside, Dr. Shapiro's assumption of a lasting price impact is contradicted by controlling Second Circuit case law. It is well settled that "[e]xpert opinions that conflict with controlling law are not helpful to the jury." In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., No. 14-MD-2542 (VSB), 2025 WL 354671, at *50 (S.D.N.Y. Jan. 30, 2025); In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2022 WL 15053250, at *23 (E.D.N.Y. Oct. 26, 2022) (excluding expert's opinion that contradicted controlling case law because those opinions "are not helpful to the factfinder" and collecting cases); Betances v. Fischer, No. 11-CV-3200 (RWL), 2021 WL 1534159, at *4 (S.D.N.Y. Feb. 23, 2021) (excluding expert testimony where expert made statements of fact or law that were inconsistent with decision already rendered by the Court).

As Harrington's counsel acknowledged, Dr. Shapiro's damages calculation necessarily requires a conclusion that a spoofing episode has a lasting price impact, with no temporal connection between the alleged harm (the sale of stock at an artificial price) and the spoofing episode. 1/12/26 Tr. at 22-23, 116-118. And the logical implication of Dr. Shapiro's assumption is that a plaintiff attempting to establish loss causation on a claim of market manipulation based on spoofing may seek damages for trading activity that occurred any time during the applicable statute of limitations for the cause of action, because Dr. Shapiro's damages analysis imposes no other temporal connection between the trading activity and the manipulative behavior. See 1/12/26 Tr. at 118; see also id. at 133-134. None of this can be squared with the Second Circuit's decision in Gamma Traders.

The plaintiffs in Gamma Traders sued a group of defendants who had "previously admitted to having manipulated prices" in the futures and options markets for four precious metals, by engaging in frequent and widespread "spoofing activities" that ultimately resulted in

71

criminal penalties and fines. 41 F.4th at 74-76. Unlike here, there was no dispute in Gamma

Traders that the defendants had engaged in unlawful market manipulation through spoofing.

Following enforcement actions by the government, private plaintiffs like Gamma Traders,

commenced civil actions alleging market manipulation in violation of the Commodity Exchange

Act ("CEA"). Id. at 74, 76. Gamma Traders alleged in its amended complaint that "there were

nine separate dates on which at least one plaintiff traded, and at least one defendant spoofed in

the opposite direction, in the same market." Id. at 76. In dismissing the amended complaint, the

district court concluded that Gamma Traders had not "plausibly allege[d] that it was harmed by

Defendants' spoofing" and had therefore failed to plead damages. Id. at 76-77. The Second

Circuit agreed.

To state a claim for relief under the CEA, a plaintiff must plead that it was damaged by

the defendant's conduct, meaning that the defendant took action that had a negative impact on

the plaintiff's position. Id. at 78. "While the most direct way to plead such an injury is to allege

privity (i.e., that the defendant directly traded with the plaintiff while manipulating the market

price), other factual allegations that give rise to an inference of harm can also be sufficient." Id.

To plead an inference of harm, Gamma Traders relied on two theories, only one of which is

relevant to the facts of this case: "on nine specific dates, [d]efendants spoofed and Gamma took

positions opposite the Defendants' in the same markets at some point on each of those days."[22]

---

[22] The other theory of liability relied on by Gamma Traders pointed to the fact that "the parties engaged in such a high volume of trading that it is at least plausible (if not probable) that [d]efendants' spoofing influenced the price at which Gamma bought and sold futures and options contracts on at least one occasion[.]" 41 F.4th at 78. In rejecting Gamma Trader's theory of harm based on the high volume of trading, the Circuit reasoned that "[i]f allegations such as Gamma's were enough to state a claim, then any person who traded with even modest frequency could state a CEA claim against a market-manipulating defendant, without ever plausibly alleging that she suffered a loss as a result of the defendant's conduct." Id.

Id. The Second Circuit rejected that theory, concluding that it did not support a reasonable inference that Gamma Traders was injured by the defendants' spoofing. Id. The Court reasoned that "Gamma does not plead, even in general terms, how long it takes for the market price to return to a non-artificial level after a spoof," and "we cannot reasonably infer that spoofing's effects last throughout the day." Id. at 80. Although the Court had no occasion to determine how "close in time" a plaintiff's trades and a defendant's spoofing must be to give rise to a plausible inference that the market price was still distorted (because the plaintiff never alleged when the trades occurred), the Court made clear that the time interval must be something less than a full day. Id. ("Even pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support an inference that the effects of the spoof linger for the remainder of the trading day.").

In Gamma Traders, at the far more favorable to a plaintiff motion-to-dismiss stage, the Second Circuit refused to infer that the defendants' spoofing had an impact on the market price throughout the same day as the spoof. "Even pleading same-day, post-spoof trades [did] not justify an inference of injury." Id. at 80. Here, Dr. Shapiro assumes far more than a price impact lasting a single day. He assumes that a spoof that occurred on ▮▮▮▮▮ impacted the market price during Harrington's sale of shares on ▮▮▮▮▮

Other courts that have examined allegations of market manipulation from spoofing have rejected theories of loss causation that rely on an indefinite price impact. In Northwest Biotherapeutics, Judge Stein twice rejected a spoofing claim premised on a theory of loss causation that the spoofing had a long-term impact on the stock price because academic studies show that a security's price eventually rebounds to pre-spoofing levels. 2023 WL 9102400, at *32 (explaining that "the fact that *some* forms of market manipulation . . . may have a

73

'permanent price impact' does not justify a reasonable inference that *spoofing* has such an impact") (emphasis in original); Nw. Biotherapeutics, Inc., 2025 WL 368717, at *16 (explaining that "[a]ccording to studies of spoofing, the security's price returns quickly to the pre-spoofing level once the temporary artificiality injected by the spoofed orders dissipates" and citing publications concluding that price impact from spoofing is temporary). In affirming Judge Stein's decision in Northwest Biotherapeutics, the Honorable Gregory Woods acknowledged that "the speed at which an efficient market absorbs public information is a question of fact." See No. 22-CV-10185 (GHW), 2025 WL 934319, at *13-14 (S.D.N.Y. Mar. 26, 2025). But that "is not the same thing as" saying that the "stock price never returned" to an unmanipulated price. Id. at *14; see also Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05-CV-1898 (SAS), 2006 WL 2161887, at *6 n.74 (S.D.N.Y. Aug. 1, 2006) (noting that "[a]t least one court has found that a time lag of seven to ten days is "inconsistent with the concept of market efficiency"), aff'd by, 546 F.3d 196 (2d Cir. 2008) (citing Krogman v. Sterritt, 202 F.R.D. 467, 477 n.14 (N.D. Tex. 2001)); Krogman, 202 F.R.D. at 477 n.14 (rejecting expert testimony that in an efficient market impacts on the price of a stock last "approximately one week to ten days" as "inconsistent with the concept of market efficiency").

Further, an essential element of Harrington's market-manipulation claim under Section 10(b) is that its harm was "caused by reliance on an assumption of an efficient market free of manipulation[.]" Set Cap. LLC, 996 F.3d at 76. And "under an efficient market hypothesis, the stock price incorporates public information." Youngers v. Virtus Inv. Partners Inc., 228 F. Supp. 3d 295, 300 (S.D.N.Y. 2017). The necessary implication of Dr. Shapiro's theory is that the baiting order that caused the downward price pressure has a lasting price impact, such that any corrective measure that follows it (such as the order cancellation, a bona fide sell order, or even a

buy-side order to take advantage of the artificially depressed price) has no ability to affect the price and correct for the downward pressure. That implication cannot be squared with the efficient market hypothesis, which posits that the market does not retain the effects of stale information for extended periods of time. And, as Judge Stein recognized in Northwest Biotherapeutics, "[u]nless the price moves back in the opposite direction of the artificial price resulting from the spoofed orders, the spoofer would be unable to profit from the spoofing." 2025 WL 368717, at *16; see also id. (recognizing that "corrective information released to the market when a spoofer reverses position and drives the stock price in the opposite direction" can effect stock price).

Dr. Shapiro's assumption of a lasting price impact is also contradicted by other experts in the relevant field, including Dr. Brogaard, who specializes in market microstructure. In Dr. Brogaard's working paper, Dr. Brogaard explained that the price impact from spoofing is temporary. There, Dr. Brogaard states that "[i]f a spoofing trader can induce a *temporary* mispricing, then the process of inducing and correcting the manipulation will cause return volatility to increase," which Dr. Brogaard reasoned was "evidence that spoofing can likely induce *short-term deviations* from fundamentals, which then leads to a correction that subsequently increases return volatility." ECF No. 517-8 at 18, 24 (emphasis added). Dr. Hendershott, too, explains that the academic literature "finds that the price impact from spoofing is only expected to distort the market price *temporarily*," and "prices should quickly react when the alleged spoofing orders are canceled." Hendershott Rep. at ¶¶ 124-125 (italics in original). Additionally, studies that have focused on spoofing have found that a stock's price returns quickly to the pre-spoofing level once the temporary artificiality injected by the spoofed order dissipates. See, e.g., Merritt B. Fox, Lawrence R. Glosten & Sue S. Guan, Spoofing and Its

Regulation, 2021 Colum. Bus. L. Rev. 1244, 1288-89 (2021) (stating that spoofing "will only directly affect prices for a *very brief period of time*" and *"[v]ery short run distortions in price of the kind that will typically occur with spoofing* will not seriously undermine the role that share prices play in guiding the real economy") (emphasis added). Not surprisingly, Dr. Shapiro could not identify another academic or expert in the field who agreed with his assumption of a lasting price impact. Instead, when asked at his deposition if he could identify an article or study that concluded that the price impact of spoofing is "anything other than temporary," Dr. Shapiro responded that "[t]hose analyses see the effect as temporary." ECF No. 599-2 at 464:24-465:25.

Harrington argues that Gamma Traders and Northwest Biotherapeutics are inapposite, because those cases addressed factual allegations at the pleading stage. ECF No. 528 at 21. But in Gamma Traders, where there was no dispute that the defendants had engaged in spoofing, the Court refused to infer that the plaintiff had traded while the price of the stock was artificial, even where the trading occurred on the same day as the spoof. 41 F.4th at 80-81. The logical inference from that conclusion, which is consistent with the academic literature on spoofing, is that the Circuit believed that the effects of spoofing are temporary. And while reasonable minds may disagree as to the exact duration of that effect, no one seems to believe that the effect lasts indefinitely, as is necessary to support for Dr. Shapiro's damages calculation. See Nw. Biotherapeutics, Inc., 2025 WL 368717, at *12 (noting that "studies cited by the parties are inconclusive as to how long the[] effects [of spoofing] may endure").

Harrington also argues that because of the nature of the case, Dr. Shapiro was required to craft a novel methodology to calculate damages, and the novelty of the methodology alone does not require exclusion of his opinion. ECF No. 528 at 10-11. Of course, the novelty of the methodology by itself is not a basis to exclude Dr. Shapiro's analysis. See Amorgianos, 303 F.3d

at 266-67. But as Harrington recognizes (ECF No. 528 at 11), the methodology, even if novel, must be reliable. For the reasons discussed herein, Dr. Shapiro's methodology for calculating the damage to Harrington from the alleged spoofing episodes is not reliable, requiring its exclusion under Daubert.

   C.  *Harrington should be afforded an opportunity to submit a new report.*

Harrington seeks an opportunity to submit a supplemental report, fixing any errors identified by the Court in Dr. Shapiro's analysis. ECF No. 586 at 6-7. Despite Harrington's characterization, such a report is not a "supplemental" report under Federal Rule of Civil Procedure 26. Under Rule 26, a party is required to "supplement or correct its disclosure" in the limited circumstance that the party discovers that a disclosure made under Rule 26(a) is "in some material respect . . . incomplete or incorrect." Fed. R. Civ. P. 26(e). But the Court's rejection of the methodology used by Dr. Shapiro does not render his report "incomplete or incorrect" within the meaning of Rule 26. See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 263 F. Supp. 3d 446, 451-52 (S.D.N.Y. 2017) ("If an expert's report does not rely on any information that was previously unknown or unavailable to him it is not an appropriate supplemental report under Rule 26.") (internal quotation marks, citation, and alteration omitted).

In submitting a revised report, Dr. Shapiro would not be relying on any new trading data previously unknown or unavailable to him. See On Track Innovations, Ltd. v. T-Mobile USA, Inc., No. 12-CV-2224 (AJN), 2015 WL 14072083, at *4 (S.D.N.Y. July 24, 2015) (concluding that expert report was not a supplemental report under Rule 26 where expert sought to supplement "with information available to her at the close of expert discovery"). He would instead be conforming his calculation of damages to the Court's ruling on Defendants' Daubert motion. "Rule 26(e) is not, however, a vehicle to permit a party to serve a deficient opening

77

report and then remedy the deficiency through the expedient of a 'supplemental' report." See

Lidle v. Cirrus Design Corp., No. 08-CV-1253 (BSJ) (HBP), 2009 WL 4907201, at *5 (S.D.N.Y.

Dec. 18, 2009). Under the Federal Rules, "courts will not admit supplemental expert evidence

following the close of discovery when it 'expound[s] a wholly new and complex approach

designed to fill a significant and logical gap in the first report,' as doing so 'would eviscerate the

purpose of the expert disclosure rules.'" Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem.

Co., 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (quoting United States v. Vulcan Society, Inc.,

637 F. Supp. 2d 77, 107 (E.D.N.Y. 2009)) (alteration in original).

As such, Harrington's request should be viewed as a request to submit a new expert

report after the close of expert discovery. When this issue first arose during oral argument,

defense counsel indicated that the factors set forth in Softel, Inc. v. Dragon Medical and

Scientific Communications, Inc., 118 F.3d 955 (2d Cir. 1997), are assessed in deciding whether

the Court should exercise its discretion to allow submission of a supplemental report. 1/13/26 Tr.

at 228. The Softel factors examine "(1) the party's explanation for the failure to comply with the

discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice

suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4)

the possibility of a continuance." 118 F.3d at 961.

The first factor weighs in favor of Defendants. The most significant flaw in Dr. Shapiro's

analysis is his assumption that a spoofing episode will have an indefinite price impact. That

assumption is contrary to the Second Circuit's decision in Gamma Traders, which was decided

more than two years before Dr. Shapiro issued his report. Although Harrington argues that Dr.

Shapiro's report predates the lower court decisions in Northwest Biotherapeutics and Phunware

(ECF No. 586 at 7 n.3), those decisions merely applied Gamma Traders and the wealth of academic studies showing that spoofing has a temporary price impact.

The second factor weighs heavily in favor of Harrington. Both loss causation and damages are elements of Harrington's claim. See Harrington Glob. Opportunity Fund, Ltd., 585 F. Supp. 3d 405, 415 (S.D.N.Y. 2022) (listing elements of Section 10(b) claim). Without an expert to opine on either, Harrington will be unable to establish necessary elements of its claim. See McIntosh v. Katapult Holdings, Inc., No. 21-CV-7251 (AS) (KHP), 2024 WL 5118192, at *10 (S.D.N.Y. Dec. 13, 2024) (explaining that establishing "proof of damages in a securities fraud case is always difficult and invariably requires expert testimony"). In the case cited by Defendants to support their argument that Harrington should not be afforded a second chance (ECF No. 582 at 4), the precluded evidence was not as significant as it is here. Cf. On Track Innovations, Ltd., 2015 WL 14072083, at *5 (noting that the plaintiff's "affirmative case" did not rely on the expert testimony being precluded and reasoning that the plaintiff "may be able to establish many of the underlying facts relating to damages through the testimony of fact witnesses").

The third factor examines the prejudice to Defendants from having to meet the new evidence. Allowing Dr. Shapiro a do-over would necessitate reopening expert discovery. This is not a circumstance involving a calculation error or a simple mathematical revision. Dr. Shapiro would have to scrap his methodology and begin anew. Defendants would then need an opportunity to depose Dr. Shapiro and submit a rebuttal report, if they desire. Defendants would be forced to incur the costs of deposing Dr. Shapiro again, submitting another rebuttal report from Dr. Hendershott, and potentially engaging in another round of Daubert motion practice. And all of this work would necessarily require a continuance. Although the prejudice to

Defendants is plain, there are measures short of preclusion of a new report that could alleviate this prejudice. First, Defendants should not have to incur the expense of expert discovery twice. Consequently, to the extent Harrington elects to submit a new report on loss causation and damages, it should be required to bear all of Defendants' costs in having to prepare to meet that new evidence. Second, any potential prejudice from delay could be lessened by requiring Harrington to submit a new report quickly.

The fourth and final factor assesses the possibility of a continuance. This factor weighs slightly in Plaintiff's favor. To be sure, this case has been pending since 2021, there have been several extensions of the fact discovery deadline (see ECF No. 278), and after this motion, the case is poised for summary judgment. But all that aside, a continuance is possible because there has been no summary judgment briefing or decision and a trial date has not been set. Cf. On Track Innovations, Ltd., 2015 WL 14072083, at *6 (concluding that fourth factor weighed in favor of precluding late disclosed report where "a firm trial date has been set"); see also Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 385-86 (S.D.N.Y. 2003) (denying request to designate a new valuation expert in case that had been pending seven years where request was made "two days before the argument of the summary judgment motions").[23]

"Although the Court has authority to preclude expert reports which are not compliant with Rule 26, exclusion of expert testimony is a drastic remedy which is inconsistent with the judicial preference for 'determination of issues on the merits.'" In re Specialist & Other Vessel

---

[23] Although Lippe v. Bairnco Corp. did concern a circumstance where the preclusion of the new evidence left the plaintiff with no admissible evidence essential to its fraud claim, 249 F. Supp. 2d at 377, that case is distinguishable, because the plaintiff sought to reopen discovery after the summary judgment briefing had been completed and on the eve of oral argument, despite having been aware of the deficiency in its expert's report for years. Id. at 385-86. The same is not true here.

Owner Limitation Actions, No. 16-CV-5010 (KMK) (PED), 2020 WL 8665287, at *2 (S.D.N.Y. June 30, 2020) (internal quotation marks, citations, and alteration omitted). Given the significance of the evidence and the ability to shift costs to alleviate the prejudice to Defendants, Harrington should be afforded an opportunity to submit a new report.

**CONCLUSION**

For the foregoing reasons, Defendants' motion as to Dr. Brogaard is **DENIED**.

Defendants' motion as to Dr. Shapiro is **GRANTED**. If Plaintiff elects to file a new expert report

in lieu of Dr. Shapiro's report, it must do so by no later than **April 27, 2026**. If Plaintiff elects to

submit a supplemental report for Dr. Brogaard, as discussed herein, see supra p. 26, it must do so

by the same date. The Clerk of Court is respectfully directed to terminate the motions at ECF

Nos. 507 and 513, and file this opinion under seal.

    **SO ORDERED.**

DATED:    New York, New York
         March 26, 2026

                        _____
                        VALERIE FIGUEREDO
                        United States Magistrate Judge